XAVIER BECERRA
Attorney General of California
ROBERT W. BYRNE
SALLY MAGNANI
MICHAEL L. NEWMAN
Senior Assistant Attorneys General
MICHAEL P. CAYABAN
CHRISTINE CHUANG
EDWARD H. OCHOA
Supervising Deputy Attorneys General
HEATHER C. LESLIE
JANELLE M. SMITH
JAMES F. ZAHRADKA II
LEE I. SHERMAN (SBN 272271)
Deputy Attorneys General
  300 S. Spring St., Suite 1702
  Los Angeles, CA 90013
  Telephone: (213) 269-6404
  Fax: (213) 897-7605
  E-mail: Lee.Sherman@doj.ca.gov
*Attorneys for Plaintiff State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; ATTORNEY GENERAL DANA NESSEL ON BEHALF OF THE PEOPLE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF OREGON;** and **COMMONWEALTH OF VIRGINIA**; | Case No. |
| Plaintiffs, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| **DONALD J. TRUMP,** in his official capacity as President of the United States of America; **UNITED STATES OF AMERICA; U.S.** | |

1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**DEPARTMENT OF DEFENSE**; **PATRICK M. SHANAHAN**, in his official capacity as Acting Secretary of Defense; **MARK T. ESPER**, in his official capacity as Secretary of the Army; **RICHARD V. SPENCER**, in his official capacity as Secretary of the Navy; **HEATHER WILSON**, in her official capacity as Secretary of the Air Force; **U.S. DEPARTMENT OF THE TREASURY; STEVEN T. MNUCHIN**, in his official capacity as Secretary of the Department of the Treasury; **U.S. DEPARTMENT OF THE INTERIOR; DAVID BERNHARDT,** in his official capacity as Acting Secretary of the Interior; **U.S. DEPARTMENT OF HOMELAND SECURITY; KIRSTJEN M. NIELSEN**, in her official capacity as Secretary of Homeland Security;

                              Defendants.

Complaint for Declaratory and Injunctive Relief

**INTRODUCTION**

1.      The States of California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, the Commonwealth of Virginia, and Attorney General Dana Nessel on behalf of the People of Michigan (collectively, "Plaintiff States"), bring this action to protect their residents, natural resources, and economic interests from President Donald J. Trump's flagrant disregard of fundamental separation of powers principles engrained in the United States Constitution. Contrary to the will of Congress, the President has used the pretext of a manufactured "crisis" of unlawful immigration to declare a national emergency and redirect federal dollars appropriated for drug interdiction, military construction, and law enforcement initiatives toward building a wall on the United States-Mexico border.  This includes the diversion of funding that each of the Plaintiff States receive.  Defendants must be enjoined from carrying out President Trump's unconstitutional and unlawful scheme.

2.      President Trump has veered the country toward a constitutional crisis of his own making.  For years, President Trump has repeatedly stated his intention to build a wall across the United States-Mexico border.  Congress has repeatedly rebuffed the President's insistence to fund a border wall, recently resulting in a record 35-day partial government shutdown over the border wall dispute.[1]  After the government reopened, Congress approved, and the President signed into law, a $1.375 billion appropriation for fencing along the southern border, but Congress made clear that funding could not be used to build President Trump's proposed border wall.

3.      After an agreement was reached on the spending bill to prevent another government shutdown, on February 15, 2019, President Trump declared an intention to redirect federal funds toward the construction of a border wall.  On the same day, the Administration announced an executive action ("Executive Action,") to make up to $6.7 billion in additional funding available for construction of the border wall, including through the declaration of a

---

[1] References to "border wall" in this Complaint refer to any barrier or border-related infrastructure and/or project relating to the construction of a barrier or border-related infrastructure along the southern border that President Trump has called for and has not been approved by Congress.

national emergency under the National Emergencies Act ("Emergency Declaration," combined with the "Executive Action," the "Executive Actions").

4.      Use of those additional federal funds for the construction of a border wall is contrary to Congress's intent in violation of the U.S. Constitution, including the Presentment Clause and Appropriations Clause.  Such use would divert counter-drug programming funds directed to the states, and military construction funds to be spent in the states, for the non-appropriated purpose of constructing a border wall.  Even if the Administration could constitutionally redirect funds toward the construction of the border wall, the Administration does not satisfy the criteria in the statutes that it invokes to enable it to do so.

5.      If the Administration were to use the funding sources identified in the Executive Actions, Plaintiff States collectively stand to lose millions in federal funding that their national guard units receive for domestic drug interdiction and counter-drug activities, and millions of dollars received on an annual basis for law enforcement programs from the Treasury Forfeiture Fund, harming the public safety of Plaintiff States.  The redirection of funding from authorized military construction projects located in Plaintiff States will cause damage to their economies. Plaintiff States will face harm to their proprietary interests by the diversion of funding from military construction projects for the States' national guard units.  And the construction of a wall along California's and New Mexico's southern borders will cause irreparable environmental damage to those States' natural resources.

6.      There is also no objective basis for President Trump's Emergency Declaration.  By the President's own admission, an emergency declaration is not necessary.  The federal government's own data prove there is no national emergency at the southern border that warrants construction of a wall.  Customs and Border Protection ("CBP") data show that unlawful entries are near 45-year lows.  The State Department recognizes there is a lack of credible evidence that terrorists are using the southern border to enter the United States.  Federal data confirm that immigrants are less likely to commit crimes than are native-born Americans.  CBP data demonstrate that dangerous drugs are much more likely to be smuggled through, not between,

1  official ports of entry—rendering a border wall ineffectual at preventing their entry into this
2  country.

3         7.     Notwithstanding the illegality of and wholesale lack of necessity for the
4  Emergency Declaration, the Trump Administration has expressed its intent to move quickly with
5  the construction of the border wall.  A senior advisor to the White House reportedly said the
6  Administration will proceed with construction at a speed that will "shock" people.  The thwarting
7  of congressional intent to fund a vanity project that not only will fail to safeguard national
8  security, but is positioned to cause significant harm to the public safety, public fisc, environment,
9  and well-being of Plaintiff States' residents, cries out for judicial intervention.

10         8.     For these reasons, and those discussed below, the Court should declare that the
11  Executive Actions directing the diversion of federal funds and other resources for border wall
12  construction are unlawful and unconstitutional, and enjoin Defendants from taking any action in
13  furtherance of President Trump's Executive Actions.

14  **JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT**

15         9.     This Court has jurisdiction because this action arises under the United States
16  Constitution and the laws of the United States.  This Court also has jurisdiction under 28 U.S.C.
17  sections 1331 and 2201.

18         10.    An actual, present, and justiciable controversy exists between the parties within the
19  meaning of 28 U.S.C. section 2201(a), and this Court has authority to grant declaratory and
20  injunctive relief under 28 U.S.C. sections 2201 and 2202.

21         11.    Venue is proper in this judicial district under 28 U.S.C. section 1391(e) because
22  the California Attorney General and the State of California have offices at 455 Golden Gate
23  Avenue, San Francisco, California and at 1515 Clay Street, Oakland, California, and therefore
24  reside in this district, and no real property is involved in this action.  This is a civil action in
25  which Defendants are agencies of the United States or officers of such an agency.

26         12.    Assignment to the San Francisco Division of this District is proper pursuant to
27  Civil Local Rule 3-2(c)-(d) and 3-5(b) because Plaintiff State of California and Defendant United
28  States both maintain offices in the District in San Francisco.

5

**PARTIES**

**PLAINTIFF STATE OF CALIFORNIA**

13.     The State of California, represented by and through its Attorney General, is a sovereign state of the United States of America.

14.     Attorney General Xavier Becerra is the chief law officer of the State of California and has the authority to file civil actions to protect California's rights and interests, the environment, and the natural resources of this State.  Cal. Const., art. V, § 13; Cal. Gov't Code §§ 12511, 12600-12.  This challenge is brought pursuant to the Attorney General's independent constitutional, common law, and statutory authority.

15.     Governor Gavin Newsom is the chief executive officer of the State.  The Governor is responsible for overseeing the operations of the State and ensuring that its laws are faithfully executed.  As the leader of the executive branch, the Governor is the chief of California's executive branch agencies, including those whose injuries are discussed in this Complaint.  Cal. Const., art. V, § 1.  Governor Newsom is the Commander-in-Chief of the California National Guard.  Cal. Const., art. V, § 7; Cal. Mil. & Vet. Code § 550 et seq.

16.     California, as one of several affected states located within President Trump's declared "national emergency" southern border area, has an interest in ensuring public safety within its borders and protecting its economic interests and the rights of its residents.  California shares over 140 miles of its southern border with Mexico.[2]  The orderly flow of goods and people across the border is a critical element in California's success as the fifth-largest economy in the world.

17.     California is aggrieved by the actions of Defendants and has standing to bring this action because of the injury due to the loss of federal drug interdiction, counter-narcotic, and law-enforcement funding to the State caused by Defendants' diversion of funding.

18.     The threat of losing funding to conduct drug interdiction and counter-narcotic activity prevents California from moving forward with critical criminal narcotics programs and

---

[2] Janice Cheryl Beaver, *U.S. International Borders: Brief Facts*, Cong. Res. Serv. (Nov. 9, 2006), https://tinyurl.com/y49jq9vv.

1     threatens the public safety of all Californians.  The diversion of funding from the Treasury

2     Forfeiture Fund will harm public safety by impacting critically necessary funding for law

3     enforcement officers and their agencies.

4           19.      California is aggrieved by the actions of Defendants and has standing to bring this

5     action because of the injury to the State and its residents caused by Defendants' reduction of

6     federal defense spending in California due to diversion of funding to the border wall.

7           20.      California has an interest in protecting the economic health and well-being of its

8     residents.  *Alfred L. Snapp & Son, Inc. v. Puerto Rico* ex rel. *Barez*, 458 U.S. 592, 607 (1982).

9           21.      California has an interest in preventing the diminution of specific tax revenues

10     caused by reduced construction on California military installations and the corresponding

11     reduction in economic activity.  *Wyoming v. Oklahoma*, 502 U.S. 437, 448-50 (1992).

12           22.      California has an interest in its exercise of sovereign power over individuals and

13     entities within the State, including enforcement of its legal code.  *Snapp*, 458 U.S. at 601; *Hawaii*

14     *v. Trump*, 859 F.3d 741, 765 (9th Cir. 2017), *rev'd on other grounds*, 138 S. Ct. 2392 (2018).

15           23.      The diversion of military construction funding for projects supporting or used by

16     California's National Guard units harms the State.

17           24.      The diversion of military construction funding from projects in California will

18     harm California's economy.

19           25.      The State would suffer economic harm from diversion of funding from military

20     construction projects on California bases.  More defense contractor funding is spent in California

21     than in any other state, and such funding generates significant state and local tax revenues,

22     employment, and economic activity.

23           26.      California has an interest in the natural resources of this State—such as wildlife,

24     fish, and water—that are held in trust by the State for its residents.  *Sierra Forest Legacy v.*

25     *Sherman*, 646 F.3d 1161, 1178 (9th Cir. 2011).

26           27.      In the areas of California's borderlands where construction of a border wall is most

27     likely, dozens of sensitive plant and animal species that are listed as "endangered," "threatened,"

28     or "rare" will be seriously at risk.

28.     Defendants' diversion of funding to construct a wall along the southern border will create environmental harm and deprive California of its procedural right to protect its public trust resources.

29.     Defendants' unconstitutional actions undermine California's sovereignty and harm the State through their effects on California residents, businesses, and the environment.

## PLAINTIFF STATE OF COLORADO

30.     The State of Colorado is a sovereign state of the United States of America.

31.     The State of Colorado brings this action by and through its Attorney General, Philip J. Weiser.  The Attorney General has authority to represent the State, its departments, and its agencies, and "shall appear for the state and prosecute and defend all actions and proceedings, civil and criminal, in which the state is a party."  Colo. Rev. Stat. § 24-31-101.

32.     The State of Colorado will suffer injury because of the actions of Defendants and has standing to bring this action for at least two reasons.

33.     First, Defendants intend to fund the wall using money from the Pentagon's drug interdiction program, which will likely impact funding to Colorado and affect Colorado's ability to address drugs illegal under state law in Colorado.

34.     Second, Colorado is home to many major military bases, including the Air Force Academy, Buckley Air Force Base, Cheyenne Mountain Air Force Base, Peterson Air Force Base, Schriever Air Force Base, and Fort Carson Army Base.  These military bases play a critical role in our nation's defense and to the economy of the State of Colorado.  The use of funding for a southern border wall rather than for necessary maintenance and repairs to these military bases harms Colorado and its economy.

## PLAINTIFF STATE OF CONNECTICUT

35.     The State of Connecticut, represented by and through its Attorney General, is a sovereign state of the United States of America.

36.     Attorney General William Tong is the chief legal officer of the State of Connecticut and has the authority to file civil actions to protect Connecticut's rights and interests. Conn. Const., art. IV, § 4; Conn. Gen. Stat. §§ 3-124 et seq.  This challenge is brought pursuant to

the Attorney General's authority and responsibility to protect Connecticut's sovereign, quasi-sovereign, and proprietary interests.

37.     Governor Ned Lamont is the chief executive officer of the State.  The Governor is responsible for overseeing the operations of the State and ensuring that its laws are faithfully executed.  As the leader of the executive branch, the Governor is the chief of Connecticut's executive branch agencies, including those whose injuries are discussed in this Complaint.  Conn. Const. art IV, § 5.

38.     On information and belief, Connecticut is aggrieved by the actions of Defendants and has standing to bring this action because of the injury caused by Defendants' unlawful and unconstitutional diversion of funding from military construction projects in Connecticut to construction of a border wall in Texas, Arizona, New Mexico, and California.  Defendants' actions will hurt Connecticut's economy and, by damaging the State's critical security infrastructure, threaten the safety of Connecticut's National Guard and of all Connecticut residents.

39.     Further, on information and belief, Defendants' diversion of funding aimed at drug interdiction and counter-narcotic activity threatens to hurt the State's law enforcement agencies and compromise the public safety of all Connecticut residents.

**PLAINTIFF STATE OF DELAWARE**

40.     The State of Delaware, represented by and through its Attorney General, is a sovereign state of the United States of America.

41.     Attorney General Kathleen Jennings is the chief legal officer of the State of Delaware and has the authority to file civil actions to protect Delaware's rights and the rights of Delaware citizens.  29 *Del. C.* § 2504.  The Attorney General's powers and duties include litigating matters in our nation's federal courts on matters of public interest.  The Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Delaware residents as a matter of constitutional, statutory, and common law authority.

42.     Governor John Carney is the chief executive officer of the State of Delaware.  The Governor is responsible for overseeing the operations of the State of Delaware and is required to take care that Delaware's laws be faithfully executed.  Del. Const., Art. III, §§ 1, 8.

43.     Delaware is aggrieved by the actions of Defendants and has standing to bring this action because of the injury due to loss of federal funding to the State of Delaware caused by Defendants' unconstitutional and unlawful diversion of funding discussed herein.

44.     The diversion of funding from Delaware's National Guard, Dover Air Force Base, and any other military construction project, drug interdiction, or other law enforcement program in Delaware will harm Delaware residents by depleting Delaware's economy and draining Delaware of needed law enforcement resources.  Defense spending, including military construction projects and other planned or unplanned capital improvement projects, impacts Delaware's economy and any resulting loss of funds would negatively impact Delaware's Gross Domestic Product, the economic interests, and tax revenues of the State of Delaware.

45.     Defendants' unlawful and unconstitutional diversion of funds away from projects authorized and appropriated for disbursement and use within the State of Delaware will cause it injury in fact, which is fairly traceable to Defendants' conduct as set forth herein.

### PLAINTIFF STATE OF HAWAII

46.     The State of Hawaii, represented by and through its Attorney General, is a sovereign state of the United States of America.

47.     Attorney General Clare E. Connors is the chief legal officer of the State of Hawaii and has authority to appear, personally or by deputy, for the State of Hawaii in all courts, criminal or civil, in which the State may be a party or be interested.  Haw. Rev. Stat. § 28-1 (2009).  The Department of the Attorney General has the authority to represent the State in all civil actions in which the State is a party.  *Id.* § 26-7.  This challenge is brought pursuant to the Attorney General's constitutional, statutory, and common law authority.  *See* Haw. Const. art. V, § 6; Haw. Rev. Stat. Chapter 28; Haw. Rev. Stat. § 26-7.

48.     Hawaii is aggrieved by the actions of Defendants and has standing to bring this action because of the injury due to the loss of federal funding to the State caused by Defendants'

diversion of funding. The loss of funding to conduct drug interdiction and counter-narcotic activity threatens the public safety of all Hawaii residents.

49. The diversion of funding from military construction projects and drug interdiction programs in Hawaii will harm Hawaii residents by depleting Hawaii's economy and draining Hawaii of needed law enforcement resources. Defense spending, which would include military construction projects, is the second largest segment of Hawaii's economy and represents a significant portion of the State's Gross Domestic Product. On information and belief, Hawaii is at risk of losing in excess of $300 million in military construction funds.

## PLAINTIFF STATE OF ILLINOIS

50. The State of Illinois is a sovereign state of the United States of America.

51. This action is being brought on behalf of the State by Attorney General Kwame Raoul, the State's chief legal officer. *See* Ill. Const., Art. 5, § 15; 15 Ill. Comp. Stat. 205/4.

52. J. B. Pritzker is the governor of Illinois, and under Illinois law has the "supreme executive power" and the duty to ensure "the faithful execution of the laws." Ill. Const., Art. V, § 8.

53. On information and belief, Illinois is aggrieved by the actions of Defendants and has standing to bring this action because of the injury due to the loss of federal funding to the State caused by Defendants' diversion of funding. The loss of funding to conduct drug interdiction and counter-narcotics activity threatens the public safety of all Illinois residents.

54. On information and belief, Illinois is also aggrieved by the actions of Defendants and has standing to bring this action because of the injury due to the loss of federal funding resulting from the diversion of military construction projects from Illinois to the construction of a border wall on the nation's southern border.

55. In filing this action, the Attorney General seeks to protect the residents and agencies of Illinois from harm caused by Defendants' illegal conduct, prevent further harm, and seek redress for the injuries caused to Illinois by Defendants' actions. Those injuries include harm to Illinois's sovereign, quasi-sovereign, and proprietary interests.

**PLAINTIFF STATE OF MAINE**

56.     The State of Maine, represented by and through its Attorney General, is a sovereign state of United States of America.

57.     The Attorney General of Maine, Aaron M. Frey, is a constitutional officer with the authority to represent the State of Maine in all matters, and serves as its chief legal officer with general charge, supervision, and direction of the State's legal business.  Me. Const. art. IX, Sec. 11; 5 M.R.S., §§ 191 *et seq.*  The Attorney General's powers and duties include acting on behalf of the State and the people of Maine in the federal courts on matters of public interest.  The Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maine residents as a matter of constitutional, statutory, and common law authority.

58.     The Governor of Maine, Janet T. Mills, is the chief executive officer of the State. The Governor is responsible for overseeing the operations of the State and ensuring that its laws are faithfully executed.  As the leader of the executive branch, the Governor is the chief of Maine's executive branch agencies, including those whose injuries are discussed in this Complaint.  Me. Const. art V, § 1.  Governor Mills is the Commander-in-Chief of the Maine National Guard.  37-B M.R.S. §§ 103 *et seq.*

59.     Maine is aggrieved by the actions of Defendants and has standing to bring this action because of the injury due to the loss of federal funding to the State caused by Defendants' diversion of funding.

60.     Maine is aggrieved by the actions of Defendants and has standing to bring this action because of the injury to the State and its residents caused by Defendants' reduction of federal defense spending in Maine due to diversion of funding to the border wall.

61.     Maine has an interest in protecting the health, safety, and well being of its residents, including protecting its residents from harms to their economic health.

62.     Maine has an interest in the State's economic vitality and workforce.

63.     Maine has an interest in preventing diminution of its tax revenues.

64.     The diversion of military construction funding from authorized projects in Maine

12

1   will harm Maine's economy.

2       65.     The State would suffer economic harm from diversion of funding from authorized

3   military construction projects in Maine.

4                               **PLAINTIFF STATE OF MARYLAND**

5       66.     The State of Maryland is a sovereign state of the United States of America.

6   Maryland is represented by and through its chief legal officer, the Attorney General of Maryland

7   Brian E. Frosh.  Under the Constitution of Maryland, and as directed by the Maryland General

8   Assembly, the Attorney General has the authority to file suit to challenge action by the federal

9   government that threatens the public interest and welfare of Maryland residents.  Md. Const. art.

10  V, § 3(a)(2); 2017 Md. Laws, J. Res. 1.

11      67.     Maryland is aggrieved by the actions of Defendants and has standing to bring this

12  action due to the loss of federal funding to the State caused by Defendants' diversion of federal

13  funds.  The loss of funding to conduct drug interdiction and counter-narcotic activity would

14  threaten the public safety of all Marylanders.

15      68.     Maryland is also aggrieved by the actions of Defendants and has standing to bring

16  this action because of the injury due to the diversion of funding for military construction projects.

17  On information and belief, Maryland stands to lose up to $513 million in military construction

18  funding for currently planned projects at Fort Meade and Joint Base Andrews.

19                      **PLAINTIFF ATTORNEY GENERAL DANA NESSEL ON BEHALF**

20                              **OF THE PEOPLE OF MICHIGAN**

21      69.     The People of Michigan are the sovereign of one of the states of the United States

22  and are represented by and through the Attorney General Dana Nessel.

23      70.     Attorney General Dana Nessel is the chief legal officer of the State of Michigan

24  and her powers and duties include acting in federal court in matters of concern to the People of

25  Michigan, to protect Michigan residents.  *Fieger v. Cox*, 734 N.W.2d 602, 604 (Mich. Ct. App.

26  2007); Mich. Comp. Laws §§ 14.28, 14.101.  This action is brought to protect the interests of the

27  People of Michigan.

28      71.     The Michigan National Guard has over 10,000 soldiers and airmen, employs a

13

1  substantial number of employees on a full-time basis, and operates over 40 facilities in the state.

2  The Michigan Department of Military and Veterans Affairs receives a majority of its funding

3  from the federal government.  On information and belief, it performs missions training and

4  prepares citizen soldiers and airmen to respond to, among other things, state emergencies,

5  military support, and protection of local communities.  Loss of funding negatively impacts this

6  vital service for the People of Michigan.

7  **PLAINTIFF STATE OF MINNESOTA**

8  72.    The State of Minnesota, represented by and through its Attorney General, is a

9  sovereign state of the United States of America.

10  73.    Attorney General Keith Ellison is the chief legal officer of the State of Minnesota

11  and his powers and duties include acting in federal court in matters of State concern and to protect

12  Minnesota residents.  Minn. Stat. § 8.01.  This action is brought to protect Minnesota's sovereign,

13  quasi-sovereign, and proprietary interests.

14  74.    Governor Tim Walz is the chief executive officer of the State of Minnesota,

15  custodian of state property and federal funds made available to the State, and the Commander-in-

16  Chief of the state military.  Minn. Const., art. V, § 3; Minn. Stat. §§ 4.01 & .07.  As the chief

17  executive officer and Commander-in-Chief of the State of Minnesota, Governor Walz leads

18  executive branch agencies injured by the actions described in this Complaint.

19  75.    The Minnesota National Guard has over 13,000 soldiers and airmen, employs

20  more than 2,000 people on a full-time basis, and operates over 60 facilities in the state.  The

21  Minnesota National Guard receives more than 96% of its funding from the federal government.  It

22  performs missions training and prepares citizen soldiers and airmen to respond to, among other

23  things, the Governor of Minnesota for state emergency response, military support, and protection

24  of local communities.  Loss of funding negatively impacts this vital service for the State of

25  Minnesota.

26  76.    For example, diverting federal funding for the Minnesota National Guard's

27  counterdrug programs and domestic drug interdiction activities to construct a wall along the

28  United States-Mexico border would harm Minnesota's law enforcement agencies and

14

1    compromise the health and safety of Minnesota residents.

2        77.    In addition, diverting federal funding from necessary military construction projects

3    in Minnesota, including National Guard projects, to construct a wall along the United States-

4    Mexico border would also harm Minnesota, its economy, and its residents.

5                          **PLAINTIFF STATE OF NEW JERSEY**

6        78.    The State of New Jersey is a sovereign state of the United States of America.

7        79.    This action is being brought on behalf of the State by Attorney General Gurbir S.

8    Grewal, the State's chief legal officer.  *See* N.J. Stat. Ann. § 52:17A-4(e), (g).

9        80.    New Jersey is aggrieved by the actions of Defendants and has standing to bring

10   this action because of the injury due to the loss of federal funding to the State caused by

11   Defendants' diversion of funding.  The loss of funding to conduct drug interdiction and counter-

12   narcotic activity threatens the public safety of all New Jersey residents.

13       81.    New Jersey is also aggrieved by the actions of Defendants and has standing to

14   bring this action because of the injury due to the loss of federal funding resulting from the

15   diversion of military construction projects from New Jersey to the construction of a border wall

16   on the nation's southern border.

17       82.    In filing this action, the Attorney General seeks to protect the residents and

18   agencies of New Jersey from harm caused by Defendants' illegal conduct, prevent further harm,

19   and seek redress for the injuries caused to New Jersey by Defendants' actions.  Those injuries

20   include harm to New Jersey's sovereign, quasi-sovereign, and proprietary interests.

21                         **PLAINTIFF STATE OF NEW MEXICO**

22       83.    The State of New Mexico, represented by and through its Attorney General, is a

23   sovereign state of the United States of America.

24       84.    Attorney General Hector Balderas is the chief legal officer of the State of New

25   Mexico.  He is authorized to prosecute all actions and proceedings on behalf of New Mexico

26   when, in his judgment, the interest of the State requires such action.  N.M. Stat. Ann. § 8-5-2(B).

27   This challenge is brought pursuant to Attorney General Balderas's statutory and common law

28   authority.

85.     Governor Michelle Lujan Grisham possesses the "supreme executive power" of the State of New Mexico.  N.M. Const., art. V, § 4.  She has the responsibility to execute the laws of the State and preserve the public peace.  *Id.*  She also has the authority to oversee the State's agencies that will be affected by Defendants' actions.  N.M. Const., art. V, § 5.

86.     New Mexico is aggrieved by Defendants' actions and has standing to bring this lawsuit.  Defendants' diversion of federal funding to conduct drug-interdiction and counter-narcotics efforts threatens the safety and health of all New Mexicans.

87.     New Mexico will also be harmed by Defendants' diversion of military construction funding.  Some $85 million of this funding currently is allocated to construct a MQ-9 Formal Training Unit at Holloman Air Force Base in Otero County, New Mexico.[3]  Another $40 million is allocated to White Sands Missile Range in New Mexico to build an information systems facility.[4]  The loss of these projects would harm New Mexico's economy, particularly in the communities surrounding these military installations.

88.     New Mexico shares over 179 miles of its southern border with Mexico.[5]

89.     If Defendants use the diverted funding to construct any of their border wall in New Mexico, it will also impose environmental harm to the State.  The environmental damage caused by a border wall in New Mexico would include the blocking of wildlife migration, flooding, and habitat loss.[6]  Further, this border wall would be constructed on state land, taking the State's sovereign property.[7]

### PLAINTIFF STATE OF NEVADA

90.     The State of Nevada, represented by and through its Attorney General, is a

---

[3] Alamogordo Daily News, *Holloman Getting $85M for Construction Project* (Feb. 3, 2018), https://tinyurl.com/y5u7vx4k.
[4] Miriam U. Rodriguez, WSMR to Build State of the Art Information Systems Facility, U.S. Army (Jan. 10, 2018), https://tinyurl.com/y3yr24yr.
[5] *U.S. International Borders*, *supra* note 2.
[6] *See* Robert Peters et al., *Nature Divided, Scientists United: US–Mexico Border Wall Threatens Biodiversity and Binational Conservation*, 68 BioScience 740, 743 (Oct. 2018), https://tinyurl.com/y3t4ymfn.
[7] *See* Deming Headlight, *N.M. Land Commish Aubrey Dunn Rejects Settlement Offer from CBP*, (Aug. 17, 2018), https://tinyurl.com/y557wpcb.

1   sovereign state of the United States of America.

2   91.   Attorney General Aaron D. Ford is the chief legal officer of the State of Nevada

3   and has the authority to commence actions in federal court to protect the interests of the State.

4   Nev. Rev. Stat. 228.170.

5   92.   Governor Stephen F. Sisolak is the chief executive officer of the State of Nevada.

6   The Governor is responsible for overseeing the operations of the State and ensuring that its laws

7   are faithfully executed.  Nev. Const., art. 5, § 1. Governor Sisolak is the Commander-in-Chief of

8   the Nevada state military forces. Nev. Const., art. 5, § 5.

9   93.   On information and belief, Nevada is aggrieved by the actions of Defendants and

10   has standing to bring this action because of the injury to the State and its residents caused by the

11   reduction of federal funding to the State due to Defendants' diversion of funding to a southern

12   border wall.

13   94.   Any diversion of military construction funding from Nevada will harm the State's

14   economy. Nevada is home to several military bases, including Nellis Air Force Base, Creech Air

15   Force Base, Hawthorne Army Depot Base, and Naval Air Station Fallon.  These military bases

16   play a critical role in our nation's defense and to the State's economy.  The use of funding for a

17   southern border wall rather than for necessary expenses at these military bases harms Nevada and

18   its economy.

19   95.   Any diversion of federal counter-narcotic funding from Nevada will harm the

20   State. The use of funding for a southern border wall rather than to conduct drug interdiction and

21   counter-narcotic activity in the State threatens the public safety of all Nevadans.

22   96.   Defendants' unconstitutional actions undermine Nevada's sovereignty and harm

23   the State through their effects on Nevada's residents and its economy.

24   **PLAINTIFF STATE OF NEW YORK**

25   97.   The State of New York, represented by and through its Attorney General, is a

26   sovereign state of the United States of America.  The Attorney General is New York State's chief

27   law enforcement officer and is authorized to pursue this action pursuant to N.Y. Executive Law

28   § 63.

1    98.    Upon information and belief, New York is aggrieved by the actions of Defendants

2 and has standing to bring this action because of the injury due to the loss of federal funding to the

3 State caused by Defendants' diversion of federal funds. The loss of funding to conduct drug

4 interdiction and counter-narcotic activity would injure the State's law enforcement agencies and

5 threaten the public safety of all New Yorkers.

6    99.    Upon information and belief, Defendants' unlawful diversion of funding from

7 military construction projects in New York to construction of a border wall will injure New

8 York's economy and, by damaging the State's critical security infrastructure, threaten the safety

9 of New York's National Guard and of all New York residents.

10 **PLAINTIFF STATE OF OREGON**

11    100.    Plaintiff State of Oregon, acting through its Attorney General, Ellen Rosenblum, is

12 a sovereign state in the United States of America.

13    101.    Attorney General Rosenblum is the chief law officer of Oregon and is empowered

14 to bring this action on behalf of the State of Oregon and the affected state agencies under ORS

15 160.060, ORS 180.210, and ORS 180.220.

16    102.    On information and belief, Oregon is aggrieved by the actions of Defendants and

17 has standing to bring this action because of the injury due to the loss of federal funding to the

18 State caused by Defendants' diversion of federal funds. The loss of funding to conduct drug

19 interdiction and counter-narcotic activity, including funding that supports Oregon's work in this

20 area with other States, would threaten the public safety of all Oregonians.

21    103.    On information and belief, the diversion of military construction funds will harm

22 Oregon. Defendants' diversion of funding from military construction projects in Oregon to

23 construction of a border wall in Texas, New Mexico, Arizona, and California would impact

24 Oregon's economy. In particular and without limitation, any diversion of funds from U.S. Army

25 Corps of Engineers projects in Oregon would harm Oregon's environment and could cause

26 flooding and other dangers to the health and safety of Oregonians.

27 **PLAINTIFF COMMONWEALTH OF VIRGINIA**

28    104.    The Commonwealth of Virginia is a sovereign state of the United States of

18

America.

105.    The Commonwealth of Virginia brings this action by and through its Attorney General, Mark R. Herring.  The Attorney General has authority to represent the Commonwealth, its departments, and its agencies in "all civil litigation in which any of them are interested."  Va. Code Ann. § 2.2-507(A).

106.    On information and belief, the diversion of over 16% of the available military construction funding harms the Commonwealth of Virginia and provides a basis for standing.  The Commonwealth is home to several military bases, encompassing each branch of service.  The use of funding for a southern border wall rather than for necessary maintenance and repairs to Virginia's military bases harms the Commonwealth's economy and the safety of Virginia's service members.  Specifically, Virginia stands to lose up to $131.7 million in military construction funding for currently planned projects at Dam Neck, Fort A.P. Hill, Fort Belvoir, Humphreys Engineer Center, Joint Base Langley-Eustis, and the Pentagon.

107.    On information and belief, the Commonwealth of Virginia would likewise be aggrieved if President Trump diverts federal drug interdiction and prevention funding from the states to the southern border wall.  This loss of funding—to the tune of approximately $3 million in Virginia—to implement counter-narcotics and drug interdiction measures would threaten the public safety of all Virginians.

## DEFENDANTS

108.    Defendant Donald J. Trump, the President of the United States of America, is responsible for the actions and decisions that are being challenged by Plaintiffs in this action and is sued in his official capacity.

109.    Defendant United States of America is responsible for enforcing laws that are consistent with the United States Constitution.

110.    Defendant Department of Defense ("DOD") is the federal agency to which Congress has appropriated the military construction and drug interdiction funding implicated by the President's Executive Actions.

111.    Defendant Patrick M. Shanahan, acting Secretary of Defense, oversees the DOD

and is responsible for the actions and decisions that are being challenged by Plaintiffs in this action.  Defendant Shanahan is sued in his official capacity.

112.    Defendant Mark T. Esper, Secretary of the Army, oversees the United States Army within DOD, and is responsible for the actions and decisions that are being challenged by Plaintiffs in this action.  Defendant Esper is sued in his official capacity.

113.    Defendant Richard V. Spencer, Secretary of the Navy, oversees the United States Navy within DOD, and is responsible for the actions and decisions that are being challenged by Plaintiffs in this action.  Defendant Spencer is sued in his official capacity.

114.    Defendant Heather A. Wilson, Secretary of the Air Force, oversees the United States Air Force within DOD, and is responsible for the actions and decisions that are being challenged by Plaintiffs in this action.  Defendant Wilson is sued in her official capacity.

115.    Defendant Department of the Treasury (the "Treasury") is the federal agency responsible for the Treasury Forfeiture Fund that is implicated by the President's Executive Actions.

116.    Defendant Steven T. Mnuchin, Secretary of the Treasury, oversees the Treasury and is responsible for the actions and decisions that are being challenged by Plaintiffs in this action.  Defendant Mnuchin is sued in his official capacity.

117.    Defendant Department of Homeland Security ("DHS") is the federal agency responsible for providing border security along the United States-Mexico border in a manner that is consistent with the laws and Constitution of the United States.

118.    Defendant Kirstjen M. Nielsen, Secretary of DHS, oversees DHS and is responsible for the actions and decisions that are being challenged by Plaintiffs in this action. Defendant Nielsen is sued in her official capacity.

119.    Defendant Department of the Interior ("DOI") is the federal agency responsible for managing federal lands.

120.    Defendant David Bernhardt, acting Secretary of the Interior, oversees the Department of the Interior, and is responsible for the actions that are being challenged by Plaintiffs in this action.  Defendant Bernhardt is sued in his official capacity.

**FACTUAL ALLEGATIONS**

I.   PRESIDENT TRUMP HAS LONG CLAIMED THAT A "CRISIS" AT THE BORDER REQUIRES BUILDING A BORDER WALL, BUT HAS NOT DECLARED A NATIONAL EMERGENCY UNTIL NOW

121.   Dating back to at least August 2014, President Trump has advocated for a wall along the southern border.[8]

122.   In his speech announcing his candidacy for President in June 2015, President Trump claimed that a border wall is needed to stop a tide of illegal immigration, and that he would build it as President and have Mexico pay for the wall.[9]  In the same speech, he also stated, "When Mexico sends its people, they're not sending their best . . . They're bringing drugs. They're bringing crime.  They're rapists."  This claim and his promise to build a wall and have Mexico pay for it became a consistent theme of his campaign.

123.   President Trump repeatedly stated that the border wall he planned to build would help prevent terrorism, crime, and drug smuggling.  For example, on October 4, 2014, President Trump tweeted, "The fight against ISIS starts at our border.  'At least' 10 ISIS have been caught crossing the Mexico border. Build a wall!"[10]  More recently, on February 3, 2019, President Trump tweeted, "If there is no Wall, there is no Security. Human Trafficking, Drugs and Criminals of all dimensions - KEEP OUT!".[11]

124.   On July 13, 2016, President Trump tweeted, "We will build the wall and MAKE AMERICA SAFE AGAIN!"[12]

125.   On August 27, 2016, President Trump tweeted that "[h]eroin overdoses are taking over our children and others in the MIDWEST.  Coming in from our southern border.  We need strong border & WALL!"[13]

---

[8] Donald J. Trump (@realDonaldTrump), Twitter (Aug. 5, 2014, 1:34 PM), https://tinyurl.com/yydre3ep.
[9] Time, *Here's Donald Trump's Presidential Announcement Speech* (June 16, 2015), https://tinyurl.com/qzk4wrv.
[10] Donald J. Trump (@realDonaldTrump), Twitter (Oct. 8 2014, 2:26 PM), https://tinyurl.com/yxntlamo.
[11] *Id.* (Feb. 3, 2019, 2:03 PM), https://tinyurl.com/yywmw9yx.
[12] *Id.* (Jul. 13, 2016, 2:56 PM), https://tinyurl.com/gm8yty6.
[13] *Id.* (Aug. 27, 2016, 7:17 AM), https://tinyurl.com/y3f6bp9s.

21

126.    In a speech shortly before the 2016 presidential election, President Trump stated that "[o]n day one [of his Administration], we will begin working on an impenetrable, physical, tall, power [sic], beautiful southern border wall" to "help stop the crisis of illegal crossings" and "stop the drugs and the crime from pouring into our country."[14]

127.    As President, President Trump has continued to repeatedly mention the need for the border wall and his intention to build it.

128.    On January 27, 2017, President Trump discussed his proposed border wall with Mexico's then-President Enrique Peña Nieto, in which he reportedly pressured Mexico to pay for the border wall and stated that he "[has] been talking about it for a two-year period."[15]

129.    On February 28, 2017, President Trump delivered an address to a joint session of Congress in which he stated that in order to "restore integrity and the rule of law at our borders . . . we will soon begin the construction of a great, great wall along our southern border."[16]

130.    Additional statements by President Trump regarding the border wall include a campaign rally speech on August 22, 2017 ("[W]e are building a wall on the southern border which is absolutely necessary."),[17] and tweets on January 26, 2017 ("badly needed wall"),[18] February 23, 2018 ("MS-13 gang members are being removed by our Great ICE and Border Patrol Agents by the thousands, but these killers come back in from El Salvador, and through Mexico, like water. . . . We need The Wall!"),[19] June 21, 2018 ("We shouldn't be hiring judges by the thousands, as our ridiculous immigration laws demand, we should be changing our laws,

---

[14] New York Times, *Transcript of Donald Trump's Immigration Speech* (Sept. 1, 2016), https://tinyurl.com/yalom4hl.
[15] Greg Miller, *Trump Urged Mexican President to End His Public Defiance on Border Wall, Transcript Reveals*, Wash. Post (Aug. 3, 2017), https://tinyurl.com/y3gqdf2m.
[16] White House, *Remarks by President Trump in Joint Address to Congress* (Feb. 28, 2017), https://tinyurl.com/y4kvpj7n.
[17] Time, *President Trump Ranted for 77 Minutes in Phoenix.  Here's What He Said* (Aug. 23, 2017), https://tinyurl.com/ycxt2woc.
[18] Donald J. Trump (@realDonaldTrump), Twitter (Jan. 26, 2017, 5:55 AM), https://tinyurl.com/zm26eaf.
[19] *Id.* (Feb. 23, 2018, 3:28 AM), https://tinyurl.com/y9xypa55.

1   building the Wall, hire Border Agents and Ice [sic] and not let people come into our country

2   based on the legal phrase they are told to say as their password."),[20] December 19, 2018

3   ("Because of the tremendous dangers at the Border, including large scale criminal and drug

4   inflow, the United States Military will build the Wall!"),[21] and December 31, 2018 ("I

5   campaigned on Border Security, which you cannot have without a strong and powerful Wall.  Our

6   Southern Border has long been an 'Open Wound,' where drugs, criminals (including human

7   traffickers) and illegals would pour into our Country.  Dems should get back here an [sic] fix

8   now!").[22]

9        131.   The salient facts regarding the ostensible "crisis" that President Trump repeatedly

10  invoked in these numerous statements have not significantly changed since his inauguration as

11  President in January 2017.

12        132.   President Trump acknowledged this when he stated that the "emergency" at the

13  border "began a long time [ago]," citing 2014 as the beginning of the ostensible "crisis at the

14  border."[23]

15        133.   There is no evidence of change to the historic pattern of unauthorized immigrants

16  committing crimes at substantially lower rates than native-born Americans.[24]

17        134.   The evidence from the federal government's own data also shows that the vast

18  majority of the drugs smuggled into the country that the President has singled out as dangerous

19  (methamphetamine, heroin, cocaine, and fentanyl)[25] continue to come through, not between, ports

20  of entry.[26]

---

[20] *Id.* (June 21, 2018, 5:12 AM), https://tinyurl.com/y3zaqk7d.
[21] *Id.* (Dec. 19, 2018, 5:43 AM), https://tinyurl.com/y95cnd8r.
[22] *Id.* (Dec. 31, 2018, 5:29 AM), https://tinyurl.com/y6stmopr.
[23] White House, *Remarks by President Trump Before Marine One Departure* (Jan. 10, 2019), https://tinyurl.com/yycew5dk.
[24] *See, e.g.*, Alex Nowrateh, *The Murder of Mollie Tibbetts and Illegal Immigrant Crime: The Facts*, Cato Institute (Aug. 22, 2018), https://tinyurl.com/y5boc9me (showing that "[t]he illegal immigrant conviction rate for homicide was 44 percent *below* that of native-born Americans in 2016 in Texas") (emphasis in original).
[25] White House, *President Donald J. Trump's Address to the Nation on the Crisis at the Border* (Jan. 8, 2019), https://tinyurl.com/y5uloxyg.
[26] CBP, *CBP Enforcement Statistics FY2018*, https://tinyurl.com/y9c4c6ft (showing that through August 2018, federal agents seized 88 percent of cocaine, 90 percent of heroin, 87

135.    There continues to be a lack of credible evidence that terrorists are using the southern border as a means of entering the United States, as a State Department report produced under the Trump Administration makes clear.[27]

136.    In his own public statements, President Trump has made clear that his emergency declaration was triggered by his inability to secure funding for the border wall from Congress rather than an actual national emergency at the border.

137.    When asked by the media about his plans to declare a national emergency relating to the border wall, President Trump stated his preference for "do[ing] the deal through Congress," but that if the deal did not "work out" he would "almost . . . definitely" declare a national emergency.[28]  While he reiterated his claims that the volume of drugs, criminals, and gangs coming through the border between ports of entry constituted a "crisis," President Trump repeatedly cited the ongoing impasse with Congress as his rationale for the emergency declaration.[29]

138.    Around the same time, when asked by the media what his threshold was for declaring a national emergency, President Trump responded, "My threshold will be if I can't make a deal with people that are unreasonable."[30]

139.    On February 1, 2019, President Trump made clear in an interview that he was planning to wait until February 15, the deadline for a congressional conference committee to avert another government shutdown, before issuing an emergency declaration.[31]  President Trump claimed he was already building the border wall, and strongly implied that he needed neither

---

percent of methamphetamine, and 80 percent of fentanyl at ports of entry in this fiscal year).

[27] U.S. Dep't of State, Bureau of Counterterrorism, *Country Reports on Terrorism 2017* 205 (Sept. 2018), https://tinyurl.com/y93n5fes.

[28] *Trump Remarks before Marine One Departure*, *supra* note 23.

[29] *Id.*

[30] George Sargent, *Trump: I Have the 'Absolute Right' to Declare a National Emergency if Democrats Defy Me*, Wash. Post (Jan 9, 2018), https://tinyurl.com/y4vmtezb.

[31] New York Times, *Excerpt from Trump's Interview with the New York Times* (Feb. 1, 2019), https://tinyurl.com/y9gsosk4; *see also* CBS, *Transcript: President Trump on "Face the Nation"* (Feb. 3, 2019), https://tinyurl.com/y8l38g72 (President Trump describing emergency declaration as an "alternative" to the process that Congress was engaged in to avert another shutdown, which was to end on February 15).

24

1  additional funding nor an emergency declaration to build it.[32]

2      140.    During a press conference that same day, when asked whether he would consider

3  other options besides the emergency declaration, President Trump stated that "we will be looking

4  at a national emergency, because I don't think anything is going to happen [in Congress].  I think

5  the Democrats don't want border security."[33]  President Trump also repeated his view that the

6  wall was already being built "with funds that are on hand . . . we're building a lot of wall right

7  now, as we speak . . . [a]nd we're getting ready to hand out some very big contracts with money

8  that we have on hand and money that comes in."[34]

## II.    CONGRESS HAS APPROPRIATED LIMITED FUNDING TOWARD A BORDER BARRIER AND NO FUNDING TOWARD PRESIDENT TRUMP'S PROPOSED BORDER WALL

      141.    Congress has exercised its Article I powers by appropriating funds for the

construction of border barriers and related infrastructure when Congress deemed it appropriate.

During the period of 2005 through 2011, Congress appropriated funding for the construction of

hundreds of miles of border barriers.[35]  Currently, there is a total of 705 miles of primary,

secondary, or tertiary fencing along 654 miles of the southwest border.[36]

      142.    In the 115th Congress, between 2017 and 2018, Congress considered, but

repeatedly declined to adopt, legislation appropriating funding for President Trump's proposed

---

[32] *New York Times Interview, supra* note 31 (President Trump stating: "I'm building the wall right now. . . . it's been funded . . . . . We'll be up to, by the end of this year, 115 miles. . . . At least. . . . And that doesn't include large amounts of wall that we'll be starting before the end of the year.  So we'll be up to hundreds of miles of wall between new wall and renovation wall in a fairly short period of time. . . . . And I'll continue to build the wall, and we'll get the wall finished. Now whether or not I declare a national emergency, that you'll see"); *see also* Donald J. Trump (@realDonaldTrump), Twitter (Jan. 31,  2019, 9:43 AM), https://tinyurl.com/y56tevok ("Wall is being built!").

[33] White House, *Remarks by President Trump in Meeting on Human Trafficking on the Southern Border* (Feb. 1, 2019), https://tinyurl.com/y5ghp3eh.

[34] *Id.*

[35] Gov't Accountability Office, *Additional Actions Needed to Better Assess Fencing's Contributions to Operations and Provide Guidance for Identifying Capability Gaps*, GAO-17-331 (Feb. 16, 2017), at 7-10, https://tinyurl.com/yaqbny6e; Gov't Accountability Office, *Secure Border Initiative Fence Construction Costs*, GAO-09-244R (Jan. 29, 2009), at 4-11, https://tinyurl.com/y2kgefp5.

[36] U.S. Border Patrol, *Mileage of Pedestrian and Vehicle Fencing by State* (Aug. 2, 2017), https://tinyurl.com/y6f27h4e.

border wall.[37]

143.    Near the end of the 115th Congress, Congress worked on a funding bill before the December 22, 2018 deadline when federal funding ran out for a number of federal departments. On December 11, 2018, President Trump held a televised meeting with the Democratic leaders of Congress, then-House Minority Leader Nancy Pelosi and Senate Minority Leader Chuck Schumer, to discuss the funding deadline.  At that meeting, President Trump said he wanted $5 billion to build a portion of the border wall.  President Trump said at that meeting, "If we don't get what we want one way or the other, whether it's through you, through a military, through anything you want to call, I will shut down the government, absolutely."  President Trump reiterated that he would be "proud to shut down the government for border security."  At the meeting, Leaders Schumer and Pelosi said they disagreed with the President on providing funding for the border wall.[38]

144.    On December 19, 2018, the Senate passed by voice vote a bill to fund the government through February 8, 2019 that did not include any funding for a border wall. Department of Defense Appropriations Act of 2018, H.R. 695, 115th Cong. (2018).

145.    After the Senate passed the temporary funding bill, on December 20, 2018, President Trump announced that "I've made my position very clear.  Any measure that funds the

---

[37] See, e.g., The WALL Act of 2018, S. 3713, 115th Cong. (2018) (proposed $25 billion appropriation for border wall; no committee action); 50 Votes for the Wall Act, H.R. 7073, 115th Cong. (2018) (proposed $25 billion appropriation for funding for border wall; no committee action); Build the Wall, Enforce the Law Act of 2018, H.R. 7059, 115th Cong. (2018) (proposed $16.6 billion appropriation for border wall; no committee action); Fund and Complete the Border Wall Act, H.R. 6657, 115th Cong. (2018) (proposed authorization of funding for border wall; no committee action); American Border Act, H.R. 6415, 115th Cong. (2018) (proposed $16.6 billion appropriation for border wall; no committee action); Border Security and Immigration Reform Act of 2018, H.R. 6136, 115th Cong. (2018) (proposed $16.6 billion appropriation for border wall; voted down by House 301 to 121); Securing America's Future Act of 2018, H.R. 4760, 115th Cong. (2018) (proposed construction of physical barrier, including border wall; voted down by House 231-193); Border Security and Deferred Action Recipient Relief Act, S. 2199, 115th Cong. (2017) (proposal to make available $38.2 million for planning for border wall construction; no action in Senate); Make America Secure Appropriations Act, H.R. 3219, 115th Cong. (2017) (proposed $38.2 million appropriation for border wall; passed House of Representatives, but no action by Senate).

[38] C-SPAN, President Trump Meeting with Democratic Leaders (Dec. 11, 2018), https://tinyurl.com/ycalrz3x.

government must include border security," which he clarified must include funding for a wall.[39]

146.    On December 20, 2018, the House of Representatives approved a short-term funding bill appropriating $5.7 billion for "U.S. Customs and Border Protection – Procurement, Construction, and Improvements."  Department of Defense Appropriations Act of 2018, H.R. 695, 115th Cong. (2018).  The Senate never passed the House-approved version of the legislation.

147.    With no agreement between Congress and the President on funding, on December 22, 2018, the federal government partially shut down.

148.    On January 3, 2019, Nancy Pelosi became Speaker of the House.  The day before, Speaker Pelosi reiterated in a televised interview that the House would be providing "[n]othing for the wall."[40]  On January 3, the House of Representatives approved a short-term funding bill without any funding for a border wall.  Consolidated Appropriations Act of 2019, H.R. 21, 116th Cong. (2019).  The Senate never passed the House approved version of the legislation.

149.    On January 19, 2019, President Trump addressed the nation regarding the partial government shutdown and laid out his immigration proposal.  In his remarks, he repeated his unsupported claims of an immigration enforcement crisis at the border in connection with his continued proposal for $5.7 billion in funding for a wall, stating that "[a]s a candidate for president, I promised I would fix this crisis, and I intend to keep that promise one way or the other."[41]

150.    When he announced the congressional agreement that ended the government shutdown on January 25, 2019, President Trump stated: "If we don't get a fair deal from Congress, the government will either shut down on February 15th, again, or I will use the powers afforded to me under the laws and the Constitution of the United States to address this emergency."[42]

---

[39] CNN, *Trump: "I've Made My Position Very Clear" on Spending Bill* (Dec. 20, 2018), https://tinyurl.com/yy9cvzdd.

[40] Tal Axelrod, *Pelosi on Negotiations with Trump: "Nothing for the Wall"*, The Hill, (Jan. 2, 2019), https://tinyurl.com/y77o89hp.

[41] White House, *Remarks by President Trump on the Humanitarian Crisis on our Southern Border and the Shutdown* (Jan. 19, 2019), https://tinyurl.com/y7gdj6s8.

[42] White House, *Remarks by President Trump on the Government Shutdown* (Jan. 25, 2019), https://tinyurl.com/y4mplplb.

151.    After weeks of negotiation, on February 14, 2019, Congress passed the Consolidated Appropriations Act, 2019 (H.J. Res. 31) (the "2019 Appropriations Act").  The 2019 Appropriations Act provides $1.375 billion for "construction of primary pedestrian fencing, including levee pedestrian fencing, in the Rio Grande Valley Sector" of the border.  H.J. Res. 31 § 230(a)(1).  That is the only funding in the 2019 Appropriations Act that Congress designated for the construction of a barrier.

152.    The 2019 Appropriations Act also imposes limitations on how the fencing may be constructed.  The amount designated for fencing in the Rio Grande Valley Sector "shall only be available for operationally effective designs deployed as of the date of the Consolidated Appropriations Act, 2017 (Public Law 115-31), such as currently deployed steel bollard designs, that prioritize agent safety."  *Id.* § 230(b).  The Consolidated Appropriations Act of 2017 was enacted on May 5, 2017.  *See* Pub. L. No. 115-31.  Thus, the 2019 Appropriations Act authorized fencing only using designs already "deployed" nearly two years ago.  The Consolidated Appropriations Act of 2017 likewise does not authorize the construction of a concrete or steel wall.  *Id.*

153.    Congress made clear its intent that it was not appropriating any funding toward the construction of a wall.  Senator Patrick Leahy, Vice Chairman of the Senate Appropriations Committee, who was actively involved in negotiations on the 2019 Consolidated Appropriations Act, stated, "The agreement does not fund President Trump's wasteful wall."  165 Cong. Rec. S1362 (daily ed. Feb 14, 2019).  Senator Schumer, the Senate Minority Leader, noted that, "The agreement will provide smart border security, increasing support for technologies at our ports of entry.  It will not fund the President's expensive, ineffective wall."  165 Cong. Rec. S1363 (daily ed. Feb. 14, 2019).  The congressional record in the House of Representatives is no different.  *See, e.g.*, 165 Cong. Rec. H2019 (daily ed. Feb. 14, 2019) (statement of Rep. Price) ("This agreement denies the President billions of dollars for an unnecessary wall."); 165 Cong. Rec. H2020 (daily ed. Feb. 14, 2019) (statement of Rep. Aguilar) ("What this bill will not do is . . . fund the President's wall from sea to shining sea, a wall that he said Mexico would pay for.").

154.    On February 15, 2019, President Trump signed the 2019 Consolidated

1    Appropriations Act into law.

2    **III.   PRESIDENT TRUMP'S EXECUTIVE ACTION AND EMERGENCY DECLARATION**

3            155.    That same day, the Trump Administration announced that the President was taking

4    Executive Action to redirect funding beyond what was appropriated by Congress toward

5    construction of a border wall.  The Administration outlined specific plans for the diversion of an

6    additional $6.7 billion "that will be available to build the border wall once a national emergency

7    is declared and additional funds have been reprogramed."[43]  The Administration identified the

8    following funding for diversion:

9        • $601 million from the Treasury Forfeiture Fund;

10       • Up to $2.5 billion under the Department of Defense funds transferred for Support for

11          Counterdrug Activities (10 U.S.C. § 284); and

12       • Up to $3.6 billion reallocated from Department of Defense military construction projects

13          under the President's declaration of a national emergency (10 U.S.C. § 2808).[44]

14           156.    In conjunction with that announcement, the President also declared a national

15   emergency under the National Emergencies Act claiming that there is a "border security and

16   humanitarian crisis that threatens core national security interests and constitutes a national

17   emergency."  The Emergency Declaration claimed that the border is an entry point for "criminals,

18   gang members, and illicit narcotics."[45]  The Emergency Declaration continues: "The problem of

19   large-scale unlawful migration through the southern border is long-standing, and despite the

20   executive branch's exercise of existing statutory authorities, the situation has worsened in certain

21   respects in recent years.  In particular, recent years have seen sharp increases in the number of

22   family units entering and seeking entry to the United States and an inability to provide detention

23   space for many of these aliens while their removal proceedings are pending."[46]  The Emergency

24   Declaration concludes that the difficulty in removing these family units justifies the declaration,

25   ───────────────
             [43] White House, *President Donald J. Trump's Border Security Victory* (Feb. 15, 2019),
26   https://tinyurl.com/y3empmay.
             [44] *Id.*
27           [45] President Donald J. Trump, *Proclamation Declaring a National Emergency Concerning
     the Southern Border of the United States* (Feb. 15, 2019).
28           [46] *Id.*

but it does not make any connection to how the entry of these family units into the United States contributes to the flow of "criminals, gang members, and illicit narcotics" into the country.[47]

157.    The President invoked the National Emergencies Act and declared that the "emergency requires use of the Armed Forces" and "that the construction authority provided in section 2808 of title 10, United States Code, is invoked and made available, according to its terms, to the Secretary of Defense, and at the discretion of the Secretary of Defense, to the Secretaries of the military departments."

158.    The Emergency Declaration directs the Secretary of Defense or the Secretary of relevant military departments to "order as many units or members of the Ready Reserve to active duty as the Secretary concerned, in the Secretary's discretion, determines to be appropriate to assist and support the activities of the Secretary of Homeland Security at the southern border."[48]

159.    The Emergency Declaration further directs the Secretaries of Defense, Interior, and Homeland Security to "take all appropriate actions, consistent with applicable law, to use or support the use of the authorities herein invoked."[49]

160.    At a press conference announcing the Executive Actions, President Trump acknowledged that Congress provided more than enough funding for homeland security, and that the Administration has "so much money, we don't know what to do with it."  In explaining his rationale for the Executive Actions, the President candidly admitted that the emergency declaration reflected his personal preference to construct the wall more quickly, rather than an actual urgent need for it to be built immediately: "I could do the wall over a longer period of time. I didn't need to do this.  But I'd rather do it much faster."[50]

## IV.    LEGAL BACKGROUND

### A.    The National Emergencies Act (50 U.S.C. §§ 1601-1651)

161.    The National Emergencies Act ("NEA"), Pub. L. 94-412, 90 Stat. 1255, codified at 50 U.S.C. §§ 1601-1651, was enacted by Congress in 1976 to rein in, rather than expand, the

---

[47] *Id.*
[48] *Id.* § 1.
[49] *Id.* § 2.
[50] White House, *Remarks by President Trump on the National Security and Humanitarian Crisis on our Southern Border* (Feb. 15, 2019), https://tinyurl.com/y3jenqeu.

power of the president. The NEA was designed to "insure" that the president's "extraordinary" emergency powers would "be utilized only when emergencies actually exist." S. Rep. No. 94-1168, at 2 (1976). Senator Frank Church, who was instrumental in the development of the NEA, testified before the Senate Committee of Government Operations "that the President should not be allowed to invoke emergency authorities or in any way utilize the provisions of this Act for frivolous or partisan matters, nor for that matter in cases where important but not 'essential' problems are at stake." *Hearing on H.R. 3884 Before the S. Comm. of Governmental Operations*, 94th Cong. 7 (1976) (statement of Sen. Frank Church). Senator Church continued that "[t]he Committee intentionally chose language which would make clear that the authority of the Act was to be reserved for matters that are 'essential' to the protection of the Constitution and the people." *Id.*

162.     The NEA allows the president to utilize emergency powers, as authorized by Congress in other federal statutes, when there is a national emergency, and one has been declared. 50 U.S.C. § 1621.

163.     Under the NEA, the president must specify the statutory emergency authorities he intends to invoke upon issuing a national emergency. He must also publish the proclamation of a national emergency in the Federal Register and transmit it to Congress. 50 U.S.C. § 1631.

**B.     Section 2808's Emergency Military Construction Authority (10 U.S.C. § 2808)**

164.     The President seeks to reallocate "[u]p to $3.6 billion . . . from Department of Defense military construction projects under the President's declaration of a national emergency."[51]

165.     Section 2808 states that when the president declares a national emergency "that requires use of the armed forces," the Secretary of Defense may "undertake military construction projects . . . not otherwise authorized by law that are necessary to support such use of the armed forces." 10 U.S.C. § 2808(a).

_____

[51] *President Donald J. Trump's Border Security Victory*, *supra* note 43 (citing 10 U.S.C. § 2808).

166.    Section 2808 limits the funds available for emergency military construction to "the total amount of funds that have been appropriated for military construction . . . that have not been obligated."  10 U.S.C. § 2808(a).

167.    "Military construction" under Section 2808 includes "any construction, development, conversion, or extension of any kind carried out with respect to a military installation," and "military installation" includes a "base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department."  10 U.S.C. § 2801.

### C.    Section 284's Authority to Support Counter-Drug Activities (10 U.S.C. § 284)

168.    The President seeks to use "[u]p to $2.5 billion under the Department of Defense funds transferred for Support for Counterdrug Activities."[52]

169.    Section 284 authorizes the Secretary of Defense to assist civilian law enforcement with drug enforcement activities.  10 U.S.C. § 284.  It states that the Secretary of Defense "may provide support for the counterdrug activities or activities to counter transnational organized crime" of any law enforcement agency.  Such support may include "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States."  *Id.*

170.    Use of Section 284 is not dependent on the president declaring a national emergency.

171.    Congress has appropriated to the DOD funding for interdiction and counter-drug activities.  For instance, in FY 2019, Congress appropriated $217,178,000 for National Guard counter-drug programs subject to specific limitations on how the Administration may expend these funds.[53]  That funding is intended to support counterdrug operations at all levels of government, including on a state-wide basis.[54]  According to a U.S. Government Accountability

---

[52] *Id.* (citing 10 U.S.C. § 284).

[53] Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. No. 115-245 (Sept. 28, 2018).

[54] National Guard, National Guard Counterdrug Program, https://tinyurl.com/yx9whzd8 (last visited Feb. 17, 2019).

1    Office analysis, National Guard Counterdrug Program funding was planned for all fifty states

2    plus Washington, D.C., Puerto Rico, the U.S. Virgin Islands, and Guam.[55]

3         **D.    Authority to Transfer Funds from Treasury Asset Forfeiture Fund (31**
              **U.S.C. § 9705)**
4

5         172.    The President seeks to use "about $601 million" from the Department of the

6    Treasury's Asset Forfeiture Fund.[56]

7         173.    Section 9705(g)(4)(B) provides that after reserves and required transfers, the

8    Treasury Forfeiture Fund's "unobligated balances . . . shall be available to the Secretary . . . for

9    obligation or expenditure in connection with the law enforcement activities of any Federal

10   agency. . . ."

11        **E.    National Environmental Policy Act ("NEPA")**

12        174.    NEPA, 42 U.S.C. section 4321 et seq., is the "basic national charter for protection

13   of the environment."  40 C.F.R. § 1500.1(a).  NEPA contains several action-forcing procedures,

14   most significantly the mandate to prepare an environmental impact statement ("EIS") on major

15   federal actions "significantly affecting the quality of the human environment."  *Robertson v.*

16   *Methow Valley Citizen Council*, 490 U.S. 332, 348 (1989) (citing 42 U.S.C. § 4332 (2)(C)).

17        175.    NEPA requires federal agencies to consider several factors relating to the

18   "intensity" of the project, including: the "[u]nique characteristics of the geographic area such as

19   proximity to . . . ecologically critical areas" (40 C.F.R. § 1508.27(3)); "[t]he degree to which the

20   action may adversely affect an endangered or threatened species or its habitat that has been

21   determined to be critical under the Endangered Species Act of 1973" (40 C.F.R. § 1508.27(9));

22   and "[w]hether the action threatens a violation of Federal, State, or local law or requirements

23   imposed for the protection of the environment."  40 C.F.R. § 1508.27(10).

24        176.    "NEPA requires that the evaluation of a project's environmental consequences

25   take place at an early stage in the project's planning process."  *State of California v. Block*, 690

26   F.2d 753, 761 (9th Cir. 1982) (citation omitted).  A proposal subject to NEPA exists where an

27        [55] Gov't Accountability Office, *Drug Control, DOD Should Improve Its Oversight of the National Guard Counterdrug Program*, GAO-19-27 (Jan. 2019), https://tinyurl.com/y4e6ocra.
28        [56] *Border Security Victory, supra* note 43.

1    agency has a goal and is actively preparing to make a decision on the alternatives in

2    accomplishing that goal, regardless of whether the agency declares that such a proposal exists:

3    "An agency shall commence preparation of an environmental impact statement as close as

4    possible to the time the agency is developing or is presented with a proposal."  40 C.F.R. §

5    1502.5.  A "[p]roposal exists at that stage in the development of an action when an agency subject

6    to the Act has a goal and is actively preparing to make a decision on one or more alternative

7    means of accomplishing that goal and the effects can be meaningfully evaluated."  40 C.F.R. §

8    1508.23.

9    **V.    THERE IS NO IMMIGRATION ENFORCEMENT "CRISIS" OR "INVASION" AT THE
          SOUTHERN BORDER TO SUPPORT THE DECLARATION OF EMERGENCY**

10

11   **A.    There Is No Evidence That a Massive Influx of Migrants Is Overwhelming
          Government Resources at the Southern Border**

12       177.    President Trump's continued claim that an unprecedented flood of migrants is

13   causing an immigration enforcement crisis amounting to a "national emergency" is not supported

14   by the facts.

15       178.    As CBP statistics show, apprehensions at the border in recent months are within

16   the historic range, and indeed lower than they have been in some months in prior years (especially

17   2014).[57]

18       179.    From a larger perspective, apprehensions at the southwest border are actually near

19   historic lows, with fewer than 400,000 apprehensions in FY2018 compared to over 1.6 million in

20   FY2000.[58]

21       180.    In FY2017, CBP made the fewest apprehensions since FY2000, and the number of

22   apprehensions in FY2018 was the fifth lowest since FY2000.[59]

23

24       [57] CBP, *Southwest Border Migration FY2019*, https://tinyurl.com/CBP-app-2019 (last
25   visited Feb. 17, 2019).
         [58] CBP, *Nationwide Illegal Alien Apprehensions Fiscal Years 1925-2017*,
26   https://tinyurl.com/y2kysbr8 (last visited Feb. 17, 2019) (also showing over 1 million
     apprehensions in each of fiscal years 1954, 1983-87, 1990-99, 2001, 2004-06, as well as over
27   800,000 apprehensions in each of fiscal years 1953, 1977-79, 1981-82, 1988-89, 2002, 2003, and
     2007).
28       [59] *Id.* (also the source of data for the graph included herein).



181.    During this same time span, there were dramatic increases in the number of border patrol agents utilized to patrol the southwest border between the ports of entry.  From 2000 to 2017, CBP increased its border patrol agent staffing nationwide by 111%, from 9,212 to 19,437 agents.  CBP increased the number of border patrol agents assigned to the southwest border sectors by nearly 94%, from 8,580 to 16,605 agents during the 2000-2017 time period.[60]

182.    CBP personnel have significantly increased over the past two decades, while illegal border crossings have dropped, causing the average annual number of apprehensions made by each CBP agent to drop by almost 91%, from 192 in FY2000 to only 18 in FY2017.[61]

183.    In September 2017, DHS published a report in which it concluded that "the southwest land border is more difficult to illegally cross today than ever before."[62]

184.    President Trump and other Administration officials have pointed to a series of "caravans" of asylum seekers from Central America as posing a national security threat to the

---

[60] CBP, *Border Patrol Agent Nationwide Staffing by Fiscal Year*, https://tinyurl.com/yyazdqm7 (last visited Feb. 17, 2019).
[61] *Id.*; CBP, *Total Illegal Alien Apprehensions by Fiscal Year*, https://tinyurl.com/y73mzshs (last visited Feb. 17, 2019).
[62] DHS, Off. of Immigr. Stats., *Efforts by DHS to Estimate Southwest Border Security between Ports of Entry* (Sept. 2017), https://tinyurl.com/y9gbn5js.

United States and to justify the border wall.[63]

185.    But these caravans have not materially changed the situation at the border—and will not materially change it—because numerically they represent a small fraction of CBP's monthly southwest border apprehensions.

186.    CBP reported 58,207 apprehensions at the southwest border in January 2019—47,893 between ports of entry and 10,314 at ports of entry—an average of almost 1,900 per day.[64]

187.    A recent migrant caravan that departed Honduras is estimated to contain around 2,000 members.[65]

188.    Thus, even if the entire caravan entered at once, this entry would constitute approximately one day's average apprehensions and less than 4% of monthly apprehensions.

189.    CBP has dealt with far larger changes in migrant flows in the past; for example, apprehensions increased by 13,596 from February to March 2018.[66]

190.    In general, the population of undocumented immigrants from Mexico has dropped

---

[63] *See, e.g.,* Donald J. Trump (@realDonaldTrump), Twitter (Nov. 18, 2018, 10:42 AM), https://tinyurl.com/invasion-tweet ("the U.S. is ill-prepared for this invasion, and will not stand for it"); *id.*, Twitter (Jan. 15, 2019, 4:37 AM) https://tinyurl.com/yyjrbfyn ("A big new Caravan is heading up to our Southern Border from Honduras. Tell Nancy and Chuck that a drone flying around will not stop them. Only a Wall will work. Only a Wall, or Steel Barrier, will keep our Country safe!"); *id.*, Twitter (Jan. 18, 2019, 6:13 AM) https://tinyurl.com/yyjrbfyn ("Another big Caravan heading our way. Very hard to stop without a Wall!"); *id.*, Twitter (Feb. 3, 2019) https://tinyurl.com/yywmw9yx ("With Caravans marching through Mexico and toward our Country, Republicans must be prepared to do whatever is necessary for STRONG Border Security"); 2019 State of the Union Address, *supra* ("As we speak, large, organized caravans are on the march to the United States. We have just heard that Mexican cities, in order to remove the illegal immigrants from their communities, are getting trucks and buses to bring them up to our country in areas where there is little border protection. I have ordered another 3,750 troops to our southern border to prepare for this tremendous onslaught"); DHS, *Secretary Nielsen Statement on New Migrant "Caravan"* (Feb. 5, 2019), https://tinyurl.com/y6gt7wjk (calling caravan "lawless" and stating DHS intention to "take all steps to ensure the safety and security of law enforcement personnel on the frontlines . . . . [and] do everything in its power—with the assistance of federal and state partners—to hold smugglers and traffickers accountable, enforce our laws, and keep American communities safe").

[64] *See Southwest Border Migration*, *supra* note 57.

[65] Tom Phillips, *Latest migrant caravan marches on as Trump again demands border wall*, The Guardian (Jan. 17, 2019), https://tinyurl.com/yas7msld.

[66] *Southwest Border Migration*, *supra* note 57.

1    significantly in recent years, falling by 1.3 million between 2010 and 2017. In 2016 alone, this

2    decrease was 400,000.[67]

3        191.    The Director of National Intelligence's most recent "Worldwide Threat

4    Assessment" ("DNI Report") was produced on January 29, 2019. That report discusses several

5    topics germane to the Emergency Declaration, including migration, terrorism, and transnational

6    crime (including human and drug trafficking).[68]

7        192.    While the DNI Report notes that "high crime rates and weak job markets will spur

8    additional US-bound migrants from the Northern Triangle—El Salvador, Guatemala, and

9    Honduras," and that "[m]any migrants apparently perceive that traveling in caravans on the

10   journey north affords a certain level of security," the report contains no mention of a security

11   threat from the caravans or at the southwest border generally.[69] The report also discusses

12   "transnational organized crime" as a driver of migration,[70] consistent with research by federal

13   officials indicating that most migrants from the Northern Triangle are "fleeing violence at home"

14   and seeking to claim asylum in the United States.[71]

15       193.    At the January 29, 2019, hearing of the Senate Intelligence Committee where the

16   report was presented, the heads of the Office of the Director of National Intelligence, Federal

17   Bureau of Investigation, and Central Intelligence Agency—all appointed by President Trump—

18   testified about international threats to the United States. "None of the officials said there is a

19   security crisis at the U.S.-Mexico border, where Trump has considered declaring a national

20   emergency so that he can build a wall."[72]

21

22       [67] Robert Warren, *U.S. Undocumented Population Continued to Fall from 2016 to 2017,
     and Visa Overstays Significantly Exceeded Illegal Crossings for the Seventh Consecutive Year*,
23   Ctr. for Migration Studies (Jan. 16, 2019), https://tinyurl.com/y7wa849r.
         [68] Daniel R. Coats, *Worldwide Threat Assessment*, Off. of the Dir. of Nat'l Intelligence
24   (Jan. 29, 2019), https://tinyurl.com/y9r6kkhu.
         [69] *Id.* at 41.
25       [70] *Id.* at 19.
         [71] Max Ehrenfreund, *The Huge Immigration Problem That Donald Trump's Wall Won't
26   Solve*, Wash. Post (Dec. 18, 2015), https://tinyurl.com/yxgwlx2q (citing research by Federal
     Reserve Bank of Dallas economist).
27       [72] Shane Harris, *Testimony by Intelligence Chiefs on Global Threats Highlights
     Differences with President*, Wash. Post (Jan. 29, 2019), https://tinyurl.com/y45voevk.
28

**B.     There Is No Evidence that Terrorists Are Infiltrating the United States via the Southern Border**

194.    The Trump Administration's assertions that terrorism concerns justify its actions here are without factual basis.

195.    President Trump and other members of his Administration, including DHS Secretary Nielsen, have repeatedly claimed that terrorists have attempted to infiltrate the United States via the southern border and that the border wall is needed to stop this from happening.[73]

196.    However, the federal government's own reports, as well as credible third-party analysis, show that these claims are false.

197.    In fact, while over 2,500 individuals on the Federal Bureau of Investigation's terrorist watchlist attempted to travel to the United States in FY2017, the vast majority—over 2,100—attempted to do so by air.[74]

198.    More generally, a 2018 State Department report finds that there is "no credible evidence indicating that international terrorist groups have established bases in Mexico, worked with Mexican drug cartels, or sent operatives via Mexico into the United States."[75]

199.    While noting that "[t]he U.S. southern border remains vulnerable to *potential* terrorist transit," the report concluded that "terrorist groups likely seek other means of trying to

---

[73] *See* White House, *Remarks by Vice President Mike Pence at an America First Policies Tax Reform Event* (Feb. 17, 2018), https://tinyurl.com/y54tmrzo (claiming that "seven individuals a day who are either known or suspected terrorists" are apprehended at one Texas port of entry); Donald J. Trump (@realDonaldTrump), Twitter (Oct. 22, 2018, 5:37 AM), https://tinyurl.com/mid-easterners-tweet (asserting that "unknown Middle Easterners" are part of the Caravan, and that he has "alerted Border Patrol and Military that this is a National Emergy [sic]."); *see also* Calvin Woodward, *AP FACT CHECK: Trump's Mythical Terrorist Tide From Mexico*, ABC News (Jan. 7, 2019), https://tinyurl.com/yyhewhrl (collecting other statements by Administration officials asserting that large numbers of individuals with terrorist ties are apprehended at the Southern Border).

[74] DHS and U.S. Dep't of Justice, *Executive Order 13780: Protecting the Nation From Foreign Terrorist Entry Into the United States Initial Section 11 Report* 9 (Jan. 2018), https://tinyurl.com/yy6bg66j.  The report does not specify whether the 355 individuals who attempted to enter by land were doing so at the northern or southern border.

[75] U.S. Dep't of State, Bureau of Counterterrorism, *Country Reports on Terrorism 2017* 205 (Sept. 2018), https://tinyurl.com/y93n5fes.

1    enter the United States."[76]

2        200.    A recent comprehensive study by the Cato Institute—using data going back to

3    1975—found that "there have been zero people murdered or injured in terror attacks committed

4    by illegal border crossers on U.S. soil."[77]

5        201.    In fact, almost every individual convicted of even planning a terrorist attack on the

6    United States who entered the country illegally came over the Canadian border or jumped ship in

7    American ports.[78]

8        202.    Only three individuals convicted of a terrorist plot entered illegally through the

9    Mexican border, and they did so as children in the 1980s, decades before the planned attack was

10   foiled in 2007.[79]

11       203.    Further, the Cato Institute noted that "[n]ot a single terrorist in any visa category

12   came from Mexico or Central America during the 43-year period."[80]

13       204.    The DNI Report contains a three-page discussion of terrorism.  That discussion

14   does not mention any threat of terrorists infiltrating the United States through the Southwest

15   Border.[81]  Indeed, terrorism is not discussed at all in the Western Hemisphere section of the

16   report.[82]

17       205.    Thus, while combating terrorism is an important national priority, illegal crossings

18   at our southern border do not materially contribute to that problem and provide no factual

19   justification for declaring an emergency requiring the diversion of funds to build a wall.

20       **C.    There Is No Evidence that a Border Wall Will Decrease Crime Rates**

21       206.    Studies have consistently shown that the connection that President Trump attempts

22   _____

23       [76] *Id.*
         [77] David Bier & Alex Nowrasteh, *45,000 "Special Interest Aliens" Caught Since 2007,*

24   *But No U.S. Terrorist Attacks from Illegal Border Crossers*, Cato Inst. (Dec. 17, 2018),
     https://tinyurl.com/yddqwes3.

25       [78] *Id.*
         [79] *Id.*

26       [80] Alex Nowrasteh, *Does the Migrant Caravan Pose a Serious Terrorism Risk?*, Cato Inst.
     (Oct. 23, 2018), https://tinyurl.com/yap9uc9s.

27       [81] *DNI Report*, *supra* note 68 at 10–13.
         [82] *Id.* at 40–42.

28

1    to draw between unauthorized immigration and increased crime rates is false.

2          207.    According to a 2018 Cato Institute study examining 2016 incarceration rates,

3    unauthorized immigrants were 47% *less* likely to be incarcerated for crimes than native-born

4    Americans.[83]

5          208.    A 2018 Cato Institute report examining 2015 Texas crime statistics found that

6    undocumented immigrants had a criminal conviction rate 50% *below* that for native-born

7    Americans.[84]

8          209.    A 2018 study published in *Criminology* examining national crime rates from 1990

9    to 2014 found "that undocumented immigration *does not increase* violence" and in fact

10   "[i]ncreases in the undocumented immigrant population within states are associated with

11   significant *decreases* in the prevalence of violence."[85]

12         210.    A 2017 study in the *Journal of Ethnicity in Criminal Justice* examining

13   immigration and crime rates nationally over a 40-year period found that in the 10 cities where the

14   immigrant population increased the most, crime levels in 2016 *decreased* to lower levels of crime

15   than in 1980.[86] "The most striking finding from our research is that for murder, robbery, burglary

16   and larceny, *as immigration increased, crime decreased*, on average, in American metropolitan

17   areas."[87] Large cities with substantial immigrant populations have *lower* crime rates, on average,

18   than those with minimal immigrant populations.[88]

19

20

21

22   [83] Michelangelo Landgrave & Alex Nowrasteh, *Incarcerated Immigrants in 2016*, Cato
     Inst. Res. and Pol'y Br. No. 7 (Jun. 4, 2018), https://tinyurl.com/y2jn4e3x.

23   [84] Alex Nowrasteh, *Criminal Immigrants in Texas*, Cato Inst. Res. and Pol'y Br. No. 4
     (Feb. 26, 2018), https://tinyurl.com/y62qjsa6

24   [85] Michael T. Light & Ty Miller, *Does Undocumented Immigration Increase Violent
     Crime?* Criminology (Mar. 25, 2018), https://tinyurl.com/ycyzsf27.

25   [86] Robert Adelman et al., *Urban crime rates and the changing face of immigration:
     Evidence across four decades*, J. of Ethnicity in Crim. Justice, Vol. 15 (2017),

26   https://tinyurl.com/y6czenh7; *see also* Anna Flag, *The Myth of the Criminal Immigrant*, N.Y.
     Times (Mar. 30, 2018), https://tinyurl.com/y9hcu6kp.

27   [87] Charis Kubrin et al., *Immigrants Do Not Increase Crime, Research Shows* Scientific
     American (Feb. 7, 2017), https://tinyurl.com/h8xauk2.

28   [88] *Id.*

211.     A 2010 study showed that native-born American men between ages 18 to 39 with no high school diploma had **triple the incarceration rate** of immigrant men from Mexico, El Salvador, and Guatemala with the same age and education profile.[89]

212.     The Administration's repeated claims that building a border barrier in El Paso, Texas reduced a previously high rate of violent crimes there are also false.[90]

213.     In fact, when the new border barrier was built in 2009, crime in El Paso had been dramatically decreasing since the 1990s, just as the violent crime rate decreased substantially nationwide from the 1990s through the present.[91] "From 2006 to 2011—two years before the fence was built to two years after—the number of violent crimes recorded in El Paso increased by 17 percent."[92]

### D.     There Is No Evidence that a Border Wall Will Impact the Smuggling of Dangerous Drugs into the United States

214.     For years, the vast majority of the drugs smuggled into the country that the President has singled out as dangerous (methamphetamine, heroin, cocaine, and fentanyl)[93] have been smuggled through, not between, ports of entry.[94]

---

[89] Ewing, *The Criminalization of Immigration in the United States*, Am. Immigr. Council Rep. (Jul. 13, 2015), https://tinyurl.com/jxcv9aq.

[90] *See, e.g.,* State of the Union address, *supra* ("The border city of El Paso, Texas, used to have extremely high rates of violent crime — one of the highest in the entire country, and considered one of our nation's most dangerous cities. Now, immediately upon its building, with a powerful barrier in place, El Paso is one of the safest cities in our country.")

[91] Federal Bureau of Investigation, Uniform Crime Reports, Crime in the United States, Table 1 (showing violent crime rate reduction from 567.6 violent crimes per 100,000 inhabitants in 1998 to 382.9 per 100,000 inhabitants in 2017), https://tinyurl.com/yyvc6636 (last visited Feb. 17, 2019).

[92] Madlin Mekelburg, *State of the Union: Facts Show Trump Wrong to Say El Paso Dangerous City until Fence*, El Paso Times (Feb. 5, 2019), https://tinyurl.com/y9ol96az (citing crime data from El Paso County Sheriff's Office and FBI Uniform Crime Reports).

[93] *Trump Address on Crisis at Border*, *supra* note 25; *see also* White House, *President Donald J. Trump Is Committed to Working with Congress to Solve Our Urgent Immigration Crisis* (Feb. 5, 2019), https://tinyurl.com/yyhzvrq9 ("Tens of thousands of Americans are killed by tons of deadly, illicit drugs trafficked into our country by criminal aliens, gangs, and cartels exploiting our porous border. The lethal drugs that flood across our border and into our communities include meth, heroin, cocaine, and fentanyl.").

[94] CBP, *Enforcement Statistics FY2018*, https://tinyurl.com/y9c4c6ft (showing that through August 2018, out of all the drugs seized by CBP in that fiscal year, 88 percent of cocaine, 90 percent of heroin, 87 percent of methamphetamine, and 80 percent of fentanyl were seized by Field Operations at ports of entry).

41

1    215.    From 2012-2018, 86% of cocaine, 88% of heroin, and 84% of methamphetamine

2    came through ports of entry.[95]

3    216.    From 2017-2018, 83% of fentanyl came through legal border ports of entry.[96]

4    217.    For instance, CBP officers recently made what is being touted (including by

5    President Trump[97]) as the largest seizure of fentanyl in history.  Some 254 pounds of the drug and

6    395 pounds of methamphetamine were discovered hidden in a floor compartment of a truck

7    loaded with cucumbers as the truck tried to enter through the port of entry at Nogales, Arizona.[98]

8    218.    Overall, drug seizures outside legal points of entry have significantly decreased.

9    In the period 2012-2017, total drug seizures outside ports of entry dropped 62%.[99]

10    219.    The DNI Report discusses drug trafficking from Mexico; however, it contains no

11    mention of smuggling between ports of entry.[100]

12    220.    In fact, the DNI Report notes that as to fentanyl—one of the drugs that President

13    Trump has invoked in support of the border wall[101]—"Chinese synthetic drug suppliers . . .

14    probably ship the majority of US fentanyl, when adjusted for purity."[102]

15    **E.    There Is No Factual Basis to Support the Statutory Criteria for Diverting Funding**

16

17    221.    Building a border wall does not "require[] use of the armed forces" under 10

18    U.S.C. section 2808.

19    222.    Construction of border fencing has been carried out by civilian contractors in

20    recent years.

21    223.    In fact, in 2007, the U.S. military informed DHS that "military personnel would no

22

23    ――――――――――――――
     [95] *Id.*
24    [96] *Id.*
     [97] Donald J. Trump (@realDonaldTrump), Twitter (Jan. 31, 2019, 4:14 PM),
     https://tinyurl.com/y4c4zxo3.
25    [98] Pete Williams, *Feds Make Largest Fentanyl Bust in U.S. History*, NBC News (Jan. 31,
     2019), https://tinyurl.com/y9zgnv7p.
26    [99] *CBP Enforcement Statistics FY2018*, *supra* note 94.
     [100] *DNI Report*, *supra* note 68.
27    [101] *Trump Address on Crisis at Border*, *supra* note 25.
     [102] *DNI Report*, *supra* note 68 at 18.

28

42

1  longer be available to build fencing."[103]

2  224.    This, along with the desire to not take CBP agents away from their other duties,

3  led CBP to decide to use "commercial labor for future infrastructure projects."[104]

4  225.    This decision has been reflected in recent projects related to the border wall,

5  including contract awards in California[105] and Arizona[106] in Fall 2018.

6  226.    The construction of a border wall also does not constitute a "military construction"

7  project, as defined in 10 U.S.C. section 2801.  Since at least 2001, 10 U.S.C. section 2808 has

8  only been invoked to justify military construction directly linked to a military installation.[107]

9  227.    In fact, with one exception, it has only been invoked in relation to construction at

10  military installations outside the United States.[108]

11  228.    That single instance related to securing domestic sites at which weapons of mass

12  destruction were sited.[109]

13  229.    Furthermore, the diversion of funding for the proposed border wall does not satisfy

14  the requirements of 10 U.S.C. section 284, the Counterdrugs Activities statute because, for the

15  reasons discussed *supra*, the proposed border wall will not assist in blocking "drug smuggling

16  corridors."  10 U.S.C. § 284(b)(7).

17  **F.    Plaintiff States and their Residents Are Harmed by the Executive Actions**

18  **1.    Harm caused by diversion of funding and other resources**

19  230.    Plaintiff States and their residents are harmed by the Executive Actions and

20  Defendants' unlawful actions undertaken to construct the border wall.  *See* Parties section *supra*.

21  [103] Gov't Accountability Office, *GAO-09-244R Secure Border Initiative Fence
22  Construction Costs* 7 (Jan. 29, 2009), https://tinyurl.com/y2kgefp5.
        [104] *Id.*
23  [105] CBP, *Border Wall Contract Awards in California* (Dec. 21, 2018),
24  https://tinyurl.com/y3px9ubj (announcing $287 million contract with SLSCO Ltd. to build border
    barriers).
25  [106] CBP, *Border Wall Contract Award in Arizona* (Nov. 15, 2018),
    https://tinyurl.com/y2t5u6pw (announcing $172 million contract with Barnard Construction Co.
26  to build border barriers).
27  [107] Michael J. Vassalotti & Brendan W. McGarry, *Military Construction Funding in the
    Event of a National Emergency*, Cong. Res. Serv. (Jan. 11, 2019), https://tinyurl.com/y23t8xbc.
        [108] *Id.*
28      [109] *Id.*

43

1    231.    California will be harmed by the diversion of funds it receives from the federal

2    government for drug interdiction program funding, which will impact public safety and the

3    welfare of its residents.

4    232.    California has been allocated $24 million in drug interdiction funds from the

5    federal government.  If California loses this funding, there will be negative public safety impacts

6    arising from the impairment of the State's criminal and narcotics operations.

7    233.    Diversion of funds from the Treasury's Forfeiture Fund will deprive California of

8    access to millions of dollars of funds that would otherwise be available for law enforcement

9    purposes, negatively impacting the public safety and welfare of California's residents.

10    234.    California also will be harmed by diversion of funding for military construction.

11    235.    More funds are spent on defense in California than in any other state, with $48.8

12    billion in FY2017 alone.[110]

13    236.    California also leads the nation in defense contract spending, with $35.2 billion

14    that same year.[111]  In fact, Plaintiff States collectively account for $129.8 billion in defense

15    contract spending.

16    237.    Three of the top ten contract spending locations are in California (San Diego with

17    $9.2 billion, Los Angeles with $5.3 billion, and Santa Clara County with $4.8 billion).[112]

18    238.    This defense spending—including construction—in California generates

19    significant economic activity, employment, and tax revenue.[113]

20    239.    In FY2016, this spending generated $86.9 billion of direct economic activity in

21    California, $17.4 billion of economic activity (created through the supply chain of direct

22    activities), and $52 billion of "induced" economic activity created because of additional money in

23    the economy.[114]

24    _____

25    [110] DOD, Off. of Econ. Adjustment, *Defense Spending by State Fiscal Year 2017*, https://tinyurl.com/yxcqugzr.

26    [111] *Id.*
      [112] *Id.*

27    [113] Devin Lavelle, *California Statewide National Security Economic Impacts*, Cal. Res. Bureau (Aug. 2018), https://tinyurl.com/yxqlw43b.

28    [114] *Id.*

240.    This economic activity, in turn, generates employment for Californians.  In FY 2016, approximately 358,000 jobs were directly attributable to employment by defense agencies and their contractors, 84,000 were generated through the supply chain, and 324,000 resulted from economic activity induced by the additional money in the economy.[115]

241.    The economic activity generated by defense spending also resulted in significant tax revenues for California at the state and local level, estimated at $5.8 billion total annually, including $1.9 billion in income tax, $1.7 billion in sales tax and $1.3 billion in property tax.[116]

242.    Certain regions of the state particularly rely on defense spending for employment, including Lassen County (with 18% of jobs reliant on defense spending) and San Diego (16%).[117]

243.    In a briefing with reporters on February 15, 2019, White House officials (Acting Chief of Staff Mick Mulvaney, Defendant Nielsen, and Acting Director of the Office of Management and Budget Russell Vought) discussed the Administration's plans to carry out the Emergency Declaration.[118]  In response to a question regarding "which military construction projects will see the money moved for the border wall," one Administration official stated during that briefing: "We would be looking at lower priority military construction projects.  We would be looking at ones that are to fix or repair a particular facility that might be able to wait a couple of months into next year."[119]

244.    A number of military construction projects that could fit this description, and for which funds have been appropriated but are as yet unobligated, are planned in California.[120] These projects include repairs to existing military infrastructure.  If Defendants determine that these projects can wait, funding for them could be diverted to the border wall, and California would be deprived of this federal funding and the resulting positive economic, employment, and tax consequences.

---

[115] *Id.*
[116] *Id.*
[117] *Id.*
[118] White House, *Background Press Call on President Trump's Remarks on the National Security and Humanitarian Crisis on Our Southern Border* (Feb. 15, 2019). This document was available on the White House website but then taken down that same day.
[119] *Id.*
[120] *E.g.*, DOD, *Construction Programs (C-1), Department of Defense Budget Fiscal Year 2019* (Feb. 2018), https://tinyurl.com/yy85dch9.

1    245.    If these types of projects are delayed due to the diversion of funding for border

2    wall construction, California stands to suffer economic harm.

3    246.    Other Plaintiff States will suffer similar harms due to diversion of military

4    construction, drug interdiction, and drug forfeiture funding.

### 2.    Environmental harms to the States of California and New Mexico

6    247.    On December 12, 2018, DHS announced that if it received $5 billion in additional

7    funding, it would use this funding to construct 330 miles of new barriers along the United States-

8    Mexico border in areas that the United States Border Patrol identified as "highest priority" in each

9    of the four border states.  DHS specifically identified a five-mile barrier project in the CBP's San

10   Diego Sector (California), a nine-mile project in the CBP's El Centro Sector (California), and a

11   nine-mile project in the CBP's El Paso Sector (New Mexico).[121]

12   248.    CBP's San Diego Sector is located in San Diego County, California and

13   shares a 60-mile segment of the border with Mexico, 46 linear miles of which are already lined

14   with primary fencing.[122]  The only portions of the border located within the San Diego Sector that

15   are not already lined with primary fencing are located in the southeastern portion of the county in

16   or near the Otay Mountain Wilderness Area.[123]  Thus, the only segment of the border within the

17   San Diego Sector where DHS can construct new primary fencing, as it announced on December

18   12, 2018, are areas within or near the Otay Wilderness Area.

19   249.    CBP's El Centro Sector is located within Imperial County, California, and shares a

20   70-mile segment of the border with Mexico, 59 linear miles of which are already lined by primary

21   fencing.[124]  The only portions of the border located within the El Centro Sector that are not

22   already lined with primary fencing are located in the southwestern portion of Imperial County,

23   [121] DHS, *Walls Work* (Dec. 12, 2018), https://tinyurl.com/y7ca6byc.

24   [122] CBP, *San Diego Sector California* (Jan. 26, 2018), https://tinyurl.com/y5zgvftf; Gov't
Accountability Off., *GAO-17-331, Southwest Border Security: Additional Actions Needed to
Better Assess Fencing's Contributions to Operations and Provide Guidance for Identifying
25   Capability Gaps* 48, https://www.gao.gov/products/GAO-17-331.

26   [123] CBP, *Border Fencing – California* (June 2011), https://tinyurl.com/y24zbfb4; CBP,
*FY17 U.S. Border Patrol Apprehensions (Deportable) & Fencing* (Dec. 6, 2017),
https://tinyurl.com/ydfl46zk.

27   [124] CBP, *El Centro Sector California* (Apr. 11, 2018), https://tinyurl.com/y5kpbk2e;
*Southwest Border Security*, *supra* note 122.

28

which is comprised of a mountainous landscape and the Jacumba Wilderness Area.[125]  Thus, the only segment of the border within the El Centro Sector where DHS can construct new primary fencing, as it announced on December 12, 2018, are areas within or near the Jacumba Wilderness Area.

250.    The Otay Mountain Wilderness and the Jacumba Wilderness areas are home to more than 100 sensitive plant and animal species that are listed as "endangered," "threatened," or "rare" under the federal Endangered Species Act of 1973, 16 U.S.C. § 1531 et seq., and/or the California Endangered Species Act, Cal. Fish & Game Code § 2050 et seq.  These species include the following federally and state endangered species: the Mexican flannel bush, Thornmint, the Quino Checkerspot Butterfly, the Southwestern Willow Flycatcher, and the Peninsular Desert Bighorn sheep.[126]  Some of the listed plant species, such as the Tecate Cypress and the Mexican flannel bush, are so rare they can only be found in these wilderness areas.[127]  The federally and state-endangered Peninsular Desert Bighorn sheep has a range that includes mountainous terrain in Mexico near the United States-Mexico border and extends north across the border through the Jacumba Wilderness to California's Anza-Borrego State Park.[128]

251.    The construction of border barriers within or near the Jacumba Wilderness Area and the Otay Mountain Wilderness Area will have significant adverse effects on environmental resources, including direct and indirect impacts to endangered or threatened wildlife.  These injuries to California's public trust resources would not occur but for Defendants' unlawful and unconstitutional diversion of funds.

252.    The construction of a border wall in the El Paso Sector along New Mexico's

---

[125] CBP, *Border Fencing 2011 & 2017*, *supra* note 123.
[126] Cal. Dept. of Fish & Wildlife, *Threatened and Endangered Species*, https://tinyurl.com/7l65784 (last visited Feb. 17, 2019); Wilderness Connect, *Jacumba Wilderness*, https://tinyurl.com/y5yh23x5 (last visited Feb. 17, 2019); U.S. Bureau of Land Management, *Jacumba Wilderness* https://tinyurl.com/y43hv424 (last visited Feb. 17, 2019); U.S. Bureau of Land Management, *Otay Mountain Wilderness* https://tinyurl.com/y3zamvsh (last visited Feb. 17, 2019); Wilderness Connect, *Otay Mountain Wilderness*, https://tinyurl.com/y3ymkazn (last visited Feb. 17, 2019).
[127] Wilderness Connect, *Otay Mountain*, *supra* note 126.
[128] Cal. Dept. of Fish & Wildlife, *Peninsular Desert Bighorn Sheep* https://tinyurl.com/yyvu5kwa (last visited Feb. 17, 2019).

47

1   southern border will have significant adverse effects on the State's environmental resources,

2   including direct and indirect impacts to endangered or threatened wildlife.

3       253.    If Defendants use the diverted funding announced in President Trump's February

4   15 Executive Actions to construct any of the border wall in New Mexico, it will impose

5   environmental harm to the State.  The environmental damage caused by a border wall in New

6   Mexico would include the blocking of wildlife migration, flooding, and habitat loss.[129]

7       254.    The Chihuahuan desert bisected by the New Mexico-Mexico border is the most

8   biologically diverse desert in the Western Hemisphere.[130]  Species common along the border are a

9   number of endangered, threatened, and candidate species including the beautiful shiner,

10  Chiricahua leopard frog,  jaguar, lesser long-nosed bat, loach minnow, Mexican long-nosed bat,

11  Mexican spotted owl, Mexican wolf, narrow-headed gartersnake, New Mexican ridge-nosed rattle

12  snake, northern aplomado falcon, northern Mexican gartersnake, southwestern willow flycatcher,

13  spikedace, and yellow billed cuckoo.[131]  A barrier built in the Chihuahuan desert is likely to

14  disrupt or destroy habitat of these migratory animals, nesting birds and reclusive reptiles.

15      255.    In particular, New Mexico's border is also home to the endangered Mexican gray

16  wolf, the rarest subspecies of gray wolf in North America, which was nearly extirpated by the

17  1970s and only recently reintroduced.[132]  A wall impossible to breach may make it impossible for

18  the wolf to disperse across the border to reestablish recently extirpated populations or bolster

19  small existing populations.  On March 14, 2018, the New Mexico Department of Game and Fish

20  signed an agreement with the United States Department of Fish and Wildlife to increase

21  cooperation in reintroduction of this species to the wild, evidencing the State's commitment to

22

23      [129] *See* Robert Peters et al., *Nature Divided, Scientists United: US–Mexico Border Wall Threatens Biodiversity and Binational Conservation*, BioScience (Oct. 2018), https://tinyurl.com/y3t4ymfn.

24      [130] Nat'l Park Service, *Chihuahuan Desert Ecoregion* (Sept. 20, 2018),

25  https://www.nps.gov/im/chdn/ecoregion.htm.
        [131] U.S. Fish & Wildlife Serv., *Species By County Report*, https://tinyurl.com/yxmwz9qm

26  (Hidalgo County, NM); https://tinyurl.com/y4ojwrtq (Luna County, NM) (last visited Feb. 17, 2019).

27      [132] U.S. Fish & Wildlife Serv., *Mexican Wolf*, https://tinyurl.com/y2hf5ea2 (last visited Feb. 17, 2019).

28

48

1    preventing the extinction of this species.

2         256.    The segment of New Mexico's border with Mexico that does not already have

3    primary fencing is in the State's "bootheel" region.[133] If Defendants' diverted funding resulted in

4    the construction of a barrier in New Mexico's bootheel, it would cause environmental harm in

5    one of the State's most ecologically pristine and fragile regions.  The bootheel is where temperate

6    and subtropical climates converge, making it another of the most biologically diverse regions in

7    the world, home to jaguars and wolves that coexist along the U.S.-Mexico border.[134] Recognizing

8    the ecological importance of this region, the U.S. Fish and Wildlife Service has designated large

9    segments of the bootheel's border with Mexico as critical habitat for the jaguar.[135]

10        257.    Defendant DHS has not engaged in a public review of these adverse effects.  By

11   failing to do so at the earliest possible stage of the project's planning process, DHS is violating

12   the requirements of NEPA.  *Robertson v. Methow Valley Citizen Council*, 490 U.S. 332, 348-49

13   (1989); 40 C.F.R. §§ 1508.27(b)(9), (10).  California and New Mexico have suffered, and will

14   continue to suffer, injuries to their procedural rights under NEPA and the Administrative

15   Procedure Act (APA), 5 U.S.C. § 551, and injuries to their concrete, quasi-sovereign interests

16   relating to the preservation of wildlife resources within their boundaries, including but not limited

17   to wildlife on state properties.  *Massachusetts v. EPA*, 549 U.S. 497, 519-24 (2007); *Sierra Forest*

18   *Legacy*, 646 F.3d at 1178.

19                              **FIRST CLAIM FOR RELIEF**

20                **VIOLATION OF CONSTITUTIONAL SEPARATION OF POWERS**

21        258.    Plaintiff States incorporate the allegations of the preceding paragraphs by

22   reference.

23        259.    Article I, Section 1 of the United States Constitution enumerates that "[a]ll

24   legislative Powers herein granted shall be vested in [the] Congress."  Article I, Section 8 of the

25   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
26        [133] CBP, *Border Fencing - New Mexico/West Texas* (June 2011),
     https://tinyurl.com/y24zbfb4.
27        [134] Lauren Villagran, *Land That Time Forgot*, Albuquerque J. (Apr. 30, 2017),
     https://tinyurl.com/mxqht6r.
28        [135] U.S. Fish & Wildlife Serv., *Jaguar (Panthera onca)*, https://tinyurl.com/y6qpjdjl (last
     visited Feb. 17, 2019); 79 Fed. Reg. 12571 (Mar. 5, 2014).

1    United States Constitution vests exclusively in Congress the spending power to "provide for

2    the . . . General Welfare of the United States."

3        260.    Article I, Section 7, Clause 2 of the United States Constitution, known as the

4    Presentment Clause, requires that all bills passed by the House of Representatives and the Senate

5    be presented to the President for signature.  The President then has the choice to sign or veto the

6    bill.  Article II, Section 3 of the United States Constitution requires that the President "shall take

7    Care that the Laws be faithfully executed."

8        261.    The President acts at the lowest ebb of his power if he acts contrary to the

9    expressed or implied will of Congress.  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579,

10   637 (1952) (Jackson, J., concurring).  Moreover, there is no provision in the United States

11   Constitution that authorizes the President to enact, amend, or repeal statutes, including

12   appropriations already approved by Congress and signed into law by the President.  *Clinton v.*

13   *City of New York*, 524 U.S. 417, 438 (1998).

14       262.    Defendants have violated the United States Constitution's separation of powers

15   doctrine by taking executive action to fund a border wall for which Congress has refused to

16   appropriate funding.  The 2019 Appropriations Act is an explicit denial of the President's

17   requested funding for a border wall.  Defendants have further violated the separation of powers

18   doctrine—specifically the Presentment Clause—by unilaterally diverting funding that Congress

19   already appropriated for other purposes to fund a border wall for which Congress has provided no

20   appropriations.

21       263.    For the reasons stated herein, Plaintiffs are entitled to a declaration that

22   Defendants' diversion of funding toward the construction of a border wall is unconstitutional, and

23   the Court should enjoin Defendants' implementation of the President's Executive Actions.

24                              **SECOND CLAIM FOR RELIEF**

25                         **VIOLATION OF APPROPRIATIONS CLAUSE**

26       264.    Plaintiff States incorporate the allegations of the preceding paragraphs by

27   reference.

28       265.    Article I, Section 9, Clause 7, known as the Appropriations Clause, provides that

1   "[n]o Money shall be drawn from the treasury, but in Consequence of Appropriations made by

2   Law."  The Appropriations Clause is a "straightforward and explicit command" that "no money

3   can be paid out of the Treasury unless it has been appropriated by an act of Congress."  *Office of*

4   *Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (quoting *Cincinnati Soap Co. v. United*

5   *States*, 301 U.S. 308, 321 (1937)).

6        266.    Congress has not authorized or appropriated the funding that President Trump has

7   declared he will use towards the construction of a border wall.  Defendants have therefore

8   violated the Appropriations Clause by funding construction of the border wall with funds that

9   were not appropriated for that purpose.

10        267.    For the reasons stated herein, Plaintiffs are entitled to a declaration that

11   Defendants' diversion of funding toward the construction of a border wall is unconstitutional, and

12   the Court should enjoin Defendants' implementation of the President's Executive Actions.

13                              **THIRD CLAIM FOR RELIEF**

14                                    **ULTRA VIRES**

15        268.    Plaintiff States incorporate the allegations of the preceding paragraphs by

16   reference.

17        269.    Neither the President nor an agency can take any action that exceeds the scope of

18   their constitutional and/or statutory authority.

19        270.    The President has acted ultra vires in seeking to divert funding pursuant to the

20   National Emergencies Act because no emergency exists to warrant the invocation of that statute.

21        271.    In addition, Defendants have acted ultra vires in seeking to divert funding pursuant

22   to 10 U.S.C. section 2808 for failure to meet the criteria required under that statute.  The

23   construction of the border wall: (a) is not a "military construction project"; (b) does not "require[]

24   use of the armed forces"; and (c) is not "necessary to support such use of the armed forces."

25        272.    Defendants have acted ultra vires in seeking to divert funding pursuant to 10

26   U.S.C. section 284 for failure to meet the criteria required under that statute.  The construction of

27   the border wall: (a) does not constitute the construction of a road or fence; and (b) does not assist

28   the blocking of "drug smuggling corridors."

273.     Defendants have acted ultra vires in seeking to divert funding pursuant to 31 U.S.C. section 9705 for failure to meet the criteria required under that statute.

274.     For the reasons stated herein, Plaintiffs are entitled to a declaration that Defendants' diversion of funding toward the construction of a border wall is unlawful, and the Court should enjoin Defendants' implementation of the President's Executive Actions.

**FOURTH CLAIM FOR RELIEF**

**VIOLATION OF NATIONAL ENVIRONMENTAL POLICY ACT**

**(For Plaintiff States California and New Mexico)**

275.     Plaintiff States incorporate the allegations of the preceding paragraphs by reference.

276.     Defendant DHS is an "agency" under the APA, 5 U.S.C. § 552(1).

277.     Defendant DHS has taken final agency action by proposing southern border wall development projects in "high priority" areas and has identified specific projects along the border in the El Centro, San Diego, and El Paso Sectors.[136]

278.     Defendants, through the Executive Actions, have taken steps to divert federal funding and other resources for those southern border wall construction projects.

279.     NEPA compels federal agencies such as Defendant DHS to evaluate and consider the direct, indirect and cumulative effects that a proposed development project or program will have on the environment by requiring the agency to prepare an EIS that analyzes a reasonable range of alternatives and compares each alternative's environmental impacts.  40 C.F.R. §§ 1502.16, 1508.7, 1508.8, l508.27(b)(7).  The EIS must also include an analysis of the affected areas and resources and the environmental consequences of the proposed action and the alternatives.  40 C.F.R. §§ 1502.10- 1502.19.  The agency must commence preparation of the EIS "as close as possible to the time that the agency is developing or is presented with a proposal" so that the environmental effects of each alternative can be evaluated in a meaningful way.  40

---

[136] The proposed projects are not located within areas covered by any existing waiver issued by DHS pursuant to section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act (8 U.S.C. § 1103 note).  84 Fed. Reg. 2897 (February 8, 2019); 83 Fed. Reg. 3012 (January 22, 2018); 82 Fed. Reg. 42829 (September 12, 2017); 82 Fed. Reg. 35984 (August 2, 2017).

1   C.F.R. § 1502.23.

2       280.    Defendant DHS is in violation of NEPA and the APA because it failed to prepare

3   an EIS concerning border wall development projects that will have adverse effects on the

4   environment, including but not limited to direct, indirect and cumulative impacts on plant and

5   animal species that are listed as endangered or threatened under the Endangered Species Act

6   and/or California Endangered Species Act.

7       281.    The imminency of this action is shown by the Trump Administration's expression

8   of its intent to move quickly with the construction of the border wall, with a senior advisor to the

9   White House reportedly saying that the Administration will proceed with construction at a speed

10  that will "shock" people.[137]  In addition, during his speech announcing the Emergency

11  Declaration, President Trump spoke of his desire to build the wall "much faster" that he could

12  otherwise.[138]

13      282.    The States of California and New Mexico have concrete and particularized

14  interests in the protection of their own proprietary interests near the border as well as the

15  protection of natural, historical, cultural, economic, and recreational resources within their

16  jurisdictional boundaries.  Defendants' failure to comply with NEPA and the APA injures and

17  denies California's and New Mexico's procedural rights necessary to protect these interests.

18                          **PRAYER FOR RELIEF**

19      WHEREFORE, Plaintiff States respectfully request that this Court enter judgment in their

20  favor, and grant the following relief:

21      1.      Issue a judicial declaration that the Executive Actions' diversion of federal funds

22  toward construction of a border wall is unconstitutional and/or unlawful because it: (a) violates

23  the separation of powers doctrine; (b) violates the Appropriations Clause; and (c) exceeds

24  congressional authority conferred to the Executive Branch and is ultra vires;

25      2.      The States of California and New Mexico seek a judicial declaration that

26  Defendants violated NEPA and the APA and further seek an order enjoining DHS, requiring it to

27  _____

[137] Rachael Bade et al., *'A Recipe for Disaster'? Trump's Border Emergency Drags the GOP into a Risky Fight Ahead of 2020*, Wash. Post (Feb. 15, 2019), https://tinyurl.com/y4l3lu99.

28  [138] White House, *President Trump's Feb. 15, 2019, Remarks*, *supra* note 50.

comply with NEPA and the APA—including preparing an EIS—before taking any further action pursuant to the Executive Actions;

3. Permanently enjoin Defendants from constructing a border wall without an appropriation by Congress for that purpose;

4. Permanently enjoin Defendants from diverting federal funding toward construction of a border wall; and

5. Grant such other relief as the Court may deem just and proper.

Dated: February 18, 2019                                 Respectfully submitted,

XAVIER BECERRA
Attorney General of California
ROBERT W. BYRNE
SALLY MAGNANI
MICHAEL L. NEWMAN
Senior Assistant Attorneys General
MICHAEL P. CAYABAN
CHRISTINE CHUANG
EDWARD H. OCHOA
Supervising Deputy Attorneys General

/s/ Lee Sherman
LEE I. SHERMAN (SBN 272271)
HEATHER C. LESLIE
JANELLE M. SMITH
JAMES F. ZAHRADKA II
Deputy Attorneys General
 300 S. Spring St., Suite 1702
 Los Angeles, CA 90013
 Telephone: (213) 269-6404
 Fax: (213) 897-7605
 E-mail: Lee.Sherman@doj.ca.gov
*Attorneys for Plaintiff State of California*

54

1   Philip J. Weiser
Attorney General of Colorado

WILLIAM TONG
Attorney General of Connecticut

2

3   /s/ Eric R. Olson
Eric R. Olson (*pro hac vice pending*)
Solicitor General

/s/ Margaret Q. Chapple
MARGARET Q. CHAPPLE (*pro hac vice forthcoming*)
Deputy Attorney General

4   *Attorneys for Plaintiff the State of Colorado*

55 Elm Street

5

Hartford, CT 06106

6

Telephone: (860) 808-5316
Margaret.chapple@ct.gov

7

*Attorneys for Plaintiff State of Connecticut*

8

9   KATHLEEN JENNINGS
Attorney General of Delaware
AARON R. GOLDSTEIN

CLARE E. CONNORS
Attorney General of Hawaii

10   Chief Deputy Attorney General
ILONA KIRSHON

/s/ Clyde J. Wadsworth
CLYDE J. WADSWORTH

11   Deputy State Solicitor

Solicitor General
Department of the Attorney General

12   /s/ David J. Lyons
DAVID J. LYONS

425 Queen Street
Honolulu, Hawaii 96813

13   Deputy Attorney General
*Attorneys for Plaintiff State of Delaware*

Telephone: (808) 586-1360
E-mail: Clyde.J.Wadsworth@hawaii.gov

14

*Attorneys for Plaintiff State of Hawaii*

15

16   KWAME RAOUL
Attorney General

BRIAN E. FROSH
Attorney General of Maryland

17   State of Illinois
100 West Randolph Street, 12th Floor

/s/ Jeffrey P. Dunlap

18   Chicago IL 60601

Jeffrey P. Dunlap (*pro hac vice forthcoming*)
Assistant Attorney General

19   By: /s/ Caleb Rush
Caleb Rush

200 Saint Paul Place, 20th Floor
Baltimore, MD 21202

20       Assistant Attorney General
David L. Franklin,  Solicitor General

(410) 576-6300
jdunlap@oag.state.md.us

21   100 West Randolph Street, 12th Floor
Chicago IL 60601

*Attorneys for Plaintiff State of Maryland*

22   (312) 814-5376
crush@atg.state.il.us

23   *Attorneys for Plaintiff State of Illinois*

24

25

26

27

28

55

Complaint for Declaratory and Injunctive Relief

1  AARON M. FREY                                    Dana Nessel
   ATTORNEY GENERAL OF MAINE                        Michigan Attorney General
2  SUSAN P. HERMAN (*pro hac vice pending*)         P.O. Box 30212
   Deputy Attorney General                          Lansing, Michigan 48909
3  6 State House Station
   Augusta, Maine 04333-0006                        /s/ B. Eric Restuccia
4  Telephone: (207) 626-8814                        Assistant Attorney General B. Eric Restuccia
   Email: susan.herman@maine.gov                    (P49550) (pro hac vice pending)
5  *Attorneys for Plaintiff State of Maine*         Solicitor General Fadwa A. Hammoud
                                                    *Attorneys for Plaintiff State of Michigan*
6

7  KEITH ELLISON
   Attorney General of Minnesota
8  JOHN KELLER                                      AARON D. FORD
   Chief Deputy Attorney General                    Attorney General of Nevada
9  JAMES W. CANADAY
   Deputy Attorney General                          /s/ Heidi Parry Stern
10                                                  HEIDI PARRY STERN
                                                    Solicitor General
11 */s/ Jacob Campion*                              Office of the Nevada Attorney General
   JACOB CAMPION (*pro hac vice forthcoming*)       100 North Carson Street
12 Assistant Attorney General                       Carson City, Nevada 89701-4717
   445 Minnesota Street, Suite 1100                 775-684-1100
13 St. Paul, Minnesota 55101-2128                   775-684-1108 Fax
   Telephone: (651) 757-1459                        *Attorneys for Plaintiff State of Nevada*
14 Email: jacob.campion@ag.state.rnn.us
15 *Attorneys for Plaintiff State of Minnesota*

16 GURBIR S. GREWAL                                 HECTOR BALDERAS
   Attorney General of New Jersey                   Attorney General of New Mexico
17
   /s/ Jeremy Feigenbaum                            /s/ Tania Maestas
18 JEREMY FEIGENBAUM                                TANIA MAESTAS (*pro hac vice forthcoming*)
   Assistant Attorney General                       Chief Deputy Attorney General
19 New Jersey Attorney General's Office             NICHOLAS M. SYDOW
   Richard J. Hughes Justice Complex                Civil Appellate Chief
20 25 Market Street                                 JENNIE LUSK
   Trenton, NJ 08625                                Assistant Attorney General, Director
21 (609) 376-3235                                   MATTHEW L. GARCIA
   Jeremy.Feigenbaum@njoag.gov                      Governor's General Counsel
22 *Attorneys for Plaintiff State of New Jersey*    PO Drawer 1508
                                                    Santa Fe, New Mexico  87504-1508
23                                                  E-mail:  tmaestas@nmag.gov
                                                    *Attorneys for Plaintiff State of New Mexico,*
24                                                  *by and through Attorney General Hector Balderas*

25

26

27

28

                                   56

1  LETITIA JAMES
   Attorney General of the State of New York
2

3  By: /s/ *Matthew Colangelo*
   Matthew Colangelo
4    *Chief Counsel for Federal Initiatives*
   Steven C. Wu, *Deputy Solicitor General*
5  Eric R. Haren, *Special Counsel*
   Gavin McCabe, *Special Assistant Attorney*
6  *General*
7  Amanda Meyer, *Assistant Attorney General*
   Office of the New York State Attorney General
8  28 Liberty Street
   New York, NY 10005
9  Phone: (212) 416-6057
10 matthew.colangelo@ag.ny.gov
   *Attorneys for the State of New York*
11
   MARK R. HERRING
12 Attorney General
   TOBY J. HEYTENS
13   Solicitor General
       Counsel of Record
14 MATTHEW R. MCGUIRE
     Principal Deputy
15       Solicitor General
16
   /s/ Michelle S. Kallen
17 MICHELLE S. KALLEN
     Deputy Solicitor General
18 BRITTANY M. JONES (*pro hac vice*
   *forthcoming*)
19   Attorney
   Office of the Attorney General
20 202 North Ninth Street
   Richmond, Virginia 23219
21 (804) 786-7240 – Telephone
   (804) 371-0200 – Facsimile
22 SolicitorGeneral@oag.state.va.us
23 *Attorney for Plaintiff Commonwealth of*
   *Virginia*
24

25

26

27

28

ELLEN ROSENBLUM
Attorney General of Oregon
Henry Kantor (*pro hac vice pending*)
Special Counsel to Attorney General

/s/ J. Nicole Defever
J. NICOLE DEFEVER SBN #191525
Senior Assistant Attorney General
*Attorney for the State of Oregon*

57