1  XAVIER BECERRA
   Attorney General of California
2  ROBERT W. BYRNE
   SALLY MAGNANI
3  MICHAEL L. NEWMAN
   Senior Assistant Attorneys General
4  MICHAEL P. CAYABAN
   CHRISTINE CHUANG
5  EDWARD H. OCHOA
   Supervising Deputy Attorneys General
6  HEATHER C. LESLIE
   LEE I. SHERMAN
7  JANELLE M. SMITH
   JAMES F. ZAHRADKA II (SBN 196822)
8  Deputy Attorneys General
    1515 Clay Street, 20th Floor
9   Oakland, CA  94612-0550
    Telephone: (510) 879-1247
10 E-mail:  James.Zahradka@doj.ca.gov
   *Attorneys for Plaintiff State of California*

11

12                IN THE UNITED STATES DISTRICT COURT

13             FOR THE NORTHERN DISTRICT OF CALIFORNIA

14                        OAKLAND DIVISION

15

16

17 **STATE OF CALIFORNIA; STATE OF**          Case No. 4:19-cv-00872-HSG
   **COLORADO; STATE OF**
18 **CONNECTICUT; STATE OF**
   **DELAWARE; STATE OF HAWAII;**
19 **STATE OF ILLINOIS; STATE OF**             **FIRST AMENDED COMPLAINT FOR**
   **MAINE; STATE OF MARYLAND;**               **DECLARATORY AND INJUNCTIVE**
20 **COMMONWEALTH OF**                         **RELIEF**
   **MASSACHUSETTS; ATTORNEY**
21 **GENERAL DANA NESSEL ON BEHALF**
   **OF THE PEOPLE OF MICHIGAN;**
22 **STATE OF MINNESOTA; STATE OF**
   **NEVADA; STATE OF NEW JERSEY;**
23 **STATE OF NEW MEXICO; STATE OF**
   **NEW YORK; STATE OF OREGON;**
24 **STATE OF RHODE ISLAND; STATE OF**
   **VERMONT; COMMONWEALTH OF**
25 **VIRGINIA; and STATE OF WISCONSIN**;

                                             Plaintiffs,
26

27              **v.**

28

---

1  **DONALD J. TRUMP,** in his official capacity
2  as President of the United States of America;
   **UNITED STATES OF AMERICA; U.S.**
3  **DEPARTMENT OF DEFENSE; PATRICK**
   **M. SHANAHAN**, in his official capacity as
4  Acting Secretary of Defense; **MARK T.**
   **ESPER**, in his official capacity as Secretary of
5  the Army; **RICHARD V. SPENCER**, in his
   official capacity as Secretary of the Navy;
6  **HEATHER WILSON**, in her official capacity
7  as Secretary of the Air Force; **U.S.**
   **DEPARTMENT OF THE TREASURY;**
8  **STEVEN T. MNUCHIN**, in his official
   capacity as Secretary of the Treasury; **U.S.**
9  **DEPARTMENT OF THE INTERIOR;**
   **DAVID BERNHARDT,** in his official capacity
10 as Acting Secretary of the Interior; **U.S.**
   **DEPARTMENT OF HOMELAND**
11 **SECURITY; KIRSTJEN M. NIELSEN**, in
12 her official capacity as Secretary of Homeland
   Security;
13
                                          Defendants.
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**INTRODUCTION**

1.      The States of California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, Wisconsin, the Commonwealths of Massachusetts and Virginia, and Attorney General Dana Nessel on behalf of the People of Michigan (collectively, "Plaintiff States"), bring this action to protect their residents, natural resources, and economic interests from President Donald J. Trump's flagrant disregard of fundamental separation of powers principles engrained in the United States Constitution.  Contrary to the will of Congress, the President has used the pretext of a manufactured "crisis" of unlawful immigration to declare a national emergency and redirect federal dollars appropriated for drug interdiction, military construction, military personnel, and law enforcement initiatives toward building a wall on the United States-Mexico border.  This includes the diversion of funding that each of the Plaintiff States receive. Defendants must be enjoined from carrying out President Trump's unconstitutional and unlawful scheme.

2.      President Trump has veered the country toward a constitutional crisis of his own making.  For years, President Trump has repeatedly stated his intention to build a wall across the United States-Mexico border.  Congress has repeatedly rebuffed the President's insistence to fund a border wall, recently resulting in a record 35-day partial government shutdown over the border wall dispute.[1]  After the government reopened, Congress approved, and the President signed into law, a $1.375 billion appropriation for fencing along a specific stretch of the southern border, but Congress made clear that funding could not be used to build President Trump's proposed border wall.

3.      After an agreement was reached on the spending bill to prevent another government shutdown, on February 15, 2019, President Trump declared an intention to redirect federal funds toward the construction of a border wall.  On the same day, the Administration

---

[1] References to "border wall" in this First Amended Complaint ("Complaint") refer to any barrier or border-related infrastructure and/or project relating to the construction of a barrier or border-related infrastructure along the southern border that President Trump has called for and has not been approved by Congress.

1

announced an executive action ("Executive Action") to make up to $6.7 billion in additional funding available for construction of the border wall, including through the declaration of a national emergency under the National Emergencies Act ("Emergency Declaration," combined with the "Executive Action," the "Executive Actions").

4.      Use of those additional federal funds for the construction of a border wall is contrary to Congress's intent in violation of the U.S. Constitution, including the Presentment Clause and Appropriations Clause.  This use would divert funding that has been appropriated to support Plaintiff States' law enforcement and counter-drug programming efforts, as well as military construction and other Department of Defense projects in Plaintiff States, for the non-appropriated purpose of constructing a border wall.  Even if the Administration could constitutionally redirect funds toward the construction of the border wall, the Administration does not satisfy the criteria in the statutes that it invokes to enable it to do so.  In addition, Defendants' actions to divert funding from state and local law enforcement, military construction, and other appropriated Department of Defense projects toward a border wall for which funding has not been appropriated by Congress is arbitrary and capricious and exceeds Defendants' authority in violation of the Administrative Procedure Act ("APA").

5.      If the Administration were to use the funding sources identified in the Executive Actions for the purpose of building a border wall, Plaintiff States collectively stand to lose millions of dollars in federal funding that their national guard units receive for domestic drug interdiction and counter-drug activities, and millions of dollars received on an annual basis for law enforcement programs from the Treasury Forfeiture Fund, harming the public safety of Plaintiff States.  The redirection of funding from authorized military construction and other Department of Defense projects located in Plaintiff States will cause damage to their economies. Plaintiff States will face harm to their proprietary interests by the diversion of funding from military construction projects or military pay for the States' national guard units.  And the diversion of any funding toward construction of a wall along California's and New Mexico's southern borders will cause irreparable environmental damage to those States' natural resources.

2

6.      There is also no objective basis for President Trump's Emergency Declaration.  By the President's own admission, an emergency declaration is not necessary.  The federal government's own data prove there is no national emergency at the southern border that warrants construction of a wall.  U.S. Customs and Border Protection ("CBP") data show that unlawful entries are well below historic highs set nearly two decades ago.  Border Patrol staffing and budgets have markedly increased in recent years, and undetected unlawful entries have plummeted; the Trump Administration itself has claimed that it is more difficult to illegally cross the southern border today than ever before.  The U.S. State Department and intelligence agencies recognize that there is a lack of credible evidence that terrorists are using the southern border to enter the United States.  Federal data confirm that immigrants are less likely to commit violent crimes than native-born Americans.  CBP data demonstrate that dangerous drugs are much more likely to be smuggled through, not between, official ports of entry—rendering a border wall ineffectual at preventing their entry into this country.

7.      Notwithstanding the illegality of and wholesale lack of necessity for the Emergency Declaration, the Trump Administration has expressed its intent to move quickly with the construction of the border wall.  Many contracts are close to being signed.  A senior advisor to the White House reportedly said the Administration will proceed with construction at a speed that will "shock" people.  The thwarting of congressional intent to fund a vanity project that not only will fail to safeguard national security, but is positioned to cause significant harm to the public safety, public fisc, environment, and well-being of Plaintiff States and their residents, cries out for judicial intervention.

8.      For these reasons, and those discussed below, the Court should declare that the Executive Actions directing the diversion of federal funds and other resources for border wall construction are unlawful and unconstitutional, and enjoin Defendants from taking any action in furtherance of President Trump's Executive Actions.

**JURISDICTION AND VENUE**

9.      This Court has jurisdiction because this action arises under the United States Constitution and the laws of the United States.  Jurisdiction is proper under the judicial review

3

1    provisions of the APA, 5 U.S.C. sections 701-06.  This Court also has jurisdiction under 28

2    U.S.C. sections 1331 and 2201.

3         10.    An actual, present, and justiciable controversy exists between the parties within the

4    meaning of 28 U.S.C. section 2201(a), and this Court has authority to grant declaratory and

5    injunctive relief under 28 U.S.C. sections 2201 and 2202.

6         11.    Venue is proper in this judicial district under 28 U.S.C. section 1391(e) because

7    the California Attorney General and the State of California have offices at 455 Golden Gate

8    Avenue, San Francisco, California and at 1515 Clay Street, Oakland, California, and therefore

9    reside in this district, and no real property is involved in this action.  This is a civil action in

10   which Defendants are agencies of the United States or officers of such an agency.

11        12.    Assignment to the San Francisco Division of this District is proper pursuant to

12   Civil Local Rule 3-2(c)-(d) and 3-5(b) because Plaintiff State of California and Defendant United

13   States both maintain offices in the District in San Francisco.

14                                      **PARTIES**

15                           **PLAINTIFF STATE OF CALIFORNIA**

16        13.    The State of California, represented by and through its Attorney General, is a

17   sovereign state of the United States of America.

18        14.    Attorney General Xavier Becerra is the chief law officer of the State of California

19   and has the authority to file civil actions to protect California's rights and interests, the

20   environment, and the natural resources of this State.  Cal. Const., art. V, § 13; Cal. Gov't Code

21   §§ 12511, 12600-12.  This challenge is brought pursuant to the Attorney General's independent

22   constitutional, common law, and statutory authority.

23        15.    As head of the California Department of Justice, Cal. Gov't Code section 12510,

24   Attorney General Becerra also has standing to bring this action because funding for law

25   enforcement throughout the State is at stake.  *See Pierce v. Sup. Ct.*, 1 Cal. 2d 759, 761-62 (1934)

26   (Attorney General "has the power to file any civil action or proceeding directly involving the

27   rights and interests of the state . . . and the protection of public rights and interest.").

28

4

16.    Governor Gavin Newsom is the chief executive officer of the State.  The Governor is responsible for overseeing the operations of the State and ensuring that its laws are faithfully executed.  As the leader of the executive branch, the Governor is the chief of California's executive branch agencies, including those whose injuries are discussed in this Complaint.  Cal. Const., art. V, § 1.  Governor Newsom is the Commander-in-Chief of the California National Guard.  Cal. Const., art. V, § 7; Cal. Mil. & Vet. Code § 550 et seq.

17.    California, as one of several affected states located within President Trump's declared "national emergency" southern border area, has an interest in ensuring public safety within its borders and protecting its economic interests and the rights of its residents.  California shares over 140 miles of its southern border with Mexico.[2]  The orderly flow of goods and people across the border is a critical element in California's success as the fifth-largest economy in the world.

18.    California is aggrieved by the actions of Defendants and has standing to bring this action because of the injury due to the loss of federal drug interdiction, counter-narcotic, and law-enforcement funding to the State caused by Defendants' diversion of funding and resources.

19.    The threat of losing funding to conduct drug interdiction and counter-narcotic activity prevents California from moving forward with critical criminal narcotics programs and threatens the public safety of all Californians.  The diversion of funding from the Treasury Forfeiture Fund will harm public safety by impacting critically necessary funding for law enforcement officers and their agencies.

20.    California is aggrieved by the actions of Defendants and has standing to bring this action because of the injury to the State and its residents caused by Defendants' reduction of federal defense spending in California due to diversion of funding to the border wall.

21.    California has an interest in protecting the economic health and well-being of its residents.  *Alfred L. Snapp & Son, Inc. v. Puerto Rico* ex rel. *Barez*, 458 U.S. 592, 607 (1982).

---

[2] Janice Cheryl Beaver, *U.S. International Borders: Brief Facts*, Cong. Res. Serv. (Nov. 9, 2006), https://tinyurl.com/y49jq9vv.

22.     California has an interest in preventing the diminution of specific tax revenues caused by reduced construction on California military installations and the corresponding reduction in economic activity. *Wyoming v. Oklahoma*, 502 U.S. 437, 448-50 (1992).

23.     California has an interest in its exercise of sovereign power over individuals and entities within the State, including enforcement of its legal code. *Snapp*, 458 U.S. at 601; *Hawaii v. Trump*, 859 F.3d 741, 765 (9th Cir. 2017), *rev'd on other grounds*, 138 S. Ct. 2392 (2018).

24.     The diversion of military construction and other Department of Defense funding for projects supporting or used by California's National Guard units harms the State.  Any diversion of military funding intended for the California National Guard harms the State as well.

25.     The diversion of military construction funding from projects in California will harm California's economy.

26.     The State would suffer economic harm from diversion of funding from military construction projects on California bases.  More defense contractor funding is spent in California than in any other state, and such funding generates significant state and local tax revenues, employment, and economic activity.

27.     California has an interest in the natural resources of this State—such as wildlife, fish, and water—that are held in trust by the State for its residents and are protected by state and federal laws. *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1178 (9th Cir. 2011).

28.     In the areas of California's borderlands where construction of a border wall will take place, dozens of sensitive plant and animal species that are listed as "endangered," "threatened," or "rare" will be seriously at risk.

29.     Defendants' diversion of funding and resources to construct a wall along the southern border will create environmental harm and deprive California of its procedural right to protect its public trust resources.

30.     Defendants' unconstitutional actions undermine California's sovereignty and harm the State through their effects on California residents, businesses, and the environment.

### PLAINTIFF STATE OF COLORADO

31.     The State of Colorado is a sovereign state of the United States of America.

6

32.     The State of Colorado brings this action by and through its Attorney General, Philip J. Weiser.  The Attorney General has authority to represent the State, its departments, and its agencies, and "shall appear for the state and prosecute and defend all actions and proceedings, civil and criminal, in which the state is a party."  Colo. Rev. Stat. § 24-31-101.

33.     The State of Colorado will suffer injury because of the actions of Defendants and has standing to bring this action for at least three reasons.

34.     First, Defendants intend to fund the wall using money from the Pentagon's drug interdiction program, which will likely impact funding to Colorado and affect Colorado's ability to address drugs illegal under state law in Colorado.

35.     Second, Colorado is home to many major military bases, including the Air Force Academy, Buckley Air Force Base, Cheyenne Mountain Air Force Base, Peterson Air Force Base, Schriever Air Force Base, and Fort Carson Army Base.  These military bases play a critical role in our nation's defense and to the economy of the State of Colorado.  The use of funding for a southern border wall rather than for necessary maintenance and repairs to these military bases harms Colorado and its economy.

36.     Third, Colorado has received money from the Treasury Forfeiture Fund in the past, and expects to receive comparable monies in the future absent diversion to fund the construction of a wall.  According to audits of the Treasury Forfeiture Fund, in 2018, Colorado received $877,000 in equitable sharing from the Treasury Forfeiture Fund; in 2017, Colorado received $316,000; in 2016, Colorado received $303,000; in 2015, Colorado received $1,746,000; and in 2014, Colorado received $228,000.

**PLAINTIFF STATE OF CONNECTICUT**

37.     The State of Connecticut, represented by and through its Attorney General, is a sovereign state of the United States of America.

38.     Attorney General William Tong is the chief legal officer of the State of Connecticut and has the authority to file civil actions to protect Connecticut's rights and interests.  Conn. Const., art. IV, § 4; Conn. Gen. Stat. §§ 3-124 et seq.  This challenge is brought pursuant to

7

1  the Attorney General's authority and responsibility to protect Connecticut's sovereign, quasi-

2  sovereign, and proprietary interests.

3      39.    Governor Ned Lamont is the chief executive officer of the State.  The Governor is

4  responsible for overseeing the operations of the State and ensuring that its laws are faithfully

5  executed.  As the leader of the executive branch, the Governor is the chief of Connecticut's

6  executive branch agencies, including those whose injuries are discussed in this Complaint.  Conn.

7  Const. art IV, § 5.

8      40.    On information and belief, Connecticut is aggrieved by the actions of Defendants

9  and has standing to bring this action because of the injury caused by Defendants' unlawful and

10  unconstitutional diversion of funding from military construction projects in Connecticut to

11  construction of a border wall in Texas, Arizona, New Mexico, and California.  Defendants'

12  actions will hurt Connecticut's economy and, by damaging the State's critical security

13  infrastructure, threaten the safety of Connecticut's National Guard and of all Connecticut

14  residents.

15      41.    Further, on information and belief, Defendants' diversion of funding aimed at drug

16  interdiction and counter-narcotic activity threatens to hurt the State's law enforcement agencies

17  and compromise the public safety of all Connecticut residents.  Connecticut has received and—

18  absent the unlawful and unconstitutional actions of Defendants—intends to continue to receive

19  equitable sharing funding through the Treasury Forfeiture Fund.  Defendants' diversion of that

20  funding threatens the budgets of Connecticut law enforcement agencies and the public safety of

21  all Connecticut residents.

22                                **PLAINTIFF STATE OF DELAWARE**

23      42.    The State of Delaware, represented by and through its Attorney General, is a

24  sovereign state of the United States of America.

25      43.    Attorney General Kathleen Jennings is the chief legal officer of the State of

26  Delaware and has the authority to file civil actions to protect Delaware's rights and the rights of

27  Delaware citizens.  29 Del. C. § 2504.  The Attorney General's powers and duties include

28  litigating matters in our nation's federal courts on matters of public interest.  The Attorney

8

1  General has the authority to file suit to challenge action by the federal government that threatens

2  the public interest and welfare of Delaware residents as a matter of constitutional, statutory, and

3  common law authority.

4       44.    Governor John Carney is the chief executive officer of the State of Delaware.  The

5  Governor is responsible for overseeing the operations of the State of Delaware and is required to

6  take care that Delaware's laws be faithfully executed.  Del. Const., Art. III, §§ 1, 8.

7       45.    Delaware is aggrieved by the actions of Defendants and has standing to bring this

8  action because of the injury due to loss of federal funding to the State caused by Defendants'

9  unconstitutional and unlawful diversion of funding discussed herein.

10      46.    Defendants have and intend to continue to misappropriate equitable sharing funds

11  gained through forfeiture of assets in the context of Delaware's enforcement of state and federal

12  law.  As such, Delaware will be deprived of such funds that are owed to it to carry on law

13  enforcement activities.

14      47.    Delaware has received money from the Treasury Forfeiture Fund in the past, and

15  expects to receive comparable monies in the future absent diversion to fund the construction of a

16  wall.  According to audits of the Treasury Forfeiture Fund, in 2018, Delaware received more than

17  $1.3 million in equitable sharing from the Treasury Forfeiture Fund; in 2017, Delaware received

18  $349,045; in 2016, Delaware received more than $1.2 million; in 2015, Delaware received

19  $331,134; and in 2014, Delaware received more than $2.5 million.  These resources are used to

20  supplement and enhance law enforcement agencies' state-appropriated funding.

21      48.    With a federally funded budget of over $1 million, any diversion of annual federal

22  funding intended for the Delaware National Guard's drug interdiction programs will harm

23  Delaware given the success of such programs resulting in the annual confiscation of illegal drugs

24  and by and through the support it provides to state and local law enforcement agencies for this

25  purpose.

26      49.    Defendants' unlawful and unconstitutional diversion of funds away from projects

27  authorized and appropriated for disbursement and use within the State of Delaware will cause it

28  injury in fact, which is traceable to Defendants' conduct as set forth herein.

9

**PLAINTIFF STATE OF HAWAII**

50.     The State of Hawaii, represented by and through its Attorney General, is a sovereign state of the United States of America.

51.     Attorney General Clare E. Connors is the chief legal officer of the State of Hawaii and has authority to appear, personally or by deputy, for the State of Hawaii in all courts, criminal or civil, in which the State may be a party or be interested.  Haw. Rev. Stat. § 28-1.  The Department of the Attorney General has the authority to represent the State in all civil actions in which the State is a party.  *Id.* § 26-7.  This challenge is brought pursuant to the Attorney General's constitutional, statutory, and common law authority.  *See* Haw. Const. art. V, § 6; Haw. Rev. Stat. Chapter 28; Haw. Rev. Stat. § 26-7.

52.     As the chief law enforcement officer of the State of Hawaii, the Attorney General has ultimate responsibility for enforcing the penal laws of the State, and thus has a strong interest in protecting public safety.  Haw. Rev. Stat. §§ 28-2 & 28-2.5; *Amemiya v. Sapienza*, 629 P.2d 1126, 1129 (Haw. 1981).

53.     Hawaii has an interest in its exercise of sovereign power over individuals and entities within the State, including the enforcement of its legal code.

54.     Hawaii is aggrieved by the actions of Defendants and has standing to bring this action because of the injury due to the loss of federal drug interdiction, counter-narcotic, and law enforcement funding to the State caused by Defendants' diversion of funds.

55.     Hawaii participates in federally-funded drug interdiction and counter-narcotic programs, such as the National Guard Counterdrug Program.  Diversion of this funding will reduce the funds available to Hawaii for accomplishing critical drug interdiction and counter-narcotic efforts, and will therefore threaten public safety in Hawaii.

56.     State and local law enforcement agencies in Hawaii have received funds from the Treasury Forfeiture Fund in the past and anticipate doing so again in the future.  Unless diverted, these funds would be available to Hawaii's state and local law enforcement agencies.  Diversion of funding therefore will harm public safety by reducing the availability of critical funds for state and local law enforcement officers and their agencies.

10

57.     Hawaii is aggrieved by the actions of Defendants, including Defendants' diversion of funds, and has standing to bring this action because of the injury to the State and its residents caused by the reduction of federal defense spending in Hawaii.

58.     Hawaii has an interest in protecting its State economy and the economic health and well-being of its residents.

59.     Diversion of funding from military construction projects in Hawaii will harm the State and its residents by injuring Hawaii's economy.  Defense spending, which includes military construction projects, is the second-largest segment of Hawaii's economy and, as of 2017, represents 7.2 percent of the State's Gross Domestic Product—the second highest percentage in the nation.  Hawaii has several major military installations, including Joint Base Pearl Harbor-Hickam, Schofield Barracks, Fort Shafter, Marine Corps Base Hawaii (Kaneohe Bay), Camp Smith, Tripler Army Medical Center, Wheeler Army Airfield, and the Pacific Missile Range Facility at Barking Sands.  On information and belief, Hawaii is subject to losing in excess of $311 million in military construction funds.

60.     Defense spending in Hawaii contributes to economic activity, employment, and increased tax revenues, all of which would be harmed if that funding is diverted, thereby injuring the State of Hawaii.  As of 2017, defense spending injects $6.4 billion into Hawaii's economy, is responsible for 58,625 jobs, and accounts for $4.6 billion in total payroll (and the associated income tax revenue).

**PLAINTIFF STATE OF ILLINOIS**

61.     The State of Illinois is a sovereign state of the United States of America.

62.     This action is being brought on behalf of the State by Attorney General Kwame Raoul, the State's chief legal officer.  *See* Ill. Const., Art. 5, § 15; 15 Ill. Comp. Stat. 205/4.

63.     J. B. Pritzker is the governor of Illinois, and under Illinois law has the "supreme executive power" and the duty to ensure "the faithful execution of the laws."  Ill. Const., Art. V, § 8.

64.     On information and belief, Illinois is aggrieved by the actions of Defendants and has standing to bring this action because of the injury due to the loss of federal funding to the

11

1   State from the Treasury Forfeiture Fund.  The loss of funding for state and local law enforcement

2   operational needs threatens the public safety of all Illinois residents.

3         65.    On information and belief, Illinois is aggrieved by the actions of Defendants and

4   has standing to bring this action because of the injury due to the loss of federal funding to the

5   State caused by Defendants' diversion of funding.  The loss of funding to conduct drug

6   interdiction and counter-narcotics activity threatens the public safety of all Illinois residents.

7         66.    On information and belief, Illinois is also aggrieved by the actions of Defendants

8   and has standing to bring this action because of the injury due to the loss of federal funding

9   resulting from the diversion of military construction projects from Illinois to the construction of a

10  border wall on the nation's southern border.

11        67.    In filing this action, the Attorney General seeks to protect the residents and

12  agencies of Illinois from harm caused by Defendants' illegal conduct, prevent further harm, and

13  seek redress for the injuries caused to Illinois by Defendants' actions.  Those injuries include

14  harm to Illinois's sovereign, quasi-sovereign, and proprietary interests.

15                        **PLAINTIFF STATE OF MAINE**

16        68.    The State of Maine, represented by and through its Attorney General, is a

17  sovereign state of United States of America.

18        69.    The Attorney General of Maine, Aaron M. Frey, is a constitutional officer with the

19  authority to represent the State of Maine in all matters, and serves as its chief legal officer with

20  general charge, supervision, and direction of the State's legal business.  Me. Const. art. IX, Sec.

21  11; 5 M.R.S., §§ 191 et seq.  The Attorney General's powers and duties include acting on behalf

22  of the State and the people of Maine in the federal courts on matters of public interest.  The

23  Attorney General has the authority to file suit to challenge action by the federal government that

24  threatens the public interest and welfare of Maine residents as a matter of constitutional, statutory,

25  and common law authority.

26        70.    The Governor of Maine, Janet T. Mills, is the chief executive officer of the State.

27  The Governor is responsible for overseeing the operations of the State and ensuring that its laws

28  are faithfully executed.  As the leader of the executive branch, the Governor is the chief of

12

Maine's executive branch agencies, including those whose injuries are discussed in this Complaint.  Me. Const. art V, § 1.  Governor Mills is the Commander-in-Chief of the Maine National Guard.  37-B M.R.S. §§ 103 et seq.

71.   Maine is aggrieved by the actions of Defendants and has standing to bring this action because of the injury due to the loss of federal funding to the State caused by Defendants' diversion of funding.

72.   Maine is aggrieved by the actions of Defendants and has standing to bring this action because of the injury to the State and its residents caused by Defendants' reduction of federal defense spending in Maine due to diversion of funding to the border wall.

73.   Maine has an interest in protecting the health, safety, and well-being of its residents, including protecting its residents from harms to their economic health.

74.   Maine has an interest in the State's economic vitality and workforce.

75.   Maine has an interest in preventing diminution of its tax revenues.

76.   The diversion of military construction funding from authorized projects in Maine will harm Maine's economy.

77.   The State would suffer economic harm from diversion of funding from authorized military construction projects in Maine.

78.   Maine participates in the equitable sharing program, pursuant to which eligible Maine law enforcement agencies are entitled to reimbursement from the Treasury Forfeiture Fund for law enforcement agency expenditures associated with seizures and forfeitures, 31 U.S.C. section 9705(a)(1)(B)(iii).

79.   During the federal fiscal years 2009 through 2018, eligible law enforcement agencies within the State of Maine were entitled to receive or received approximately $4.9 million dollars in equitable sharing funds from the Treasury Forfeiture Fund account, or an average of approximately $490,000 annually.

80.   In addition to the state-wide impact that loss of Treasury Forfeiture Funds would have on all law enforcement agencies within Maine, the State of Maine, Department of Inland

13

1  Fisheries & Wildlife, Maine Warden Service ("Maine Warden Service") will be impacted by the

2  non-payment of an approved pending claim for Treasury Forfeiture Fund equitable sharing.

3          81.     By letter dated September 7, 2018, the Maine Warden Service was notified by the

4  Department of Treasury, Internal Revenue Service that the Maine Warden Service was entitled to

5  equitable sharing at the rate of 3 percent of $238,956.42 (or $7,168), the net amount available for

6  equitable sharing related to the liquidation of two parcels of land seized during a joint law

7  enforcement operation conducted in 2014.

8          82.     To date, the Maine Warden Service has not received payment of its equitable

9  share.

10         83.     The diversion of Treasury Forfeiture Funds will harm Maine by depriving Maine

11  of the proceeds of equitable sharing to which it is entitled and by impacting public safety

12  generally by reducing critically necessary funding for law enforcement officers and their agencies

13  within Maine.

14                          **PLAINTIFF STATE OF MARYLAND**

15         84.     The State of Maryland is a sovereign state of the United States of America.

16  Maryland is represented by and through its chief legal officer, Attorney General Brian E. Frosh.

17  Under the Constitution of Maryland, and as directed by the Maryland General Assembly, the

18  Attorney General has the authority to file suit to challenge action by the federal government that

19  threatens the public interest and welfare of Maryland residents.  Md. Const. art. V, § 3(a)(2); 2017

20  Md. Laws, J. Res. 1.

21         85.     Maryland is aggrieved by the actions of Defendants and has standing to bring this

22  action due to the loss of federal funding to the State caused by Defendants' diversion of federal

23  funds.  The loss of funding to conduct drug interdiction and counter-narcotic activity would

24  threaten the public safety of all Marylanders.

25         86.     Maryland is also aggrieved by the actions of Defendants and has standing to bring

26  this action because of the injury due to the diversion of funding for military construction projects.

27  On information and belief, Maryland stands to lose up to $513 million in military construction

28  funding for currently planned projects at Fort Meade and Joint Base Andrews.

14

87.     Additionally, Maryland has received money from the Treasury Forfeiture Fund in the past, and expects to receive comparable monies in the future absent diversion to fund the construction of a border wall.  During the fiscal year that ended September 30, 2018, Maryland state and local law enforcement agencies received $1.79 million in equitable sharing payments from the Treasury Forfeiture Fund for their participation in successful seizure and forfeiture activities; the previous year, that amount was $1.32 million.  The Maryland State Police has regularly received equitable sharing payments from the Treasury Forfeiture Fund for its contributions to operations that led to forfeitures.  In 2018, the Maryland State Police received over $429,000 in equitable sharing payments from the Treasury Forfeiture Fund.  The Maryland State Police currently has over 50 requests pending with the Treasury Forfeiture Fund for equitable shares relating to forfeited assets worth over $8.3 million.  The diversion of funds from the Treasury Forfeiture Fund could deprive the Maryland State Police of its fair share of the forfeited assets, impacting its budget and hindering law enforcement activities, negatively affecting the public safety and welfare of Maryland citizens.

## PLAINTIFF COMMONWEALTH OF MASSACHUSETTS

88.     The Commonwealth of Massachusetts, represented by and through its Attorney General, is a sovereign state of the United States of America.

89.     Attorney General Maura Healey is the chief law enforcement officer in Massachusetts and has both statutory and common-law authority to bring lawsuits to protect the interests of the Commonwealth of Massachusetts and the public interest of the people.  *Feeney v. Commonwealth*, 366 N.E.2d 1262, 1265-66 (Mass. 1977); Mass. Gen. Laws Ch. 12, § 3, 10.

90.     Massachusetts is aggrieved by the actions of Defendants and has standing to bring this action because of injury due to the probable loss of federal drug interdiction and counter-narcotic funding, asset forfeiture funds, and military construction funds to and in Massachusetts, caused by Defendants' unlawful diversion of funding to pay for border wall construction.

91.     Losing drug interdiction and counterdrug activities funding would hamper Massachusetts' efforts to combat the opioid crisis, which continues to cause grave harm to Massachusetts residents and the public health.

15

92.     The Department of Defense allocated $2.3 million to Massachusetts for drug interdiction and counterdrug activities in fiscal year (or "FY") 2019.  Of that allocation, Massachusetts has not yet received more than $965,000.

93.     The Massachusetts National Guard uses these funds to combat drug trafficking organizations operating in our communities, and to support federal, state, and local law enforcement agencies in their efforts to decrease illicit drug supply and demand while reducing opioid overdose deaths.

94.     Specifically, the Massachusetts National Guard uses Department of Defense drug interdiction and counter-narcotic funds to provide investigative case analysis support, linguist services, transportation support, inter-agency training, and reconnaissance.

95.     These funds are particularly important in Massachusetts, where the number of fatal opioid-related overdoses has increased by over 420 percent from 2000 to 2018.  Heroin and fentanyl trafficking and consumption remain a major threat, due to widespread availability, high demand, low costs, and high incidence of addiction.  Local agencies often have neither the resources nor the expertise to properly conduct extensive drug investigations, and illegal narcotics are rarely manufactured, distributed and consumed all within the same municipality.  The Massachusetts National Guard drug interdiction and counter-narcotic programs provide critically important support for these agencies in pursuing inter-agency and inter-jurisdictional work.

96.     Massachusetts will also be harmed due to the loss of federal asset forfeiture funds to state and local law enforcement agencies in Massachusetts.

97.     Massachusetts receives Treasury Forfeiture Funds through equitable sharing when participating in asset forfeiture activities with certain federal law enforcement agencies.

98.     In fiscal year 2018, state and local law enforcement agencies in Massachusetts received approximately $307,000 in currency and $34,000 in property through the Treasury Forfeiture Fund's equitable sharing program.  These resources are used to supplement and enhance law enforcement agencies' state appropriated funding.

99.     The Massachusetts State Police and Massachusetts Port Authority received a combined $481,822 in fiscal year 2017 and $35,286 in fiscal year 2018 from the Treasury

16

1  Forfeiture Fund's equitable sharing program.

2  100.   In fiscal year 2019, the Massachusetts State Police has already received $13,980

3  through the Treasury Forfeiture Fund's equitable sharing program, and the Massachusetts Office

4  of the Attorney General has received $17,313.

5  101.   On information and belief, Massachusetts law enforcement agencies have

6  submitted requests for equitable sharing funds that remain pending with the Treasury Department.

7  102.   Massachusetts will be additionally harmed due to the loss of funding for military

8  construction projects in Massachusetts.

9  103.   Funds that could be diverted include, but may not be limited to, $90 million

10  appropriated by Congress for a new compound semiconductor facility and microelectronics

11  integration facility at Hanscom Air Force Base's Lincoln Laboratory, which is affiliated with the

12  Massachusetts Institute of Technology, and $42.6 million appropriated by Congress for

13  construction of a new hangar at Westover Air Force Base.

14  104.   In addition, the Massachusetts National Guard has been allocated $9.7 million in

15  funding for a multi-purpose machine gun range for fiscal year 2020.  $8.9 million of these funds

16  have not yet been obligated.

17  105.   Not only are these military construction projects important to national security,

18  military readiness, and well-being of our service members, they are important generators of

19  economic activity for Massachusetts.

20  **PLAINTIFF ATTORNEY GENERAL DANA NESSEL ON BEHALF**

21  **OF THE PEOPLE OF MICHIGAN**

22  106.   The People of Michigan are the sovereign of one of the states of the United States

23  and are represented by and through the Michigan Attorney General Dana Nessel.

24  107.   Attorney General Dana Nessel is the chief legal officer of the State of Michigan

25  and her powers and duties include acting in federal court in matters of concern to the People of

26  Michigan, to protect Michigan residents.  *Fieger v. Cox*, 734 N.W.2d 602, 604 (Mich. Ct. App.

27  2007); Mich. Comp. Laws §§ 14.28, 14.101.  This action is brought to protect the interests of the

28  People of Michigan.

108.    The Michigan National Guard has over 10,000 soldiers and airmen, employs over 700 state employees on a full-time basis through the Department of Military and Veterans Affairs, and operates over 40 facilities in the state.  The Michigan Department of Military and Veterans Affairs receives a majority of its funding from the federal government.  On information and belief, it performs missions training and prepares citizen soldiers and airmen to respond to, among other things, state emergencies, military support, and protection of local communities.  Loss of funding negatively impacts this vital service for the People of Michigan.

109.    The People of Michigan are aggrieved by the actions of Defendants and have standing to bring this action because of the injury due to the loss of federal funding to the People of Michigan caused by Defendants' diversion of funding.  The loss of funding to conduct drug interdiction and counter-narcotic activity threatens the public safety of all Michigan residents.

110.    Michigan receives Treasury Forfeiture Funds through equitable sharing when participating in asset forfeiture activities with certain federal law enforcement agencies.

111.    Michigan has received money from the Treasury Forfeiture Fund in the past, and expects to receive comparable monies in the future absent diversion to fund the construction of a wall.  According to audits of the Treasury Forfeiture Fund, in 2018, Michigan received $375,000 in equitable sharing from the Treasury Forfeiture Fund; in 2017, Michigan received $333,000; in 2016, Michigan received more than $1.3 million; in 2015, Michigan received more than $1.3 million; and in 2014, Michigan received more than $2 million.  These resources are used to supplement and enhance law enforcement agencies' state appropriated funding.

112.    The People of Michigan will also be harmed due to the loss of federal asset forfeiture funds to state and local law enforcement agencies in Michigan.

**PLAINTIFF STATE OF MINNESOTA**

113.    The State of Minnesota, represented by and through its Attorney General, is a sovereign state of the United States of America.

114.    Attorney General Keith Ellison is the chief legal officer of the State of Minnesota and his powers and duties include acting in federal court in matters of State concern and to protect Minnesota residents.  Minn. Stat. § 8.01.  This action is brought to protect Minnesota's sovereign,

18

1  quasi-sovereign, and proprietary interests.

2      115.  Governor Tim Walz is the chief executive officer of the State of Minnesota,

3  custodian of state property and federal funds made available to the State, and the Commander-in-

4  Chief of the state military.  Minn. Const., art. V, § 3; Minn. Stat. §§ 4.01 & .07.  As the chief

5  executive officer and Commander-in-Chief of the State of Minnesota, Governor Walz leads

6  executive branch agencies injured by the actions described in this Complaint.

7      116.  The Minnesota National Guard has over 13,000 soldiers and airmen, employs

8  more than 2,000 people on a full-time basis, and operates over 60 facilities in the state.  The

9  Minnesota National Guard receives more than 96 percent of its funding from the federal

10  government.  It performs missions training and prepares citizen soldiers and airmen to respond to,

11  among other things, the Governor of Minnesota for state emergency response, military support,

12  and protection of local communities.  Loss of funding negatively impacts this vital service for the

13  State of Minnesota.

14      117.  For example, diverting federal funding for the Minnesota National Guard's

15  counterdrug programs and domestic drug interdiction activities to construct a wall along the

16  United States-Mexico border would harm Minnesota's law enforcement agencies and

17  compromise the health and safety of Minnesota residents.

18      118.  In addition, diverting federal funding from necessary military construction projects

19  in Minnesota, including National Guard projects, to construct a wall along the United States-

20  Mexico border would also harm Minnesota, its economy, and its residents.

21      119.  Law enforcement agencies in Minnesota, and the Minnesotans they protect and

22  serve, are also harmed by the diversion of funding from the Treasury Forfeiture Fund to construct

23  a wall along the United States-Mexico border.  Law enforcement agencies in Minnesota

24  participate in the Treasury Forfeiture Fund's strategic mission "to use high-impact asset forfeiture

25  in investigative cases to disrupt and dismantle criminal enterprises."[3]  For example, in Fiscal Year

26

27  [3] *See* Off. of Inspector Gen., Dep't of the Treasury, *Audit of the Department of the Treasury Forfeiture Fund's Financial Statements for Fiscal Years 2018 and 2017* at 2 (Dec. 13, 2018), https://tinyurl.com/y6ovg5s3.

28

2018, a Minnesota-based investigation and prosecution of a nationwide wire fraud scheme primarily targeting elderly Hmong people resulted in the forfeiture of $1,612,451.84.[4]

120.    Law enforcement agencies in Minnesota have pending requests for money from the Treasury Forfeiture Fund and will likely have additional requests in the future.  The delay, reduction, or denial of payment resulting from the diversion of funding from the Treasury Forfeiture Fund to construct a wall along the United States-Mexico border harms these law enforcement agencies and compromises the health and safety of Minnesota residents.

<strong>PLAINTIFF STATE OF NEVADA</strong>

121.    The State of Nevada, represented by and through its Attorney General, is a sovereign state of the United States of America.

122.    Attorney General Aaron D. Ford is the chief legal officer of the State of Nevada and has the authority to commence actions in federal court to protect the interests of the State. Nev. Rev. Stat. 228.170.

123.    Governor Stephen F. Sisolak is the chief executive officer of the State of Nevada. The Governor is responsible for overseeing the operations of the State and ensuring that its laws are faithfully executed.  Nev. Const., art. 5, § 1.  Governor Sisolak is the Commander-in-Chief of the Nevada state military forces. Nev. Const., art. 5, § 5.

124.    On information and belief, Nevada is aggrieved by the actions of Defendants and has standing to bring this action because of the injury to the State and its residents caused by the reduction of federal funding to the State due to Defendants' diversion of funding to a southern border wall.

125.    Any diversion of military construction funding from Nevada will harm the State's economy.  Nevada is home to several military bases, including Nellis Air Force Base, Creech Air Force Base, Hawthorne Army Depot Base, and Naval Air Station Fallon.  These military bases play a critical role in our nation's defense and to the State's economy.  The use of funding for a southern border wall rather than for necessary expenses at these military bases harms Nevada and its economy.

---

[4] *Id.* at 5.

126.    Any diversion of federal counter-narcotic funding from Nevada will harm the State.  The use of funding for a southern border wall rather than to conduct drug interdiction and counter-narcotic activity in the State threatens the public safety of all Nevadans.

127.    Nevada is harmed by the diversion of funds from the Treasury Forfeiture Fund. Since State Fiscal Year (SFY) 2015, the Nevada Office of the Attorney General (OAG) has received approximately $422,211.94 in equitable sharing from the Treasury Forfeiture Fund. This total includes equitable sharing payments of $35,777.35 in SFY 2015; $369,469.30 in SFY 2016; $831 in SFY 2017; and $16,134.29 in SFY 2018.  The OAG has not received any equitable sharing payments in SFY 2019.  These payments resulted from the OAG's participation in criminal investigations that resulted in successful seizure and forfeiture activities.  The OAG has approximately six outstanding forfeiture requests where the office expects to receive between 10-35 percent of the value of seized and forfeited assets once those investigations are completed. The diversion of these funds from the Treasury Forfeiture Fund could deprive the OAG of its share of pending forfeited assets, impacting its future budget and hindering other law enforcement, training, and criminal prosecution activities.

128.    Defendants' unconstitutional actions undermine Nevada's sovereignty and harm the State through their effects on Nevada's residents and its economy.

### PLAINTIFF STATE OF NEW JERSEY

129.    The State of New Jersey is a sovereign state of the United States of America.

130.    This action is being brought on behalf of the State by Attorney General Gurbir S. Grewal, the State's chief legal officer.  *See* N.J. Stat. Ann. § 52:17A-4(e), (g).

131.    New Jersey is aggrieved by the actions of Defendants and has standing to bring this action because of the injury due to the loss of federal funding to the State caused by Defendants' diversion of funding.  The threat of a loss of funding to conduct drug interdiction and counter-narcotic activity prevents critical criminal counter-narcotics programs and threatens the public safety of all New Jersey residents.  The diversion of funding from the Treasury Forfeiture Fund will harm public safety by impacting critically necessary funding for law enforcement officials and their agencies.

132.    New Jersey is aggrieved by the actions of Defendants and has standing to bring this action because of the injury due to the loss of federal funding to the State caused by Defendants' diversion of funding.  The threat of a loss of funding to conduct drug interdiction and counter-narcotic activity prevents critical criminal counter-narcotics programs and threatens the public safety of all New Jersey residents.

133.    New Jersey conducts joint law enforcement activity with federal agencies and receives equitable sharing payments through the Treasury Forfeiture Fund on a regular basis.  The diversion of funding from the Treasury Forfeiture Fund will harm public safety by impacting critically necessary funding for law enforcement officials and their agencies.

134.    In filing this action, the Attorney General seeks to protect the residents and agencies of New Jersey from harm caused by Defendants' illegal conduct, prevent further harm, and seek redress for the injuries caused to New Jersey by Defendants' actions.  Those injuries include harm to New Jersey's sovereign, quasi-sovereign, and proprietary interests.

**PLAINTIFF STATE OF NEW MEXICO**

135.    The State of New Mexico, represented by and through its Attorney General, is a sovereign state of the United States of America.

136.    Attorney General Hector Balderas is the chief legal officer of the State of New Mexico.  He is authorized to prosecute all actions and proceedings on behalf of New Mexico when, in his judgment, the interest of the State requires such action.  N.M. Stat. Ann. § 8-5-2(B).  This challenge is brought pursuant to Attorney General Balderas's statutory and common law authority.

137.    Governor Michelle Lujan Grisham possesses the "supreme executive power" of the State of New Mexico.  N.M. Const., art. V, § 4.  She has the responsibility to execute the laws of the State and preserve the public peace.  *Id.*  She also has the authority to oversee the State's agencies that will be affected by Defendants' actions.  N.M. Const., art. V, § 5.

138.    New Mexico shares over 179 miles of its southern border with Mexico.[5]  This close relationship gives New Mexico a special interest in the economic and public safety

---

[5] *U.S. International Borders*, *supra* note 2.

1   consequences of cross-border activity.  Attorney General Balderas has worked with law

2   enforcement counterparts in Mexico to facilitate international extraditions, implement

3   technologies to combat human trafficking, and train prosecutors.[6]  Trade across New Mexico's

4   southern border is a crucial component of the State's economy, with Mexico its largest export

5   partner.[7]

6        139.   New Mexico is aggrieved by Defendants' actions and has standing to bring this

7   lawsuit.  Defendants' diversion of federal funding to conduct drug-interdiction and counter-

8   narcotics efforts threatens the safety and health of all New Mexicans.

9        140.   New Mexico will also be harmed by Defendants' diversion of military

10   construction funding.  Some $85 million of this funding currently is allocated to construct a MQ-

11   9 Formal Training Unit at Holloman Air Force Base in Otero County, New Mexico.[8]  Another

12   $40 million is allocated to White Sands Missile Range in New Mexico to build an information

13   systems facility.[9]  The loss of these projects would harm New Mexico's economy, particularly in

14   the communities surrounding these military installations.

15        141.   If Defendants use the diverted funding to construct any of their border wall in New

16   Mexico, it will also impose environmental harm to the State.  The environmental damage caused

17   by a border wall in New Mexico would include the blocking of wildlife migration, flooding, and

18   habitat loss.[10]  Further, this border wall would be constructed on state land, taking the State's

19   _____

20       [6] Ryan Boetel, *Attorney General Announces Pilot Project for Mexico Extraditions*, Albuquerque J. (July 25, 2018), https://tinyurl.com/y2zdbc8h; PR Newswire, *TrustStamp and the*

21   *Conference of Western Attorneys General Alliance Partnership Introduce Technology to Ease Data Sharing Among Law Enforcement* (Aug. 30, 2018), https://tinyurl.com/y2seu64t; Carol

22   Clark, *AG Balderas Trains Mexican Prosecutors, Forensic Scientists, Investigators in Effort to Stop Crime From Crossing Border*, Los Alamos Daily Post (Nov. 3, 2017), https://tinyurl.com/y3mcvrms.

23       [7] Int'l Trade Admin., *New Mexico Exports, Jobs, & Foreign Investment* (Feb. 2018), https://tinyurl.com/y25tsost.

24       [8] Alamogordo Daily News, *Holloman Getting $85M for Construction Project* (Feb. 3, 2018), https://tinyurl.com/y5u7vx4k.

25       [9] Miriam U. Rodriguez, *WSMR to Build State of the Art Information Systems Facility*, U.S. Army (Jan. 10, 2018), https://tinyurl.com/y3yr24yr.

26       [10] *See* Robert Peters et al., *Nature Divided, Scientists United: US–Mexico Border Wall*

27   *Threatens Biodiversity and Binational Conservation*, 68 BioScience 740, 743 (Oct. 2018), https://tinyurl.com/y3t4ymfn.

28

1   sovereign property.[11]

2   **PLAINTIFF STATE OF NEW YORK**

3       142.    The State of New York, represented by and through its Attorney General, is a

4   sovereign state of the United States of America.  The Attorney General is New York State's chief

5   law enforcement officer and is authorized to pursue this action pursuant to N.Y. Executive Law

6   section 63.

7       143.    Upon information and belief, New York is aggrieved by the actions of Defendants

8   and has standing to bring this action because of the injury due to the loss of federal funding to the

9   State caused by Defendants' diversion of federal funds.  The loss of funding to conduct drug

10  interdiction and counter-narcotic activity would injure the State's law enforcement agencies and

11  threaten the public safety of all New Yorkers.

12      144.    New York participates in the Treasury Forfeiture Fund through state law

13  enforcement agencies, state prosecutorial agencies, and joint federal-state task forces, and

14  regularly receives equitable sharing payments to state agencies from forfeitures generated by joint

15  law enforcement operations with federal law enforcement.  Defendants' unlawful diversion of

16  funding from the Treasury Forfeiture Fund will harm the public safety of New York's residents

17  by impacting critically necessary funding for law enforcement officers and their agencies.

18      145.    Upon information and belief, Defendants' unlawful diversion of funding from

19  military construction projects in New York to construction of a border wall will injure New

20  York's economy and, by damaging the State's critical security infrastructure, threaten the safety

21  of New York's National Guard and of all New York residents.

22  **PLAINTIFF STATE OF OREGON**

23      146.    Plaintiff State of Oregon, acting through its Attorney General, Ellen Rosenblum, is

24  a sovereign state in the United States of America.

25      147.    Attorney General Rosenblum is the chief law officer of Oregon and is empowered

26  to bring this action on behalf of the State of Oregon and the affected state agencies under ORS

27  

28  _____

[11] *See* Deming Headlight, *N.M. Land Commish Aubrey Dunn Rejects Settlement Offer from CBP* (Aug. 17, 2018), https://tinyurl.com/y557wpcb.

160.060, ORS 180.210, and ORS 180.220.

148.    On information and belief, Oregon is aggrieved by the actions of Defendants and has standing to bring this action because of the injury due to the loss of federal funding to the State caused by Defendants' diversion of federal funds.  The loss of funding to conduct drug interdiction and counter-narcotic activity, including funding that supports Oregon's work in this area with other States, would threaten the public safety of all Oregonians.

149.    On information and belief, the diversion of military construction funds will harm Oregon.  Defendants' diversion of funding from military construction projects in Oregon to construction of a border wall in Texas, New Mexico, Arizona, and California would impact Oregon's economy.  In particular and without limitation, any diversion of funds from U.S. Army Corps of Engineers projects in Oregon would harm Oregon's environment and could cause flooding and other dangers to the health and safety of Oregonians.

150.    Oregon has received money from the Treasury Forfeiture Fund in the past and expects to receive comparable monies in the future absent diversion to fund the construction of a wall.  According to federal audits of the Treasury Forfeiture Fund in 2018, Oregon received more than $9 million in equitable sharing from the Treasury Forfeiture Fund over the years 2008-2017.  These resources are used to supplement and enhance law enforcement agencies' state-appropriated funding.

**PLAINTIFF STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS**

151.    The State of Rhode Island, represented by and through its Attorney General, is a sovereign state of the United States of America.

152.    Attorney General Peter F. Neronha is the chief law officer of the State of Rhode Island and has the authority to file civil actions to protect Rhode Island's rights and the rights of Rhode Island citizens.  The Attorney General has the authority to file suit to take legal action against the federal government for the protection of the public interest and welfare of Rhode Island citizens as a matter of constitutional, statutory, and common law authority.  R.I. Const. art. IX, sec. 12; R.I. Gen. Laws §§ 42-9-1, et seq.; *see also State v. Lead Industries Ass'n*, 951 A.2d 428 (R.I. 2008).

1    153.    The Governor of Rhode Island, Gina M. Raimondo, is the chief executive officer

2    of the State of Rhode Island.  The Governor oversees the operations of the State and is in charge

3    of the State military, the Rhode Island National Guard, which is comprised of the Rhode Island

4    Army National Guard, Rhode Island Air National Guard, and the Historic Rhode Island Militia.

5    154.    The Rhode Island National Guard is the oldest military branch in the United States

6    and consists of over 3,300 members (2,178 in the Army National Guard, 1,136 in the Air National

7    Guard) and operates 14 armories, three air bases, two training sites, 10 support buildings, four

8    organization maintenance facilities, and one combined support maintenance facility and is

9    responsible for responding to statewide civil emergencies declared by the Governor, as well as

10   supporting the defense of the nation and national security interests, including actively

11   participating in counterdrug efforts.

12   155.    The Rhode Island National Guard is financed with approximately 74 percent

13   federal funds and federal equipment housed and secured at these facilities and is valued in excess

14   of $500 million.  The estimated annual impact on the State attributed to National Guard programs

15   exceeds $238 million.[12]

16   156.    The Rhode Island National Guard, Counterdrug Support program ("RING-CD"),

17   coordinates and provides unique military skills and resources to support state and federal law

18   enforcement and community-based organizations in their efforts to disrupt and dismantle various

19   aspects of the illicit markets supporting the drug and narcotic trade.

20   157.    RING-CD provides support to state and federal law enforcement agencies with

21   embedded criminal intelligence analysts, the local offices of the U.S. Drug Enforcement

22   Administration ("DEA"), the U.S. Postal Inspector Service ("USP"), the Food and Drug

23   Administration Office of Criminal Investigations ("FDA"), the U.S. Internal Revenue Service

24   ("IRS"), the U.S. Marshall Service, the Rhode Island State Police Narcotics, High Intensity Drug

25   Trafficking Area ("HIDTA"), and Financial Crimes Units, and the Providence Police

26   Department.[13]

27   ─────────────────
[12] State of Rhode Island and Providence Plantations, *Fiscal Year 2019 Budget*, Vol. IV, 103-111 (Jan. 2018), http://tinyurl.com/y3nucc5s.
28   [13] R.I. Nat'l Guard, *Joint Units*, https://ri.ng.mil/Joint-Units/.

158.    RING-CD provides support to Rhode Island State Police and local law enforcement that is essential to combat illicit drug markets in Rhode Island, as well as ensuring the health and safety of officers, investigators, and other law enforcement personnel from the evolving dangers that the drug trade poses.[14]

159.    For Fiscal Year 2018, the Rhode Island National Guard received approximately $852,000 in connection with the U.S. Department of Defense National Guard Counterdrug program for state drug interdiction and counterdrug activities.

160.    For Fiscal Year 2019, the U.S. Department of Defense allocated approximately $900,000 to be paid in monthly installments to the Rhode Island National Guard in connection with the U.S. Department of Defense National Guard Counterdrug program for state drug interdiction and counterdrug activities.

161.    For Fiscal Year 2019, the Rhode Island National Guard has received approximately $450,000 under the National Guard Counterdrug program and approximately $450,000 remains outstanding.

162.    The Rhode Island State Police is a full-service, statewide law enforcement agency whose mission is to fulfill the law enforcement needs of the people with the highest degree of fairness, professionalism, and integrity, and protect the inherent rights of the people of Rhode Island to live in freedom and safety.

163.    The Rhode Island State Police receives funds from the Treasury Forfeiture Fund in connection with law enforcement activities jointly performed by and between the Rhode Island State Police and federal law enforcement agencies.

164.    In 2018, the Rhode Island State Police received approximately $26,960.10 from the Treasury Forfeiture Fund in connection with joint law enforcement actions.

---

[14] For example, in 2018 RING-CD procured a Liquid Chromatography Mass Spectrometer.  This device supports Rhode Island's efforts to combat the dramatic effects of opioid abuse.  The Rhode Island Department of Health Forensic Toxicology Laboratory previously identified a significant lag in in confirming the presence of illicit trace evidence to the Law Enforcement Community.  This device, and RING memorandum of agreement with the Department of Health, targets that capability gap.  This system began supporting casework in Rhode Island during the last fiscal year.  R.I. Nat'l Guard, *Annual Report 2018*, http://tinyurl.com/y2qagky6.

27

165.     So far, in 2019, the Rhode Island State Police has received approximately $19,305.77 from the Treasury Forfeiture Fund in connection with joint law enforcement actions.

166.     At present, the Rhode Island State Police has 59 forfeiture requests pending for U.S. currency and property seized during investigations between the Rhode Island State Police and federal law enforcement agencies.  The forfeitures seized in connection with these pending applications is estimated to be valued at approximately $4,285,721.81 of which Rhode Island is entitled to a *pro rata* share.

167.     Upon information and belief, the Executive Actions seek to divert some or all funds referenced in the prior paragraph from the Treasury Forfeiture Fund.  These funds have been shared or distributed to Rhode Island in the past and Rhode Island presently has applications pending for equitable sharing relating to the Treasury Forfeiture Fund.

168.     Rhode Island is aggrieved by the actions of Defendants and has standing to bring this action because of the loss of federal funding from the Treasury Forfeiture Fund.

169.     Diversion of funds from the Treasury Forfeiture Fund will deprive Rhode Island of access to funds that would otherwise be available for law enforcement purposes, negatively impacting the public safety and welfare of Rhode Island citizens.

**PLAINTIFF STATE OF VERMONT**

170.     The State of Vermont, represented by and through its Attorney General, is a sovereign state of the United States of America.

171.     Attorney General Thomas J. Donovan is the chief legal officer of the State of Vermont and has the authority to file civil actions to protect Vermont's rights and interests.  Vt. Stat. Ann. tit. 3, §§ 152, 157.

172.     Vermont is aggrieved by the actions of Defendants and has standing to bring this action because of the injury due to the loss of federal drug interdiction, counter-narcotic, and law enforcement funding to the State caused by Defendants' diversion of funding. The threat of losing funding to conduct drug interdiction and counter-narcotic activity threatens the public safety of all Vermonters.

173.     Vermont participates in the Treasury Forfeiture Fund through state and local law

28

1    enforcement agencies. These Vermont law enforcement agencies regularly receive equitable

2    sharing payments from the Treasury Forfeiture Fund and expect to receive comparable payments

3    in the future absent diversion to fund the construction of a wall.

4         174.    The diversion of funding from the Treasury Forfeiture Fund will harm public

5    safety by impacting critical funding for these law enforcement agencies and their officers.

6                        **PLAINTIFF COMMONWEALTH OF VIRGINIA**

7         175.    The Commonwealth of Virginia is a sovereign state of the United States of

8    America.

9         176.    The Commonwealth of Virginia brings this action by and through its Attorney

10   General, Mark R. Herring.  The Attorney General has authority to represent the Commonwealth,

11   its departments, and its agencies in "all civil litigation in which any of them are interested."  Va.

12   Code Ann. § 2.2-507(A).

13        177.    On information and belief, the Commonwealth of Virginia will be injured by the

14   diversion of funding from the Treasury Forfeiture Fund.  The Commonwealth participates as an

15   equitable sharing partner in the Fund and, from 2013 to 2017, received over $122 million in

16   distributions to state and local law enforcement.  On information and belief, the announced

17   diversion of forfeiture funding will diminish the future funding available for the

18   Commonwealth's participating law enforcement agencies, thereby decreasing the resources

19   available for future investigations to the detriment of the safety and welfare of Virginia's citizens

20   and law enforcement officers.

21        178.    On information and belief, the Commonwealth of Virginia will be injured by the

22   diversion of funding from the Treasury Forfeiture Fund.  The Commonwealth participates as an

23   equitable sharing partner in the Fund and, in the past five years, has received over $79 million in

24   distributions to state and local law enforcement.  On information and belief, the announced

25   diversion of forfeiture funding will diminish the funding available for the Commonwealth's

26   participating law enforcement agencies.

27        179.    On information and belief, the Commonwealth of Virginia would likewise be

28   aggrieved if Defendants divert federal funding under the National Guard Drug Interdiction and

29

Prevention Program for use on a southern border wall.  This loss of funding—to the tune of approximately $3 million for Virginia—to implement counter-narcotics and drug interdiction measures would threaten the public safety of all Virginians.

**PLAINTIFF STATE OF WISCONSIN**

180.   The State of Wisconsin is a sovereign state of the United States of America.

181.   Governor Tony Evers is the chief executive officer of the State of Wisconsin and has the duty to "take care that the laws be faithfully executed."  Wis. Const. art. V, §§ 1, 4.  The Governor is the commander-in-chief of the military and naval forces of the State, including the Wisconsin National Guard.  Wis. Const. art. V, § 1.

182.   Attorney General Joshua L. Kaul is the chief legal officer of the State of Wisconsin and has the authority to file civil actions to protect Wisconsin's rights and interests. *See* Wis. Stat. § 165.25(1m).  The Attorney General's powers and duties include appearing for and representing the State, on the governor's request, "in any court or before any officer, any cause or matter, civil or criminal, in which the state or the people of this state may be interested." Wis. Stat. § 165.25(1m).

183.   The State of Wisconsin brings this action by and through its Attorney General, Joshua L. Kaul.

184.   In filing this action, the Attorney General seeks to redress and prevent injuries to the State and its residents caused by Defendants' illegal diversion of federal funds to build the border wall.  These injuries include harms to Wisconsin's sovereign, quasi-sovereign, and proprietary interests.

185.   Wisconsin has an interest in protecting the State's economy and security, as well as the health, safety, and welfare of its residents.

186.   Wisconsin has an interest in protecting its tax revenues, including those resulting from economic activity in communities near military bases in Wisconsin.

187.   On information and belief, Defendants' diversion of funds for the border wall includes over $29 million in military construction funding for projects currently planned in Wisconsin.

30

188.    Wisconsin is home to multiple military bases, which play a critical role in our nation's defense and in Wisconsin's economy.  On information and belief, Defendants' diversion of funds from necessary maintenance and repairs at these military bases would harm Wisconsin's economy and the economic welfare of Wisconsin residents.

189.    Additionally, the Wisconsin National Guard has over 10,000 soldiers and airmen who are trained to assist civil authorities in protecting life and property, and in preserving peace, order, and public safety during emergencies, as directed by the Governor of Wisconsin.  The Wisconsin National Guard receives a majority of its funding from the federal government.

190.    On information and belief, the diversion of military construction funding for projects supporting or used by the Wisconsin National Guard would interfere with the Wisconsin National Guard's ability to provide these services for the State, thereby injuring the State and its residents.

191.    Further, on information and belief, Defendants' diversion of funds for the border wall also includes funds otherwise allocated to Wisconsin or its agencies for drug interdiction and counter-narcotics efforts.

192.    On information and belief, Defendants' diversion of funds otherwise allocated for drug interdiction and counter-narcotics efforts in Wisconsin would prevent state law enforcement agencies from implementing critical programs and initiatives, thereby threatening the State's security and economic welfare, as well as the health, safety, and welfare of Wisconsin residents.

193.    On information and belief, Defendants' diversion of funding from the Treasury Forfeiture Fund would harm public safety in Wisconsin by impacting critically necessary funding for law enforcement officers and their agencies.

## DEFENDANTS

194.    Defendant Donald J. Trump, the President of the United States of America, is responsible for the actions and decisions that are being challenged by Plaintiffs in this action and is sued in his official capacity.

195.    Defendant United States of America is responsible for enforcing laws that are consistent with the United States Constitution.

196.     Defendant Department of Defense ("DOD") is the federal agency to which Congress has appropriated the military construction and drug interdiction funding implicated by the President's Executive Actions.  Defendant DOD is an executive department of the United States of America pursuant to 5 U.S.C. section 101, and a federal agency within the meaning of 28 U.S.C. section 2671.  As such, it engages in agency action within the meaning of 5 U.S.C. section 702, and is named as a defendant in this action pursuant to 5 U.S.C. section 702.

197.     Defendant Patrick M. Shanahan, acting Secretary of Defense, oversees the DOD and is responsible for the actions and decisions that are being challenged by Plaintiffs in this action.  Defendant Shanahan is sued in his official capacity pursuant to 5 U.S.C. section 702.

198.     Defendant Mark T. Esper, Secretary of the Army, oversees the United States Army within DOD, and is responsible for the actions and decisions that are being challenged by Plaintiffs in this action.  Defendant Esper is sued in his official capacity pursuant to 5 U.S.C. section 702.

199.     Defendant Richard V. Spencer, Secretary of the Navy, oversees the United States Navy within DOD, and is responsible for the actions and decisions that are being challenged by Plaintiffs in this action.  Defendant Spencer is sued in his official capacity pursuant to 5 U.S.C. section 702.

200.     Defendant Heather A. Wilson, Secretary of the Air Force, oversees the United States Air Force within DOD, and is responsible for the actions and decisions that are being challenged by Plaintiffs in this action.  Defendant Wilson is sued in her official capacity pursuant to 5 U.S.C. section 702.

201.     Defendant Department of the Treasury (the "Treasury") is the federal agency responsible for the Treasury Forfeiture Fund that is implicated by the President's Executive Actions.  Defendant the Treasury is an executive department of the United States of America pursuant to 5 U.S.C. section 101, and a federal agency within the meaning of 28 U.S.C. section 2671.  As such, it engages in agency action within the meaning of 5 U.S.C. section 702, and is named as a defendant in this action pursuant to 5 U.S.C. section 702.

202.     Defendant Steven T. Mnuchin, Secretary of the Treasury, oversees the Treasury

32

1    and is responsible for the actions and decisions that are being challenged by Plaintiffs in this

2    action.  Defendant Mnuchin is sued in his official capacity pursuant to 5 U.S.C. section 702.

3    203.    Defendant Department of Homeland Security ("DHS") is the federal agency

4    responsible for providing border security along the United States-Mexico border in a manner that

5    is consistent with the laws and Constitution of the United States.  Defendant DHS is an executive

6    department of the United States of America pursuant to 5 U.S.C. section 101, and a federal

7    agency within the meaning of 28 U.S.C. section 2671.  As such, it engages in agency action

8    within the meaning of 5 U.S.C. section 702, and is named as a defendant in this action pursuant to

9    5 U.S.C. section 702.

10    204.    Defendant Kirstjen M. Nielsen, Secretary of DHS, oversees DHS and is

11    responsible for the actions and decisions that are being challenged by Plaintiffs in this action.

12    Defendant Nielsen is sued in her official capacity pursuant to 5 U.S.C. section 702.

13    205.    Defendant Department of the Interior ("DOI") is the federal agency responsible for

14    managing federal lands.

15    206.    Defendant David Bernhardt, acting Secretary of the Interior, oversees the

16    Department of the Interior, and is responsible for the actions that are being challenged by

17    Plaintiffs in this action.  Defendant Bernhardt is sued in his official capacity.

**FACTUAL ALLEGATIONS**

I.   **PRESIDENT TRUMP HAS LONG CLAIMED THAT A "CRISIS" AT THE BORDER REQUIRES BUILDING A BORDER WALL, BUT HAS NOT DECLARED A NATIONAL EMERGENCY UNTIL NOW**

21    207.    Dating back to at least August 2014, President Trump has advocated for a wall

22    along the southern border.[15]

23    208.    In his speech announcing his candidacy for President in June 2015, President

24    Trump claimed that a border wall is needed to stop a tide of illegal immigration, and that he

25    would build it as President and have Mexico pay for the wall.[16]  In the same speech, he also

26    _____

27    [15] Donald J. Trump (@realDonaldTrump), Twitter (Aug. 5, 2014, 1:34 PM), https://tinyurl.com/yydre3ep.

28    [16] Time, *Here's Donald Trump's Presidential Announcement Speech* (June 16, 2015), https://tinyurl.com/qzk4wrv.

1  stated, "When Mexico sends its people, they're not sending their best . . . They're bringing drugs.

2  They're bringing crime.  They're rapists."  This claim and his promise to build a wall and have

3  Mexico pay for it became a consistent theme of his campaign.

4       209.   President Trump repeatedly stated that the border wall he planned to build would

5  help prevent terrorism, crime, and drug smuggling.  For example, on October 4, 2014, President

6  Trump tweeted, "The fight against ISIS starts at our border.  'At least' 10 ISIS have been caught

7  crossing the Mexico border. Build a wall!"[17]  More recently, on February 3, 2019, President

8  Trump tweeted, "If there is no Wall, there is no Security. Human Trafficking, Drugs and

9  Criminals of all dimensions - KEEP OUT!".[18]

10       210.   On July 13, 2016, President Trump tweeted, "We will build the wall and MAKE

11  AMERICA SAFE AGAIN!"[19]

12       211.   On August 27, 2016, President Trump tweeted that "[h]eroin overdoses are taking

13  over our children and others in the MIDWEST.  Coming in from our southern border.  We need

14  strong border & WALL!"[20]

15       212.   In a speech shortly before the 2016 presidential election, President Trump stated

16  that "[o]n day one [of his Administration], we will begin working on an impenetrable, physical,

17  tall, power [sic], beautiful southern border wall" to "help stop the crisis of illegal crossings" and

18  "stop the drugs and the crime from pouring into our country."[21]

19       213.   As President, President Trump has continued to repeatedly mention the need for

20  the border wall and his intention to build it.

21       214.   On January 27, 2017, President Trump discussed his proposed border wall with

22  Mexico's then-President Enrique Peña Nieto, in which he reportedly pressured Mexico to pay for

23

24      [17] Donald J. Trump (@realDonaldTrump), Twitter (Oct. 8 2014, 2:26 PM),
https://tinyurl.com/yxntlamo.

25      [18] *Id.* (Feb. 3, 2019, 2:03 PM), https://tinyurl.com/yywmw9yx.

26      [19] *Id.* (Jul. 13, 2016, 2:56 PM), https://tinyurl.com/gm8yty6.

    [20] *Id.* (Aug. 27, 2016, 7:17 AM), https://tinyurl.com/y3f6bp9s.

27      [21] N.Y. Times, *Transcript of Donald Trump's Immigration Speech* (Sept. 1, 2016),
https://tinyurl.com/yalom4hl.

28

1   the border wall and stated that he "[has] been talking about it for a two-year period."[22]

2   215.   On February 28, 2017, President Trump delivered an address to a joint session of

3   Congress in which he stated that in order to "restore integrity and the rule of law at our

4   borders . . . we will soon begin the construction of a great, great wall along our southern

5   border."[23]

6   216.   Additional statements by President Trump regarding the border wall include a

7   campaign rally speech on August 22, 2017 ("[W]e are building a wall on the southern border

8   which is absolutely necessary."),[24] and tweets on January 26, 2017 ("badly needed wall"),[25]

9   February 23, 2018 ("MS-13 gang members are being removed by our Great ICE and Border

10   Patrol Agents by the thousands, but these killers come back in from El Salvador, and through

11   Mexico, like water. . . . We need The Wall!"),[26] June 21, 2018 ("We shouldn't be hiring judges

12   by the thousands, as our ridiculous immigration laws demand, we should be changing our laws,

13   building the Wall, hire Border Agents and Ice [sic] and not let people come into our country

14   based on the legal phrase they are told to say as their password."),[27] December 19, 2018

15   ("Because of the tremendous dangers at the Border, including large scale criminal and drug

16   inflow, the United States Military will build the Wall!"),[28] and December 31, 2018 ("I

17   campaigned on Border Security, which you cannot have without a strong and powerful Wall.  Our

18   Southern Border has long been an 'Open Wound,' where drugs, criminals (including human

19   traffickers) and illegals would pour into our Country.  Dems should get back here an [sic] fix

20   now!").[29]

---

21   [22] Greg Miller, *Trump Urged Mexican President to End His Public Defiance on Border
22   Wall, Transcript Reveals*, Wash. Post (Aug. 3, 2017), https://tinyurl.com/y3gqdf2m.
     [23] White House, *Remarks by President Trump in Joint Address to Congress* (Feb. 28,
23   2017), https://tinyurl.com/y4kvpj7n.
     [24] Time, *President Trump Ranted for 77 Minutes in Phoenix.  Here's What He Said* (Aug.
24   23, 2017), https://tinyurl.com/ycxt2woc.
     [25] Donald J. Trump (@realDonaldTrump), Twitter (Jan. 26, 2017, 5:55 AM),
25   https://tinyurl.com/zm26eaf.
     [26] *Id.* (Feb. 23, 2018, 3:28 AM), https://tinyurl.com/y9xypa55.
26   [27] *Id.* (June 21, 2018, 5:12 AM), https://tinyurl.com/y3zaqk7d.
     [28] *Id.* (Dec. 19, 2018, 5:43 AM), https://tinyurl.com/y95cnd8r.
27   [29] *Id.* (Dec. 31, 2018, 5:29 AM), https://tinyurl.com/y6stmopr.

28

35

1    217.    Indeed, President Trump has made it clear that his plan to build the border wall

2 would go forward regardless of the actual need for one.  During a speech to the National Rifle

3 Association, President Trump stated in the context of statistics showing a decrease in unauthorized

4 border crossings that "we will build the wall no matter how low this number gets or how this goes.

5 Don't even think about it.  Don't even think about it."[30]

6    218.    The salient facts regarding the ostensible "crisis" that President Trump repeatedly

7 invoked in these numerous statements have not significantly changed since his inauguration as

8 President in January 2017.

9    219.    President Trump acknowledged this when he stated that the "emergency" at the

10 border "began a long time [ago]," citing 2014 as the beginning of the ostensible "crisis at the

11 border."[31]

12    220.    There is no evidence of change to the historic pattern of unauthorized immigrants

13 committing crimes at substantially lower rates than native-born Americans.[32]

14    221.    The federal government's own data also show that the vast majority of the drugs

15 smuggled into the country that the President has singled out as dangerous (methamphetamine,

16 heroin, cocaine, and fentanyl)[33] continue to come through, not between, ports of entry.[34]

17    222.    There continues to be a lack of credible evidence that terrorists are using the

18 southern border as a means of entering the United States, as a State Department report produced

19 under the Trump Administration makes clear.[35]

20    [30] White House, *Remarks by President Trump at the National Rifle Association
Leadership Forum* (Apr. 28, 2017), https://tinyurl.com/y5dtnaej.
21    [31] White House, *Remarks by President Trump Before Marine One Departure* (Jan. 10,
22 2019), https://tinyurl.com/yycew5dk.
    [32] *See, e.g.*, Alex Nowrateh, *The Murder of Mollie Tibbetts and Illegal Immigrant Crime:
23 The Facts*, Cato Institute (Aug. 22, 2018), https://tinyurl.com/y5boc9me (showing that "[t]he
illegal immigrant conviction rate for homicide was 44 percent *below* that of native-born
24 Americans in 2016 in Texas") (emphasis in original).
    [33] White House, *President Donald J. Trump's Address to the Nation on the Crisis at the
25 Border* (Jan. 8, 2019), https://tinyurl.com/y5uloxyg.
    [34] CBP, *CBP Enforcement Statistics FY2018*, https://tinyurl.com/y9c4c6ft (showing that
26 through August 2018, federal agents seized 88 percent of cocaine, 90 percent of heroin, 87
percent of methamphetamine, and 80 percent of fentanyl at ports of entry in this fiscal year).
27    [35] U.S. Dep't of State, Bureau of Counterterrorism, *Country Reports on Terrorism 2017*

28

36

223.   In his own public statements, President Trump has made clear that his emergency declaration was triggered by his inability to secure funding for the border wall from Congress rather than an actual national emergency at the border.

224.   When asked by the media about his plans to declare a national emergency relating to the border wall, President Trump stated his preference for "do[ing] the deal through Congress," but that if the deal did not "work out" he would "almost . . . definitely" declare a national emergency.[36] While he reiterated his claims that the volume of drugs, criminals, and gangs coming through the border between ports of entry constituted a "crisis," President Trump repeatedly cited the ongoing impasse with Congress as his rationale for the emergency declaration.[37]

225.   Around the same time, when asked by the media what his threshold was for declaring a national emergency, President Trump responded, "My threshold will be if I can't make a deal with people that are unreasonable."[38]

226.   On February 1, 2019, President Trump made clear in an interview that he was planning to wait until February 15, the deadline for a congressional conference committee to avert another government shutdown, before issuing an emergency declaration.[39] President Trump claimed he was already building the border wall, and strongly implied that he needed neither additional funding nor an emergency declaration to build it.[40]

---

205 (Sept. 2018), https://tinyurl.com/y93n5fes.
[36] *Trump Remarks before Marine One Departure*, *supra* note 31.
[37] *Id.*
[38] George Sargent, *Trump: I Have the 'Absolute Right' to Declare a National Emergency if Democrats Defy Me*, Wash. Post (Jan 9, 2018), https://tinyurl.com/y4vmtezb.
[39] N.Y. Times, *Excerpt from Trump's Interview with the New York Times* (Feb. 1, 2019), https://tinyurl.com/y9gsosk4; *see also* CBS, *Transcript: President Trump on "Face the Nation"* (Feb. 3, 2019), https://tinyurl.com/y8l38g72 (President Trump describing emergency declaration as an "alternative" to the process that Congress was engaged in to avert another shutdown, which was to end on February 15).
[40] *New York Times Interview, supra* note 39 (President Trump stating: "I'm building the wall right now. . . . it's been funded . . . . We'll be up to, by the end of this year, 115 miles . . . . At least . . . . And that doesn't include large amounts of wall that we'll be starting before the end of the year.  So we'll be up to hundreds of miles of wall between new wall and renovation wall in a fairly short period of time . . . . And I'll continue to build the wall, and we'll get the wall

227.    During a press conference that same day, when asked whether he would consider other options besides the emergency declaration, President Trump stated that "we will be looking at a national emergency, because I don't think anything is going to happen [in Congress].  I think the Democrats don't want border security."[41]  President Trump also repeated his view that the wall was already being built "with funds that are on hand . . . we're building a lot of wall right now, as we speak . . . [a]nd we're getting ready to hand out some very big contracts with money that we have on hand and money that comes in."[42]

## II.    CONGRESS HAS APPROPRIATED LIMITED FUNDING TOWARD A BORDER BARRIER AND NO FUNDING TOWARD PRESIDENT TRUMP'S PROPOSED BORDER WALL

228.    Congress has exercised its Article I powers by appropriating funds for the construction of border barriers and related infrastructure when Congress deemed it appropriate. During the period of 2005 through 2011, Congress appropriated funding for the construction of hundreds of miles of border barriers.[43]  Currently, there is a total of 705 miles of primary, secondary, or tertiary fencing along 654 miles of the southwest border.[44]

229.    In the 115th Congress, between 2017 and 2018, Congress considered, but repeatedly declined to adopt, legislation appropriating funding for President Trump's proposed border wall.[45]

---

finished. Now whether or not I declare a national emergency, that you'll see"); *see also* Donald J. Trump (@realDonaldTrump), Twitter (Jan. 31,  2019, 9:43 AM), https://tinyurl.com/y56tevok ("Wall is being built!").

[41] White House, *Remarks by President Trump in Meeting on Human Trafficking on the Southern Border* (Feb. 1, 2019), https://tinyurl.com/y5ghp3eh.

[42] *Id.*

[43] Gov't Accountability Office, *Additional Actions Needed to Better Assess Fencing's Contributions to Operations and Provide Guidance for Identifying Capability Gaps*, GAO-17-331 (Feb. 16, 2017), at 7-10, https://tinyurl.com/yaqbny6e; Gov't Accountability Office, *Secure Border Initiative Fence Construction Costs*, GAO-09-244R (Jan. 29, 2009), at 4-11, https://tinyurl.com/y2kgefp5.

[44] U.S. Border Patrol, *Mileage of Pedestrian and Vehicle Fencing by State* (Aug. 2, 2017), https://tinyurl.com/y6f27h4e.

[45] *See, e.g.*, The WALL Act of 2018, S. 3713, 115th Cong. (2018) (proposed $25 billion appropriation for border wall; no committee action); 50 Votes for the Wall Act, H.R. 7073, 115th Cong. (2018) (proposed $25 billion appropriation for funding for border wall; no committee action); Build the Wall, Enforce the Law Act of 2018, H.R. 7059, 115th Cong. (2018) (proposed

38

1    230.    Near the end of the 115th Congress, Congress worked on a funding bill before the

2  December 22, 2018 deadline when federal funding ran out for a number of federal departments.

3  On December 11, 2018, President Trump held a televised meeting with the Democratic leaders of

4  Congress (then-House Minority Leader Nancy Pelosi and Senate Minority Leader Chuck

5  Schumer) to discuss the funding deadline.  At that meeting, President Trump said he wanted $5

6  billion to build a portion of the border wall.  President Trump said at that meeting, "If we don't

7  get what we want one way or the other, whether it's through you, through a military, through

8  anything you want to call, I will shut down the government, absolutely."  President Trump

9  reiterated that he would be "proud to shut down the government for border security."  At the

10  meeting, Leaders Schumer and Pelosi said they disagreed with the President on providing funding

11  for the border wall.[46]

12    231.    On December 19, 2018, the Senate passed by voice vote a bill to fund the

13  government through February 8, 2019 that did not include any funding for a border wall.

14  Department of Defense Appropriations Act of 2018, H.R. 695, 115th Cong. (2018).

15    232.    After the Senate passed the temporary funding bill, on December 20, 2018,

16  President Trump announced that "I've made my position very clear.  Any measure that funds the

17  government must include border security," which he clarified must include funding for a wall.[47]

18

19  $16.6 billion appropriation for border wall; no committee action); Fund and Complete the Border
    Wall Act, H.R. 6657, 115th Cong. (2018) (proposed authorization of funding for border wall; no
20  committee action); American Border Act, H.R. 6415, 115th Cong. (2018) (proposed $16.6 billion
    appropriation for border wall; no committee action); Border Security and Immigration Reform
21  Act of 2018, H.R. 6136, 115th Cong. (2018) (proposed $16.6 billion appropriation for border
    wall; voted down by House 301 to 121); Securing America's Future Act of 2018, H.R. 4760,
22  115th Cong. (2018) (proposed construction of physical barrier, including border wall; voted down
    by House 231-193); Border Security and Deferred Action Recipient Relief Act, S. 2199, 115th
23  Cong. (2017) (proposal to make available $38.2 million for planning for border wall construction;
    no action in Senate); Make America Secure Appropriations Act, H.R. 3219, 115th Cong. (2017)
24  (proposed $38.2 million appropriation for border wall; passed House of Representatives, but no
    action by Senate).
25
    [46] CSPAN, *President Trump Meeting with Democratic Leaders* (Dec. 11, 2018),
26  https://tinyurl.com/ycalrz3x.
    [47] CNN, *Trump: "I've Made My Position Very Clear" on Spending Bill* (Dec. 20, 2018),
27  https://tinyurl.com/yy9cvzdd.
28

233.    On December 20, 2018, the House of Representatives approved a short-term funding bill appropriating $5.7 billion for "U.S. Customs and Border Protection – Procurement, Construction, and Improvements."  Department of Defense Appropriations Act of 2018, H.R. 695, 115th Cong. (2018).  The Senate never passed the House-approved version of the legislation.

234.    With no agreement between Congress and the President on funding, on December 22, 2018, the federal government partially shut down.

235.    On January 3, 2019, Nancy Pelosi became Speaker of the House.  The day before, Speaker Pelosi reiterated in a televised interview that the House would be providing "[n]othing for the wall."[48]  On January 3, the House of Representatives approved a short-term funding bill without any funding for a border wall.  Consolidated Appropriations Act of 2019, H.R. 21, 116th Cong. (2019).  The Senate never passed the House-approved version of the legislation.

236.    The Office of Management and Budget formally requested $5.7 billion from Congress for the border wall on January 6, 2019.[49]

237.    On January 19, 2019, President Trump addressed the nation regarding the partial government shutdown and laid out his immigration proposal.  In his remarks, he repeated his unsupported claims of an immigration enforcement crisis at the border in connection with his continued proposal for $5.7 billion in funding for a wall, stating that "[a]s a candidate for president, I promised I would fix this crisis, and I intend to keep that promise one way or the other."[50]

238.    When he announced the congressional agreement that ended the government shutdown on January 25, 2019, President Trump stated: "If we don't get a fair deal from Congress, the government will either shut down on February 15th, again, or I will use the powers afforded to me under the laws and the Constitution of the United States to address this

---

[48] Tal Axelrod, *Pelosi on Negotiations with Trump: "Nothing for the Wall"*, The Hill, (Jan. 2, 2019), https://tinyurl.com/y77o89hp.
[49] Letter from Russell T. Vought, Acting Director, Off. of Mgmt. and Budget, to Sen. Richard Shelby (Jan. 6, 2019), https://tinyurl.com/y224y59q.
[50] White House, *Remarks by President Trump on the Humanitarian Crisis on our Southern Border and the Shutdown* (Jan. 19, 2019), https://tinyurl.com/y7gdj6s8.

1    emergency."[51]

2        239.    After weeks of negotiation, on February 14, 2019, Congress passed the

3    Consolidated Appropriations Act, 2019 (H.J. Res. 31) (the "2019 Appropriations Act").  The

4    2019 Appropriations Act provides $1.375 billion for "construction of primary pedestrian fencing,

5    including levee pedestrian fencing, in the Rio Grande Valley Sector" of the border.  H.J. Res. 31

6    § 230(a)(1).  That is the only funding in the 2019 Appropriations Act that Congress designated for

7    the construction of a barrier.

8        240.    The 2019 Appropriations Act also imposes limitations on how the fencing may be

9    constructed.  The amount designated for fencing in the Rio Grande Valley Sector "shall only be

10   available for operationally effective designs deployed as of the date of the Consolidated

11   Appropriations Act, 2017 (Public Law 115-31), such as currently deployed steel bollard designs,

12   that prioritize agent safety."  *Id.* § 230(b).  The Consolidated Appropriations Act of 2017 was

13   enacted on May 5, 2017.  *See* Pub. L. No. 115-31.  Thus, the 2019 Appropriations Act authorized

14   fencing only using designs already "deployed" nearly two years ago.  The Consolidated

15   Appropriations Act of 2017 likewise does not authorize the construction of a concrete or any

16   other solid wall.  *Id.*

17       241.    Congress made clear its intent that it was not appropriating any funding toward the

18   construction of a wall.  Senator Patrick Leahy, Vice Chairman of the Senate Appropriations

19   Committee, who was actively involved in negotiations on the 2019 Consolidated Appropriations

20   Act, stated, "The agreement does not fund President Trump's wasteful wall."  165 Cong. Rec.

21   S1362 (daily ed. Feb 14, 2019).  Senator Schumer, the Senate Minority Leader, noted that, "The

22   agreement will provide smart border security, increasing support for technologies at our ports of

23   entry.  It will not fund the President's expensive, ineffective wall."  165 Cong. Rec. S1363 (daily

24   ed. Feb. 14, 2019).  The congressional record in the House of Representatives is no different.

25   *See, e.g.*, 165 Cong. Rec. H2019 (daily ed. Feb. 14, 2019) (statement of Rep. Price) ("This

26   agreement denies the President billions of dollars for an unnecessary wall."); 165 Cong. Rec.

27   _____

28   [51] White House, *Remarks by President Trump on the Government Shutdown* (Jan. 25,
     2019), https://tinyurl.com/y4mplplb.

41

1    H2020 (daily ed. Feb. 14, 2019) (statement of Rep. Aguilar) ("What this bill will not do is . . .

2    fund the President's wall from sea to shining sea, a wall that he said Mexico would pay for.").

3          242.    On February 15, 2019, President Trump signed the 2019 Consolidated

4    Appropriations Act into law.

5    **III.   PRESIDENT TRUMP'S EXECUTIVE ACTION AND EMERGENCY DECLARATION**

6          243.    That same day, the Trump Administration announced that the President was taking

7    Executive Action to redirect funding beyond what was appropriated by Congress toward

8    construction of a border wall. The Administration outlined specific plans for the diversion of an

9    additional $6.7 billion "that will be available to build the border wall once a national emergency

10   is declared and additional funds have been reprogramed."[52] The Administration identified the

11   following funding for diversion to "be used sequentially":

12      •   $601 million from the Treasury Forfeiture Fund;

13      •   Up to $2.5 billion under the Department of Defense funds transferred for Support for

14         Counterdrug Activities (10 U.S.C. § 284); and

15      •   Up to $3.6 billion reallocated from Department of Defense military construction projects

16         under the President's declaration of a national emergency (10 U.S.C. § 2808).[53]

17          244.    In conjunction with that announcement, the President also declared a national

18   emergency under the National Emergencies Act claiming that there is a "border security and

19   humanitarian crisis that threatens core national security interests and constitutes a national

20   emergency." The Emergency Declaration claimed that the border is an entry point for "criminals,

21   gang members, and illicit narcotics."[54] The Emergency Declaration continues: "The problem of

22   large-scale unlawful migration through the southern border is long-standing, and despite the

23   executive branch's exercise of existing statutory authorities, the situation has worsened in certain

24   respects in recent years. In particular, recent years have seen sharp increases in the number of

25             ──────────────

26   [52] White House, *President Donald J. Trump's Border Security Victory* (Feb. 15, 2019), https://tinyurl.com/y3empmay.

[53] *Id.*

27   [54] Declaring a National Emergency Concerning the Southern Border of the United States, 84 Fed. Reg. 4949 (Feb. 15, 2019).

28

family units entering and seeking entry to the United States and an inability to provide detention space for many of these aliens while their removal proceedings are pending."[55]  The Emergency Declaration concludes that the difficulty in removing these family units justifies the declaration, but it does not make any connection to how the entry of these family units into the United States contributes to the flow of "criminals, gang members, and illicit narcotics" into the country.[56]

245.     The President invoked the National Emergencies Act and declared that the "emergency requires use of the Armed Forces" and "that the construction authority provided in section 2808 of title 10, United States Code, is invoked and made available, according to its terms, to the Secretary of Defense, and at the discretion of the Secretary of Defense, to the Secretaries of the military departments."

246.     The Emergency Declaration directs the Secretary of Defense or the Secretary of relevant military departments to "order as many units or members of the Ready Reserve to active duty as the Secretary concerned, in the Secretary's discretion, determines to be appropriate to assist and support the activities of the Secretary of Homeland Security at the southern border."[57] The Emergency Declaration acknowledges that DOD had previously "provided support and resources to the Department of Homeland Security at the southern border" pursuant to President Trump's April 4, 2018 memorandum.[58]

247.     The Emergency Declaration further directs the Secretaries of Defense, Interior, and Homeland Security to "take all appropriate actions, consistent with applicable law, to use or support the use of the authorities herein invoked."[59]

248.     At a press conference announcing the Executive Actions, President Trump acknowledged that Congress provided more than enough funding for homeland security, and that the Administration has "so much money, we don't know what to do with it."  In explaining his rationale for the Executive Actions, the President candidly admitted that the emergency

---

[55] *Id.*
[56] *Id.*
[57] *Id.* § 1.
[58] *Id.*
[59] *Id.* § 2.

1    declaration reflected his personal preference to construct the wall more quickly, rather than an

2    actual urgent need for it to be built immediately: "I could do the wall over a longer period of time.

3    I didn't need to do this.  But I'd rather do it much faster."[60]

4          249.    Following the announcement of the Executive Actions, Defendants announced

5    their plans in more specific detail.  Based on information and belief, on February 15, 2019, the

6    Treasury notified Congress that it would be transferring $242 million from the Treasury

7    Forfeiture Fund to DHS to support law enforcement border security efforts conducted by CBP to

8    be available for obligation as of March 2, 2019, with the remaining $359 million to be transferred

9    and available for obligation at a later date.

10          250.    On February 26, 2019, the White House released a "fact sheet" indicating that in

11    order to accommodate the Executive Action's directive to use $2.5 billion from DOD's drug

12    interdiction account toward construction of a border wall, DOD "will augment existing

13    counterdrug funds" through the Department's transfer authority provided in section 8005 of the

14    FY2019 Department of Defense Appropriations Act, P.L. No. 115-245.[61]  Based on information

15    and belief, DOD has informed Congress that it immediately plans to divert $1 billion in

16    "underutilized" funds that were appropriated for military pay and pensions for the construction of

17    the border wall.[62]

18    **IV.    LEGAL BACKGROUND**

19        **A.    The National Emergencies Act (50 U.S.C. §§ 1601-1651)**

20          251.    The National Emergencies Act ("NEA"), Pub. L. 94-412, 90 Stat. 1255, codified at

21    50 U.S.C. sections 1601-1651, was enacted by Congress in 1976 to rein in, rather than expand,

22    the power of the president.  The NEA was designed to "insure" that the president's

23    "extraordinary" emergency powers would "be utilized only when emergencies actually exist."  S.

24    Rep. No. 94-1168, at 2 (1976).  Senator Frank Church, who was instrumental in the development

25

26    [60] White House, *Remarks by President Trump on the National Security and Humanitarian Crisis on our Southern Border* (Feb. 15, 2019), https://tinyurl.com/y3jenqeu.

27    [61] White House, *The Funds Available to Address the National Emergency at Our Border* (Feb. 26, 2019), https://tinyurl.com/y3yu3pr8.

28    [62] Andrew Taylor and Lisa Mascaro, *Pentagon May Tap Military Pay, Pensions for Border Wall*, ABC News (Mar. 7, 2019), https://tinyurl.com/y5pg7wtv.

of the NEA, testified before the Senate Committee of Government Operations "that the President should not be allowed to invoke emergency authorities or in any way utilize the provisions of this Act for frivolous or partisan matters, nor for that matter in cases where important but not 'essential' problems are at stake." *Hearing on H.R. 3884 Before the S. Comm. of Governmental Operations*, 94th Cong. 7 (1976) (statement of Sen. Frank Church). Senator Church continued that "[t]he Committee intentionally chose language which would make clear that the authority of the Act was to be reserved for matters that are 'essential' to the protection of the Constitution and the people." *Id.*

252.   The NEA allows the president to utilize emergency powers, as authorized by Congress in other federal statutes, when there is a national emergency, and one has been declared. 50 U.S.C. § 1621.

253.   Under the NEA, the president must specify the statutory emergency authorities he intends to invoke upon issuing a national emergency. He must also publish the proclamation of a national emergency in the Federal Register and transmit it to Congress. 50 U.S.C. § 1631.

254.   The NEA sets out a procedure whereby Congress may terminate the national emergency if a resolution is passed by both houses of Congress and becomes law. 50 U.S.C. § 1622. This procedure requires that the joint resolution be signed into law by the President, or if vetoed by the President, that Congress overrides the veto with a two-thirds vote in both chambers of Congress.

255.   On February 26, 2019, the House of Representatives passed H.J. Res. 46 terminating the Emergency Declaration by a vote of 245 to 182. The Senate has yet to act on the resolution. President Trump has vowed to veto any resolution by Congress terminating the Emergency Declaration.[63]

**B.    Section 2808's Emergency Military Construction Authority (10 U.S.C. § 2808)**

256.   The President seeks to reallocate "[u]p to $3.6 billion . . . from Department of

---

[63] Phil Helsel, *Trump Says He Will Veto Resolution Terminating National Emergency*, NBC News (Feb. 28, 2019), https://tinyurl.com/y2a53xrz.

Defense military construction projects under the President's declaration of a national emergency."[64]

257.   Section 2808 states that when the president declares a national emergency "that requires use of the armed forces," the Secretary of Defense may "undertake military construction projects . . . not otherwise authorized by law that are necessary to support such use of the armed forces." 10 U.S.C. § 2808(a).

258.   Section 2808 limits the funds available for emergency military construction to "the total amount of funds that have been appropriated for military construction . . . that have not been obligated." *Id.*

259.   "Military construction" under Section 2808 includes "any construction, development, conversion, or extension of any kind carried out with respect to a military installation," and "military installation" includes a "base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department." 10 U.S.C. § 2801.

**C.   Section 284's Authority to Support Counter-Drug Activities (10 U.S.C. § 284) and Section 8005's Transfer Authority**

260.   The President seeks to use "[u]p to $2.5 billion under the Department of Defense funds transferred for Support for Counterdrug Activities."[65]  Defendants intend to transfer up to $2.5 billion from other DOD accounts into the Department's account for counterdrug activities in order to satisfy that directive.[66]

261.   Section 284 authorizes the Secretary of Defense to assist civilian law enforcement with drug enforcement activities.  10 U.S.C. § 284.  It states that the Secretary of Defense "may provide support for the counterdrug activities or activities to counter transnational organized crime" of any law enforcement agency.  Such support may include "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international

---

[64] *President Donald J. Trump's Border Security Victory*, *supra* note 43 (citing 10 U.S.C. § 2808).
[65] *Id.* (citing 10 U.S.C. § 284).
[66] *Funds Available to Address the National Emergency at Our Border*, *supra* note 61(citing section 8005 of the FY2019 Department of Defense Appropriations Act).

1  boundaries of the United States." *Id.*

2  262.   Use of Section 284 is not dependent on the president declaring a national

3  emergency.

4  263.   Congress has appropriated funding for interdiction and counterdrug activities to

5  the DOD.  For instance, in FY2019, Congress appropriated $217,178,000 for National Guard

6  counterdrug programs subject to specific limitations on how the Administration may expend these

7  funds.[67]  That funding is intended to support counterdrug operations at all levels of government,

8  including on a state-wide basis.[68]  According to a U.S. Government Accountability Office

9  analysis, National Guard Counterdrug Program funding was planned for all fifty states plus

10  Washington, D.C., Puerto Rico, the U.S. Virgin Islands, and Guam.[69]

11  264.   Section 8005 of the FY2019 Department of Defense Appropriations Act, P.L. No.

12  115-245 provides that "[u]pon determination by the Secretary of Defense that such action is

13  necessary in the national interest, he may, with the approval of the Office of Management and

14  Budget, transfer not to exceed $4,000,000,000 of working capital funds of the Department of

15  Defense or funds made available in this Act to the Department of Defense for military functions

16  (except military construction) between such appropriations or funds or any subdivision thereof, to

17  be merged with and to be available for the same purposes and for the same time period, as the

18  appropriation or fund to which transferred."

19  265.   The "funds made available" in the FY2019 Department of Defense Appropriations

20  Act includes those funds for the States' national guards such as over $8.6 billion appropriated for

21  Army National Guard personnel, almost $3.7 billion appropriated for Air Force National Guard

22  personnel, over $7.1 billion appropriated for Army National Guard operations and maintenance,

23  over $6.4 billion appropriated for Air Force National Guard operations and maintenance, and $1.3

24  [67] Department of Defense and Labor, Health and Human Services, and Education
25  Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. No. 115-245 (Sept. 28, 2018).
26  [68] Nat'l Guard, National Guard Counterdrug Program, https://tinyurl.com/yx9whzd8 (last visited Feb. 17, 2019).
27  [69] Gov't Accountability Off., *Drug Control, DOD Should Improve Its Oversight of the National Guard Counterdrug Program*, GAO-19-27 (Jan. 2019), https://tinyurl.com/y4e6ocra.
28

47

1    billion for procurement items for the reserve components of the Armed Forces, including the

2    National Guard.[70]

3        266.    Section 8005's transfer authority is subject to several conditions, including

4    "prompt" notification to Congress.  In addition, the Section 8005 transfer authority "may not be

5    used unless for higher priority items, based on unforeseen military requirements, than those for

6    which originally appropriated and in no case where the item for which funds are requested has

7    been denied by Congress."

8        267.    Defendants have not explained how diversion of DOD funds toward construction

9    of a border wall would "block drug smuggling corridors" as contemplated by 10 U.S.C. section

10   284.  Neither have Defendants explained how transferring funding for a border wall is for a

11   "higher priority item" nor an "unforeseen military requirement."  Defendants have not provided

12   an explanation, nor could they, as to how diverting funding toward construction of a border wall

13   would not be transferring funds for a project for which Congress has already denied funding.

14       **D.    Authority to Transfer Funds from Treasury Forfeiture Fund (31 U.S.C. §**
         **9705)**
15

16       268.    The President seeks to use "about $601 million" from the Department of the

17   Treasury's Forfeiture Fund.[71]

18       269.    Section 9705(g)(4)(B) provides that after reserves and required transfers, the

19   Treasury Forfeiture Fund's "unobligated balances . . . shall be available to the Secretary . . . for

20   obligation or expenditure in connection with the law enforcement activities of any Federal

21   agency. . . ."

22       270.    Defendants have not provided any explanation justifying the diversion of funding

23   from the Treasury Forfeiture Fund toward construction of the border wall.  Specifically,

24   Defendants have not provided any explanation to warrant using Treasury Forfeiture Funds for the

25   construction of a border wall as opposed to reimbursing the Plaintiffs States' outstanding claims

26   from the Treasury Forfeiture Fund.

27   _____

28   [70] H.R. 6157, 115th Cong. § 4 (2019).
     [71] *Border Security Victory, supra* note 52.

48

E.   **National Environmental Policy Act ("NEPA")**

271.    NEPA, 42 U.S.C. section 4321 et seq., is the "basic national charter for protection of the environment."  40 C.F.R. § 1500. l (a).  NEPA contains several action-forcing procedures, most significantly the mandate to prepare an environmental impact statement ("EIS") on major federal actions "significantly affecting the quality of the human environment." *Robertson v. Methow Valley Citizen Council*, 490 U.S. 332, 348 (1989) (citing 42 U.S.C. § 4332 (2)(C)).

272.    NEPA requires federal agencies to consider several factors relating to the "intensity" of the project, including: the "[u]nique characteristics of the geographic area such as proximity to . . . ecologically critical areas" (40 C.F.R. § 1508.27(3)); "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973" (40 C.F.R. § 1508.27(9)); and "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment."  40 C.F.R. § 1508.27(10).

273.    "NEPA requires that the evaluation of a project's environmental consequences take place at an early stage in the project's planning process." *State of California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982) (citation omitted).  A proposal subject to NEPA exists where an agency has a goal and is actively preparing to make a decision on the alternatives in accomplishing that goal, regardless of whether the agency declares that such a proposal exists: "An agency shall commence preparation of an environmental impact statement as close as possible to the time the agency is developing or is presented with a proposal."  40 C.F.R. § 1502.5.  A "[p]roposal exists at that stage in the development of an action when an agency subject to the Act has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated."  40 C.F.R. § 1508.23.

V.   **THERE IS NO IMMIGRATION ENFORCEMENT "CRISIS" OR "INVASION" AT THE SOUTHERN BORDER TO SUPPORT THE DECLARATION OF EMERGENCY**

A.   **There Is No Evidence That a Massive Influx of Migrants Is Overwhelming Government Resources at the Southern Border**

274.    President Trump's continued claim that an unprecedented flood of migrants is

49

1   causing an immigration enforcement crisis amounting to a "national emergency" is not supported

2   by the facts.[72]

3       275.    As CBP statistics show, apprehensions at the border in recent months—while they

4   show increases stemming from an increase in migrant families seeking asylum—are well within

5   the historic range.[73]

6       276.    In recent years, apprehensions at the southwest border have been near historic

7   lows, with fewer than 400,000 apprehensions in FY2018 compared to over 1.6 million in

8   FY2000.[74]

9       277.    In FY2017, CBP made the fewest apprehensions since FY2000, and the number of

10  apprehensions in FY2018 was the fifth lowest since FY2000.[75]

11

12

13

14

15

16

17

18

19

20

---

21      [72] *See* 165 Cong. Rec. S1412 (daily ed. Feb. 25, 2019) (joint declaration of 58 former
United States senior government national security, defense, and diplomatic officials, including
22  former Cabinet Secretaries Madeline Albright, Chuck Hegel, John Kerry, and Leon Panetta,
hereafter "Former Gov't Officials Decl.") (stating that "there is no evidence of a sudden or
23  emergency increase in the number of people seeking to cross the southern border").
        [73] CBP, *Southwest Border Migration FY2019*, https://tinyurl.com/CBP-app-2019 (last
24  visited Feb. 17, 2019).
        [74] CBP, *Nationwide Illegal Alien Apprehensions Fiscal Years 1925-2017*,
25  https://tinyurl.com/y2kysbr8 (last visited Feb. 17, 2019) (also showing over 1 million
apprehensions in each of fiscal years 1954, 1983-87, 1990-99, 2001, 2004-06, as well as over
26  800,000 apprehensions in each of fiscal years 1953, 1977-79, 1981-82, 1988-89, 2002, 2003, and
27  2007).
        [75] *Id.* (also the source of data for the graph included herein).

28



278.     During this same time span, there were dramatic increases in the number of Border Patrol agents utilized to patrol the southwest border between the ports of entry.  From 2000 to 2017, CBP increased its Border Patrol agent staffing nationwide by 111 percent, from 9,212 to 19,437 agents.  CBP increased the number of Border Patrol agents assigned to the southwest border sectors by nearly 94 percent, from 8,580 to 16,605 agents during the 2000-2017 time period.[76]

279.     The number of Border Patrol agents have significantly increased over the past two decades, while illegal border crossings have dropped, causing the average annual number of apprehensions made by each Border Patrol agent to drop by almost 91 percent, from 192 in FY2000 to only 18 in FY2017.[77]

280.     The Border Patrol's budget has also significantly increased during this period, with Congress' appropriations increasing from $1.055 billion in FY2000 to $3.805 billion in FY2017, an increase of over 260 percent.[78]

[76] CBP, *Border Patrol Agent Nationwide Staffing by Fiscal Year*, https://tinyurl.com/yyazdqm7 (last visited Feb. 17, 2019).
[77] *Id.*; CBP, *Total Illegal Alien Apprehensions by Fiscal Year*, https://tinyurl.com/y73mzshs (last visited Feb. 17, 2019).
[78] CBP, *Enacted Border Patrol Program Budget by Fiscal Year*,

51

281.    In September 2017, DHS published a report in which it concluded that "the southwest land border is more difficult to illegally cross today than ever before."[79]

282.    This difficulty is borne out in the precipitous drop in undetected unlawful entries, which, as a 2018 DHS study estimated, "fell from approximately 851,000 to nearly 62,000 [between FY2006 and 2016], a 93 percent decrease."[80]

Figure 2:  Estimated Southwest Border Undetected Unlawful Entries, FY 2006 – FY 2016



283.    That same DHS report contained data showing that probability of detection markedly increased during this time period, "from 70 percent in FY2006 (when an estimated 2.0 million unlawful border crossers were detected out of an estimated 2.9 million total unlawful border crossers) to 91 percent in FY2016 (611,000 detected out of 673,000 total estimated unlawful border crossers)."[81]

284.    In general, the undocumented population in the United States has dropped

https://tinyurl.com/yxw4bj4b (last visited Mar. 12, 2019).
[79] DHS, Off. of Immigr. Stats., *Efforts by DHS to Estimate Southwest Border Security between Ports of Entry* (Sept. 2017), https://tinyurl.com/y9gbn5js.
[80] DHS, *Border Security Metrics Report* (May 1, 2018), https://tinyurl.com/y2p96d2o (2016 is the most recent year for which this data is available).
[81] *Id.*

1  significantly in recent years, falling by about 1 million between 2010 and 2017.[82]

2      285.    The overall characteristics of individuals who are apprehended at the southwest

3  border have changed significantly, from predominantly adult male Mexican nationals entering the

4  United States alone, to increasing numbers of families from Central America.[83]  Many of these

5  migrant families are requesting asylum upon entry into the United States.[84]

6      286.    The Director of National Intelligence's most recent "Worldwide Threat

7  Assessment" ("DNI Report") was produced on January 29, 2019.  That report discusses several

8  topics germane to the Emergency Declaration, including migration, terrorism, and transnational

9  crime (including human and drug trafficking).[85]

10     287.    While the DNI Report notes that "high crime rates and weak job markets will spur

11  additional United States-bound migrants from the Northern Triangle—El Salvador, Guatemala,

12  and Honduras," the report contains no mention of a security threat at the southwest border.[86]  The

13  report also discusses "transnational organized crime" as a driver of migration,[87] consistent with

14  research by federal officials indicating that most migrants from the Northern Triangle are "fleeing

15  violence at home" and seeking to claim asylum in the United States.[88]

16     288.    At the January 29, 2019, hearing of the Senate Intelligence Committee where the

17  report was presented, the heads of the Office of the Director of National Intelligence (DNI),

18  Federal Bureau of Investigation, and Central Intelligence Agency—all appointed by President

19

20  [82] Robert Warren, *U.S. Undocumented Population Continued to Fall from 2016 to 2017, and Visa Overstays Significantly Exceeded Illegal Crossings for the Seventh Consecutive Year*, Ctr. for Migration Studies (Jan. 16, 2019), https://tinyurl.com/y7wa849r; *see also* Former Gov't

21  Officials Decl., *supra* note 72, at S1412 ("The United States currently hosts what is estimated to be the smallest number of undocumented immigrants since 2004").

22  [83] Cong. Res. Serv., *The Trump Administration's "Zero Tolerance" Immigration Enforcement Policy* (Jul. 20, 2018) https://tinyurl.com/y6rxgjpk.

23  [84] *See, e.g.*, Noomaan Merchant, *Crush of Desperate Migrant Families Seek Asylum at Border*, Associated Press (Jan. 23, 2019), https://tinyurl.com/y4to9ykq.

24  [85] Daniel R. Coats, *Worldwide Threat Assessment*, Off. of the Dir. of Nat'l Intelligence (Jan. 29, 2019), https://tinyurl.com/y9r6kkhu.

25  [86] *Id.* at 41.

26  [87] *Id.* at 19.

27  [88] Max Ehrenfreund, *The Huge Immigration Problem That Donald Trump's Wall Won't Solve*, Wash. Post (Dec. 18, 2015), https://tinyurl.com/yxgwlx2q (citing research by Federal Reserve Bank of Dallas economist).

28

Trump—testified about international threats to the United States.  During that hearing, none of these officials even mentioned issues relating to the southwest border; they also did not testify that the situation at the United States-Mexico border constituted a threat to the United States' national security.[89]

**B.     There Is No Evidence that Terrorists Are Infiltrating the United States via the Southern Border**

289.    The Trump Administration's assertions that terrorism concerns justify its actions here are without factual basis.

290.    President Trump and other members of his Administration, including DHS Secretary Nielsen, have repeatedly claimed that terrorists have attempted to infiltrate the United States via the southern border and that the border wall is needed to stop this from happening.[90]

291.    However, the federal government's own reports, as well as credible third-party analysis, show that these claims are false.

292.    In fact, while over 2,500 individuals on the Federal Bureau of Investigation's terrorist watchlist attempted to travel to the United States in FY2017, the vast majority—over 2,100—attempted to do so by air.[91]

293.    More generally, a 2018 U.S. State Department report finds that there is "no

---

[89] CSPAN, *Global Threats and National Security* (Jan. 29, 2019), https://tinyurl.com/ydyaugm5; *see also* Former Gov't Officials Decl., *supra* note 72, at S1413 ("In a briefing before the House Armed Services Committee the next day, Pentagon officials acknowledged that the 2018 National Defense Strategy does not identify the southern border as a security threat").

[90] *See* White House, *Remarks by Vice President Mike Pence at an America First Policies Tax Reform Event* (Feb. 17, 2018), https://tinyurl.com/y54tmrzo (claiming that "seven individuals a day who are either known or suspected terrorists" are apprehended at one Texas port of entry); Donald J. Trump (@realDonaldTrump), Twitter (Oct. 22, 2018, 5:37 AM), https://tinyurl.com/mid-easterners-tweet (asserting that "unknown Middle Easterners" are part of the Caravan, and that he has "alerted Border Patrol and Military that this is a National Emergy [sic]."); *see also* Calvin Woodward, *AP FACT CHECK: Trump's Mythical Terrorist Tide From Mexico*, ABC News (Jan. 7, 2019), https://tinyurl.com/yyhewhrl (collecting other statements by Administration officials asserting that large numbers of individuals with terrorist ties are apprehended at the Southern Border).

[91] DHS and U.S. Dep't of Justice, *Executive Order 13780: Protecting the Nation From Foreign Terrorist Entry Into the United States Initial Section 11 Report* 9 (Jan. 2018), https://tinyurl.com/yy6bg66j.

---

54

credible evidence indicating that international terrorist groups have established bases in Mexico, worked with Mexican drug cartels, or sent operatives via Mexico into the United States."[92]

294.   While noting that "[t]he U.S. southern border remains vulnerable to *potential* terrorist transit," the report concluded that "terrorist groups likely seek other means of trying to enter the United States."[93]

295.   A recent comprehensive study by the Cato Institute—using data going back to 1975—found that "there have been zero people murdered or injured in terror attacks committed by illegal border crossers on U.S. soil."[94]

296.   In fact, almost every individual convicted of even planning a terrorist attack on the United States who entered the country illegally came over the Canadian border or jumped ship in American ports.[95]

297.   Only three individuals convicted of a terrorist plot entered illegally through the Mexican border, and they did so as children in the 1980s, decades before the planned attack was foiled in 2007.[96]

298.   Further, the Cato Institute noted that "[n]ot a single terrorist in any visa category came from Mexico or Central America during the 43-year period."[97]

299.   The DNI Report contains a three-page discussion of terrorism.  That discussion does not mention any threat of terrorists infiltrating the United States through the southwest border.[98]  Indeed, terrorism is not discussed at all in the Western Hemisphere section of the

---

[92] U.S. Dep't of State, Bureau of Counterterrorism, *Country Reports on Terrorism 2017* 205 (Sept. 2018), https://tinyurl.com/y93n5fes.
[93] *Id.* (emphasis added).
[94] David Bier & Alex Nowrasteh, *45,000 "Special Interest Aliens" Caught Since 2007, But No U.S. Terrorist Attacks from Illegal Border Crossers*, Cato Inst. (Dec. 17, 2018), https://tinyurl.com/yddqwes3.
[95] *Id.*; *see also* Former Gov't Officials Decl., *supra* note 72, at S1412 ("Between October 2017 and March 2018, forty-one foreign immigrants on the terrorist watchlist were intercepted at the northern border.  Only six such immigrants were intercepted at the southern border").
[96] *Id.*
[97] Alex Nowrasteh, *Does the Migrant Caravan Pose a Serious Terrorism Risk?*, Cato Inst. (Oct. 23, 2018), https://tinyurl.com/yap9uc9s.
[98] *DNI Report*, *supra* note 85 at 10–13.

55

1  report.[99]

2  300.   At the January 29, 2019, Senate Intelligence Committee hearing about the report,

3  none of the national security officials testified to terrorists infiltrating the United States through

4  the southern border.  The DNI's and Central Intelligence Agency Director's testimony focused on

5  threats in the Middle East, Africa, and the Philippines.[100]

6  301.   Thus, while combating terrorism is an important national priority, illegal crossings

7  at the southern border do not materially contribute to that problem and provide no factual

8  justification for declaring an emergency requiring the diversion of funds to build a wall.

9  **C.   There Is No Evidence that a Border Wall Will Decrease Crime Rates**

10  302.   Studies have consistently shown that the connection that President Trump attempts

11  to draw between unauthorized immigration and increased crime rates is false.

12  303.   According to a 2018 Cato Institute study examining 2016 incarceration rates,

13  unauthorized immigrants were 47 percent less likely to be incarcerated for crimes than native-

14  born Americans.[101]

15  304.   A 2018 Cato Institute report examining 2015 Texas crime statistics found that

16  undocumented immigrants had a criminal conviction rate 50 percent below that for native-born

17  Americans.[102]

18  305.   A 2018 study published in *Criminology* examining national crime rates from 1990

19  to 2014 found "that undocumented immigration does not increase violence" and in fact

20

21

22  [99] *Id.* at 40–42.
23  [100] Global Threats and National Security, *supra* note 89 (24:12-:21; 32:05-:50; 1:27:15-:50; 1:28:40-:29:57).
24  [101] Michelangelo Landgrave & Alex Nowrasteh, *Incarcerated Immigrants in 2016*, Cato Inst. Res. and Pol'y Br. No. 7 (Jun. 4, 2018), https://tinyurl.com/y2jn4e3x; *see also* Former Gov't
25  Officials Decl., *supra* note 72, at S1412 (stating that "in Texas, undocumented immigrants were found to have a first-time conviction rate 32 percent below that of native-born Americans; the
26  conviction rates of unauthorized immigrants for violent crimes such as homicide and sex offenses were also below those of native-born Americans").
27  [102] Alex Nowrasteh, *Criminal Immigrants in Texas*, Cato Inst. Res. and Pol'y Br. No. 4 (Feb. 26, 2018), https://tinyurl.com/y62qjsa6.

28

1    "[i]ncreases in the undocumented immigrant population within states are associated with

2    significant decreases in the prevalence of violence."[103]

3        306.    A 2017 study in the *Journal of Ethnicity in Criminal Justice* examining

4    immigration and crime rates nationally over a 40-year period found that in the 10 cities where the

5    immigrant population increased the most, crime levels in 2016 decreased to lower levels of crime

6    than in 1980.[104]  "The most striking finding from our research is that for murder, robbery,

7    burglary and larceny, as immigration increased, crime decreased, on average, in American

8    metropolitan areas."[105]  Large cities with substantial immigrant populations have *lower* crime

9    rates, on average, than those with minimal immigrant populations.[106]

10       307.    A 2010 study showed that native-born American men between ages 18 to 39 with

11   no high school diploma had triple the incarceration rate of immigrant men from Mexico, El

12   Salvador, and Guatemala with the same age and education profile.[107]

13       308.    The Administration's repeated claims that building a border barrier in El Paso,

14   Texas reduced a previously high rate of violent crimes there are also false.[108]

15       309.    In fact, when the new border barrier was built in 2009, crime in El Paso had been

16   dramatically decreasing since the 1990s, just as the violent crime rate decreased substantially

17   nationwide from the 1990s through the present.[109]  "From 2006 to 2011—two years before the

18
19           [103] Michael T. Light & Ty Miller, *Does Undocumented Immigration Increase Violent
     Crime?* Criminology (Mar. 25, 2018), https://tinyurl.com/ycyzsf27.
20           [104] Robert Adelman et al., *Urban crime rates and the changing face of immigration:
     Evidence across four decades*, J. of Ethnicity in Crim. Justice, Vol. 15 (2017),
21   https://tinyurl.com/y6czenh7; *see also* Anna Flag, *The Myth of the Criminal Immigrant*, N.Y.
     Times (Mar. 30, 2018), https://tinyurl.com/y9hcu6kp.
22           [105] Charis Kubrin et al., *Immigrants Do Not Increase Crime, Research Shows*, Scientific
     American (Feb. 7, 2017), https://tinyurl.com/h8xauk2.
23           [106] *Id.*
24           [107] Walter Ewing, et al., *The Criminalization of Immigration in the United States*, Am.
     Immigr. Council Rep. (Jul. 13, 2015), https://tinyurl.com/jxcv9aq.
25           [108] *See, e.g.,* White House, *President Donald J. Trump's State of the Union Address* (Feb.
     5, 2019), https://tinyurl.com/y77nquv5 ("The border city of El Paso, Texas, used to have
26   extremely high rates of violent crime—one of the highest in the entire country, and considered
     one of our nation's most dangerous cities.  Now, immediately upon its building, with a powerful
27   barrier in place, El Paso is one of the safest cities in our country.").
             [109] Federal Bureau of Investigation, Uniform Crime Reports, Crime in the United States,
28

57

1  fence was built to two years after—the number of violent crimes recorded in El Paso increased by

2  17 percent."[110]

3       310.    CBP data show that as the mix of apprehended migrants has shifted to an

4  increasing proportion of families as discussed above, the numbers of violent crimes committed by

5  this group has also decreased.[111]

6     **D.   There Is No Evidence that a Border Wall Will Impact the Smuggling of
           Dangerous Drugs into the United States**

7

8       311.    For years, the vast majority of the drugs smuggled into the country that the

9  President has singled out as dangerous (methamphetamine, heroin, cocaine, and fentanyl)[112] have

10 been smuggled through, not between, ports of entry.[113]

11      312.    From 2012-2018, 86 percent of cocaine, 88 percent of heroin, and 84 percent of

12 methamphetamine came through ports of entry.[114]

13      313.    From 2017-2018, 83 percent of fentanyl came through legal border ports of

14 entry.[115]

15

16 Table 1 (showing violent crime rate reduction from 567.6 violent crimes per 100,000 inhabitants
   in 1998 to 382.9 per 100,000 inhabitants in 2017), https://tinyurl.com/yyvc6636 (last visited Feb.
17 17, 2019).
        [110] Madlin Mekelburg, *State of the Union: Facts Show Trump Wrong to Say El Paso*
18 *Dangerous City until Fence*, El Paso Times (Feb. 5, 2019), https://tinyurl.com/y9ol96az (citing
   crime data from El Paso County Sheriff's Office and FBI Uniform Crime Reports).
19      [111] Alex Nowrasteh, *There Is No National Emergency on the Border, Mr. President*, Cato
20 Institute, https://www.cato.org/blog/there-no-national-emergency-border-mr-president (citing
   CBP data).
21      [112] *Trump Address on Crisis at Border*, *supra* note 33; *see also* White House, *President
22 Donald J. Trump Is Committed to Working with Congress to Solve Our Urgent Immigration
   Crisis* (Feb. 5, 2019), https://tinyurl.com/yyhzvrq9 ("Tens of thousands of Americans are killed
23 by tons of deadly, illicit drugs trafficked into our country by criminal aliens, gangs, and cartels
   exploiting our porous border.  The lethal drugs that flood across our border and into our
24 communities include meth, heroin, cocaine, and fentanyl.").
        [113] CBP, *Enforcement Statistics FY2018*, https://tinyurl.com/y9c4c6ft (showing that
25 through August 2018, out of all the drugs seized by CBP in that fiscal year, 88 percent of cocaine,
26 90 percent of heroin, 87 percent of methamphetamine, and 80 percent of fentanyl were seized by
   Field Operations at ports of entry).
27      [114] *Id.*
        [115] *Id.*
28

1    314.    For instance, CBP officers recently made what is being touted (including by

2    President Trump[116]) as the largest seizure of fentanyl in history.  Some 254 pounds of the drug

3    and 395 pounds of methamphetamine were discovered hidden in a floor compartment of a truck

4    loaded with cucumbers as the truck tried to enter through the port of entry at Nogales, Arizona.[117]

5    315.    The most recent Drug Enforcement Agency (DEA) National Drug Threat

6    Assessment affirms the CBP data showing that the bulk of dangerous illegal drugs flow through,

7    not between, ports of entry.[118]

8    316.    For example, in that report, the DEA states that "[a] small percentage of all heroin

9    seized by CBP along the land border was between Ports of Entry (POEs)."[119]

10   317.    As to fentatyl, the report states that "Mexican [Transnational Criminal

11   Organizations] most commonly smuggle the multi-kilogram loads of fentanyl concealed in

12   [privately owned vehicles] before trafficking the drugs through SWB POEs."[120]

13   318.    Finally, the report notes that privately owned vehicles "remain the primary method

14   used to smuggle cocaine across the SWB.  Traffickers hide cocaine amongst legitimate cargo of

15   commercial trucks or within secret compartments built within passenger vehicles."[121]

16   319.    The DNI Report discusses drug trafficking from Mexico; however, it contains no

17   mention of smuggling between ports of entry.[122]

18   320.    In fact, the DNI Report notes that as to fentanyl—one of the drugs that President

19   Trump has invoked in support of the border wall[123]—"Chinese synthetic drug suppliers . . .

20   probably ship the majority of US fentanyl, when adjusted for purity."[124]

21   ──────────────

[116] Donald J. Trump (@realDonaldTrump), Twitter (Jan. 31, 2019, 4:14 PM),
22   https://tinyurl.com/y4c4zxo3.
[117] Pete Williams, *Feds Make Largest Fentanyl Bust in U.S. History*, NBC News (Jan. 31,
23   2019), https://tinyurl.com/y9zgnv7p.
[118] DEA, *2018 National Drug Threat Assessment* (Oct. 2018),
24   https://tinyurl.com/yaqyh3ld.
[119] *Id.*
25   [120] *Id.*
[121] *Id.*
26   [122] *DNI Report*, *supra* note 85.
[123] *Trump Address on Crisis at Border*, *supra* note 33.
27   [124] *DNI Report*, *supra* note 85 at 18; *see also* Former Gov't Officials Decl., *supra* note 72,

28

59

E.     **There Is No Factual Basis to Support the Statutory Criteria for Diverting Funding**

321.     Building a border wall does not "require[] use of the armed forces" under 10 U.S.C. section 2808.[125]

322.     Construction of border fencing has been carried out by civilian contractors in recent years.

323.     In fact, in 2007, the U.S. military informed DHS that "military personnel would no longer be available to build fencing."[126]

324.     This, along with the desire to not take CBP agents away from their other duties, led CBP to decide to use "commercial labor for future infrastructure projects."[127]

325.     This decision has been reflected in recent projects related to the border wall, including contract awards in California[128] and Arizona[129] in Fall 2018.

326.     The construction of a border wall also does not constitute a "military construction" project, as defined in 10 U.S.C. section 2801.  Since at least 2001, 10 U.S.C. section 2808 has only been invoked to justify military construction directly linked to a military installation.[130]

327.     In fact, with one exception, it has only been invoked in relation to construction at

---

at S1412 (noting that border wall will not "stop drugs from entering via international mail (which is how high-purity fentanyl, for example, is usually shipped from China directly to the United States)").

[125] *See also* Former Gov't Officials Decl., *supra* note 72, at S1412 (noting that "the composition of southern border crossings has shifted such that families and unaccompanied minors now account for the majority of immigrants seeking entry at the southern border; these individuals do not present a threat that would need to be countered with military force").

[126] Gov't Accountability Office, *GAO-09-244R Secure Border Initiative Fence Construction Costs* 7 (Jan. 29, 2009), https://tinyurl.com/y2kgefp5.

[127] *Id.*

[128] CBP, *Border Wall Contract Awards in California* (Dec. 21, 2018), https://tinyurl.com/y3px9ubj (announcing $287 million contract with SLSCO Ltd. to build border barriers).

[129] CBP, *Border Wall Contract Award in Arizona* (Nov. 15, 2018), https://tinyurl.com/y2t5u6pw (announcing $172 million contract with Barnard Construction Co. to build border barriers).

[130] Michael J. Vassalotti & Brendan W. McGarry, *Military Construction Funding in the Event of a National Emergency*, Cong. Res. Serv. (Jan. 11, 2019), https://tinyurl.com/y23t8xbc.

1    military installations outside the United States.[131]

2       328.   That single instance related to securing domestic sites at which weapons of mass

3    destruction were sited.[132]

4       329.   Furthermore, the diversion of funding and resources for the proposed border wall

5    does not satisfy the requirements of 10 U.S.C. section 284, the Counterdrugs Activities statute

6    because the proposed border wall does not "block drug smuggling corridors," 10 U.S.C. §

7    284(b)(7), as contemplated by the statute.  Defendants also do not satisfy the criteria under

8    section 8005 of the FY2019 Department of Defense Appropriations Act to transfer other

9    Department of Defense funds toward construction of the border wall because it is not a "higher

10   priority item," is not a "unforeseen military requirement," and *is* an item for which Congress has

11   denied funding.

12      330.   The diversion of Treasury Forfeiture Funds for construction of a border wall fails

13   to satisfy the criteria of 31 U.S.C. section 9705 because infrastructure construction is not within

14   the scope of the activities for which Treasury Forfeiture Funds may be used under that statute.

15   **F.   Plaintiff States and their Residents Are Harmed by the Executive Actions**

16      **1.   Harm caused by diversion of funding and other resources**

17      331.   Plaintiff States and their residents are harmed by the Executive Actions and

18   Defendants' unlawful actions undertaken to construct the border wall.  *See* Parties section *supra*.

19      332.   California will be harmed by the diversion of funds it receives from the federal

20   government for drug interdiction program funding, which will impact public safety and the

21   welfare of its residents.

22      333.   California is typically allocated tens of millions of dollars in drug interdiction

23   funds from the federal government annually (for example, over $25 million in FY2018-19).  If

24   California loses this funding, there will be negative public safety impacts arising from the

25   impairment of the State's criminal and narcotics operations.

26

27   _____
        [131] *Id.*
        [132] *Id.*

28

61

334.    Diversion of DOD funding from California's National Guard will likewise cause harm to the State.  For FY2019-20, California expected to receive $126.1 million in federal funds that are at risk due to the Executive Actions.[133]  Any diversion of military funding intended for the California National Guard will also harm the State.

335.    Diversion of funds from the Treasury's Forfeiture Fund will deprive the State of California and its local law enforcement agencies of access to millions of dollars of funds that would otherwise be available for law enforcement purposes, negatively impacting the public safety and welfare of California's residents.

336.    The law enforcement agencies within the Plaintiff States received over 73 percent of the equitable shares paid to local and state agencies under the Treasury Forfeiture Fund's equitable share program in FY2018.  California law enforcement agencies, many of which have participated in the equitable share program for over a decade, received $53,304,000 in funding from the Treasury Forfeiture Fund in FY2018, more than any state.[134]  Based on information and belief, California's state and local agencies, including the California Department of Justice, California Highway Patrol, and California National Guard, have millions of dollars in outstanding claims based on their previous participation in law enforcement activities.

337.    California also will be harmed by diversion of funding for military construction.

338.    More funds are spent on defense in California than in any other state, with $48.8 billion in FY2017 alone.[135]

339.    California also leads the nation in defense contract spending, with $35.2 billion that same year.[136]  Plaintiff States collectively account for $142.3 billion in defense contract spending, which represents 52 percent of all defense contract spending.

340.    Three of the top ten defense contract spending locations in the nation are in

---

[133] State of California, *2019-20 Governor's Budget, Statewide Financial Information* at 29 (Jan. 10, 2019) (estimating $126.1 million in federal funding for the California Military Department for FY2019-20), https://tinyurl.com/y48pjdnl.
[134] *Forfeiture Fund Audit*, *supra* note 3, at 67.
[135] DOD, Off. of Econ. Adjustment, *Defense Spending by State Fiscal Year 2017*, https://tinyurl.com/yxcqugzr.
[136] *Id.*

California (San Diego with $9.2 billion, Los Angeles with $5.3 billion, and Santa Clara County with $4.8 billion).[137]

341.    This defense spending—including construction—in California generates significant economic activity, employment, and tax revenue.[138]

342.    In FY2016, this spending generated $86.9 billion of direct economic activity in California, $17.4 billion of economic activity created through the supply chain, and $52 billion of "induced" economic activity created because of additional money in the economy.[139]

343.    This economic activity, in turn, generates employment for Californians.  In FY2016, approximately 358,000 jobs were directly attributable to employment by defense agencies and their contractors, 84,000 were generated through the supply chain, and 324,000 resulted from economic activity induced by the additional money in the economy.[140]

344.    The economic activity generated by defense spending also resulted in significant tax revenues for California at the state and local level, estimated at $5.8 billion total annually, including $1.9 billion in income tax, $1.7 billion in sales tax and $1.3 billion in property tax.[141]

345.    Certain regions of the state particularly rely on defense spending for employment, including Lassen County (with 18% of jobs reliant on defense spending) and San Diego (16%).[142]

346.    In a briefing with reporters on February 15, 2019, White House officials (Acting Chief of Staff John Michael Mulvaney, Defendant Nielsen, and Acting Director of the Office of Management and Budget Russell Vought) discussed the Administration's plans to carry out the Emergency Declaration.[143]  In response to a question regarding "which military construction projects will see the money moved for the border wall," one Administration official stated during

---

[137] *Id.*

[138] Devin Lavelle, *California Statewide National Security Economic Impacts*, Cal. Res. Bureau (Aug. 2018), https://tinyurl.com/yxqlw43b.

[139] *Id.*

[140] *Id.*

[141] *Id.*

[142] *Id.*

[143] White House, *Background Press Call on President Trump's Remarks on the National Security and Humanitarian Crisis on Our Southern Border* (Feb. 15, 2019). This document was available on the White House website but then taken down that same day.

1   that briefing: "We would be looking at lower priority military construction projects.  We would

2   be looking at ones that are to fix or repair a particular facility that might be able to wait a couple

3   of months into next year."[144]

4        347.    A number of military construction projects that could fit this description, and for

5   which funds have been appropriated but are as yet unobligated, are planned in California.[145]

6   These projects include repairs to existing military infrastructure.  If Defendants determine that

7   these projects can wait, funding for them could be diverted to the border wall, and California

8   would be deprived of this federal funding and the resulting positive economic, employment, and

9   tax consequences.

10        348.    If these types of projects are delayed due to the diversion of funding for border

11   wall construction, California stands to suffer economic harm.

12        349.    Other Plaintiff States will suffer similar harms due to diversion of military

13   construction, drug interdiction, and drug forfeiture funding.

14        **2.    Environmental harms to the States of California and New Mexico**

15        350.    On December 12, 2018, DHS announced that if it received $5 billion in additional

16   funding, it would use this funding to construct 330 miles of new barriers along the United States-

17   Mexico border in areas that the United States Border Patrol identified as "highest priority" in each

18   of the four border states.  DHS specifically identified a five-mile barrier project in the CBP's San

19   Diego Sector (California), a nine-mile project in the CBP's El Centro Sector (California), and a

20   nine-mile project in the CBP's El Paso Sector (New Mexico).[146]

21        351.    Following Defendant DHS's December 12, 2018 announcement that it intended to

22   construct 330 miles of new barriers along the United States-Mexico border, DHS now intends to

23   construct hundreds more miles of new border barriers.  During a March 6, 2019 hearing before

24   the House of Representatives' Homeland Security Committee, Defendant Nielsen testified that

25

26   _____

     [144] *Id.*

27   [145] *E.g.*, DOD, *Construction Programs (C-1), Department of Defense Budget Fiscal Year 2019* (Feb. 2018), https://tinyurl.com/yy85dch9.

28   [146] DHS, *Walls Work* (Dec. 12, 2018), https://tinyurl.com/y7ca6byc.

1  DHS now seeks to construct more than 700 miles of additional barriers along the southern

2  border.[147]

3      352.   CBP's San Diego Sector is located in San Diego County, California and

4  shares a 60-mile segment of the border with Mexico, 46 linear miles of which are already lined

5  with primary fencing.[148]  The only portions of the border located within the San Diego Sector that

6  are not already lined with primary fencing are located in the southeastern portion of the county in

7  or near the Otay Mountain Wilderness Area.[149]  Thus, the only segment of the border within the

8  San Diego Sector where DHS can construct new primary fencing, as it announced on December

9  12, 2018, are areas within or near the Otay Wilderness Area.

10     353.   CBP's El Centro Sector is located within Imperial County, California, and shares a

11 70-mile segment of the border with Mexico, 59 linear miles of which are already lined by primary

12 fencing.[150]  The only portions of the border located within the El Centro Sector that are not

13 already lined with primary fencing are located in the southwestern portion of Imperial County,

14 which is comprised of a mountainous landscape and the Jacumba Wilderness Area.[151]  Thus, the

15 only segment of the border within the El Centro Sector where DHS can construct new primary

16 fencing, as it announced on December 12, 2018, are areas within or near the Jacumba Wilderness

17 Area.

18     354.   The Otay Mountain Wilderness and the Jacumba Wilderness areas are home to

19 more than 100 sensitive plant and animal species that are listed as "endangered," "threatened," or

20 "rare" under the federal Endangered Species Act of 1973, 16 U.S.C. § 1531 et seq., and/or the

21     [147] CSPAN, *Immigration and Border Security* (Mar. 6, 2019),
22 https://tinyurl.com/y5fqdmma.
     [148] CBP, *San Diego Sector California* (Jan. 26, 2018), https://tinyurl.com/y5zgvftf; Gov't
23 Accountability Off., *GAO-17-331, Southwest Border Security: Additional Actions Needed to
   Better Assess Fencing's Contributions to Operations and Provide Guidance for Identifying
24 Capability Gaps* 48, https://www.gao.gov/products/GAO-17-331.
     [149] CBP, *Border Fencing – California* (June 2011), https://tinyurl.com/y24zbfb4; CBP,
25 *FY17 U.S. Border Patrol Apprehensions (Deportable) & Fencing* (Dec. 6, 2017),
26 https://tinyurl.com/ydfl46zk.
     [150] CBP, *El Centro Sector California* (Apr. 11, 2018), https://tinyurl.com/y5kpbk2e;
27 *Southwest Border Security*, *supra* note 148.
     [151] CBP, *Border Fencing 2011 & 2017*, *supra* note 149.
28

California Endangered Species Act, Cal. Fish & Game Code § 2050 et seq.  These species include the following federally and state endangered species: the Mexican flannel bush, Thornmint, the Quino Checkerspot Butterfly, the Southwestern Willow Flycatcher, and the Peninsular Desert Bighorn sheep.[152]  Some of the listed plant species, such as the Tecate Cypress and the Mexican flannel bush, are so rare they can only be found in these wilderness areas.[153]  The federally and state-endangered Peninsular Desert Bighorn sheep has a range that includes mountainous terrain in Mexico near the United States-Mexico border and extends north across the border through the Jacumba Wilderness to California's Anza-Borrego State Park.[154]

355.    The construction of border barriers within or near the Jacumba Wilderness Area and the Otay Mountain Wilderness Area will have significant adverse effects on environmental resources, including direct and indirect impacts to endangered or threatened wildlife.  These injuries to California's public trust resources would not occur but for Defendants' unlawful and unconstitutional diversion of funds.

356.    The construction of a border wall in the El Paso Sector along New Mexico's southern border will have significant adverse effects on the State's environmental resources, including direct and indirect impacts to endangered or threatened wildlife.

357.    If Defendants use the diverted funding announced in President Trump's February 15 Executive Actions to construct any of the border wall in New Mexico, it will impose environmental harm to the State.  The environmental damage caused by a border wall in New

---

[152] Cal. Dept. of Fish & Wildlife, *Threatened and Endangered Species*, https://tinyurl.com/7l65784 (last visited Feb. 17, 2019); Wilderness Connect, *Jacumba Wilderness*, https://tinyurl.com/y5yh23x5 (last visited Feb. 17, 2019); U.S. Bureau of Land Management, *Jacumba Wilderness* https://tinyurl.com/y43hv424 (last visited Feb. 17, 2019); U.S. Bureau of Land Management, *Otay Mountain Wilderness* https://tinyurl.com/y3zamvsh (last visited Feb. 17, 2019); Wilderness Connect, *Otay Mountain Wilderness*, https://tinyurl.com/y3ymkazn (last visited Feb. 17, 2019).
[153] Wilderness Connect, *Otay Mountain*, *supra* note 152.
[154] Cal. Dept. of Fish & Wildlife, *Peninsular Desert Bighorn Sheep* https://tinyurl.com/yyvu5kwa (last visited Feb. 17, 2019).

Mexico would include the blocking of wildlife migration, flooding, and habitat loss.[155]

358.    The Chihuahuan desert bisected by the New Mexico-Mexico border is the most biologically diverse desert in the Western Hemisphere.[156]  Species common along the border are a number of endangered, threatened, and candidate species including the beautiful shiner, Chiricahua leopard frog, jaguar, lesser long-nosed bat, loach minnow, Mexican long-nosed bat, Mexican spotted owl, Mexican wolf, narrow-headed gartersnake, New Mexican ridge-nosed rattle snake, northern aplomado falcon, northern Mexican gartersnake, southwestern willow flycatcher, spikedace, and yellow billed cuckoo.[157]  A barrier built in the Chihuahuan desert is likely to disrupt or destroy habitat of these migratory animals, nesting birds and reclusive reptiles.

359.    In particular, New Mexico's border is also home to the endangered Mexican gray wolf, the rarest subspecies of gray wolf in North America, which was nearly extirpated by the 1970s and only recently reintroduced.[158]  A wall impossible to breach may make it impossible for the wolf to disperse across the border to reestablish recently extirpated populations or bolster small existing populations.  On March 14, 2018, the New Mexico Department of Game and Fish signed an agreement with the U.S. Department of Fish and Wildlife to increase cooperation in reintroduction of this species to the wild, evidencing the State's commitment to preventing the extinction of this species.

360.    The segment of New Mexico's border with Mexico that does not already have primary fencing is in the State's "bootheel" region.[159]  If Defendants' diverted funding resulted in the construction of a barrier in New Mexico's bootheel, it would cause environmental harm in

---

[155] *See* Robert Peters et al., *Nature Divided, Scientists United: US–Mexico Border Wall Threatens Biodiversity and Binational Conservation*, BioScience (Oct. 2018), https://tinyurl.com/y3t4ymfn.

[156] Nat'l Park Service, *Chihuahuan Desert Ecoregion* (Sept. 20, 2018), https://www.nps.gov/im/chdn/ecoregion.htm.

[157] U.S. Fish & Wildlife Serv., *Species By County Report*, https://tinyurl.com/yxmwz9qm (Hidalgo County, NM); https://tinyurl.com/y4ojwrtq (Luna County, NM) (last visited Feb. 17, 2019).

[158] U.S. Fish & Wildlife Serv., *Mexican Wolf*, https://tinyurl.com/y2hf5ea2 (last visited Feb. 17, 2019).

[159] CBP, *Border Fencing - New Mexico/West Texas* (June 2011), https://tinyurl.com/y24zbfb4.

1    one of the State's most ecologically pristine and fragile regions.  The bootheel is where temperate

2    and subtropical climates converge, making it another of the most biologically diverse regions in

3    the world, home to jaguars and wolves that coexist along the U.S.-Mexico border.[160] Recognizing

4    the ecological importance of this region, the U.S. Fish and Wildlife Service has designated large

5    segments of the bootheel's border with Mexico as critical habitat for the jaguar.[161]

6         361.    Defendant DHS has not engaged in a public review of these adverse effects.  By

7    failing to do so at the earliest possible stage of the project's planning process, DHS is violating

8    the requirements of NEPA.  *Robertson v. Methow Valley Citizen Council*, 490 U.S. 332, 348-49

9    (1989); 40 C.F.R. §§ 1508.27(b)(9), (10).  California and New Mexico have suffered, and will

10   continue to suffer, injuries to their procedural rights under NEPA and the APA, 5 U.S.C. section

11   551, and injuries to their concrete, quasi-sovereign interests relating to the preservation of wildlife

12   resources within their boundaries, including but not limited to wildlife on state properties.

13   *Massachusetts v. EPA*, 549 U.S. 497, 519-24 (2007); *Sierra Forest Legacy*, 646 F.3d at 1178.

14   These injuries to California's and New Mexico's procedural rights and quasi-sovereign interests

15   would not occur but for Defendants' unlawful and unconstitutional diversion of funds.

16                        **DECLARATORY/INJUNCTIVE RELIEF**

17        362.    Plaintiff States will suffer irreparable injury if Defendants take action to build the

18   border wall by diverting funds and resources in contravention of the United States Constitution

19   and several federal statutes, and Plaintiffs have no adequate remedy at law.

20                          **FIRST CLAIM FOR RELIEF**

21            **VIOLATION OF CONSTITUTIONAL SEPARATION OF POWERS**

22        363.    Plaintiff States incorporate the allegations of the preceding paragraphs by

23   reference.

24        364.    Article I, Section 1 of the United States Constitution enumerates that "[a]ll

25   legislative Powers herein granted shall be vested in [the] Congress."  Article I, Section 8 of the

26   _____

27   [160] Lauren Villagran, *Land That Time Forgot*, Albuquerque J. (Apr. 30, 2017),
     https://tinyurl.com/mxqht6r.
     [161] U.S. Fish & Wildlife Serv., *Jaguar (Panthera onca)*, https://tinyurl.com/y6qpjdjl (last

28   visited Feb. 17, 2019); 79 Fed. Reg. 12571 (Mar. 5, 2014).

                                   68

1    United States Constitution vests exclusively in Congress the spending power to "provide for

2    the . . . General Welfare of the United States."

3           365.    Article I, Section 7, Clause 2 of the United States Constitution, known as the

4    Presentment Clause, requires that all bills passed by the House of Representatives and the Senate

5    be presented to the President for signature.  The President then has the choice to sign or veto the

6    bill.  Article II, Section 3 of the United States Constitution requires that the President "shall take

7    Care that the Laws be faithfully executed."

8           366.    The President acts at the lowest ebb of his power if he acts contrary to the

9    expressed or implied will of Congress.  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579,

10   637 (1952) (Jackson, J., concurring).  Moreover, there is no provision in the United States

11   Constitution that authorizes the President to enact, amend, or repeal statutes, including

12   appropriations already approved by Congress and signed into law by the President.  *Clinton v.*

13   *City of New York*, 524 U.S. 417, 438 (1998).

14          367.    Defendants have violated the United States Constitution's separation of powers

15   doctrine by taking executive action to fund a border wall for which Congress has refused to

16   appropriate funding.  The 2019 Appropriations Act is an explicit denial of the President's

17   requested funding for a border wall.  Defendants have further violated the separation of powers

18   doctrine—specifically the Presentment Clause—by unilaterally diverting funding that Congress

19   already appropriated for other purposes to fund a border wall for which Congress has provided no

20   appropriations.

21          368.    For the reasons stated herein, Plaintiffs are entitled to a declaration that

22   Defendants' diversion of funding and resources toward the construction of a border wall is

23   unconstitutional, and the Court should enjoin Defendants' implementation of the President's

24   Executive Actions.

## SECOND CLAIM FOR RELIEF

### VIOLATION OF APPROPRIATIONS CLAUSE

27          369.    Plaintiff States incorporate the allegations of the preceding paragraphs by

28   reference.

69

370.    Article I, Section 9, Clause 7, known as the Appropriations Clause, provides that "[n]o Money shall be drawn from the treasury, but in Consequence of Appropriations made by Law."  The Appropriations Clause is a "straightforward and explicit command" that "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress."  *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)).

371.    Congress has not authorized or appropriated the funding that Defendants have diverted towards the construction of a border wall.  Defendants have therefore violated the Appropriations Clause by funding construction of the border wall with funds that were not appropriated for that purpose.

372.    For the reasons stated herein, Plaintiffs are entitled to a declaration that Defendants' diversion of funding and resources toward the construction of a border wall is unconstitutional, and the Court should enjoin Defendants' implementation of the President's Executive Actions.

### THIRD CLAIM FOR RELIEF

### ULTRA VIRES

373.    Plaintiff States incorporate the allegations of the preceding paragraphs by reference.

374.    Neither the President nor an agency can take any action that exceeds the scope of their constitutional and/or statutory authority.

375.    The President has acted ultra vires in seeking to divert funding pursuant to the National Emergencies Act because no emergency exists to warrant the invocation of that statute.

376.    In addition, Defendants have acted ultra vires in seeking to divert funding pursuant to 10 U.S.C. section 2808 for failure to meet the criteria required under that statute.  The construction of the border wall: (a) is not a "military construction project"; (b) does not "require[] use of the armed forces"; and (c) is not "necessary to support such use of the armed forces."

377.    Defendants have acted ultra vires in seeking to divert funding and resources pursuant to 10 U.S.C. section 284 for failure to meet the criteria required under that statute.  The

70

1    statute does not contemplate the construction of a border wall as proposed by the President.

2    Moreover, Defendants have acted ultra vires in seeking to transfer funding pursuant to section

3    8005 of the FY2019 Department of Defense Consolidated Appropriations Act to ultimately use

4    for the construction of a border wall because it is not being transferred for: (a) a "higher priority

5    item;" (b) "unforeseen military requirements;" or (c) an item for which Congress has not denied

6    funding.

7         378.    Defendants have acted ultra vires in seeking to divert funding pursuant to 31

8    U.S.C. section 9705 for failure to meet the criteria required under that statute.

9         379.    For the reasons stated herein, Plaintiffs are entitled to a declaration that

10   Defendants' diversion of funding and resources toward the construction of a border wall is

11   unlawful, and the Court should enjoin Defendants' implementation of the President's Executive

12   Actions.

13                          **FOURTH CLAIM FOR RELIEF**

14              **VIOLATION OF ADMINISTRATIVE PROCEDURE ACT**

15   **(Constitutional Violation and Excess of Statutory Authority under 10 U.S.C. section 284, section 8005 of the FY2019 Department of Defense Appropriations Act, and 31 U.S.C. section 9705)**

16

17        380.    Plaintiff States incorporate the allegations of the preceding paragraphs by

18   reference.

19        381.    Defendants DOD and the Treasury are "agencies" under the APA, 5 U.S.C. section

20   551(1), and diversions of funding for construction of a border wall constitute "agency action"

21   under the APA, *id.* section 551(13).

22        382.    The diversion of federal funds toward construction of a border wall constitutes an

23   "[a]gency action made reviewable by statute and final agency action for which there is no other

24   adequate remedy in a court." *Id.* § 704.

25        383.    The APA requires that a court "hold unlawful and set aside agency action,

26   findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or

27   immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory

28   right." *Id.* § 706(2)(B)-(C).

                                         71

384.    Defendants DOD and the Treasury's diversion of funding and resources pursuant to 10 U.S.C. section 284, section 8005 of the FY 2019 Department of Defense Appropriations Act, and 31 U.S.C. section 9705 for construction of a border wall is unconstitutional because Defendants have: (a) overstepped their powers by exercising lawmaking authority that is solely reserved to Congress under Article I, Section I of the United States Constitution; (b) amended or cancelled appropriations that have already been approved by Congress; and (c) diverted funding and resources for the construction of a border wall that Congress did not appropriate for that purpose.  Furthermore, these Defendants' diversion of federal funding and resources pursuant to those statutes for construction of a border wall is ultra vires in excess of their statutory authority.

385.    For the reasons stated herein, because Defendants DOD and the Treasury acted unconstitutionally and in excess of their statutory authority in diverting federal funds and resources toward construction of a border wall pursuant to the statutes described above, these actions are unlawful and should be set aside under 5 U.S.C. section 706.  Moreover, the Court should enjoin Defendants' implementation of the Executive Actions.

## FIFTH CLAIM FOR RELIEF

### VIOLATION OF ADMINISTRATIVE PROCEDURE ACT
**(Arbitrary and Capricious actions under 10 U.S.C. section 284, section 8005 of the FY2019 Department of Defense Appropriations Act, and 31 U.S.C. section 9705)**

386.    Plaintiff States incorporate the allegations of the preceding paragraphs by reference.

387.    Defendants DOD and the Treasury are "agencies" under the APA, 5 U.S.C. section 551(1), and their actions to divert funding for construction of a border wall constitute "agency action" under the APA, *id.* section 551(13).

388.    The diversion of federal funds toward construction of a border wall constitutes an "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court."  *Id.* § 704.

389.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

1   otherwise not in accordance with law." *Id.* § 706(2)(A).

2          390.    Defendants DOD and the Treasury's diversion of funding and resources pursuant

3   to 10 U.S.C. section 284, section 8005 of the FY2019 Department of Defense Appropriations Act,

4   and 31 U.S.C. section 9705 for construction of a border wall is arbitrary and capricious and an

5   abuse of discretion because Defendants have relied on factors that Congress did not intend, failed

6   to consider an important aspect of the problem the agency is addressing, and offered no

7   explanation for the decision to divert funding and resources toward construction of a border wall

8   that is consistent with the evidence that is before the agencies. *See Motor Vehicle Mfrs. Ass'n of*

9   *the U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

10          391.    For the reasons stated herein, because Defendants DOD and the Treasury acted in

11   an arbitrary and capricious manner in diverting federal funds and resources toward construction

12   of a border wall pursuant to the statutes described above, these actions are unlawful and should be

13   set aside under 5 U.S.C. section 706.  Moreover, the Court should enjoin Defendants'

14   implementation of the Executive Actions.

15                                **SIXTH CLAIM FOR RELIEF**

16                    **VIOLATION OF NATIONAL ENVIRONMENTAL POLICY ACT**

17                      **(For Plaintiff States California and New Mexico)**

18          392.    Plaintiff States incorporate the allegations of the preceding paragraphs by

19   reference.

20          393.    Defendant DHS is an "agency" under the APA, 5 U.S.C. section 552(1).

21          394.    Defendant DHS has taken final agency action by proposing southern border wall

22   development projects in "high priority" areas and has identified specific projects along the border

23   in the El Centro, San Diego, and El Paso Sectors.[162]

24          395.    Defendants, through the Executive Actions, have taken steps to divert federal

25

26          [162] The proposed projects are not located within areas covered by any existing waiver
     issued by DHS pursuant to section 102 of the Illegal Immigration Reform and Immigrant
27   Responsibility Act (8 U.S.C. § 1103 note).  84 Fed. Reg. 2897 (February 8, 2019); 83 Fed. Reg.
     3012 (January 22, 2018); 82 Fed. Reg. 42829 (September 12, 2017); 82 Fed. Reg. 35984 (August
28   2, 2017).

73

1    funding and other resources for those southern border wall construction projects.

2        396.    NEPA compels federal agencies such as Defendant DHS to evaluate and consider

3    the direct, indirect and cumulative effects that a proposed development project or program will

4    have on the environment by requiring the agency to prepare an EIS that analyzes a reasonable

5    range of alternatives and compares each alternative's environmental impacts.  40 C.F.R. §§

6    1502.16, 1508.7, 1508.8, l508.27(b)(7).  The EIS must also include an analysis of the affected

7    areas and resources and the environmental consequences of the proposed action and the

8    alternatives.  40 C.F.R. §§ 1502.10- 1502.19.  The agency must commence preparation of the EIS

9    "as close as possible to the time that the agency is developing or is presented with a proposal" so

10   that the environmental effects of each alternative can be evaluated in a meaningful way.  40

11   C.F.R. § 1502.23.

12       397.    Defendant DHS is in violation of NEPA and the APA because it failed to prepare

13   an EIS concerning border wall development projects that will have adverse effects on the

14   environment, including but not limited to direct, indirect and cumulative impacts on plant and

15   animal species that are listed as endangered or threatened under the Endangered Species Act

16   and/or California Endangered Species Act.

17       398.    The imminent nature of this action is shown by the Trump Administration's

18   expression of its intent to move quickly with the construction of the border wall, DHS's

19   announcement designating priority areas for new border wall construction within the San Diego,

20   El Centro, and El Paso Sectors, and Defendant Nielsen's testimony regarding the intent to

21   construct even more fencing than previously designated.[163]  In addition, during his speech

22   announcing the Emergency Declaration, President Trump spoke of his desire to build the wall

23   "much faster" that he could otherwise,[164] and recently claimed that "[m]any additional contracts

24   are close to being signed."[165]

25

26   _____

     [163] Rachael Bade et al., *'A Recipe for Disaster'? Trump's Border Emergency Drags the GOP into a Risky Fight Ahead of 2020*, Wash. Post (Feb. 15, 2019), https://tinyurl.com/y4l3lu99.
27       [164] White House, *President Trump's Feb. 15, 2019, Remarks*, *supra* note 60.
         [165] Donald J. Trump (@realDonaldTrump), Twitter (Mar. 8, 2019, 4:24 AM),
28   https://tinyurl.com/y3tsqmgl.

                                                   74

1        399.    The States of California and New Mexico have concrete and particularized

2    interests in the protection of their own proprietary interests near the border as well as the

3    protection of natural, historical, cultural, economic, and recreational resources within their

4    jurisdictional boundaries.  Defendants' failure to comply with NEPA and the APA injures and

5    denies California's and New Mexico's procedural rights necessary to protect these interests.

6                                **PRAYER FOR RELIEF**

7        WHEREFORE, Plaintiff States respectfully request that this Court enter judgment in their

8    favor, and grant the following relief:

9        1.    Issue a judicial declaration that the Executive Actions' diversion of federal funds

10   and resources toward construction of a border wall is unconstitutional and/or unlawful because it:

11   (a) violates the separation of powers doctrine; (b) violates the Appropriations Clause; (c) exceeds

12   congressional authority conferred to the Executive Branch and is ultra vires; and (d) violates the

13   Administrative Procedure Act;

14       2.    The States of California and New Mexico seek a judicial declaration that

15   Defendants violated the National Environmental Policy Act and Administrative Procedure Act

16   and further seek an order enjoining DHS, requiring it to comply with the National Environmental

17   Policy Act and Administrative Procedure Act—including preparing an EIS—before taking any

18   further action pursuant to the Executive Actions;

19       3.    Permanently enjoin Defendants from constructing a border wall without an

20   appropriation by Congress for that purpose;

21       4.    Permanently enjoin Defendants from diverting federal funding and resources

22   toward construction of a border wall; and

23       5.    Grant such other relief as the Court may deem just and proper.

24

25

26

27

28

75

1     Dated: March 13, 2019                        Respectfully submitted,

2                                          XAVIER BECERRA
                                         Attorney General of California

3                                          ROBERT W. BYRNE
                                         SALLY MAGNANI

4                                          MICHAEL L. NEWMAN
                                         Senior Assistant Attorneys General

5                                          MICHAEL P. CAYABAN
                                         CHRISTINE CHUANG

6                                          EDWARD H. OCHOA
                                         Supervising Deputy Attorneys General

7

8                                          /s/ James F. Zahradka II
                                         JAMES F. ZAHRADKA II (SBN 196822)

9                                          HEATHER C. LESLIE
                                         LEE I. SHERMAN

10                                         JANELLE M. SMITH
                                        Deputy Attorneys General

11                                           1515 Clay Street, 20th Floor
                                          Oakland, CA  94612-0550

12                                           Telephone: (510) 879-1247
                                          E-mail: James.Zahradka@doj.ca.gov

13                                          *Attorneys for Plaintiff State of California*

14   Philip J. Weiser                              WILLIAM TONG
    Attorney General of Colorado               Attorney General of Connecticut

15

16   /s/ Eric R. Olson
    Eric R. Olson (*pro hac vice pending*)         /s/ Margaret Q. Chapple
    Solicitor General                          MARGARET Q. CHAPPLE (*pro hac vice*

17     *Attorneys for Plaintiff the State of Colorado*    *forthcoming*)
                                          Deputy Attorney General

18                                           55 Elm Street
                                          Hartford, CT 06106

19                                           Telephone: (860) 808-5316
                                          Margaret.chapple@ct.gov

20                                           *Attorneys for Plaintiff State of Connecticut*

21

22

23

24

25

26

27

28

1    KATHLEEN JENNINGS                         CLARE E. CONNORS
     Attorney General of Delaware              Attorney General of Hawaii
2    AARON R. GOLDSTEIN
     Chief Deputy Attorney General
3    ILONA KIRSHON                             /s/ Clyde J. Wadsworth
     Deputy State Solicitor                    CLYDE J. WADSWORTH
4                                              Solicitor General
     /s/ David J. Lyons                        Department of the Attorney General
5    DAVID J. LYONS                            425 Queen Street
     Deputy Attorney General                   Honolulu, Hawaii 96813
6    *Attorneys for Plaintiff State of Delaware*   Telephone: (808) 586-1360
                                               E-mail: Clyde.J.Wadsworth@hawaii.gov
7                                              *Attorneys for Plaintiff State of Hawaii*

8

9    KWAME RAOUL                               BRIAN E. FROSH
     Attorney General                          Attorney General of Maryland
10   State of Illinois

11   By: /s/ Caleb Rush                        /s/ Jeffrey P. Dunlap
     Caleb Rush                                Jeffrey P. Dunlap (*pro hac vice forthcoming*)
12     Assistant Attorney General             Assistant Attorney General
     David L. Franklin, Solicitor General      200 Saint Paul Place, 20th Floor
13   100 West Randolph Street, 12th Floor      Baltimore, MD 21202
     Chicago IL 60601                          (410) 576-6300
14   (312) 814-5376                            jdunlap@oag.state.md.us
     crush@atg.state.il.us                     *Attorneys for Plaintiff State of Maryland*
15   *Attorneys for Plaintiff State of Illinois*

16

17   AARON M. FREY                             MAURA HEALEY
     ATTORNEY GENERAL OF MAINE                 Attorney General for Massachusetts
18   SUSAN P. HERMAN (*pro hac vice pending*)
     Deputy Attorney General                   /s/ Abigail B. Taylor
19   6 State House Station                     ABIGAIL B. TAYLOR (*pro hac vice forthcoming*)
     Augusta, Maine 04333-0006                 Director, Child & Youth Protection Unit
20   Telephone: (207) 626-8814                 DAVID C. KRAVITZ
     Email: susan.herman@maine.gov             Assistant State Solicitor
21   *Attorneys for Plaintiff State of Maine*  TARA D. DUNN
                                               Assistant Attorney General, Civil Rights Division
22                                             Office of the Attorney General
                                               One Ashburton Place
23                                             Boston, MA 02108
                                               Tel: (617) 727-2200
24                                             Abigail.Taylor@mass.gov
                                               David.Kravitz@mass.gov
25                                             Tara.Dunn@mass.gov
                                               *Attorneys for Plaintiff Commonwealth of*
26                                             *Massachusetts*

27

28
                                    77

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dana Nessel
Michigan Attorney General
P.O. Box 30212
Lansing, Michigan 48909

/s/ B. Eric Restuccia
Assistant Attorney General B. Eric Restuccia
(P49550) (*pro hac vice pending*)
Solicitor General Fadwa A. Hammoud
*Attorneys for Plaintiff State of Michigan*

KEITH ELLISON
Attorney General of Minnesota
JOHN KELLER
Chief Deputy Attorney General
JAMES W. CANADAY
Deputy Attorney General

/s/ *Jacob Campion*
JACOB CAMPION (*pro hac vice forthcoming*)
Assistant Attorney General
445 Minnesota Street, Suite 1100
St. Paul, Minnesota 55101-2128
Telephone: (651) 757-1459
Email: jacob.campion@ag.state.rnn.us
*Attorneys for Plaintiff State of Minnesota*

AARON D. FORD
Attorney General of Nevada

/s/ Heidi Parry Stern
HEIDI PARRY STERN
Solicitor General
Office of the Nevada Attorney General
100 North Carson Street
Carson City, Nevada 89701-4717
775-684-1100
775-684-1108 Fax
*Attorneys for Plaintiff State of Nevada*

GURBIR S. GREWAL
Attorney General of New Jersey

/s/ Jeremy Feigenbaum
JEREMY FEIGENBAUM (*pro hac vice forthcoming*)
Assistant Attorney General
New Jersey Attorney General's Office
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625
(609) 376-3235
Jeremy.Feigenbaum@njoag.gov
*Attorneys for Plaintiff State of New Jersey*

78

1
HECTOR BALDERAS
Attorney General of New Mexico

LETITIA JAMES
Attorney General of the State of New York

2

/s/ Tania Maestas
3
TANIA MAESTAS (*pro hac vice
forthcoming*)
4
Chief Deputy Attorney General
NICHOLAS M. SYDOW
5
Civil Appellate Chief
JENNIE LUSK
6
Assistant Attorney General, Director
MATTHEW L. GARCIA
7
Governor's General Counsel
PO Drawer 1508
8
Santa Fe, New Mexico  87504-1508
E-mail:  tmaestas@nmag.gov
9
*Attorneys for Plaintiff State of New Mexico,
by and through Attorney General Hector
10
Balderas*

By: /s/ *Matthew Colangelo*
Matthew Colangelo
   *Chief Counsel for Federal Initiatives*
Steven C. Wu, *Deputy Solicitor General*
Eric R. Haren, *Special Counsel*
Gavin McCabe, *Special Assistant Attorney General*
Amanda Meyer, *Assistant Attorney General*
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-6057
matthew.colangelo@ag.ny.gov
*Attorneys for the State of New York*

11

ELLEN ROSENBLUM
12
Attorney General of Oregon
Henry Kantor (*pro hac vice pending*)
13
Special Counsel to Attorney General

PETER F. NERONHA
Attorney General of Rhode Island

14
/s/ J. Nicole Defever
J. NICOLE DEFEVER SBN #191525
15
Senior Assistant Attorney General
*Attorney for the State of Oregon*
16

/s/ *Justin Sullivan*
JUSTIN J. SULLIVAN (*pro hac vice forthcoming*)
Special Assistant Attorney General
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400 | Fax: (401) 453-0410
jjsullivan@riag.ri.gov
*Attorneys for Plaintiff State of Rhode Island*

17

18

19

20

21

22

23

24

25

26

27

28

79

THOMAS J. DONOVAN
Attorney General of Vermont
*/s/ Benjamin D. Battles*
BENJAMIN D. BATTLES (*pro hac vice
forthcoming*)
Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-5500
benjamin.battles@vermont.gov
*Attorneys for the State of Vermont*

MARK R. HERRING
Attorney General
TOBY J. HEYTENS
   Solicitor General
      Counsel of Record
MATTHEW R. MCGUIRE
   Principal Deputy
      Solicitor General

*/s/ Michelle S. Kallen*
MICHELLE S. KALLEN
   Deputy Solicitor General
BRITTANY M. JONES (*pro hac vice forthcoming*)
   Attorney
Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7240 – Telephone
(804) 371-0200 – Facsimile
SolicitorGeneral@oag.state.va.us
*Attorney for Plaintiff Commonwealth of Virginia*

JOSHUA L. KAUL
Wisconsin Attorney General

/s/ Gabe Johnson-Karp
GABE JOHNSON-KARP (*pro hac vice
forthcoming*)
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707
P: (608) 267-8904
F: (608) 267-2223
johnsonkarpg@doj.state.wi.us
*Attorney for State of Wisconsin*

80