1   XAVIER BECERRA
    Attorney General of California
2   ROBERT W. BYRNE
    SALLY MAGNANI
3   MICHAEL L. NEWMAN
    Senior Assistant Attorneys General
4   MICHAEL P. CAYABAN
    CHRISTINE CHUANG
5   EDWARD H. OCHOA
    Supervising Deputy Attorneys General
6   HEATHER C. LESLIE
    JANELLE M. SMITH
7   JAMES F. ZAHRADKA II
    LEE I. SHERMAN (SBN 272271)
8   Deputy Attorneys General
      300 S. Spring St., Suite 1702
9     Los Angeles, CA 90013
      Telephone: (213) 269-6404
10    Fax: (213) 897-7605
      E-mail: Lee.Sherman@doj.ca.gov
11  *Attorneys for Plaintiff State of California*

12                  IN THE UNITED STATES DISTRICT COURT

13              FOR THE NORTHERN DISTRICT OF CALIFORNIA

14                          OAKLAND DIVISION

15

16

17  **STATE OF CALIFORNIA; STATE OF**          Case No. 4:19-cv-00872-HSG
    **COLORADO; STATE OF**
18  **CONNECTICUT; STATE OF**                  **REQUEST FOR JUDICIAL NOTICE IN**
    **DELAWARE; STATE OF HAWAII;**             **SUPPORT OF PLAINTIFFS' MOTION**
19  **STATE OF ILLINOIS; STATE OF**            **FOR PRELIMINARY INJUNCTION**
    **MAINE; STATE OF MARYLAND;**
20  **COMMONWEALTH OF**                        Date:       May 9, 2019
    **MASSACHUSETTS; ATTORNEY**                Time:       2:00 pm
21  **GENERAL DANA NESSEL ON BEHALF**          Dept:       2
    **OF THE PEOPLE OF MICHIGAN;**             Judge:      Honorable Haywood S. Gilliam,
22  **STATE OF MINNESOTA; STATE OF**                       Jr.
    **NEVADA; STATE OF NEW JERSEY;**           Trial Date: None Set
23  **STATE OF NEW MEXICO; STATE OF**          Action Filed: February 18, 2019
    **NEW YORK; STATE OF OREGON;**
24  **STATE OF RHODE ISLAND; STATE OF**
    **VERMONT; COMMONWEALTH OF**
25  **VIRGINIA; and STATE OF WISCONSIN;**

26                              Plaintiffs,

27          v.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**DONALD J. TRUMP,** in his official capacity as President of the United States of America; **UNITED STATES OF AMERICA; U.S. DEPARTMENT OF DEFENSE; PATRICK M. SHANAHAN,** in his official capacity as Acting Secretary of Defense; **MARK T. ESPER,** in his official capacity as Secretary of the Army; **RICHARD V. SPENCER,** in his official capacity as Secretary of the Navy; **HEATHER WILSON,** in her official capacity as Secretary of the Air Force; **U.S. DEPARTMENT OF THE TREASURY; STEVEN T. MNUCHIN,** in his official capacity as Secretary of the Treasury; **U.S. DEPARTMENT OF THE INTERIOR; DAVID BERNHARDT,** in his official capacity as Acting Secretary of the Interior; **U.S. DEPARTMENT OF HOMELAND SECURITY; KIRSTJEN M. NIELSEN,** in her official capacity as Secretary of Homeland Security;

Defendants.

Plaintiffs hereby respectfully request, pursuant to Federal Rule of Evidence 201, that this Court take judicial notice of the following documents.

1.   Attached hereto as **Exhibit 1** is a true and correct copy of a tweet posted by President Trump on March 8, 2019.[1]

2.   Attached hereto as **Exhibit 2** is a true and correct copy of a declaration signed by Loren Flossman, Acquisition Program Manager for the Wall Program Management Office (Wall PMO), U.S. Border Patrol Program Management Directorate, U.S. Customs and Border Protection (CBP), and filed in *Alvarez v. Trump*, Case No. 19-cv-00404 [ECF 8-1] (D.D.C. April 1, 2019).

3.   Attached hereto as **Exhibit 3** is a true and correct copy of an excerpt of the transcript of a speech President Trump delivered when he announced his candidacy for president on June 16, 2015.

4.   Attached hereto as **Exhibit 4** is a true and correct copy of a tweet posted by President Trump on July 13, 2016.

5.   Attached hereto as **Exhibit 5** is a true and correct copy of a tweet posted by President Trump on August 27, 2016.

6.   Attached hereto as **Exhibit 6** is a true and correct copy of an excerpt of the transcript of a speech delivered by President Trump on September 1, 2016.

7.   Attached hereto as **Exhibit 7** is a true and correct copy of an excerpt of the transcript of remarks delivered by President Trump on April 3, 2018.  As of April 4, 2019, the complete transcript is posted on the White House's official website, at https://www.whitehouse.gov/briefings-statements/remarks-president-trump-working-lunch-heads-baltic-states/.

8.   Attached hereto as **Exhibit 8** is a true and correct copy of an excerpt of the transcript of a speech delivered by President Trump on February 28, 2017. As of April 4, 2019,

---

[1] The U.S. Department of Justice has stated that President Trump's tweets are "official statements of the President of the United States," since "a tweet can be the equivalent of a public statement or speech." *James Madison Project v. Dep't of Justice*, Case No. 1:17-cv-00144, Def. Supp. Mem., at 2, 5-6 & n.4 [ECF No. 29] (D.D.C. Nov. 13, 2017).

1

Req. for Judicial Notice in Supp. of Mot. for Prelim. Inj. (4:19-cv-00872-HSG)

the transcript is posted on the White House's official website, at

https://www.whitehouse.gov/briefings-statements/remarks-president-trump-joint-

address-congress/.

9.  Attached hereto as **Exhibit 9** is a true and correct copy of an excerpt of the transcript

of a speech delivered by President Trump on April 28, 2017.  As of April 4, 2019, the

transcript is posted on the White House's official website, at

https://www.whitehouse.gov/briefings-statements/remarks-president-trump-national-

rifle-association-leadership-forum/.

10.  Attached hereto as **Exhibit 10** is a true and correct copy of an excerpt of the transcript

of a speech delivered by President Trump on August 23, 2017.

11.  Attached hereto as **Exhibit 11** is a true and correct copy of a tweet posted by

President Trump on February 23, 2018.

12.  Attached hereto as **Exhibit 12** is a true and correct copy of a tweet posted by

President Trump on June 21, 2018.

13.  Attached hereto as **Exhibit 13** is a true and correct copy of an excerpt of the transcript

of remarks delivered by President Trump on January 10, 2019.  As of April 4, 2019,

the complete transcript is posted on the White House's official website, at

https://www.whitehouse.gov/briefings-statements/remarks-president-trump-marine-

one-departure-30/.

14.  Attached hereto as **Exhibit 14** is a true and correct copy of an excerpt of The WALL

Act of 2018, S. 3713, 115th Cong. (2018).  No action was taken on the bill after

referral to the Senate Committee on Finance.  As of April 4, 2019, the complete text

of the bill is posted on the United States Congress's official website, at

https://www.congress.gov/115/bills/s3713/BILLS-115s3713is.pdf; and the history of

the bill is posted on Congress's official website, at

https://www.congress.gov/bill/115th-congress/senate-bill/3713/all-actions.

15.  Attached hereto as **Exhibit 15** is a true and correct copy of the 50 Votes for the Wall

Act, H.R. 7073, 115th Cong. (2018).  No action was taken on the bill after referral to

2

1     the House Subcommittee on Border and Maritime Security.  As of April 4, 2019, the

2     complete text of the bill is posted on the United States Congress's official website, at

3     https://www.congress.gov/115/bills/hr7073/BILLS-115hr7073ih.pdf; and the history

4     of the bill is posted on Congress's official website, at

5     https://www.congress.gov/bill/115th-congress/house-bill/7073/all-actions.

6     16.   Attached hereto as **Exhibit 16** is a true and correct copy of an excerpt of the Build the

7           Wall, Enforce the Law Act of 2018, H.R. 7059, 115th Cong. (2018).  No action was

8           taken on the bill after referral to the House Subcommittee on Trade.  As of April 4,

9           2019, the complete text of the bill is posted on the United States Congress's official

10          website, at https://www.congress.gov/115/bills/hr7059/BILLS-115hr7059ih.pdf; and

11          the history of the bill is posted on Congress's official website, at

12          https://www.congress.gov/bill/115th-congress/house-bill/7059/all-actions.

13    17.   Attached hereto as **Exhibit 17** is a true and correct copy of an excerpt of the Fund and

14          Complete the Border Wall Act, H.R. 6657, 115th Cong. (2018).  No action was taken

15          on the bill after referral to the House Subcommittee on Immigration and Border

16          Security.  As of April 4, 2019, the complete text of the bill is posted on the United

17          States Congress's official website, at

18          https://www.congress.gov/115/bills/hr6657/BILLS-115hr6657ih.pdf; and the history

19          of the bill is posted on Congress's official website, at

20          https://www.congress.gov/bill/115th-congress/house-bill/6657/all-actions.

21    18.   Attached hereto as **Exhibit 18** is a true and correct copy of an excerpt of the

22          American Border Act, H.R. 6415, 115th Cong. (2018).  No action was taken on the

23          bill after referral to the House Subcommittee on Immigration and Border Security.

24          As of April 4, 2019, the complete text of the bill is posted on the United States

25          Congress's official website, at https://www.congress.gov/115/bills/hr6415/BILLS-

26          115hr6415ih.pdf; and the history of the bill is posted on Congress's official website,

27          at https://www.congress.gov/bill/115th-congress/house-bill/6415/all-actions.

28

3

19. Attached hereto as **Exhibit 19** is a true and correct copy of an excerpt of the Border Security and Immigration Reform Act of 2018, H.R. 6136, 115th Cong. (2018).  On June 27, 2018, this bill failed in the House of Representatives by a recorded vote of 121 – 301.  As of April 4, 2019, the complete text of the bill is posted on the United States Congress's official website, at https://www.congress.gov/115/bills/hr6136/BILLS-115hr6136ih.pdf; and the history of the bill is posted on Congress's official website, at https://www.congress.gov/bill/115th-congress/house-bill/6136/all-actions.

20. Attached hereto as **Exhibit 20** is a true and correct copy of an excerpt of the Securing America's Future Act of 2018, H.R. 4760, 115th Cong. (2018).  On June 21, 2018, this bill failed in the House of Representatives by a recorded vote of 193 – 231.  As of April 4, 2019, the complete text of the bill is posted on the United States Congress's official website, at https://www.congress.gov/115/bills/hr4760/BILLS-115hr4760ih.pdf; and the history of the bill is posted on Congress's official website, at https://www.congress.gov/bill/115th-congress/house-bill/4760/all-actions.

21. Attached hereto as **Exhibit 21** is a true and correct copy of an excerpt of the transcript of a December 11, 2018, meeting between President Trump, Senate Minority Leader Chuck Schumer, and House Speaker-Designate Nancy Pelosi.  As of April 4, 2019, the complete transcript is posted on the White House's official website, at https://www.whitehouse.gov/briefings-statements/remarks-president-trump-meeting-senate-minority-leader-chuck-schumer-house-speaker-designate-nancy-pelosi/.

22. Attached hereto as **Exhibit 22** is a true and correct copy of the Senate Amendment to House Amendment to Senate Amendment of the Department of Defense Appropriations Act of 2018, H.R. 695, 115th Cong. (2018).  On December 19, 2018, the Senate approved the bill with an amendment by a Voice Vote, which the House did not adopt.  As of April 4, 2019, the complete text of the bill with the Senate's amendments is posted on the United States Congress's official website, at https://www.congress.gov/115/bills/hr695/BILLS-115hr695eas2.pdf; and the history

4

1   of the bill is posted on Congress's official website, at

2   https://www.congress.gov/bill/115th-congress/house-bill/695/all-actions.

3   23.   Attached hereto as **Exhibit 23** is a true and correct copy an article containing quotes

4   from President Trump during an event on December 20, 2018.

5   24.   Attached hereto as **Exhibit 24** is a true and correct copy of an excerpt of the House

6   Amendment to Senate Amendment to House Amendment to Senate Amendment of

7   the Department of Defense Appropriations Act of 2018, H.R. 695, 115th Cong.

8   (2018).  On December 20, 2018, the House approved the bill with an amendment by a

9   vote of 217 – 185, which the Senate did not adopt.  As of April 4, 2019, the complete

10   text of the bill with the House's amendments is posted on the United States

11   Congress's official website, at https://www.congress.gov/115/bills/hr695/BILLS-

12   115hr695eah2.pdf; and the history of the bill is posted on Congress's official website,

13   at https://www.congress.gov/115/bills/hr695/BILLS-115hr695eah2.pdf.

14   25.   Attached hereto as **Exhibit 25** is a true and correct copy of a January 6, 2019 letter

15   sent from Office of Management and Budget Acting Director Russell T. Vought to

16   Senate Appropriations Committee Chairman Richard Shelby.

17   26.   Attached hereto as **Exhibit 26** is a true and correct copy of a transcript of remarks

18   delivered by President Trump on January 25, 2019.  As of April 4, 2019, the

19   complete transcript is posted on the White House's official website, at

20   https://www.whitehouse.gov/briefings-statements/remarks-president-trump-

21   government-shutdown/.

22   27.   Attached hereto as **Exhibit 27** is a true and correct copy of a memorandum issued by

23   President Trump on April 4, 2018.  As of April 4, 2019, the complete memorandum

24   is posted on the White House's official website, at

25   https://www.whitehouse.gov/presidential-actions/presidential-memorandum-

26   secretary-defense-attorney-general-secretary-homeland-security/.

27   28.   Attached hereto as **Exhibit 28** is a true and correct copy of a memorandum issued by

28   President Trump on February 15, 2019, referred to in Plaintiffs States' Notice of

5

1    Motion and Motion for Preliminary Injunction as the "Executive Action."  As of

2    April 4, 2019, the Executive Action is posted on the White House's official website,

3    at https://www.whitehouse.gov/briefings-statements/president-donald-j-trumps-

4    border-security-victory/.

5    29.    Attached hereto as **Exhibit 29** is a true and correct copy of the Office of the Inspector

6    General's Audit of the Department of the Treasury Forfeiture Fund's Financial

7    Statements for Fiscal Years 2018 and 2017 dated December 13, 2018.  As of April 4,

8    2019, the complete Audit Report is posted on the Treasury's official website, at

9    https://www.treasury.gov/about/organizational-

10    structure/ig/Audit%20Reports%20and%20Testimonies/OIG-19-022.pdf.

11    30.    Attached hereto as **Exhibit 30** is a true and correct copy of a February 15, 2019 letter

12    and attachment sent from Assistant Secretary of the Treasury for Management David

13    F. Eisner to the chairs and ranking members of congressional appropriations

14    committees.

15    31.    Attached hereto as **Exhibit 31** is a true and correct copy of a memorandum issued by

16    the White House on March 4, 2019.

17    32.    Attached hereto as **Exhibit 32** is a true and correct copy of a reprogramming action

18    issued by the Department of Defense on March 25, 2019.

19    33.    Attached hereto as **Exhibit 33** is a true and correct copy of a February 25, 2019 letter

20    from Department of Homeland Security Executive Secretary Christina Bobb to

21    Department of Defense Executive Secretary Capt. Hallock N. Mohler, Jr.

22    34.    Attached hereto as **Exhibit 34** is a true and correct copy of a March 25, 2019 letter

23    from Acting Department of Defense Secretary Patrick M. Shanahan to Department of

24    Homeland Security Secretary Kirstjen Nielsen.

25    35.    Attached hereto as **Exhibit 35** is a true and correct copy of a March 26, 2019 letter

26    from House Armed Services Committee Chairman Adam Smith to Department of

27    Defense Under Secretary David L. Norquist.  As of April 4, 2019, this letter is

28    available on the House Armed Service Committee's official website, at

6

https://armedservices.house.gov/_cache/files/5/7/57ea01fb-9872-4a49-b878-9b844ca0b030/B5C69226DA76BB0F77AC9E06052FA8AC.fy-19-01-ra.pdf.

36.  Attached hereto as **Exhibit 36** is a true and correct copy of a March 26, 2019 letter from Peter J. Visclosky, Chairman of the House Appropriations Committee's Defense Subcommittee, to Department of Defense Under Secretary David L. Norquist.

37.  Attached hereto as **Exhibit 37** is a true and correct copy of an excerpt of the Department of Defense's Fiscal Law Deskbook.  As of April 4, 2019, the complete document is posted on the Library of Congress's official website, at http://www.loc.gov/rr/frd/Military_Law/pdf/fiscal-law-deskbook_2014.pdf.

38.  Attached hereto as **Exhibit 38** is a true and correct copy of an excerpt of the Department of Defense's Financial Management Regulations.  As of April 4, 2019, the complete Regulations are posted on the Department of Defense's official website, at https://comptroller.defense.gov/Portals/45/documents/fmr/Combined_Volume1-16.pdf.

39.  Attached hereto as **Exhibit 39** is a true and correct copy of an excerpt of the transcript of a March 26, 2019, hearing of the House Armed Services Committee.

40.  Attached hereto as **Exhibit 40** is a true and correct copy of a page from the Department of Homeland Security's website entitled "Walls Work" that is dated December 12, 2018.  As of April 4, 2019, the complete document is posted on the Department of Homeland Security's website, at https://www.dhs.gov/news/2018/12/12/walls-work.

41.  Attached hereto as **Exhibit 41** is a true and correct copy of a page from the Department of Homeland Security's website entitled "El Paso Sector."  As of April 4, 2019, this information is posted on the U.S. Customs and Border Protection's website, at https://www.cbp.gov/border-security/along-us-borders/border-patrol-sectors/el-paso-sector-texas.

42.  Attached hereto as **Exhibit 42** is a true and correct copy of a document published by the Treasury Executive Office for Asset Forfeiture entitled "Treasury Forfeiture

7

Fund, Program Summary by Budget Activity." As of April 4, 2019, the complete document is posted on the Department of Treasury's website, at https://www.treasury.gov/about/budget-performance/budget-in-brief/BIB19/20.%20TEOAF%20BIB.pdf.

43. Attached hereto as **Exhibit 43** is a true and correct copy of a report published by the Treasury Executive Office for Asset Forfeiture entitled "Congressional Budget Justification and Annual Performance Report and Plan FY 2019." As of April 4, 2019, the complete report is posted on the Department of Treasury's website, at https://www.treasury.gov/about/budget-performance/CJ19/21.%20TEOAF%202019%20CJ.pdf.

44. Attached hereto as **Exhibit 44** is a true and correct copy of a December 21, 2015, press release issued by the U.S. Department of Justice entitled "Assets [sic] Forfeiture Fund Rescission Impact on Equitable Sharing Program." As of March 28, 2016, this press release is posted on the U.S. Department of Justice's website, at https://www.justice.gov/criminal-afmls/file/801381/download.

45. Attached hereto as **Exhibit 45** is a true and correct copy of an excerpt of a memorandum issued by the Government Accountability Office entitled "Secure Border Initiative Fence Construction Costs" dated January 29, 2009. As of April 4, 2019, the complete memorandum is posted on the Government Accountability Office's official website, at https://www.gao.gov/new.items/d09244r.pdf.

46. Attached hereto as **Exhibit 46** is a true and correct copy of an excerpt of the transcript of a March 14, 2019, hearing of the Senate Armed Services Committee.

47. Attached hereto as **Exhibit 47** is a true and correct copy of an excerpt of the transcript of a February 26, 2019, hearing of the Senate Armed Services Committee.

48. Attached hereto as **Exhibit 48** is a true and correct copy of an excerpt of the Director of National Intelligence's "Worldwide Threat Assessment," dated on January 29, 2019. As of April 4, 2019, the complete report is posted on the Director of National

1    Intelligence's official website, at https://www.dni.gov/files/ODNI/documents/2019-

2    ATA-SFR---SSCI.pdf.

3    49.   Attached hereto as **Exhibit 49** is a true and correct copy of an excerpt of the

4          Chairman of the Joint Chiefs of Staff Instruction regarding DOD Counterdrug

5          Support dated January 26, 2007.  As of April 4, 2019, the complete document is

6          posted on the Joint Chiefs of Staff's official website, at

7          https://www.jcs.mil/Portals/36/Documents/Library/Instructions/3710_01.pdf?ver=20

8          16-02-05-175036-593.

9    50.   Attached hereto as **Exhibit 50** is a true and correct copy an excerpt of the transcript of

10         remarks delivered by President Trump on February 15, 2019.  As of April 4, 2019,

11         the complete transcript is posted on the White House's official website, at

12         https://www.whitehouse.gov/briefings-statements/remarks-president-trump-national-

13         security-humanitarian-crisis-southern-border/.

14         Each of these exhibits is a matter of public record and is therefore subject to judicial notice.

15   Fed. R. Evid. 201(b); *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (a court may

16   judicially notice matters of public record unless the matter is a fact subject to reasonable dispute).

17         **Exhibit 2** is judicially noticeable because it is a court record from a proceeding that

18   addresses issues relevant to this litigation.  *U.S. ex rel. Robinson Rancheria Citizens Council v.*

19   *Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (holding that a court "may take notice of

20   proceedings in other courts, both within and without the federal judicial system, if those

21   proceedings have a direct relation to matters at issue").

22         **Exhibits 8-9, 13, 25-38, 40-46, 49-51** are judicially noticeable because government

23   memoranda, bulletins, letters, statements and opinions are matters of public record appropriate for

24   judicial notice. *See Brown v. Valoff*, 422 F.3d 926, 933 n.9 (9th Cir. 2005) (judicially noticing an

25   administrative bulletin); *Mack v. S. Bay Beer Distribs., Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986)

26   (court may take judicial notice of records and reports of state administrative bodies), *overruled on*

27   *other grounds by Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 111 (1991);

28   *Interstate Nat. Gas. Co. v. S. Cal. Gas. Co.*, 209 F.2d 380, 385 (9th Cir. 1953) (judicially noticing

9

government agency records and reports); *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 520 nn.5, 8, 11 (N.D. Cal. 2017) (taking judicial notice of government memoranda and letters).

**Exhibits 8-9, 13-22, 24, 26-29, 35, 37-38, 40-46, 49-51** are judicially noticeable because they are posted on official government websites. *See Daniels–Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010) (judicially noticing information contained on a government website); *Paralyzed Veterans of America v. McPherson*, No. C 06–4670 SBA, 2008 WL 4183981, at *5 (N.D. Cal. Sept. 9, 2008) (finding that courts commonly take judicial notice of information and documents on government websites, citing cases from various jurisdictions). Thus, the statements of government departments and agencies contained within these exhibits are not subject to reasonable dispute, as the statements "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. § 201(b)(2).

**Exhibits 1-13, 21, 23, 25-36, 39-51** are judicially noticeable because the statements of government officials or entities that these documents contain are not subject to reasonable dispute, as the statements "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. § 201(b)(2).

**Exhibits 13-20, 22, 24, 39, 47, and 48** are judicially noticeable because they are either bills considered by Congress or transcripts of congressional testimony. In general, "[l]egislative history is properly a subject of judicial notice." *Anderson*, 673 F.3d at 1094 n.1. This is also true of testimony given at congressional hearings. *See Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147, 1168 n.12 (10th Cir. 2000) (taking "judicial notice of the content of hearings and testimony before [] congressional committees and subcommittees"); *see also Cnty. of Santa Clara*, 250 F. Supp. 3d 520 nn. 4, 6, 7, 10 (taking judicial notice of government officials' press conference statements, press briefings, and interview statements).

10

Req. for Judicial Notice in Supp. of Mot. for Prelim. Inj. (4:19-cv-00872-HSG)

1    Dated:  April 4, 2019                                  Respectfully Submitted,

2                                                            XAVIER BECERRA
                                                            Attorney General of California
3                                                            ROBERT W. BYRNE
                                                            SALLY MAGNANI
4                                                            MICHAEL L. NEWMAN
                                                            Senior Assistant Attorneys General
5                                                            MICHAEL P. CAYABAN
                                                            CHRISTINE CHUANG
6                                                            EDWARD H. OCHOA
                                                            Supervising Deputy Attorneys General
7
                                                            */s/ Lee I. Sherman*
8                                                            LEE SHERMAN
                                                            HEATHER C. LESLIE
9                                                            JANELLE M. SMITH
                                                            JAMES F. ZAHRADKA II
10                                                           Deputy Attorneys General
                                                            *Attorneys for Plaintiff State of California*
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

11

Req. for Judicial Notice in Supp. of Mot. for Prelim. Inj. (4:19-cv-00872-HSG)

# EXHIBIT 1



**Donald J. Trump** ✔
@realDonaldTrump

The Wall is being built and is well under construction. Big impact will be made. ==Many additional contracts are close to being signed.== Far ahead of schedule despite all of the Democrat Obstruction and Fake News!

4:24 AM - 8 Mar 2019

**26,376** Retweets **109,887** Likes

💬 23K   🔁 26K   ♡ 110K

**Brian Krassenstein** @krassenstein · Mar 8
Replying to @realDonaldTrump
YOUR wall is not being built.  Parts of the FENCE is being renovated, which were scheduled to be renovated for years.  Stop LYING!
💬 778   🔁 951   ♡ 6.3K

**Brian Krassenstein** @krassenstein · Mar 8
You can keep telling lies to your base, trying to convince them that you are building the wall you promised Mexico would pay for, but as you lie you lose more and more of your base to reality.
💬 278   🔁 176   ♡ 2.2K

**Brian Krassenstein** @krassenstein · Mar 8
America is WAKING UP!
💬 541   🔁 84   ♡ 1.8K

**Mitch Andresen** @Mitch_Andresen · Mar 8
Ya we are and it's not with you.
💬 3   🔁 1   ♡ 50

# EXHIBIT 2

# EXHIBIT 2

## SECOND DECLARATION OF LOREN FLOSSMAN

I, Loren Flossman, declare as follows:

1. I am the Acquisition Program Manager for the Wall Program Management Office (Wall PMO), U.S. Border Patrol Program Management Directorate, U.S. Customs and Border Protection (CBP), an agency of the Department of Homeland Security (DHS). I have held this position since May 2018. Prior to this, I was the Director of the Border Patrol & Air and Marine Program (BPAM) Management Office within the Office of Facilities and Asset Management, CBP. BPAM is the office within CBP that historically was responsible for the construction and maintenance of facilities, tactical infrastructure, and border infrastructure such as barriers and roads that are required by the United States Border Patrol (Border Patrol) or CBP Air and Marine. Responsibility for border barrier projects was transferred from BPAM to Wall PMO. Therefore, Wall PMO is now responsible for border barrier projects, including the border barrier projects that are ongoing or being planned for the Rio Grande Valley sector.

2. The statements in this declaration are based on my personal knowledge and information that I have received in my official capacity.

### Funding of Border Barrier Construction in the Rio Grande Valley Sector

3. CBP is a U.S. Government Agency responsible for securing the Nation's borders. CBP's mission is to prevent terrorists and terrorist weapons from entering the United States, and to detect, interdict, and apprehend those who attempt to enter illegally or smuggle any person or contraband across the Nation's borders. CBP is specifically responsible for patrolling nearly 6,000 miles of Mexican and Canadian international land

1

borders and over 2,000 miles of coastal waters surrounding the Florida Peninsula and the island of Puerto Rico.

4. CBP divides its enforcement zones along the southern border with Mexico into nine sectors. From west to east, the sectors are: San Diego, El Centro, Yuma, Tucson, El Paso, Big Bend, Del Rio, Laredo, and Rio Grande Valley (RGV).

5. The RGV covers more than 34,000 square miles of southeast Texas and includes the following Texas counties: Cameron, Willacy, Hidalgo, Starr, Brooks, Kenedy, Kleberg, Nueces, San Patricio, Jim Wells, Bee, Refugio, Calhoun, Goliad, Victoria, DeWitt, Jackson, Matagorda, Brazoria, Galveston, Chambers, Jefferson, Wharton, Fort Bend, Colorado, Austin, Waller, Montgomery, Liberty, Hardin, Orange, Harris, Aransas, and Lavaca. Border Patrol in the RGV is responsible for securing approximately 300 river miles along the Rio Grande River separating the United States and Mexico as well as approximately 300 miles of coast along the Gulf of Mexico.

6. The RGV currently has approximately 54.9 miles of border barrier. This mileage is predominantly steel bollard, levee wall systems but also includes steel bollard, pedestrian wall systems.

7. The barrier projects, both planned and ongoing, in the RGV are for levee and pedestrian barrier systems. The wall system includes steel bollards, a 150-foot enforcement zone on the river side of the wall system, detection and surveillance technology, vehicle and pedestrian gates, lighting, and an all-weather road running parallel to the barrier.

8. All barrier construction projects currently ongoing or planned in the RGV are or will be funded from one of three sources: (1) CBP's Fiscal Year 2018 appropriations (Public Law No. 115-141, § 230); (2) CBP's Fiscal Year 2019 appropriations (Public Law No.

116-6, § 230); or (3) funds received from the Treasury Forfeiture Fund pursuant to 31 U.S.C. § 9705. CBP will not use funds transferred pursuant to authorities invoked in the President's February 15, 2019 national emergency proclamation, including 10 U.S.C. § 2808, or pursuant to 10 U.S.C. § 284 for any ongoing or planned barrier construction in the RGV.

**CBP's Use of Treasury Forfeiture Funds**

9. On December 26, 2018, DHS submitted a request to the United States Department of the Treasury (Treasury) to use Treasury Forfeiture Funds (TFF) in order to enhance border security infrastructure and operations in support of CBP's law enforcement efforts. Treasury approved DHS' request and, on February 15, 2019, notified Congress of this action.

10. TFF are being made available to CBP in two tranches. The first tranche of $242 million was made available to CBP for obligation on March 14, 2019. The second tranche of $359 million is expected to be made available for obligation at a later date upon Treasury's receipt of additional anticipated forfeitures.

11. CBP's Fiscal Year 2019 appropriation provided $1.375 billion for the construction of primary pedestrian fencing in the RGV. CBP intends to start obligating these funds in the near future, but may not finish obligating the entirety of these funds before it begins to obligate TFF funds. Although CBP has not made any decisions about when it will begin obligating TFF funds, CBP intends to obligate all available TFF funds before the end of Fiscal Year 2019 or, if not, before the end of the 2019 calendar year.

12. With respect to funding barrier construction along the southern border, CBP will use TFF funds exclusively for projects in the RGV. CBP will not use TFF funds to build

3

barrier construction projects in the other eight sectors along the southern border. CBP may use some TFF funds for planning related to barrier construction projects in other sectors, but no decisions have been made to use TFF funds for that purpose.

This declaration is made pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct to the best of my current knowledge.

Executed on this _1 day of April, 2019.

Loren Flossman

Digitally signed by Loren Flossman
DN: cn=Loren Flossman, o=Border
Wall PMO, ou=Portfolio Manager,
email=Loren.w.flossman@cbp.dhs.go
v, c=US
Date: 2019.04.01 07:46:58 -04'00'

Loren Flossman
Acquisition Program Manager
U.S. Customs and Border Protection

# EXHIBIT 3

# TIME

## Here's Donald Trump's Presidential Announcement Speech

BY TIME STAFF JUNE 16, 2015

Wow. Whoa. That is some group of people. Thousands.

So nice, thank you very much. That's really nice. Thank you. It's great to be at Trump Tower. It's great to be in a wonderful city, New York. And it's an honor to have everybody here. This is beyond anybody's expectations. There's been no crowd like this.

And, I can tell, some of the candidates, they went in. They didn't know the air-conditioner didn't work. They sweated like dogs.

They didn't know the room was too big, because they didn't have anybody there. How are they going to beat ISIS? I don't think it's gonna happen.

Our country is in serious trouble. We don't have victories anymore. We used to have victories, but we don't have them. When was the last time anybody saw us beating, let's say, China in a trade deal? They kill us. I beat China all the time. All the time.

When did we beat Japan at anything? They send their cars over by the millions, and what do we do? When was the last time you saw a Chevrolet in Tokyo? It doesn't exist, folks. They beat us all the time.

When do we beat Mexico at the border? They're laughing at us, at our stupidity. And now they are beating us economically. They are not our friend, believe me. But they're killing us economically.

The U.S. has become a dumping ground for everybody else's problems.



**The Brief Newsletter**
Sign up to receive the top stories you need to know right now. View Sample

SIGN UP NOW

Thank you. It's true, and these are the best and the finest. When Mexico sends its people, they're not sending their best. They're not sending you. They're not sending you. They're sending people that have lots of problems, and they're bringing those problems with us. They're bringing drugs. They're bringing crime. They're rapists. And some, I assume, are good people.

According to the economists— who I'm not big believers in, but, nevertheless, this is what they're saying— that $24 trillion— we're very close— that's the point of no return. $24 trillion. We will be there soon. That's when we become Greece. That's when we become a country that's unsalvageable. And we're gonna be there very soon. We're gonna be there very soon.

So, just to sum up, I would do various things very quickly. I would repeal and replace the big lie, Obamacare.

I would build a great wall, and nobody builds walls better than me, believe me, and I'll build them very inexpensively, I will build a great, great wall on our southern border. And I will have Mexico pay for that wall.

Mark my words.

Nobody would be tougher on ISIS than Donald Trump. Nobody.

I will find — within our military, I will find the General Patton or I will find General MacArthur, I will find the right guy. I will find the guy that's going to take that military and make it really work. Nobody, nobody will be pushing us around.

I will stop Iran from getting nuclear weapons. And we won't be using a man like Secretary Kerry that has absolutely no concept of negotiation, who's making a horrible and laughable deal, who's just being tapped along as they make weapons right now, and then goes into a bicycle race at 72 years old, and falls and breaks his leg. I won't be doing that. And I promise I will never be in a bicycle race. That I can tell you.

I will immediately terminate President Obama's illegal executive order on immigration, immediately.

Fully support and back up the Second Amendment.

Now, it's very interesting. Today I heard it. Through stupidity, in a very, very hard core prison, interestingly named Clinton, two vicious murderers, two vicious people escaped, and nobody knows where they are. And a woman was on television this morning, and she said, "You know, Mr. Trump," and she was telling other people, and I actually called her, and she said, "You know, Mr. Trump, I always was against guns. I didn't want guns. And now since this happened"— it's up in the prison area— "my husband and I are finally in agreement, because he wanted the guns. We now have a gun on every table. We're ready to start shooting."

I said, "Very interesting."

So protect the Second Amendment.

Reduce our $18 trillion in debt, because, believe me, we're in a bubble. We have artificially low interest rates. We have a stock market that, frankly, has been good to me, but I still hate to see what's happening. We have a stock market that is so bloated.

Be careful of a bubble because what you've seen in the past might be small potatoes compared to what happens. So be very, very careful.

And strengthen our military and take care of our vets. So, so important.

Sadly, the American dream is dead.

But if I get elected president I will bring it back bigger and better and stronger than ever before, and we will make America great again.

Thank you. Thank you very much.

*Read next:* *How Donald Trump Stole Jeb Bush's Moment*

*Listen to the most important stories of the day.*

**Contact us** at editors@time.com.

---

IDEAS   *TIME Ideas hosts the world's leading voices, providing commentary on events in news, society, and culture. We welcome outside contributions. Opinions expressed do not necessarily reflect the views of TIME editors.*

# EXHIBIT 4



# EXHIBIT 5



Twitter   Home   Moments   Search Twitter   Have an account? Log in ▾

**Donald J. Trump** ✔
@realDonaldTrump

Follow

Heroin overdoses are taking over our children and others in the MIDWEST. Coming in from our southern border. We need strong border & WALL!

7:17 AM - 27 Aug 2016

**10,288** Retweets  **30,780** Likes

💬 3.5K    ⇄ 10K    ♡ 31K

This Tweet is unavailable

**Mary Salesses Wright** @StillWaiting_JH · 27 Aug 2016
Can't wait until November to vote this SOB out of existence @tkdmike @realDonaldTrump

💬 5    ⇄ 6    ♡ 21

**Patti Coppersmith** @coppertime · 27 Aug 2016
If only voting him out wd get rid of him. I think his hateful big mouth is just getting started.

💬 3    ⇄ 2    ♡ 9

**Mary Salesses Wright** @StillWaiting_JH · 27 Aug 2016
Hopefully he'll just be an insignificant blip on the radar of history @coppertime @tkdmike @realDonaldTrump

💬 2    ⇄ 1    ♡ 3

**Ellen Gray** @Electro_Gal · 27 Aug 2016
Can't wait till KillaryHillary goes to prison. She's a female Satan

# EXHIBIT 6

## The New York Times

# Transcript of Donald Trump's Immigration Speech

Sept. 1, 2016

*Following is a transcript of the remarks by Donald J. Trump on immigration in Phoenix on Wednesday, as transcribed by the Federal News Service.*

**TRUMP:** Wow. Thank you. That's a lot of people, Phoenix, that's a lot of people.

(APPLAUSE)

Thank you very much.

Thank you, Phoenix. I am so glad to be back in Arizona.

(APPLAUSE)

The state that has a very, very special place in my heart. I love people of Arizona and together we are going to win the White House in November.

(APPLAUSE)

Now, you know this is where it all began for me. Remember that massive crowd also? So, I said let's go and have some fun tonight. We're going to Arizona, O.K.?

This will be a little bit different. This won't be a rally speech, per se. Instead, I'm going to deliver a detailed policy address on one of the greatest challenges facing our country today, illegal immigration.

(APPLAUSE)

I've just landed having returned from a very important and special meeting with the president of Mexico, a man I like and respect very much. And a man who truly loves his country, Mexico.

You have 4 free articles remaining.

SUBSCRIBE TO THE TIMES

While Hillary Clinton meets only with donors and lobbyists, my plan was crafted with the input from Federal Immigration offices, very great people. Among the top immigration experts anywhere in this country, who represent workers, not corporations, very important to us.

I also worked with lawmakers, who've led on this issue on behalf of American citizens for many years. And most importantly I've met with the people directly impacted by these policies. So important.

Number one, are you ready? Are you ready?

(APPLAUSE)

We will build a great wall along the southern border.

(APPLAUSE)

**AUDIENCE:** Build the wall! Build the wall! Build the wall!

And Mexico will pay for the wall.

(APPLAUSE)

One hundred percent. They don't know it yet, but they're going to pay for it. And they're great people and great leaders but they're going to pay for the wall.

On day one, we will begin working on an impenetrable, physical, tall, power, beautiful southern border wall.

(APPLAUSE)

We will use the best technology, including above and below ground sensors that's the tunnels. Remember that, above and below.

(APPLAUSE)

Above and below ground sensors. Towers, aerial surveillance and manpower to supplement the wall, find and dislocate tunnels and keep out criminal cartels and Mexico you know that, will work with us. I really believe it. Mexico will work with us. I absolutely believe it. And especially after meeting with their wonderful, wonderful president today. I really believe they want to solve this problem along with us, and I'm sure they will.

(APPLAUSE)

I will get this done for you and for your family. We'll do it right. You'll be proud of our country again. We'll do it right. We will accomplish all of the steps outlined above. And, when we do, peace and law and justice and prosperity will prevail. Crime will go down. Border crossings will plummet. Gangs will disappear.

And the gangs are all over the place. And welfare use will decrease. We will have a peace dividend to spend on rebuilding America, beginning with our American inner cities. We're going to rebuild them, for once and for all.

For those here illegally today, who are seeking legal status, they will have one route and one route only. To return home and apply for reentry like everybody else, under the rules of the new legal immigration system that I have outlined above. Those who have left to seek entry —

Thank you.

Thank you. Thank you. Those who have left to seek entry under this new system — and it will be an efficient system — will not be awarded surplus visas, but will have to apply for entry under the immigration caps or limits that will be established in the future.TRUMP: We will break the cycle of amnesty and illegal immigration. We will break the cycle. There will be no amnesty.

(APPLAUSE)

Our message to the world will be this. You cannot obtain legal status or become a citizen of the United States by illegally entering our country. Can't do it.

(APPLAUSE)

This declaration alone will help stop the crisis of illegal crossings and illegal overstays, very importantly. People will know that you can't just smuggle in, hunker down and wait to be legalized. It's not going to work that way. Those days are over.

(APPLAUSE)

Importantly, in several years when we have accomplished all of our enforcement and deportation goals and truly ended illegal immigration for good, including the construction of a great wall, which we will have built in record time. And at a reasonable cost, which you never hear from the government.

(APPLAUSE)

And the establishment of our new lawful immigration system then and only then will we

I want to thank Phoenix for the support you've always given me, and I want to tell you what. I'm supporting the man who will — who is the only man who is going to save our country, and what we our going to be leaving our children.

(APPLAUSE)

**(SPEAKER'S VOICE):** I'm Steve Ronnebeck, father of Grant Ronnebeck, 21 years old. Killed January 22, 2015 by an illegal immigrant who shot him in the face. I truly believe that Mr. Trump is going to change things. He's going to fight for my family, and he's going to fight for America.

(APPLAUSE)

**TRUMP:** These are amazing people, and I am not asking for their endorsement, believe me that. I just think I've gotten to know so many of them, and many more, from our group. But they are incredible people and what they're going through is incredible, and there's just no reason for it. Let's give them a really tremendous hand.

(APPLAUSE)

That's tough stuff, I will tell you. That is tough stuff. Incredible people.

So, now is the time for these voices to be heard. Now is the time for the media to begin asking questions on their behalf. Now is the time for all of us as one country, Democrat, Republican, liberal, conservative to band together to deliver justice, and safety, and security for all Americans.

Let's fix this horrible, horrible, problem. It can be fixed quickly. Let's our secure our border.

(APPLAUSE)

Let's stop the drugs and the crime from pouring into our country. Let's protect our social security and Medicare. Let's get unemployed Americans off the welfare and back to work in their own country.

This has been an incredible evening. We're going to remember this evening. November 8, we have to get everybody. This is such an important state. November 8 we have to get everybody to go out and vote.

We're going to bring — thank you, thank you. We're going to take our country back, folks. This is a movement. We're going to take our country back.

Thank you.

(APPLAUSE)

Thank you.

This is an incredible movement. The world is talking about it. The world is talking about it and by the way, if you haven't been looking to what's been happening at the polls over the last three or four days I think you should start looking. You should start looking.

(APPLAUSE)

Together we can save American lives, American jobs, and American futures. Together we can save America itself. Join me in this mission, we're going to make America great again.

Thank you. I love you. God bless you, everybody. God bless you. God bless you, thank you.

*Find out what you need to know about the 2016 presidential race today, and get politics news updates via Facebook, Twitter and the First Draft newsletter.*

  

# EXHIBIT 7

**REMARKS**

# Remarks by President Trump Before a Working Lunch with Heads of the Baltic States

**FOREIGN POLICY**

Issued on: **April 3, 2018**

★ ★ ★

Cabinet Room

12:12 P.M. EDT

PRESIDENT TRUMP:  Okay, thank you very much.  Today, it's my pleasure to congratulate Estonia, Latvia, and Lithuania on the 100th anniversary of their independence.  That's really quite a great achievement, and congratulations.  And I'm honored to have you with us in the White House and the Oval Office.  We covered a little territory today.  Right?  Really tremendous.  One hundred years.

We're thrilled to celebrate this historic milestone by welcoming all of you to our country.  And I know you've been here a little bit before, but this is something special.  So we really enjoy having you.

From the very beginning of your countries' independence, the United States never — and this is, like, never — and I think you know that better than anybody — never ceased to recognize the sovereignty of the three Baltic republics, even though, throughout the

Thank you very much for being here.  Thank you.  Thank you very much, everybody.
Thank you.  Thank you very much.

I have to say this: China.  I have great respect for President Xi.  Two of the most incredible
days of my life were spent in China, and many of you were with me.  He's a tremendous
person.  But we have a problem with China.  They've created a trade deficit, and I really
blame our representatives and, frankly, our preceding Presidents for this.  We have a
trade deficit of $500 billion a year.  It's not something we can live with.

So we'll be working with China.  We'll be negotiating with China.  Again, our relationship
is very good with China, and we intend to keep it that way.  But we have to do something
to seriously relieve that trade deficit.  We can't have a $500 billion-a-year trade deficit.

We also have the theft of intellectual property, and that probably is in the neighborhood
of $200 [billion] to $300 billion a year.

So whether we like it or not, we have a great stock market.  We have a very, very powerful
country.  We have our country, militarily, as you know, Presidents.  We have just received
$700 billion.  Our military will be stronger than ever before.  But we have to do something
on trade with certain countries.  And, obviously, China is the leader in terms of deficits.
We've never had a situation where a country — nor has there ever been in history a
situation where a country has done that to another country.

We've helped rebuild China over the last 25 years, if you take a look at what's happened.
We have helped rebuild China.  So we intend to get along with China, but we have to do
something very substantial about the trade deficit.  And with that, nothing is easy.  I
campaigned on that, I talked about that.  China won't be the only country, but I did, in
fact, campaign on it.

Mexico — if you look at the caravan of thousands of people coming across — I told
Mexico, look, you have a cash cow in NAFTA.  NAFTA has been great for Mexico; it has not
been good for the United States.  A lot of businesses have closed down because of

NAFTA.  You look at empty plants all over the place — and this is from years ago — and they still haven't recovered.  NAFTA has been a terrible deal for the United States.  We're renegotiating the deal right now, but it will still be good for Mexico and for Canada.

And when this caravan came in — and this is a caravan of a lot of people coming in — in this case, from Honduras.  If it reaches our border, our laws are so weak and so pathetic, you would not understand this because — I know how strong your laws are at the border.  It's like we have no border because we had Obama make changes.  President Obama made changes that basically created no border.  It's called catch-and-release.  You catch them, you register them, they go into our country and we can't throw them out.  And, in many cases, they shouldn't be here.  In many, many cases, they shouldn't be here.  And after they get whatever happens over the next two or three years, they're supposed to come back to court.  Almost nobody comes back to court.  They're in our country, and we can't do anything about it because the laws that were created by Democrats are so pathetic and so weak.

So I told Mexico — and I respect what they did — I said, look, your laws are very powerful; your laws are very strong.  We have very bad laws for our border, and we are going to be doing some things — I've been speaking with General Mattis — we're going to be doing things militarily.  Until we can have a wall and proper security, we're going to be guarding our border with the military.  That's a big step.  We really haven't done that before — certainly not very much before.

But we will be doing things with Mexico, and they have to do this, otherwise I'm not going to do the NAFTA deal.  NAFTA has been fantastic for Mexico, bad for us.  We've had our car plants moved to Mexico — many of them.  We make tremendous numbers — millions of cars in Mexico that years ago didn't exist.  They closed in Michigan, they closed in Ohio, they closed in other places.  Now they're starting to move back.  Because of what we've done with regulation and with taxes, they're starting to come back into our country in a big way.

But I told Mexico very strongly: You're going to have to do something about these caravans that are coming up. And I just noticed that the caravan now, which is toward the middle of Mexico coming up from Honduras, is breaking up very rapidly. That's because Mexico has very strong immigration laws, as we should have. We should have those laws. We don't have — we have immigration laws that are laughed at by everybody. And it's going to be changed. We need the wall, we need the protection, and we have to change our immigration laws at the border and elsewhere.

So Mexico has — at this moment, it seems they've broken up large numbers of that particular caravan. And we'll see what happens. But we're prepared at our border. We cannot have people flowing into our country illegally, disappearing, and, by the way, never showing up to court. So the court case will be set for two years or three years, if you can believe this, and they never show up, for the most part. Very rarely do they show up.

Plus, if you notice, they're trying to hire thousands of judges so every person that walks across — and they're taught to say the right thing — they walk across, and then they go and they're supposed to go to court. So we're supposed to have thousands of judges because we cannot have them take it out. We have to bring them before a ridiculous court system.

We have to change our policies fast — just like we have to change on sanctuary cities. If you look at what's happening in California, they're having revolts out there because there are a lot of areas — Orange County and others — they don't want to have sanctuary cities, which are guarding criminals.

So a lot of things are changing. But I've just heard that the caravan coming up from Honduras is broken up, and Mexico did that. And they did it because, frankly, I said, "You really have to do it." We're going to have a relationship with NAFTA. We're going to have to include security in NAFTA. So Mexico has very strong laws, and that's the way it is. So it looks like it's been broken up. So that will be good.

not fair to the United States.  It's not fair to our taxpayers.  And Amazon has the money to pay the fair rate at the Post Office, which would be much more than they're paying right now.

The other thing is a lot of retail businesses all over the country are going out of business, so that's a different problem, and it's a big problem.  You have retailers all over the United States that are going out of business.  You look at some of these small towns where they had a beautiful Main Street with stores — the stores are all gone.  So that's a different problem that we're going to have to talk about.

But if you look at the cost that we're subsidizing — we're giving a subsidy to Amazon.  And we're talking about billions of dollars a year.  The real cost.  And a report just came out; they said, $1.47, I believe, or about that — for every time they deliver a package, the United States government — meaning, the Post Office — loses a $1.47.  So Amazon is going to have to pay much more money to the Post Office, there's no doubt about that.

Thank you all very much.  Thank you.

Q   Scott Pruitt, sir?  Do you support Scott Pruitt?

PRESIDENT TRUMP:  I hope he's going to be great.

END

12:30 P.M. EDT

# EXHIBIT 8



**REMARKS**

# Remarks by President Trump in Joint Address to Congress

Issued on: **February 28, 2017**



U.S. Capitol

Washington, D.C.

9:09 P.M. EST

THE PRESIDENT:  Thank you very much.  Mr. Speaker, Mr. Vice President, members of Congress, the First Lady of the United States — (applause) — and citizens of America:

Tonight, as we mark the conclusion of our celebration of Black History Month, we are reminded of our nation's path towards civil rights and the work that still remains to be done.  (Applause.)  Recent threats targeting Jewish community centers and vandalism of Jewish cemeteries, as well as last week's shooting in Kansas City, remind us that while we may be a nation divided on policies, we are a country that stands united in condemning hate and evil in all of its very ugly forms.  (Applause.)

Each American generation passes the torch of truth, liberty and justice in an unbroken chain all the way down to the present.  That torch is now in our hands.  And we will use it to light up the world.  I am here tonight to deliver a message of unity and strength, and it

regulations must be eliminated.  (Applause.)  We're going to stop the regulations that threaten the future and livelihood of our great coal miners.  (Applause.)

We have cleared the way for the construction of the Keystone and Dakota Access Pipelines — (applause) — thereby creating tens of thousands of jobs.  And I've issued a new directive that new American pipelines be made with American steel.  (Applause.)

We have withdrawn the United States from the job-killing Trans-Pacific Partnership.  (Applause.)  And with the help of Prime Minister Justin Trudeau, we have formed a council with our neighbors in Canada to help ensure that women entrepreneurs have access to the networks, markets and capital they need to start a business and live out their financial dreams.  (Applause.)

To protect our citizens, I have directed the Department of Justice to form a Task Force on Reducing Violent Crime.  I have further ordered the Departments of Homeland Security and Justice, along with the Department of State and the Director of National Intelligence, to coordinate an aggressive strategy to dismantle the criminal cartels that have spread all across our nation.  (Applause.)  We will stop the drugs from pouring into our country and poisoning our youth, and we will expand treatment for those who have become so badly addicted.  (Applause.)

At the same time, my administration has answered the pleas of the American people for immigration enforcement and border security.  (Applause.)  By finally enforcing our immigration laws, we will raise wages, help the unemployed, save billions and billions of dollars, and make our communities safer for everyone.  (Applause.)  We want all Americans to succeed, but that can't happen in an environment of lawless chaos.  We must restore integrity and the rule of law at our borders.  (Applause.)

For that reason, we will soon begin the construction of a great, great wall along our southern border.  (Applause.)  As we speak tonight, we are removing gang members, drug dealers, and criminals that threaten our communities and prey on our very

children learn in peace, and jobs where Americans prosper and grow are not too much to ask.  (Applause.)

When we have all of this, we will have made America greater than ever before — for all Americans.  This is our vision.  This is our mission.  But we can only get there together.  We are one people, with one destiny.  We all bleed the same blood.  We all salute the same great American flag.  And we all are made by the same God.  (Applause.)

When we fulfill this vision, when we celebrate our 250 years of glorious freedom, we will look back on tonight as when this new chapter of American Greatness began.  The time for small thinking is over.  The time for trivial fights is behind us.  We just need the courage to share the dreams that fill our hearts, the bravery to express the hopes that stir our souls, and the confidence to turn those hopes and those dreams into action.

From now on, America will be empowered by our aspirations, not burdened by our fears; inspired by the future, not bound by the failures of the past; and guided by our vision, not blinded by our doubts.

I am asking all citizens to embrace this renewal of the American spirit.  I am asking all members of Congress to join me in dreaming big, and bold, and daring things for our country.  I am asking everyone watching tonight to seize this moment.  Believe in yourselves, believe in your future, and believe, once more, in America.

Thank you, God bless you, and God bless the United States.  (Applause.)

END

10:09 P.M. EST

# EXHIBIT 9



**REMARKS**

# Remarks by President Trump at the National Rifle Association Leadership Forum

**— LAW & JUSTICE**

Issued on: **April 28, 2017**



Georgia World Congress Center

Atlanta, Georgia

2:06 P.M. EDT

Thank you, Chris, for that kind introduction and for your tremendous work on behalf of our Second Amendment.  Thank you very much.  (Applause.)  I want to also thank Wayne LaPierre for his unflinching leadership in the fight for freedom.  Wayne, thank you very much.  Great.  (Applause.)

I'd also like to congratulate Karen Handel on her incredible fight in Georgia 6. (Applause.)  The election takes place on June 20th.  And, by the way, on primaries, let's not have 11 Republicans running for the same position, okay?  (Laughter.)  It's too nerve-shattering.  She's totally for the NRA and she's totally for the Second Amendment.  So get out and vote.  She's running against someone who's going to raise your taxes to the sky, destroy your healthcare, and he's for open borders — lots of crime, and he's not even able to vote in the district that he's running in.  Other than that, I think he's doing a fantastic job, right?  (Laughter.)  So get out and vote for Karen.

for them anymore.  That's a bad group.  (Applause.)  Not pleasant for MS-13.  Get them the hell out of here, right?  Get them out.

(Applause.)

We are protecting the freedoms of law-abiding Americans, and we are going after the criminal gangs and cartels that prey on our innocent citizens.  And we are really going after them.  (Applause.)

As members of the NRA know well, some of the most important decisions a President can make are appointments — and I've appointed people who believe in law, order, and justice.  (Applause.)

That is why I have selected as your Attorney General, number one, a really fine person, a really good man, a man who has spent his career fighting crime, supporting the police, and defending the Second Amendment.  For the first time in a long time, you now have a pro-Second-Amendment, tough-on-crime Attorney General, and his name is Jeff Sessions.  (Applause.)

And Attorney General Sessions is putting our priorities into action.  He's going after the drug dealers who are peddling their poison all over our streets and destroying our youth.  He's going after the gang members who threaten our children.  And he's fully enforcing our immigration laws in all 50 states.  And you know what?  It's about time.  (Applause.)

Heading up the effort to secure America's borders is a great military general, a man of action:  Homeland Security Director [sic], John Kelly.  (Applause.)

Secretary Kelly, who used to be General Kelly, is following through on my pledge to protect the borders, remove criminal aliens, and stop the drugs from pouring into our country.  We've already seen — listen to this; it never happened before, people can't even believe it.  And, by the way, we will build the wall no matter how low this number gets or how this goes.  Don't even think about it.  Don't even think about it.  (Applause.)

I greatly appreciated your support on November 8th, in what will hopefully be one of the most important and positive elections for the United States of all time.  And to the NRA, I can proudly say I will never, ever let you down.

Thank you.  God Bless you.  God Bless our Constitution, and God bless America.

Thank you very much.  Thank you.  Thank you.  (Applause.)

END
2:35 P.M. EDT

# EXHIBIT 10

# TIME

## President Trump Ranted For 77 Minutes in Phoenix. Here's What He Said

**AUGUST 23, 2017**

President Donald Trump on Tuesday lambasted his critics in a 77-minute speech at a rally in Phoenix, as protesters gathered outside.

He attacked Arizona's two Republican senators, though he didn't directly name either of them, and fired back at the widespread criticism of his remarks on the clashes in Charlottesville, Va. Trump also hinted that he plans to pardon former Sheriff Joe Arpaio and threatened to shut down the government over funding for a Mexican border wall.

Trump tweeted about the rally Wednesday morning, calling the crowd "amazing."



Read his full remarks from the Phoenix rally below:

> TRUMP: What a crowd.
>
> (APPLAUSE)
>
> TRUMP: And just so you know from the Secret Service, there aren't too many people outside protesting, OK. That I can tell you.
>
> (APPLAUSE)
>
> A lot of people in here, a lot of people pouring right now. They can get them in. Whatever you can do, fire marshals, we'll appreciate it.
>
> TRUMP: And I want to thank our great vice president, Mike Pence, for the introduction.
>
> (APPLAUSE)

(LAUGHTER)

But it was great. And I met with the Border Patrol and I met with ICE, and these are incredible people; the job they do.

(APPLAUSE)

And in fact, General Kelly, who was in charge of Homeland Security, where people coming in down 78 and almost 80 percent. He did so good, I made him my chief of staff, right? That made sense.

John, where's John? Where is he? Where's General Kelly? Get him out here. He's great. He's doing a great job.

But we did a lot before anything happened, we did a lot. We respect and cherish our ICE officers and our Border Patrol agents, and we respect and cherish our police officers, and our firemen, and all of our uniform services.

(APPLAUSE)

But during that visit, I heard first hand from the frontline agents about the security threats they confront each and every day, and I pledged my continued resolve to them, and all of you, to keep our country safe. All around the nation, I have spent time with the wonderful Americans whose children were killed for the simple reason that our government failed to enforce our immigration laws, already existing laws.

And I promised these families, the deaths of their loved ones will not have been in vain. I promised them. I know so many of them.

(APPLAUSE)

One by one we are finding the gang members, the drug dealers and the criminals who prey on our people. We are throwing them out of the country or we're putting the hell, fast in jail.

(APPLAUSE)

We are cracking down on these sanctuary cities that shield criminal aliens, finally.

(APPLAUSE)

And we are building a wall on the southern border which is absolutely necessary.

(APPLAUSE)

CROWD: Build that wall! Build that wall! Build that wall!

(APPLAUSE)

*This is our moment. This is our chance. This is our opportunity to recapture our dynasty like never before, to rebuild our future, to deliver justice for every forgotten man and woman and child in America.*

*Freedom will prevail, our values will endure, our citizens will prosper, Arizona will thrive, and our beloved nation will succeed like never, ever before.*

*So to Americans young and old, near and far, in cities small and large, we say these words again tonight: We will make America strong again. We will make America wealthy again. We will make America proud again. We will make America safe again. And we will make America great again.*

(APPLAUSE)

*Thank you Arizona. God bless you. Thank you. Thank you.*

**Contact us** at editors@time.com.

# EXHIBIT 11



Home    Moments        Search Twitter        Have an account? Log in ⌄

**Donald J. Trump** ✓
@realDonaldTrump

Follow

MS-13 gang members are being removed by our Great ICE and Border Patrol Agents by the thousands, but these killers come back in from El Salvador, and through Mexico, like water. El Salvador just takes our money, and Mexico must help MORE with this problem. We need The Wall!

3:28 AM - 23 Feb 2018

**25,596** Retweets **117,302** Likes

💬 22K     ↻ 26K     ♡ 117K

**Dr. Scheidenberg** @Dr_Scheidenberg · 24 Feb 2018
Replying to @realDonaldTrump
Start building that Wall then. What are you doing all day long? Playing golf and watching TV?
💬 24     ↻ 3     ♡ 62

**RC** @droody · 24 Feb 2018
Don't forget tweeting and eating McDonalds.
💬 8     ↻ 1     ♡ 54

**odalis rivas** @ooodalisss · 24 Feb 2018
Don't forget eating KFC bowls!! 🙆 👌 👌
💬 2     ↻     ♡ 12

1 more reply

**Robin Sinclair** @RobinSinclair10 · 24 Feb 2018

# EXHIBIT 12



Twitter — Home — Moments — Search Twitter — Have an account? Log in

### Donald J. Trump ✔
@realDonaldTrump

We shouldn't be hiring judges by the thousands, as our ridiculous immigration laws demand, we should be changing our laws, building the Wall, hire Border Agents and Ice and not let people come into our country based on the legal phrase they are told to say as their password.

5:12 AM - 21 Jun 2018

**25,659** Retweets **99,746** Likes

💬 15K   🔁 26K   ♡ 100K

**Cheryl** @Cherylmm2 · 22 Jun 2018
Replying to @realDonaldTrump @magickSword

American citizens are clear.  We want the Wall fully funded!  We want an end to diversity lottery & chain migration.  We want E-verify & true voter ID!  In POTUS, we have the only opportunity we are likely to have to save our country!  We are behind you!

💬 8   🔁 11   ♡ 51

**Katherine Goetchius** @KatherineGoetc1 · 22 Jun 2018
Hell yeah!

💬   🔁 1   ♡ 11

**Peter Fox** 🦊🇦🇺 @Peter_Fox59 · 22 Jun 2018
Replying to @realDonaldTrump

Here's a novel idea. How about helping Central American nations to lift their living standards, employment & create incentives to stay instead imposing tariffs & poverty.

# EXHIBIT 13



**REMARKS**

# Remarks by President Trump Before Marine One Departure

Issued on: **January 10, 2019**



South Lawn

9:32 A.M. EST

THE PRESIDENT:  So, we're going to Texas.  We're going to the border.  Just spoke with some of my friends in Arizona.  We have tremendous support.  The Republicans are extremely united.  They all want to see something happen, but they're extremely united.  And I don't think I've ever seen unity like this in the Republican Party.

The media — which I call the "opposition party," a lot of the media — in coordination with the Democrats, they're not talking about the Democrats folding.  For instance, this morning, a number of people came out and said, "You do need very strong border security, and that includes a wall or whatever it is."  A number of Democrats said that, but people don't like to report on it.

We have tremendous unity in the Republican Party.  It's really a beautiful thing to see.  I don't think there will be any breakaway because they know we need border security and we have to have it.  And the only you're going to have border security — there's only way: You can have all the technology in the world.  I'm a professional at technology.  But if you don't have a steel barrier or a wall of some kind — strong, powerful — you're going to

Q   (Inaudible.)

THE PRESIDENT:  I can't hear you.

Q   (Inaudible.)

THE PRESIDENT:  We have plenty of funds that.  If there's a national emergency, there's a lot of funds.

Q   (Inaudible.)

THE PRESIDENT:  If we declare a national emergency, we have a tremendous amount of funds — tremendous — if we want to do that, if we want to go that route.  Again, there is no reason why we can't come to a deal.  But you have another side that doesn't care about border security.  The Democrats — which I've been saying all along — they don't give a damn about crime.  They don't care about crime.  They don't care about gang members coming in and stabbing people, and cutting people up.  They don't care about crime.

And if they're not going to care about crime, then I agree they shouldn't do anything at the border.  But I care about crime and I care about drugs.  We're spending a fortune on trying to stop drugs, and they pour in through the border.  But I see it more now than ever before.  The Democrats don't care about the border and they don't care about crime.

Q   (Inaudible.)

THE PRESIDENT:  Say it?  Say it?

Q   This emergency on the border, this crisis, when did it begin?

THE PRESIDENT:  Oh, it began a long time.  Ask President Obama.  Obama used to call it a crisis at the border, too.  I think he said it in 2014.

Look, look.  You can all play cute.  And I say 80 percent of you are possibly in coordination with the opposition party.  I mean, the whole thing is ridiculous.  All you have to do is look at the border.  Rent a helicopter — except you don't want to know the truth — and watch.

And, by the way, here's the story: There is another major caravan forming right now in Honduras.  And so far — we're trying to break it up.  But so far, it's bigger than anything we've seen.  And a drone isn't going to stop it.  And a sensor isn't going to stop it.  But you know what's going to stop it in its tracks?  A nice, powerful wall.

Q   Does the buck stop with you over this shutdown?

THE PRESIDENT:  The buck stops with everybody.  They could solve this problem in literally 15 minutes.  We could be back.  We could have border security.  They could stop this problem in 15 minutes if they wanted to.  I really believe now that they don't want to.  I really believe that.  I really believe that they don't care about crime.  I really believe this.  The Democrats don't care about crime.

They've been taken over by a group of young people who, frankly, in some cases — I've been watching — I actually think they're crazy.  But they've been taken over by a group that is so far left.  I really don't think they care about crime.  And, you know, sadly, they're viewing this as the beginning of the 2020 presidential race, and that's okay with me.  But they have been taken over by a group of people that don't care about gangs.  They don't care about human trafficking and drugs.  They don't care about anything.  I'll tell you what — they have gone crazy.

Q   How much longer is this shutdown going to last?

THE PRESIDENT:  I wish him luck.  It's going to be a beauty.


END          9:47 A.M. EST

# EXHIBIT 14

II

115TH CONGRESS
2D SESSION
# S. 3713

To appropriate $25,000,000,000 for the construction of a border wall between the United States and Mexico, and for other purposes.

---

## IN THE SENATE OF THE UNITED STATES

DECEMBER 5, 2018

Mr. INHOFE (for himself, Mr. ROUNDS, Mr. KENNEDY, and Mr. CRUZ) introduced the following bill; which was read twice and referred to the Committee on Finance

---

# A BILL

To appropriate $25,000,000,000 for the construction of a border wall between the United States and Mexico, and for other purposes.

1   *Be it enacted by the Senate and House of Representa-*

2   *tives of the United States of America in Congress assembled,*

3   **SECTION 1. SHORT TITLE.**

4       This Act may be cited as the ''WALL Act of 2018''.

5   **SEC. 2. MANDATORY SPENDING FOR BORDER WALL.**

6       (a) IN GENERAL.—There is appropriated

7   $25,000,000,000 for the purpose of constructing a phys-

8   ical barrier along the southern border of the United

9   States.

# EXHIBIT 15

I

115TH CONGRESS
2D SESSION

# H. R. 7073

To provide for reconciliation pursuant to title II of the concurrent resolution
on the budget for fiscal year 2019.

––––––––––––––

## IN THE HOUSE OF REPRESENTATIVES

OCTOBER 19, 2018

Mr. BYRNE (for himself, Mr. CRAMER, Mr. ROGERS of Alabama, Mr. BROOKS of Alabama, Mr. BURGESS, Mr. FRANCIS ROONEY of Florida, Mr. BABIN, Mr. BANKS of Indiana, Mr. GOSAR, Mr. GAETZ, Mr. NORMAN, Mr. BIGGS, Mr. POSEY, Mr. MOONEY of West Virginia, Mr. DESJARLAIS, and Mr. SMITH of Texas) introduced the following bill; which was referred to the Committee on Homeland Security

––––––––––––––

# A BILL

To provide for reconciliation pursuant to title II of the concurrent resolution on the budget for fiscal year 2019.

1    *Be it enacted by the Senate and House of Representa-*

2  *tives of the United States of America in Congress assembled,*

3  **SECTION 1. SHORT TITLE.**

4    This Act may be cited as the "50 Votes for the Wall

5  Act".

6  **SEC. 2. BORDER WALL AND SECURITY TRUST FUND.**

7    (a) ESTABLISHMENT OF FUND.—There is estab-

8  lished a fund, to be known as the "Border Wall and Secu-

2

1  rity Trust Fund'', consisting of such amounts as may be

2  appropriated pursuant to subsection (b) to construct a

3  wall (including physical barriers and associated detection

4  technology, roads, and lighting) along the international

5  border between the United States and Mexico by January

6  19, 2021.

7      (b) APPROPRIATION OF AMOUNTS.—There is hereby

8  appropriated to the Border Wall and Security Trust Fund

9  established under subsection (a), out of any money in the

10  Treasury not otherwise appropriated, such sums as the

11  Secretary of Homeland Security may request of the Sec-

12  retary of Treasury on or after October 1, 2018, up to a

13  total of $25,000,000,000, to remain available until ex-

14  pended to carry out the purpose described in subsection

15  (a).

16      (c) SUNSET.—The authority provided by this Act

17  shall terminate on September 30, 2028, and the unobli-

18  gated balance of any amounts in the Border Wall and Se-

19  curity Trust Fund on such date shall be returned to the

20  general fund of the Treasury.

○

# EXHIBIT 16

I

115TH CONGRESS
2D SESSION
# H. R. 7059

To fund construction of the southern border wall and to ensure compliance
with Federal immigration law.

———————————————

## IN THE HOUSE OF REPRESENTATIVES

OCTOBER 12, 2018

Mr. MCCARTHY introduced the following bill; which was referred to the Committee on the Judiciary, and in addition to the Committees on Homeland Security, Ways and Means, Armed Services, and the Budget, for a period to be subsequently determined by the Speaker, in each case for consideration of such provisions as fall within the jurisdiction of the committee concerned

———————————————

# A BILL

To fund construction of the southern border wall and to
ensure compliance with Federal immigration law.

1    *Be it enacted by the Senate and House of Representa-*

2    *tives of the United States of America in Congress assembled,*

3    **SECTION 1. SHORT TITLE.**

4        This Act may be cited as the "Build the Wall, En-

5    force the Law Act of 2018".

6    **SEC. 2. FINDINGS.**

7        Congress finds the following:

41

1          212(a)(2)(J) or section 237(a)(2)(G)

2          shall be eligible for any immigration

3          benefit under this subparagraph;''.

4    (i) PAROLE.—An alien described in section

5  212(a)(2)(J) of the Immigration and Nationality Act, as

6  added by subsection (b), shall not be eligible for parole

7  under section 212(d)(5)(A) of such Act unless—

8    (1) the alien is assisting or has assisted the

9    United States Government in a law enforcement

10    matter, including a criminal investigation; and

11    (2) the alien's presence in the United States is

12    required by the Government with respect to such as-

13    sistance.

14  (j) EFFECTIVE DATE.—The amendments made by

15  this section shall take effect on the date of the enactment

16  of this Act and shall apply to acts that occur before, on,

17  or after the date of the enactment of this Act.

## SEC. 9. BORDER SECURITY FUNDING.

19  (a) FUNDING.—In addition to amounts otherwise

20  made available by this Act or any other provision of law,

21  there is hereby appropriated to the "U.S. Customs and

22  Border Protection—Procurement, Construction, and Im-

23  provements" account, out of any amounts in the Treasury

24  not otherwise appropriated, $23,400,000,000, to be avail-

25  able as described in subsections (b) and (c), of which—

42

1      (1) $16,625,000,000 shall be for a border wall

2   system along the southern border of the United

3   States, including physical barriers and associated de-

4   tection technology, roads, and lighting; and

5      (2) $6,775,000,000 shall be for infrastructure,

6   assets, operations, and technology to enhance border

7   security along the southern border of the United

8   States, including—

9          (A) border security technology, including

10         surveillance technology, at and between ports of

11         entry;

12         (B) new roads and improvements to exist-

13         ing roads;

14         (C) U.S. Border Patrol facilities and ports

15         of entry;

16         (D) aircraft, aircraft-based sensors and as-

17         sociated technology, vessels, spare parts, and

18         equipment to maintain such assets;

19         (E) a biometric entry and exit system; and

20         (F) family residential centers.

21   (b) AVAILABILITY OF BORDER WALL SYSTEM

22 FUNDS.—

23      (1) IN GENERAL.—Of the amount appropriated

24   in subsection (a)(1)—

46

1 House of Representatives regarding activities under and

2 progress made in carrying out this section.

3     (g) RULES OF CONSTRUCTION.—Nothing in this sec-

4 tion may be construed to limit the availability of funds

5 made available by any other provision of law for carrying

6 out the requirements of this Act or the amendments made

7 by this Act. Any reference in this section to an appropria-

8 tion account shall be construed to include any successor

9 accounts.

10    (h)   DISCRETIONARY   AMOUNTS.—Notwithstanding

11 any other provision of law, the amounts appropriated

12 under subsection (a) are discretionary appropriations (as

13 that term is defined in section 250(c)(7) of the Balanced

14 Budget and Emergency Deficit Control Act of 1985 (2

15 U.S.C. 900(c)(7)).

16 **SEC. 10. EXCLUSION FROM PAYGO SCORECARDS.**

17    The budgetary effects of this Act shall not be entered

18 on either PAYGO scorecard maintained pursuant to sec-

19 tion 4(d) of the Statutory Pay-As-You-Go Act of 2010.

○

# EXHIBIT 17

I

115TH CONGRESS
2D SESSION

# H. R. 6657

To establish a separate account in the Treasury to hold deposits to be used to secure the southern border of the United States, and for other purposes.

---

## IN THE HOUSE OF REPRESENTATIVES

AUGUST 7, 2018

Mr. BIGGS (for himself, Mr. GOSAR, Mr. BROOKS of Alabama, Mr. GAETZ, Mr. DESJARLAIS, and Mr. NORMAN) introduced the following bill; which was referred to the Committee on Homeland Security, and in addition to the Committees on Ways and Means, the Judiciary, Foreign Affairs, Financial Services, Education and the Workforce, and Appropriations, for a period to be subsequently determined by the Speaker, in each case for consideration of such provisions as fall within the jurisdiction of the committee concerned

---

# A BILL

To establish a separate account in the Treasury to hold deposits to be used to secure the southern border of the United States, and for other purposes.

1    *Be it enacted by the Senate and House of Representa-*

2  *tives of the United States of America in Congress assembled,*

3  **SECTION 1. SHORT TITLE.**

4    This Act may be cited as the "Fund and Complete

5  the Border Wall Act".

2

1 **SEC. 2. BORDER WALL TRUST FUND.**

2     (a) ESTABLISHMENT OF FUND.—At the end of sub-

3 chapter III of chapter 33 of title 31, United States Code,

4 insert the following:

5 **"§ 3344. Secure the Southern Border Fund.**

6     "(a) IN GENERAL.—Not later than 60 days after the

7 date of enactment of this section, the Secretary of the

8 Treasury shall establish an account in the Treasury of the

9 United States, to be known as the 'Secure the Southern

10 Border Fund', into which funds shall be deposited in ac-

11 cordance with the Fund and Complete the Border Wall

12 Act and the amendments made by that Act.

13     "(b) APPROPRIATION.—Funds deposited in the Se-

14 cure the Southern Border Fund shall be available until

15 expended. Such funds are authorized to be appropriated,

16 and are appropriated, to the Secretary of Homeland Secu-

17 rity only—

18         "(1) to plan, design, construct, or maintain a

19     barrier along the international border between the

20     United States and Mexico; and

21         "(2) to purchase and maintain necessary vehi-

22     cles and equipment for U.S. Border Patrol agents.

23     "(c) LIMITATION.—Not more than 5 percent of the

24 funds deposited in the Secure the Southern Border Fund

25 may be used for the purpose described in subsection

26 (b)(2).".

7

1 essing U.S. Customs and Border Protection Form I–94

2 shall be allocated as follows:

3     (1) $6 shall be deposited in the Land Border

4     Inspection Fee Account and used in accordance with

5     such section 286(q).

6     (2) To the extent provided in advance in appro-

7     priations Acts, $10 shall be used for salaries for

8     U.S. Border Patrol agents.

9     (3) $9 shall be deposited in the Secure the

10     Southern Border Fund established by the amend-

11     ment made by section 2 of this Act.

12 **SEC. 6. CONSTRUCTION OF BORDER WALL.**

13     (a) IMPROVEMENT OF BARRIERS AT BORDER.—Sec-

14 tion 102 of the Illegal Immigration Reform and Immi-

15 grant Responsibility Act of 1996 (Division C of Public

16 Law 104–208; 8 U.S.C. 1103 note) is amended—

17     (1) by amending subsection (a) to read as fol-

18     lows:

19     "(a) IN GENERAL.—Not later than December 31,

20 2019, the Secretary of Homeland Security shall take such

21 actions as may be necessary (including the removal of ob-

22 stacles to detection of illegal entrants) to design, test, con-

23 struct, and install physical barriers, roads, and technology

24 along the international land border between the United

8

1      States and Mexico to prevent illegal crossings in all
2      areas.'';

3         (2) in subsection (b)—

4            (A) in paragraph (1)—

5               (i) in the paragraph heading, by strik-
6             ing "ADDITIONAL FENCING" and inserting
7             "FENCING";

8               (ii) by striking subparagraph (A) and
9             inserting the following:

10            "(A) PHYSICAL BARRIERS.—In carrying
11         out subsection (a), the Secretary of Homeland
12         Security shall construct physical barriers, in-
13         cluding secondary barriers in locations where
14         there is already a fence, along the international
15         land border between the United States and
16         Mexico that will prevent illegal entry and will
17         assist in gaining operational control of the bor-
18         der (as defined in section 2(b) of the Secure
19         Fence Act of 2006 (8 U.S.C. 1701 note; Public
20         Law 109–367)).'';

21               (iii) by striking subparagraph (B) and
22             redesignating subparagraphs (C) and (D)
23             as subparagraphs (B) and (C), respec-
24             tively;

14

1   the remainder of this Act, or an amendment made by this

2   Act, or the application of such provision to other persons

3   or circumstances, shall not be affected.

○

# EXHIBIT 18

I

115TH CONGRESS
2D SESSION

# H. R. 6415

To provide for border security, and for other purposes.

————————————

## IN THE HOUSE OF REPRESENTATIVES

JULY 18, 2018

Mr. FERGUSON introduced the following bill; which was referred to the Committee on Homeland Security, and in addition to the Committees on the Judiciary, Transportation and Infrastructure, Oversight and Government Reform, Foreign Affairs, Agriculture, Armed Services, Natural Resources, the Budget, and Ways and Means, for a period to be subsequently determined by the Speaker, in each case for consideration of such provisions as fall within the jurisdiction of the committee concerned

————————————

# A BILL

To provide for border security, and for other purposes.

1    *Be it enacted by the Senate and House of Representa-*

2  *tives of the United States of America in Congress assembled,*

3  **SECTION 1. SHORT TITLE; TABLE OF CONTENTS.**

4    (a) SHORT TITLE.—This Act may be cited as the

5  ''American Border Act''.

6    (b) TABLE OF CONTENTS.—The table of contents for

7  this Act is as follows:

Sec. 1. Short title; table of contents.

TITLE I—BORDER SECURITY

Sec. 1101. Definitions.

125

1  or imprisonment for not more than 15 years, or

2  both.

3  　　"(3) If the injury or depredation was described

4  under paragraph (2) and, in the commission of the

5  offense, the offender used or carried a firearm or, in

6  furtherance of any such offense, possessed a firearm,

7  by a fine under this title or imprisonment for not

8  more than 20 years, or both.".

# TITLE IV—BORDER SECURITY FUNDING

9
10

**SEC. 4101. BORDER SECURITY FUNDING.**

12  (a) FUNDING.—In addition to amounts otherwise

13  made available by this Act or any other provision of law,

14  there is hereby appropriated to the "U.S. Customs and

15  Border Protection—Procurement, Construction, and Im-

16  provements" account, out of any amounts in the Treasury

17  not otherwise appropriated, $23,400,000,000, to be avail-

18  able as described in subsections (b) and (c), of which—

19  　　(1) $16,625,000,000 shall be for a border wall

20  system along the southern border of the United

21  States, including physical barriers and associated de-

22  tection technology, roads, and lighting; and

23  　　(2) $6,775,000,000 shall be for infrastructure,

24  assets, operations, and technology to enhance border

130

1    (g) RULES OF CONSTRUCTION.—Nothing in this sec-
2 tion may be construed to limit the availability of funds
3 made available by any other provision of law for carrying
4 out the requirements of this Act or the amendments made
5 by this Act. Any reference in this section to an appropria-
6 tion account shall be construed to include any successor
7 accounts.

8    (h)   DISCRETIONARY   AMOUNTS.—Notwithstanding
9 any other provision of law, the amounts appropriated
10 under subsection (a) are discretionary appropriations (as
11 that term is defined in section 250(c)(7) of the Balanced
12 Budget and Emergency Deficit Control Act of 1985 (2
13 U.S.C. 900(c)(7))).

**14  SEC. 4102. EXCLUSION FROM PAYGO SCORECARDS.**

15    The budgetary effects of this Act shall not be entered
16 on either PAYGO scorecard maintained pursuant to sec-
17 tion 4(d) of the Statutory Pay-As-You-Go Act of 2010.

○

# EXHIBIT 19

I

115TH CONGRESS
2D SESSION

# H. R. 6136

To amend the immigration laws and provide for border security, and for
other purposes.

————————————

## IN THE HOUSE OF REPRESENTATIVES

JUNE 19, 2018

Mr. GOODLATTE (for himself, Mr. CURBELO of Florida, Mr. MCCAUL, and
Mr. DENHAM) introduced the following bill; which was referred to the
Committee on the Judiciary, and in addition to the Committees on Home-
land Security, Agriculture, Natural Resources, Transportation and Infra-
structure, Ways and Means, Energy and Commerce, Armed Services,
Foreign Affairs, the Budget, and Oversight and Government Reform, for
a period to be subsequently determined by the Speaker, in each case for
consideration of such provisions as fall within the jurisdiction of the com-
mittee concerned

————————————

# A BILL

To amend the immigration laws and provide for border
security, and for other purposes.

1 	*Be it enacted by the Senate and House of Representa-*

2 	*tives of the United States of America in Congress assembled,*

3 	**SECTION 1. SHORT TITLE; TABLE OF CONTENTS.**

4 	(a) SHORT TITLE.—This Act may be cited as the

5 	''Border Security and Immigration Reform Act of 2018''.

6 	(b) TABLE OF CONTENTS.—The table of contents for

7 	this Act is as follows:

152

1     "(3) If the injury or depredation was described

2     under paragraph (2) and, in the commission of the

3     offense, the offender used or carried a firearm or, in

4     furtherance of any such offense, possessed a firearm,

5     by a fine under this title or imprisonment for not

6     more than 20 years, or both.".

# TITLE V—BORDER SECURITY FUNDING

**SEC. 5101. BORDER SECURITY FUNDING.**

10     (a) FUNDING.—In addition to amounts otherwise

11 made available by this Act or any other provision of law,

12 there is hereby appropriated to the "U.S. Customs and

13 Border Protection—Procurement, Construction, and Im-

14 provements" account, out of any amounts in the Treasury

15 not otherwise appropriated, $23,400,000,000, to be avail-

16 able as described in subsections (b) and (c), of which—

17     (1) $16,625,000,000 shall be for a border wall

18     system along the southern border of the United

19     States, including physical barriers and associated de-

20     tection technology, roads, and lighting; and

21     (2) $6,775,000,000 shall be for infrastructure,

22     assets, operations, and technology to enhance border

23     security along the southern border of the United

24     States, including—

# EXHIBIT 20

I

115TH CONGRESS
2D SESSION

# H. R. 4760

To amend the immigration laws and the homeland security laws, and for
other purposes.

————————————————

## IN THE HOUSE OF REPRESENTATIVES

JANUARY 10, 2018

Mr. GOODLATTE (for himself, Mr. McCAUL, Mr. LABRADOR, Ms. McSALLY, Mr. SENSENBRENNER, and Mr. CARTER of Texas) introduced the following bill; which was referred to the Committee on the Judiciary, and in addition to the Committees on Education and the Workforce, Homeland Security, Foreign Affairs, Ways and Means, Armed Services, Oversight and Government Reform, Agriculture, Transportation and Infrastructure, and Natural Resources, for a period to be subsequently determined by the Speaker, in each case for consideration of such provisions as fall within the jurisdiction of the committee concerned

————————————————

# A BILL

To amend the immigration laws and the homeland security
laws, and for other purposes.

1  *Be it enacted by the Senate and House of Representa-*

2  *tives of the United States of America in Congress assembled,*

3  **SECTION 1. SHORT TITLE; TABLE OF CONTENTS.**

4      (a) SHORT TITLE.—This Act may be cited as the

5  ''Securing America's Future Act of 2018''.

6      (b) TABLE OF CONTENTS.—The table of contents for

7  this Act is as follows:

254

1          (11) UNMANNED AERIAL VEHICLE.—The term

2     "unmanned aerial vehicle" has the meaning given

3     the term "unmanned aircraft" in section 331 of the

4     FAA Modernization and Reform Act of 2012 (Public

5     Law 112–95; 49 U.S.C. 40101 note).

# Subtitle A—Infrastructure and Equipment

8  **SEC. 1111. STRENGTHENING THE REQUIREMENTS FOR BAR-**

9                 **RIERS ALONG THE SOUTHERN BORDER.**

10        Section 102 of the Illegal Immigration Reform and

11   Immigrant Responsibility Act of 1996 (Division C of Pub-

12   lic Law 104–208; 8 U.S.C. 1103 note) is amended—

13          (1) by amending subsection (a) to read as fol-

14     lows:

15     "(a) IN GENERAL.—The Secretary of Homeland Se-

16     curity shall take such actions as may be necessary (includ-

17     ing the removal of obstacles to detection of illegal en-

18     trants) to design, test, construct, install, deploy, and oper-

19     ate physical barriers, tactical infrastructure, and tech-

20     nology in the vicinity of the United States border to

21     achieve situational awareness and operational control of

22     the border and deter, impede, and detect illegal activity

23     in high traffic areas.";

24          (2) in subsection (b)—

1            (A) in the subsection heading, by striking

2    "Fencing and Road Improvements" and in-

3    serting "Physical Barriers";

4            (B) in paragraph (1)—

5                (i) in subparagraph (A)—

6                    (I) by striking "subsection (a)"

7                and inserting "this section";

8                    (II) by striking "roads, lighting,

9                cameras, and sensors" and inserting

10               "tactical infrastructure, and tech-

11               nology"; and

12                   (III) by striking "gain" inserting

13               "achieve situational awareness and";

14               and

15               (ii) by amending subparagraph (B) to

16    read as follows:

17        "(B) Physical barriers and tactical

18    infrastructure.—

19               "(i) In general.—Not later than

20    September 30, 2022, the Secretary of

21    Homeland Security, in carrying out this

22    section, shall deploy along the United

23    States border the most practical and effec-

24    tive physical barriers and tactical infra-

25    structure available for achieving situational

# EXHIBIT 21



REMARKS

# Remarks by President Trump in Meeting with Senate Minority Leader Chuck Schumer and House Speaker–Designate Nancy Pelosi

—— **NATIONAL SECURITY & DEFENSE**

Issued on: **December 11, 2018**



Oval Office

11:40 A.M. EST

THE PRESIDENT:  Okay, thank you very much.  It's a great honor to have Nancy Pelosi with us and Chuck Schumer with us.  And we've actually worked very hard on a couple of things that are happening.  Criminal justice reform — as you know, we've just heard word — got word that Mitch McConnell and the group, we're going to be putting it up for a vote.  We have great Democrat support, great Republican support.  So, criminal justice reform, something that people have been trying to get — how long, Nancy?  Many years.

HOUSE SPEAKER-DESIGNATE PELOSI:  A long time.

THE PRESIDENT:  Many, many years.  Looks like it's going to be passing, hopefully — famous last words — on a very bipartisan way.  And it's really something we're all very proud of.  And again, tremendous support from Republicans and tremendous support

Chuck, did you want to say something?

SENATE MINORITY LEADER SCHUMER:  Yeah.  Here's what I want to say: We have a lot of disagreements here.  The Washington Post today gave you a whole lot of Pinocchios because they say you constantly misstate how much the wall is — how much of the wall is built and how much is there.

But that's not the point here.  We have a disagreement about the wall —

THE PRESIDENT:  Well, the Washington Post — (laughs) —

SENATE MINORITY LEADER SCHUMER:  — whether it's effective or it isn't.  Not on border security, but on the wall.

We do not want to shut down the government.  You have called 20 times to shut down the government.  You say, "I want to shut down the government."  We don't.  We want to come to an agreement.  If we can't come to an agreement, we have solutions that will pass the House and Senate right now, and will not shut down the government.  And that's what we're urging you to do.  Not threaten to shut down the government —

THE PRESIDENT:  Chuck —

SENATE MINORITY LEADER SCHUMER:  — because you —

THE PRESIDENT:  You don't want to shut down the government, Chuck.

SENATE MINORITY LEADER SCHUMER:  Let me just finish. Because you can't get your way.

THE PRESIDENT:  Because the last time you shut it down you got killed.

SENATE MINORITY LEADER SCHUMER:  We do.

THE PRESIDENT:  See?  We get along.

Thank you, everybody.

Q   (Inaudible), Mr. President.  You say border security and the wall.  Can you have border
security without the wall?  There's a commonality on border security.

THE PRESIDENT:  No, you need the wall.  The wall is a part of border security.

Q   Are you re-defining what it means to have border security?

SENATE MINORITY LEADER SCHUMER:  Yes.

THE PRESIDENT:  Yeah.  We need border security.  The wall is a part of border security.
You can't have very good border security without the wall, no.

HOUSE SPEAKER-DESIGNATE PELOSI:  That's simply not true.  That is a political
promise.  Border security is a way to effectively honor our responsibilities.

SENATE MINORITY LEADER SCHUMER:  And the experts say you can do border security
without a wall, which is wasteful and doesn't solve the problem.

THE PRESIDENT:  It totally solves the problem.

HOUSE SPEAKER-DESIGNATE PELOSI:  Again, but I don't want to take this —

THE PRESIDENT:  And it's very important.

HOUSE SPEAKER-DESIGNATE PELOSI:  Unfortunately, this has spiraled downward from
— we came at a place to say, "How do we meet the needs of American people who have

THE PRESIDENT: You know what I'll say: Yes, if we don't get what we want, one way or the other — whether it's through you, through a military, through anything you want to call — I will shut down the government. Absolutely.

SENATE MINORITY LEADER SCHUMER: Okay. Fair enough. We disagree.

THE PRESIDENT: And I am proud — and I'll tell you what —

SENATE MINORITY LEADER SCHUMER: We disagree.

THE PRESIDENT: I am proud to shut down the government for border security, Chuck, because the people of this country don't want criminals and people that have lots of problems and drugs pouring into our country. So I will take the mantle. I will be the one to shut it down. I'm not going to blame you for it. The last time you shut it down, it didn't work. I will take the mantle of shutting down.

HOUSE SPEAKER-DESIGNATE PELOSI: That is (inaudible).

THE PRESIDENT: And I'm going to shut it down for border security.

SENATE MINORITY LEADER SCHUMER: But we believe you shouldn't shut it down.

THE PRESIDENT: Okay. Thank you very much everybody. Thank you.

HOUSE SPEAKER-DESIGNATE PELOSI: (Inaudible) shut down the government.

Q   Chief of Staff?

Q   Have you picked a Chief of Staff, Mr. President?

THE PRESIDENT: Thank you very much. Yeah, we're interviewing a lot of — we have a lot of great people for Chief of Staff. A lot of people want the job. A lot of people want the

job.  And I have some great people.  A lot of friends of mine want it.  A lot of people that Chuck and Nancy know very well want it.  I think people you'd like.  We have a lot of people that want the job — Chief of Staff.  So we'll be seeing what happens very soon. We're in no rush.  We're in no rush.

Q   Why?  Why no rush, Mr. President?

THE PRESIDENT:  Why?  Because we have a wonderful Chief of Staff right now.  Just no — we are in no rush.  Over a period of a week or two, or maybe less, we'll announce who it's going to be.  But we have a lot of people that want the position.

Thank you very much everybody.  Thanks.

END

11:58 A.M. EST

# EXHIBIT 22

# *In the Senate of the United States,*

*December 19, 2018.*

*Resolved,* That the Senate agree to the amendment of the House of Representatives to the amendment of the Senate to the bill (H.R. 695), entitled "An Act to amend the National Child Protection Act of 1993 to establish a national criminal history background check system and criminal history review program for certain individuals who, related to their employment, have access to children, the elderly, or individuals with disabilities, and for other purposes.", with the following

## SENATE AMENDMENT TO HOUSE AMENDMENT TO SENATE AMENDMENT:

In lieu of the matter proposed to be inserted by the House amendment, insert the following:

1    *DIVISION A—FURTHER ADDITIONAL*

2    *CONTINUING APPROPRIATIONS ACT, 2019*

3        *SEC. 101. The Continuing Appropriations Act, 2019*

4    *(division C of Public Law 115–245) is further amended—*

5            *(1) by striking the date specified in section*

6        *105(3) and inserting "February 8, 2019"; and*

2

1    *(2) by adding after section 136 the following:*

2    *"SEC. 137. Notwithstanding section 251(a)(1) of the*

3  *Balanced Budget and Emergency Deficit Control Act of*

4  *1985 and the timetable in section 254(a) of such Act, the*

5  *final sequestration report for fiscal year 2019 pursuant to*

6  *section 254(f)(1) of such Act and any order for fiscal year*

7  *2019 pursuant to section 254(f)(5) of such Act shall be*

8  *issued, for the Congressional Budget Office, 10 days after*

9  *the date specified in section 105(3), and for the Office of*

10 *Management and Budget, 15 days after the date specified*

11 *in section 105(3).*

12   *"SEC. 138. The authority provided under title XXI of*

13 *the Homeland Security Act of 2002 (6 U.S.C. 621 et seq.),*

14 *as amended by section 2(a) of the Protecting and Securing*

15 *Chemical Facilities from Terrorist Attacks Act of 2014*

16 *(Public Law 113–254), shall continue in effect through the*

17 *date specified in section 105(3).*

18   *"SEC. 139. Section 319L(e)(1)(A) of the Public Health*

19 *Service Act (42 U.S.C. 247d–7e(e)(1)(A)) shall continue in*

20 *effect through the date specified in section 105(3) of this*

21 *Act.*

22   *"SEC. 140. Section 405(a) of the Pandemic and All-*

23 *Hazards Preparedness Act (42 U.S.C. 247d–6a note) shall*

24 *continue in effect through the date specified in section*

25 *105(3) of this Act.".*

3

1    This division may be cited as the "Further Additional

2 Continuing Appropriations Act, 2019".

# DIVISION B—MEDICAID EXTENDERS

### SEC. 101. EXTENSION OF MONEY FOLLOWS THE PERSON RE-BALANCING DEMONSTRATION.

7    (a) GENERAL FUNDING.—Section 6071(h) of the Def-

8 icit Reduction Act of 2005 (42 U.S.C. 1396a note) is

9 amended—

10        (1) in paragraph (1)—

11            (A) in subparagraph (D), by striking "and"

12        after the semicolon;

13            (B) in subparagraph (E), by striking the

14        period at the end and inserting "; and"; and

15            (C) by adding at the end the following:

16        "(F) subject to paragraph (3), $112,000,000

17        for fiscal year 2019.";

18        (2) in paragraph (2)—

19            (A) by striking "Amounts made" and in-

20        serting "Subject to paragraph (3), amounts

21        made"; and

22            (B) by striking "September 30, 2016" and

23        inserting "September 30, 2021"; and

24        (3) by adding at the end the following new para-

25    graph:

4

1       "(3) SPECIAL RULE FOR FY 2019.—*Funds ap-*

2     *propriated under paragraph (1)(F) shall be made*

3     *available for grants to States only if such States have*

4     *an approved MFP demonstration project under this*

5     *section as of December 31, 2018.".*

6     *(b)* FUNDING FOR QUALITY ASSURANCE AND IMPROVE-

7 MENT; TECHNICAL ASSISTANCE; OVERSIGHT.—*Section*

8 *6071(f) of the Deficit Reduction Act of 2005 (42 U.S.C.*

9 *1396a note) is amended by striking paragraph (2) and in-*

10 *serting the following:*

11     "(2) FUNDING.—*From the amounts appropriated*

12     *under subsection (h)(1)(F) for fiscal year 2019,*

13     *$500,000 shall be available to the Secretary for such*

14     *fiscal year to carry out this subsection.".*

15     *(c)* TECHNICAL AMENDMENT.—*Section 6071(b) of the*

16 *Deficit Reduction Act of 2005 (42 U.S.C. 1396a note) is*

17 *amended by adding at the end the following:*

18     "(10) SECRETARY.—*The term 'Secretary' means*

19     *the Secretary of Health and Human Services.".*

20 **SEC. 102. EXTENSION OF PROTECTION FOR MEDICAID RE-**

21              **CIPIENTS OF HOME AND COMMUNITY-BASED**

22              **SERVICES AGAINST SPOUSAL IMPOVERISH-**

23              **MENT.**

24     *(a)* IN GENERAL.—*Section 2404 of Public Law 111–*

25 *148 (42 U.S.C. 1396r–5 note) is amended by striking "the*

5

1 5-year period that begins on January 1, 2014," and insert-

2 ing "the period beginning on January 1, 2014, and ending

3 on March 31, 2019,".

4     (b) RULE OF CONSTRUCTION.—

5         (1) PROTECTING STATE SPOUSAL INCOME AND

6     ASSET DISREGARD FLEXIBILITY UNDER WAIVERS AND

7     PLAN AMENDMENTS.—Nothing in section 2404 of Pub-

8     lic Law 111–148 (42 U.S.C. 1396r–5 note) or section

9     1924 of the Social Security Act (42 U.S.C. 1396r–5)

10     shall be construed as prohibiting a State from dis-

11     regarding an individual's spousal income and assets

12     under a State waiver or plan amendment described

13     in paragraph (2) for purposes of making determina-

14     tions of eligibility for home and community-based

15     services or home and community-based attendant

16     services and supports under such waiver or plan

17     amendment.

18         (2) STATE WAIVER OR PLAN AMENDMENT DE-

19     SCRIBED.—A State waiver or plan amendment de-

20     scribed in this paragraph is any of the following:

21         (A) A waiver or plan amendment to provide

22         medical assistance for home and community-

23         based services under a waiver or plan amend-

24         ment under subsection (c), (d), or (i) of section

25         1915 of the Social Security Act (42 U.S.C.

6

1      1396n) or under section 1115 of such Act (42
2      U.S.C. 1315).

3            (B) A plan amendment to provide medical
4      assistance for home and community-based serv-
5      ices for individuals by reason of being deter-
6      mined eligible under section 1902(a)(10)(C) of
7      such Act (42 U.S.C. 1396a(a)(10)(C)) or by rea-
8      son of section 1902(f) of such Act (42 U.S.C.
9      1396a(f)) or otherwise on the basis of a reduction
10     of income based on costs incurred for medical or
11     other remedial care under which the State dis-
12     regarded the income and assets of the individ-
13     ual's spouse in determining the initial and ongo-
14     ing financial eligibility of an individual for such
15     services in place of the spousal impoverishment
16     provisions applied under section 1924 of such
17     Act (42 U.S.C. 1396r–5).

18           (C) A plan amendment to provide medical
19     assistance for home and community-based at-
20     tendant services and supports under section
21     1915(k) of such Act (42 U.S.C. 1396n(k)).

7

1 **SEC. 103. REDUCTION IN FMAP AFTER 2020 FOR STATES**
2         **WITHOUT ASSET VERIFICATION PROGRAM.**

3     *Section 1940 of the Social Security Act (42 U.S.C.*
4 *1396w) is amended by adding at the end the following new*
5 *subsection:*

6     *"(k) REDUCTION IN FMAP AFTER 2020 FOR NON-*
7 *COMPLIANT STATES.—*

8         *"(1) IN GENERAL.—With respect to a calendar*
9     *quarter beginning on or after January 1, 2021, the*
10    *Federal medical assistance percentage otherwise deter-*
11    *mined under section 1905(b) for a non-compliant*
12    *State shall be reduced—*

13            *"(A) for calendar quarters in 2021 and*
14        *2022, by 0.12 percentage points;*

15            *"(B) for calendar quarters in 2023, by 0.25*
16        *percentage points;*

17            *"(C) for calendar quarters in 2024, by 0.35*
18        *percentage points; and*

19            *"(D) for calendar quarters in 2025 and*
20        *each year thereafter, by 0.5 percentage points.*

21        *"(2) NON-COMPLIANT STATE DEFINED.—For*
22    *purposes of this subsection, the term 'non-compliant*
23    *State' means a State—*

24            *"(A) that is one of the 50 States or the Dis-*
25        *trict of Columbia;*

8

1　　　　　　　*"(B) with respect to which the Secretary*
2　　　　　　　*has not approved a State plan amendment sub-*
3　　　　　　　*mitted under subsection (a)(2); and*

4　　　　　　　*"(C) that is not operating, on an ongoing*
5　　　　　　　*basis, an asset verification program in accord-*
6　　　　　　　*ance with this section.".*

7 **SEC. 104. MEDICAID IMPROVEMENT FUND.**

8　　　*Section 1941(b)(1) of the Social Security Act (42*
9 *U.S.C. 1396w–1(b)(1)) is amended by striking*
10 *"$31,000,000" and inserting "$6,000,000".*

11 **SEC. 105. BUDGETARY EFFECTS.**

12　　　*(a) STATUTORY PAYGO SCORECARDS.—The budgetary*
13 *effects of this division shall not be entered on either PAYGO*
14 *scorecard maintained pursuant to section 4(d) of the Statu-*
15 *tory Pay-As-You-Go Act of 2010 (2 U.S.C. 933(d)).*

16　　　*(b) SENATE PAYGO SCORECARDS.—The budgetary ef-*
17 *fects of this division shall not be entered on any PAYGO*
18 *scorecard maintained for purposes of section 4106 of H.*
19 *Con. Res. 71 (115th Congress).*

20　　　*(c) CLASSIFICATION OF BUDGETARY EFFECTS.—Not-*
21 *withstanding Rule 3 of the Budget Scorekeeping Guidelines*
22 *set forth in the joint explanatory statement of the committee*
23 *of conference accompanying Conference Report 105–217*
24 *and section 250(c)(8) of the Balanced Budget and Emer-*

9

1  gency Deficit Control Act of 1985, the budgetary effects of

2  this division shall not be estimated—

3          (1) for purposes of section 251 of such Act; and

4          (2) for purposes of paragraph (4)(C) of section

5      3 of the Statutory Pay-As-You-Go Act of 2010 as

6      being included in an appropriation Act.

7      (d) PAYGO ANNUAL REPORT.—For the purposes of

8  the annual report issued pursuant to section 5 of the Statu-

9  tory Pay-As-You-Go Act of 2010 (2 U.S.C. 934) after ad-

10 journment of the second session of the 115th Congress, and

11 for determining whether a sequestration order is necessary

12 under such section, the debit for the budget year on the 5-

13 year scorecard, if any, and the 10-year scorecard, if any,

14 shall be deducted from such scorecard in 2019 and added

15 to such scorecard in 2020.

        Attest:



                                                Secretary.

115TH CONGRESS
2D SESSION

# H.R. 695

SENATE AMENDMENT TO
HOUSE AMENDMENT TO
SENATE AMENDMENT

# EXHIBIT 23

The Washington Post

**Business**

# Trump says he won't sign Senate deal to avert shutdown, demands funds for border security

By Erica Werner ,
Damian Paletta and
Mike DeBonis

December 21, 2018

President Trump threatened Thursday to veto a stopgap spending bill unless it includes billions of dollars to build a wall along the border with Mexico, sending large parts of the federal government lurching toward a shutdown starting Saturday.

His comments came after an emergency meeting with House Republican leaders, where Trump revealed he would reject a measure passed in the Senate the night before. That measure would fund many government agencies through Feb. 8, but it would not include any new money for Trump's border wall.

"I've made my position very clear. Any measure that funds the government must include border security," Trump said in an event at the White House. He added, "Walls work, whether we like it or not. They work better than anything."

Trump's comments on Thursday completely overturned the plan GOP leaders were patching together earlier in the day. With no other viable options available, they had hoped to pass the short-term spending bill approved by the Senate, averting a government shutdown set to start days before Christmas.

Many lawmakers had expected Trump to grudgingly accept the stopgap measure with Republicans about to lose their majority in the House, and his rejection set off a chaotic day in the Capitol.

House Republican leaders hurried to appease the president, pulling together a bill that would keep the government funded through Feb. 8 while also allocating $5.7 billion for the border wall. The House bill also included nearly $8 billion for disaster relief for hurricanes and wildfires.

The legislation passed the House on a near-party-line vote of 217 to 185 Thursday night, over strident objections from Democrats who criticized the wall as immoral and ineffective and declared the legislation dead on arrival in the Senate. No Democrats voted for the House measure, and eight Republicans voted against it.

In a late-night tweet, Trump thanked "our GREAT Republican Members of Congress" for the vote, adding: "Now on to the Senate!"

Trump also mocked House Minority Leader Nancy Pelosi (D-Calif.), who said in an Oval Office meeting last week that she did not think Trump could corral the votes to pass a spending bill with his requested wall funding.

"Nancy does not have to apologize. All I want is GREAT BORDER SECURITY!" Trump wrote.

Barely 24 hours away from a shutdown set to start at the end of Friday, the House vote only hardened Washington's budget impasse: Democrats have the Senate votes to block any bill that includes funding for Trump's wall, and Trump says he'll veto any bill that doesn't.

The chances of a shutdown are "certainly higher than they were this morning," Rep. Tom Cole (R-Okla.) said after Thursday night's House vote.

Funding for roughly 25 percent of the federal agencies whose budgets rely on Congress will expire at the end of Friday. The agencies affected deal with homeland security, law enforcement, national parks, transportation and housing, among others.

The rest of the government, including the military, would not be affected, as it's funded through September by bills lawmakers passed earlier this year.

The impacted agencies would continue to perform some of their functions, but more than 100,000 employees are expected to be sent home without pay.

The White House hasn't yet revealed the full impact of a partial shutdown, as it is up to each agency to implement its own plan. But it is clear the effects would be widespread: Close to 80,000 Internal Revenue Service employees would no longer come into work, and national parks that are locked at night would not reopen in the morning.

It can occasionally take several days for the full impact of a shutdown to kick in, and some agencies could remain open on Saturday but close by Monday.

Numerous agencies would be affected immediately, and some on Thursday seemed unprepared for the brinkmanship.

Officials from the Smithsonian Institution, Statue of Liberty, Golden Gate National Park and Gateway Arch either said they weren't sure whether they would be open Saturday or didn't respond to requests for comment.

A government shutdown could drag on for days or weeks, as Democrats have shown no willingness to budge from their refusal to finance a wall. Democrats take control of the House of Representatives in early January, giving them even more leverage in negotiations.

As Thursday night wore on, a partial government shutdown began to appear all but inevitable to many on Capitol Hill, though House Majority Leader Kevin McCarthy (R-Calif.) insisted that "there's still plenty of time" to avoid one.

"I think you'll find that we'll be able to move forward and make sure we keep the government open," McCarthy said after returning from the White House. "And also we believe we need border security."

But the path forward was far from clear, and the 115th Congress threatened to end on a bitter note of dysfunction as House conservatives, who've waged numerous futile battles over the years, picked one last fight before sinking into the minority, this time backed up by the president.

Trump is scheduled to leave Friday afternoon for two weeks in Florida, but it was unclear whether he would do so amid a partial government shutdown.

He has repeatedly threatened a government shutdown since taking office, telling advisers it would be good politics for Republicans to demonstrate their resolve in building a border wall.

But many in the party saw it as impractical and have repeatedly worked to persuade the president to keep the government open. Trump was prepared for a shutdown this fall, but GOP leaders, fearful of a government closure weeks before the midterm elections, convinced him to sign legislation extending funding through December — in part by promising to fight for wall money at the next budget deadline.

Senate Majority Leader Mitch McConnell (R-Ky.) on Thursday warned Republicans they may have to return for a vote Friday. But it's impossible for McConnell to pass a spending bill without support from Democrats, who have locked arms in opposition to any money for a border wall.

Trump's opposition to the short-term deal brings him full-circle. Last week, he told Pelosi, who is expected to return as House speaker in January, and Senate Minority Leader Charles E. Schumer (D-N.Y.) that he would be "proud" to shut the government down if he did not get the $5 billion for the wall.

On Tuesday, when it became clear that Trump did not have enough support in Congress for the $5 billion, the White House began backing down from the ultimatum. White House press secretary Sarah Sanders said Trump would find other ways to fund the construction of the wall.

On Wednesday, Trump wrote in a tweet that the military would build it, though a number of budget experts said that would be illegal, as money can't be redirected without Congress's approval.

When Trump appeared to be backing down, conservative media outlets and Congress's most conservative members revolted, demanding the president rethink his decision. By Thursday, Trump was back to demanding his wall and insisting the money come from Congress.

Conservatives including members of the House Freedom Caucus encouraged the president to take a hard-line stance, arguing this was his last opportunity to try to extract any money for the wall.

"We have to fight now or America will never believe we'll fight," Rep. Mark Meadows (R-N.C.) told Republicans at a closed-door meeting Thursday.

"The time to fight is now. I mean, this is stupid," said Rep. Paul A. Gosar (R-Ariz.).

As GOP leaders moved to adjust to Trump's shifting stances, Democrats ridiculed the spectacle, even as they repeated promises that they would provide no money for Trump's wall.

"I don't know that anyone ever has any assurances from the White House on any subject including this one," said Pelosi. "We're right in the middle of a sort of a meltdown on the part of Republicans."

The construction of a wall along the Mexican border was one of Trump's top campaign promises in 2016, and he vowed to somehow make Mexico pay for it all. Since he won the election, he has demanded the money come from Congress, seeking between $1.6 billion and $5 billion. At one point, he even insisted Democrats give him $25 billion for the wall.

In tweets early Thursday, Trump had ripped Democrats and promised to fight for wall funding but still appeared ready to sign a measure to keep the government open. He claimed his initiatives to move more agents along the Mexican border had made it "tight" and said he would not support infrastructure legislation next year unless Democrats eventually agree to finance the construction of a wall.

"Remember the Caravans?" Trump wrote on Twitter. "Well, they didn't get through and none are forming or on their way. Border is tight. Fake News silent!"

The government's Department of Homeland Security painted a much different picture of the situation just a few weeks ago. It reported that the number of people arrested or detained along the Mexico border reached a new high for the Trump presidency in November, as arrests of juveniles and parents with children continued to rise. U.S. Customs and Border Protection detained 25,172 members of "family units" in November, the highest number ever recorded.

Last week, Trump said terrorists were crossing the U.S. border and he also offered the unfounded claim that people with contagious diseases were entering the country. At Trump's meeting with Pelosi and Schumer, the president said he would take responsibility for a government shutdown, upsetting many Republicans who had wanted to blame Democrats for any impasse.

*Seung Min Kim, John Wagner, Josh Dawsey, Paul Kane and Sean Sullivan contributed to this report.*

**Erica Werner**

Erica Werner has worked at The Washington Post since 2017, covering Congress with a focus on economic policy. Previously, she worked at the Associated Press for more than 17 y

---

**Damian Paletta**

Damian Paletta is White House economic policy reporter for The Washington Post. Before joining The Post, he covered the White House for the Wall Street Journal.  Follow 🐦

---

**Mike DeBonis**

Mike DeBonis covers Congress, with a focus on the House, for The Washington Post. He previously covered D.C. politics and government from 2007 to 2015.  Follow 🐦

---



The Washington Post

Our journalism keeps watch on Washington and the world.

Try 1 month for $10 $1

Send me this offer

Already a subscriber? Sign in

# EXHIBIT 24

# *In the House of Representatives, U. S.,*

*December 20, 2018.*

*Resolved,* That the House agree to the amendment of the Senate to the amendment of the House to the amendment of the Senate to the bill (H.R. 695) entitled "An Act to amend the National Child Protection Act of 1993 to establish a national criminal history background check system and criminal history review program for certain individuals who, related to their employment, have access to children, the elderly, or individuals with disabilities, and for other purposes.", with the following

## HOUSE AMENDMENT TO SENATE AMENDMENT TO HOUSE AMENDMENT TO SENATE AMENDMENT:

In lieu of the matter proposed to be inserted by the Senate, insert the following:

1     **DIVISION A—FURTHER ADDITIONAL**

2   **CONTINUING APPROPRIATIONS ACT, 2019**

3     *SEC. 101. The Continuing Appropriations Act, 2019*

4 *(division C of Public Law 115–245) is further amended—*

5     *(1) by striking the date specified in section*

6 *105(3) and inserting "February 8, 2019"; and*

7     *(2) by adding after section 136 the following:*

8 *"SEC. 137. Notwithstanding section 251(a)(1) of the*

9 *Balanced Budget and Emergency Deficit Control Act of*

10 *1985 and the timetable in section 254(a) of such Act, the*

2

1 *final sequestration report for fiscal year 2019 pursuant to*

2 *section 254(f)(1) of such Act and any order for fiscal year*

3 *2019 pursuant to section 254(f)(5) of such Act shall be*

4 *issued, for the Congressional Budget Office, 10 days after*

5 *the date specified in section 105(3), and for the Office of*

6 *Management and Budget, 15 days after the date specified*

7 *in section 105(3).*

8  *"SEC. 138. The authority provided under title XXI of*

9 *the Homeland Security Act of 2002 (6 U.S.C. 621 et seq.),*

10 *as amended by section 2(a) of the Protecting and Securing*

11 *Chemical Facilities from Terrorist Attacks Act of 2014*

12 *(Public Law 113–254), shall continue in effect through the*

13 *date specified in section 105(3).*

14  *"SEC. 139. Section 319L(e)(1)(A) of the Public Health*

15 *Service Act (42 U.S.C. 247d–7e(e)(1)(A)) shall continue in*

16 *effect through the date specified in section 105(3) of this*

17 *Act.*

18  *"SEC. 140. Section 405(a) of the Pandemic and All*

19 *Hazards Preparedness Act (42 U.S.C. 247d–6a note) shall*

20 *continue in effect through the date specified in section*

21 *105(3) of this Act.*

22  *"SEC. 141. Notwithstanding any other provision of*

23 *this Act, there is appropriated for 'U.S. Customs and Bor-*

24 *der Protection—Procurement, Construction, and Improve-*

3

1 *ments' $5,710,357,000 for fiscal year 2019,* to remain avail-

2 able until September 30, 2023.

3 &ldquo;SEC. 142. Notwithstanding section 101, section 230

4 of division F of Public Law 115–141 shall not apply to

5 amounts made available by this Act.&rdquo;.

6 This division may be cited as the &ldquo;Further Additional

7 Continuing Appropriations Act, 2019&rdquo;.

## DIVISION B—MEDICAID EXTENDERS

10 **SEC. 101. EXTENSION OF MONEY FOLLOWS THE PERSON RE-**

11 **BALANCING DEMONSTRATION.**

12 (a) GENERAL FUNDING.—Section 6071(h) of the Def-

13 icit Reduction Act of 2005 (42 U.S.C. 1396a note) is

14 amended—

15 (1) in paragraph (1)—

16 (A) in subparagraph (D), by striking &ldquo;and&rdquo;

17 after the semicolon;

18 (B) in subparagraph (E), by striking the

19 period at the end and inserting &ldquo;; and&rdquo;; and

20 (C) by adding at the end the following:

21 &ldquo;(F) subject to paragraph (3), $112,000,000

22 for fiscal year 2019.&rdquo;;

23 (2) in paragraph (2)—

# EXHIBIT 25



EXECUTIVE OFFICE OF THE PRESIDENT
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

January 6, 2019

The Honorable Richard Shelby
Chairman
Committee on Appropriations
United States Senate
Washington, DC 20510

Dear Mr. Chairman:

The President continues to stress the need to pass legislation that will both reopen the
Federal Government and address the security and humanitarian crisis at our Nation's Southwest
border. The Administration has previously transmitted budget proposals that would support his
ongoing commitment to dramatically reduce the entry of illegal immigrants, criminals, and
drugs; keep out terrorists, public safety threats, and those otherwise inadmissible under U.S. law;
and ensure that those who do enter without legal permission can be promptly and safely returned
home.

Appropriations bills for fiscal year (FY) 2019 that have already been considered by the
current and previous Congresses are inadequate to fully address these critical issues. Any
agreement for the current year should satisfy the following priorities:

- *Border Wall, Customs and Border Protection (CBP):* The President requests $5.7 billion for
construction of a steel barrier for the Southwest border. Central to any strategy to achieve
operational control along the southern border is physical infrastructure to provide requisite
impedance and denial. In short, a physical barrier—wall—creates an enduring capability that
helps field personnel stop, slow down and/or contain illegal entries. In concert with the U.S.
Army Corps of Engineers, CBP has increased its capacity to execute these funds. The
Administration's full request would fund construction of a total of approximately 234 miles of
new physical barrier and fully fund the top 10 priorities in CBP's Border Security Improvement
Plan. **This would require an increase of $4.1 billion over the FY 2019 funding level in the
Senate version of the bill.**

- *Immigration Judge Teams – Executive Office for Immigration Review (EOIR):* The President
requests at least $563 million for 75 additional Immigration Judges and support staff to reduce the
backlog of pending immigration cases. The Administration appreciates that the Senate's FY 2019
bill provides this level of funding, and looks forward to working with the Congress on further
increases in this area to facilitate an expansion of in-country processing of asylum claims.

- *Law Enforcement Personnel, Border Patrol Agent Hiring, CBP:* The President requests $211
million to hire 750 additional Border Patrol Agents in support of his promise to keep our borders
safe and secure. While the Senate's FY 2019 bill supports some Border Patrol Agent hiring,
fulfilling this request **requires an increase of $100 million over the FY 2019 funding level in
the Senate version of the bill.**

- *Law Enforcement Personnel, Immigration and Customs Enforcement (ICE):* The President
requests $571 million for 2,000 additional law enforcement personnel, as well as support staff,
who enforce our U.S. immigration laws and help address gang violence, smuggling and
trafficking, and the spread of drugs in our communities. **This would require an increase of $571
million over the FY 2019 funding level in the Senate version of the bill.**

- *Detention Beds, ICE:* The President requests $4.2 billion to support 52,000 detention beds. Given that in recent months, the number of people attempting to cross the border illegally has risen to 2,000 per day, providing additional resources for detention and transportation is essential. **This would require an increase of $798 million over the FY 2019 funding level in the Senate version of the bill.**
- *Humanitarian Needs:* **The President requests an additional $800 million to address urgent humanitarian needs.** This includes additional funding for enhanced medical support, transportation, consumable supplies appropriate for the population, and additional temporary facilities for processing and short-term custody of this vulnerable population, which are necessary to ensure the well-being of those taken into custody.
- *Counter-narcotics/weapons Technology:* Beyond these specific budgetary requests, the Administration looks forward to working with Congress to provide resources in other areas to address the unprecedented challenges we face along the Southwest border. Specifically, $675 million would provide Non-Intrusive Inspection (NII) technology at inbound lanes at U.S. Southwest Border Land Ports of Entry (LPOE) would allow CBP to deter and detect more contraband, including narcotics, weapons, and other materials that pose nuclear and radiological threats. **This would require an increase of $631 million over the FY 2019 funding level in the Senate version of the bill.**

In addition, to address the humanitarian crisis of unaccompanied alien children (UACs), Democrats have proposed in-country asylum processing for Central American Minors. This would require a statutory change, along with reallocation of State Department funds to establish in-country processing capacities at Northern Triangle consulates and embassies. Furthermore, for the new procedure to achieve the desired humanitarian result, a further corresponding statutory change would be required to ensure that those who circumvent the process and come to the United States without authorization can be promptly returned home. Without the latter change, in-country processing will not reduce the unauthorized flow or successfully mitigate the humanitarian crisis."

These upfront investments in physical barriers and technology, as well as legislation to close loopholes in our immigration system, will reduce illegal immigration, the flow of illicit drugs entering our country and reduce the long term costs for border and immigration enforcement activities.

The Administration looks forward to advancing these critical priorities as part of legislation to reopen the Government.

Sincerely,

Russell T. Vought
Acting Director

2

# EXHIBIT 26

# Remarks by President Trump on the Government Shutdown | The White House

Rose Garden
2:17 P.M. EST

THE PRESIDENT:  Thank you very much.  My fellow Americans, I am very proud to announce today that we have reached a deal to end the shutdown and re-open the federal government.  (Applause.)  As everyone knows, I have a very powerful alternative, but I didn't want to use it at this time.  Hopefully it will be unnecessary.

I want to thank all of the incredible federal workers, and their amazing families, who have shown such extraordinary devotion in the face of this recent hardship.  You are fantastic people.  You are incredible patriots.  Many of you have suffered far greater than anyone, but your families would know or understand.  And not only did you not complain, but in many cases you encouraged me to keep going because you care so much about our country and about its border security.

Again, I thank you.  All Americans, I thank you.  You are very, very special people.  I am so proud that you are citizens of our country.  When I say "Make America Great Again," it could never be done without you.  Great people.

In a short while, I will sign a bill to open our government for three weeks until February 15th.  I will make sure that all employees receive their back pay very quickly, or as soon as possible.  It'll happen fast.  I am asking Senate Majority Leader Mitch McConnell to put this proposal on the floor immediately.

After 36 days of spirited debate and dialogue, I have seen and heard from enough Democrats and Republicans that they are willing to put partisanship aside — I think — and put the security of the American people first.  I do believe they're going to do that.  They have said they are for complete border security, and they have finally and fully acknowledged that having barriers, fencing, or walls — or whatever you want to call it — will be an important part of the solution.

A bipartisan Conference Committee of House and Senate lawmakers and leaders will immediately begin reviewing the requests of our Homeland Security experts — and experts they are — and also law enforcement professionals, who have worked with us so closely.  We want to thank Border Patrol, ICE, and all law enforcement.  Been incredible.  (Applause.)

Based on operational guidance from the experts in the field, they will put together a Homeland Security package for me to shortly sign into law.

Over the next 21 days, I expect that both Democrats and Republicans will operate in good faith.  This is an opportunity for all parties to work together for the benefit of our whole beautiful, wonderful nation.

If we make a fair deal, the American people will be proud of their government for proving that we can put country before party.  We can show all Americans, and people all around the world, that both political parties are united when it comes to protecting

our country and protecting our people.

Many disagree, but I really feel that, working with Democrats and Republicans, we can make a truly great and secure deal happen for everyone.

Walls should not be controversial.  Our country has built 654 miles of barrier over the last 15 years, and every career Border Patrol agent I have spoken with has told me that walls work.  They do work.  No matter where you go, they work.  Israel built a wall — 99.9 percent successful.  Won't be any different for us.

They keep criminals out.  They save good people from attempting a very dangerous journey from other countries — thousands of miles — because they think they have a glimmer of hope of coming through.  With a wall, they don't have that hope.  They keep drugs out, and they dramatically increase efficiency by allowing us to patrol far larger areas with far fewer people.  It's just common sense.  Walls work.

That's why most of the Democrats in Congress have voted in the past for bills that include walls and physical barriers and very powerful fences.  The walls we are building are not medieval walls.  They are smart walls designed to meet the needs of frontline border agents, and are operationally effective.  These barriers are made of steel, have see-through visibility, which is very important, and are equipped with sensors, monitors, and cutting-edge technology, including state-of-the-art drones.

We do not need 2,000 miles of concrete wall from sea to shining sea — we never did; we never proposed that; we never wanted that — because we have barriers at the border where natural structures are as good as anything that we can build.  They're already there.  They've been there for millions of years.

Our proposed structures will be in pre-determined high-risk locations that have been specifically identified by the Border Patrol to stop illicit flows of people and drugs.  No border security plan can ever work without a physical barrier.  Just doesn't happen.

At the same time, we need to increase drug detection technology and manpower to modernize our ports of entry, which are obsolete.  The equipment is obsolete.  They're old.  They're tired.  This is something we have all come to agree on, and will allow for quicker and safer commerce.  These critical investments will improve and facilitate legal trade and travel through our lawful ports of entry.

Our plan also includes desperately needed humanitarian assistance for those being exploited and abused by coyotes, smugglers, and the dangerous journey north.

The requests we have put before Congress are vital to ending the humanitarian and security crisis on our southern border.  Absolutely vital.  Will not work without it.

This crisis threatens the safety of our country and thousands of American lives.  Criminal cartels, narco-terrorists, transnational gangs like MS-13, and human traffickers are brazenly violating U.S. laws and terrorizing innocent communities.

Human traffickers — the victims are women and children.  Maybe to a lesser extent, believe or not, children.  Women are tied up.  They're bound.  Duct tape put around their faces, around their mouths.  In many cases, they can't even breathe.  They're put in the backs of cars or vans or trucks.  They don't go through your port of entry.  They make a right turn going very quickly.  They go into the desert areas, or whatever areas

you can look at.  And as soon as there's no protection, they make a left or a right into the United States of America.  There's nobody to catch them.  There's nobody to find them.

They can't come through the port, because if they come through the port, people will see four women sitting in a van with tape around their face and around their mouth. Can't have that.

And that problem, because of the Internet, is the biggest problem — it's never been like this before — that you can imagine.  It's at the worst level — human trafficking — in the history of the world.  This is not a United States problem; this is a world problem.  But they come through areas where they have no protection, where they have no steel barriers, where they have no walls.  And we can stop almost 100 percent of that.

The profits reaped by these murderous organizations are used to fund their malign and destabilizing conduct throughout this hemisphere.

Last year alone, ICE officers removed 10,000 known or suspected gang members, like MS-13 and members as bad as them.  Horrible people.  Tough.  Mean.  Sadistic.  In the last two years, ICE officers arrested a total of 266,000 criminal aliens inside of the United States, including those charged or convicted of nearly 100,000 assaults, 30,000 sex crimes, and 4,000 homicides or, as you would call them, violent, vicious killings.  It can be stopped.

Vast quantities of lethal drugs — including meth, fentanyl, heroin, and cocaine — are smuggled across our southern border and into U.S. schools and communities.  Drugs kill much more than 70,000 Americans a year and cost our society in excess of $700 billion.

The sheer volume of illegal immigration has overwhelmed federal authorities and stretched our immigration system beyond the breaking point.  Nearly 50 migrants a day are being referred for medical assistance — they are very, very sick — making this a health crisis as well.  It's a very big health crisis.  People have no idea how big it is, unless you're there.

Our backlog in the immigration courts is now far greater than the 800,000 cases that you've been hearing about over the last couple of years.  Think of that, though: 800,000 cases because our laws are obsolete.  So obsolete.  They're the laughing stock all over the world.  Our immigration laws, all over the world — they've been there for a long time — are the laughing stock, all over the world.

We do not have the necessary space or resources to detain, house, vet, screen, and safely process this tremendous influx of people.  In short, we do not have control over who is entering our country, where they come from, who they are, or why they are coming.

The result, for many years, is a colossal danger to public safety.  We're going to straighten it out.  It's not hard.  It's easy, if given the resources.

Last month was the third straight month in a row with 60,000 apprehensions on our southern border.  Think of that.  we apprehended 60,000 people.  That's like a stadium full of people.  A big stadium.

There are many criminals being apprehended, but vast numbers are coming because our economy is so strong.  We have the strongest economy now in the entire world.  You see what's happening.  We have nowhere left to house them and no way to promptly remove them.  We can't get them out because our laws are so obsolete, so antiquated, and so bad.

Without new resources from Congress, we will be forced to release these people into communities — something we don't want to do — called catch-and-release.  You catch them.  Even if they are criminals, you then release them.  And you can't release them from where they came, so they go into our country and end up in places you would least suspect.  And we do as little releasing as possible, by they're coming by the hundreds of thousands.

I have had zero Democrat lawmakers volunteer to have them released into their districts or states.  And I think they know that, and that's what we're going to be discussing over the next three weeks.

The painful reality is that the tremendous economic and financial burdens of illegal immigration fall on the shoulders of low-income Americans, including millions of wonderful, patriotic, law-abiding immigrants who enrich our nation.

As Commander-in-Chief, my highest priority is the defense of our great country.  We cannot surrender operational control over the nation's borders to foreign cartels, traffickers, and smugglers.  We want future Americans to come to our country legally and through a system based on merit.  We need people to come to our country.  We have great companies moving back into the United States.  And we have the lowest employment and the best employment numbers that we've ever had.  There are more people working today in the United States than have ever worked in our country.  We need people to come in to help us — the farms, and with all of these great companies that are moving back.  Finally, they're moving back.  People said it couldn't happen.  It's happening.

And we want them to enjoy the blessings of safety and liberty, and the rule of law.  We cannot protect and deliver these blessings without a strong and secure border.

I believe that crime in this country can go down by a massive percentage if we have great security on our southern border.  I believe drugs, large percentages of which come through the southern border, will be cut by a number that nobody will believe.

So let me be very clear: We really have no choice but to build a powerful wall or steel barrier.  If we don't get a fair deal from Congress, the government will either shut down on February 15th, again, or I will use the powers afforded to me under the laws and the Constitution of the United States to address this emergency.  We will have great security.

And I want to thank you all very much.  Thank you very much.  (Applause.)

END            2:35 P.M. EST

# EXHIBIT 27

# Presidential Memorandum for the Secretary of Defense, the Attorney General, and the Secretary of Homeland Security | The White House

MEMORANDUM FOR THE SECRETARY OF DEFENSE
THE ATTORNEY GENERAL
THE SECRETARY OF HOMELAND SECURITY

SUBJECT:        Securing the Southern Border of the United States

1.  The security of the United States is imperiled by a drastic surge of illegal activity on the southern border.  Large quantities of fentanyl, other opioids, and other dangerous and illicit drugs are flowing across our southern border and into our country at unprecedented levels, destroying the lives of our families and loved ones.  Mara Salvatrucha (MS-13) and other deadly transnational gangs are systematically exploiting our unsecured southern border to enter our country and develop operational capacity in American communities throughout the country.  The anticipated rapid rise in illegal crossings as we head into the spring and summer months threatens to overwhelm our Nation's law enforcement capacities.

2.  The combination of illegal drugs, dangerous gang activity, and extensive illegal immigration not only threatens our safety but also undermines the rule of law.  Our American way of life hinges on our ability as a Nation to adequately and effectively enforce our laws and protect our borders.  A key and undeniable attribute of a sovereign nation is the ability to control who and what enters its territory.

3.  Our professional and dedicated U.S. Customs and Border Protection agents and officers, U.S. Immigration and Customs Enforcement officers, and other Federal, State, and local law enforcement personnel work tirelessly to defend our homeland against these threats.  They risk their lives daily to protect the people of this country.  Theirs is a record of dedication and sacrifice, meriting the unwavering support of the entire United States Government.

4.  The situation at the border has now reached a point of crisis.  The lawlessness that continues at our southern border is fundamentally incompatible with the safety, security, and sovereignty of the American people.  My Administration has no choice but to act.

5.  The Department of Defense currently assists other nations in many respects, including assisting with border security, but the highest sovereign duty of the President is to defend this Nation, which includes the defense of our borders.

6.  The President may assign a mission to the Secretary of Defense to support the operations of the Department of Homeland Security in securing our southern border, including by requesting use of the National Guard, and to take other necessary steps to stop the flow of deadly drugs and other contraband, gang members and other criminals, and illegal aliens into the country.  The Secretary of Defense may use all

available authorities as appropriate, including use of National Guard forces, to fulfill this mission. During the administrations of Presidents George W. Bush and Barack Obama, the National Guard provided support for efforts to secure our southern border. The crisis at our southern border once again calls for the National Guard to help secure our border and protect our homeland.

Therefore, by the authority vested in me as President by the Constitution and the laws of the United States, including section 502 of title 32, United States Code, and section 301 of title 3, United States Code, I hereby direct as follows:

Section 1. The Secretary of Defense shall support the Department of Homeland Security in securing the southern border and taking other necessary actions to stop the flow of deadly drugs and other contraband, gang members and other criminals, and illegal aliens into this country. The Secretary of Defense shall request use of National Guard personnel to assist in fulfilling this mission, pursuant to section 502 of title 32, United States Code, and may use such other authorities as appropriate and consistent with applicable law.

Sec. 2. The Secretary of Homeland Security shall work with the Secretary of Defense to provide any training or instruction necessary for any military personnel, including National Guard units, to effectively support Department of Homeland Security personnel in securing the border.

Sec. 3. The Secretary of Defense and the Secretary of Homeland Security, in coordination with the Attorney General, are directed to determine what other resources and actions are necessary to protect our southern border, including Federal law enforcement and United States military resources. Within 30 days of the date of this memorandum, the Secretary of Defense and the Secretary of Homeland Security, in coordination with the Attorney General, shall submit to the President a report detailing their findings and an action plan, including specific recommendations as to any other executive authorities that should be invoked to defend the border and security of the United States.

Sec. 4. Any provision of any previous proclamation, memorandum, or Executive Order that is inconsistent with the actions taken in this memorandum is superseded to the extent of such inconsistency.

Sec. 5. (a) Nothing in this memorandum shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This memorandum shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

# EXHIBIT 28

# President Donald J. Trump's Border Security Victory

*President Donald J. Trump*

**SECURING OUR BORDER: President Donald J. Trump is following through on his promise to secure the border with legislation and Executive action.**

- President Trump was elected partly on his promise to secure the Southern Border with a barrier and, since his first day in office, he has been following through on that promise.
- As the President has said, sections of the border wall are already being built, and legislation and Executive actions are building on that progress.
- Executive action being taken by the President makes available additional funding to secure our border that is essential to our national security.

**LEGISLATIVE WINS: President Trump secured a number of significant legislative victories in the Homeland Security appropriations bill that further his effort to secure the Southern Border and protect our country.**

- The funding bill contains robust resources and additional provisions to secure the border and strengthen immigration enforcement.
- The bill provides $1.375 billion for approximately 55 miles of border barrier in highly dangerous and drug smuggling areas in the Rio Grande Valley, where it is desperately needed.
  - More than 40 percent of all border apprehensions occurred in the Rio Grande Valley sector in fiscal year (FY) 2018.
  - The Rio Grande Valley was the border sector with the most known deaths of illegal border crossers in FY 2018.
- $415 million will go toward addressing the humanitarian crisis at the border by providing medical care, transportation, processing centers, and consumables.
- President Trump successfully rejected efforts by some to undercut Immigration and Customs Enforcement's (ICE) ability to uphold our laws and detain illegal aliens, including criminals.
  - ICE funding supports nearly 5,000 additional beds to detain illegal aliens and keep criminals off our streets.
- Customs and Border Protection will receive funding for 600 additional officers.
- This bill will help keep deadly drugs out of our communities by increasing drug detection at ports of entry, including opioid detection staffing, labs, and equipment.

**A PROMISE TO ACT: President Trump is taking Executive action to ensure we stop the national security and humanitarian crisis at our Southern Border.**

- President Trump is using his legal authority to take Executive action to secure additional resources, just as he promised.  In part, he is declaring a national emergency that makes available additional troops and funding for military

construction.

- Including funding in Homeland Security appropriations, the Administration has so far identified up to $8.1 billion that will be available to build the border wall once a national emergency is declared and <mark>additional funds have been reprogrammed, including:</mark>
  - <mark>About $601 million from the Treasury Forfeiture Fund</mark>
  - <mark>Up to $2.5 billion under the Department of Defense funds transferred for Support for Counterdrug Activities (Title 10 United States Code, section 284)</mark>
  - <mark>Up to $3.6 billion reallocated from Department of Defense military construction projects under the President's declaration of a national emergency (Title 10 United States Code, section 2808)</mark>
- These funding sources will be used sequentially and as needed.
- The Department of Homeland Security, Department of Defense, and the Army Corps of Engineers are working to create a prioritized list of segments and a work plan for the remainder of FY 2019 and beyond.
  - New projects could include: new levee wall, new and replacement primary pedestrian barrier, new vehicle-to-pedestrian barrier, and new secondary barrier.

**NATIONAL EMERGENCY ON OUR BORDER: The President is using his clear authority to declare a national emergency as allowed under the National Emergencies Act.**

- Since 1976, presidents have declared nearly 60 national emergencies.
  - Most of the previously declared national emergencies have been continually renewed and are still in effect, after being continually renewed.
- Multiple Governors have declared states of emergency along the border in the past.
  - Former Arizona Governor Janet Napolitano, who became President Obama's DHS Secretary, declared a state of emergency along the border in 2005.
  - Former New Mexico Governor Bill Richardson also declared a state of emergency at the border in 2005.
- Former President George W. Bush and former President Obama both directed the use of the military to assist DHS in securing and managing the Southern Border.
- Former President Bush declared a national emergency in 2001, which invoked reprogramming authority granted by Title 10 United States Code, section 2808, and both he and former President Obama used that authority a total of 18 times to fund projects between 2001 and 2014.

**ADDRESSING THE CRISIS AT HAND: President Trump is taking the necessary steps to address the crisis at our Southern Border and stop crime and drugs from flooding into our Nation.**

- Cartels, traffickers, and gangs, like the vile MS-13 gang, have taken advantage of our weak borders for their own gain.
- Immigration officers have made 266,000 arrests of criminal aliens in the last two fiscal years.
  - This includes aliens charged or convicted of approximately 100,000 assaults, 30,000 sex crimes, and 4,000 killings.
- Tons of deadly drugs have flooded across the border and into our communities,

taking countless American lives.

- ○ Methamphetamine, heroin, cocaine, and fentanyl all flow across our Southern Border and destroy our communities.
- ○ More than 70,000 Americans died of drug overdoses in 2017 alone.
- Human traffickers exploit our borders to traffic young girls and women into our country and sell them into prostitution and slavery.
- Massive caravans of migrants view our unsecure border as a way to gain illegal entry into our country and take advantage of our nonsensical immigration loopholes.

# EXHIBIT 29










# Audit Report



OIG-19-022

**FINANCIAL MANAGEMENT**

**Audit of the Department of the Treasury Forfeiture Fund's Financial Statements for Fiscal Years 2018 and 2017**

December 13, 2018

# Office of Inspector General
Department of the Treasury

This Page Intentionally Left Blank



**OFFICE OF
INSPECTOR GENERAL**

**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

December 13, 2018

**MEMORANDUM FOR JOHN FARLEY, DIRECTOR
TREASURY EXECUTIVE OFFICE FOR ASSET FORFEITURE**

**FROM:**          James Hodge /s/
                   Director, Financial Audit

**SUBJECT:**       Audit of the Department of the Treasury Forfeiture Fund's
                   Financial Statements for Fiscal Years 2018 and 2017

I am pleased to transmit the attached subject report. Under a contract monitored
by our office, GKA, P.C. (GKA), a certified independent public accounting firm,
audited the financial statements of the Department of the Treasury Forfeiture Fund
(TFF) as of September 30, 2018 and 2017, and for the years then ended, and
provided a report on internal control over financial reporting, and a report on
compliance with laws, regulations, and contracts tested. The contract required that
the audit be performed in accordance with U.S. generally accepted government
auditing standards, Office of Management and Budget Bulletin No. 19-01, *Audit
Requirements for Federal Financial Statements*, and the Government Accountability
Office/Council of the Inspectors General on Integrity and Efficiency, *Financial Audit
Manual*.

In its audit of the TFF, GKA found

- the financial statements were fairly presented, in all material respects, in
  accordance with U.S. generally accepted accounting principles;
- no deficiencies in internal control over financial reporting that are considered
  material weaknesses; and
- no instances of reportable noncompliance with laws, regulations, and
  contracts tested.

GKA also issued a management letter dated October 30, 2018, discussing a matter
involving internal controls that was identified during the audit but was not required
to be included in the auditors' report. This letter will be transmitted separately.

In connection with the contract, we reviewed GKA's reports and related
documentation and inquired of its representatives. Our review, as differentiated
from an audit performed in accordance with U.S. generally accepted government
auditing standards, was not intended to enable us to express, and we do not

Page 2

express, opinions on TFF's financial statements or conclusions about the effectiveness of internal control or compliance with laws and regulations. GKA is responsible for the attached auditors' reports dated October 30, 2018, and the conclusions expressed in the reports. However, our review disclosed no instances where GKA did not comply, in all material respects, with U.S. generally accepted government auditing standards.

Should you have any questions, please contact me at (202) 927-0009, or a member of your staff may contact Catherine Yi, Manager, Financial Audit, at (202) 927-5591.

Attachment



**gka,p.c.**
Certified Public Accountants
& Consultants

1920 L Street, NW
Suite 425
Washington, DC  20036
Tel:  202-857-1777
www.gkacpa.com

# Treasury Forfeiture Fund
## ACCOUNTABILITY REPORT
### Fiscal Year 2018

**DEPARTMENT OF THE TREASURY
WASHINGTON, D.C.**

*Member of the American Institute of Certified Public Accountants*

THIS PAGE INTENTIONALLY LEFT BLANK

## Message from the Director

I am pleased to present the fiscal year (FY) 2018 Accountability Report for the Treasury Forfeiture Fund (the Fund). While highlighting the Fund's financial and operational performance over the past year, this report also focuses on some of the significant investigative achievements of our participating law enforcement agencies this year. FY 2018 was another challenging year with a permanent rescission of $1.1 billion as part of the Consolidated Appropriations Act of 2018 (P.L. 115-141). Additionally, $150 million was sequestered as part of the government-wide sequestration order. In terms of overall revenue, FY 2018 was another highly successful year for the law enforcement bureaus participating in the Treasury Forfeiture Fund, with earned revenue of $1.3 billion deposited to the Fund.

The continued high-impact performance of the Fund reflects the ongoing hard work of our law enforcement bureaus as well as Fund management's emphasis on major case initiatives, asset forfeiture program training, and a focused approach regarding our performance measure, which gauges revenue from high-impact cases. The mission of the Fund is to affirmatively influence the consistent and strategic use of asset forfeiture by our law enforcement bureaus to disrupt and dismantle criminal enterprises. It is our view that the greatest damage to criminal enterprises can be achieved through large forfeitures; hence we have set a target level of 80 percent of our forfeitures to be high-impact, i.e., cash forfeitures equal to or greater than $100,000. This target level is up from 75 percent set for FY 2010 and prior years. For FY 2018, our member bureaus exceeded the target with a performance level of 94 percent.

In FY 2018, we continued prioritizing the strategic use of forfeited funds to enhance our participating agencies' infrastructure and capabilities while supporting high-impact financial investigations. These capabilities are particularly critical for highly complex Third Party Money laundering (3PML) investigations aimed at dismantling the financial networks of major criminal enterprises. In union with the 3PML initiative, the Fund hosted a multi-agency seminar on 3PML issues in Charlotte, NC. The seminar specifically highlighted the importance of the partnership between law enforcement agencies and financial institutions in combating money laundering, and it featured a number of speakers representing major banks' Anti-Money laundering units. The topics also included investigations targeting non-compliant financial institutions, TFF-funded resources available to support our member agencies' 3PML cases, and recent investigative and prosecutorial successes in this investigative area.

This fiscal year, the Fund was able to provide $47.1 million in Strategic Support (SS) funding to its member agencies for their priority initiatives. This funding enabled Treasury Forfeiture Fund agencies to advance their operational capabilities to include new cutting edge technology, IT systems, and big data analysis tools in order to respond in real time to emerging criminal threats.

The Treasury Forfeiture Fund continues in its capacity as a successful multi-Departmental Fund representing the interests of law enforcement components of the Departments of the Treasury and Homeland Security. Member bureaus include the Internal Revenue Service's Criminal Investigation (IRS-CI), the U.S. Secret Service (USSS), Immigration and Customs Enforcement (ICE), and Customs and Border Protection (CBP). The U.S. Coast Guard (USCG) continues its close working relationship with the legacy Customs bureaus. We look forward to another successful year in FY 2019.

John Farley, Director
Treasury Executive Office for Asset Forfeiture
U.S. Department of the Treasury

THIS PAGE INTENTIONALLY LEFT BLANK

# Table of Contents

## Section I: Overview

Profile of the Treasury Forfeiture Fund ...........................................................................1
Strategic Mission and Vision .............................................................................................1
Case Highlights.....................................................................................................................2
Program and Fund Highlights.............................................................................................9
Program Performance .......................................................................................................10
Financial Statement Highlights........................................................................................12

## Section II: Independent Auditor's Reports

Independent Auditor's Report on Financial Statements ................................................16
Independent Auditor's Report on Internal Control over Financial Reporting.................19
Independent Auditor's Report on Compliance and Other Matters ...................................21

## Section III: Financial Statements and Notes

Financial Statements:
    Balance Sheets .....................................................................................................23
    Statements of Net Cost...........................................................................................24
    Statements of Changes in Net Position ................................................................25
    Statements of Budgetary Resources......................................................................26
    Notes to Financial Statements...............................................................................27

## Section IV:

Required Supplemental Information ................................................................................45

## Section V:

Other Accompanying Information .....................................................................................47

THIS PAGE INTENTIONALLY LEFT BLANK

**Treasury Forfeiture Fund**
**FY 2018 Management Overview**

## Profile of the Treasury Forfeiture Fund

The Treasury Forfeiture Fund (the Fund) is the receipt account for the deposit of non-tax forfeitures made pursuant to laws enforced or administered by law enforcement bureaus that participate in the Treasury Forfeiture Fund. The Fund was established in October of 1992 as the successor to the Forfeiture Fund of the United States Customs Service. The Fund is a "special receipt account." This means the Fund can provide money to other federal entities toward the accomplishment of a specific objective for which the recipient bureaus are authorized to spend money and toward other authorized expenses. The use of Fund resources is governed by law, policy and precedent as interpreted and implemented by the Department of the Treasury, which manages the Fund. A key objective for management is the long-term viability of the Fund to ensure that there are ongoing resources to support member-bureau seizure and forfeiture activities well into the future. The emphasis of Fund management is on high impact cases that can do the most damage to criminal infrastructure.

The Treasury Forfeiture Fund continues in its capacity as a multi-Departmental Fund, representing the interests of law enforcement components of the Departments of Treasury and Homeland Security. Our member bureaus include the Internal Revenue Service's Criminal Investigation (IRS- CI), the U.S. Secret Service, Immigration and Customs Enforcement (ICE), and Customs and Border Protection (CBP). The U.S. Coast Guard continues its close working relationship with the legacy Customs bureaus and functions in a member-bureau capacity.

The Treasury Executive Office for Asset Forfeiture (TEOAF), which provides management oversight of the Fund, falls under the auspices of the Under Secretary for Terrorism and Financial Intelligence. TEOAF's organizational structure includes a Director, Deputy Director, Legal Counsel, and three Assistant Directors for; Financial Management, Policy & Administration, and Strategic Planning. Functional responsibilities are delegated to various team leaders. TEOAF is located in Washington, D.C., and currently has 28 authorized full time equivalent positions.

### Strategic Mission

The mission of the Treasury Forfeiture Fund is to affirmatively influence the consistent and strategic use of asset forfeiture by law enforcement bureaus that participate in the Treasury Forfeiture Fund to disrupt and dismantle criminal enterprises.

### Strategic Vision

Fund management works to focus the asset forfeiture program on strategic cases and investigations that result in high-impact forfeitures. Management believes this approach incurs the greatest damage to criminal organizations while accomplishing the ultimate objective – to disrupt and dismantle criminal enterprises.

## Case Highlights

The following case highlights are intended to give the reader an idea of the types of investigative cases worked by the Fund's law enforcement bureaus during FY 2018 that resulted in the seizure and forfeiture of assets. Such cases as those profiled below are consistent with the Strategic Mission and Vision of the Treasury Forfeiture Program, which is to use high-impact asset forfeiture in investigative cases to disrupt and dismantle criminal enterprises.

### Immigration and Customs Enforcement (ICE)
### Department of Homeland Security

### and

### Internal Revenue Service, Criminal Investigation (IRS-CI)
### Department of the Treasury

### Rabobank Forfeits $318,701,259 as Part of Guilty Plea
Information included in the following forfeiture article is attributed to: Information provided by the HSI-ICE and IRS-CI Liaisons to TEOAF; U.S. Attorney's February 7, 2018 press release entitled, "*Rabobank NA Pleads Guilty, Agrees to Pay Over $360 Million*"; TEOAF internal records.

On February 7, 2018, Rabobank National Association (Rabobank) pleaded guilty to a felony conspiracy charge for impairing, impeding and obstructing its primary regulator, the Department of the Treasury's Office of the Comptroller of the Currency (the OCC) by concealing deficiencies in its anti-money laundering (AML) program and for obstructing the OCC's examination of Rabobank. Rabobank agreed to forfeit $368,701,259 as a result of allowing illicit funds to be processed through the bank without adequate Bank Secrecy Act (BSA) or AML review. Of that sum, $318,701,259 was forfeited to the Treasury Forfeiture Fund. The OCC imposed a $50,000,000 civil money penalty, which was credited towards the forfeiture agreement.

Rabobank pleaded guilty to conspiracy to defraud the United States and to obstruct an examination of a financial institution. In pleading guilty, Rabobank admitted to conspiring with several former executives to defraud the United States by unlawfully impeding the OCC's ability to regulate the bank, and to obstruct an examination by the OCC of its operations throughout California, including its Calexico and Tecate bank branches. Rabobank admitted that its deficient AML program allowed hundreds of millions of dollars in untraceable cash, sourced from Mexico and elsewhere, to be deposited into its rural bank branches in Imperial County, and transferred via wire transfers, checks, and cash transactions, without proper notification to federal regulators as required by law. Knowing these failures, during the OCC's 2012 examination of Rabobank's BSA/AML compliance program, Rabobank executives actively sought to hide and minimize the deficiencies in its AML program in an effort to deceive the regulators as to its true state in hopes of avoiding regulatory sanctions that had previously been imposed on Rabobank in 2006 and 2008 for nearly identical failures.

According to court documents, Rabobank received regular alerts of transactions by "High-Risk" customers, or through accounts deemed to be "High-Risk," and that had been the subject of prior SARs filed by Rabobank. These High-Risk customers and accounts included those controlled and managed by Mexican businesses, nonresident aliens, and U.S.-based accountholders who transacted hundreds of millions of dollars in untraceable cash, sourced from Mexico and elsewhere, into and through Rabobank accounts.

According to court documents, Rabobank also created and implemented policies and procedures to prevent adequate investigations into these suspicious transactions, customers, and accounts. Among those policies and procedures was Rabobank's "Verified List" – a policy that effectively resulted in Rabobank executing an end-run around the BSA/AML and SAR requirements. In particular, Rabobank instructed its employees that if a customer was on the "Verified List," no further review of that customer's transactions was necessary -- even if the transactions generated an internal alert, or the customer's activity had changed dramatically from when it was "verified." Rabobank's BSA/AML staff were further instructed to aggressively increase the number of bank accounts on the Verified List, as evidenced by the fact that in 2009, Rabobank had less than 10 "verified" customers, but by 2012, as a result of its defective BSA/AML policies and procedures, it had more than 1,000 "verified" customers.

Additionally, Rabobank admitted failing to monitor and conduct adequate investigations into these transactions and submit SARs to the Financial Crimes Enforcement Network (FinCEN), as required by the BSA. Rabobank's border branches, including those located in Calexico and Tecate in Imperial County, California, were heavily dependent on cash deposits from Mexico. Rabobank knew that millions of dollars in cash deposits at these branches were likely tied to illicit conduct. In particular, the Calexico branch, located about two blocks from the U.S.-Mexico border, was the "highest performing" branch in the Imperial Valley region due to the cash deposits from Mexico. Throughout the relevant time period, Rabobank continued this practice of soliciting cash-intensive customers from Mexico and elsewhere, all the while employing the foregoing inadequate BSA/AML policies and procedures to address the obvious, known "High Risks" associated with these accounts, transactions, and transactors.

When the OCC began conducting its periodic examination of Rabobank in 2012, Rabobank, acting through three of its executives, agreed to, among other things, knowingly obstruct the OCC's examination. Rabobank responded to the OCC's February 2013 initial report of examination with false and misleading information about the state of Rabobank's BSA/AML program. Rabobank also made false and misleading statements to the OCC regarding the existence of reports developed by a third-party consultant, which detailed the deficiencies and resulting ineffectiveness of Rabobank's BSA/AML program.

To further conceal the inadequate nature of its BSA/AML program and to avoid "others contradicting our findings" and statements to the OCC, Rabobank demoted or terminated two RNA employees who were raising questions about the adequacy of Rabobank's BSA/AML program.

The investigation was conducted by HSI, IRS-CI, and the Financial Investigations and Border Crimes Task Force (FIBC), a multiagency Task Force based in San Diego and Imperial County. The investigation was funded by the Treasury Executive Office of Asset Forfeiture (TEOAF) and occurred parallel to regulatory investigations by the OCC, Office of General Counsel, and FinCEN's Enforcement Division.

*Internal Revenue Service, Criminal Investigation (IRS-CI)*
*Department of the Treasury*

### New York Man Sentenced to 87 Months and Forfeits $1,624,172 for Multi-State Biodiesel Fraud Scheme

Information included in the following article is attributed to US Attorney's February 6, 2018 press release entitled, "*New York Man Sentenced to 87 Months for Multi-State Biodiesel Fraud Scheme*," TEOAF records, and from information provided by the IRS-CI Liaison to TEOAF.

Andre Bernard, of Mount Kisco, New York, pleaded guilty for his participation in a multi-state scheme to defraud biodiesel buyers and U.S. taxpayers by fraudulently selling biodiesel credits and fraudulently claiming tax credits.

According to his plea, Bernard conspired with Thomas Davanzo, of Estero, Florida, Robert Fedyna, of Naples, Florida, and Scott Johnson of Pasco, Washington in a scheme to defraud biodiesel credit (known as "RIN" credits) buyers and U.S. taxpayers. The conspiracy involved having Gen-X Energy Group (Gen-X and its subsidiary, Southern Resources and Commodities (SRC), generate fraudulent RINs and tax credits multiple times on the same material.

Bernard and his co-conspirators operated several shell companies that claimed to purchase and sell the renewable fuel. The co-conspirators also cycled the funds through these shell companies' bank accounts to perpetuate the fraud scheme and conceal its proceeds.

From March 2013 to March 2014, the co-conspirators generated at least 60 million RINs that were based on fuel that was either never produced or was merely re-processed at the Gen-X or SRC facilities. The co-conspirators received at least $42 million from the sale of these fraudulent RINs to third parties. In addition, Gen-X received approximately $4,360,724.50 in false tax credits for this fuel.

U.S. District Judge Sherri Polster Chappell sentenced Andre Bernard to seven years and three months in federal prison for his role in a multi-state scheme to defraud biodiesel buyers and U.S. taxpayers by fraudulently selling biodiesel credits and fraudulently claiming tax credits. As part of his sentence, the Court also entered a money judgment in the amount of $10,500,497.92, the proceeds Bernard personally received as a result of the charged criminal conduct.

On November 29, 2017, a Default Judgment was issued for bank accounts previously seized worth $1,624,172.53. Those funds were received and processed by the TFF on January 10, 2018.

Internal Revenue Service Criminal Investigations (IRS-CI) was joined in this case by the U.S. Secret Service and the Environmental Protection Agency, Criminal Investigation Division.

*United States Secret Service (USSS)*
*Department of Homeland Security*

**Man who defrauded Hmong Community is Sentenced to 87 Months in Prison, Forfeits $1,612,451**

Information included in the following forfeiture article is attributed to: October 11, 2017 DOJ press release entitled, "*Seng Xiong Sentenced To 87 Months In Prison For Defrauding Members Of The Hmong Community*"; information provided by the USSS Liaison to TEOAF; TEOAF internal records.

In September 2015, the St. Paul Police Department contacted the U.S. Secret Service Minneapolis Field Office requesting assistance regarding the investigation of a large scale nationwide wire fraud scheme targeting an elderly Southeast Asia ethnic group known as the Hmong people living in approximately 18 known states in the U.S. The primary criminal schemes date back to at least October 2014 and involved Seng Xiong purporting to be leaders of an organization called the "Hmong Tebchaws Organization" or "International Fund for Hmong Development."

Through a series of YouTube videos and nationwide conference calls, Xiong promoted his scheme in the Hmong language to solicit elderly members of the Hmong community to invest money in the range of $3,000 - $5,000 or more in monthly payments to bank accounts in the name of Seng Xiong. The suspects promised victims that they would use the money to issue land rights of up to 10 acres in a future proposed Hmong Country they claim to be developing with the assistance of the United Nations (UN) and the approval of the White House. Additional promises for the initial investment of $3,000 - $5,000 included receiving a house, healthcare, free education, as well as possible positions in the future cabinet of the government and other benefits.

The case went to trial, and Seng Xiong was convicted of wire fraud and mail fraud, and was sentenced to 87 months in prison. On December 20, 2017, a final order of forfeiture was signed in the District of Minnesota for $1,612,451.84.

*Coast Guard*
*Department of Homeland Security*

**Coast Guard Cutter Offloads Over 18 Tons of Cocaine**

Information included in the following forfeiture article is attributed to:  United States Coast Guard (USCG) news release dated March 20, 2018 entitled: "*Coast Guard offloads 36,000 lbs of cocaine seized from Eastern Pacific Ocean*," and from information provided by the Coast Guard Liaison to TEOAF.

On March 20, 2018, the U.S. Coast Guard offloaded approximately 36,000 pounds of cocaine, with an estimated value of $500 million. The seized narcotics were the result of 17 interdictions of suspected smuggling vessels off the coasts of Central and South America between early February and early March of 2018.

As part of its Western Hemisphere Strategy, the Coast Guard has increased its presence in the Eastern Pacific Ocean and Caribbean Basin. During interdictions in international waters, a suspect vessel is

initially located and tracked by U.S. and allied, military or law enforcement personnel. Coast Guard members conduct the interdictions, including the actual boarding.

In addition to Coast Guard crews, numerous U.S. agencies from the Departments of Homeland Security, Defense and Justice along with allied and international partner agencies are involved in the effort to combat transnational organized crime.

The bulk offload consisted of seized drugs from 17 interdictions by crews aboard the following Coast Guard cutters:

- Coast Guard Cutter Venturous, one case, estimated 2,877 pounds seized.
- Coast Guard Cutter Bear, three cases, estimated 9,016 pounds seized.
- Coast Guard Cutter Diligence, three cases, estimated 3902 pounds seized.
- Coast Guard Cutter Bertholf, four cases, estimated 5,103 pounds seized.
- Coast Guard Cutter Harriet Lane, six cases, estimated 15,434 pounds seized.

"This offload by the Bertholf represents the great work being conducted in the Eastern Pacific combating the transnational organized crime groups, behind the drug trade which spreads instability, fear and harm to people, communities and entire nations," said Rear Adm. Todd Sokalzuk, the 11th Coast Guard District commander, who oversees the law enforcement phase of counter-smuggling operations in the Eastern Pacific region. "Thanks in part to the hard work and dedication of the brave crew men and women of the Bertholf, and other ships on patrol, we're seizing record amounts of cocaine for the third year in a row."



Figure 1: Pallets containing approximately 18 tons of seized cocaine.

**Coast Guard unloads $721 million in cocaine seized since November in San Diego**
Information included in the following forfeiture article is attributed to:  United States Coast Guard (USCG) news release dated January 25, 2018 entitled: "*Coast Guard offloads $721 million worth of cocaine in San Diego,*" and from information provided by the Coast Guard Liaison to TEOAF.

In San Diego on January 25, 2018, the U.S. Coast Guard Cutter Stratton offloaded more than 47,000 pounds of cocaine worth over $721 million. U.S. and Canadian forces operating in international waters off the coast of Central and South America seized the cocaine in 23 separate interdictions in the eastern Pacific Ocean.

Senior U.S. and Canadian officials discussed new tactics used by transnational organized crime groups and to highlight international cooperation in combating the threat posed by these dangerous groups. U.S. Coast Guard personnel currently assigned to Cutter Stratton turned the narcotics over to federal agents for investigation, prosecution and, ultimately, destruction.

"The threat of transnational organized crime is a danger no one ship, agency, country or person can address alone," said Vice Adm. Fred Midgette, commander, U.S. Coast Guard Pacific Area. "We stand alongside our interagency and international partners resolved in a shared purpose to protect those harmed by these dangerous drugs and bring the criminals who smuggle them to justice."

In a three-day period, the crew of Cutter Stratton stopped two low profile go-fast boats and seized more than 5,800 pounds of cocaine worth almost $78 million.  In a period of less than five months, the Coast Guard stopped five suspected drug smuggling boats and seized a total of over 12,000 pounds of cocaine worth $165 million.

Other interdiction seizures from the offload included:
- Coast Guard Cutter Steadfast, five cases, 12,000 pounds
- Coast Guard Cutter Mohawk, five cases, 6,700 pounds
- Coast Guard Cutter Northland, five cases, 10,300 pounds
- Coast Guard Cutter Thetis, two cases, 3,100 pounds
- Coast Guard Cutter Stratton, five cases, 12,000 pounds
- HMCS Nanaimo, one case, 3,300 pounds

Fifteen of the seizures represented in the offload were taken from go-fast boats, and an additional four were from "low-profile go-fast boats." Low-profile go-fast boats, a variant design from traditional go-fast boats, ride low in the water to reduce their radar signature, have multiple outboard engines to allow them to travel at high speeds and are painted to blend in with the water to avoid detection from military and law enforcement authorities operating in the region.



**Figure 2: Seized pallets of cocaine on board the *Stratton*.**

The Stratton was equipped with at least one unmanned aerial vehicle known as a ScanEagle that can be used on long patrol flights and fitted with infrared and telescope cameras to scan the ocean for vessels.

"The drones are a game changer for us because they can stay up so long and they have a very wide swath of the water they can look at," Midgette said. "When you are trying to find one of these pangas or low-profile vessels, it is hard to spot them on the water. The radars don't pick them up well if they are painted correctly....They absolutely have increased our effectiveness."

**Program and Fund Highlights**

The Treasury Forfeiture Fund is a "special receipt account." Such accounts represent federal fund collections earmarked by law for a specific purpose. The enabling legislation for the Treasury Forfeiture Fund (31 U.S.C. § 9705, Public Law 114-22) defines those purposes for which Treasury forfeiture revenue may be used. Once property or cash is seized, there is a forfeiture process. Upon forfeiture, seized currency, initially deposited into a suspense account, or holding account, is transferred to the Fund as forfeited revenue. Once forfeited, physical properties are sold and the proceeds are deposited into the Fund as forfeited revenue. It is this forfeiture revenue that comprises the budget authority for meeting expenses of running Treasury's forfeiture program.

Expenses of the Fund are set in a relative priority so that unavoidable or "mandatory" costs are met first as a matter of policy. Expenses may not exceed revenue in the Fund. The Fund has several different spending authorities. Each of them is described below.

### Mandatory Authority

The mandatory authority items are generally used to meet "business expenses" of the Fund, including expenses of storing and maintaining seized and forfeited assets, valid liens and mortgages, investigative expenses incurred in pursuing a seizure, information and inventory systems, and certain costs of local police agencies incurred in joint law enforcement operations. Following forfeiture, equitable shares are paid to state and local law enforcement agencies that contributed to the seizure activity at a level proportionate to their involvement.

It is a strategic goal of the Fund to emphasize and monitor high impact forfeitures. To make significant forfeitures requires longer, more in-depth investigations. To this end, Fund management emphasizes the use of mandatory funding authorities that fuel large case initiatives. These authorities include the Purchase of Evidence and Information, expenses associated with Joint Operations, Investigative Expenses Leading to Seizure, and Asset Identification and Removal Groups. In recent years, funding provided to computer forensic investigative tools has yielded high impact results.

### Secretary's Enforcement Fund

The Secretary's Enforcement Fund (SEF) is derived from equitable shares received from the Justice Department's Forfeiture Fund for work done by law enforcement bureaus participating in the Treasury Forfeiture Fund leading to Justice forfeitures. SEF revenue is available for federal law enforcement purposes of any Treasury law enforcement organization or law enforcement bureau that participates in the Treasury Forfeiture Fund. In FY 2018, the Fund expensed just over $37 million in SEF authority as compared to $5.9 million in FY 2017, an increase of $31.1 million.

### Strategic Support

Strategic Support (formerly Super Surplus) represents the remaining unobligated balance after an amount is reserved for Fund operations in the next fiscal year. Strategic Support can be used for any federal law enforcement purpose. In FY 2018, the fund expensed 47.1 million in Strategic Support authority as compared to $39.5 million in FY 2017.

## Program Performance

### Strategic View

Fund management continues to focus on strategic cases and investigations that result in high-impact forfeitures. We believe this approach affects the greatest damage to criminal organizations while accomplishing the ultimate objective – to disrupt and dismantle criminal activity. Generally, significant forfeitures require longer, more in-depth investigations. To this end, Fund management emphasizes the use of mandatory funding authorities that fuel large case initiatives including Purchase of Evidence and Information, expenses associated with Joint Operations, Investigative Expenses Leading to Seizure, Asset Identification and Removal teams and state-of-the-art Computer Forensics capability.

FY 2018 was a successful revenue year by our member bureaus and was another successful year in equitable share deposits received from the Department of Justice (DOJ) forfeiture fund for forfeitures in which one or more of our member bureaus played a role. Equitable shares received totaled $49.6 million in FY 2018 as compared to $14.2 million in FY 2017. In addition, the Fund continues to support record levels of sharing of federal forfeitures with the state and local and foreign governments that contributed to the successful seizure and forfeiture activity of the Fund. The Fund expensed $138.5 million for state and local and foreign equitable sharing expenses in FY 2018 as compared to $67.3 million in FY 2017. These are important resources afforded by policy of the Treasury Forfeiture Fund to protect and preserve the valuable working relationships between our federal law enforcement bureaus and the critically important state, local and foreign law enforcement agencies that work with them in an investigative capacity day-in and day-out.

### Strategic Mission and Goal

The mission of the Treasury Forfeiture Fund is to affirmatively influence the consistent and strategic use of asset forfeiture by law enforcement bureaus to disrupt and dismantle criminal enterprises. The goal of the Treasury Forfeiture Fund is to support the Department of the Treasury's national asset forfeiture program in a manner that results in federal law enforcement's continued and effective use of asset forfeiture as a high-impact law enforcement sanction to disrupt and dismantle criminal activity. To achieve our mission and goal, the program must be administered in a fiscally responsible manner that seeks to minimize the administrative costs incurred, thereby maximizing the benefits for law enforcement and the society it protects.

### Multi-Departmental Fund

The Treasury Forfeiture Fund continued in its capacity as a multi-Departmental Fund in FY 2018, representing the interests of law enforcement components of the Departments of the Treasury and Homeland Security. FY 2018 posed continued management challenges including oversight of significant general property contract expenses associated with an increasingly complex forfeiture program. In addition, commensurate with the successful revenue year, there were significant expenses incurred by the bureaus to run their programs. In the midst of this period of growth and change, the Fund's family of law enforcement bureaus continued their hard work of federal law enforcement and the application of asset forfeiture as a sanction to bring criminals to justice.

FY 2018 was another robust year with regular revenue of $1.3 billion from all sources, as compared with FY 2017 revenue of $507.7 million. As we enter fiscal year 2019, the Fund remains focused on support for strategic investigative initiatives that will have the greatest impact on national and international criminal enterprise including valuable training and investigative expense funding which emphasizes high-impact cases.

## Performance Measure

In FY 2018, the Fund measured performance through the use of the following performance measure: Percent of forfeited cash proceeds resulting from high-impact cases. This measures the percentage of forfeited cash proceeds resulting from high-impact cases (those with currency seizures in excess of $100,000). Focusing on strategic cases and investigations which result in high-impact seizures will affect the greatest damage to criminal organizations while accomplishing the ultimate objective – to disrupt and dismantle criminal activity.

## Results

The Fund performance measure and result for FY 2018 is as follows:

| Performance Measure | FY 2017 Actual | FY 2018 Target | FY 2018 Actual |
|---|---|---|---|
| Percent of forfeited cash proceeds resulting from high-impact cases | 82% | 80% | **94%** |

A target of 75 percent high-impact cases was set for FY 2010 and prior years since inception of the performance measure in FY 2002. However, for FY 2011, the target was increased to 80 percent, reflecting member bureaus' prior success in meeting the previous target. This is a fixed target for the Fund designed to afford our law enforcement bureaus the opportunity to undertake smaller seizure activity that is important to the overall federal law enforcement mission. The final percentage for FY 2018 was 94 percent, exceeding the new target set in 2011. This compares with our FY 2016 and FY 2017 performance of 89 percent and 82 percent, respectively.

The performance of our member bureaus is excellent and reflects Fund management's longstanding emphasis on high-impact forfeiture strategies as well as the use of Fund authorities to assist member bureaus with larger cases that may take longer or require additional resources not otherwise available. This measure was put into effect beginning with FY 2002, and in all but 3 years, member bureaus met the target for high-impact forfeitures.

This measure is calculated by dividing the total amount of forfeited cash proceeds from cases greater than $100,000 by the total amount of forfeited cash proceeds for all cases.

The following provides a brief explanation for each major section of the audited financial statements accompanying this report for the fiscal year ended September 30, 2018.

These statements have been prepared to disclose the financial position of the Fund, its net costs, changes in net position, and budgetary resources, pursuant to the requirements of the *Chief Financial Officers Act of 1990 and the Government Management Reform Act of 1994 (GMRA)*.  While the financial statements have been prepared from the books and records of the Fund in accordance with the formats prescribed by the Office of Management and Budget, the statements are different from the financial reports used to monitor and control budgetary resources that are prepared from the same books and records and are subsequently presented in federal budget documents.  Further, the notes to the financial statements and the independent auditor's opinion and reports on internal control over financial reporting, and compliance and other matters are also integral components to understanding fully the financial highlights of Fund operations described in this chapter.

## Statements:  Changes in Net Position

Follows are brief highlights from the Statements of Changes in Net Position for FY 2018 and 2017.

**Net Position – End of Year.**    For FY 2018, the Net Position for the Fund at the end of the year, an indicator of the future capability to support ongoing operations of the Fund, totaled $1.4 billion versus $2.2 billion at the end of FY 2017.  Both years closed with a strong and viable net position with which to commence the next fiscal year's operations.

**Total Gross Non-Exchange Revenues.**  This line item on the *Statements of Changes in Net Position* is the best indicator of regular "business-type" income of the account on an annual basis.  For FY 2018, the Fund closed with $1.3 billion in Gross Non-Exchange Revenues and a total of $507.7 million for FY 2017, reflecting two, highly successful revenue years for the Treasury Forfeiture Fund.

**Proceeds from Participating with other Federal Agencies.**   This line item on the *Statements of Changes in Net Position* indicates revenue earned from the participation of Treasury Forfeiture Fund law enforcement bureaus in the seizures leading to forfeiture of bureaus that participate in the Department of Justice Assets Forfeiture Fund or with the forfeiture fund of the U.S. Postal Service (Postal Service).

As of the close of FY 2018, Treasury Forfeiture Fund bureaus earned a total of $49.6 million in revenue from participation in the seizures leading to forfeiture of the Justice and Postal Service forfeiture funds as compared to a total of $14.2 million during FY 2017.  Fund management continues to work with the Department of Justice to identify delays and/or explain downward adjustments to percentages associated with equitable sharing payments owed to the Treasury Forfeiture Fund.  This revenue affords Treasury management significant funding flexibilities for our participating agencies as the authority is broad and not confined to funding program costs; it can be used for any law enforcement purpose of our participating bureaus.  The allocation of this type of revenue for FY 2017 and FY 2018 was restricted by the need to meet enacted budget rescissions, sequestrations, and permanent reductions.

**Net Cost of Operations.**  For FY 2018, the Net Cost of Operations totaled $239.4 million, up from $221.5 million in FY 2017.

**Investment Interest Income.** The Fund is authorized to invest cash balances in Treasury securities. As of September 30, 2018, investments totaled $2.6 billion as compared with $3.1 billion invested as of September 30, 2017. During FY 2018 investment income totaled $47.8 million, as compared to $19.1 million in FY 2017.

**Equitable Sharing with Federal, State and Local Governments, and Foreign Countries.** Each year, the Fund pays tens of millions of dollars to state and local law enforcement agencies, and foreign governments, for their participation in seizures that lead to forfeitures of the Treasury Forfeiture Fund. State and local law enforcement agencies can use these resources to augment their law enforcement budgets to fight crime in their jurisdictions. Without these funds, budgets of the local municipalities would be taxed to provide these important resources or the need would go unmet. During FY 2018, the Fund shared a total of $156.7 million with other federal, state and local law enforcement agencies, and another $627 thousand with foreign countries. This compares with $188.9 million shared with other federal, state and local law enforcement agencies during FY 2017 and $2.9 million and with foreign countries.

**Victim Restitution.** During FY 2018, the Fund paid $524.8 million in restitution to victims as compared to $77.2 million in FY 2017.

**Summary of Statements of Changes in Net Position.** The Fund closed with a strong net position in FY 2018. Management will continue to emphasize high-impact cases by participating law enforcement bureaus. The FY 2018 performance with forfeiture revenue earnings of $1.3 billion from all sources, while exceeding the new higher performance measure target rate of high-impact cases, is truly a credit to the dedicated law enforcement personnel of our participating law enforcement bureaus.

## Statements: Net Cost

**Costs of the Forfeiture Program – Intra-governmental.** After revenue is applied toward policy mandates such as equitable sharing, shown in the Statements of Changes in Net Position as negative revenue or applied non-exchange revenue, the remaining financing supports the law enforcement activities of the Fund and pays for the storage of seized and forfeited property and sales associated with the disposition of forfeited property.

On the Statements of Net Cost, the Net Cost of Operations totaled $239.4 million in FY 2018, up from $221.5 million in FY 2017.

**Intra-governmental.** This cost category totaled $166.9 million in FY 2018, up from $154.8 million in FY 2017. The amounts represent costs incurred by participating bureaus in running their respective forfeiture programs.

**National Seized Property Contracts and Other.** One of the largest program costs of the Fund is the storage, maintenance and disposal of real and personal property. During FY 2018, general property was maintained by AECOM/URS. Real property was maintained by the CWS Asset Management & Sales Group, both contracts of the Department of the Treasury. In FY 2018, expenses of these contracts, which comprised over 99% of the total expenses for this line, including other contracts, totaled $57.0 million, up from $51.0 million expensed in FY 2017.

**Statements: Budgetary Resources**

As of the end of FY 2018, the Fund has estimated future expenditures and commitments of $434.6 million (reductions) which may need to be paid in future years. These reductions relate to remissions, victim restitution and equitable sharing. These future obligations will be funded from the unobligated balance of $825.2 million as reported on the SF-133" Report on Budget Execution" for FY 2018. The unobligated balance less reductions would result in $390.6 million remaining at the end of FY 2018.

**Balance Sheet**

**Assets, Liabilities and Net Position**

Total assets of the Fund decreased in FY 2018 to $3.4 billion, down from $4.0 billion in FY 2017, a decrease in asset value of 15 percent. If seized currency and other monetary assets, which are assets in the custody of the government but not yet owned by the government, are backed out of both figures, the adjusted total assets of the Fund decreased to $1.7 billion in FY 2018, down from $2.4 billion in FY 2017. During FY 2018, total liabilities of the Fund were $2.0 billion, comparable to the $1.7 billion in FY 2017. If seized currency and other monetary assets, which are also shown as a liability because they are not yet owned by the government, are backed out of both figures, the adjusted total liabilities of the Fund increases to $260.1 million in FY 2018, up from $190.8 million in FY 2017.

With decreasing asset amounts and increasing liabilities, the Cumulative Results of Operations, i.e., retained earnings, decreased at the end of FY 2018 to a total of $1.4 billion, down from $2.2 billion at the end of FY 2017.

**Financial and Program Performance - What is needed and planned.** OMB Circular A-136, *Financial Reporting Requirements,* requires that agencies include an explanation of what needs to be done and what is being planned to improve financial or program performance. In this regard, Fund management continues to work closely with member bureaus, through the financial planning process, to review revenue and expense projections during the operating year.

**Auditor's Findings**

**FY 2018 Audit.** The Fund's independent auditors have given the FY 2018 financial statements an Unmodified Opinion with no material weaknesses or significant deficiencies in internal control over financial reporting identified**.** The auditor's report on compliance and other matters disclosed no instances of noncompliance or other matters that are required to be reported under *Government Auditing Standards* or OMB Bulletin No. 19-01, *Audit Requirements for Federal Financial Statements.*

*Summary of Financial Statement Highlights*

**Net Position.** To summarize, Fund management concluded a highly productive FY 2018 "in the black," with the necessary resources to commence the business of the asset forfeiture program for FY 2019. Even though there was a rescission of $1.1 billion and a sequestration of $150 million, Fund management was able to declare Strategic Support funding from FY 2018 operations, and will work to recognize the hard work of our participating agencies in the allocation of these resources.

*A Look Forward*

Fund management will continue to work with our large and diverse array of federal law enforcement bureaus as they undertake increasingly sophisticated methods and global efforts to secure the financial and commercial markets of the nation and the world given the interdependence of financial systems. Our bureaus support immigration enforcement that is designed to identify illegal smuggling to deter its impact on the nation's financial infrastructure and to ensure that human smugglers do not harm unsuspecting victims keen on seeking a new if illegal start in the United States. Investigative initiatives intended to interrupt the financial support for terrorism remains a critical part of the work of federal law enforcement. Emphasis will continue to be placed on ever-evolving state-of-the-art investigative techniques, high-impact major case initiatives, and training to support these areas of emphasis. This has and will continue to be the key to the growing success and law enforcement reach of the Treasury Forfeiture Fund.

### Improper Payments Elimination and Recovery Act (IPERA) and Improper Payments Elimination and Recovery Improvement Act (IPERIA) Reporting Detail

The Improper Payments Elimination and Recovery Act of 2010 (IPERA) requires agencies to review their programs and activities increasing efforts to recapture improper payments by intensifying and expanding payment recapture audits. All agencies are required to develop a method of reviewing all programs to identify those that are susceptible to significant erroneous payments. "Significant" means that an estimated error rate and a dollar amount exceed the threshold of 1.5 percent of program outlays and $10 million of total program or activity payments made during the fiscal year reported or $100 million regardless of the improper payment percentage of total program outlays.

Currently the Fund conducts an internal review and analysis for its major contracts. The contract activity is high dollar value for each payment with limited volume. This activity has low risk, but based on the high dollar value requiring minimal resources, the Fund will continue to conduct these internal contract audits. Based on this analysis, the Fund has determined that recapture audits are not necessary and will not be implementing them at this time.

The Improper Payments Elimination and Recovery Improvement Act of 2012 requires agencies to incorporate the Do Not Pay Initiative (DNP) to further reduce improper payments. The Fund uses the Death Master File and the System of Award Management as part of a continuous monitoring process and post payment review. During FY 2018 and 2017, the Fund reviewed 13,580 and 15,038 payments totaling $1.036 billion and $649.5 million respectively, and reports less than .01% of IPERA or DNP reportable improper payments.

**Limitations of the Financial Statements.** As required by OMB Circular A-136, Fund management makes the following statements regarding the limitations of the financial statements:
- The financial statements have been prepared to report the financial position and results of operations of the entity, pursuant to the requirements of 31 USC § 3515(b).

- While the statements have been prepared from the books and records of the entity in accordance with the formats prescribed by OMB, the statements are in addition to the financial reports used to monitor and control budgetary resources which are prepared from the same books and records.

- The statements should be read with the realization that they are for a component of the U.S. government, a sovereign entity. One implication of this is that liabilities cannot be liquidated without legislation that provides resources to do so.

THIS PAGE INTENTIONALLY LEFT BLANK

# SECTION II

## INDEPENDENT AUDITOR'S REPORTS

THIS PAGE INTENTIONALLY LEFT BLANK



**Certified Public Accountants**
**& Consultants**

www.gkacpa.com

### Independent Auditor's Report on Financial Statements

Inspector General
U.S. Department of the Treasury
Washington, D.C.

### Report on the Financial Statements

We have audited the accompanying financial statements of the Department of
the Treasury Forfeiture Fund (the Fund), which comprise the balance sheets as
of September 30, 2018 and 2017, and the related statements of net cost,
changes in net position, and budgetary resources for the years then ended, and
the related notes to the financial statements.

### *Management's Responsibility for the Financial Statements*

Management is responsible for the preparation and fair presentation of these
financial statements in accordance with accounting principles generally
accepted in the United States of America; this includes the design,
implementation, and maintenance of internal control relevant to the preparation
and fair presentation of financial statements that are free from material
misstatement, whether due to fraud or error.

### *Auditor's Responsibility*

Our responsibility is to express an opinion on these financial statements based
on our audits. We conducted our audits in accordance with auditing standards
generally accepted in the United States of America; the standards applicable to
financial audits contained in *Government Auditing Standards* issued by the
Comptroller General of the United States; and applicable provisions of Office
of Management and Budget (OMB) Bulletin No. 19-01, *Audit Requirements
for Federal Financial Statements*. Those standards and OMB Bulletin No. 19-
01 require that we plan and perform the audit to obtain reasonable assurance
about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the
amounts and disclosures in the financial statements. The procedures selected
depend on the auditor's judgment, including the assessment of the risks of
material misstatement of the financial statements, whether due to fraud or
error.

1920 L Street, NW
Suite 425
Washington, DC 20036
Tel: 202-857-1777

*Member of the American Institute of Certified Public Accountants*

In making those risk assessments, the auditor considers internal control relevant to the Fund's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Fund's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

### *Opinion*

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of the Department of the Treasury Forfeiture Fund as of September 30, 2018 and 2017, and its net costs, changes in net position, and budgetary resources for the years then ended in accordance with accounting principles generally accepted in the United States of America.

### *Other Matters*

#### *Required Supplementary Information*

Accounting principles generally accepted in the United States of America require that the information in Section I: Overview, and Section IV: Required Supplemental Information be presented to supplement the basic financial statements referred to in the first paragraph of this report. Such information, although not a part of the basic financial statements, is required by the Federal Accounting Standards Advisory Board who considers it to be an essential part of financial reporting for placing the basic financial statements in an appropriate operational, economic, or historical context. We have applied certain limited procedures to the required supplementary information in accordance with auditing standards generally accepted in the United States of America, which consisted of inquiries of management about the methods of preparing the information and comparing the information for consistency with management's responses to our inquiries, the basic financial statements, and other knowledge we obtained during our audits of the basic financial statements. We do not express an opinion or provide any assurance on the information because the limited procedures do not provide us with sufficient evidence to express an opinion or provide any assurance.

#### *Other Information*

Our audits were conducted for the purpose of forming an opinion on the basic financial statements taken as a whole. The information in the *Message from the Director*, and Section V: Other Accompanying Information is presented for the purposes of additional analysis and is not a required part of the basic financial statements. Such information has not been subjected to the auditing procedures applied in the audits of the basic financial statements, and accordingly, we do not express an opinion or provide any assurance on it.

**Other Reporting Required by *Government Auditing Standards***

In accordance with *Government Auditing Standards*, we have also issued our reports dated October 30, 2018, on our consideration of the Fund's internal control over financial reporting and on our tests of its compliance with certain provisions of laws, regulations, contracts, and grant agreements, and other matters.  The purpose of these reports is to describe the scope of our testing of internal control over financial reporting and compliance and the results of that testing, and not to provide an opinion on internal control over financial reporting or on compliance. Those reports are an integral part of an audit performed in accordance with *Government Auditing Standards* in considering the Fund's internal control over financial reporting and compliance.

GKA, P.C.

Washington, DC
October 30, 2018



**Independent Auditor's Report on Internal Control over Financial Reporting**

www.gkacpa.com

Inspector General
U.S. Department of the Treasury
Washington, D.C.

We have audited, in accordance with auditing standards generally accepted in the United States of America; the standards applicable to financial audits contained in *Government Auditing Standards*, issued by the Comptroller General of the United States; and applicable provisions of Office of Management and Budget (OMB) Bulletin No. 19-01, *Audit Requirements for Federal Financial Statements*, the financial statements of the Department of the Treasury Forfeiture Fund (the Fund), which comprise the balance sheets as of September 30, 2018 and 2017, and the related statements of net cost, changes in net position, and budgetary resources for the years then ended, and the related notes to the financial statements, and have issued our report thereon dated October 30, 2018.

In planning and performing our audit of the financial statements as of and for the year ended September 30, 2018, we considered the Fund's internal control over financial reporting (internal control) to determine the audit procedures that are appropriate in the circumstances for the purpose of expressing our opinion on the financial statements, but not for the purpose of expressing an opinion on the effectiveness of the Fund's internal control. Accordingly, we do not express an opinion on the effectiveness of the Fund's internal control. We did not test all internal controls relevant to operating objectives as broadly defined by the *Federal Managers' Financial Integrity Act of 1982*.

A *deficiency in internal control* exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent, or detect and correct, misstatements on a timely basis. A *material weakness* is a deficiency, or a combination of deficiencies, in internal control, such that there is a reasonable possibility that a material misstatement of the entity's financial statements will not be prevented, or detected and corrected on a timely basis.

Our consideration of internal control was for the limited purpose described in the second paragraph and was not designed to identify all deficiencies in internal control that might be material weaknesses.

1920 L Street, NW
Suite 425
Washington, DC 20036
Tel: 202-857-1777

*Member of the American Institute of Certified Public Accountants*

Given these limitations, during our audit we did not identify any deficiencies in internal control that we consider to be material weaknesses. However, material weaknesses may exist that have not been identified.

**Purpose of this Report**

The purpose of this report is solely to describe the scope of our testing of internal control and the result of that testing, and not to provide an opinion on the effectiveness of the Fund's internal control. This report is an integral part of an audit performed in accordance with *Government Auditing Standards* in considering the Fund's internal control. Accordingly, this communication is not suitable for any other purpose.

*GKA.P.C.*

Washington, DC
October 30, 2018



www.gkacpa.com

**Independent Auditor's Report on Compliance and Other Matters**

Inspector General
U.S. Department of the Treasury
Washington, D.C.

We have audited, in accordance with auditing standards generally accepted in the United States of America; the standards applicable to financial audits contained in *Government Auditing Standards*, issued by the Comptroller General of the United States; and applicable provisions of Office of Management and Budget (OMB) Bulletin No. 19-01, *Audit Requirements for Federal Financial Statements*, the financial statements of the Department of the Treasury Forfeiture Fund (the Fund), which comprise the balance sheets as of September 30, 2018 and 2017, and the related statements of net cost, changes in net position, and budgetary resources for the years then ended, and the related notes to the financial statements, and have issued our report thereon dated October 30, 2018.

As part of obtaining reasonable assurance about whether the Fund's financial statements are free from material misstatement, we performed tests of the Fund's compliance with certain provisions of laws, regulations, and contracts, noncompliance with which could have a direct and material effect on the determination of financial statement amounts, and certain provisions of other laws and regulations specified in OMB Bulletin No. 19-01. However, providing an opinion on compliance with those provisions was not an objective of our audit, and accordingly, we do not express such an opinion.

The results of our tests disclosed no instances of noncompliance or other matters that are required to be reported under *Government Auditing Standards* or OMB Bulletin No. 19-01.

**Purpose of this Report**

The purpose of this report is solely to describe the scope of our testing of compliance and the result of that testing, and not to provide an opinion on the Fund's compliance.

1920 L Street, NW
Suite 425
Washington, DC 20036
Tel: 202-857-1777

*Member of the American Institute of Certified Public Accountants*

This report is an integral part of an audit performed in accordance with *Government Auditing Standards* in considering the Fund's compliance. Accordingly, this communication is not suitable for any other purpose.

GKA, P.C.

Washington, DC
October 30, 2018

THIS PAGE INTENTIONALLY LEFT BLANK

## SECTION III

### FINANCIAL STATEMENTS AND NOTES

THIS PAGE INTENTIONALLY LEFT BLANK

**Department of the Treasury Forfeiture Fund**
**BALANCE SHEETS**
**As of September 30, 2018 and 2017**
(Dollars in thousands)

|  | 2018 | 2017 |
|---|---|---|
| **Assets:** | | |
| **Intragovernmental:** | | |
| Fund balance with Treasury | $ 32,425 | $ 35,607 |
| Investments and related interest receivable (Note 3) | 2,574,872 | 3,124,344 |
| **Total Intragovernmental** | 2,607,297 | 3,159,951 |
| | | |
| Cash and other monetary assets (Note 5) | 703,476 | 743,749 |
| Accounts Receivable | 815 | 1,478 |
| | 704,291 | 745,227 |
| Forfeited property (Note 6) | | |
| Held for sale, net of mortgages, liens and claims | 74,699 | 62,678 |
| To be shared with federal, state or local, or foreign governments | 415 | 153 |
| Total forfeited property, net of mortgages, liens and claims | 75,114 | 62,831 |
| | | |
| **Total Assets** | $3,386,702 | $3,968,009 |
| | | |
| **Liabilities:** | | |
| | | |
| **Intragovernmental:** | | |
| Accounts payable | $ 133,240 | $ 87,782 |
| **Total Intragovernmental** | 133,240 | 87,782 |
| | | |
| Seized currency and other monetary instruments (Note 8) | 1,690,876 | 1,529,034 |
| Distributions payable (Note 10) | | |
| State and local agencies and foreign governments | 43,127 | 32,755 |
| Accounts payable | 8,589 | 7,409 |
| Deferred revenue from forfeited assets | 75,114 | 62,831 |
| | | |
| **Total Liabilities** | 1,950,946 | 1,719,811 |
| | | |
| Commitments and contingencies (Note 15) | - | - |
| | | |
| **Net Position:** | | |
| Cumulative results of operations (Note 11) | 1,435,756, | 2,248,198 |
| | | |
| **Total Liabilities and Net Position** | $3,386,702 | $3,968,009 |

*The accompanying notes are an integral part of these financial statements.*

Department of the Treasury Forfeiture Fund
STATEMENTS OF NET COST
For the years ended September 30, 2018 and 2017
(Dollars in thousands)

|  | 2018 | 2017 |
|---|---|---|
| **Program:** | | |
| **ENFORCEMENT** | | |
| | | |
| **Intragovernmental:** | | |
| Seizure investigative costs and asset management | $ 112,193 | $   99,068 |
| Other asset related contract services | 6,634 | 8,581 |
| Data systems, training and others | 48,089 | 47,175 |
| | | |
| **Total Intragovernmental** | 166,916 | 154,824 |
| | | |
| **With the Public:** | | |
| National contract services seized property and other | 56,964 | 51,048 |
| Joint operations | 15,551 | 15,660 |
| | | |
| **Total with the Public** | 72,515 | 66,708 |
| | | |
| **Net Cost of Operations** (Note 16) | $   239,431 | $ 221,532 |

*The accompanying notes are an integral part of these financial statements.*

**Department of the Treasury Forfeiture Fund**
**STATEMENTS OF CHANGES IN NET POSITION**
**For the years ended September 30, 2018 and 2017**
(Dollars in thousands)

|  | 2018 | 2017 |
|---|---|---|
| **Net Position – Beginning of Year** | $ 2,248,198 | $ 2,590,444 |
| **Financing Sources (Non-Exchange Revenues):** | | |
| **Intragovernmental** | | |
| Investment interest income | 47,840 | 19,085 |
| **Public** | | |
| Forfeited currency and monetary instruments | 1,089,225 | 374,895 |
| Sales of forfeited property net of mortgages and claims | 99,240 | 83,711 |
| Proceeds from participating with other federal agencies | 49,553 | 14,175 |
| Value of property transferred in equitable sharing | 545 | 240 |
| Payments in lieu of forfeiture, net of refunds (Note 19) | 9,990 | 8,840 |
| Reimbursed costs | 3,708 | 3,330 |
| Other | (1,486) | 3,466 |
| **Total Gross Non-Exchange Revenues** | 1,298,615 | 507,742 |
| **Less:  Equitable Sharing** | | |
| **Intragovernmental** | | |
| Federal | (18,799) | (124,595) |
| **Public** | | |
| State and local agencies | (137,873) | (64,306) |
| Foreign countries | (627) | (2,953) |
| Victim restitution | (524,763) | (77,195) |
|  | (663,263) | (144,454) |
| **Total Equitable Sharing** | (682,062) | (269,049) |
| **Total Non-Exchange Revenues, Net** | 616,553 | 238,693 |
| **Transfers –In (Out)** | | |
| **Intragovernmental** | | |
| Strategic support (Note 13) | (47,125) | (39,497) |
| Secretary's enforcement fund (Note 14) | (37,477) | (5,910) |
| Transfer to the general fund (Note 9) | (1,104,962) | (314,000) |
| **Total Transfers Out** | (1,189,564) | (359,407) |
| **Total Financing Sources - Net** | (573,011) | (120,714) |
| **Net Cost of Operations** | (239,431) | (221,532) |
| **Net Results of Operations** | (812,442) | (342,246) |
| **Net Position – End of Year** | $ 1,435,756 | $ 2,248,198 |

*The accompanying notes are an integral part of these financial statements.*

**Department of the Treasury Forfeiture Fund**
**STATEMENTS OF BUDGETARY RESOURCES**
**For the years ended September 30, 2018 and 2017**
(Dollars in thousands)

|  | 2018 | 2017 |
|---|---|---|
| **Budgetary Resources:** | | |
| Unobligated balances- beginning of year | $ 668,529 | $ 1,034,832 |
| Recoveries of prior year unpaid obligations | 16,163 | 41,094 |
| Other changes in unobligated balance | 770 | 528 |
| Unobligated balance from prior year budget authority, net | 685,462 | 1,076,454 |
| Budget authority | 1,147,136 | 118,303 |
| **Total Budgetary Resources** | $ 1,832,598 | $ 1,194,757 |
| **Status of Budgetary Resources:** | | |
| Obligations incurred | $ 1,007,425 | $ 526,228 |
| Unobligated balances – apportioned | $ 466,136 | $ 557,363 |
| Unobligated balances – unapportioned | 359,037 | 111,166 |
| Unobligated balances – end of year (Note 17) | $ 825,173 | $ 668,529 |
| **Total Budgetary Resources** | $ 1,832,598 | $ 1,194,757 |
| **Outlays, net** | | |
| Outlays, net | $ 952,274 | $ 578,067 |
| Agency outlays, net | $ 952,274 | $ 578,067 |

*The accompanying notes are an integral part of these financial statements.*

**Note 1:  Reporting Entity**

The Department of the Treasury Forfeiture Fund (Treasury Forfeiture Fund or the Fund) was established by the Treasury Forfeiture Fund Act of 1992, Public Law 102-393 (the TFF Act), and is codified at 31 USC 9705.  The Fund was created to consolidate all Treasury law enforcement bureaus under a single forfeiture fund program administered by the Department of the Treasury (Treasury). Treasury law enforcement bureaus fully participating in the Fund upon enactment of this legislation were the U.S. Customs Service (Customs); the Internal Revenue Service – Criminal Investigation (IRS-CI); the United States Secret Service (Secret Service); the Bureau of Alcohol, Tobacco and Firearms (ATF); the Financial Crimes Enforcement Network (FinCEN); and the Federal Law Enforcement Training Center (FLETC).  FinCEN and FLETC contribute no revenue to the Fund, however in FY 2016, significant amounts of Strategic Support funds were allocated to FinCEN towards Bank Secrecy Act (BSA) Information Technology (IT) modernization, a tool used in the fight against money laundering and other criminal activity. The U.S. Coast Guard, formerly part of the Department of Transportation, now part of the Department of Homeland Security (DHS), also participates in the Fund. However, all Coast Guard seizures are treated as Customs seizures because the Coast Guard lacks forfeiture authority.

With enactment of the Homeland Security Act of 2002 (Homeland Security Act), law enforcement bureaus currently participating in the Fund are: the Internal Revenue Service - Criminal Investigation (IRS-CI) of Treasury, Customs and Border Protection (CBP), Immigration and Customs Enforcement (ICE) and the U.S. Secret Service (USSS) of DHS. The U.S. Coast Guard of DHS joins these bureaus. The Fund continues in its capacity as a multi-departmental fund, representing the interests of law enforcement components of the Departments of Treasury and Homeland Security.

The Fund is a special fund that is accounted for under Treasury symbol number 20X5697.  From this no-year account, expenses may be incurred consistent with 31 USC 9705, as amended. A portion of these expenses, referred to as discretionary expenses, are subject to annual appropriation limitations. Others, referred to as non-discretionary (mandatory) expenses, are limited only by the availability of resources in the Fund.  Both expense categories are limited in total by the amount of revenue in the Fund.  The Fund is managed by Treasury's Executive Office for Asset Forfeiture (TEOAF).

The mission of the Treasury Forfeiture Fund is to affirmatively influence the consistent and strategic use of asset forfeiture by law enforcement bureaus to disrupt and dismantle criminal enterprises.  The goal of the Treasury Forfeiture Fund is to support the Treasury's national asset forfeiture program in a manner that results in federal law enforcement's continued and effective use of asset forfeiture as a high-impact law enforcement sanction to disrupt and dismantle criminal activity.   Under a Memorandum of Understanding (MOU) with Treasury, CBP acts as the executive agent for certain operations of the Fund. Pursuant to that executive agency role, CBP's National Finance Center (NFC) is responsible for accounting and financial reporting for the Fund, including timely and accurate reporting and compliance with Treasury, the Comptroller General and the Office of Management and Budget (OMB) regulations and reporting requirements.

## Note 2:  Summary of Significant Accounting Policies

### Basis of Accounting and Presentation

The Fund began preparing audited financial statements in Fiscal Year 1993 as required by the Fund's enabling legislation, 31 USC 9705(f)(2)(H), and the Chief Financial Officers Act of 1990.  Beginning with the Fiscal Year 1996 report, the Government Management Reform Act of 1994 (GMRA) requires executive agencies, including the Treasury, to produce audited consolidated accountability reports and related footnotes for all activities and funds.

The financial statements have been prepared from the accounting records of the Fund in conformity with accounting principles generally accepted in the United States of America (GAAP) and specified by OMB in OMB Circular A-136, *Financial Reporting Requirements (OMB Circular A-136)*.  GAAP for federal entities is prescribed by the Federal Accounting Standards Advisory Board (FASAB), which is designated the official accounting standards setting body of the Federal Government by the American Institute of Certified Public Accountants.

The preparation of financial statements in accordance with accounting principles generally accepted in the Unites States of America requires management to make estimates and assumptions that affect the reported amounts of assets, liabilities, disclosures of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

Certain fiscal year 2017 balances may have been reclassified, retitled, or combined with other financial statement line items for consistency with the current year presentation.

### Allowable Fund Expenses

The majority of the revenue recorded by the Fund is utilized for operating expenses or distributed to state and local law enforcement agencies, other federal agencies, and foreign governments, in accordance with the various laws and policies governing the operations and activities of the Fund. Under the TFF Act, the Fund is authorized to pay certain expenses using discretionary or mandatory funding authorities of the Fund.

Discretionary authorities include but may not be limited to:  the payment of expenses for the purchase of awards for information or assistance leading to a civil or criminal forfeiture involving any law enforcement bureau participating in the Fund; purchase of evidence or information that meet the criteria set out in 31 USC 9705(a)(2)(B); payment for equipment for vessels, vehicles, or aircraft available for official use as described by 31 USC 9705(a)(2)(D) and (F); reimbursement of private persons for expenses incurred  while cooperating with a Treasury law enforcement organization in investigations; publication of the availability of certain awards; and payment for training foreign law enforcement personnel with respect to seizure or forfeiture activities of the Fund.  Discretionary expenses are subject to an annual, definite Congressional appropriation from revenue in the Fund.

Expenses from the mandatory authorities of the Fund include but are not limited to:  all proper expenses of the seizure, including investigative costs and purchases of evidence and information leading to seizure, holding costs, security costs, etc., awards of compensation to informers under section 619 of the Tariff Act (19 USC 1619); satisfaction of liens against the forfeited property, and

claims of parties with interest in forfeited property; expenses incurred by state and local law enforcement agencies in joint law enforcement operations with law enforcement agencies participating in the Fund; and equitable sharing payments made to state and local law enforcement agencies in recognition of their efforts in a Fund seizure leading to forfeiture. These mandatory expenses are paid pursuant to the permanent indefinite authorities of the Fund; are only limited by revenue in the Fund each year and do not require additional Congressional action for expenditure.

The Fund's expenses are either paid on a reimbursement basis or paid directly on behalf of a participating bureau. Reimbursable expenses are incurred by the respective bureaus participating in the Fund against their appropriation and then submitted to the Fund for reimbursement. The bureaus are reimbursed through Inter-Agency Transfers (SF-1081) or Intra-governmental Payments and Collection (IPAC) System. Certain expenses such as equitable sharing, liens, claims and state and local joint operations costs are paid directly from the Fund.

Further, the Fund is a component unit of the Treasury with participating bureaus in the DHS. As such, employees of both Departments may perform certain operational and administrative tasks related to the Fund. Payroll costs of employees directly involved in the security and maintenance of forfeited property are also recorded as expenses in the financial statements of the Fund (included in the line item "seizure investigative costs and asset management" in the statement of net cost.)

### Revenue and Expense Recognition

Revenue from the forfeiture of property is deferred until the property is sold or transferred to a state, local or federal agency. Revenue is not recorded if the forfeited property is ultimately destroyed or cannot be legally sold.

Revenue from currency is recognized upon forfeiture. Payments in lieu of forfeiture (mitigated seizures) are recognized as revenue when the payment is received. Revenue received from participating with certain other federal agencies is recognized when the payment is received. Operating costs are recorded as expenses and related liabilities when goods are received or services are performed. Certain probable equitable sharing liabilities existing at year end are accrued based on estimates.

As provided for in the TFF Act, the Fund invests seized and forfeited currency that is not needed for current operations. Treasury's Bureau of Fiscal Service invests the funds in obligations of, or guaranteed by, the United States Government. Interest is reported to the Fund and recorded monthly as revenue in the general ledger.

### Funds from Dedicated Collections

Funds from dedicated collections are financed by specifically identified revenues, often supplemented by other financing sources, which remain available over time. These specifically identified revenues and other financing sources are required by statute to be used for designated activities, benefits, or purposes, and must be accounted for separately from the Government's general revenues. In accordance with SFFAS 43, *Funds from Dedicated Collections,* all of the TFF's revenue meets these criteria and constitutes funds from dedicated collections.

The Federal Government does not set aside assets to pay future benefits or other expenditures associated with funds from dedicated collections. The cash collected from funds from dedicated collections is deposited in the U.S. Treasury, which uses the cash for general government purposes.

Treasury securities are issued to the TFF as evidence of its receipts. Treasury securities are an asset to the TFF and a liability to the U.S. Treasury. Because the TFF and U.S. Treasury are both parts of the government, these assets and liabilities offset each other from the standpoint of the government as a whole. For this reason, they do not represent an asset or a liability in the U.S. Government-wide financial statements.

Treasury securities provide the TFF with authority to draw upon the U.S. Treasury to make future benefit payments or other expenditures. When the TFF requires redemption of these securities to make expenditures, the government finances those expenditures out of accumulated cash balances, by raising taxes or other receipts, by borrowing from the public or repaying less debt or by curtailing other expenditures. This is the same way that the government finances all other expenditures.

### *Equitable Sharing (Assets Distributed)*

Forfeited property, currency, or proceeds from the sales of forfeited property may be shared with federal, state and local law enforcement agencies or foreign governments, which provided direct or indirect assistance in the related seizure. In addition, the Fund may transfer forfeited property to other federal agencies, which would benefit from the use of the item. A class of asset distribution was established for victim restitution in 1995. These distributions include property and cash returned to victims of fraud and other illegal activity. Upon approval by Fund management to share or transfer the assets, both revenue from distributed forfeited assets and distributions are recognized for the net realizable value of the asset to be shared or transferred, thereby resulting in no gain or loss recognized. Revenue and /or expenses are recognized for property and currency, which are distributed to or shared with non-federal agencies, per SFFAS No. 7, *Accounting for Revenue and Other Financing Sources*.

### *Entity Assets*

Entity assets are used to conduct the operations and activities of the Fund. Entity assets comprise intragovernmental and non-intragovernmental assets. Intragovernmental balances arise from transactions among federal agencies. These assets are claims of a federal entity against another federal entity. Entity assets consist of cash or other assets, which could be converted into cash to meet the Fund's current or future operational needs. Such other assets include investments of forfeited balances, accrued interest on seized balances, receivables, and forfeited property, which are held for sale or to be distributed.

- **Fund Balance with Treasury** – This represents amounts on deposit with Treasury.

- **Investments and Related Interest Receivable** – This includes forfeited cash held by the Fund and seized currency held in the Customs Suspense Account that had been invested in short term U.S. Government Securities.

- **Accounts Receivables** – The values reported for other receivables are primarily funds due from the national seized property contractor for properties sold; the proceeds of which have not yet been deposited into the Fund. No allowance has been made for uncollectible amounts as the accounts recorded as a receivable at year end were considered to be fully collectible as of September 30, 2018 and 2017.

- **Cash and Other Monetary Assets** – This includes forfeited currency on hand not yet deposited and forfeited currency held as evidence.

- **Forfeited Property and Currency** – Forfeited property and currency is recorded in the respective seized property and forfeited asset tracking systems at the estimated fair value at the time of seizure. However, based on historical sales experiences for the year, properties are adjusted to reflect the market value at the end of the fiscal year for financial statement reporting purposes. Direct and indirect holding costs are not capitalized for individual forfeited assets. Forfeited currency not deposited into the Fund is included as part of Entity Assets - Cash and Other Monetary Assets.

Further, mortgages and claims on forfeited assets are recognized as a valuation allowance and a reduction of deferred revenue from forfeited assets when the asset is forfeited. The allowance includes mortgages and claims on forfeited property held for sale and a minimal amount of claims on forfeited property previously sold. Mortgages and claims expenses are recognized when the related asset is sold and is reflected as a reduction of sales of forfeited property.

Additionally, SFFAS No. 3, *Accounting for Inventory and Related Property*, requires certain additional disclosures in the notes to the financial statements, including an analysis of changes in seized and forfeited property and currency, for both carrying value and quantities, from that on hand at the beginning of the year to that on hand at the end of the year. These analyses are disclosed in Notes 7 and 8.

*Non-entity Assets*

Non-entity assets held by the Fund are not available for use by the Fund. Non-entity assets comprise intragovernmental and other assets. Intragovernmental balances arise from transactions among federal agencies. These assets are claims of a federal entity against another federal entity. Non-entity assets are not considered as financing sources (revenue) available to offset operating expenses, therefore, a corresponding liability is recorded and presented as governmental liabilities in the balance sheet to reflect the custodial/fiduciary nature of these activities.

- **Seized Currency and Property** – Seized Currency is defined as cash or monetary instruments that are readily convertible to cash on a dollar for dollar basis. SFFAS No. 3 requires that seized monetary instruments (cash and cash equivalents) be recognized as an asset in the financial statements and a liability be established in an amount equal to the seized asset value due to: (i) the fungible nature of monetary instruments, (ii) the high level of control that is necessary over these assets; and (iii) the possibility that these monies may be returned to their owner in lieu of forfeiture.

Seized property is recorded at its appraised value at the time of seizure. The value is determined by the seizing entity and is usually based on a market analysis such as a third party appraisal, standard property value publications or bank statements. Seized property is not recognized as an asset in the financial statements, as transfer of ownership to the government has not occurred as of September 30. Accordingly, seized property other than monetary instruments is disclosed in the footnotes in accordance with SFFAS No. 3.

- **Investments and Related Interest Receivable** – This balance includes seized cash on deposit in the Fund's suspense account held by Treasury, which has been invested in short term U.S. Government Securities.

- **Cash and Other Monetary Assets** – This balance represents the aggregate amount of the Fund's seized currency on deposit in the Fund's suspense account held by Treasury, seized cash on deposit held with other financial institutions and, cash on hand in vaults held at field office locations.

*Liabilities Covered by Budgetary Resources*

Liabilities covered by budgetary resources represent liabilities incurred, which are covered by available budgetary resources. The components of such liabilities for the Fund are as follows:

- **Distributions Payable** – Distributions payable to federal and non-federal agencies is primarily related to equitable sharing payments and payments to be made by the Fund to the victims of fraud.

- **Accounts Payable** – Amounts reported in this category include accrued expenses authorized by the TFF Act (See "Allowable Fund Expenses") for which payment was pending at year end.

- **Seized Currency** – Amounts reported in this category represent the value of seized currency that is held by the Fund which equals the amount of seized currency reported as an asset.

- **Deferred Revenue from Forfeited Assets** – At year end, the Fund held forfeited assets, which had not yet been converted into cash through a sale. The amount reported here represents the value of these assets, net of mortgages and claims.

*Liabilities Not Covered by Budgetary Resources*

The Fund does not currently have liabilities not covered by available budgetary resources.

*Net Position*

The components of net position are classified as follows:
- **Retained Capital** – There is no cap on amounts that the Fund can carry forward into Fiscal Year 2019. The cap was removed by the Fiscal Year 1997 Omnibus Appropriations Act (PL 104-208).

- **Unliquidated Obligations** – This category represents the amount of undelivered purchase orders, contracts and equitable sharing requests which have been obligated with current budget resources or delivered purchase orders and contracts that have not been invoiced. An expense and liability are recognized and the corresponding obligations are reduced as goods are received or services are performed. A portion of the equitable sharing requests that were in final stages of approval are recognized as liabilities at year end. Prior experience with the nature of this account indicated that a substantial portion of these requests were certain liabilities at year end. (See also Distributions Payable at Note 10).

- **Net Results of Operations** – This category represents the net difference, for the activity during the year, between: (i) financing sources including transfers, and revenues; and (ii) expenses.

## Note 3:  Investments and Related Interest Receivable

All investments are intragovernmental short-term (35 days or less) non-marketable par value federal debt securities issued by, and purchased through Treasury's Bureau of the Fiscal Service, Federal Investments Branch.  Investments are always purchased at a discount and are reported at acquisition cost, net of discount.  The discount is amortized into interest income over the term of the investment. The investments are always held to maturity. They are made from cash in the Fund and from seized currency held in the Customs Suspense Account. The Customs Suspense Account became the depository for seized cash for the Fund following enactment of the TFF Act.

The following schedule presents the investments on hand as of September 30, 2018 and 2017, respectively (dollars in thousands):

**Entity Assets**

| Description | Cost | Unamortized Discount | Investment, Net |
|---|---|---|---|
| **September 30, 2018** | | | |
| Treasury Forfeiture Fund - | | | |
| 28 days 2.0650% U.S. Treasury Bills | $1,542,772 | ($2,478) | $1,540,294 |
| Interest Receivable | | | 444 |
| Total Investment, Net, and Interest Receivable | | | $1,540,738 |
| Fair Market Value | | | $1,540,622 |
| **September 30, 2017** | | | |
| Treasury Forfeiture Fund - | | | |
| 28 days  0.09550% U.S. Treasury Bills | $2,237,149 | ($1,662) | $2,235,487 |
| Interest Receivable | | | 162 |
| Total Investment, Net, and Interest Receivable | | | $2,235,649 |
| Fair Market Value | | | $2,235,747 |

**Non-entity Assets**

| Description | Cost | Unamortized Discount | Investment, Net |
|---|---|---|---|
| **September 30, 2018** | | | |
| Treasury Forfeiture Fund – Seized Currency Suspense Account | | | |
| 28 days 2.0650% U.S. Treasury Bills | $1,035,798 | ($1,664) | $1,034,134 |
| Fair Market Value | | | $1,034,354 |
| **September 30, 2017** | | | |
| Treasury Forfeiture Fund – Seized Currency Suspense Account | | | |
| 28 days 0.09550% U.S. Treasury Bills | $809,294 | ($601) | $ 808,693 |
| Fair Market Value | | | $ 808,787 |

## Note 4: Analysis of Non-Entity Assets

The following schedule presents the non-entity assets as of September 30, 2018 and 2017, respectively (dollars in thousands):

| | 2018 | 2017 |
|---|---|---|
| **Seized currency:** | | |
| Intragovernmental Investments (Note 3) | $ 1,034,134 | $ 808,693 |
| Cash and other monetary assets (Note 5) | 656,742 | 720,341 |
| **Total Non-Entity Assets** | 1,690,876 | 1,529,034 |
| **Total Entity Assets** | 1,695,826 | 2,438,975 |
| **Total Assets** | $ 3,386,702 | $ 3,968,009 |

## Note 5:  Cash and Other Monetary Assets

**Entity Assets**

Cash and Other Monetary Assets held on hand included forfeited currency not yet deposited, as well as forfeited currency held as evidence, amounting to $46.7 million and $23.4 million as of September 30, 2018 and 2017, respectively.

**Non-Entity Assets**

Cash and Other Monetary Assets included seized currency not yet deposited, as well as deposited seized currency which is not invested in order to pay remissions, amounted to $656.7 million and $720.3 million as of September 30, 2018 and 2017, respectively.

## Note 6:  Forfeited Property/Deferred Revenue

The following summarizes the components of forfeited property (net), as of September 30, 2018 and 2017, respectively (dollars in thousands):

|  | 2018 | 2017 |
|---|---|---|
| Held for sale | $ 78,263 | $ 67,670 |
| To be shared with federal, State or local, or foreign government | 415 | 153 |
| Total forfeited property (Note 7) | 78,678 | 67,823 |
| Less: Allowance for liens and claims | (3,564) | (4,992) |
| Total forfeited property, net | $ 75,114 | $ 62,831 |

## Note 7: Analysis of Changes in Forfeited Property and Currency

The following schedule presents the changes in the forfeited property and currency balances from October 1, 2017 to September 30, 2018. (Dollar value is in thousands)

| | 10/1/17 Financial Statement Balance | | Adjustments | | 10/1/17 Carrying Value | | Forfeitures | | Deposits/Sales | | Disposals/Transfers | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Value | No. | Value | No. | Value | No. | Value | No. | Value | No. | Value | No. |
| Currency | $12,329 | - | $- | - | $12,329 | - | $1,020,421 | - | $(1,065,906) | - | $ - | - |
| Other Monetary Instruments | 11,079 | - | - | - | 11,079 | - | - | - | (3,786) | - | (45) | - |
| Subtotal | 23,408 | - | - | - | 23,408 | - | 1,020,421 | - | (1,069,692) | - | (45) | - |
| Real Property | 44,828 | 217 | 6,790 | - | 51,618 | 217 | 42,012 | 135 | (41,036) | (170) | (1,690) | (4) |
| General Property | 12,319 | 16,708 | 38,582 | - | 50,901 | 16,780 | 33,407 | 20,244 | (13,669) | (1,785) | (1,290) | (2,673) |
| Vessels | 1,306 | 119 | 171 | - | 1,477 | 119 | 792 | 106 | (1,082) | (58) | (29) | (3) |
| Aircraft | 813 | 8 | 279 | - | 1,092 | 8 | 1,840 | 8 | (2,163) | (11) | - | (1) |
| Vehicles | 8,557 | 2,610 | 9,563 | - | 18,120 | 2,610 | 27,047 | 7,691 | (19,133) | (4,394) | (6,357) | (768) |
| Subtotal | 67,823 | 19,734 | 55,385 | - | 123,208 | 19,734 | 105,098 | 28,184 | (77,083) | (6,418) | (9,366) | (3,449) |
| Grand Total | $91,231 | 19,734 | $55,385 | - | $146,616 | 19,734 | $1,125,519 | 28,184 | $(1,146,775) | (6,418) | $(9,411) | (3,449) |

| | Victim Restitution | | Destroyed | | Other Adjustments | | Value Change | | 2018 Carrying Value | | Fair Market Value Adjustment | | 9/30/18 Financial Statement Balance | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Value | No. | Value | No. | Value | No. | Value | No. | Value | No. | Value | No. | Value | No. |
| Currency | $- | - | $- | - | $72,878 | - | $(236) | - | $39,486 | - | $- | - | $39,486 | - |
| Other Monetary Instruments | - | | - | | | | | | 7,248 | | | | 7,248 | - |
| Subtotal | - | - | - | - | 72,878 | - | (236) | - | 46,734 | - | - | - | 46,734 | - |
| Real Property | - | - | - | - | 9,219 | 7 | 330 | - | 60,453 | 185 | (11,805) | - | 48,648 | 185 |
| General Property | - | - | (8,920) | (17,369) | (891) | 845 | (17,136) | - | 42,402 | 16,042 | (22,433) | - | 19,969 | 16,042 |
| Vessels | - | - | (96) | (63) | 547 | 12 | 77 | - | 1,686 | 113 | (648) | - | 1,038 | 113 |
| Aircraft | - | - | - | - | 1,300 | 3 | (161) | - | 1,908 | 7 | (1,056) | - | 852 | 7 |
| Vehicles | - | - | (4,703) | (2,993)) | 1614 | 216 | (1,065) | - | 15,523 | 2,362 | (7,352) | - | 8,171 | 2,362 |
| Subtotal | - | - | (13,719) | (20,425) | 11,789 | 1,083 | (17,955) | - | 121,972 | 18,709 | (43,294) | - | 78,678 | 18,709 |
| Grand Total | $- | - | $(13,719) | (20,425) | $84,667 | 1,083 | $(18,191) | - | $168,706 | 18,709 | $(43,294) | - | $125,412 | 18,709 |

**Note 7:  Analysis of Changes in Forfeited Property and Currency**

The following schedule presents the changes in the forfeited property and currency balances from October 1, 2016 to September 30, 2017.
(Dollar value is in thousands)

| | 10/1/16 Financial Statement Balance | | Adjustments | | 10/1/16 Carrying Value | | Forfeitures | | Deposits/Sales | | Disposals/Transfers | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Value | No. | Value | No. | Value | No. | Value | No. | Value | No. | Value | No. | | |
| Currency | $17,152 | - | $- | - | $17,152 | - | $353,185 | - | $(381,016) | - | $ - | - | | |
| Other Monetary Instruments | 11,079 | - | - | - | 11,079 | - | 1,836 | - | (1,811) | - | (25) | - | | |
| Subtotal | 28,231 | - | - | - | 28,231 | - | 355,021 | - | (382,827) | - | (25) | - | | |
| | | | | | | | | | | | | | | |
| Real Property | 36,698 | 255 | 17,679 | - | 54,377 | 255 | 34,376 | 132 | (44,453) | (194) | - | - | | |
| General Property | 46,946 | 20,636 | 51,400 | - | 98,346 | 20,636 | 14,352 | 21,574 | (44,341) | (3,467) | (1,354) | (1,308) | | |
| Vessels | 1,043 | 95 | 859 | - | 1,902 | 95 | 896 | 114 | (452) | (32) | (73) | (2) | | |
| Aircraft | 454 | 8 | 1,479 | - | 1,933 | 8 | 1,133 | 11 | (3,215) | (8) | - | - | | |
| Vehicles | 8,897 | 2,159 | 7,654 | - | 16,551 | 2,159 | 29,565 | 7,811 | (20,880) | (5,983) | (6,079) | (942) | | |
| Subtotal | 94,038 | 23,153 | 79,071 | - | 173,109 | 23,153 | 80,322 | 29,642 | (113,341) | (9,684) | (7,506) | (2,252) | | |
| Grand Total | $122,269 | 23,153 | $79,071 | - | $201,340 | 23,153 | $435,343 | 29,642 | $(496,168) | (9,684) | $(7,531) | (2,252) | | |

| | Victim Restitution | | Destroyed | | Other Adjustments | | Value Change | | 2017 Carrying Value | | Fair Market Value Adjustment | | 9/30/17 Financial Statement Balance | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Value | No. | Value | No. | Value | No. | Value | No. | Value | No. | Value | No. | Value | No. |
| Currency | $- | - | $- | - | $24,995 | - | $(1,987) | - | $12,329 | - | $- | - | $12,329 | - |
| Other Monetary Instruments | - | | | - | | | - | - | 11,079 | - | - | - | 11,079 | - |
| Subtotal | - | - | - | - | 24,995 | - | (1,987) | - | 23,408 | - | - | - | 23,408 | - |
| | | | | | | | | | | | | | | |
| Real Property | - | - | - | (1) | 6,803 | 25 | 515 | - | 51,618 | 217 | (6,790) | - | 44,828 | 217 |
| General Property | - | - | (378) | (20,628) | (6,274) | (27) | (9,450) | - | 50,901 | 16,780 | (38,582) | - | 12,319 | 16,780 |
| Vessels | - | - | - | (53) | (617) | (3) | (179) | - | 1,477 | 119 | (171) | - | 1,306 | 119 |
| Aircraft | - | - | - | (1) | 1,292 | (2) | (51) | - | 1,092 | 8 | (279) | - | 813 | 8 |
| Vehicles | - | - | (35) | (612) | (681) | 177 | (321) | - | 18,120 | 2,610 | (9,563) | - | 8,557 | 2,610 |
| Subtotal | - | - | (413) | (21,295) | 523 | 170 | (9,486) | - | 123,208 | 19,734 | (55,385) | - | 67,823 | 19,734 |
| Grand Total | $- | - | $(413) | (21,295) | $25,518 | 170 | $(11,473) | - | $146,616 | 19,734 | $(55,385) | - | $91,231 | 19,734 |

## Note 8:  Analysis of Changes in Seized Property and Currency

Seized property and currency result primarily from enforcement activities. Seized property is not legally owned by the Fund until judicially or administratively forfeited.  Because of the fungible nature of currency and the high level of control necessary over these assets and the possibility that these monies may be returned to their owners in lieu of forfeiture, seized currency is reported as a custodial asset upon seizure.  Seized property other than currency is reported as a custodial asset upon forfeiture. The following schedule presents the changes in the seized property and currency balances from October 1, 2017 to September 30, 2018.  (Dollar value is in thousands)

| | 9/30/17 Financial Statement Balance | | Seizures | | Remissions | | Forfeitures | | Adjustments | | Value Changes | | 9/30/18 Financial Statement Balance | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Value | No. | Value | No. | Value | No. | Value | No. | Value | No. | Value | No | Value | No. |
| Currency | $1,516,467 | - | $1,288,943 | - | $(70,784) | - | $(1,020,421) | - | $(35,908) | - | $12 | - | $1,678,309 | - |
| Other Monetary Instruments | 12,567 | - | 4 | - | (4) | - | - | - | - | - | - | - | 12,567 | - |
| Subtotal | 1,529,034 | - | 1,288,947 | - | (70,788) | - | (1,020,421) | - | (35,908) | - | 12 | - | 1,690,876 | - |
| Real Property | 212,913 | 534 | 92,272 | 136 | (10,161) | (51) | (42,012) | (135) | 13,687 | 4 | (9,091) | - | 257,608 | 488 |
| General Property | 436,381 | 33,979 | 119,182 | 27,966 | (28,575) | (4,162) | (33,407) | (20,244) | (61,956) | (7,108) | (16,002) | - | 415,623 | 30,431 |
| Vessels | 6,412 | 117 | 2,799 | 155 | (269) | (12) | (792) | (106) | (1,712) | (24) | (52) | - | 6,386 | 130 |
| Aircraft | 15,130 | 26 | 6,518 | 29 | (2,301) | (4) | (1,840) | (8) | (3,327) | (8) | (449) | - | 13,731 | 35 |
| Vehicles | 44,342 | 4,227 | 89,091 | 12,571 | (54,020) | (3,978) | (27,047) | (7,691) | (2,763) | (180) | (2,479) | - | 47,124 | 4,949 |
| Subtotal | 715,178 | 38,883 | 309,862 | 40,857 | (95,326) | (8,207) | (105,098) | (28,184) | (56,071) | (7,316) | (28,073) | - | 740,472 | 36,033 |
| Grand Total | $2,244,212 | 38,883 | $1,598,809 | 40,857 | $(166,114) | (8,207) | $(1,125,519) | (28,184) | $(91,979) | (7,316) | (28,061) | - | $2,431,348 | 36,033 |

## Note 8:  Analysis of Changes in Seized Property and Currency

Seized property and currency result primarily from enforcement activities. Seized property is not legally owned by the Fund until judicially or administratively forfeited.  Because of the fungible nature of currency and the high level of control necessary over these assets and the possibility that these monies may be returned to their owners in lieu of forfeiture, seized currency is reported as a custodial asset upon seizure.  Seized property other than currency is reported as a custodial asset upon forfeiture. The following schedule presents the changes in the seized property and currency balances from October 1, 2016 to September 30, 2017.  (Dollar value is in thousands)

| | 9/30/16 Financial Statement Balance | | Seizures | | Remissions | | Forfeitures | | Adjustments | | Value Changes | | 9/30/17 Financial Statement Balance | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Value | No. | Value | No. | Value | No. | Value | No. | Value | No. | Value | No | Value | No. |
| Currency | $1,518,587 | - | $459,036 | - | $(165,398) | - | $(353,185) | - | $57,727 | - | $(300) | - | $1,516,467 | - |
| Other Monetary Instruments | 14,203 | - | 82 | - | (7) | - | (1,836) | - | 125 | - | - | - | 12,567 | - |
| Subtotal | 1,532,790 | - | 459,118 | - | (165,405) | - | (355,021) | - | 57,852 | - | (300) | - | 1,529,034 | - |
| Real Property | 222,587 | 572 | 41,186 | 115 | (14,271) | (41) | (34,376) | (132) | 6,247 | 20 | (8,460) | - | 212,913 | 534 |
| General Property | 272,833 | 29,455 | 210,312 | 30,103 | (26,081) | (3,738) | (14,352) | (21,574) | 3,985 | (267) | (10,316) | - | 436,381 | 33,979 |
| Vessels | 5,350 | 112 | 2,600 | 148 | (426) | (15) | (896) | (114) | (121) | (14) | (95) | - | 6,412 | 117 |
| Aircraft | 18,909 | 30 | 3,998 | 20 | (781) | (6) | (1,133) | (11) | (3,702) | (7) | (2,161) | - | 15,130 | 26 |
| Vehicles | 47,053 | 4,710 | 87,682 | 12,106 | (56,680) | (4,389) | (29,565) | (7,811) | (3,257) | (389) | (891) | - | 44,342 | 4,227 |
| Subtotal | 566,732 | 34,879 | 345,778 | 42,492 | (98,239) | (8,189) | (80,322) | (29,642) | 3,152 | (657) | (21,923) | - | 715,178 | 38,883 |
| Grand Total | $2,099,522 | 34,879 | $804,896 | 42,492 | $(263,644) | (8,189) | $(435,343) | (29,642) | $61,004 | (657) | (22,223) | - | $2,244,212 | 38,883 |

### Note 9:  Permanent Reduction/Transfer to the General Fund

The unobligated balance is usually available to cover costs related to seizures and forfeitures and certain other law enforcement activities.  The Consolidated Appropriations Act of 2018 permanently cancelled $1.1 billion. This permanent reduction or cancellation means that the amount will never be used for its intended purposes. The cancelled funds were transferred to the General Fund on June 1, 2018. In fiscal year 2017, the Consolidated Appropriations Act of 2017 permanently cancelled $314 million. The cancelled funds were transferred to the General Fund on May 25, 2017.

### Note 10:  Distributions Payable

Distributions Payable (state and local agencies and foreign governments) amounted to $43.1 million and $32.8 million as of September 30, 2018 and 2017, respectively.  Fund management recognizes as a liability a portion (based on the average of historical pay-out percentage) of the equitable sharing requests, that were approved or in final stages of approval on September 30, 2018 and 2017, respectively. Prior experience with the nature of this account indicated that a substantial portion of these requests were certain to be paid out by the Fund during the following fiscal year.

### Note 11:  Net Position

*Cumulative Results of Operations*

The following summarizes components of cumulative results of operations as of September 30, 2018 and 2017, respectively (dollars in thousands):

|                           | 2018        | 2017        |
|---------------------------|-------------|-------------|
| Retained Capital          | $  1,835,220 | $  2,158,651 |
| Unliquidated Obligations  | 412,978     | 431,793     |
| Net Results of Operations | (812,442)   | (342,246)   |
|                           | $  1,435,756 | $  2,248,198 |

*Unliquidated Obligations*

The following summarizes the components of unliquidated obligations as of September 30, 2018 and 2017 respectively (dollars in thousands):

|                   | 2018       | 2017       |
|-------------------|------------|------------|
| Equitable Sharing | $  259,984  | $  210,405  |
| Mandatory         | 152,994    | 221,388    |
|                   | $  412,978  | $  431,793  |

### Note 12:  Related Party Transactions

The Fund reimbursed agencies for the purchase of certain capital assets.  These assets are reported by the participating agencies in their financial statements.

## Note 13:  Strategic Support

31 USC 9705 (g)(4)(B) allows for the expenditure, without fiscal year limitation, after the reservation of amounts needed to continue operations of the Fund.  This "Strategic Support" balance may be used for law enforcement activities of any federal agency.

Amounts distributed to other federal agencies for law enforcement activities under "Strategic Support" requirements amounts to $47.1 million and $39.5 million in fiscal years 2018 and 2017, respectively.

The following summarizes Strategic Support payments, net of Transfers-In as of September 30, 2018 and 2017, respectively, (dollars in thousands):

|  | 2018 | 2017 |
|---|---|---|
| Transfers - Out | $ (49,500) | $ (39,537) |
| Transfers - In | 2,375 | 40 |
| Total | $ (47,125) | $ (39,497) |

## Note 14:  Secretary's Enforcement Fund

31 USC 9705(b)(5) is another category of permanent indefinite authority.  These funds are available to the Secretary, without further action by Congress and without fiscal year limitation, for federal law enforcement purposes of Treasury law enforcement organizations.  The source of Section 9705(b)(5) funds is equitable sharing payments received from the Department of Justice and the U.S. Postal Service (USPS) representing Treasury's share of forfeiture proceeds from Justice and USPS cases.

Amounts distributed for federal law enforcement purposes of Treasury law enforcement organizations amounted to $37.5 million and $5.9 million in fiscal years 2018 and 2017, respectively.

The following summarizes Secretary's Enforcement Fund payments, net of Transfers-In as of September 30, 2018 and 2017, respectively, (dollars in thousands):

|  | 2018 | 2017 |
|---|---|---|
| Transfers - Out | $ (38,564) | $ (7,015) |
| Transfers - In | 1,087 | 1,105 |
| Total | $ (37,477) | $ (5,910) |

## Note 15: Commitments and Contingencies

COMMITMENTS

The Fund is subject to equitable sharing claims from participating state and local law enforcement agencies.  A portion of these claims that were in final stages of approval have been recognized as liabilities as of September 30 (See Note 10).

In addition to the amounts estimated above, there are other amounts, which may ultimately be shared, that are not identified at this time.

CONTINGENCIES

As of September 30, 2018, the Fund had future expenditures of $434.6 million (see Note 17) for refunds and equitable sharing matters, which are reasonably estimable. The future expenditures are based upon the best estimate of costs to be incurred for refunds in light of the progress made by seizing agencies and the relevant United States Attorney's Offices in achieving a resolution to forfeitures. Additionally, part of the amount will soon be equitably shared with the Department of Justice pursuant to a long-standing memorandum of agreement.

In the opinion of the Fund management and legal counsel, there are no pending or threatened litigation claims for which the amount of potential loss, individually, or in aggregate, will have a material adverse effect on the Fund's financial statements.

**Note 16:  Disclosures Related to the Statements of Net Cost**

Gross costs and earned revenue related to Law Enforcement Programs administered by the Fund are presented in Treasury's budget functional classification (in thousands) as set out below:

|  | 2018 | 2017 |
|---|---|---|
| Gross Costs | $ 239,431 | $ 221,532 |
| Earned Revenues | - | - |
| Net Costs | $ 239,431 | $ 221,532 |

The Fund falls under the Treasury's budget functional classification related to Administration of Justice.

## Note 17:  Disclosures Related to the Statements of Budgetary Resources

The Fund's budgetary obligations are fully covered by cash on hand in the Fund and Entity Investments. The Fund does not have borrowing or contract authority and, therefore, has no repayment requirements, financing sources for repayment, or other terms of borrowing authority. There are no legal arrangements, outside of normal government wide restrictions, specifically affecting the Fund's use of unobligated balances of budget authority.

Adjustments to budgetary resources available at the beginning of fiscal years 2018 and 2017 consist of the following (in thousands):

|  | 2018 | 2017 |
|---|---|---|
| Recoveries of Prior Year Unpaid Obligations | $  16,163 | $  41,094 |
| Other Changes in Unobligated Balance | 770 | 528 |
| Total | $  16,933 | $  41,622 |

The Fund was required to change its methodology for recognizing remissions and equitable sharing obligations beginning in FY 2016.  Under the newly adopted method, an obligation for refunds or remissions will be created only upon receipt of a Ruling Letter from the Department of Justice for judicial forfeiture cases or from Fund member agencies for administrative forfeitures.  Additionally, obligations related to equitable sharing will be recognized upon TEOAF's approval of Fund member agencies' request for transfers and related distribution percentages and amounts on the Decision Form.  Consequently, the Fund has future expenditures and commitments from remissions and equitable sharing that will be funded from the September 30, 2018 unobligated balance.

The following shows anticipated reductions to the unobligated balances of budget authority resulting from these future expenditures and commitments for fiscal years 2018 and 2017.

The change in the methodology for recognizing remissions and equitable sharing obligations was accounted for as a change in accounting estimate on a prospective basis effective October 1, 2015 (See Note 15).

|  | 2018 | 2017 |
|---|---|---|
| Unobligated balance | $      825,173 | $      668,529 |
| Future expenditures (Note 15): |  |  |
|    Refund and remissions | (346,150) | (344,498) |
|    Equitable sharing | (88,409) | (60,283) |
| Total future expenditures | (434,559) | (404,781) |
| Commitments (Note 15) | - | (13,633) |
| Total reductions to unobligated balance | (434,559) | (418,414) |
| Unobligated balance net of future expenditures, and commitments | $      390,614 | $      250,115 |

## Note 18:  Dedicated Collections

The Fund is classified as a special fund.  All its activities are reported as dedicated collections held for later use.

**Note 19:  Payments in Lieu of Forfeiture, Net of Refunds**

The following summarizes Payments in Lieu of Forfeiture, Net of Refunds as of September 30, 2018 and 2017, respectively (dollars in thousands):

|  | 2018 | 2017 |
|---|---|---|
| Payments in Lieu of Forfeiture | $  10,769 | $  11,104 |
| Refunds | (779) | (2,264) |
| Total | $    9,990 | $    8,840 |

**Note 20:  Reconciliation of Net Cost of Operations (Proprietary) to Budget**

The reconciliation of Net Cost of Operations to Budget demonstrates the relationship between the Fund's proprietary (net cost of operations) and budgetary accounting (net obligations) information (in thousands).

|  | 2018 | 2017 |
|---|---|---|
| **Resources Used to Finance Activities:** | | |
| Budgetary resources obligated | | |
| Obligations incurred | $    1,007,425 | $    526,228 |
| Less: Spending authority from offsetting | | |
| Collections and recoveries | (16,933) | (41,622) |
| Net Obligations | 990,492 | 484,606 |
| Other resources | | |
| Transfers – out | (1,189,564) | (359,407) |
| **Total Resources Used to Finance Activities** | (199,072) | 125,199 |
| **Resources Used to Finance Items not Part of the Net Cost of Operations** | | |
| Change in budgetary resources obligated for goods, services and benefits ordered but not yet provided | 1,124,300 | 370,096 |
| Other resources or adjustments to net obligated resources that do not affect net cost of operations | | |
| Mortgages and claims | (2,956) | (2,450) |
| Refunds | (779) | (2,264) |
| Equitable Sharing (federal, state/local and foreign) | (157,299) | (191,854) |
| Victim restitution | (524,763) | (77,195) |
| **Total Resources Used to Finance Items not Part of the Net Cost of Operations** | 438,503 | 96,333 |
| **Total Resources Used to Finance the Net Cost of Operations** | 239,431 | 221,532 |
| **Net Cost of Operations** | $    239,431 | $    221,532 |

SECTION IV

REQUIRED SUPPLEMENTAL INFORMATION

(UNAUDITED)

THIS PAGE INTENTIONALLY LEFT BLANK

Intragovernmental Amounts – Assets (Dollars in thousands)

| | 2018 | | 2017 | |
|---|---|---|---|---|
| Partner Agency | Fund Balance with Treasury | Investments | Fund Balance with Treasury | Investments |
| Treasury Bureau of the Fiscal Service | $ 32,425 | $ - | $ 35,607 | $ - |
| | - | 2,574,872 | - | 3,124,344 |
| Totals | $ 32,425 | $ 2,574,872 | $ 35,607 | $ 3,124,344 |

Intragovernmental Amounts – Liabilities (Dollars in thousands)

| Partner Agency | 2018 Accounts Payable | | 2017 Accounts Payable | |
|---|---|---|---|---|
| Department of Justice | $ | 10,820 | $ | 6,309 |
| Department of Homeland Security | | 92,754 | | 59,921 |
| Departmental Offices | | 2,209 | | 2,888 |
| Treasury Office of the Inspector General | | 135 | | 131 |
| Tax and Trade | | 1,075 | | 348 |
| Treasury Franchise Fund | | - | | 90 |
| Internal Revenue Service | | 26,247 | | 18,095 |
| Totals | $ | 133,240 | $ | 87,782 |

Intragovernmental Amounts – Revenues and Costs (Dollars in thousands)

| | 2018 | | 2017 | |
|---|---|---|---|---|
| Budget Functions | Cost to Generate Exchange Intragovernmental Revenue | Costs to Generate Non-Exchange Intragovernmental Revenue | Cost to Generate Exchange Intragovernmental Revenue | Costs to Generate Non-Exchange Intragovernmental Revenue |
| Administration of Justice | $ - | $ 166,916 | $ - | $ 154,824 |

Intragovernmental Amounts – Non-exchange Revenue (Dollars in thousands):

| | | 2018 | | | 2017 | | |
|---|---|---|---|---|---|---|---|
| Partner Agency | | Transfers In | Transfers Out | Net Transfers In (Out) | Transfers In | Transfers Out | Net Transfers In (Out) |
| Department of Homeland Security | $ | 2,091 $ | (60,833) $ | (58,742) $ | 23 $ | (29,816) $ | (29,793) |
| Internal Revenue Service | | 493 | (26,231) | (25,738) | 1,121 | (16,513) | (15,392) |
| Financial Crimes Enforcement Network | | 90 | - | 90 | - | - | - |
| Tax and Trade | | 18 | (1,000) | (982) | - | (200) | (200) |
| Central Intelligence Agency | | 770 | - | 770 | - | - | - |
| Department of Defense | | - | - | - | - | (22) | (22) |
| General Fund | | - | (1,104,962) | (1,104,962) | - | (314,000) | (314,000) |
| | $ | 3,462 $ | (1,193,026) $ | (1,189,564) $ | 1,144 $ | (360,551) $ | (359,407) |

SECTION V

OTHER ACCOMPANYING INFORMATION

(UNAUDITED)

THIS PAGE INTENTIONALLY LEFT BLANK

**TREASURY FORFEITURE FUND**
**Equitable Sharing Summarized by State and U.S. Territories**
**For the Year Ended September 30, 2018**
**(Dollars in Thousands)**
**(Unaudited)**

| State/U.S. Territories | Currency Value | Property Value |
|---|---|---|
| Alabama | $ 229 | $ 24 |
| Alaska | 37 | - |
| Arizona | 215 | 407 |
| Arkansas | 76 | 51 |
| California | 53,304 | 62 |
| Colorado | 853 | 24 |
| Connecticut | 1060 | 53 |
| D.C. Washington | 8 | - |
| Delaware | 0 | - |
| Florida | 4,425 | 522 |
| Georgia | 2,657 | - |
| Guam | 349 | - |
| Hawaii | 30 | - |
| Idaho | 81 | - |
| Illinois | 6,864 | - |
| Indiana | 1,931 | - |
| Iowa | 17 | - |
| Kansas | 39 | 13 |
| Kentucky | 980 | - |
| Louisiana | 4 | 4 |
| Maine | 48 | - |
| Maryland | 1,790 | 26 |
| Massachusetts | 307 | 34 |
| Michigan | 141 | 234 |
| Minnesota | 30 | - |
| Mississippi | 730 | - |
| Missouri | 267 | 1 |
| Montana | 212 | - |
| Nebraska | 1,699 | - |
| Nevada | 402 | 1 |
| New Jersey | 929 | - |
| New Hampshire | 24 | - |
| New Mexico | - | - |
| New York | 27,137 | 231 |
| North Carolina | 2,235 | 2 |
| North Dakota | 113 | - |
| Ohio | 2,859 | 180 |
| Oklahoma | 363 | - |
| Oregon | 294 | - |
| Pennsylvania | 1,430 | 26 |
| Puerto Rico | 13 | 32 |
| Rhode Island | 39 | - |
| South Carolina | 259 | 124 |
| South Dakota | | 14 |
| Tennessee | 945 | 57 |
| Texas | 7,101 | 2,041 |
| Utah | 370 | - |
| *Subtotal carried forward* | $ 122,896 | $4,163 |

**TREASURY FORFEITURE FUND**
**Equitable Sharing Summarized by State and U.S. Territories**
**For the Year Ended September 30, 2018**
**(Dollars in Thousands)**
**(Unaudited)**

| State/U.S. Territories | Currency Value | Property Value |
|---|---|---|
| *Subtotal brought forward* | 122,896 | 4,163 |
| Vermont | - | - |
| Virgin Islands | - | - |
| Virginia | 183 | 123 |
| Washington | 445 | - |
| West Virginia | 190 | 182 |
| Wisconsin | 21 | 1 |
| Wyoming | 194 | - |
| Totals | $123,929 | $4,469 |

Summarized above are the currency and property values of assets forfeited and shared with state and local agencies and U.S. Territories participating in the seizure. This supplemental schedule is not a required part of the financial statement of the Department of the Treasury Forfeiture Fund. Information presented on this schedule represents assets physically transferred during the year and, therefore, does not agree with total assets shared with state and local agencies in the financial statements. In addition, the above numbers do not include the adjustment to present property distributed at net realizable value.

**TREASURY FORFEITURE FUND**
**Uncontested Seizures of Currency and Monetary Instruments Valued Over**
**$100 Thousand Taking More Than 120 Days from Seizure to Deposit in Fund**
**For the Year Ended September 30, 2018**
**(Dollars in Thousands)**

31 U.S.C. 9705(f)(2)(E) requires the Secretary of the Treasury to report annually to Congress uncontested seizures of currency or proceeds of monetary instruments over $100 thousand which were not deposited in the Department of the Treasury Forfeiture Fund within 120 days of the seizure date. There were 50 administrative seizures over $100 thousand over 120 days old totaling $21,173 that had not been transferred from the Seized Currency Suspense Account to the Treasury Forfeiture Fund as of the end of FY 2018.

**TREASURY FORFEITURE FUND**
**Analysis of Revenue and Expenses and Distributions**
**For the Year Ended September 30, 2018**
**(Dollars in Thousands)**

Revenue, Expenses and Distributions by Asset Category:

|  | Revenue | Expenses and Distributions |
|---|---|---|
| Vehicles | $   20,734 | $   167,134 |
| Vessels | 5,759 | 212,946 |
| Aircraft | 5,759 | 68,603 |
| General Property | 18,430 | 675,902 |
| Real Property | 64,504 | 26,474 |
| Currency and monetary instruments | 1,187,164 | 151,291 |
|  | 1,302,350 | 1,302,350 |
| Less: |  |  |
| Mortgages and claims | (2,956) | (2,956) |
| Refunds | (779) | (779) |
| Add: |  |  |
| Excess of net revenues and financing sources over total program expenses | - | - |
| Total | $1,298,615 | $ 1,298,615 |

Revenue, Transfers, Expenses and Distributions by Type of Disposition:

| | | |
|---|---|---|
| Sales of property and forfeited currency and monetary instruments | $   616,580 | $   247,448 |
| Reimbursed storage costs | 3,708 | 130,235 |
| Assets shared with state and local agencies | 137,873 | 137,873 |
| Assets shared with other federal agencies | 18,799 | 18,799 |
| Assets shared with foreign countries | 627 | 627 |
| Victim Restitution | 524,763 | 524,763 |
| Destructions | - | 156,282 |
| Pending disposition | - | 86,323 |
|  | 1,302,350 | 1,302,350 |
| Less: |  |  |
| Mortgages and claims | (2,956) | (2,956) |
| Refunds | (779) | (779) |
| Add: |  |  |
| Excess of net revenues and financing sources over total program expenses | - | - |
| Total | $ 1,298,615 | $ 1,298,615 |

The revenue amount of $1,298,615 is from the Statement of Changes in Net Position.  This supplemental schedule "Analysis of Revenues, Expenses and Distributions" is required under the Treasury Forfeiture Fund Act of 1992.

**TREASURY FORFEITURE FUND**
**Information Required by 31 U.S.C. 9705(f)**
**For the Year Ended September 30, 2018**
**(Dollars in Thousands)**

The Treasury Forfeiture Fund Act of 1992, 31 U.S.C. 9705(f), requires the Secretary of the Treasury to transmit to Congress, no later than February 1, of each year, certain information.   The following summarizes the required information.

(1)   A report on:

(A)   The estimated total value of property forfeited with respect to which funds were not deposited in the Department of the Treasury Forfeiture Fund during the preceding fiscal year under any law enforced or administered by the Department of the Treasury law enforcement organizations or the United States Coast Guard, in the case of fiscal years beginning after 1993.

**As reported in the audited financial statements, at September 30, 2018, the Fund had forfeited property held for sale of $78,263.   The realized proceeds will be deposited in the Fund when the property is sold.**

**Upon seizure, currency and other monetary instruments not needed for evidence in judicial proceedings are deposited in a Customs and Border Protection (CBP) suspense account. Upon forfeiture, it is transferred to the Treasury Forfeiture Fund.   At September 30, 2018, there was $46,734 of forfeited currency and other monetary instruments that had not yet been transferred to the Fund.   This is reported as a part of "Cash and Other Monetary Assets" in the audited financial statements.**

(B)   The estimated total value of all such property transferred to any state or local law enforcement agency.

**The estimated total value of all such property transferred to any state or local law enforcement bureau is summarized by state and U.S. territories.   Total currency transferred was $123,929 and total property transferred was $4,469 at appraised value.**

(2)   A report on:

(A)   The balance of the Fund at the beginning of the preceding fiscal year.

**The total net position of the Treasury Forfeiture Fund on September 30, 2017 which became the beginning balance for the Fund on October 1, 2017, as reported in the audited financial statements is $2,248,198.**

**TREASURY FORFEITURE FUND**
**Information Required by 31 U.S.C. 9705(f)**
**For the Year Ended September 30, 2018**
**(Dollars in Thousands)**

(B) Liens and mortgages paid and the amount of money shared with federal, state, local and foreign law enforcement bureaus during the preceding fiscal year.

**Mortgages and claims expense, as reported in the audited financial statements, was $2,956. The amount actually paid on a cash basis was not materially different.**

**The amount of forfeited currency and property shared with federal, and distributed to state, local and foreign law enforcement bureaus as reported in the audited financial statements was as follows:**

|  | Amount |
|---|---|
| State and local | $137,873 |
| Foreign countries | 627 |
| Other federal agencies | 18,799 |
| Victim restitution | 524,763 |

(C) The net amount realized from the operations of the Fund during the preceding fiscal year, the amount of seized cash being held as evidence, and the amount of money that has been carried over into the current fiscal year.

**The net cost of operations of the Fund as shown in the audited financial statements is $239,431.**

**The amount of seized currency not on deposit in the Fund's suspense account at September 30, 2018, was $656,742. This amount includes some funds in the process of being deposited at year-end, cash seized in August or September 2018 that is pending determination of its evidentiary value from the U.S. Attorney, and the currency seized for forfeiture being held as evidence.**

**On a budgetary basis, unobligated balances as originally reported on the Office of Management and Budget Reports, SF-133, "Report on Budget Execution" was approximately $825,173 for fiscal year 2018. This excluded $149,613 in FY 2018 rescinded authority that was classified as "temporary". If these figures are added to the unobligated balances at the end of FY 2018, the figure became $974,786.**

TREASURY FORFEITURE FUND
Information Required by 31 U.S.C. 9705(f)
For the Year Ended September 30, 2018
(Dollars in Thousands)

(D) Any defendant's property not forfeited at the end of the preceding fiscal year, if the equity in such property is valued at $1 million or more.

The total approximate value of such property for the Treasury Forfeiture Fund, at estimated values determined by bureau and contractor's officials, and the number of seizures is as follows:

| Bureau | Amount | Number |
|--------|--------|--------|
| CBP | $ 206,754 | 65 seizures |
| IRS | 1,015,590 | 142 seizures |
| U.S. Secret Service | 40,393 | 15 seizures |

(E) The total dollar value of uncontested seizures of monetary instruments having a value of over $100 thousand which, or the proceeds of which, have not been deposited into the Fund within 120 days after the seizure, as of the end of the preceding fiscal year.

The total dollar value of such seizures is $21,173. This is also documented on page 49.

(F) The balance of the Fund at the end of the current fiscal year.

The total net position of the Fund at September 30, 2018, as reported in the audited financial statements is $1,435,756.

(G) The net amount, if any, of the excess unobligated amounts remaining in the Fund at the end of the preceding fiscal year and available to the Secretary for Federal law enforcement related purposes.

There is no cap on amounts that can be carried forward into Fiscal Year 2018 per the fiscal year 1997 Omnibus Appropriations Act (PL 104-208).

(H) A complete set of audited financial statements prepared in a manner consistent with the requirements of the Chief Financial Officers Act of 1990.

The audited financial statements, including the Independent Auditor's Report, are found in Sections II and III.

(I) An analysis of income and expense showing revenue received or lost: (i) by property category (such as general property, vehicles, vessels, aircraft, cash, and real property); and (ii) by type of disposition (such as sale, remission, cancellation, placement into official use, sharing with state and local agencies, and destruction).

A separate schedule is presented on page 50.



**REPORT WASTE, FRAUD, AND ABUSE**

**Treasury OIG Hotline: 1-800-359-3898**
Hotline@oig.treas.gov

**Gulf Coast Restoration Hotline: 1-855-584.GULF (4853)**
gulfcoastrestorationhotline@oig.treas.gov

Access Treasury OIG reports and other information online:
www.treasury.gov/about/organizational-structure/ig

# EXHIBIT 30

**DEPARTMENT OF THE TREASURY**
**WASHINGTON, D.C.**

**ASSISTANT SECRETARY**

February 15, 2019

The Honorable Mike Quigley
Chairman
  Subcommittee on Financial Services
  and General Government
Committee on Appropriations
U.S. House of Representatives
Washington, D.C. 20515

The Honorable John Kennedy
Chairman
  Subcommittee on Financial Services
  and General Government
Committee on Appropriations
United States Senate
Washington, D.C. 20510

The Honorable Tom Graves
Ranking Member
  Subcommittee on Financial Services
  and General Government
Committee on Appropriations
U.S. House of Representatives
Washington, D.C. 20515

The Honorable Christopher A. Coons
Ranking Member
  Subcommittee on Financial Services
  and General Government
Committee on Appropriations
United States Senate
Washington, D.C. 20510

Dear Chairman Quigley, Chairman Kennedy, Ranking Member Graves, and Ranking Member Coons:

Enclosed is the Department of the Treasury's Strategic Support spending proposal for Fiscal Year 2019. The Strategic Support program is authorized by 31 U.S.C. § 9705(g)(4)(B) and is available to the Secretary of the Treasury for the law enforcement activities of any federal agency. This plan provides up to $601 million requested by the Department of Homeland Security to support law enforcement border security efforts conducted by U.S. Customs and Border Protection. These funds will be available in two tranches. The first tranche of up to $242 million will be available for obligation 15 days after this letter is submitted. The second tranche of $359 million will be available for obligation after that date subject to the receipt of additional anticipated forfeitures.

If you have any questions or need additional information, please contact the Office of Legislative Affairs at (202) 622-1900.

Sincerely,

David F. Eisner
Assistant Secretary for Management

Enclosure

**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C.

**ASSISTANT SECRETARY**

February 15, 2019

The Honorable Nita M. Lowey
Chairwoman
Committee on Appropriations
U.S. House of Representatives
Washington, DC 20515

The Honorable Richard Shelby
Chairman
Committee on Appropriations
United States Senate
Washington, DC 20510

The Honorable Kay Granger
Ranking Member
Committee on Appropriations
U.S. House of Representatives
Washington, DC 20515

The Honorable Patrick Leahy
Vice Chairman
Committee on Appropriations
United States Senate
Washington, DC 20510

Dear Chairwoman Lowey, Chairman Shelby, Ranking Member Granger, and Vice Chairman Leahy:

Enclosed is the Department of the Treasury's Strategic Support spending proposal for Fiscal Year 2019. The Strategic Support program is authorized by 31 U.S.C. § 9705(g)(4)(B) and is available to the Secretary of the Treasury for the law enforcement activities of any federal agency. This plan provides up to $601 million requested by the Department of Homeland Security to support law enforcement border security efforts conducted by U.S. Customs and Border Protection. These funds will be available in two tranches. The first tranche of up to $242 million will be available for obligation 15 days after this letter is submitted. The second tranche of $359 million will be available for obligation after that date subject to the receipt of additional anticipated forfeitures.

If you have any questions or need additional information, please contact the Office of Legislative Affairs at (202) 622-1900.

Sincerely,

David F. Eisner
Assistant Secretary for Management

Enclosure

**TREASURY FORFEITURE FUND**
**FY2019 STRATEGIC SUPPORT FUNDING**
**(In Millions)**

| Agency | Proposed Amount | |
|---|---|---|
| CBP | Tranche 1 | 242.000 |
| | Tranche 2 | 359.000 |
| Total | | 601.000 |

| EXPENSE CATEGORIES | FY19 Proposed Amount | DESCRIPTIONS/COMMENTS |
|---|---|---|
| **STRATEGIC SUPPORT FUND (SS)** | | |
| U.S. Border Patrol - Border Security Efforts | 601.000 | CBP has been working in partnership with the United States Army Corps of Engineers (USACE) to implement Border Security and Immigration Enforcement Improvements.  These funds will be used to enhance border security infrastructure and operations in support of CBP law enforcement efforts.   The efforts include the plan, design, and construction of a physical structure, using appropriate materials and technology to most effectively achieve complete operational control of the southern border.  Funding will be made available in two tranches.  The first tranche of up to $242 million will be available for obligation 15 days after this letter is submitted.  The second tranche of $359 million will be available for obligation  after that date subject to the receipt of additional anticipated forfeitures. |
| **SRATEGIC SUPPORT TOTALS** | **601.000** | |

# EXHIBIT 31

**Sequencing of Border Barrier Construction Authorities**
**March 4, 2019**

**Topline**

- The Administration is pursuing a strategic and phased approach to border wall construction in fiscal year 2019, using various authorities and funding sources as necessary and as they become available. All decisions about border wall construction will be based upon the core national security interests of the United States, consistent with duly-passed Congressional law.

- Generally speaking, the approach is calibrated based on the ability of the U.S. Army Corps of Engineers (USACE) to obligate funds, execute contracts, and initiate construction.

- Three funding sources will be executed in phase 1 (DHS appropriations, Treasury Forfeiture Fund, and the Drug Interdiction and Counter-Drug Activities, Defense appropriation using Section 284 authority), which has already begun.

- As progress is being made, phase 2 will then include additional tranches of funding under two of those funding sources (Treasury Forfeiture Fund, Drug Interdiction and Counter-Drug Activities).  These tranches would move forward in May.

- Lastly, phase 3 will include military construction funds authorized by the declaration of national emergency (10 U.S.C. § 2808).  The Acting Secretary of Defense will review what military construction is necessary to support the use of armed forces in connection with the national emergency.  We anticipate specific projects and determinations to be highlighted in the coming months, although the precise timeline will depend upon USACE's progress in executing on the first phases and the operational needs at the border.

**In Depth:**

- The Department of Homeland Security (DHS) and the Department of Defense (DOD) will consider and use multiple authorities in a sequential manner, as needed, to support the construction of a border barrier.

  – DHS expects to execute its authorities in the following sequence (note: not all Treasury Forfeiture funds may be exhausted prior to moving to use of DHS appropriations):

    ▪ DHS will use approximately $601 million from the Treasury Forfeiture Fund to fund border barrier projects using the authority provided by Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended (IIRIRA), 8 U.S.C. 1103 note.

    ▪ DHS will use $1.3 billion appropriated in the Homeland Security Appropriations Act, 2019, to fund border barrier projects using the authority provided by Section 102 of IIRIRA.

  – DOD expects to decide whether to exercise its authorities in the following sequence:

    ▪ DOD is now reviewing the February 25, 2019, DHS request for assistance under **Section 284** of Title 10, U.S. Code.  Upon approval of that request, DOD would begin the process of transferring funds into and then obligating up to $2.5 billion from the Drug Interdiction and Counter-Drug Activities, Defense, account to assist DHS with

the construction of fences and roads and the installation of lighting, as authorized by 10 U.S.C. § 284 – Support for counterdrug activities.  As noted above, Section 284 transfers will take place in increments.

- After DOD decides whether to approve DHS's request for assistance under Section 284, DOD will consider whether additional projects are necessary to support the use of the armed forces in connection with the national emergency declared by the President.  Upon determining that such additional projects are necessary, DOD would begin the process of notifying Congress of construction projects that would be undertaken and obligating up to $3.6 billion of unobligated military construction funds to undertake military construction using the authority provided by **10 U.S.C. 2808** – Construction authority in the event of a national emergency.

- Note:  The timing of DOD's decision whether to approve support to DHS under Section 284 is independent of when DHS executes its barrier construction authorities.  DOD's decision whether to exercise its authority under Section 2808 will occur after the decision to approve projects under Section 284, but could occur before the obligation of funds/award of contracts for projects carried out under other authorities, including Section 284.

- **The Fiscal Year (FY) 2019 Appropriation for DHS** provides $1.375 billion for 55 miles of primary pedestrian fencing. The funding will support construction in the Rio Grande Valley (RGV), U.S. Border Patrol's highest operational priorities, 1 and 2, as outlined in the Border Security Improvement Plan (BSIP).

  - The FY 2019 DHS Appropriation bill included language that restricts the use of DHS funds for construction within multiple wildlife refuges and historical parks, and also restricts border wall construction using such funds to operationally effective designs deployed as of the date of the FY 2017 Consolidated Appropriations Act. U.S. Customs and Border Protection (CBP) will also apply those restrictions while executing the TFF monies.

- DHS and CBP will also be utilizing funding from the **Treasury Forfeiture Fund (TFF)**. Congress has been notified of a $601 million transfer from Treasury Strategic Support Program to DHS/CBP. The funds will be provided in two tranches:

  - Tranche 1 = $242 million. The funding will be available for obligation 15 days after submission of the Congressional notification (March 2, 2019).

  - Tranche 2 = $359 million. The funding will be available for obligation after the receipt of additional anticipated forfeitures. Timing for receipt of Tranche 2 is unknown at this time.

  - The $601 million of TFF funding will support construction of approximately 26 miles in the Rio Grande Valley in BSIP priorities 2 and 3.

- **10 U.S.C. 284** authorizes DOD to support counterdrug activities of Federal law enforcement agencies through the construction of roads and fences, and the installation of lighting, to block drug-smuggling corridors across international boundaries of the United States.  Such support is funded using DOD's Drug Interdiction and Counter-Drug Activities, Defense, appropriation.

  - Upon approval of a Request for Assistance (RFA) from DHS (received February 25, 2019), DOD will use $500,000 of existing that will transfer from the counter-narcotics support line

of the Drug Interdiction and Counter-Drug Activities, Defense, account to the Operation and Maintenance, Army, account for use by the U.S. Army Corps of Engineers to conduct planning and surveys.  This transfer uses internal DOD reprogramming procedures.

– Thereafter, DOD will transfer necessary funds into the Drug Interdiction and Counter-Drug Activities, Defense, account in two tranches:

– $1 billion for construction efforts is projected to be transferred into the DOD counter-drug account in mid-March, 2019.

– Up to $1.5 billion for additional construction efforts is projected to be transferred into the DOD counter-drug account in late May 2019.

– **DOD Sources:**  Currently, for the first $1 billion, DOD plans to use funds that have been identified as excess to need as part of DOD's ongoing current year execution reviews, such as under-execution in military personnel accounts resulting from lower than expected military end-strength.  DOD will seek to minimize effects on readiness in transferring these funds.

– **Congressional Notifications/Engagements:**  DOD will notify the Congress promptly of the transfer of funds into the Drug Interdiction and Counter-Drug Activities, Defense, appropriation, as required by Section 8005 of the Department of Defense Appropriations Act, 2019.  The first notification is projected to occur in mid-March 2019, and the second notification is projected to occur in late May 2019.

- **10 U.S.C. § 2808** authorizes the Secretary of Defense to undertake military construction projects, not otherwise authorized by law, that are necessary to support the use of the armed forces in connection with a national emergency declared by the President that requires use of the armed forces.

– The Acting Secretary of Defense is considering whether and how to use the authority provided by Section 2808.  To inform his determination and in light of DHS's expertise in border security, the Acting Secretary of Defense asked DHS to provide a list of proposed border barrier construction projects that DHS considers to be most effective in improving the effectiveness and efficiency of DOD personnel supporting CBP, along with analyses supporting this proposal.  Once received, the Acting Secretary will use this information, independent advice from the Chairman of the Joint Chiefs of Staff, input from the DOD Comptroller, and information regarding barrier construction projects approved pursuant to other authorities, outlined above, to inform his final decision.

– In support of the Acting Secretary of Defense's consideration of Section 2808, the Department is currently conducting a deliberate process to identify military construction projects that could be deferred and used as funding sources (up to $3.6 billion), if necessary, for projects to support the use of the armed forces in connection with the national emergency. The Department is considering:

  ▪ Projects not yet awarded that could potentially be deferred.

  ▪ Projects that are scheduled to be awarded later in FY 2019 or beyond.

  ▪ Projects that pose minimal operational or readiness risks if delayed.

– Family housing projects are not being considered as funding sources.

– DOD has not yet decided to slow down or withhold construction contract awards for funded DOD military construction projects.

– **Congressional Notifications/Engagements:**  Should the Acting Secretary of Defense determine that military construction is necessary to support the use of armed forces in connection with the national emergency, DOD will provide Congress information regarding projects that will be delayed.  Furthermore, as required by Section 2808, DOD will provide the appropriate committees of Congress with written notice of any decision to undertake military construction projects pursuant to Section 2808.

– No DOD military construction projects will be cancelled.  DOD will request funding in the Fiscal Year 2020 budget to replenish funds for military construction projects that will be delayed to support this use of Section 2808 authority.

# EXHIBIT 32

*Unclassified*       **REPROGRAMMING ACTION**       Page 1 of 3

| Subject: Support for DHS Counter-Drug Activity Reprogramming Action | | | | | | DoD Serial Number: FY 19-01 RA | |
|---|---|---|---|---|---|---|---|
| Appropriation Title: Various Appropriations | | | | | | | |
| | | | | | | Includes Transfer? Yes | |

| Component Serial Number: | *(Amounts in Thousands of Dollars)* | | | | | | |
|---|---|---|---|---|---|---|---|
| | Program Base Reflecting Congressional Action | | Program Previously Approved by Sec Def | | Reprogramming Action | | Revised Program |
| Line Item | Quantity | Amount | Quantity | Amount | Quantity | Amount | Quantity | Amount |
| a | b | c | d | e | f | g | h | i |

This reprogramming action is submitted because this action uses general transfer authority. This reprogramming action provides funding in support of higher priority items, based on unforeseen military requirements, than those for which originally appropriated; and is determined to be necessary in the national interest. It meets all administrative and legal requirements, and none of the items has previously been denied by the Congress.

This reprogramming action transfers $1,000.000 million from the Military Personnel, Army, 19/19, and Reserve Personnel, Army, 19/19, appropriations to the Drug Interdiction and Counter-Drug Activities, Defense, 19/19, appropriation. This reprogramming action uses $1,000.000 million of general transfer authority pursuant to section 8005 of division A of Public Law 115-245, the Department of Defense (DoD) Appropriations Act, 2019; and section 1001 of Public Law 115-232, the John S. McCain National Defense Authorization Act for Fiscal Year (FY) 2019.

**FY 2019 REPROGRAMMING INCREASE:**       **+1,000,000**

**Drug Interdiction and Counter-Drug Activities, Defense, 19/19**       **+1,000,000**

Budget Activity 01: Counter-Narcotics Support

      238,306       238,306       **+1,000,000**       1,238,306

Explanation: Funds are required to provide support for counter-drug activities of the Department of Homeland Security (DHS). DHS has identified areas along the southern border of the United States that are being used by individuals, groups, and transnational criminal organizations as drug smuggling corridors, and determined that the construction of additional physical barriers and roads in the vicinity of the United States border is necessary in order to impede and deny drug smuggling activities. DHS requests DoD assistance in the execution of projects to replace existing vehicle barriers or dilapidated pedestrian fencing with new pedestrian fencing, construct roads, and install lighting. Title 10, U.S.Code, Section 284(b)(7) authorizes the DoD to support counterdrug activities of other Federal agencies through the construction of roads and fences, and the installation of lighting, to block drug smuggling corridors across international boundaries of the United States. Such support is funded using DoD's Drug Interdiction and Counter-Drug Activities appropriation. This is a base budget requirement.

Approved (Signature and Date)

*Elain McCustN*       3/25/19

**DD 1415-1**       ***UNCLASSIFIED***

| *Unclassified* | REPRODUCTION ACTION | Page 2 of 3 |

**Unclassified**      **REPROGRAMMING ACTION**      Page 2 of 3

| Subject: Support for DHS Counter-Drug Activity Reprogramming Action | DoD Serial Number: FY 19-01 RA |
|---|---|
| Appropriation Title: Various Appropriations | Includes Transfer? Yes |

| Component Serial Number: | *(Amounts in Thousands of Dollars)* | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Program Base Reflecting Congressional Action | | Program Previously Approved by Sec Def | | Reprogramming Action | | Revised Program | |
| Line Item | Quantity | Amount | Quantity | Amount | Quantity | Amount | Quantity | Amount |
| a | b | c | d | e | f | g | h | i |

**FY 2019 REPROGRAMMING DECREASES:**        **-1,000,000**

**Military Personnel, Army, 19/19**        **-993,627**

Budget Activity 01:  Pay and Allowances of Officers

         14,000,263          14,000,263         **-56,440**          13,943,823

Explanation:  Funds are available due to lower than expected Thrift Savings Plan (TSP) automatic and matching contributions ($-38.9 million) and Continuation Pay (CP) ($-17.5 million) for military members enrolled in the new Blended Retirement System (BRS) as a result of fewer than planned opt-ins from the legacy retirement system.  This is base budget funding.

Budget Activity 02:  Pay and Allowances of Enlisted

         27,151,209          27,151,209        **-754,212**          26,396,997

Explanation:  Funds are available due to a 9,500 Soldier reduction to Army's overall end strength target (478,000 vice 487,500) as Army refocuses on smart, modest annual growth without compromising quality in a highly challenging recruiting and retention market.  Funds are available from the following programs stemming from strength reductions and rate-driven adjustments observed in execution to date.  This is base budget funding.
- $325.9 million in basic pay, primarily driven by the decrease in projected average strength
- $135.1 million in retired pay accrual, primarily driven by the decrease in projected average strength
- $15.9 million in clothing allowances, stemming from reduced requirements for non-accession related uniform purchases
- $13.3 million in incentive pays and family separation allowances, reflecting current base budget execution trends showing a shift toward higher Overseas Contingency Operations execution
- $141.3 million in separation payments, driven by nearly 10 thousand fewer projected separations than seen in fiscal year 2018, fewer Soldiers eligible for disability separation in the Integrated Disability Evaluation System, and fewer projected involuntary separations
- $29.0 million in social security tax employer contributions, primarily driven by the decrease in projected average strength
- $27.6 million in enlistment and reenlistment incentives, due to projections for fewer recruitment contracts with bonus options compared to prior year execution and a smaller than expected cohort eligible for reenlistment
- $66.1 million due to lower than expected Thrift Savings Plan (TSP) automatic and matching contributions ($-41.4 million) and Continuation Pay (CP) ($-24.7 million) for military members enrolled in the new Blended Retirement System (BRS) as a result of fewer than planned opt-ins from the legacy retirement system

| *Unclassified* | **REPROGRAMMING ACTION** | Page 3 of 3 |

| Subject: Support for DHS Counter-Drug Activity Reprogramming Action | DoD Serial Number: FY 19-01 RA |
| Appropriation Title: Various Appropriations | |
| | Includes Transfer? Yes |

| Component Serial Number: | *(Amounts in Thousands of Dollars)* | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Program Base Reflecting Congressional Action | | Program Previously Approved by Sec Def | | Reprogramming Action | | Revised Program | |
| Line Item | Quantity | Amount | Quantity | Amount | Quantity | Amount | Quantity | Amount |
| a | b | c | d | e | f | g | h | i |

Budget Activity 04:  Subsistence of Enlisted Personnel
|  | | 2,269,930 | | 2,269,930 | | **-57,420** | | 2,212,510 |

Explanation:  Funds are available due to a decrease in projected average enlisted strength, lower than budgeted rate increases (no inflation in 2019 vice 3.4% budgeted), and a slight increase in the amount of realized collections for members subsisting in Army dining facilities.  This is base budget funding.

Budget Activity 05:  Permanent Change of Station Travel
|  | | 1,785,401 | | 1,785,401 | | **-115,726** | | 1,669,675 |

Explanation:  Funds are available due to lower than budgeted rates of execution that have been realized in recent move expenditures.  This is base budget funding.  Specifically:
- $36.9 million is available in accession moves
- $26.1 million is available in rotational moves
- $52.7 million is available in separation moves

Budget Activity 06:  Other Military Personnel Costs
|  | | 317,883 | | 317,883 | | **-9,829** | | 308,054 |

Explanation:  Funds are available due to a lower-than-projected number of former soldiers receiving unemployment compensation payments.  This is base budget funding.

**Reserve Personnel, Army, 19/19**      **-6,373**
Budget Activity 01:  Reserve Component Training and Support
|  | | 4,874,662 | | 4,871,312 | | **-6,373** | | 4,864,939 |

Explanation:  Funds are available due to lower than expected Thrift Savings Plan (TSP) automatic and matching contributions for military members enrolled in the new Blended Retirement System (BRS) as a result of fewer than planned opt-ins from the legacy retirement system.  This is base budget funding.

# EXHIBIT 33



*Executive Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528

February 25, 2019

| | |
|---|---|
| MEMORANDUM FOR: | CAPT Hallock N. Mohler Jr.<br>Executive Secretary<br>Department of Defense (DoD) |
| FROM: | Christina Bobb<br>Executive Secretary<br>Department of Homeland Security (DHS) |
| SUBJECT: | Request for Assistance Pursuant to 10 U.S.C. § 284 |

## I. Overview

As the government department tasked with border security, the Department of Homeland Security (DHS), through U.S. Customs and Border Protection (CBP), is requesting that the Department of Defense assist DHS in its efforts to secure the southern border. The Secretary has directed me to transmit this request for assistance to your attention. This memorandum supersedes the February 22, 2019 version.

In Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended (IIRIRA), 8 U.S.C. § 1103 note, Congress has directed DHS to construct border infrastructure in areas of high illegal entry to deter illegal crossing of both drugs and people into the United States. Pursuant to Section 102, DHS has identified the areas set forth in Section II below as areas of high illegal entry where CBP must take action (the Project Areas).

Within the Project Areas, DHS is experiencing large numbers of individuals and narcotics being smuggled into the country illegally. The Project Areas are also used by individuals, groups, and transnational criminal organizations as drug smuggling corridors. Mexican Cartels continue to remain dominant in these areas, influencing and controlling narcotics and human smuggling operations, within their respective strongholds.

DHS must use its authority under Section 102 of IIRIRA to install additional physical barriers and roads in the vicinity of the United States border in order to deter and prevent illegal crossings within the Project Areas. The construction of border infrastructure within the Project Areas will support DHS's ability to impede and deny illegal entry and drug smuggling activities within the Project Areas.

Subject: Request for Assistance Pursuant to 10 U.S.C. § 284
Page 2

The Project Areas identified are adjacent to some of the most densely populated
metropolitan areas of Mexico and are also home to some of the strongest and most
violent drug cartels in the world. Deterring and preventing illegal cross-border activity
will help stem the flow of illegal narcotics and entries in these areas. Similarly, the
improved ability to impede, deny, and be mobile within the Project Areas creates a safer
operational environment for law enforcement.

To support DHS's action under Section 102 of IIRIRA, DHS is requesting that DoD,
pursuant to its authority under 10 U.S.C. § 284(b)(7), assist with the construction of
fences roads, and lighting within the Project Areas to block drug-smuggling corridors
across the international boundary between the United States and Mexico.

## II. Capabilities Requested

Within the Project Areas there is existing vehicle fence and dilapidated pedestrian
fencing. Vehicle fencing is intended to stop vehicles from illegally entering the United
States, but can be climbed over or under by individuals. Pedestrian fencing is intended to
prevent and deter individuals and vehicles from illegally crossing into the United States.

DHS requests that DoD assist in the execution of projects, within the Project Areas set
forth below, to: (1) replace existing vehicle barriers or dilapidated pedestrian fencing
with new pedestrian fencing; (2) construct roads; and (3) install lighting.

The new pedestrian fencing includes a Linear Ground Detection System, which is
intended to, among other functions, alert Border Patrol agents when individuals attempt
to damage, destroy or otherwise harm the barrier. The road construction includes the
construction of new roads and the improvement of existing roads. The lighting that is
requested has an imbedded camera that works in conjunction with the pedestrian fence.
The lighting must be supported by grid power.

The segments of fence within the Project Areas identified below are situated on federal
property. DHS will be responsible for securing, to the extent required, any other real
estate interest or instrument that is required for project execution. In the event a real
estate interest or instrument that is needed for project execution cannot be obtained for a
segment of fence within a Project Area in a time frame that is within the requirements of
this request for assistance, the segment may be withdrawn from this request. In addition,
DHS will be responsible for any applicable environmental planning and compliance to
include stakeholder outreach and consultation associated with the projects.

Subject:  Request for Assistance Pursuant to 10 U.S.C. § 284
Page 3

**Project Areas:**

**II.A.  El Centro Sector**

Within the United States Border Patrol El Centro Sector (El Centro Sector) DHS is
requesting that DoD assist by undertaking road construction, by replacing approximately
15 miles of existing vehicle barrier with new pedestrian fencing, and by installing
lighting in the specific locations identified below.

The specific Project Area identified below is located in Imperial County, California and
has been identified by the Office of National Drug Control Policy (ONDCP) as a High
Intensity Drug Trafficking Area (HIDTA).  Multiple local transnational criminal
organizations known for smuggling drugs into Calexico from Mexico using a variety of
tactics, techniques, procedures, and varying concealment methods operate in this area,
including *Cartel De Jalisco Nueva Generación* (CJNG) as well as remnants of the
*Beltran Leyva* Organization and *La Familia Michoacana* organizations.  CJNG, based in
Jalisco, was previously a faction of the *Sinaloa* Cartel. CJNG broke away from the
*Sinaloa* Cartel and has become an established Mexican Cartel.  The Mexican government
has declared CJNG as one of the most dangerous cartels in the country.

Due to the close proximity of urban areas on both sides of the border, the El Centro
Sector suffers from some of the quickest vanishing times – that is, the time it takes to
illegally cross into the United States and assimilate into local, legitimate traffic.  These
quick vanishing times enable the illegal activities of transnational criminal organizations,
whether they are smuggling people or narcotics.

Border Patrol's own experience with apprehensions between border crossings bears this
out.  In fiscal year 2018, there were over 29,000 apprehensions of illegal entrants
attempting to enter the United States between border crossings in the El Centro Sector.
Also in fiscal year 2018, Border Patrol had approximately 200 separate drug-related
events between border crossings in the El Centro Sector, through which it seized over
620 pounds of marijuana, over 165 pounds of cocaine, over 56 pounds of heroin, and
over 1,600 pounds of methamphetamine.

The specific Project Area is as follows:

- *El Centro Project 1:*

    o The project begins approximately 10 miles west of the Calexico Port of
      Entry continuing west 15.25 miles in Imperial County.
    o Start coordinate: 32.63273, -115.922787; End coordinate: 32.652563,
      -115.662399

Subject:  Request for Assistance Pursuant to 10 U.S.C. § 284
Page 4

## II.B.  Yuma Sector

Within the United States Border Patrol Yuma Sector (Yuma Sector) DHS is requesting that DoD assist by undertaking road construction, by replacing approximately 36 miles of existing vehicle barrier and approximately 6 miles of dilapidated pedestrian fencing with new pedestrian fencing, and by installing lighting in the specific locations identified below.  The specific areas identified below are located in Yuma County, Arizona.

Yuma County has been identified by the ONDCP as a HIDTA.  Of particular note is the operation of the *Sinaloa* Cartel in this area.  The *Sinaloa* Cartel continues to be the most powerful cartel in the country and controls illicit networks and operations in the United States. Despite the arrest of Joaquin "El Chapo" Guzman-Loera, its narcotics business has continued uninterrupted.  As a result, there have been no significant changes within the *Sinaloa* Cartel's hierarchy, or any changes in the illicit operations conducted by the *Sinaloa* Cartel.

Border Patrol's own experience with apprehensions between border crossings bears this out.  In fiscal year 2018, there were over 26,000 apprehensions of illegal entrants attempting to enter the United States between border crossings in the Yuma Sector. Also during fiscal year 2018, Border Patrol had over 1,400 separate drug-related events between border crossings in the Yuma Sector, through which it seized over 8,000 pounds of marijuana, over 78 pounds of cocaine, over 102 pounds of heroin, over 1,700 pounds of methamphetamine, and over 6 pounds of fentanyl.

The replacement of ineffective pedestrian fencing in this area is necessary because the older, wire mesh design is easily breached and has been damaged to the extent that it is ineffective.  Additionally, this area is notorious for border violence and narcotics smuggling.  Furthermore, while the deployment of vehicle barrier in the Yuma Sector initially curtailed the volume of illegal cross-border vehicular traffic, transnational criminal organizations quickly adapted their tactics switching to foot traffic, cutting the barrier, or simply driving over it to smuggle their illicit cargo into the United States. Thus, in order to respond to these changes in tactics, DHS now requires pedestrian fencing.

The specific Project Areas are as follows:

- *Yuma Project 1:*

  o The project begins approximately 1 mile southeast of the Andrade Port of Entry continuing along the Colorado River for approximately 5 miles in Yuma County.
  o Start coordinate: 32.704197, -114.726013; End coordinate: 32.642102, -114.764632)

Subject:  Request for Assistance Pursuant to 10 U.S.C. § 284
Page 5

- *Yuma Project 2:*

  o The project involves the replacement of two segments of primary
    pedestrian fencing in Yuma Sector for a total of approximately 6 miles.
    This includes approximately 2 miles of fencing along the Colorado River.
  o Start coordinate: 32.37755528, -114.4268201; End coordinate:
    32.3579244, -114.3623999;
  o The project also includes replacement of primary pedestrian fencing
    approximately 17 miles east of the San Luis Port of Entry, on the
    Barry M Goldwater Range, continuing east for approximately 4 miles.
  o Start coordinate: 32.51419938, -114.8011175; End coordinate:
    32.49350559, -114.8116619

- *Yuma Project 3:*

  o The project begins approximately 0.4 miles east of the
    Barry M. Goldwater Range continuing approximately 31 miles east
    through the Cabeza Prieta National Wildlife Refuge in Yuma County.
  o Start coordinate: 32.232935, -113.955211; End coordinate: 32.039033,
    -113.33411

## III.C.  Tucson Sector

Within the United States Border Patrol Tucson Sector (Tucson Sector) DHS is requesting
that DoD assist by undertaking road construction, by replacing approximately 86 miles of
existing vehicle barrier with new pedestrian fencing, and by installing lighting in the
specific locations identified below.  The specific areas identified below are located in
Pima, Cochise, and Santa Cruz Counties, Arizona.

Pima, Cochise and Santa Cruz Counties have been identified by the ONDCP as a
HIDTA.  The *Sinaloa* Cartel relies on their local associates to coordinate, direct, and
support the smuggling of illegal drugs and aliens from Mexico to the United States.
Since Arizona is contiguous with the U.S.-Mexico International Boundary, the Tucson
and Phoenix metropolitan areas are major trans-shipment and distribution points for
contraband smuggling. Plaza bosses operate as a *Sinaloa* Cartel leader within their
specific area of operation along the Sonora-Arizona corridor of the U.S.-Mexico
International Boundary.

Border Patrol's own experience with apprehensions between border crossings bears this
out.  In fiscal year 2018, there were over 52,000 apprehensions of illegal entrants
attempting enter the United States between the border crossings in the Tucson Sector.
Also in fiscal year 2018 Border Patrol had over 1,900 separate drug-related events
between border crossings in the Tucson Sector, through which it seized over 1,600
pounds of marijuana, over 52 pounds of cocaine, over 48 pounds of heroin, over 902
pounds of methamphetamine, and over 11 pounds of fentanyl.

Subject: Request for Assistance Pursuant to 10 U.S.C. § 284
Page 6

In addition, the absence of adequate pedestrian fencing, either due to the presence of vehicle barrier only or ineffective pedestrian designs, in the Tucson sector continues to be particularly problematic as it pertains to the trafficking of illegal narcotics. Rival transnational criminal organizations frequently employ "rip crews" who leverage the remote desert environment and lack of infrastructure to steal one another's illicit cargo resulting in increased border violence.

The terrain also provides high ground to scouts seeking to protect and warn smuggling loads being passed through the area. Transnational criminal organizations have successfully utilized this advantage in furtherance of their illicit activity and for this reason the area is in need of an improved capability to impede and deny illegal crossings or people and narcotics. In addition, the area hosts a number of tourist attractions that allow illegal activity to blend into legitimate activity; avoiding detection and evading interdiction.

The specific Project Areas are as follows:

- *Tucson Project 1:*
  o The project includes replacement of two segments of vehicle barriers. The first segment begins approximately 2 miles west of the Lukeville Port of Entry continuing west approximately 30 miles.
  o Start coordinate: 32.038278, -113.331716; End coordinate: 31.890032, -112.850162
  o The second segment project begins approximately 3 miles east of the Lukeville Port of Entry and continues east approximately 8 miles in Pima County, Arizona.
  o Start coordinate: 31.8648, -112.76757; End coordinate: 31.823911, -112.634298

- *Tucson Project 2:*
  o The project includes approximately 5 miles of primary pedestrian fence replacement around the Lukeville Port of Entry extending from approximately 2 miles west of the port to approximately 3 miles east of the port.
  o Start coordinate: 31.88999921, -112.850162; End coordinate: 31.8648, -112.76757

Subject:  Request for Assistance Pursuant to 10 U.S.C. § 284
Page 7

- *Tucson Project 3*:

  - o The project includes three segments of vehicle barrier replacement beginning approximately 18 miles west of the Naco Port of Entry and continuing to approximately 25 miles east of the Douglas Port of Entry (or approximately 5 miles west of the Arizona/New Mexico state line) for approximately 20 miles of non-contiguous vehicle barrier replacement in Cochise County, Arizona.
  - o Start coordinate: 31.333754, -110.253863; End coordinate: 31.333767, -110.250286;
  - o Start coordinate: 31.334154, -110.152548; End coordinate: 31.334137, -110.147464;
  - o Start coordinate: 31.333995, -109.453305; End coordinate: 31.332759, -109.129344

- *Tucson Project 4:*

  - o The project begins approximately 9 miles east of the Nogales Port of Entry and continues eastward for approximately 30 miles with approximately 26 miles of non-contiguous vehicle barrier replacement in Santa Cruz and Cochise Counties, Arizona.
  - o Start coordinate: 31.333578, -110.79579; End coordinate: 31.333511, -110.775333;
  - o start coordinate:  31.33328, -110.70545; End coordinate: 31.333602, -110.288665)
  - o Note: An additional approximately 0.3 miles of new pedestrian fence could be built between the existing segmented vehicle barrier locations to fill existing gaps if appropriate real estate interest can be verified

- *Tucson Project 5:*

  - o The project includes approximately 2 miles of vehicle barrier replacement beginning approximately 4.5 miles east of the Sasabe Port of Entry continuing east in six non-continuous segments for approximately 15 miles in Pima and Santa Cruz Counties, Arizona.
  - o Start Coordinate: 31.460175, -111.473171; End Coordinate: 31.459673, -111.471584;
  - o Start Coordinate: 31.453091, -111.450959; End Coordinate: 31.449633, -111.440132;
  - o Start Coordinate: 31.440683, -111.412054; End Coordinate: 31.437351, -111.40168;
  - o Start Coordinate: 31.423471, -111.358336; End Coordinate: 31.422541, -111.355444;
  - o Start Coordinate: 31.42221, -111.354379; End Coordinate: 31.421321, -111.351608;

Subject:  Request for Assistance Pursuant to 10 U.S.C. § 284
Page 8

> o  Start Coordinate: 31.386813, -111.243966; End Coordinate: 31.385462,
>    -111.239759)

## II.D.  El Paso Sector

Within the United States Border Patrol El Paso (El Paso Sector) DHS is requesting that
DoD assist by undertaking road construction, by replacing approximately 70 miles of
existing vehicle barrier with new pedestrian fencing, and by installing lighting in the
specific locations identified below.  The specific areas identified below are located in
Luna, Hidalgo and Doña Ana Counties, New Mexico.  Luna, Hidalgo and Doña Ana
Counties have been identified by the ONDCP as a HIDTA.

There are three specific transnational criminal organizations of interest operating in the El
Paso Sector - the *Sinaloa* Cartel as well as remnants of the *Juarez* Cartel and the *Beltran
Leyva* Organization.  In the El Paso Sector the *Sinaloa* Cartel employs a variety of tactics,
techniques and procedures depending upon the terrain and environment to move drugs
across the border.  While the *Sinaloa* Cartel has a strong presence and control of
territories at the flanks of the Sector, it does not have full control of the territory
throughout the El Paso Sector.  The *Juarez* Cartel, traditionally a major trafficker of
marijuana and cocaine, has become an active member in opium cultivation and heroin
production.

Border Patrol's own experience with apprehensions between border crossings bears this
out.  In fiscal year 2018, there were over 31,000 apprehensions of illegal entrants
attempting to enter the United States between border crossings in the El Paso Sector.
Also in fiscal year 2018, Border Patrol had over 700 separate drug-related events between
border crossings in the El Paso Sector, through which it seized over 15,000 pounds of
marijuana, over 342 pounds of cocaine, over 40 pounds of heroin, and over 200 pounds
of methamphetamine.

Although the deployment of vehicle barrier in the El Paso Sector initially curtailed the
volume of illegal cross-border vehicular traffic, transnational criminal organizations
quickly adapted their tactics switching to foot traffic, cutting the barrier, or simply
driving over it to smuggle their illicit cargo into the United States.

Thus, in order to respond to these changes in tactics, CBP now requires pedestrian
fencing.  Successfully impeding and denying illegal activities or transnational criminal
organizations in this area is further complicated by the close proximity of New Mexico
Highway 9 to the border.  In some cases the highway is less than a half a mile, allowing
illegal cross-border traffic to evade detection and apprehension and quickly vanish from
the border area.

Subject: Request for Assistance Pursuant to 10 U.S.C. § 284
Page 9

The specific Project Areas are as follows:

- *El Paso Project 1:*
  - The project includes 46 miles of vehicle barrier replacement beginning approximately 17.5 miles west of the Columbus Port of Entry continuing east in non-contiguous segments to approximately 35 miles east of the Columbus Port of Entry within the Luna and Doña Ana Counties, New Mexico.
  - Start Coordinate: 31.7837, -107.923151; End Coordinate: 31.783689, -107.679049;
  - Start Coordinate: 31.783672, -107.573919; End Coordinate: 31.783741, -107.038154

- *El Paso Project 2:*
  - The project includes 23.51 miles of Vehicle Barrier replacement in non-contiguous segments within Hidalgo and Luna Counties, New Mexico. The first segment begin approximately 5.1 miles east of the New Mexico/Arizona Border continuing east 4.55 miles.
  - Start Coordinate:  31.332323, -108.962631; End Coordinate: 31.332292, -108.885946;
  - The second segment begins approximately 3 miles west of the Antelope Wells Port of Entry to 3 miles east of the port of entry for 6.12 miles of Vehicle Barrier replacement.
  - Start Coordinate:  31.333368, -108.582412; End Coordinate: 31.333407, -108.47926;
  - The third segment begins approximately 20 miles west of the Columbus Port of Entry extending west 12.84 miles.
  - Start Coordinate:  31.783722, -108.182442; End Coordinate: 31.783708, -107.963193;

## III.    Technical Specifications

As set forth above, DHS requires road construction, installation of lighting, and the replacement of existing vehicle barrier or dilapidated pedestrian fencing with new pedestrian fencing within the Project Areas.  DHS will provide DoD with more precise technical specifications as contract and project planning moves forward.

Given DHS's experience and technical expertise, DHS plans to coordinate closely with DoD throughout project planning and execution, to include review and approval of design specifications, barrier alignment and location, and other aspects of project planning and execution.

Subject:  Request for Assistance Pursuant to 10 U.S.C. § 284
Page 10

## IV.  Sequencing

The DHS request for assistance includes approximately 218 miles in which DHS requires road construction, the installation of lighting, and the replacement of existing vehicle fencing or dilapidated pedestrian fencing with new pedestrian fencing within the Project Areas.  DHS requests that DoD's support under 10 U.S.C. § 284 address the requirements in order of priority as DoD resources allow.  The DHS order of priority is as follows:

1. Yuma Sector Project 1
2. Yuma Sector Project 2
3. El Paso Sector Project 1
4. El Centro Sector Project 1
5. Tucson Sector Project 1
6. Tucson Sector Project 2
7. Tucson Sector Project 3
8. Tucson Sector Project 4
9. Yuma Sector Project 3
10. El Paso Sector Project 2
11. Tucson Sector Project 5

## V.  Funding

DHS requests that DoD provide the above-referenced border fences, roads, and lighting on a non-reimbursable basis as support to block drug smuggling corridors.

DHS will accept custody of the completed infrastructure and account for that infrastructure in its real property records.

DHS will operate and maintain the completed infrastructure.

## VI.  Conclusion

DHS requests DoD assistance under 10 U.S.C. § 284 to construct fences, roads, and to install lighting in order to block drug smuggling corridors in the Project Areas set forth above.  The Projects Areas set forth above are also areas of high illegal entry under IIRIRA § 102(a), and the requested fences, roads, and lighting will assist in deterring illegal crossings in the Project Areas.

# EXHIBIT 34



**SECRETARY OF DEFENSE**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

**MAR 2 5 2019**

The Honorable Kirstjen Nielsen
Secretary of Homeland Security
Washington, DC 20528

Dear Madam Secretary:

Thank you for your February 25, 2019 request that the Department of Defense provide support to your Department's effort to secure the southern border by blocking up to 11 drug-smuggling corridors along the border through the construction of roads and fences and the installation of lighting.

10 U.S.C. § 284(b)(7) gives the Department of Defense the authority to construct roads and fences and to install lighting to block drug-smuggling corridors across international boundaries of the United States in support of counter-narcotic activities of Federal law enforcement agencies. For the following reasons, I have concluded that the support you request satisfies the statutory requirements:

• The Department of Homeland Security (DHS)/Customs and Border Protection (CBP) is a Federal law enforcement agency;

• DHS has identified each project area as a drug-smuggling corridor; and

• The work requested by DHS to block these identified drug smuggling corridors involves construction of fences (including a linear ground detection system), construction of roads, and installation of lighting (supported by grid power and including imbedded cameras).

Accordingly, at this time, I have decided to undertake Yuma Sector Projects 1 and 2 and El Paso Sector Project 1 by constructing 57 miles of 18-foot-high pedestrian fencing, constructing and improving roads, and installing lighting as described in your February 25, 2019 request.

As the proponent of the requested action, CBP will serve as the lead agency for environmental compliance and will be responsible for providing all necessary access to land. I request that DHS place the highest priority on completing these actions for the projects identified above. DHS will accept custody of the completed infrastructure, account for that infrastructure in its real property records, and operate and maintain the completed infrastructure.

The Commander, U.S. Army Corps of Engineers, is authorized to coordinate directly with DHS/CBP and immediately begin planning and executing up to $1B in support to DHS/CBP by undertaking the projects identified above.

Additional support may be available in the future, subject to the availability of funds and other factors.

Patrick M. Shanahan
Acting

# EXHIBIT 35

ADAM SMITH, WASHINGTON, CHAIRMAN
SUSAN A. DAVIS, CALIFORNIA
JAMES R. LANGEVIN, RHODE ISLAND
RICK LARSEN, WASHINGTON
JIM COOPER, TENNESSEE
JOE COURTNEY, CONNECTICUT
JOHN GARAMENDI, CALIFORNIA
JACKIE SPEIER, CALIFORNIA
TULSI GABBARD, HAWAII
DONALD NORCROSS, NEW JERSEY
RUBEN GALLEGO, ARIZONA
SETH MOULTON, MASSACHUSETTS
SALUD O. CARBAJAL, CALIFORNIA
ANTHONY G. BROWN, MARYLAND, VICE CHAIR
RO KHANNA, CALIFORNIA
WILLIAM R. KEATING, MASSACHUSETTS
FILEMON VELA, TEXAS
ANDY KIM, NEW JERSEY
KENDRA S. HORN, OKLAHOMA
GILBERT RAY CISNEROS, JR., CALIFORNIA
CHRISSY HOULAHAN, PENNSYLVANIA
JASON CROW, COLORADO
XOCHITL TORRES SMALL, NEW MEXICO
ELISSA SLOTKIN, MICHIGAN
MIKIE SHERRILL, NEW JERSEY
KATIE HILL, CALIFORNIA
VERONICA ESCOBAR, TEXAS
DEBRA A. HAALAND, NEW MEXICO
JARED GOLDEN, MAINE
LORI TRAHAN, MASSACHUSETTS
ELAINE G. LURIA, VIRGINIA

WILLIAM M. "MAC" THORNBERRY, TEXAS,
    RANKING MEMBER
JOE WILSON, SOUTH CAROLINA
ROB BISHOP, UTAH
MICHAEL R. TURNER, OHIO
MIKE ROGERS, ALABAMA
K. MICHAEL CONAWAY, TEXAS
DOUG LAMBORN, COLORADO
ROBERT J. WITTMAN, VIRGINIA
VICKY HARTZLER, MISSOURI
AUSTIN SCOTT, GEORGIA
MO BROOKS, ALABAMA
PAUL COOK, CALIFORNIA
BRADLEY BYRNE, ALABAMA
SAM GRAVES, MISSOURI
ELISE M. STEFANIK, NEW YORK
SCOTT DesJARLAIS, TENNESSEE
RALPH LEE ABRAHAM, LOUISIANA
TRENT KELLY, MISSISSIPPI
MIKE GALLAGHER, WISCONSIN
MATT GAETZ, FLORIDA
DON BACON, NEBRASKA
JIM BANKS, INDIANA
LIZ CHENEY, WYOMING
PAUL MITCHELL, MICHIGAN
JACK BERGMAN, MICHIGAN
MICHAEL WALTZ, FLORIDA

PAUL ARCANGELI, STAFF DIRECTOR

## COMMITTEE ON ARMED SERVICES

### U.S. House of Representatives

#### Washington, DC 20515–6035

ONE HUNDRED SIXTEENTH CONGRESS

March 26, 2019

The Honorable David L. Norquist
Under Secretary of Defense, Comptroller
  and Chief Financial Officer
U.S. Department of Defense
Washington, D.C. 20301

Dear Mr. Norquist:

The House Committee on Armed Services has completed its review of the proposed reprogramming request FY 19-01 RA. This reprogramming action would transfer approximately $1.0 billion among fiscal year 2019 appropriations.

The committee denies this request. The committee does not approve the proposed use of Department of Defense funds to construct additional physical barriers and roads or install lighting in the vicinity of the United States border.

Sincerely,

Adam Smith
Chairman

AS:msh

# EXHIBIT 36

NITA M. LOWEY, NEW YORK, CHAIRWOMAN

MARCY KAPTUR, OHIO
PETER J. VISCLOSKY, INDIANA
JOSÉ E. SERRANO, NEW YORK
ROSA L. DeLAURO, CONNECTICUT
DAVID E. PRICE, NORTH CAROLINA
LUCILLE ROYBAL-ALLARD, CALIFORNIA
SANFORD D. BISHOP, JR., GEORGIA
BARBARA LEE, CALIFORNIA
BETTY McCOLLUM, MINNESOTA
TIM RYAN, OHIO
C. A. DUTCH RUPPERSBERGER, MARYLAND
DEBBIE WASSERMAN SCHULTZ, FLORIDA
HENRY CUELLAR, TEXAS
CHELLIE PINGREE, MAINE
MIKE QUIGLEY, ILLINOIS
DEREK KILMER, WASHINGTON
MATT CARTWRIGHT, PENNSYLVANIA
GRACE MENG, NEW YORK
MARK POCAN, WISCONSIN
KATHERINE M. CLARK, MASSACHUSETTS
PETE AGUILAR, CALIFORNIA
LOIS FRANKEL, FLORIDA
CHERI BUSTOS, ILLINOIS
BONNIE WATSON COLEMAN, NEW JERSEY
BRENDA L. LAWRENCE, MICHIGAN
NORMA J. TORRES, CALIFORNIA
CHARLIE CRIST, FLORIDA
ANN KIRKPATRICK, ARIZONA
ED CASE, HAWAII

KAY GRANGER, TEXAS
HAROLD ROGERS, KENTUCKY
ROBERT B. ADERHOLT, ALABAMA
MICHAEL K. SIMPSON, IDAHO
JOHN R. CARTER, TEXAS
KEN CALVERT, CALIFORNIA
TOM COLE, OKLAHOMA
MARIO DIAZ-BALART, FLORIDA
TOM GRAVES, GEORGIA
STEVE WOMACK, ARKANSAS
JEFF FORTENBERRY, NEBRASKA
CHUCK FLEISCHMANN, TENNESSEE
JAIME HERRERA BEUTLER, WASHINGTON
DAVID P. JOYCE, OHIO
ANDY HARRIS, MARYLAND
MARTHA ROBY, ALABAMA
MARK E. AMODEI, NEVADA
CHRIS STEWART, UTAH
STEVEN M. PALAZZO, MISSISSIPPI
DAN NEWHOUSE, WASHINGTON
JOHN R. MOOLENAAR, MICHIGAN
JOHN H. RUTHERFORD, FLORIDA
WILL HURD, TEXAS

SHALANDA YOUNG
CLERK AND STAFF DIRECTOR
(202) 225-2771

# Congress of the United States
## House of Representatives
## Committee on Appropriations
## Washington, DC 20515–6015

March 26, 2019

The Honorable David L. Norquist
Under Secretary of Defense, Comptroller
Department of Defense
Washington, DC 20301

Dear Mr. Secretary:

The Committee has received and reviewed the requested reprogramming action, FY 19-01RA, submitted to the Committee on March 25, 2019, which proposes the transfer of $1 billion from fiscal year 2019 Military Personnel, Army and Army Reserve accounts to the Drug Interdiction and Counter Drug Activities account for the purposes of erecting a wall on the U.S. southern border.

The Committee denies the request.

The Defense Appropriations Act of 2019 was enacted on September 28, 2018, and inherent in the enactment is the specific allocation of appropriations and the execution of funds as called for under the Constitution between the Congress and the Executive Branch. Article 1 states, "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law". The reprogramming transmitted by the Department denies the Congress and the Committee on Appropriations those stated Constitutional prerogatives; these funds were neither requested nor appropriated for the activities described in the reprogramming. With this unilateral action, the historic and unprecedented comity that has existed between the Committee and the Department has been breached.

Sincerely,

Peter J. Visclosky
Chairman
Defense Subcommittee

# EXHIBIT 37

# Chapter 12:



# Reprogramming and Transfer Authority

4.      Subdivisions of an appropriation contained in the agency's budget request or in conference or committee reports are not legally binding upon the department or agency concerned unless they are specified in the appropriations act itself. Newport News Shipbldg. and Dry Dock Co., B-184830, 55 Comp. Gen. 812 (1976).[8]

5.      Reprogramming is based on minimal congressional and legislative guidance.  There "is no general statutory provision either authorizing or prohibiting it and it has evolved largely in the form of informal (i.e. non-statutory) agreements between various agencies and their congressional oversight committees."[9]  There are some general limitations to reprogramming:

   a.      Agencies must comply with the requirements of 31 U.S.C. § 1301.

   b.      Agencies must check appropriations acts for statutory prohibitions to proposed reprogramming.  The DOD Appropriation Act usually sets out broad guidelines.

   c.      Agencies must follow their internal policies and procedures.  For DOD, there are detailed procedures located in the DOD FMR, vol. 3, ch. 3 and 6.

6.      Items eligible for reprogramming.  Congress, in the annual appropriation act, typically states that DOD may submit actions only for higher priority items, based on unforeseen military requirements, than those for which the funds were originally appropriated.  See Consolidated Appropriations Act for FY 2013, Pub.L. No. 113-6, § 8005 (2013).

---

[8] Since the 2009 NDAA, Congress has started adding funding tables to the authorization act so that the conference reports have the legal force of law.  See NDAA 2009, P.L. 110-417, Section 1005, 14 October 2008, for the first joint explanatory statement.  Each year since that time, the NDAA has included funding tables, usually at Division D.
[9] GAO, Principles of Fed. Appropriations Law, p. 2-30 to 2-31.

7. Items ineligible for reprogramming.  Annually, Congress prohibits DOD from submitting reprogramming actions on items for which funds have previously been requested from Congress but denied.  <u>See e.g.</u>, Consolidated Appropriations Act for FY 2012, Pub.L. No. 112-74, § 8005 (2012).  GAO has stated that in the absence of a similar statutory provision, a reprogramming that has the effect of restoring funds deleted in the legislative process is okay.  <u>See</u> Propriety of LEAA Funding of Urban Crime Prevention Program, B-195269, Oct. 15, 1979.

8. **All DOD reprogramming actions must be approved by the DOD Comptroller**.  Additionally, some reprogramming actions require notice to or approval by the appropriate congressional subcommittees. DOD FMR, vol. 3, ch. 6 and 7.  Regarding the routing of requests, "Military Departments must submit proposed DD 1415 [reprogramming] actions formally by memorandum addressed to the USD(C) from the Assistant Secretary (Financial Management and Comptroller) of the Military Department."  DOD FMR, vol 3, ch. 6, para. 060407.

## V.   REPROGRAMMING TYPES

A.   ==**Reprogramming Actions Requiring Prior Approval of Congressional Committees**==.  DOD FMR vol. 3, ch. 6, para. 060401, A-F.  *See also* Conference Report accompanying annual DOD appropriations acts.

1. If a DOD Component (i.e. Army, Air Force, Navy, Marines) wants to reprogram funds (requiring Congressional approval), then the Component Comptroller will forward a formal request to the DOD Comptroller explaining the details of the reprogramming request.  The DOD Comptroller will forward the request to Congress for consideration (the House Armed Services Committee, the Senate Armed Services Committee, the House Appropriations Committee, and the Senate Appropriations Committee).  The DOD Comptroller will receive letters from each of these committees and will notify the Component Comptroller if its request has been approved or disapproved.  If the request is denied, then the Component Comptroller will not reprogram the funds.

2. ==The following types of reprogramming requests require Congressional approval:==

a.    Any reprogramming that involves an item designated as a Congressional special interest item.

b.    Any increase in the procurement quantity of a major end item, such as an individual aircraft, missile, naval vessel, tracked combat vehicle, and other weapon or torpedo and related support equipment.

c.    Any reprogramming action that involves the application of funds which *exceed thresholds* agreed upon by the congressional committees and DOD:

(1)    Military Personnel: cumulative increases in a budget activity[10] of $10 million or more.

(2)    Operation and Maintenance: net changes in a budget activity of $15 million or more.

(3)    Procurement:  cumulative increases for any program year of $20 million or more (or 20 percent of the appropriated amount, whichever is less); cumulative decreases for any program year of $20 million or more (or 20 percent of the appropriated amount, whichever is less).

(4)    Research, Development, Test, and Evaluation (RDT&E): cumulative increases for any program year of $10 million or more in an existing program element (or 20 percent of the appropriated amount, whichever is less); cumulative decreases for any program year of $10 million or more (or 20 percent of the appropriated amount, whichever is less).

---

[10] "Budget activities" are defined as categories within each appropriation and fund accounts that identify the purposes, projects, or types of activities financed by the appropriation or fund.  DOD FMR, vol. 3, ch. 6.  For an example of budget activities, see the Joint Explanatory Statement of The Committee of Conference for the FY 2012 Consolidated Appropriations Act, which breaks down the budget activities in some detail.  For example, prior appropriation acts required approval if the Air Force wanted to perform a reprogramming action in its Military Personnel, Air Force appropriation by moving $15 million from one budget activity to another budget activity (because it exceeded the $10 million threshold for the military personnel appropriation).

12-10

(5)      Additional sub-activity thresholds as specified by Congress.[11]

d.      New Starts: a program, subprogram, modification, project or subproject not previously justified by DOD and funded by Congress is considered a "new start."  Congressional committees discourage the use of reprogramming to initiate new starts. Congress normally states in the annual DOD Appropriations Acts that before funding any new start, the requester must first notify the Secretary of Defense and Congress.[12]  For specific notification and approval procedures.  DOD FMR, vol. 3, ch. 6, para. 060401.E.

e.      Termination of programs that result in elimination of certain procurement programs and subprograms and RDT&E elements, projects, and subprojects.  DOD FMR, vol. 3, ch. 6, para. 060401.E.

f.      Most fund shifting/movements that make use of _general transfer authority_.[13]  DOD FMR, vol. 3, ch. 6, para. 060401.C, for exceptions.

---

[11]  _See e.g._ Explanatory Statement for the FY 2009 DODAA, listing multiple sub-activities (such as Army Land Forces Depot Maintenance), for which transfers out of the sub-activity in excess of $15M require Prior Approval Reprogramming; DOD FMR vol. 3, ch. 6, para. 060401.D.2.

[12]  Section 8074 states, "None of the funds provided in this Act shall be available for obligation or expenditure through a reprogramming of funds that creates or initiates a new program, project, or activity unless such program, project, or activity must be undertaken immediately in the interest of national security and only after written prior notification to the congressional defense committees."  Consolidated Appropriations Act for FY 2013, Pub.L. No. 113-6, § 8074 (2013).

[13]  Note that DOD uses a "Reprogramming Action" (DD 1415-1) to accomplish both reprogrammings _and_ transfers. There are different forms for internal (DD 1415-3) reprogramming actions (again, a term which includes those actions 'using transfer authority'), versus those that require prior approval (1415-2).  Thus, the wording of the FMR can be confusing in that it uses the terms "reprogramming" and "transfer" in the same section when referring to this process.  For example, the FMR's reprogramming chapter states that reprogramming actions that "use general transfer authority" require Congressional approval.  Bottom line, beware the distinction between "reprogramming" as defined in this outline, and a "reprogramming action" as used in the FMR.  _See e.g._ DOD FMR, vol 3, ch. 6, para. 060401C (March 2011).

B.    **"Internal" Reprogrammings**.  DOD FMR, vol. 3, ch. 6, para. 060402.

       1.    "Internal" reprogrammings are not, technically, formal reprogramming actions.  Internal reprogrammings are "audit-trail type actions processed within the Department to serve various needs."  DOD FMR, vol. 3, ch. 6, para. 060402.

       2.    Internal reprogrammings fall into three general categories:

           a.    <u>Reclassification Actions</u>.  Actions involving a reclassification or realignment of funds within budget activities or within budget line items/program elements.  These reclassifications do not involve any change in the substance of the program and the funds will be used to for the same purposes originally contemplated when submitted to Congress.

           b.    <u>Transfer Appropriations</u>.[14]  "Transfer accounts" are appropriations with funding that will be transferred to other appropriations for execution.  Reprogramming to or from transfer accounts is generally permissible without relying upon statutory authority such as the general transfer authority.  Examples of transfer accounts include: Overseas Contingency Operations Transfer Fund and Foreign Currency Fluctuations, Defense.

           c.    <u>Procurement Quantities</u>.  Approval to increase quantities of major end items where Congress has specified that approval is not required.

       3.    Technically, funding changes within program elements are not regarded as "reprogramming."  <u>The Honorable Roy Dyson, House of Representatives</u>, B-220113, 65 Comp. Gen. 360 (1986).

       4.    Internal reprogrammings are not subject to dollar thresholds.

---

[14] The language of the DOD FMR refers to "transfer appropriations" in the chapter on reprogramming, which it then describes as reprogramming actions related to transfer accounts.  *See* DOD FMR, vol 3, ch. 6, para. 060402.B.

D.     **Restrictions on Reprogrammings.**  DOD FMR, vol 3, ch. 7.

     1.     DOD will not submit a request for reprogramming:

          a.     For any project or effort that has not been authorized unless permitted under 10 U.S.C. §§ 2803, 2854 or 2853;

          b.     For any project or effort that has been denied specifically by Congress; or

          c.     To initiate programs of major scope or base realignment actions, when Congress has not authorized such efforts.

     2.     DOD Comptroller sends MILCON reprogrammings (which require congressional notification or approval) to the House and Senate Armed Services Committees and the House and Senate Appropriations Committees.

          a.     Generally, committee review process is non-statutory.

          b.     An agency generally will observe committee review and approval procedures as part of its informal arrangements with the various committees, although they are not legally binding.  GAO, Principles of Fed. Appropriations Law, p. 2-25.


**VII.   CONCLUSION**

A.     Note the differences between reprogramming and transferring funds.

B.     There are special rules involved in reprogramming for military construction purposes.

# EXHIBIT 38

## VOLUME 3, CHAPTER 6:  "REPROGRAMMING OF DOD APPROPRIATED FUNDS"

### SUMMARY OF MAJOR CHANGES

All changes are denoted by blue font.

Substantive revisions are denoted by an \* symbol preceding the section, paragraph, table, or figure that includes the revision.

Unless otherwise noted, chapters referenced are contained in this volume.

**Hyperlinks are denoted by _bold, italic, blue and underlined font_.**

The previous version dated March 2011 is archived.

| PARAGRAPH | EXPLANATION OF CHANGE/REVISION | PURPOSE |
|---|---|---|
| 060302 | Added requirement that Components use the Enterprise Funds Distribution (EFD) system for transmitting DD Form 1414, Base for Reprogramming Actions submissions | Update |
| 060401.E | Updates to sub-activity reprogramming requirements | Update |
| 060407 | Added requirement that Components use the Enterprise Funds Distribution (EFD) system to submit reprogramming actions | Update |
| 060502 | Added requirement that Components use the Enterprise Funds Distribution (EFD) system to update DD Form 1416, Report of Programs | Update |
| 0612 | FY 2014 National Defense Authorization Act eliminated the requirement for the Readiness Transfer Report | Deleted |
| Appendix B | FY 2014 National Defense Authorization Act eliminated the requirement for the Readiness Transfer Report | Deleted |

is specifically reduced as shown in the project level table or in paragraphs using the phrases "only for" or "only to" or are congressional special interest items for the purpose of the Base for Reprogramming (DD Form 1414).

      060202.        DD 1415, Reprogramming Action

      Reprogramming actions, upon approval of the Department, will be used to request the prior approval (DD 1415-1) of the congressional committees to realign or transfer appropriated funds or for internal reprogramming (DD 1415-3) requiring audit-trail type documentation of the realignment or transfer of appropriated funds.

      060203.        DD 1416, Report of Programs

      The DD 1416 report reflects the congressionally approved programs as enacted, reprogramming actions which have been approved, congressionally directed undistributed amounts and transfers, and reprogramming of funds that have been implemented by a DoD Component using below-threshold reprogramming flexibility.  This report is generated in the ***Enterprise Funds Distribution (EFD) system,*** quarterly and submitted 30-days after the end of each quarter, electronically to the congressional defense committees by the Under Secretary of Defense (Comptroller) (OUSD(C)), Program and Financial Control Directorate (P&FC), for Title III, Procurement, and Title IV, Research, Development, Test, and Evaluation and annually for Title I, Military Personnel, and Title II, Operation and Maintenance appropriations.

**0603    DETAILED PROCEDURES FOR BASE FOR REPROGRAMMING ACTIONS**

      060301.        General

      The DD Form 1414, Base for Reprogramming Actions, establishes the base from which reprogramming actions may be taken.  It identifies line items within each appropriation covered in the DoD Appropriations Acts.

      060302.        Due Date

      Within 30 days following enactment of the Department of Defense (DoD) Appropriations Act, the Components will submit their DD 1414, Base for Reprogramming Actions to OUSD(C) P&FC to ensure the Department can submit the Base for Reprogramming Actions to the congressional committees within 60 days of enactment as required by recurring general provisions in DoD Appropriations Acts (e.g., section 8007 of division C of Public Law 113-235, the Department of Defense Appropriations Act, 2015).  The DoD Components will submit their DD 1414 through the ***Enterprise Funds Distribution (EFD) system,*** for review prior to submission to the congressional committees.

      060303.        Transmittal

      Upon determination by the OUSD(C) P&FC that the Base for Reprogramming Action is acceptable, OUSD(C) P&FC will submit to OMB, pursuant to OMB Circular A-11, section 22.3.

After clearance by OMB, the OUSD(C) P&FC will prepare for printing and transmittal to the congressional committees.  Final printed copies will be distributed to the DoD Components as well as posted on the Comptroller public website.

    060304.    Security Classification

    In order facilitate use by the staffs of the congressional defense oversight committees, the Department will submit an unclassified report.  Therefore, each Service shall submit an unclassified DD 1414 and OUSD(C) P&FC will be responsible for proper security review prior to publication.  All classified programs should be consolidated into a single line item titled Classified Programs and should be displayed at the end of the Direct Program section.

    060305.    Detailed Instructions for Preparation of the DD 1414

    Detailed instructions for the Base for Reprogramming Actions for the initial appropriations act are provided in the appendices to this chapter.

0604   REPROGRAMMING ACTIONS

    060401.    Reprogramming Actions Requiring Written Congressional Approval

    Two types of reprogramming actions will be used to request the prior approval of the congressional defense committees.  Both requests are submitted using DD 1415-1, Prior Approval.  The first type is for specific requirements, which usually are combined and submitted monthly.  The second type is the annual Omnibus reprogramming action submitted prior to June 30 of each year, which was established in Fiscal Year (FY) 1991 to streamline the reprogramming process for the congressional committees and the Department.  With the exception of reprogrammings of National Intelligence Program resources (paragraph 060604), the USD(C) submits all reprogramming actions to the congressional defense committees.  The Department is expressly prohibited from preparing or forwarding to the Congress a prior approval reprogramming action except "for higher priority items, based on unforeseen military requirements, than those for which originally appropriated and in no case where the item for which reprogramming is requested has been denied by the Congress."  It is the Department's policy that reprogramming actions, which require prior approval of the congressional committees (DD 1415-1), are those which involve the application of funds that:

        A.    Increase the procurement quantity of a major end item, such as an individual aircraft, missile, naval vessel, tracked combat vehicle, and other weapon or torpedo and related support equipment for which funds are authorized.  (In such cases where specific congressional language is provided allowing for additional quantities to be procured within appropriated funds, increases to quantities for major end items shall be submitted to the USD(C) for approval as a DD 1415-3, Internal Reprogramming action.)

        B.    Affect an item that is known to be or has been designated as a matter of special interest to one or more of the congressional committees.  In rare instances, when funds from special interest items are to be reprogrammed from an existing program, subprogram,

project, or subproject to another program, subprogram, project, or subproject within the same procurement line item or program element, letter notification to the congressional committees may be made. Letters shall be submitted to the congressional committees by the DoD Component involved only after advance coordination with the applicable OUSD(C) P/B Directorate.

C.     Use general transfer authority.  Any movement of funds between appropriations or legal subdivisions requires statutory transfer authority.  Unless specific transfer authority is provided elsewhere, general transfer authority, which is provided in annual DoD Appropriations and Authorization Acts, must be used.  Any movement of funds from supplemental appropriations also uses the general transfer authority provided in the annual DoD Appropriations Act.  Section 2214 of Title 10 of the United States Code (U.S.C.) and the annual Appropriations Act provide limitations on programs for which general transfer authority may be used.  Such authority may not be used except to provide funds for a higher priority item, based on unforeseen military requirements, than the items for which funds were originally appropriated, and may not be used if the Congress has denied funds for the item.  Exceptions to the use of a DD 1415-1, Prior Approval Reprogramming action, may apply if reclassification of programs to the proper appropriation for execution is required (i.e., these actions do not change the purpose for which the funds were originally appropriated).  (See paragraph 060402A.)

D.     Exceed thresholds agreed upon between the committees.  Effective for FY 2015, the basic reprogramming thresholds agreed upon between the committees and the Department are:  $10 million for military personnel; $15 million for operation and maintenance; $20 million for procurement; and $10 million for research, development, test, and evaluation. These thresholds are cumulative from the base for reprogramming value as modified by any congressional action, to include the initial appropriation, rescissions, supplemental appropriations, and approved DD 1415 reprogramming actions.  The BTR limitation is the net value of transfers into or out at the specified level.  For example, transfers using Below Threshold Reprogramming (BTR) authority of $5.0 million out of an RDT&E PE line item and transfer of $4.0 million into the same RDT&E PE line item would result in a total amount transferred of $1.0 million, with the consequence that the $1.0 million of BTR authority was used.  The thresholds agreed upon between the committees and the Department are as follows:

1.     Military Personnel.  A cumulative increase of $10 million or more in a budget activity.

2.     Operation and Maintenance.  A cumulative increase or decrease of $15 million or more to a budget activity or to a Defense Agency for Operation and Maintenance, Defense-Wide appropriation.  When the congressional committees impose reprogramming thresholds on specific sub-activity group categories, these threshold amounts are separately identified on the DD 1414, Base for Reprogramming Actions, and reprogramming restrictions apply.  For example for FY 2015, congressional committees imposed reprogramming thresholds on specific sub-activity group categories.

a.     The committees required the Department to follow Prior Approval procedures for transfers in excess of $15.0 million **out** of the following budget sub-activities:

(1)     **Army**:   *Maneuver units; modular support brigades; land forces operations support; force readiness operations support; land forces depot maintenance; base operations support; and facilities sustainment, restoration, and modernization.*

(2)     **Navy**:   *Aircraft depot maintenance; ship depot maintenance; and facilities sustainment, restoration, and modernization.*

(3)     **Marine Corps**:   *Depot maintenance and facilities sustainment, restoration, and modernization*

(4)     **Air Force**:   *Primary combat forces; combat enhancement forces; combat communications; and facilities sustainment, restoration, and modernization.*

(5)     **Air Force Reserve**:   *Depot maintenance.*

(6)     **Air National Guard**:   *Depot maintenance.*

b.     The committees required the Department to follow Prior Approval procedures for transfers in excess of $15.0 million **into** the following budget sub-activity:

(1)     **Army National Guard:**   *Other personnel support/recruiting and advertising*.

c.     Defense-Wide O&M:   transfer of funds to or from the levels specified for defense agencies in excess of $15.0 million shall be subject to a PA reprogramming action.

d.     For FY 2015, the committees further require the Services, with Comptroller coordination, to provide written notification not later than 15-days prior to implementing transfers in excess of $15.0 million **out** of the following budget sub-activities:

(1)     **Navy**:   *Mission and other flight operations and mission and other ship operations*

(2)     **Air Force**:   *Operating forces depot maintenance; mobilization depot maintenance; training and recruiting depot maintenance; and administration and service-wide depot maintenance.*

e.     *Defense Health Program:  For FY 2015, any transfer of funds from the In-House Care budget sub-activity to any other sub-activity shall be*

DoD 7000.14-R	Financial Management Regulation	Volume 3, Chapter 6 Appendix B
	* September 2015

Appendix B – Operation and Maintenance Budget Execution Data

Operation and Maintenance Budget Execution Data

Department of the _____

(Dollars in Thousands)

Data as of  (December 31/March 31/June 30/September 30) (Fiscal Year)

| Appropriation | Budget Activity | Activity Group | Subactivity Group | President's Budget Request | Appropriation | Distribution of Unallocated Congressional Adjustments /1 | Adjustments Required by Statute /2 | Prior Approval Reprogrammings | Below Threshold Reprogrammings /3 | Other Reprogrammings /4 | Current Program /5 | Actual Obligations /6 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Budget Activity (#) Summary | | | SUBTOTAL | SUBTOTAL | SUBTOTAL | SUBTOTAL | SUBTOTAL | SUBTOTAL | SUBTOTAL | SUBTOTAL | SUBTOTAL |
| | Budget Activity (#) Summary | | | SUBTOTAL | SUBTOTAL | SUBTOTAL | SUBTOTAL | SUBTOTAL | SUBTOTAL | SUBTOTAL | SUBTOTAL | SUBTOTAL |
| | Budget Activity (#) Summary | | | SUBTOTAL | SUBTOTAL | SUBTOTAL | SUBTOTAL | SUBTOTAL | SUBTOTAL | SUBTOTAL | SUBTOTAL | SUBTOTAL |
| | Total Direct Program | | | TOTAL | TOTAL | TOTAL | TOTAL | TOTAL | TOTAL | TOTAL | TOTAL | TOTAL |

Notes

1/ The "Distribution of Unallocated Congressional Adjustments" column reflects the undistributed adjustments from Conference Report xxx-xxx.

2/ The "Adjustments Required By Statute" column reflects amounts for General Provisions (P.L. xxx-xxx) and Supplemental Appropriation (P.L. xxx-xxx).

3/ The "Below Threshold Programmings" column includes intra-Budget Activity fund reprogramming and realignments to meet congressional intent.

4/ The "Other Reprogrammings" column includes Internal Reprogramming for Counternarcotics, Environmental Restoration, Foreign Currency Fluctuation and others as directed.

5/ The "Current Program" column reflects column D of the Operation & Maintenance Appropriation Status by Fiscal Year Program and Subaccounts Report (DD 1002 report) as of (Day) (Month) (Year).

6/ The "Actual Obligations" column reflects column E of the Operation & Maintenance Appropriation Status By Fiscal Year Program and Subaccounts Report (DD 1002 report) as of Day Month Year.

# EXHIBIT 39

# House Armed Services Committee Holds Hearing on Fiscal 2020 Defense Authorization

CQ Transcriptions

March 26, 2019 Tuesday

Copyright  2019 CQ-Roll Call, Inc.        All Rights Reserved

All materials herein are protected by United States copyright law and may not be reproduced, distributed, transmitted, displayed, published or broadcast without the prior written permission of CQ Transcriptions. You may not alter or remove any trademark, copyright or other notice from copies of the content.

## Body

House Armed Services Committee Holds Hearing On Fiscal 2020 Defense Authorization

March 26, 2019 10:00 A.M.

SPEAKERS:

REP. ADAM SMITH (D-WASH.), CHAIRMAN

REP. SUSAN A. DAVIS (D-CALIF.)

REP. JIM LANGEVIN (D-R.I.)

REP. RICK LARSEN (D-WASH.)

REP. JIM COOPER (D-TENN.)

REP. JOE COURTNEY (D-CONN.)

REP. JOHN GARAMENDI (D-CALIF.)

REP. JACKIE SPEIER (D-CALIF.)

REP. TULSI GABBARD (D-HAWAII)

REP. DONALD NORCROSS (D-N.J.)

REP. RUBEN GALLEGO (D-ARIZ.)

REP. SETH MOULTON (D-MASS.)

REP. SALUD CARBAJAL (D-CALIF.)

REP. ANTHONY G. BROWN (D-MD.)

REP. RO KHANNA (D-CALIF.)

REP. WILLIAM KEATING (D-MASS.)

REP. FILEMON VELA (D-TEXAS)

House Armed Services Committee Holds Hearing on Fiscal 2020 Defense Authorization

rebuild facilities and damaged by hurricanes Florence and Michael, up to $3.6 billion to support military construction projects that will be awarded in fiscal year 2020 instead of fiscal year 2019 so we can resource border barrier projects under emergency declaration this year, and $3.6 billion in case emergency additional emergency funding is needed for the border.

Military construction on the border will not come at the expense of our people, our readiness, or our modernization. To identify the potential pool of sources of military construction funds, DOD will apply the following criteria. No military construction projects that have already been awarded and no military construction projects with fiscal year 2019 award dates will be impacted. We are solely looking at projects with award dates after September 30, 2019.

No military housing, barracks, or dormitory projects will be impacted. Decisions have not been made concerning which border barrier projects will be funded through section 2808 authority. If the department's FY 2020 budget is enacted on time as requested, no military construction project used to source section 2808 projects would be delayed or canceled.

I appreciate the inherent intra-government complexities of the Southwest border situation. I also want to emphasize the funds requested for the border barrier amount to less than 1 percent of the national defense top line. As this committee fully understands, no enemy in the field has done more damage to our military's combat readiness in years past then sequestration and budget instability, and there is no question today our adversaries are not relenting.

The instability of a continuing resolution would cost us in three important ways. First, we would be unable to implement new initiatives like standing up the space command or accelerating our development of hypersonic capabilities and artificial intelligence. Second, our funding will be in the wrong accounts. We are requesting significant investments in RDT&D for cyber, space, and disruptive technologies and in O&M for core readiness. Third, the incremental funding under SER means we lose buying power. This translates to higher costs and uncertainty for industry in the communities where we operate.

We built this budget to implement our national defense strategy, and I look forward to working with you to ensure predictable funding so our military can remain the most lethal adaptable and resilient fighting force in the world. I appreciate the critical role Congress plays to ensure our war fighters can exceed on the battlefield in both today and tomorrow, and I think our service members, their families, and all those in the Department of Defense for maintaining constant vigilance as they stand, always ready to protect our freedoms. Thank you.

SMITH: Thank you. Chairman Dunford.

DUNFORD: Chairman Smith, ranking member Thornberry, distinguished members of the committee, thank you for the opportunity to join Secretary Shanahan and Undersecretary Norquist today. It remains my privilege to represent your soldiers, sailors, airmen, and Marines. While much of our discussion this morning is going to focus on the challenges we face, it's important I begin by assuring you that your Armed Forces can deter a nuclear attack, defend the homeland, meet our alliance commitments, and effectively respond, should deterrents fail.

I believe today we have a competitive advantage over any potential adversary defined as the ability to project power and fight and win at the time and place of our choosing. But as members of this committee well know, 17 years of continuous combat and fiscal instability have affected our readiness and eroded the competitive advantage we enjoyed a decade or more ago. As the secretary highlighted, China and Russia have capitalized on our distraction and restraints by investing in capabilities specifically designed to challenge our traditional sources of strength. After careful study, the developed capabilities intended to contest our movement across all domains, sea, air, space, cyberspace, and land and disrupt our ability to project power.

With the help of Congress, starting in 2017 we began to restore that competitive advantage. Recent budgets have allowed us to build readiness and invest in new capabilities while meeting current operational commitments. But we cannot reverse decades of erosion in just a few years. This year's budget submission would allow us to continue restoring our competitive advantage by approving readiness and up and developing capabilities to enhance our lethality. It proposes investments in advanced capabilities across all domains, the air, land, space and cyberspace.

House Armed Services Committee Holds Hearing on Fiscal 2020 Defense Authorization

This year's budget also sustains investments in our nuclear enterprise to ensure a safe, secure, and effective strategic deterrent, the highest priority of the Department of Defense. We've also taken steps to more effectively employ the force we have today and build a force we need for tomorrow. We've implemented fundamental changes in our global force management process to prioritize and allocate resources in accordance with the national defense strategy while building readiness and the flexibility to respond to unforeseen contingencies.

We've also refined our process for developing and designing a future force. A joint concept threat--threat informed approach supported by a wide body of into lytic analytic work allows us to more deliberately evaluate and prioritize war fighting requirements. This also enables us to pair emerging technologies with innovative operational concepts.

In closing, I'd like to thank the committee for all we've done to support the men and women in uniform and their families. Together, we've honored their solemn obligation to never send our sons and daughters into a fair fight. And with your continued support, we never will.

SMITH: Thank you both. I appreciate that. Keeping in mind and acknowledging ranking member Thornberry's point that you don't make the policy, necessarily, that you are--you're sent up here to defend, regrettably neither President Trump nor Chief of Staff Mulvaney are going to testify before our committee, so we have to ask you about it and get your defense/explanation. And one of the biggest areas in the wall funding that's problematic for this committee and for the relationship between the Pentagon and Congress is the reprogramming requests.

And it is, you know, a bit of sort of arcane policy even I didn't fully understand. But by and large, the Pentagon is not allowed to simply move money from one account to another without coming back through the full legislative process. But given the amount of money that the at the Pentagon and given how much things change, we have given, through the congressional process, the ability to reprogram I think it was $4 billion last year.

But one of the sort of gentlemen's agreements about that was if you reprogram money, you will not do it without first getting the approval of all for relevant committees, Defense approps in the House and Senate, and armed services in the House and the Senate. For the first time since we've done that, on the reprogramming request help fund the wall, basically you're--you're shifting money from the MILPERS account into the, I forget what the drug--drug safety account, whatever it is, drug enforcement account so that you can then take it out of the account and put it to the wall. And you are not asking for our permission. Now, you understand that the result of that, likely, is that the Appropriations Committee in particular would no longer give--

[*]SMITH: -- the Pentagon reprogramming authority. I think that's unfortunate because they need it. And I guess my--my question is what was the discussion like about in deciding to break that rule and what is your view of the implications for it going forward, in terms of the relationship between the Pentagon and Congress in general, and specifically how much is it going to hamper you to not have reprogramming authority after this year?

SHANAHAN: Chairman, what was the second part of that? There was the disclosures the discussion--

SMITH: --How is it--how is it going to hamper the relationship--

SHANAHAN: --That was the--

SMITH: --The--I'm sorry, how was it going to hamper your ability to do your job if you don't have any reprogramming authority going forward?

SHANAHAN: Right, yeah. Well, the discussion, I think you and I have also been party to--to this discussion is that by unilaterally reprogramming, it was going to affect our ability long-term to be able to do discretionary reprogramming that we had traditionally done in coordination. It was a very difficult discussion and we understand the significant downsides of the losing what amounts to a privilege.

The conversation took place prior to the declaration of a national emergency. It was part of the consulting that went on. We said here are the risks longer-term to the department, and those risks--risks were weighed. And then given a legal order from the commander-in-chief, we are executing on that order. And as--as we discussed, the first reprogramming was $1 billion. And I wanted to do it before we had this committee hearing because we've been

House Armed Services Committee Holds Hearing on Fiscal 2020 Defense Authorization

talking about this for some time and I've been deliberately working to be transparent in this process, fully knowing that there is downsize, which will hamper us.

SMITH: And ultimately you ask for it--you asked for $1 billion yesterday and it's still the plan to ask for $2.4 billion out of the drug enforcement account?

SHANAHAN: We have--we haven't made the assessment of what--so consider these increments or tranches, however you want to praise them. Potentially, we could draw $2.5 billion when we look at the--the total general transfer authority. We think beyond that would be too painful to--being able to continue to maintain readiness and operations. But we don't know what that next increment of--of funding would look like.

SMITH: Right. And one final question on this piece. You're getting the money because I believe it's the Army, or was it the Army and the Marine Corps--

SHANAHAN: --Yeah--

SMITH: --That did not meet their end strength goals for--

SHANAHAN: --Let me ask David Norquist.

SMITH: Okay, sure.

NORQUIST: So the--the source of the money, as you pointed out at the beginning, is the military personnel account. The Army was falling short of its recruiting targets by about 9000, 9500. So funds that would have gone to pay the soldiers, had they been on board, is no longer needed for that purpose. That military personnel account is more like a mandatory in the sense that if there is no purpose, there's not a lot of--of other uses, and so it's available for reprogramming under those circumstances.

SMITH: I understand. So for the FY 20 budget, does your personnel request reflect that inability to recruit? Do sort of factor in, okay, we'd like to have this many, but are not? Does it make sense to give you the same amount of money from MILPER if it's just going to wind up in the drug enforcement account and then go to building a wall?

SHANAHAN: (OFF-MIC)

NORQUIST: (OFF-MIC) Yes, so we went ahead and plan to the '20 budget off of the--the Army revised its expectations for next year accordingly, and that's the number that's in the '20 budget, sir.

SMITH: Okay. Final question. So when it comes to the budget overall budget number, and I do have a slight quibble with the--with the idea that somehow this is all a problem because the Obama administration cut defense. I think in the extent that we rely on that political talking point, it undercuts the fact that this all happened because of the battle over the budget. I mean, the budget control act was in the past because the Obama administration decided they wanted to do it, it was passed because we were literally two days away from not paying our debts. There was a refusal by the then Republican controlled Congress to raise the debt ceiling and the only deal to be able to raise the debt ceiling was to agree to sequestration in the budget control act.

It was a bipartisan act of, well, self-flagellation, if you will, in terms of messing up our budget for 10 years to come just because we didn't have the political courage to live with the consequences of the money we had already spent. And that led to no end of problems, but it was a bipartisan problem. And really, it's a bipartisan unwillingness to address the reality that you can't balance the budget while cutting taxes and increasing spending, a choice has to be made.

But we decided not to make that choice, we decided to punt it into the artificial budget control act sequestration act. So a little greater honesty about the budget choices we faced is the best way out of this, not, you know, any fault of the Trump administration or the Obama administration.

House Armed Services Committee Holds Hearing on Fiscal 2020 Defense Authorization

SHANAHAN: I agree. Yes.

HAALAND: Okay. Do you agree with me that the administration's current policy of obstructing transgender individuals freedom to serve in the United States military essentially makes a mockery of this commitment?

DUNFORD: Congresswoman, just to be clear the current policy that's in place that was signed in 2017 allows transgender's to serve in the US military.

HAALAND: So they can serve freely right now?

DUNFORD: Today they can.

HAALAND: Okay, very good. And I've heard that I mean an argument is put forth that you know spending is a concern that they--that we don't want taxpayer money spent on gender dysphoria issues such as psychotherapy, prescriptions, surgeries and so forth and I just want you to know that we realize that that portion of the budget is minuscule in comparison to other things like for example erectile dysfunction which took $84 million out of the DOD budget.

So I just want you to know that I--I support wholeheartedly every single American who wants to serve in our military that they have an opportunity to do so and that with respect to budgets knowing that it's a minuscule amount that is spent on transgender troops I don't think that is anything that should dissuade them or us from--from their service and I yield my time.

SMITH: Thank you. If I could just follow up on that just briefly it--it--the policy that was just announced by the administration through the DOD is a bit more complicated, Sec. and I talked about this a little bit yesterday and I--I don't think it is the correct policy. It is not a blanket ban on people who are transgender from serving in the military. It does however make it very difficult for people depending on where they are at in terms of are they in the service, are they trying to join, have they had transition surgery, all of those things really, really complicated the ability of transgender people to serve in the military.

And I also feel that the policy as announced does not accurately reflect the--well, the medical facts but we will--we will be dealing with that later and I understand you have struggled to try and get the right policy there but it is considerably more complicated than even I thought at first glance. But I don't think right now the policy meets the standards that Ms. Haaland was hoping to have in terms of allowing diverse people to serve assuming that they are qualified, assuming that they can meet the qualifications for whatever job it is they are supposed to do in the military.

Mr. Thornberry, do you have anything quickly?

THORNBERRY: I do, Mr. Chairman. In the presence of the Sec. and Chairman and the Comptroller I just want to note that while we have been meeting today Andy Marshall(SP) has passed away. He served--he ran the office of net assessment from the Nixon administration to the Obama administration.

I can think of fewer people who have had a bigger impact on focusing our defense efforts, our national security in the right direction than--than Mr. Marshall and we--we talked about a lot of stuff today but I think as General Dunford started out it's about people. Some of them are not even in uniform but--but it is a remarkable life. He has been before our committee I don't know how many times over the years so I wanted to note that that passing but also to--to honor his memory because he made such a difference.

SMITH: And I think that is a very appropriate note to end on. We are adjourned. I thank you, gentlemen.

**Load-Date:** April 2, 2019

# EXHIBIT 40

# Walls Work



**WE ARE BUILDING THE FIRST NEW BORDER WALL IN A DECADE**.

DHS is committed to building a wall at our southern border and building a wall quickly. Under this President, we are building a new wall for the first time in a decade that is 30-feet high to prevent illegal entry and drug smuggling.

**FACT:** Prior to President Trump taking office, we have never built a border wall that high.

Once funding was provided, DHS began construction of a border wall quickly, in some locations in as little as nine months from funding to building – a process that commonly takes two years or more in other parts of Government. By the end of FY 2019, DHS expects to have construction completed or underway for more than 120 miles in the areas it's most needed by the U.S. Border Patrol. The pace of construction has picked up as initial limiting factors like land acquisition and funding have been addressed.

*Before*



*After*



*The El Centro Sector built approximately two miles of 30′ steel bollard wall west of the Calexico West Port of Entry. The contract was awarded in November 2017, construction started in February 2018 and was completed in October 2018.*

In FY 2017 Congress provided DHS $292 million to build 40 miles of a steel bollard wall in the San Diego, El Centro and El Paso Sectors – Border Patrol's highest priority locations – in place of an outdated and operationally ineffective barrier. DHS received its FY17 funding for border wall construction in May 2017. DHS awarded the first contract against that funding in November 2017 and began construction three months later in February 2018. As of November 21, 2018, CBP has constructed more than 31 of the 40 miles with the remaining 9 miles scheduled for completion by early 2019.

- **El Centro Project (2.25 miles):** Completed.
- **El Paso Project (20 miles):** Completed
- **San Diego Primary Project (14 miles):** Completion anticipated in May 2019.
- **El Paso Project (4 miles):** Construction started in September.

**Before**



**After**



*The El Centro Sector built approximately two miles of 30' steel bollard wall west of the Calexico West Port of Entry. The contract was awarded in November 2017, construction started in February 2018 and was completed in October 2018.*

*How effective is this new border wall?* On Sunday, when a violent mob of 1,000 people stormed our Southern border, we found the newly constructed portions of the wall to be very effective.  In the area of the breach, a group of people tore a hole in the old landing mat fence constructed decades ago and pushed across the border.  U.S. Border Patrol agents who responded to the area ultimately dispersed the crowd, which had become assaultive, and apprehended several individuals.  All of the individuals were either apprehended or retreated into Mexico.  That evening, the fence was repaired.  There were no breaches along the newly constructed border wall areas.

**In FY18, Congress provided $1.375B for border wall construction which equates to approximately 84 miles of border wall in multiple locations across the Southwest border, including:**

- $251M for a secondary border wall in the San Diego Sector
- $445M to construct a new levee wall system in the Rio Grande Valley Sector
- $196M to construct a new steel bollard wall system in Rio Grande Valley Sector
- $445M for a primary pedestrian wall in San Diego, El Centro, Yuma and Tucson Sectors

*What's next you might ask?* When combined with the funds provided in FY 2017 and FY 2018, if funded at $5B in FY 2019 DHS expects to construct more than 330 miles of border wall in the U.S. Border Patrol's highest priority locations across the Southwest border.

**DHS is positioned to construct 215 miles of Border Patrol's highest priority border wall miles including:**

- ~5 miles in San Diego Sector in California
- ~14 miles in El Centro Sector in California
- ~27 miles in Yuma Sector in Arizona
- ~9 miles in El Paso Sector in New Mexico
- ~55 miles in Laredo Sector in Texas

- ~104 miles in Rio Grande Valley Sector in Texas

**The Bottom Line:** Walls Work. When it comes to stopping drugs and illegal aliens from crossing our borders, border walls have proven to be extremely effective. Border security relies on a combination of border infrastructure, technology, personnel and partnerships with law enforcement at the state, local, tribal, and federal level. For example, when we installed a border wall in the Yuma Sector, we have seen border apprehensions decrease by 90 percent. In San Diego, we saw on Sunday that dilapidated, decades-old barriers are not sufficient for today's threat and need to be removed so new – up to 30 foot wall sections can be completed.

Last Published Date: December 14, 2018

# EXHIBIT 41

# El Paso Sector Texas | U.S. Customs and Border Protection

Welcome to the El Paso Sector of the U.S. Border Patrol.

This office provides law enforcement support for the counties of El Paso and Hudspeth in the state of Texas and the entire state of New Mexico.

This site provides Sector-related information, including Sector operations, Sector contact information, where our stations are located, and news.

Thank you for visiting the El Paso Sector web site.

Chief Patrol Agent

- Overview
- General Information
- Challenge Coin

## Overview

### History

As early as 1904, a small group of mounted Patrol Inspectors, later known as mounted guards, had operational headquarters at El Paso, Texas. They patrolled the Mexican border near El Paso on horseback to curb the flow of illegal Chinese aliens. The area of operation was later extended to include New Mexico and Arizona.

The El Paso Border Patrol Sector was established on July 1, 1924, under the authority of the Immigration Act approved by Congress on May 28, 1924. This Act created the Border Patrol as a uniformed law enforcement branch of the Immigration Bureau. The original El Paso Sector encompassed New Mexico and the three western counties of Texas. The first officers selected for the new Border Patrol came from the old mounted guards and Civil Services Register for Railway Mail Clerks.

The newly organized El Paso Border Patrol Station was assigned 25 Patrol Inspectors. Liquor smuggling from Mexico was a thriving industry and well organized, providing a means of considerable profit for illegal aliens entering the United States carrying a load of contraband.

As Border Patrolmen attempted to apprehend the smugglers, gunfights soon began to break out. Many bloody battles were fought in and around El Paso. Newspaper files indicate that not one 24-hour period passed in the month of February 1927 without a report of gun fighting along the border. The newly established Border Patrol built a reputation of winning most of the gun battles.

After the establishment of the El Paso Station, almost immediately a need was seen to have officers at outlying locations. Other stations opened within the sector and some were temporarily closed during the depression years for budgetary reasons.

### Area of Responsibility

Today, the El Paso Sector is one of nine Border Patrol Sectors that run along the Southwest Border of the United States with Mexico. The sector is comprised of eleven stations and covers the geographical region of the entire state of New Mexico as well as two counties within far west Texas.

The stations that make up the El Paso sector are:

- Alamogordo, New Mexico
- Albuquerque, New Mexico
- Deming, New Mexico
- El Paso, Texas
- Fabens, Texas
- Fort Hancock, Texas
- Las Cruces, New Mexico
- Lordsburg, New Mexico
- Santa Teresa, New Mexico
- Truth or Consequences, New Mexico
- Ysleta, Texas

The El Paso Sector employs approximately 2,400 Border Patrol Agent positions, six permanent vehicle checkpoints and patrols 268 miles of international border. The sector encompasses 125,500 square miles.

**General Information**

**Chief Patrol Agent:** Aaron A. Hull

**Deputy Chief Patrol Agent:** Chris Clem

**Service Area:** The El Paso Sector covers the entire state of New Mexico and the two western most counties in Texas, Hudspeth and El Paso. This consists of 125,500 square miles, 121,000 square miles in New Mexico and 4,500 square miles in Texas. There are 268 miles of international boundary.

**Sector Headquarters Location:** 8901 Montana Avenue, El Paso, Texas

**Stations:** Stations of the El Paso Sector are located in El Paso, Clint, Fort Hancock, and Ysleta, Texas and Alamagordo, Albuquerque, Deming, Las Cruces, Lordsburg, Truth or Consequences, and Santa Teresa, New Mexico. We have one sub-station in Silver City, New Mexico.

**Contact Information:** Phone: **(915) 834-8350**; Sector Headquarters Mailing Address: 8901 Montana Avenue, El Paso, TX 79925-1212

**Community Feedback:** We strive to provide quality service to our customers. If we have not lived up to this commitment, we would like to know. If we have met or exceeded your expectations, please let us know that as well. To comment on the services provided by this office, please write to the Sector Chief Patrol Agent. If you feel you were mistreated by a Border Patrol employee or wish to make a complaint of misconduct by a Border Patrol employee, you may write to the Chief Patrol Agent.

**Employment Opportunities:** To obtain information about employment opportunities with the Border Patrol, you may contact this Sector and ask to speak to a recruiter. Additional recruiter contact information is provided at Locate a Border

Patrol Recruiter. You will find additional information about careers with the Border Patrol in the Careers section of this Web site.

**Public Affairs Office:** To receive information concerning community or media-related issues, contact the El Paso Sector Public Affairs Office at **(915) 834-8312**.

**Vehicle Seizure Office:** Contact the El Paso Sector at **(915) 834-8541** for vehicle seizure or asset forfeiture inquiries.

**Border Community Liaison:** Jose Romero at JOSE.ROMERO@CBP.DHS.GOV

**Challenge Coin**



The El Paso Sector challenge coin, incorporating elements such as the U.S. flag, representations of Texas and New Mexico, and the motto, "Where the Legend Began."

# EXHIBIT 42

## Treasury Forfeiture Fund

### Program Summary by Budget Activity

| Budget Activity | FY 2017 Actual | FY 2018 Estimated [3] | FY 2019 Estimated | FY 2018 TO FY 2019 $ Change | % Change |
|---|---|---|---|---|---|
| Mandatory [1] | $479,446 | $489,833 | $450,000 | -$39,833 | -8.13% |
| Secretary's Enforcement Fund | $7,014 | $25,898 | $10,000 | -$15,898 | -61.39% |
| Strategic Support [2] | $39,768 | TBD | TBD | NA | NA |
| Total Cost of Operations | $526,228 | $515,731 | $460,000 | ($55,731) | -10.81% |
| Rescissions/Cancellations | ($1,398,050) | ($1,397,700) | ($400,000) | $997,700 | -71.38% |
| Contingent Liabilities | $387,011 | $355,000 | $355,000 | ($5,000) | -1.41% |
| Total FTE | 25 | 26 | 26 | | 0.00% |

[1] The Treasury Forfeiture Fund is staffed by Departmental Offices employees and positions are funded via reimbursable agreement. The FTE are shown here for clarity, but are also reflected in the Departmental Offices chapter in the reimbursable FTE total.
[2] For fiscal years 2018 and 2019, Treasury will revise Strategic Support (formerly known as Super Surplus) based on enacted appropriations and submit a plan to Congress if funding is available, once more is known about actual collections and expenses.
[3] FY 2018 full-year appropriations were not enacted at the time the budget was prepared; therefore, the budget assumes this account is operating under the Continuing Appropriations Act, 2018 (Division D of P.L. 115-56, as amended) and that the 2017 enacted rescission recurs in FY 2018.

### Summary

The Treasury Executive Office for Asset Forfeiture (TEOAF) administers the Treasury Forfeiture Fund. The Treasury Forfeiture Fund (the Fund) is the receipt account for deposit of non-tax forfeitures made pursuant to laws enforced or administered by participating Treasury and Department of Homeland Security agencies. The Fund was established in 1992 as the successor to what was then the Customs Forfeiture Fund. The Fund supports Treasury's goal of Enhancing National Security.

The enabling legislation for the Treasury Forfeiture Fund (Title 31 U.S.C. 9705) defines the purposes for which Treasury forfeiture revenue may be used.

### Explanation of Budget Activities

#### Mandatory ($450,000 from revenue/offsetting collections)

Mandatory expenses represent operating costs of the Fund, including storing and maintaining seized and forfeited assets, valid liens and mortgages, investigative expenses incurred in pursuing a seizure, information and inventory systems, remissions, victim restoration, and certain costs of local police agencies incurred in joint law enforcement operations. Following seizure, equitable shares may be paid to state and local law enforcement agencies that contributed to the seizure activity at a level proportionate to their involvement.

#### Secretary's Enforcement Fund ($10,000,000 from revenue/offsetting collections)

Secretary's Enforcement Fund (SEF) expenses are funded from revenue from equitable shares received from Department of Justice (DOJ) or U.S. Postal Service (USPS) forfeitures. These shares are proportionate to Treasury's participation in the overall investigative effort that led to a DOJ or USPS forfeiture. SEF revenue is available for federal law enforcement-related purposes of any bureau participating in the Fund.

#### Strategic Support (TBD from revenue/offsetting collections)

Strategic Support (formerly known as Super Surplus) authority, established by Congress in 31 U.S.C. 9705(g)(4)(B), allows TEOAF to fund priority federal law enforcement initiatives with remaining unobligated balances at the close of the fiscal year, after an amount is reserved for the next fiscal year's operations. Recently-enacted large rescissions have had a severe negative impact on the participating member agencies' investigations. Insufficient and inconsistent funding support, uncertainty about future funding, investigations disrupted by cash flow problems, and inability to obtain necessary technology/infrastructure in the absence of Strategic Support all undermine both current and future financial investigations and forfeitures.

### Contingent Liabilities ($350,000 from revenue/offsetting collections)

TEOAF tracks future remission payments to third parties as contingent liabilities. However, these amounts are not recorded as obligations from the Fund until the Department of Justice grants the petition for remission. The third parties are predominantly victims of crimes that triggered the forfeiture (e.g., Ponzi scheme or kleptocracy victims). Amounts recorded are significant because remission payments from multiple years are recorded and carried forward. The amounts change constantly as payments are made and amounts for new remission cases are added. TEOAF considers the amounts recorded as contingent liabilities as unavailable and believes that consideration of contingent liabilities provides a more accurate representation of the financial position of the Fund.

### Legislative Proposals

P.L. 114-113 rescinded $3,800,000,000 of the $3,838,800,000 forfeited by BNP Paribas in 2015 and prohibited Treasury from obligating the remaining balance. However, the remaining balance will remain in the Fund unless returned to the General Fund. Return of these funds to Treasury is being done solely to remove them from the Fund's account, but will not count as savings because the funds are already precluded from obligation.

### TEOAF Performance Highlights

| Budget Activity | Performance Measures | FY 2015 Actual | FY 2016 Actual | FY 2017 Actual | FY 2018 Target | FY 2019 Target |
|---|---|---|---|---|---|---|
| Treasury Forfeiture Fund | Percent of Forfeited Cash Proceeds Resulting from High-Impact Cases | 98.25 | 89.09 | 81.79 | 80.0 | 80.0 |

### Description of Performance

The TEOAF continues to measure the performance of the participating law enforcement bureaus through the use of the performance measure: percent of forfeited cash proceeds resulting from high impact cases. This measures the percentage of forfeited cash proceeds resulting from high impact cases, which are cases resulting in a cash forfeiture deposit equal to or greater than $100,000.

Focusing on strategic cases and investigations that result in high impact forfeitures will do the greatest damage to criminal organizations while accomplishing the ultimate objective, which is to disrupt and dismantle criminal activity. Member law enforcement bureaus participating in the Fund have met or exceeded the performance target since FY 2013. However; the performance declined from 89.09 percent to 81.79 percent from FY 2016 to FY 2017. This is attributable to large

rescissions leading to no Strategic Support funding available to the participating agencies in FY 2015 and FY 2016.  For FY 2018 and FY 2019, the target will remain at 80 percent. The Fund maintains a target of 80 percent because some cases may be important to pursue, even if they are not high-impact cases and result in deposits of less than $100,000.

# EXHIBIT 43

# Department of the Treasury
# Treasury Forfeiture Fund

# Congressional Budget Justification and Annual Performance Report and Plan

# FY 2019

# Table of Contents

**Section I – Purpose**..........................................................................................................**3**

   A – Mission Statement.................................................................................................. 3

   B – Summary of the Request ....................................................................................... 3

   1.1 – Appropriations Detail Table ............................................................................. 6

   1.2 – Operating Levels Table.................................................................................... 7

   D – Appropriations Language and Explanation of Changes ........................................ 8

   E – Legislative Proposals............................................................................................ 8

**Section II – Annual Performance Plan and Report** ........................................................**9**

   A – Strategic Alignment .............................................................................................. 9

   B – Budget and Performance by Budget Activity ........................................................ 9

   2.1.1  - Treasury Forfeiture Fund Resources and Measures ...................................... 9

## Section I − Purpose

### A − Mission Statement

To affirmatively influence the consistent and strategic use of asset forfeiture by law enforcement bureaus that participate in the Treasury Forfeiture Fund (the Fund) to disrupt and dismantle criminal enterprises.

### B − Summary of the Request

The Treasury Executive Office for Asset Forfeiture (TEOAF) administers the Fund, which is the receipt account for deposit of non-tax forfeitures made pursuant to laws enforced or administered by participating Treasury and Department of Homeland Security (DHS) bureaus. Principal revenue-producing bureaus include U.S. Customs and Border Protection, U.S. Immigration and Customs Enforcement, the Internal Revenue Service, and the U.S. Secret Service, among others. The Fund is a special fund, defined as a Federal fund account for receipts earmarked for specific purposes and the expenditure of those receipts. The law (31 U.S.C. 9705) allows TEOAF to use the funds for payment of all proper expenses of seizure or the proceeds of forfeiture and sale.

**Revenues** deposited in the Fund can be allocated and used as the result of a permanent indefinite appropriation provided by Congress. A forfeiture process begins once currency or property is seized. Seized currency is deposited into a suspense account (holding account) until forfeited. At that time, the forfeited amount is transferred (deposited) to the Fund as revenue. Forfeited properties are usually sold and the proceeds are also deposited into the Fund as revenue. This revenue represents budget authority for meeting obligations and expenses of the program.

**Expenses** of the Fund are set in a relative priority so that operating costs are met first and may not exceed revenues.

- **Mandatory** expenses represent operating costs of the Fund, including storing and maintaining seized and forfeited assets, valid liens and mortgages, investigative expenses incurred in pursuing a seizure, information and inventory systems, remissions, victim restoration, and certain costs of local police agencies incurred in joint law enforcement operations. Following seizure, equitable shares may be paid to state and local law enforcement agencies that contributed to the seizure activity at a level proportionate to their involvement.

- **Secretary's Enforcement Fund (SEF)** expenses are funded from revenue from equitable shares received from Department of Justice (DOJ) or U.S. Postal Service (USPS) forfeitures. These shares are proportionate to Treasury's participation in the overall investigative effort that led to a DOJ or USPS forfeiture. SEF revenue is available for federal law enforcement-related purposes of any bureau participating in the Fund.

- **Strategic Support (formerly known as Super Surplus)** authority, established by Congress in 31 U.S.C. 9705(g)(4)(B), allows TEOAF to fund priority federal law enforcement initiatives with remaining unobligated balances at the close of the fiscal year, after an amount is reserved for the next fiscal year's operations.

**Priorities:** In FY 2019, TEOAF will continue to support the investigations and activities of the participating law enforcement bureaus. The bulk of TEOAF expenses include supporting seizures and forfeitures to protect the health and safety of U.S. citizens and the commercial interests of U.S. businesses from pernicious criminal activity.  Funds are expended for seizure, storage, maintenance, disposition, and destruction and all costs associated with those activities.

TEOAF focuses on supporting cases and investigations that meet the mission of disrupting and dismantling criminal enterprises.  To this end, TEOAF prioritizes major case[1] initiatives when allocating funding to member agencies, including the purchase of evidence and information, joint operations expenses, investigative expenses leading to seizure, and asset identification and removal teams.  Major case initiatives are aligned directly to the National Money Laundering and Southwest Border strategies.

TEOAF also combats emerging patterns and practices that threaten our Nation's financial stability.  Funds are used to support anti-money laundering/combating financing of terrorism (AML/CFT) investigations and activities.  To be effective, analysis of large data caches and cryptocurrency-related crime requires large investments in advanced information technology hardware, software, training, and other capabilities.  These investments buttress the AML/CFT strategy of the Secretaries of Homeland Security and the Treasury.  If available, TEOAF plans to use Strategic Support (formerly super surplus) funds in FY 2019 to support such investments.

**Challenges:** Recently-enacted large rescissions have had a severe negative impact on the participating member agencies' investigations. Insufficient and inconsistent funding support, uncertainty about future funding, investigations disrupted by cash flow problems, and inability to obtain necessary technology/infrastructure in the absence of Strategic Support all undermine both current and future financial investigations and forfeitures.  FY 2017 total revenue was the lowest since FY 2007, and the substantial drop in "base" revenue (revenue from non-major forfeitures) that is relied upon to cover basic mandatory costs of the forfeiture program is especially troubling.  Total FY 2017 "base" revenue was $349 million, as compared to $419 million in FY 2016, $387 million in FY 2015, and $410 million in FY 2014.

---

[1]A major case refers to a case where the forfeiture results in a deposit greater than $5 million, or a case that disrupts, dismantles, or interrupts money laundering networks or other financial activities that threaten the financial stability, financial system, or financial interests of the United States.

The table below reflects forfeiture revenue from all sources including direct revenue, reverse asset sharing, and interest earned.



*FY 2015 data does not include the BNP Paribas S.A. forfeiture in the amount of $3,839 million. Of that amount, $3,800 million was permanently rescinded and transferred to the newly-created U.S. Victims of State Sponsored Terrorism Fund (USVSST) as directed by Congress under the Consolidated Appropriations Act of 2016, Pub. L. 114-113, Div. O, Tit. IV, §404(e) and §405(b). The remainder is precluded from obligation.

Participating agencies are seeing reluctance in the field to undertake complex major investigations due to the lack of assurance that their efforts would receive continuous support. Strategic Support funding is especially critical as a strategic investment in the agencies' operational capabilities and infrastructure supporting major cases.  It provides law enforcement much-needed flexibility to respond in real time to unanticipated critical needs, such as those driven by technology advancements or emerging criminal threats.  It often serves as seed funding for innovations that need to be tested and refined prior to full-scale implementation.

It is precisely the most important, high-impact[2] financial investigations that suffer the most from the absence of Strategic Support funding, as they require additional resources and cutting-edge capabilities (e.g., big data analytics, virtual currency tracking, mobile forensics).  Undermining these major financial investigations will directly impact the ability of Treasury and DHS to respond to priority threats such as identity theft, fentanyl trafficking, and network intrusion, and to protect the integrity of the U.S. financial system.

In addition, TEOAF tracks future remission payments to third parties as contingent liabilities.  However, these amounts are not recorded as obligations from the Fund until the Department of Justice grants the petition for remission.  The third parties are predominantly victims of crimes

---

[2] A high-impact case refers to a case resulting in a cash forfeiture deposit equal to or greater that $100,000.

that triggered the forfeiture (e.g., Ponzi scheme or kleptocracy victims). Amounts recorded are significant because remission payments from multiple years are recorded and carried forward. The amounts change constantly as payments are made and amounts for new remission cases are added. TEOAF considers the amounts recorded as contingent liabilities as unavailable and believes that consideration of contingent liabilities provides a more accurate representation of the financial position of the Fund.

## 1.1 − Appropriations Detail Table

Dollars in Thousands

| Treasury Forfeiture Fund | FY 2017 | | FY 2018 | | FY 2019 | | FY 2018 to FY 2019 | | | |
| Budgetary Resources | Actual | | Estimated[4] | | Estimated | | $ Change | | % Change | |
| | FTE | AMOUNT | FTE | AMOUNT | FTE | AMOUNT | FTE | AMOUNT | FTE | AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue/Offsetting Collections** | | | | | | | | | | |
| Interest | 0 | $18,930 | 0 | $24,000 | 0 | $9,000 | 0 | (15,000) | 0 | -62.50% |
| Restored Temporary Rescission | 0 | 876,000 | 0 | 988,000 | 0 | 988,000 | 0 | 0 | 0 | 0.00% |
| Restored Sequestration | 0 | 124,327 | 0 | 96,050 | 0 | 96,690 | 0 | 640 | 0 | 0.67% |
| Forfeiture Revenue | 0 | 497,096 | 0 | 453,000 | 0 | 429,000 | 0 | (24,000) | 0 | -5.30% |
| Recovery from Prior Years | 0 | 41,622 | 0 | 40,000 | 0 | 30,000 | 0 | (10,000) | 0 | -25.00% |
| Unobligated Balances from Prior Years | 0 | 1,034,832 | 0 | 668,529 | 0 | 355,158 | 0 | (313,371) | 0 | -46.87% |
| **Total Revenue/Offsetting Collections** | | **$2,592,807** | | **$2,269,579** | | **$1,907,848** | | **($361,731)** | | **-15.94%** |
| **Expenses/Obligations** | | | | | | | | | | |
| Asset Forfeiture | | | | | | | | | | |
| Mandatory[1] | 25 | $479,446 | 26 | $489,833 | 26 | $450,000 | 0 | ($39,833) | 0 | -8.13% |
| Secretary's Enforcement Fund | 0 | 7,014 | 0 | 25,898 | 0 | 10,000 | 0 | (15,898) | 0 | -61.39% |
| Strategic Support[2] | 0 | 39,768 | 0 | TBD | 0 | TBD | 0 | NA | 0 | NA |
| **Total Expenses/Obligations** | **25** | **$526,228** | **26** | **$515,731** | **26** | **$460,000** | **0** | **($55,731)** | **0** | **-10.81%** |
| **Rescissions/Cancellations** | | | | | | | | | | |
| Sequestration Reduction[3] | 0 | (96,050) | 0 | (96,690) | 0 | 0 | 0 | 96,690 | 0 | -100.00% |
| Temporary Rescission | 0 | (988,000) | 0 | (988,000) | 0 | 0 | 0 | 988,000 | 0 | -100.00% |
| Permanent Cancellation | 0 | (314,000) | 0 | (314,000) | 0 | (400,000) | 0 | (86,000) | 0 | 27.39% |
| **Total Rescissions/Cancellations** | | **($1,398,050)** | | **($1,398,690)** | | **($400,000)** | | **$998,690** | | **-71.40%** |
| **Net Results** | | **$668,529** | | **$355,158** | | **$1,047,848** | | **$692,690** | | **195.04%** |
| | | | | | | | | | | |
| **Contingent Liabilities** | | **$387,011** | | **$355,000** | | **$350,000** | | **($5,000)** | **0** | **-1.41%** |

[1] The Treasury Forfeiture Fund is staffed by Departmental Offices employees and positions are funded via reimbursable agreement. The FTE are shown here for clarity, but are also reflected in the Departmental Offices chapter in the reimbursable FTE total.
[2] For fiscal years 2018 and 2019, Treasury will revise Strategic Support (formerly known as Super Surplus) based on enacted appropriations and submit a plan to Congress if funding is available, once more is known about actual collections and expenses.
[3] Treasury will compute the FY 2019 sequestration reduction once the OMB Report to Congress on the Joint Committee Sequestration for Fiscal Year 2019 is released.
[4] FY 2018 full-year appropriations were not enacted at the time the budget was prepared; therefore, the budget assumes this account is operating under the Continuing Appropriations Act, 2018 (Division D of P.L. 115-56, as amended) and that the 2017 enacted rescission recurs in FY 2018.

## 1.2 – Operating Levels Table

Dollars in Thousands

| Treasury Forfeiture Fund<br>Object Classification | FY 2017<br>Actual | FY 2018<br>Estimated | FY 2019<br>Estimated |
|---|---|---|---|
| 25.2 - Other services from non-Federal sources | $56,124 | $60,000 | $52,000 |
| 25.3 - Other goods and services from Federal sources | 159,125 | 120,000 | 104,000 |
| 26.0 - Supplies and materials | 19 | 19 | 15 |
| 41.0 - Grants, subsidies, and contributions | 200,689 | 208,729 | 200,000 |
| 43.0 - Interests and dividends | 32 | 30 | 30 |
| 44.0 - Refunds | 43,557 | 64,953 | 55,955 |
| 94.0 - Financial transfers | 46,682 | 62,000 | 48000 |
| **Total Non-Personnel** | **$506,228** | **$515,731** | **$460,000** |
| **Total Budgetary Resources** | **$506,228** | **$515,731** | **$460,000** |
| **FTE** | **25** | **26** | **26** |

**D − Appropriations Language and Explanation of Changes**

| Appropriations Language | Explanation of Changes |
|---|---|
| DEPARTMENT OF THE TREASURY<br>TREASURY FORFEITURE FUND<br><br>(CANCELLATION)<br>*Of the unobligated balances available under this heading, $400,000,000 are hereby permanently cancelled not later than September 30, 2019.*<br><br>(INCLUDING RETURN OF FUNDS)<br><br>*In addition, of amounts in the Treasury Forfeiture Fund, $38,800,000 from funds paid to the United States Government by BNP Paribas S.A. as part of, or related to, a plea agreement dated June 27, 2014, entered into between the Department of Justice and BNP Paribas S.A., and subject to a consent order entered by the United States District Court for the Southern District of New York on May 1, 2015, in United States v. BNPP, No. 14 Cr. 460 (S.D.N.Y.), are hereby returned to the General Fund of the Treasury.*<br><br>Note.— A full-year 2018 appropriation for this account was not enacted at the time the budget was prepared; therefore, the budget assumes this account is operating under the Continuing Appropriations Act, 2018 (Division D of P.L. 115-56). The amounts included for 2018 reflect the annualized level provided by the continuing resolution. | P.L. 114-113 rescinded $3,800,000,000 of the $3,838,800,000 forfeited by BNP Paribas in 2015 and prohibited Treasury from obligating the remaining balance. However, the remaining balance will remain in the Fund unless returned to the General Fund. Return of these funds to Treasury is being done solely to remove them from the Fund's account, but will not count as savings because the funds are already precluded from obligation. |

**E − Legislative Proposals**

The Fund has no legislative proposals for FY 2019.

## Section II − Annual Performance Plan and Report

### A − Strategic Alignment

The purpose of the Fund is to ensure resources are managed to cover the costs of an effective asset seizure and forfeiture program, including the costs of seizure or the proceeds of forfeiture and sale, including the expenses of detention, inventory, security, maintenance, advertisement, or disposal of the property.  Additionally, the Fund is used to support law enforcement priorities, financial investigative capabilities, and the seizure of physical and financial resources to disrupt and dismantle criminal enterprises.  TEOAF supports the following Department of the Treasury strategic goal and associated objectives:

- Goal 3: Enhance National Security:
  - o  3.1 Strategic Threat Disruption
  - o  3.2 AML/CFT Framework

### B − Budget and Performance by Budget Activity

### 2.1.1  - Treasury Forfeiture Fund Resources and Measures

Dollars in Thousands

| Treasury Forfeiture Fund Budget Activity | | | | | | | |
|---|---|---|---|---|---|---|---|
| Resource Level | FY 2013 Actual | FY 2014 Actual | FY 2015 Actual | FY 2016 Actual | FY 2017 Actual | FY 2018 Estimated | FY 2019 Estimated |
| Expenses/Obligations | $908,113 | $787,849 | $4,360,617 | $508,746 | $526,228 | $515,731 | $560,045 |
| Budget Activity Total | $908,113 | $787,849 | $4,360,617 | $508,746 | $526,228 | $515,731 | $560,045 |

| Measures | FY 2013 Actual | FY 2014 Actual | FY 2015 Actual | FY 2016 Actual | FY 2017 Actual | FY 2017 Target | FY 2018 Target | FY 2019 Target |
|---|---|---|---|---|---|---|---|---|
| Percent of Forfeited Cash Proceeds Resulting from High-Impact Cases | 95.09 | 86.73 | 98.25 | 89.09 | 81.79 | 80.00 | 80.00 | 80.00 |

### Treasury Forfeiture Fund Budget and Performance

*($560,045,000 in obligations from revenue/offsetting collections):*

The Fund continues to measure the performance of the participating law enforcement bureaus through the use of the performance measure "Percent of forfeited cash proceeds resulting from high-impact cases."  This measures the percentage of forfeited cash proceeds resulting from cases that yield a cash forfeiture deposit equal to or greater than $100,000.

Focusing on strategic cases and investigations that result in high-impact forfeitures will do the greatest damage to criminal organizations while accomplishing the ultimate objective, which is to disrupt and dismantle criminal activity. Member law enforcement bureaus participating in the Fund have met or exceeded the performance target since FY 2013.  However; the performance declined from 89.09% to 81.79% from FY 2016 to FY 2017.  This is attributable to large rescissions which resulted in no Strategic Support funding available to the participating agencies in FY 2015 and FY 2016.  For FY 2018 and FY 2019, the target will remain at 80 percent.  The Fund maintains a target of 80 percent because some cases may be important to pursue, even if they are not high-impact cases and result in deposits of less than $100,000.

With the publication of the Treasury Strategic Plan for FY 2018-2022, Treasury will work in FY 2018 to baseline its performance against the new strategic objectives.  This could result in additional changes to performance measures in the FY 2020 Budget.

# EXHIBIT 44



DEPARTMENT OF JUSTICE

EQUITABLE SHARING WIRE

**March 28, 2016**

## Resumption of Equitable Sharing Payments

The Department of Justice is pleased to announce that, effective immediately, the Department is resuming Equitable Sharing payments to State, local, and tribal law enforcement agencies. As you know, the Bipartisan Budget Act of 2015 included a $746 million permanent reduction, or "rescission," that, when combined with the additional rescission of $458 million contained in the Consolidated Appropriations Act signed into law in December 2015, reduced Asset Forfeiture Program funds by $1.2 billion. Those rescissions threatened the financial solvency of the Assets Forfeiture Fund, and forced the Department to take cost-cutting steps across all discretionary programs, including on December 21, 2015, the deferral of Equitable Sharing payments.

It's worth repeating that we did not make the decision to defer Equitable Sharing payments lightly, and it was always our intent to resume payments as soon as it became financially feasible. Thus, in the months since we had to make that difficult decision, we explored alternative options, while also keeping a close eye on incoming receipts. And now, we are finally at a point where it is no longer necessary to continue the deferral.  Therefore, effective immediately, we are resuming payments and agencies will receive the full amount of their share of any approved Equitable Sharing payments.

In order to help answer any questions you may have, I have attached a fact sheet explaining the resumption of Equitable Sharing payments.  As always, the Department is available if you have additional specific questions or comments not addressed in this fact sheet.  Please direct any correspondence to afmls.communications@usdoj.gov.

The Department is grateful to our partners for standing by us on our federal law enforcement task forces while the deferral was in effect.  We understand this deferral has been difficult for many of you, as you depend on these resources for your critical law enforcement efforts to disrupt and dismantle criminal activity.  The Department appreciates all the support and patience that you have afforded to the Department while we worked through this unfortunate, but necessary response to financial circumstances that were beyond our control.

**Key Contacts**
**Permissible Use of Funds**          **A-133 Audit Inquiries**
Afmls.aca@usdoj.gov                   A133sharing@usdoj.gov

**Subscription**
To **subscribe** or **unsubscribe** to or from this email, please send a plain text email to eswire-subscribe@lists.usdoj.gov or eswire-unsubscribe@lists.usdoj.gov.

**Websites**
**Department of Justice Equitable Sharing Program**
www.justice.gov/criminal-afmls/equitable-sharing-program

**Treasury Executive Office for Asset Forfeiture**
www.treasury.gov/about/organizational-structure/offices/Pages/The-Executive-Office-for-Asset-Forfeiture.aspx

# EXHIBIT 45



**United States Government Accountability Office**
**Washington, DC 20548**

January 29, 2009

Congressional Committees

Subject: *Secure Border Initiative Fence Construction Costs*

Much of the United States' 6,000 miles of international borders with Canada and Mexico remains vulnerable to illegal entry of aliens, criminals, and cargo. The Department of Homeland Security (DHS) apprehends hundreds of thousands of people and seizes large volumes of cargo entering the country illegally each year; however, several hundreds of thousands of individuals and an unknown volume of contraband also enter the United States illegally and undetected. DHS's U.S. Customs and Border Protection (CBP) is the agency responsible for securing the nation's borders along and between ports of entry.[1]   In November 2005, DHS announced the launch of the Secure Border Initiative (SBI), a multiyear, multibillion-dollar program aimed at securing U.S. borders and reducing illegal immigration. CBP's SBI program office is responsible for managing the SBI program and for developing a comprehensive border protection system. This system has two main components: SBI*net*, which employs radars, sensors, and cameras to detect, identify, and classify the threat level associated with an illegal entry into the United States between the ports of entry, and SBI tactical infrastructure (TI), fencing, roads, and lighting intended to enhance U.S. Border Patrol agents' ability to respond to the area of the illegal entry and bring the situation to a law enforcement resolution (i.e., arrest). The current focus of the SBI program is on the southwest border areas between ports of entry that CBP has designated as having the highest need for enhanced border security because of serious vulnerabilities.

The Consolidated Appropriations Act, 2008, required DHS to complete construction by December 31, 2008, of either 370 miles or other mileage determined by the Secretary, of reinforced fencing along the southwest border wherever the Secretary determines it would be most practical and effective in deterring smugglers and aliens attempting illegal entry.[2] DHS set a goal to complete approximately 670 miles of

---

[1] At a port of entry location, CBP officers are to secure the flow of people and cargo into and out of the country, while facilitating legitimate travel and trade.

[2] Pub. L. No. 110-161, div. E, § 564(a)(2)(B)(ii), 121 Stat. 1844, 2090-91 (2007) (amending section 102(b)(1) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, div. C, 110 Stat. 3009-546, 3009-554, as amended by section 3(2) of the Secure Fence Act of 2006, Pub. L. No. 109-367, 120 Stat. 2638, 2639).  This provision also required the construction of reinforced fencing along a total of not less than 700 miles of the southwest border where fencing would be most practical and effective, but it did not establish a deadline for completion of the full 700 miles.

which 81 miles of fencing were constructed. PF 225 is the second pedestrian fencing project and is expected to result in approximately 210 miles of fence construction. The VF 300 project is expected to construct approximately 227 miles of vehicle fencing barriers along the southwest border. SBI program officials explained that the total fencing miles completed or planned under these projects total 661 because several fencing segments that were scheduled to be built in calendar year 2008 will now be constructed through a different project in calendar year 2009 (see table 1).

**Table 1: Fence Projects along the Southwest Border**

| Fence projects | Pedestrian fence miles | Vehicle fence miles | Total miles |
|---|---|---|---|
| PF 70 | 81 | N/A | **81** |
| PF 225 | 210 | N/A | **210** |
| VF 300 | N/A | 227 | **227** |
| Legacy pedestrian fence | 67[a] | N/A | **67** |
| Legacy vehicle fence | N/A | 76[a] | **76** |
| **Total** | **358** | **303** | **661** |

Source: SBI.

Note: N/A = not applicable.

[a]Seventy-eight miles of pedestrian fencing and 57 miles of vehicle fencing were in place before the SBI program began. However, since SBI began construction, some miles of fencing have been removed, replaced or retrofitted resulting in mileage totals that are different from those we have previously reported.

In an effort to identify lower-cost and easily deployable fencing solutions, CBP funded a project called Fence Lab in February 2007. Fence Lab tested fence/barrier prototypes and evaluated them based on performance criteria such as their ability to disable a vehicle traveling at 40 miles per hour, allowing animals to migrate through them, and cost-effectiveness. SBI TI program office officials told us these performance standards apply only to primary fencing, and SBI currently does not have performance standards for secondary fencing. Each style of fencing has different costs associated with construction, and the Border Patrol determines which fencing style is appropriate based on the operational need of a specific geographic area along the southwest border. Figure 2 shows examples of approved SBI Fence Lab fencing.

**Figure 2: Examples of SBI Fence Lab Fencing Styles**



Sources: CBP and GAO.

Picket fence (upper left), post and rail with wire mesh (upper right), and bollard fence (lower left) are examples of pedestrian fencing; Normandy vehicle barrier (lower right), is an example of vehicle fencing.

In October 2007, we reported that fencing costs vary based on the type of terrain, materials used, land acquisition, who performs the construction, and the need to meet an expedited schedule.[11] To minimize one of the many factors that add to cost, in the past, DHS used Border Patrol agents and DOD personnel to construct the fencing. At that time, CBP officials also reported that they planned to use commercial labor for future infrastructure projects because using Border Patrol agents took them away from their other duties and the Department of Defense had notified DHS that military personnel would no longer be available to build fencing.

**Costs of Fencing Completed**

As of September 30, 2007, about 73 miles of SBI fencing had been completed by CBP at a cost of approximately $198 million. Of the 73 miles of fencing, the SBI program had completed about 70 miles of pedestrian fencing through the PF 70 project at a cost of approximately $192 million, with per mile costs ranging from $400,000 to $4.8 million and about 1 mile of pedestrian fencing through the PF 225 project at a cost of about $3.0 million. In addition, approximately 2 miles of vehicle fencing were

---

[11]See GAO, *Secure Border Initiative: Observations on Selected Aspects of SBInet Program Implementation*, GAO-08-131T (Washington, D.C.: Oct. 24, 2007).

constructed at a cost of $2.8 million. Table 2 summarizes SBI fencing miles, costs, and cost ranges and average costs as of September 30, 2007.

**Table 2: Completed Miles and Cost of SBI Fencing as of September 30, 2007**

Dollars in millions

| Project | Miles completed | Project cost | Cost range per mile | Average cost per mile |
|---|---|---|---|---|
| PF 70 | 70[a] | $192.3 | $0.4 to 4.8 | $2.7 |
| PF 225 | 1[b] | 3.0 | 4.2 | 4.2 |
| VF 300 | 2[c] | 2.8 | 1.8 | 1.8 |
| **Total** | **73** | **$198.1** | **N/A** | **N/A** |

Source: SBI.

Note: N/A = not applicable.

[a]This excludes approximately 5 miles that were completed under PF 70, but were not funded by SBI.

[b]Actual fence completed was 0.72 miles.

[c]Actual fence completed was 1.6 miles.

As of October 31, 2008, CBP had completed a total of about 215 miles of SBI fencing at a cost of approximately $625 million. Of the 215 miles of fencing, 75 miles were completed under PF 70 at a cost of approximately $214 million, 65 miles were completed under PF 225 at a cost of about $334 million, and 75 miles were completed under VF 300 at a cost of approximately $78 million. Table 3 summarizes SBI fencing miles, costs, and cost ranges and average costs as of October 31, 2008.

**Table 3: Completed Miles and Cost of SBI Fencing as of October 31, 2008**

Dollars in millions

| Project | Miles completed | Project cost | Cost range per mile | Average cost per mile |
|---|---|---|---|---|
| PF 70 | 75[a] | $213.6 | $0.4 to 4.8 | $2.8 |
| PF 225 | 65 | 333.7 | 2.8 to 15.1 | 5.1 |
| VF 300 | 75 | 78.1 | 0.2 to 1.8 | 1.0 |
| **Total** | **215** | **$625.4** | **N/A** | **N/A** |

Source: SBI.

Note: N/A = not applicable.

[a]This excludes approximately 5 miles that were completed under PF 70, but were not funded by SBI.

The per mile cost ranges can be attributed to several factors. For example, by design, it is less expensive to construct vehicle fencing than pedestrian fencing. Also, as discussed previously, costs for fencing completed by commercial contractors are higher than for fencing built by the Border Patrol or the military. In addition, differences in terrain and other factors, such as whether the fencing is built on public or private land, can drive cost differences. More specifically, the increase in costs between the PF 70 and PF 225 projects occurred, in part, because there were minimal land acquisition costs in fiscal year 2007 when most of PF 70 was being built, while costs for real estate, labor, and materials increased in fiscal year 2008 when PF 225 was being built. In addition, about 40 percent of PF 70 was built by Border Patrol and

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday afternoon, GAO posts on its Web site newly released reports, testimony, and correspondence. To have GAO e-mail you a list of newly posted products, go to www.gao.gov and select "E-mail Updates." |
| **Order by Phone** | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's Web site, http://www.gao.gov/ordering.htm. <br><br> Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. <br><br> Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact: <br><br> Web site: www.gao.gov/fraudnet/fraudnet.htm <br> E-mail: fraudnet@gao.gov <br> Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Ralph Dawn, Managing Director, dawnr@gao.gov, (202) 512-4400 <br> U.S. Government Accountability Office, 441 G Street NW, Room 7125 <br> Washington, DC 20548 |
| **Public Affairs** | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 <br> U.S. Government Accountability Office, 441 G Street NW, Room 7149 <br> Washington, DC 20548 |

# EXHIBIT 46

**CQ Congressional Transcripts**

Mar. 14, 2019

Mar. 14, 2019 Revised Final

# Senate Armed Services Committee Holds Hearing on the Defense Budget Posture

## LIST OF PANEL MEMBERS AND WITNESSES

INHOFE:

Our meeting will come to order. It's nice to have the Steve Turner, northeastern state in the audience today to advise us along our line and we are very pleased to have the Patrick Shanahan, the Acting Secretary of Defense, General Joseph Dunford, the chairman of the Joint Chiefs of Staff, David Norquist, and I have to say, David, I enjoyed our breakfast together the other day and--and I think it--some people think it's pretty outrageous that we can actually have an audit. I'm glad that--I'm glad that you're in charge of it.

NORQUIST:

Thank you, sir.

INHOFE:

Thank the panel for their distinguished service to the country and I'm pleased to see that the Department of Defense budget request for $718.3 billion and the overall national defense request of $750 billion. This amount is an increase of less than three percent of real growth. You know, we have a--this manual represents the--the blueprints that we are following right

Thank you, Mr. Chairman. Secretary Shanahan, the recently released Missile Defense Review directed a study on operationalizing the Aegis Ashore site at the arrange facility PMRF on Kauai. You and I discussed this. We--I have some significant concerns about what operationalizing this site would do to PMR's ability to meet its testing mission, which I assume you agree is important. You can--

SHANAHAN:
--No, absolutely, senator And--

HIRONO:
--Thank you. I'll get to the question.

SHANAHAN:
All right.

HIRONO:
As well as the impact of--of removing that testing capacity from PMRF. So briefly, could you tell us how operationalizing the Aegis ashore site and Kauai would add to our ability to defend Hawaii from missile threats, especially as the major missile threat to Hawaii would be an ICBM and the Aegis ashore is not set up to counter ICBMs.

SHANAHAN:
My understanding of the request and the MDR is that it's a study to assess taking the test assets and operationalizing them. And as--as you will point out, the ground-based midcourse defense system that is resident in Alaska

defends Hawaii. I believe that the study will look at what are other threats that may be posed to Hawaii and how there might be a layered defense. But as you pointed out, the test range there is vital capability and capacity were developing our missile defense systems.

HIRONO:

So I want to make sure that my concerns are in the record. For Secretary Shanahan and General Dunford, two weeks ago, before this committee, General O'Shaughnessy, the North--Northern command commander testified that the current situation at our Southern border is, to quote him, "Not a military threat." Do you agree, Secretary Shanahan, that the situation in the southern border is not a military threat?

SHANAHAN:

Senator, you--you are referring to General O'Shaughnessy's testimony?

HIRONO:

Yes.

SHANAHAN:

Yeah, what--what I recall from his testimony is he said that it is not a military threat, he said--he said border security is national security.

HIRONO:

I understand that, but he said specifically that it's not a military threat. I'm asking whether you agree with him that it's not a military threat.

SHANAHAN:

I agree with him.

HIRONO:

General Dunford?

DUNFORD:

I agree. It's a security challenge, not a military threat.

HIRONO:

So you testified, Secretary, Mr. Secretary, that there were 6,000 troops currently deployed at our southern border. Can you tell us how long they were going to be there?

SHANAHAN:

The--I'd say 30 or 40 percent of them will be departing in the next month or so when they complete some of their work. And I believe will probably draw down to between 3 and 4,000.

HIRONO:

Is it something that the president is indicating to you or can he say that I want you all to remain at the border?

SHANAHAN:

You know, this was part of the tasking from the department of homeland security. And based on their request to us--

HIRONO:

--From the president?

SHANAHAN:

From--from the department.

HIRONO:

Yes. Let me get on to a matter that is of great concern to--to some--to a lot of us, actually. Secretary Shanahan, in your response to Senator Inhofe's question about refueling the Truman, you stated that going the workforce in the shipyard is a priority and the move to not refuel the Truman would save 3 $.4 billion over 5 years. And how does canceling three years of shipyard work grow the workforce there?

SHANAHAN:

Yes, the--the workforce, when--when we look at what is in the shipyards, so the combination of submarines, new carriers, and then maintenance, all of that is done in the same shipyards and that workforce moves from project to project. So when we look at the total employment, the actual total employment goes up over the period of time in which we are building the two carriers.

HIRONO:

Frankly, as I talked with some of the people from the shipyards, I'm not sure that that is the case. And it'll cost about $3.4 billion to refuel the Truman, which by the way, by not refueling, were only getting about 50 percent of the Truman's service life. So at the same time, there's $3.6 billion in the

**Testimony & Transcripts**

<u>Complete written testimony for this event</u> March 14, 2019

**About Senate Armed Services**

<u>Staff</u>

<u>Hearing</u>

<u>Transcripts</u>

<u>Testimony</u>

<u>Committee Reports</u>

<u>Associated Bills</u>

<u>Schedules</u>

<u>Markup</u>

<u>Amendments</u>

© 2019 · CQ - Roll Call, Inc · All Rights Reserved.

1625 Eye Street, Suite 200 · Washington, D.C. 20006-4681 · 202-650-6500

About CQ    Help    Privacy Policy    Masthead    Terms & Conditions

# EXHIBIT 47

Stenographic Transcript
Before the


COMMITTEE ON
ARMED SERVICES


# UNITED STATES SENATE



TO RECEIVE TESTIMONY ON UNITED STATES STRATEGIC
COMMAND AND UNITED STATES NORTHERN COMMAND IN
REVIEW OF THE DEFENSE AUTHORIZATION REQUEST FOR
FISCAL YEAR 2020 AND THE FUTURE YEARS DEFENSE
PROGRAM

Thursday, February 26, 2019


Washington, D.C.


ALDERSON COURT REPORTING
1111 14TH STREET NW
SUITE 1050
WASHINGTON, D.C. 20005
(202) 289-2260
www.aldersonreporting.com

1   expect to have success with 20th century technology against

2   21st century threats.

3       Chairman Inhofe:  Which is what we have had.

4       Thank you very much.

5       Senator Reed?

6       Let me interrupt, Senator Reed, if I might, because we

7   do have a quorum now.

8       I will ask the committee to consider a list of 1,818

9   pending military nominations.  All the nominations have been

10  before the committee the required length of time.  Is there

11  a motion?

12      Senator Reed:  So moved.

13      Senator Fischer:  Second.

14      Chairman Inhofe:  All in favor, say aye.

15      [Chorus of ayes.]

16      Chairman Inhofe:  No?

17      [No response.]

18      Chairman Inhofe:  It carries.

19      Senator Reed?

20      Senator Reed:  Thank you, Mr. Chairman.

21      General O'Shaughnessy, as I have indicated in my

22  opening statement, I have concerns about the use of American

23  military forces along the southern border and a hard time

24  understanding the nature of an emergency that would require

25  military forces when nowhere in the National Defense

23

1    Strategy, the worldwide threat statement from the

2    intelligence community, nor the statement from the Commander

3    of SOUTHCOM indicate that migrant caravans of civilians

4    across the border are a military threat.  In fact, in your

5    opening statement, you say -- and I quote -- the threats to

6    our nation from our southern border are not military in

7    nature.  Close quotes.

8         So just to be clear, in your professional opinion, does

9    the illegal crossing of the border by civilians represent a

10   military threat?

11        General O'Shaughnessy:  Senator, first, I would say

12   first that I do think a secure border does reduce threats to

13   the homeland.

14        Now, specific to your question about is it a military

15   threat that is coming towards us, it is not a military

16   threat, but that is slightly than answering whether the

17   military should be responding to the situation.

18        Senator Reed:  Following up, in your professional

19   opinion again, would a wall be effective in defending a

20   military attack on the United States?

21        General O'Shaughnessy:  Senator, I would say that

22   border security is national security.  I do see that any

23   barrier in place to secure our nation does have some

24   ramifications to our ability to defend against a military

25   threat as well.  Right now, there is not a specific military

1   force from the south that we are trying to take action

2   against.

3        In this particular case, though, Senator, I would say

4   over the last 5 months I have spent a tremendous amount of

5   time on the border, as you would imagine, working with our

6   CBP partners.  And in all of those trips and discussions, it

7   has been clear to me that the Customs and Border Protection

8   personnel very much value the border protection and seeing

9   it, having the awareness, having some impediments, whether

10  that be a barrier or wall, et cetera, and then having the

11  ability to respond to it.  And that has been fairly

12  universal as I have been doing my trips to the border.

13       Senator Reed:  And they are civilian law enforcement

14  officials who have a law enforcement mission, and the

15  context of their evaluation is based upon that law

16  enforcement mission.

17       General O'Shaughnessy:  That is correct, Senator.

18       Senator Reed:  Thank you.

19       You have mentioned many real threats that have been

20  articulated in the National Defense Strategy, Russia and

21  China in particular.  Many of them really are not focused on

22  our southern border but our northern border, the opening of

23  the Arctic, the operations by both China and Russia in the

24  Arctic, and also I think maintaining the capabilities of

25  NORAD.  Those are multibillion dollar tasks.  Do you think

25

1    we want our allies to understand that we can defend them

2    too.  That is what extended deterrence is all about, and

3    that means you have to be ready to support their

4    contingencies as well.

5         Senator Cotton:  Thank you, General.

6         I understand that some opponents of our nuclear force

7    or critics of it say that we should not start a new arms

8    race or be engaged in an arms race.  I will simply observe,

9    based on what you have said here today, that it is much

10   cheaper to win an arms race than it is to lose a war.

11        General Hyten:  Yes, sir.

12        Chairman Inhofe:  Thank you, Senator Cotton.

13        I thank both of you.  I will repeat what I said

14   earlier.  This has been a really enlightening session, and

15   you have been the right ones to be here.  So thank you very

16   much.

17        We are adjourned.

18        [Whereupon, at 11:35 a.m., the hearing was adjourned.]

19

20

21

22

23

24

25

# EXHIBIT 48



STATEMENT FOR THE RECORD

# WORLDWIDE THREAT ASSESSMENT
## OF THE US INTELLIGENCE COMMUNITY

**Daniel R. Coats**
Director of National Intelligence

Senate Select Committee on Intelligence

29 JANUARY 2019

and its extremist allies present a growing threat, with attacks increasing during the past year. Implementation of Mali's peace accord—an essential step for extending governance into terrorist safe havens in northern and central Mali—probably will be difficult because remaining steps are politically and financially sensitive.

### Nigeria

***Nigeria, Africa's most populous country and the largest economy, probably will face a contentious presidential election in February 2019 and sustained attacks from Boko Haram and ISIS-West Africa (ISIS-WA).***  Abuja is also facing continued violence in the politically sensitive Middle Belt region.  .

### Sudan and South Sudan

***Violence and the humanitarian crisis in South Sudan are likely to persist this year, while Sudan probably wants to improve relations with the United States but will continue reaching out to other partners to boost its economy.***  In South Sudan, the peace agreement signed between the government and opposition groups in September 2017 faces delays and implementation difficulties.  Acute food insecurity and constraints on aid access—resulting from poor infrastructure, seasonal rains, active hostilities, and government- and opposition-imposed impediments—are likely to contribute to an ongoing humanitarian crisis.  Meanwhile, Khartoum, despite facing antigovernment protests over its poor economic situation, is committed to pursuing efforts to improve its relationship with the United States and wants to be removed from the US State Sponsors of Terrorism List.  Sudan also will strengthen ties to other partners—including Russia and Turkey—in an effort to diversify its partnerships and improve its economic situation.

### Horn of Africa

***The states of East Africa will confront internal tension and a continuing threat from al-Shabaab, despite improved intergovernmental relations and Ethiopian-Eritrean rapprochement.***  Elite competition, corruption, and poor coordination among security services in Somalia will hamper efforts to tamp down violence.  The African Union Mission in Somalia (AMISOM) is unlikely to engage in aggressive offensive operations against al-Shabaab in advance of the mission's scheduled withdrawal from Somalia by 2021.  Ethiopia and Eritrea will struggle to balance political control with demands for reform from domestic constituencies.

### Central Africa

***Political unrest across Central Africa is likely to persist through 2019, compounding humanitarian challenges and armed conflict.***  The Democratic Republic of the Congo (DRC) is recovering from its contentious presidential election in December 2018, as well as dealing with an ongoing Ebola outbreak and internal displacement crisis.  Meanwhile, violence among armed groups in several regions of the DRC threatens regional and national stability, and violence in eastern DRC impedes efforts to respond to the Ebola outbreak.  The Central African Republic (CAR) is struggling to make progress toward a peace agreement between the government and multiple armed groups.

## THE WESTERN HEMISPHERE

***Flagging economies, migration flows, corruption, narcotics trafficking, and anti-US autocrats will present continuing challenges to US interests, as US adversaries and strategic competitors seek greater influence in the region.***  The hemisphere will see several presidential elections this year, including in Argentina,

Bolivia, El Salvador, Guatemala, Panama, and Uruguay, providing opportunities for outside candidates to exploit public frustration with stagnant economic growth, high crime, and corruption. China and Russia will pursue efforts to gain economic and security influence in the region.

## Mexico

***Newly inaugurated Mexican President Andres Manuel Lopez Obrador almost certainly will focus on meeting steep public expectations for improvements on anticorruption and security following his landslide electoral victory in July.*** He is likely to pursue mostly practical approaches to US cooperation that complement his ambitious domestic agenda. Lopez Obrador has promised to reduce violence, in part by addressing socioeconomic causes, but he has publicly conceded that Mexico's military must keep up its public security role in the near term, despite his initial preference to end it. Lopez Obrador has supported the US-Mexico-Canada Agreement (USMCA) trade deal, probably hoping to reduce trade-related uncertainty, allowing him to focus on his domestic economic agenda. However, Mexico's $1.15 trillion economy remains vulnerable to investor uncertainty that could weaken the export sector and slow economic growth, which was just 2 percent in 2017. Declining oil revenue will limit the Mexican Government's ability to fund Lopez Obrador's ambitious social programs and infrastructure projects.

## Central America

***We assess that high crime rates and weak job markets will spur additional US-bound migrants from the Northern Triangle—El Salvador, Guatemala, and Honduras—while a political crackdown in Nicaragua dims that country's already bleak economic outlook.*** Illicit migration northward from the region shows no signs of abating, despite increased messaging by governments to dissuade potential migrants and stepped-up immigration enforcement by Mexico. Many migrants apparently perceive that traveling in caravans on the journey north affords a certain level of security, and the decision to do so appears to result from a combination of individual motivation, encouragement from social media postings, and politically motivated efforts by some individuals and organizations.

- Nicaraguan President Daniel Ortega's refusal to heed calls for negotiation amid his political crackdown, which has left more than 300 people dead and contributed to allegations of human rights abuses, threatens to deepen a recession in one of the region's weakest economies.

## Venezuela

*Although the regime of Nicolas Maduro will continue to try to maintain power, he is facing persistent opposition.* Falling oil production, economic mismanagement, and legal challenges almost certainly will compound the worsening economic pressure on the country. Living standards have collapsed, and hyperinflation and shortages in basic goods have gripped the country. Since 2014, the UN International Organization for Migration estimates that 2-3 million Venezuelans have left the country. Maduro continues to crack down on the political and military opposition after a failed assassination attempt against him in August 2018 and disrupted coup plots in the past 12 months, but the opposition has shown resilience, as indicated by its challenge to Maduro's rule emerging in late January 2019.

### Estimated Venezuelan Migrants and Asylum Seekers by Country (2015–18)

| Recipient Nations | Venezuelan Migrants |
|---|---|
| Colombia | 1,000,000 |
| Peru | 400,000–580,000 |
| Chile | 85,000–300,000 |
| Ecuador | 250,000 |
| Panama | 21,000–88,000 |
| Brazil | 76,000 |
| Argentina | 70,000 |
| Dominican Republic | 20,000–46,000 |
| Trinidad and Tobago | 40,000 |
| Mexico | 26,000–33,000 |
| Costa Rica | 9,000–23,000 |
| Canada | 21,000 |
| Aruba | 10,000–20,000 |
| Guyana | 12,000 |
| Uruguay | 8,500 |
| Bolivia | 3,000–7,000 |
| Curacao | 5,000 |

1810-00439-U

## Colombia

*Colombian President Ivan Duque faces a fraying peace accord with the former Revolutionary Armed Forces of Colombia (FARC) while he is working to stem violence in Colombia's rural departments, carry out his coca eradication ambitions, and manage growing tensions with Caracas.* Duque has ordered increased security operations to curb common crime, threats from Colombia's insurgent and criminal groups, and address coca cultivation and trafficking. Coca cultivation in Colombia was at a record 209,000 hectares in 2017, and crop substitution and eradication programs face coordination challenges and local resistance.

## Cuba

*Cuban President Miguel Diaz-Canel will adhere to former President Raul Castro's blueprint for institutionalizing one-party rule and socialism in Cuba through constitutional reforms.* Diaz-Canel has acknowledged that Raul Castro, who still commands the ruling Communist Party, remains the dominant voice on public policy.

# EXHIBIT 49



# CHAIRMAN OF THE JOINT CHIEFS OF STAFF INSTRUCTION

**Directive current as of 12 June 2014**

J-3
DISTRIBUTION:  A, C, S

CJCSI 3710.01B
26 January 2007

### DOD COUNTERDRUG SUPPORT

References:      See Enclosure B.

1. <u>Purpose</u>.  This instruction promulgates Secretary of Defense (SecDef) delegation of authority to approve counterdrug (CD) operational support missions.  It also provides, in accordance with (IAW) the National Defense Authorization Act for 2002, as amended, instructions on authorized types of DOD CD support to law enforcement agencies (LEA), other government agencies, and foreign nations.

2. <u>Cancellation</u>.  This instruction cancels CJCSI 3710.01A, 30 March 2004.

3. <u>Applicability</u>.  This instruction is applicable to Military Departments and combatant commands and subordinate organizations conducting and supporting CD operations.

4. <u>Policy</u>.  See Enclosure A.

5. <u>Definitions</u>.  See the Glossary.  Abbreviations and acronyms are established throughout the text in Enclosure A.

6. <u>Responsibilities</u>.  See Enclosure A.

7. <u>Summary of Changes</u>.  Pursuant to SecDef discretion, this instruction:

   a.  Provides authority and guidance to CDRUSSOUTHCOM for domestic CD/law enforcement activities as a result of the 2006 Unified Command Plan expanding USSOUTHCOM's area of responsibility to include Puerto Rico and the US Virgin Islands.

   b.  Promulgates SecDef authority to Military Department Secretaries to

(3)  Except for extradition requests, federal LEA requests for transportation support will be submitted to the supported GCC (or as further delegated IAW this instruction) in whose area of responsibility the mission is to originate.  The responsible federal LEA, through its parent or national headquarters, must forward extradition requests to the DOD Executive Secretary, who will forward approved requests to the Joint Staff for action.

(4)  GCCs are **not** authorized to approve transportation support in direct tactical support of the operational portions of ongoing LEA or foreign LEA operations, or of any activities where CD-related hostilities are imminent.  If criminal evidence or prisoners seized by LEAs are brought aboard DOD aircraft, vehicles, or vessels being used to provide transportation support, such evidence and/or prisoners will remain solely within the control and custody of the LEAs.

g.  Use of Military Vessels for LEA Operating Bases.  The use of military vessels as a base of operations for LEAs, except when approved under reference b, requires SecDef and Attorney General approval.  The Secretary of Defense has not delegated authority to approve use of military vessels for LEA operating bases in the territorial waters of a host nation (HN).  Such approval coordination will be pursued as the same manner in for linguist support described in subparagraph 4.e. above and include prior notification to DOD OGC.

h.  Equipment Maintenance and Operation Support.  Authority is delegated to approve maintenance and operation support IAW references b and f but does not include the cost of parts or equipment to be funded under reference b or other sources.

i.  Command, Control, Communications, Computer, and Intelligence (C4I) and Network Support.  Assistance in establishing and maintaining C4I and networking support to provide improved integration of law enforcement, active military, and National Guard activities will be IAW reference b, section 1004(b)(8) (as amended).

j.  Technology Demonstrations.  Technology demonstrations may be conducted in coordination with the DOD Counternarco-Terrorism Technology Program Office, and technology requirements may be developed based on stated LEA needs (10 USC 380).

5.  CD Support – Domestic

a.  General Delegations.  With regard to the general delegations in paragraph 4 above and the delegations contained in this paragraph, the Secretary of Defense has delegated approval authority to CDRUSNORTHCOM, CDRUSSOUTHCOM, and CDRUSPACOM, as appropriate, for the following:

(1)  CD support involving no more than 400 personnel for any one mission.

(2)  CD support not exceeding 179 days for any one mission.

(3)  DOD personnel are not authorized to accompany LEAs on actual CD field operations nor may they participate in activities where CD-related hostilities are imminent.

(4)  CDRUSNORTHCOM/CDRUSSOUTHCOM/CDRUSPACOM will first determine if the state (and/or territory) National Guard (title 32 forces) can provide the requested support.  If the state (and/or territory) National Guard cannot provide the forces, CDRUSNORTHCOM/CDRUSSOUTHCOM/ CDRUSPACOM will determine if the request is feasible, supportable, and consistent with DOD policy IAW reference g.

(5)  GCCs/Military Departments may approve the transfer of their units, personnel, and equipment to support Joint Task Force-North (JTF-N)/ USNORTHCOM CD missions.  GCCs/Military Departments may delegate approval authority.  When approving support to JTF-N/USNORTHCOM, the GCC/Military Department will determine whether or not the proposed mission satisfies the readiness and military training value requirements of reference g.

b.  CD-Related Training of Law Enforcement Personnel. CDRUSNORTHCOM/CDRUSSOUTHCOM/CDRUSPACOM may approve training for LEA personnel in the United States.  Per reference g, no advanced military training will be provided to LEA personnel.  However, the US Army Military Police School may continue to train LEA personnel in the Counterdrug Special Reaction Team Course, Counterdrug Field Tactical Police Operations Training, and Counterdrug Marksman/Observer Course (reference g).  On an exceptional basis, CDRUSSOCOM may approve such training by special operations forces (reference n).

c.  Engineering Support.  CDRUSNORTHCOM/CDRUSPACOM may approve engineering support in the United States.  Per reference g, military engineering support is limited to the southwest border and defined as mobility and countermobility (fences, lights, roads) efforts.  This includes approval of materiel purchases necessary to support DOD mission personnel but does not include military construction or provision of other materials.  See reference b, section 1004(b)(7) (as amended).

6.  CD Support – Foreign

a.  General Delegations.  With regard to the general delegations in paragraph 4 above and the delegations contained in this paragraph, the

Secretary of Defense has delegated approval authority for CD support outside the United States; the Secretary of Defense has delegated approval authority for CD support to GCCs for:

(1) <u>Planning and Coordination Visits</u>.  Planning and coordination visits to American Embassies (contingent on Embassy approval) may be conducted with theater-assigned

(2) <u>Intelligence Analyst Support</u>.  Intelligence analyst support may be provided to US Ambassadors using theater-assigned forces (consistent with references c and d).  This approval is subject to DoD Component General Counsel concurrence when military intelligence component and/or Military Department personnel are used in support of LEAs, per reference c and component's implementing directives:

(a)  At respective US Embassies or consulates.

(b)  At US regional analysis centers.

(3) <u>Planning and Coordination Visits</u>.  Planning and coordination visits of 10 personnel or less for 60 days or less to HN headquarters (contingent on American Embassy approval) may be conducted with theater-assigned or allocated forces to accomplish the GCC's D&M mission or to support the US Ambassador's CD effort with expert advice or assistance to the US Country Team.

(4) <u>Linguist Support</u>.  Includes translator and interpreter support consistent with reference c.  This approval is subject to DoD Component General Counsel approval when military intelligence components and/or personnel are used to support LEAs, as defined in reference c and component implementing directives.  This delegation does not include authority to approve cryptologic support, real-time translation of oral or wire intercepts, direct participation in interrogation activities, or the use of counterintelligence assets for CD purposes.  Linguist missions to locations outside American Embassies will be limited to short-duration visits (not to exceed 30 days) of no more than 10 persons to primary HN and US C4I headquarters for the express purpose of accomplishing the mission of supporting the Ambassador's CD effort.

(5) <u>CD-Related Training of Law Enforcement Personnel</u>

(a)  GCCs may approve CD-related training of foreign law enforcement personnel requiring no more than 50 theater-assigned personnel for no more than 45 days with HN and Country Team approval and notification.

CJCSI 3710.01B
26 January 2007

(INTENTIONALLY BLANK)

# EXHIBIT 50



**REMARKS**

# Remarks by President Trump on the National Security and Humanitarian Crisis on our Southern Border

**IMMIGRATION**

Issued on: **February 15, 2019**



Rose Garden

10:39 A.M. EST

THE PRESIDENT:  Thank you very much, everybody.  Before we begin, I'd like to just say that we have a large team of very talented people in China.  We've had a negotiation going on for about two days.  It's going extremely well.  Who knows what that means, because it only matters if we get it done.  But we're very much working very closely with China and President Xi, who I respect a lot.  Very good relationship that we have.  And we're a lot closer than we ever were in this country with having a real trade deal.

We're covering everything — all of the points that people have been talking about for years that said couldn't be done, whether it was theft or anything.  Anything.  The unfairness.  We've been losing, on average, $375 billion a year with China.  A lot of people think it's $506 billion.  Some people think it's much more than that.  We're going to be leveling the playing field.

use it for.  I said, "What were you going to use it for?"  And I won't go into details, but it didn't sound too important to me.

Plus, if you think, I've gotten $700 billion for the military in year one, and then last year, $716 billion.  And we're rebuilding our military, but we have a lot.  And under the previous administration, our military was depleted — badly depleted.  And they weren't spending — I mean, they had a much less — they had a much smaller amount of money.

So when I got $700 billion, and then $716 billion — and this year, it's going to be pretty big too, because there's few things more important than our military.  You know, I'm a big deficit believer and all of that, but before we really start focusing on certain things, we have to build up our military.  It was very badly depleted.  And we're buying all new jetfighters, all new missiles, all new defensive equipment.  We have — we'll soon have a military like we've never had before.

But when you think about the kind of numbers you're talking about — so you have $700 billion, $716 billion — when I need $2 billion, $3 billion of out that for a wall — which is a very important instrument, very important for the military because of the drugs that pour in.  And as you know, we have specific rules and regulations where they have drugs, and what you can do in order to stop drugs.  And that's part of it, too.

We're taking a lot of money from that realm also.  But when you have that kind of money going into the military, this is a very, very small amount that we're asking for.

Yeah, go ahead.  Go ahead.  ABC.  Not NBC.  I like ABC a little bit more — not much.  Come on, ABC.  Not much.  Pretty close.

Q   Mr. President, what do you say to those, including some of your Republican allies, who say that you are violating the Constitution with this move and setting a bad precedent that will be abused by possibly Democratic Presidents in the future?  Marco Rubio has made this point.

THE PRESIDENT: Well, not too many people. Yeah. Not too many people have said that. But the courts will determine that.

Look, I expect to be sued. I shouldn't be sued. Very rarely do you get sued when you do national emergency. And then other people say, "Oh, if you use it for this, now what are we using it for?" We got to get rid of drugs and gangs and people. It's an invasion. We have an invasion of drugs and criminals coming into our country that we stop, but it's very hard to stop. With a wall, it would be very easy.

So I think that we will be very successful in court. I think it's clear. And the people that say we create precedent — well, what do you have? Fifty-six? There are a lot of times — well, that's creating precedent. And many of those are far less important than having a border. If you don't have a border, you don't have a country.

You know, we fight — before I got here — we fight all over the world to create borders for countries, but we don't create a border for our own country.

So I think what will happen is, sadly, we'll be sued, and sadly, it'll go through a process. And, happily, we'll win — I think.

Go ahead. Let's go. Let's hear it, NBC. Come on.

Q   Thank you, Mr. President. I just want to say, in the past, when President Obama tried to use executive action as it related to immigration, you said, "The whole concept of executive order, it's not the way the country is supposed to be run." You said, "You're supposed to go through Congress and make a deal." Will you concede that you were unable to make the deal that you had promised in the past, and that the deal you're ending up with now from Congress is less than what you could have had before a 35-day shutdown?

THE PRESIDENT: No. Look, I went through Congress. I made a deal. I got almost $1.4 billion when I wasn't supposed to get one dollar — not one dollar. "He's not going to get

one dollar." Well, I got $1.4 billion. But I'm not happy with it. I also got billions and billions of dollars for other things — port of entries, lots of different things. The purchase of drug equipment. More than we were even requesting.

In fact, the primary fight was on the wall. Everything else, we have so much, as I said, I don't know what to do with it we have so much money. But on the wall, they skimped.

So I did — I was successful, in that sense, but I want to do it faster. I could do the wall over a longer period of time. I didn't need to do this. But I'd rather do it much faster. And I don't have to do it for the election. I've already done a lot of wall, for the election — 2020. And the only reason we're up here talking about this is because of the election, because they want to try and win an election, which it looks like they're not going to be able to do. And this is one of the ways they think they can possibly win, is by obstruction and a lot of other nonsense.

And I think that I just want to get it done faster, that's all.

Okay. Yes, ma'am, go ahead.

Q   Thank you, Mr. President.

THE PRESIDENT:  Thank you.

Q   Roberta Rampton from Reuters. I wanted to ask about China. Do you feel that enough progress has been made in the talks to head off the increase in tariffs scheduled for March 1?

THE PRESIDENT:  Well, you know, you're talking to the wrong person, because I happen to like tariffs, okay? I mean, we're taking in billions and billions of dollars in tariffs from China. And our steel industry now, as an example, we tax dumped steel — much of it comes from China — at 25 percent. Our steel industry is so vibrant now again, they're

building plants all over the United States.  It's a beautiful thing.  And from a defensive standpoint, and from any standpoint, you need steel.

You know, you can do without certain industries.  Our country cannot do without steel.

So, I love tariffs, but I also love them to negotiate.  And right now, China is paying us billions of dollars a year in tariffs.  And I haven't even started.

Now, here's the thing: If we make a deal, they won't have to pay.  You know, it'll be a whole different story.  They won't be paying that, but we'll have a fair deal.  There won't be intellectual property theft.  There won't be so many other things that have gone on.  And no other President has done this.  No other — you know, we didn't have a deal with China.  You had the WTO, one of the worst trade deals ever made — probably even worse than NAFTA, if that's believable, which, you know, hard to believe, because I think NAFTA was just a disaster.  It was a total disaster for our country.

And now we made the USMCA, which is going to be a terrific — a great deal.  And, by the way, the USMCA, from Mexico — that's United States, Mexico, Canada — that's where the money is coming from, not directly but indirectly, for the wall.  And nobody wants to talk about that.  Because we're saving billions and billions of dollars a year, if Congress approves that deal.

Now, they might now want to approve a deal just because they'll say — one of the things I'm thinking of doing — this has never been done before: No matter how good a deal I make with China, if they sell me Beijing for one dollar, if they give me 50 percent of their land and every ship that they've built over the last two years — which is a lot — and they give them to me free, the Democrats will say, "What a lousy deal; that's a terrible deal."

Like, ZTE, I got a billion — more than a billion-dollar penalty in a short period of time.  And the Democrats said, "Oh, should've gotten more."  When I made that deal, I said, "This is incredible."  I just got — I got over a billion-dollar penalty, plus they had to change their board of directors.  They had to change their top management.  But they

And it was a very tough dialogue at the beginning.  Fire and fury.  Total annihilation.  "My button is bigger than yours" and "my button works."  Remember that? You don't remember that.  And people said, "Trump is crazy."  And you know what it ended up being?  A very good relationship.  I like him a lot and he likes me a lot.  Nobody else would have done that.

The Obama administration couldn't have done it.  Number one, they probably wouldn't have done it.  And number two, they didn't have the capability to do it.

So I just want to thank everybody.  I want to wish our Attorney General great luck and speed, and enjoy your life.  (Laughter.)  Bill, good luck.  A tremendous reputation.  I know you'll do a great job.  Thank you very much.  And thank you, everybody.  Thank you very much.  Thank you.

END            11:29 A.M. EST