1  Xavier Becerra
   Attorney General of California
2  Robert W. Byrne
   Sally Magnani
3  Michael L. Newman
   Senior Assistant Attorneys General
4  Michael P. Cayaban
   Christine Chuang
5  Edward H. Ochoa
   Supervising Deputy Attorneys General
6  Heather C. Leslie
   Janelle M. Smith
7  James F. Zahradka II
   Lee I. Sherman (SBN 272271)
8  Deputy Attorneys General
     300 S. Spring St., Suite 1702
9    Los Angeles, CA 90013
     Telephone: (213) 269-6404
10   Fax: (213) 897-7605
     E-mail: Lee.Sherman@doj.ca.gov
11 *Attorneys for Plaintiff State of California*

12

13                    IN THE UNITED STATES DISTRICT COURT

14               FOR THE NORTHERN DISTRICT OF CALIFORNIA

15                              OAKLAND DIVISION

16

| | |
|---|---|
| 17 **STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF** | Case No. 4:19-cv-00872-HSG |
| 18 **CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII;** | **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY** |
| 19 **STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND;** | **INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN** |
| 20 **COMMONWEALTH OF MASSACHUSETTS; ATTORNEY** | **SUPPORT THEREOF** |
| 21 **GENERAL DANA NESSEL ON BEHALF OF THE PEOPLE OF MICHIGAN;** | Date:        May 9, 2019 |
| 22 **STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY;** | Time:        2:00 pm<br>Dept:        2 |
| 23 **STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF OREGON;** | Judge:       Honorable Haywood S. Gilliam, Jr. |
| 24 **STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF** | Trial Date:  None Set<br>Action Filed: February 18, 2019 |
| 25 **VIRGINIA; and STATE OF WISCONSIN;** | |
| 26                    Plaintiffs, | |
| 27          **v.** | |
| 28 | |

1  **DONALD J. TRUMP,** in his official capacity
2  as President of the United States of America;
   **UNITED STATES OF AMERICA; U.S.**
3  **DEPARTMENT OF DEFENSE; PATRICK**
   **M. SHANAHAN,** in his official capacity as
4  Acting Secretary of Defense; **MARK T.**
   **ESPER,** in his official capacity as Secretary of
5  the Army; **RICHARD V. SPENCER,** in his
   official capacity as Secretary of the Navy;
6  **HEATHER WILSON,** in her official capacity
7  as Secretary of the Air Force; **U.S.**
   **DEPARTMENT OF THE TREASURY;**
8  **STEVEN T. MNUCHIN,** in his official
   capacity as Secretary of the Treasury; **U.S.**
9  **DEPARTMENT OF THE INTERIOR;**
   **DAVID BERNHARDT,**  in his official capacity
10 as Acting Secretary of the Interior; **U.S.**
   **DEPARTMENT OF HOMELAND**
11 **SECURITY; KIRSTJEN M. NIELSEN,** in
12 her official capacity as Secretary of Homeland
   Security;
13
                              Defendants.
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION ........................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................. 1

INTRODUCTION ................................................................................ 1

BACKGROUND ................................................................................. 4

 I. The Dispute Between the President and Congress over Funding for a Border Wall ................................................................................ 4

 II. Defendants' Actions to Divert Funding and Resources from Other Sources to Construct a Border Wall ................................................. 5

 III. Defendants' Actions Harm Plaintiff States ....................................... 9

  A. The Diversion of Funds through §§ 8005 and 284 toward Construction of a Border Wall Will Cause Environmental Harm to New Mexico ................................................................... 9

  B. Plaintiff States Benefit from TFF Resources that Defendants Are Diverting to Border Wall Construction ................................ 10

LEGAL ARGUMENT .......................................................................... 12

 I. Legal Standard ........................................................................ 12

 II. Plaintiff States Are Likely to Succeed on the Merits of Their Claims ................ 13

  A. Plaintiff States Are Likely to Succeed on Their Constitutional Claims ................................................................... 14

   1. Separation of Powers and Appropriations Principles .................. 14

   2. Defendants Have Violated the Separation of Powers, Including the Presentment Clause .................................. 17

   3. Defendants Have Violated the Appropriations Clause ............... 20

  B. Plaintiff States Are Likely to Succeed on Their Claims that Defendants Have Acted Ultra Vires and in Excess of Statutory Authority ................................................................ 21

   1. Defendants Lack Statutory Authority to Divert Funding and Resources for Construction of a Border Wall Under 10 U.S.C. § 284 and § 8005 of the FY 2019 DOD Appropriations Act ................................................ 22

   2. Defendants Lack Statutory Authority to Divert Funds from TFF Pursuant to 31 U.S.C. § 9705 for Construction of a Border Wall ........................................................ 25

  C. Plaintiff States Are Likely to Succeed on their APA Claim .................. 26

  D. Plaintiff States Are Likely to Succeed on their NEPA Claim .................. 28

 III. Plaintiff States Are Likely to Suffer Irreparable Harm from the Funding Diversions ................................................................... 29

i

**TABLE OF CONTENTS**
(continued)

Page

A.  New Mexico is Likely to Suffer Irreparable Harm from the Environmental Impacts Caused by the Diversion of Funding and Resources and Construction of Border Wall Without Proper Environmental Review ............................................................................. 29

B.  Diversion from TFF is Likely to Irreparably Harm the Plaintiff States ........................................................................................... 31

IV.  The Balance of Hardships Favors Granting a Preliminary Injunction ................. 33

CONCLUSION .......................................................................................................... 35

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*All. for the Wild Rockies v. Cottrell*
   632 F.3d 1127 (9th Cir. 2011)..................................................................13

*Am. Trucking Ass'ns, v. Los Angeles*
   559 F.3d 1046, 1058-59 (9th Cir. 2009) ...................................................31

*Ariz. Dream Act Coal. v. Brewer*
   757 F.3d 1053 (9th Cir. 2014).................................................................33

*Benda v. Grand Lodge of Int'l Assoc. of Machinists & Aerospace Workers*
   584 F.2d 308 (9th Cir. 1978)..................................................................18

*Biodiversity Legal Found. v. Badgley*
   309 F.3d 1166 (9th Cir. 2002).................................................................13

*Bowsher v. Synar*
   478 U.S. 714 (1986).............................................................................14

*California* ex rel. *Lockyer v. U.S. Dept. of Agric.*
   459 F. Supp. 2d 874 (N.D. Cal. 2006) ....................................................29

*Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*
   840 F.2d 701 (9th Cir. 1988)..................................................................12

*Cincinnati Soap Co. v. United States*
   301 U.S. 309 (1937).............................................................................16

*City & Cty. of San Francisco v. Trump*
   897 F.3d 1225 (9th Cir. 2018)........................................................17, 18, 19

*City of Arlington v. FCC*
   569 U.S. 290 (2013).............................................................................14

*City of Houston v. HUD*
   24 F.3d 1421 (D.C. Cir. 1994)...............................................................33

*City of Los Angeles v. Sessions*
   293 F. Supp. 3d 1087 (C.D. Cal. 2018) .................................................32

*Clinton v. City of New York*
   524 U.S. 417 (1998)..................................................................... *passim*

*Delta Data Sys. Corp. v. Webster*
   744 F. 2d 197 (D.C. Cir. 1984) ..............................................................17

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

*Encino Motorcars, LLC v. Navarro*
   136 S. Ct. 2117 (2016) ....................................................................................26

4

*FCC v. Fox Television Stations, Inc.*
   556 U.S. 502 (2009) ...................................................................................26, 27

5

6

*Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Int.*
   588 F.3d 718 (9th Cir. 2009) ..........................................................................33

7

*Giovani Carandola Ltd v. Bason*
   303 F.3d 507 (4th Cir. 2002) ..........................................................................34

8

9

*Idaho Sporting Cong. Inc. v. Alexander*
   222 F.3d 562 (9th Cir. 2000) ..........................................................................29

10

*INS. v. Chadha*
   462 U.S. 919 (1983) ...................................................................................15, 19

11

12

*Int'l Franchise Ass'n, v. City of Seattle*
   803 F.3d 389 (9th Cir. 2015) ..........................................................................32

13

14

*Jicarilla Apache Nation v. U.S. Dep't of the Interior*
   613 F.3d 1112 (D.C. Cir. 2010) .....................................................................26

15

16

*Kansas v. United States*
   249 F.3d 1213 (10th Cir. 2001) ......................................................................31

17

*M.R. v. Dreyfus*
   663 F.3d 1100 (9th Cir. 2011) ........................................................................34

18

19

*Maryland v. King*
   567 U.S. 1301 (2012) ......................................................................................32

20

*Morales v. Trans World Airlines, Inc.*
   504 U.S. 374, 381 (1992) ................................................................................31

21

22

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*
   463 U.S. 29 (1983) .....................................................................................26, 27

23

24

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*
   545 U.S. 967 (2005) ........................................................................................28

25

26

*Nat'l. Wildlife Fed'n. v. Nat'l. Marine Fisheries Serv.* (*NWF*)
   422 F.3d 782 (9th Cir. 2005) ..........................................................................13

27

28

iv

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Nevada v. Dep't of Energy*
    400 F.3d 9 (D.C. Cir. 2005) ...................................................................................20

*Nken v. Holder*
    556 U.S. 418 (2009) ...........................................................................................33

*Off. of Pers. Mgmt. v. Richmond*
    496 U.S. 414 (1990) .......................................................................................16, 17

*Population Inst. v. McPherson*
    797 F.2d 1062 (D.C. Cir. 1986) ...........................................................................33

*Rodriguez v. Robbins*
    715 F.3d 1127 (9th Cir. 2013) .............................................................................34

*Sierra Club v. Marsh*
    872 F.2d 497 (1st Cir. 1989) ................................................................................29

*Silvers v. Sony Pictures Entm't, Inc.*
    402 F.3d 881 (9th Cir. 2005) ................................................................................25

*U.S. Dep't of the Air Force v. Fed. Labor Rels. Auth.*
    648 F.3d 841 (D.C. Cir. 2011) .............................................................................21

*U.S. Dep't of Navy v. Fed. Labor Rel. Auth.*
    665 F.3d 1339 (D.C. Cir. 2012) ...........................................................................16

*United States v. MacCollom*
    426 U.S. 317 (1976) ...........................................................................................18

*United States v. McIntosh*
    833 F.3d 1163 (9th Cir. 2016) .............................................................................16

*Univ. of Texas v. Camenisch*
    451 U.S. 390 (1981) ...........................................................................................12

*Winter v. Nat. Res. Def. Council, Inc.*
    555 U.S. 7 (2008) .........................................................................................12, 33

*Youngstown Sheet & Tube Co. v. Sawyer*
    343 U.S. 579 (1952) ...........................................................................13, 15, 18, 19

STATE CASE

*Sanders-Reed ex rel. Sanders-Reed v. Martinez*
    350 P.3d 1221 (N.M. Ct. App. 2015) ...................................................................31

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3    STATUTES

4    5 U.S.C. § 706(2)(A) ...................................................................................26

5    5 U.S.C. § 706(2)(B) ...................................................................................26

6    5 U.S.C. § 706(2)(C) .............................................................................14, 26

7    6 U.S.C. § 211(c) ........................................................................................23

8    6 U.S.C. § 211(e)(3) ...............................................................................21, 26

9    6 U.S.C. § 211(g)(3)(C) ...............................................................................21

10   8 U.S.C. § 1103 note ...................................................................................28

11   10 U.S.C. § 124 ..........................................................................................23

12   10 U.S.C. § 284 .................................................................................. *passim*

13

14   10 U.S.C. § 2214(d) ....................................................................................23

15   18 U.S.C. § 1385 .........................................................................................23

16   31 U.S.C. § 1301 .........................................................................................16

17   31 U.S.C. § 1301(a) ................................................................................16, 17

18   31 U.S.C. § 9705 ................................................................................. *passim*

19   31 U.S.C. § 9705(a)(1)(B)(iii) ......................................................................10

20   31 U.S.C. § 9705(a)(1)(G) .......................................................................6, 10

21   31 U.S.C. § 9705(a)(1)(I) .............................................................................10

22   31 U.S.C. § 9705(b)(4)(A) ...........................................................................10

23   31 U.S.C. § 9705(b)(4)(B) ...........................................................................10

24   31 U.S.C. § 9705(g)(3)(C) .............................................................................6

25   31 U.S.C. § 9705(g)(4)(B) ................................................................6, 21, 25

26   31 U.S.C. § 9705(h)(1)(B) ............................................................................10

27   42 U.S.C. § 4321-4370m-12 ...........................................................................1

28

vi

# TABLE OF AUTHORITIES
**(continued)**

**Page**

42 U.S.C. § 4332(C)....................................................................................................28

Pub. L. No. 93-238, 87 Stat. 1026 (1974)..................................................................22

Pub. L. No. 115-245, 132 Stat. 2981 (2018).......................................................*passim*

Pub. L. No. 116-6, 133 Stat. 13 (2019)..............................................................*passim*

**U.S. CONSTITUTIONAL PROVISIONS**

U.S. Const., art. I, § 1................................................................................................14

U.S. Const., art. I, § 7..................................................................................13, 15, 19

U.S. Const. art. I, § 7, cl. 2..................................................................................14, 18

U.S. Const., art I, § 9, cl. 7.................................................................................13, 16, 19

U.S. Const., art II, § 3.................................................................................................14

**STATE CONSTITUTIONAL PROVISION**

N.M. Const. art. XX, § 21..........................................................................................31

**COURT RULES**

Fed. R. Civ. P. 65. ........................................................................................................1

**OTHER AUTHORITIES**

B-139510 (GAO May 13, 1959)............................................................................20, 21

40 C.F.R. § 1500.1(a)..................................................................................................28

40 C.F.R. § 1500.1(b).................................................................................................28

40 C.F.R. § 1502.5................................................................................................28, 29

1 Comp. Dec. 126 (1894)...........................................................................................20

4 Comp. Dec. 137 (1883)...........................................................................................16

36 Comp. Gen. 526 (1957)..........................................................................................20

65 Comp. Gen. 881 (1986)..........................................................................................20

82 Fed. Reg. 35984 (Aug. 2, 2017).............................................................................28

vii

Pls.' Notice of Mot. and Mot. for Prelim. Inj. and Mem. ISO (4:19-cv-00872-HSG)

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3   82 Fed. Reg. 42829 (Sept. 12, 2017) ............................................................28

4   83 Fed. Reg. 3012 (Jan. 22, 2018) ............................................................28

5   84 Fed. Reg. 2897 (Feb. 8, 2019)............................................................28

6   84 Fed. Reg. 4949 (Feb. 15, 2019)............................................................5, 6

7   The Federalist No. 58 (James Madison) ............................................................14

8   Government Accountability Office, A Glossary of Terms Used in the Federal
9        Budget Process (2005) ............................................................26

10  Government Accountability Office, Office of the General Counsel, Principles of
11       Federal Appropriations Law (4th Ed. 2017) ............................................16, 17, 20

12  H.R. Rep. No. 93-662 (1973) ............................................................22

13  H.R.J. Res. 28, 116th Cong. (2019) ............................................................5

14  H.R.J. Res. 46, 116th Cong. (2019) ............................................................5

15  Joseph Story, Commentaries on the Constitution of the United States § 1342
16       (1833) ............................................................16

17

18

19

20

21

22

23

24

25

26

27

28

viii

Pls.' Notice of Mot. and Mot. for Prelim. Inj. and Mem. ISO (4:19-cv-00872-HSG)

1

**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**

2  PLEASE TAKE NOTICE that on Thursday, May 9, 2019, at 2:00 p.m. or as soon thereafter

3 as it may be heard, before the Honorable Haywood S. Gilliam, Jr. in Courtroom 2 of the U.S.

4 District Court for the Northern District of California, 1301 Clay Street, Oakland, CA 94612,

5 Plaintiff States will and do hereby move the Court under Federal Rule of Civil Procedure 65 to

6 enter a preliminary injunction prohibiting Defendants from diverting federal funds and resources

7 for the construction of a border wall. Plaintiff States move to enjoin Defendants' use of 31 U.S.C.

8 § 9705 to divert monies from the Treasury Forfeiture Fund for border wall construction. Plaintiff

9 State of New Mexico further moves to enjoin Defendants' use of the transfer authority under §

10 8005 of the FY 2019 Department of Defense Appropriations Act, Pub. L. No. 115-245, and 10

11 U.S.C. § 284 to divert funding and resources for construction of a wall on the southern border of

12 New Mexico. Finally, Plaintiff States move to enjoin Defendants from taking any further action

13 related to their border wall proposal unless and until Defendants comply with the National

14 Environmental Policy Act, 42 U.S.C. §§ 4321-4370m-12. This motion is based on the Notice of

15 Motion and Motion, the Memorandum of Points and Authorities, the accompanying declarations

16 and Request for Judicial Notice, as well as the papers, evidence and records on file, and any other

17 written or oral evidence or argument as may be presented.

18

**MEMORANDUM OF POINTS AND AUTHORITIES**

19

**INTRODUCTION**

20  Plaintiff States file this motion to: (1) preserve their stake in federal law enforcement funds;

21 and (2) protect environmental and natural resources, both of which are imminently threatened by

22 Defendants' unlawful and unconstitutional actions to divert over one billion federal dollars in

23 fulfillment of President Trump's directive to construct a wall on the border between the United

24 States and Mexico. The fulcrum of this action is Defendants' disregard of the will of Congress

25 and violation of fundamental separation of powers principles enshrined in the United States

26 Constitution. For the first two years of President Trump's presidency, Congress repeatedly

27

28

1

Pls.' Notice of Mot. and Mot. for Prelim. Inj. and Mem. ISO (4:19-cv-00872-HSG)

rejected the president's proposals to fund a border wall.[1] Nonetheless, the president insisted that Congress fund a border wall, leading to a record 35-day partial government shutdown exclusively over border wall funding. After the government re-opened, on February 15, 2019, Congress enacted, and the president signed into law, a $1.375 billion appropriation—subject to particularized conditions—for specified pedestrian fencing along a limited stretch of the southern border in the Rio Grande Valley Sector in Texas. Dissatisfied with Congress's appropriation, on the same day it was signed into law, the president ordered Defendant agencies to divert $6.7 billion of other federal funds appropriated for other purposes toward construction of a border wall in areas not authorized by Congress and not subject to the carefully prescribed limitations placed by Congress on its appropriation for fencing at the border.

Defendants have now taken concrete steps in furtherance of President Trump's unconstitutional directive, resulting in the attempted diversions of $1.6 billion of federal funds. The Department of the Treasury (Treasury) announced that it has diverted or will soon be diverting $601 million from the Treasury Forfeiture Fund (TFF) to the Department of Homeland Security (DHS) for border wall construction, and Treasury has already made $242 million of this funding available for obligation through construction contracts. In addition, the Department of Defense (DOD) has notified Congress that it is transferring $1 billion in funds appropriated for other purposes to DOD's drug interdiction account for immediate obligation to construct border wall fencing in specified areas of New Mexico and Arizona—border wall fencing that was not approved by Congress.

Plaintiff States are likely to succeed on the merits of their claims because Defendants' redirection of funds and resources toward a border wall is unlawful and unconstitutional. Congress unequivocally rejected the president's requested appropriation for a border wall, only for the president to then order the diversion of federal funds from other sources toward the very project that Congress rejected. The U.S. Constitution, however, entrusts the power of the purse to

---

[1] Although Congress approved funding for some barriers and related infrastructure on the southern border, it has rejected much of the funding requested by President Trump. This motion uses the term "border wall" to refer to any barrier or border-related infrastructure and/or any project relating to a barrier or border-related infrastructure along the southern border, requested by President Trump that Congress has not approved.

2

Pls.' Notice of Mot. and Mot. for Prelim. Inj. and Mem. ISO (4:19-cv-00872-HSG)

1    Congress and denies the president the powers to legislate or appropriate. Defendants' actions

2    amount to a usurpation of Congress's legislative powers in violation of bedrock separation of

3    powers principles embedded in the Constitution, including the Presentment and Appropriations

4    Clauses. Thus, under the circumstances presented here, where Congress has expressly denied

5    additional funding for border wall construction and limited its authorization of construction to

6    specific areas, President Trump's actions, in effect, unilaterally modify Congress's limited

7    appropriation in violation of the Constitution.

8         Defendants also lack statutory authority to proceed with their proposed actions because they

9    cannot satisfy the criteria in any of the statutes on which they rely for the diversions of funds and

10   resources. As just one example, Defendants cannot demonstrate that their transfer of $1 billion

11   from military personnel accounts toward border wall construction is for "unforeseen military

12   requirements," or is for an item for which Congress has not already denied funding, prerequisites

13   set forth in the pertinent appropriations act. Consequently, Defendants have exceeded their

14   statutory authority and acted ultra vires.

15        Defendants' actions additionally violate the Administrative Procedure Act's (APA)

16   prohibition on arbitrary and capricious government action because Defendants failed to provide a

17   sufficiently rational analysis to justify their unprecedented action.

18        Lastly, whether or not use of the funding sources is permissible, Defendants have violated

19   the National Environmental Policy Act (NEPA) by proceeding with their construction plans

20   without conducting any environmental review.

21        Now that Defendants have directed the diversions of over $1.6 billion in federal funds, they

22   are poised to quickly proceed with constructing a border wall, as the president claims that many

23   contracts are close to being signed and CBP has indicated that it intends to obligate funds soon.

24   Req. for Judicial Notice (RJN) Exs. 1 & 2, ¶ 11. Defendants' actions to divert DOD funds and

25   resources toward the construction of new fencing in environmentally sensitive areas on the border

26   between New Mexico and Mexico pose imminent environmental harm to New Mexico. These

27   environmental injuries are independent of and in addition to the procedural injuries imposed on

28   New Mexico through Defendants' failure to comply with NEPA. Further, if Defendants are

3

Pls.' Notice of Mot. and Mot. for Prelim. Inj. and Mem. ISO (4:19-cv-00872-HSG)

1    permitted to obligate improperly diverted funds, such diversion will jeopardize not only pending

2    equitable share claims from the Plaintiff States, but also the financial viability of the TFF

3    program, which provides key support to law enforcement in those States. For these reasons, and

4    those discussed below, the Court should grant Plaintiff States' motion for preliminary injunction

5    and enjoin Defendants from diverting funding and resources and taking any additional steps

6    toward border wall construction.

7                                      **BACKGROUND**

8    **I.    THE DISPUTE BETWEEN THE PRESIDENT AND CONGRESS OVER FUNDING FOR A
           BORDER WALL**

9

10        For the past four years, including his time as a presidential candidate, President Trump

11   advocated for construction of a wall along the southern border of the United States. First Am.

12   Compl. (FAC) ¶¶ 208-219; *see also* RJN Exs. 3-13. Between 2017 and 2018, Congress

13   considered numerous bills that would have authorized or appropriated billions of dollars toward

14   President Trump's proposed border wall. All of those bills failed. *See, e.g.*, RJN Exs. 14-20.

15        At the end of 2018, as Congress and the president were negotiating an appropriations bill to

16   fund numerous federal departments for the remainder of the 2019 fiscal year (FY), President

17   Trump renewed his demand for border wall funding. At a December 11, 2018 televised meeting

18   between President Trump and congressional leaders, President Trump asserted he was "proud to

19   shut down the government for border security." RJN Ex. 21. On December 19, 2018, the Senate

20   passed by a voice vote a bill to fund the government through February 8, 2019 that did not

21   include any funding for a border wall. RJN Ex. 22. The following day, and before the House of

22   Representatives voted on the Senate's funding bill, President Trump stated, "I've made my

23   position very clear. Any measure that funds the government must include border security," which

24   he clarified must include funding for a wall. RJN Ex. 23. That same day, the House approved a

25   funding bill appropriating $5.7 billion for "U.S. Customs and Border Protection - Procurement,

26   Construction, and Improvements." RJN Ex. 24, § 141. The Senate never passed the House-

27   approved bill. As a result, on December 22, 2018, a partial government shutdown began, which

28   lasted for a record 35 days.

4

Pls.' Notice of Mot. and Mot. for Prelim. Inj. and Mem. ISO (4:19-cv-00872-HSG)

During the shutdown, on January 6, 2019, the Office of Management and Budget (OMB) requested $5.7 billion from Congress to fund "approximately 234 miles of new physical barrier." RJN Ex. 25. Congress did not grant this funding request, and on January 25, 2019, Congress and the president agreed to a three-week continuing resolution to re-open the government without any funding for a wall. H.R.J. Res. 28, 116th Cong. (2019) (enacted). When announcing the agreement, President Trump warned, "If we don't get a fair deal from Congress, the government will either shutdown on February 15, again, or I will use the powers afforded to me under the laws and the Constitution of the United States to address this emergency." RJN Ex. 26.

After weeks of negotiation, on February 14, 2019, Congress passed the Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, 133 Stat. 13 (2019) (2019 Consolidated Appropriations Act). The Act appropriates $1.375 billion to DHS to construct "primary pedestrian fencing, including levee pedestrian fencing, in the Rio Grande Valley Sector" of the southern border. *Id.* § 230(a)(1), 133 Stat at 28. This appropriation is the only funding in the 2019 Consolidated Appropriation Act that Congress designated for construction of a barrier on the southern border. Congress also specifically constrained how DHS may use the appropriated funds, limiting the appropriation to pedestrian fencing: (i) only in the Rio Grande Valley Sector; and (ii) providing that the funding is "only . . . available for operationally effective designs deployed as of the date of the Consolidated Appropriations Act 2017 (Public Law 115-31), such as currently deployed steel bollard designs, that prioritize agent safety." *Id.* § 230(b). The 2019 Consolidated Appropriations Act became law on February 15, 2019.

## II.   DEFENDANTS' ACTIONS TO DIVERT FUNDING AND RESOURCES FROM OTHER SOURCES TO CONSTRUCT A BORDER WALL

On the same day that President Trump signed the 2019 Consolidated Appropriations Act into law, he proclaimed the existence of a national emergency under the National Emergencies Act that he contends necessitates the construction of a wall across the southern border. 84 Fed. Reg. 4949 (Feb. 15, 2019) (the Emergency Declaration).[2] The Emergency Declaration

---

[2] By a vote of 245-182 in the House of Representatives and 59-41 in the Senate, Congress disapproved of the president's Emergency Declaration. H.R.J. Res. 46, 116th Cong. (2019)

5

Pls.' Notice of Mot. and Mot. for Prelim. Inj. and Mem. ISO (4:19-cv-00872-HSG)

1   acknowledged that DOD has already provided support and resources to DHS for border security

2   pursuant to an April 4, 2018 memorandum. *Id.*; *see also* RJN Ex. 27. In addition to issuing the

3   Emergency Declaration, the Trump Administration announced it would redirect federal funds

4   from three specific sources to construct a border wall, over and above the $1.375 billion that

5   Congress had appropriated for limited fencing at the border. RJN Ex. 28 (the Executive Action).

6   The diversions at issue in this motion do not depend on invocation of the National Emergencies

7   Act in order to take effect.

8       The first funding source at issue is the TFF, from which President Trump directed $601

9   million to be diverted for border wall construction. *Id.* TFF is "the receipt account for the deposit

10  of non-tax forfeitures made pursuant to laws enforced or administered by [participating] law

11  enforcement bureaus." RJN Ex. 29 at 1. State and local law enforcement agencies that contribute

12  to seizures resulting in forfeiture may claim an equitable share of the forfeited amounts. *Id.* at 9;

13  *see also* 31 U.S.C. § 9705(a)(1)(G). Equitable share claims are made after state and local law

14  enforcement have dedicated resources toward a joint law enforcement action and Plaintiff States

15  have participated in the TFF program since its inception. TFF creates a permanent indefinite

16  "[a]ppropriation" to the Treasury Secretary to make certain unobligated amounts available for

17  "obligation or expenditure in connection with the law enforcement activities of any Federal

18  agency or of a Department of the Treasury law enforcement organization," 31 U.S.C.

19  § 9705(g)(4)(B), otherwise known as Strategic Support funds. RJN Ex. 29 at 9. Any unobligated

20  balance, from Strategic Support or otherwise, is carried forward into the subsequent fiscal year,

21  where they may be used for TFF's authorized purposes, which includes payments to the states.

22  *See* 31 U.S.C. § 9705(g)(3)(C).

23      On February 15, 2019, the day of the Executive Action, Treasury informed Congress that it

24  would direct $601 million from TFF to DHS "to enhance border security infrastructure and

25  operations in support of CBP law enforcement efforts," including "the plan, design, and

26  construction of a physical structure, using appropriate materials and technology to most

27  _____

28  (unenacted). The president vetoed that resolution on March 18, 2019. The House failed to
    override the veto, with 248 voting to override and 181 voting against an override. *See id.*

6

1    effectively achieve complete operational control of the southern border." RJN Ex. 30. Treasury

2    stated that $242 million of these funds would be available for obligation as of March 2, 2019,

3    with the remaining $359 million to be available at an unspecified later date subject to receipt of

4    additional anticipated forfeitures, without any further explanation. *Id.* According to a fact sheet

5    released by the Trump Administration on March 4, 2019, the Administration intends to use the

6    $601 million from TFF to "support construction of approximately 26 miles in the Rio Grande

7    Valley," RJN Ex. 31 at 2, the same area for which Congress already appropriated $1.375 billion

8    for specified—but limited—pedestrian fencing in the 2019 Consolidated Appropriations Act. On

9    April 2, 2019, in another legal action challenging Defendants' unlawful diversion, Defendants

10   submitted a declaration confirming that "[w]ith respect to barrier construction along the southern

11   border, CBP will use TFF funds exclusively for projects in the RGV [Rio Grande Valley]." RJN

12   Ex. 2, ¶ 12. Defendants intend to "start obligating [TFF] funds in the near future" and "intend[] to

13   obligate all available TFF funds before the end of Fiscal Year 2019, or, if not, before the end of

14   the 2019 calendar year." *Id.* ¶ 11.

15        The second funding source at issue is DOD's drug-interdiction account, from which

16   President Trump directed the diversion of $2.5 billion toward construction of a border wall. RJN

17   Ex. 28. Defendants rely on 10 U.S.C. § 284(b)(7) to access resources from that account, which

18   authorizes the Secretary of Defense to support other federal agencies for the "[c]onstruction of

19   roads and fences and installation of lighting to block drug smuggling corridors across

20   international boundaries of the United States." On February 26, 2019, the Trump Administration

21   stated that in order to satisfy the president's direction to use $2.5 billion from DOD's drug

22   interdiction account toward constructing a border wall, DOD "will augment existing counterdrug

23   funds" through the Department's transfer authority in § 8005 of the Department of Defense and

24   Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing

25   Appropriations Act, 2019 (FY 2019 DOD Appropriations Act), Pub. L. No. 115-245, 132 Stat.

26   2981 (2018). DOD's drug interdiction account is funded through an appropriation "[f]or drug

27   interdiction and counter-drug activities" that was made in the FY 2019 DOD Appropriations Act.

28   *Id.* at 17. Section 8005 of this Act provides that this transfer authority "may not be used unless for

7

1    higher priority items, based on unforeseen military requirements, than those for which originally

2    appropriated and in no case where the item for which funds are requested has been denied by the

3    Congress."

4         On March 25, 2019, Defendant DOD Acting Secretary Shanahan apprised Congress that

5    pursuant to § 8005, DOD was transferring $1 billion from DOD's Military Personnel and Reserve

6    Personnel account to DOD's drug-interdiction account to be used for barrier fencing. RJN Ex. 32.

7    DOD approved the transfer in response to a February 25 request by DHS for DOD to "assist with

8    the construction of fences[,] roads, and lighting" under § 284(b)(7) to "block drug-smuggling

9    corridors across the international boundary between the United States and Mexico" in certain

10   areas identified by DHS. RJN Ex. 33. In the March 25, 2019 response to DHS's request,

11   Defendant Shanahan notified Defendant DHS Secretary Nielsen that he authorized the

12   Commander of the U.S. Army Corps of Engineers to utilize the $1 billion being transferred to

13   coordinate with DHS to assist in the construction of 18-foot-high-pedestrian fencing, the

14   construction and improvement of roads, and the installation of lighting in the Yuma Sector

15   Projects 1 and 2 (on the southwest border of Arizona) and El Paso Sector Project 1 (on the

16   southwest border of New Mexico) identified in DHS's February 25 request. RJN Ex. 34.

17   Defendant Shanahan informed Defendant Nielsen that U.S. Customs and Border Protection

18   (CBP) "will serve as the lead agency for environmental compliance and will be responsible for

19   providing all necessary access to land," and that "DHS will accept custody of the completed

20   infrastructure, account for that infrastructure in its real property records, and operate and maintain

21   the completed infrastructure." *Id.*

22        On March 26, 2019, the House Armed Services Committee informed DOD that the

23   Committee "does not approve" of the request to transfer $1 billion "to construct additional

24   physical barriers and roads or install lighting in the vicinity of the United States Border." RJN Ex.

25   35. On March 26, 2019, the House Defense Appropriations Subcommittee similarly denied the

26   request. RJN Ex. 36. Although, historically, DOD has sought congressional approval prior to

27   using its transfer authority, *see* RJN Exs. 37-38, DOD has made clear that it intends to move

28   forward with this transfer irrespective of the absence of approval from Congress.  RJN Exs. 32,

8

34, 39. A media report indicates that DOD has sent teams of engineers and experts to the El Paso

Sector in New Mexico to conduct an assessment in preparation for construction, with construction

anticipated to begin as early as the end of May.[3] No public form of environmental review of the

proposed construction has been commenced.

## III.   DEFENDANTS' ACTIONS HARM PLAINTIFF STATES

### A.   The Diversion of Funds through §§ 8005 and 284 toward Construction of a Border Wall Will Cause Environmental Harm to New Mexico

In December 2018, DHS announced its intention to prioritize the construction of a border

wall in the El Paso Sector, which straddles the border between Texas and New Mexico and is

primarily located in New Mexico. RJN Exs. 40, 41 (description of El Paso Sector from CBP

website). As discussed *supra*, on February 25, DHS requested DOD's support with barrier

construction in four sectors, including the El Paso Sector. RJN Ex. 33. As part of that request,

DHS identified two projects for the El Paso Sector, including exact coordinates for each project.

*Id.* at 9. DHS described El Paso Project 1 as "46 miles of vehicle barrier replacement beginning

approximately 17.5 miles west of the Columbus Port of Entry continuing east in non-contiguous

segments to approximately 35 miles east of the Columbus Port of Entry within the Luna and

Doña Ana Counties, New Mexico." *Id.* at 9. DHS requested that the vehicle barrier be replaced

with "new pedestrian fencing." *Id.* at 8. Vehicle fencing is the least detrimental border barrier to

wildlife as most animals can cross under or between such fencing. App'x of Decls. re Env. Harms

(Env. App'x) Ex. 5 (Traphagen Decl. ¶¶ 13-16). Conversely, pedestrian fencing impedes most

animals from passing through. *Id.* ¶ 17. Steel bollard pedestrian fencing typically only has a four-

inch gap between posts. *Id.*

Construction of pedestrian fencing in place of a permeable vehicle barrier will have

significant adverse effects on environmental resources, including direct and indirect impacts to

endangered or threatened wildlife. The El Paso Project 1 border wall will bisect important

wildlife habitats, impairing wildlife connectivity for species like the federally-endangered

---

[3] Priscilla Alvarez et al., *Exclusive: Defense Dept. Begins Scouting Sites for New Border Wall*, CNN (Mar. 28, 2019), available at https://www.cnn.com/2019/03/28/politics/pentagon-border-wall-arizona-texas/index.html.

9

Pls.' Notice of Mot. and Mot. for Prelim. Inj. and Mem. ISO (4:19-cv-00872-HSG)

1    Mexican wolf and the jaguar. Env. App'x Ex. 2 (Lasky Decl. ¶ 7); Ex. 5 (Traphagen Decl. ¶¶ 14-

2    24, 27). Further, construction impacts such as noise and increased vehicle traffic will kill or injure

3    other important species such as the Alpomado falcon and the Gila monster that live in Doña Ana

4    and Luna Counties. *Id.* Ex. 3 (Nagano Decl. ¶¶ 16, 24, 25). El Paso Project 1 will also negatively

5    affect State Trust Lands located near and within the Project site. *Id.* Ex. 5 (Traphagen Decl. ¶¶

6    27-30, Ex. B). These environmental impacts would not occur but for the diversion of 10 U.S.C.

7    §§ 8005 and 284 funding as Congress only authorized construction in Rio Grande Valley Sector

8    of Texas, not in New Mexico where these species live and traverse through. 2019 Consolidated

9    Appropriations Act, Pub. L. No. 116-6, § 230(a)(1), 133 Stat. 13, 28 (2019). Finally, because

10   Defendants are violating NEPA's environmental review requirements, New Mexico is suffering a

11   procedural injury in addition to the environmental injuries described above.

12        **B.    Plaintiff States Benefit from TFF Resources that Defendants Are Diverting
                  to Border Wall Construction**

13

14        The statute governing TFF authorizes payments to state and local law enforcement agencies

15   for reimbursement of certain expenditures incurred as part of joint law enforcement operations

16   with federal law enforcement agencies that falls under the TFF program, 31 U.S.C.

17   § 9705(a)(1)(B)(iii), (a)(1)(I), and "[e]quitable sharing payments" that Plaintiff States receive. *Id.*

18   § 9705(a)(1)(G); App'x of Decls. re TFF ("TFF App'x"); *see also* RJN Ex. 29 at 9. State and

19   local law enforcement agencies have invested and will invest considerable resources and time in

20   participating in such joint operations. TFF App'x. Treasury is authorized to transfer forfeited

21   property "to any State or local law enforcement agency that participated directly or indirectly in

22   the seizure or forfeiture of the property." 31 U.S.C. § 9705(h)(1)(B)(ii). The TFF statute requires

23   such transfers to "bear[] a reasonable relationship to the degree of participation of the State or

24   local agency in the law enforcement effort resulting in the forfeiture," *Id.* § 9705(b)(4)(A), and

25   "serve to encourage further cooperation between the recipient State or local agency and Federal

26   law enforcement agencies." *Id.* § 9705(b)(4)(B).

27        As a matter of practice, Treasury has paid out claims to state and local law enforcement

28   agencies once a seizure results in a forfeiture. TFF App'x. Plaintiff States have consistently

10

1  participated in the equitable sharing program since its inception in the early 1990s. TFF App'x

2  Ex. 1 (Declaration of Michael Cayaban ["Cayaban Decl."] ¶¶ 6-9). Collectively, Plaintiff States

3  have current outstanding claims from TFF totaling millions of dollars. *See* TFF App'x. Plaintiff

4  States use these funds to support their law enforcement functions. State and local law

5  enforcement agencies have used the amounts received from TFF to purchase needed law

6  enforcement equipment, pay overtime, provide necessary training to officers, and support

7  ongoing joint law enforcement task forces and operations. *See generally* TFF App'x.

8       For example, the New York Attorney General's Office has used its equitable share

9  payments to equip and train state and local law enforcement officers in the use of naloxone,

10  which is used to rapidly reverse opioid overdoses, as well as fund bulletproof vests for local law

11  enforcement agencies. TFF App'x Ex. 2 (Decl. of John Genovese ¶ 11). In California, the denial

12  or reduction of the State's equitable share claims would adversely impact the ability of the

13  California Department of Justice to support law enforcement task forces and potentially result in

14  the termination of task force services in certain areas of the State. TFF App'x Ex. 3 (Decl. of

15  Kevin Gardner ¶¶ 15-16). The New Jersey Attorney General's Division of Criminal Justice

16  utilized its equitable share payments to create a new digital evidence system in its Computer

17  Analysis and Technology Unit forensic lab, "which significantly enhances the State's ability to

18  obtain evidence of financial crimes." TFF App'x Ex. 4 (Decl. of William Cranford ¶ 14). Local

19  law enforcement agencies in Plaintiff States directly benefit from TFF as well. For instance, the

20  Chicago Police Department has used TFF money to fund the expansion of Strategic Decision

21  Support Centers that are designed to employ a new approach to gun violence prevention in

22  Chicago. TFF App'x Ex. 5 (Decl. of Susie Park ¶ 7). As Treasury acknowledges, "[s]tate and

23  local law enforcement agencies can use these resources to augment their law enforcement budgets

24  to fight crime in their jurisdictions. Without these funds, budgets of [these entities] would be

25  taxed to provide these important resources or the need would go unmet." RJN Ex. 29 at 13.

26       The $601 million designated for the border wall has been identified as Strategic Support.

27  RJN Ex. 30. From FY 2010 to FY 2018, Treasury collectively pulled $584 million from the

28  Strategic Support account, less than the $601 million President Trump directed to be taken from

11

Pls.' Notice of Mot. and Mot. for Prelim. Inj. and Mem. ISO (4:19-cv-00872-HSG)

1  the account for this fiscal year alone. Cayaban Decl. ¶ 11. Even before this diversion, the TFF

2  account faced significant challenges in meeting its obligations, as "recently-enacted large

3  rescissions" made by Congress from its operating budget "have had a severe negative impact" on

4  law enforcement agencies that participate in the TFF program. RJN Ex. 42. Treasury recognized

5  that "[i]nsufficient and inconsistent funding support, uncertainty about future funding,

6  investigations disrupted by cash flow problems, and inability to obtain necessary

7  technology/infrastructure in the absence of Strategic Support all undermine both current and

8  future financial investigation and forfeitures." *Id.* Treasury also noted that total revenue was at its

9  lowest level in over a decade and the "substantial drop" in base revenue used to "cover basic

10  mandatory costs of the forfeiture program is especially troubling." RJN Ex. 43 at 4.

11  Notably, in December 2015, when the U.S. Department of Justice (DOJ) Asset Forfeiture Fund

12  faced a similar predicament caused by congressional rescissions from its operating budget, DOJ

13  was compelled to suspend its equitable sharing program "[i]n order to maintain the financial

14  solvency of the Program . . . ." RJN Ex. 44. TFF, which at the end of FY 2018 had approximately

15  the same balance as the DOJ Asset Forfeiture Fund did in the fiscal year it suspended equitable

16  sharing, *see* Cayaban Decl. ¶¶ 12-18, is now facing a similar crisis that Defendants' diversion of

17  $601 million has exacerbated.

18  ## LEGAL ARGUMENT

19  ### I.   LEGAL STANDARD

20  "The purpose of a preliminary injunction is merely to preserve the relative positions of the

21  parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395

22  (1981); *Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*, 840 F.2d 701, 704 (9th Cir. 1988) ("The

23  basic function of a preliminary injunction is to preserve the *status quo* pending a determination of

24  the action on the merits."). A preliminary injunction is appropriate where a party shows: "(1) that

25  [it] is likely to succeed on the merits, (2) that [it] is likely to suffer irreparable harm in the

26  absence of preliminary relief, (3) that the balance of equities tips in [its] favor, and (4) that an

27  injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)

28  (numbering added). In the Ninth Circuit, "serious questions going to the merits and a balance of

12

Pls.' Notice of Mot. and Mot. for Prelim. Inj. and Mem. ISO (4:19-cv-00872-HSG)

1   hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction,

2   so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the

3   injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th

4   Cir. 2011) (internal quotations omitted).

5        In the context of possible irreparable harm to endangered species, a preliminary injunction

6   generally must be granted. *Nat'l. Wildlife Fed'n. v. Nat'l. Marine Fisheries Serv*. (*NWF*), 422

7   F.3d 782, 795-96 (9th Cir. 2005); *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1177 (9th

8   Cir. 2002). There is a "well-established public interest in preserving nature and avoiding

9   irreparable environmental injury." *Cottrell*, 632 F.3d at 1138 (internal citations omitted). The

10  Ninth Circuit has "recognized the public interest in careful consideration of environmental

11  impacts before major federal projects go forward, and [has] held that suspending such projects

12  until that consideration occurs comports with the public interest." *Id.* (internal citations omitted).

13  **II.    PLAINTIFF STATES ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS**

14       Plaintiff States are likely to succeed on all of their claims. First, as discussed *infra* II(A)(1)-

15  (3), Defendants' diversions of funds and resources violate the U.S. Constitution's separation of

16  powers requirements, including those in the Presentment and Appropriations Clauses. The

17  separation of powers doctrine does not permit the president to "reject[] the policy judgment made

18  by Congress" to not appropriate billions of dollars toward construction of a border wall. *Clinton*

19  *v. City of New York*, 524 U.S. 417, 444 (1998). By using a procedure outside the one delineated in

20  the Constitution to unilaterally supplement the $1.375 billion appropriation made by Congress for

21  limited barrier fencing with an additional $6.7 billion (including the $1.6 billion that is the subject

22  of this motion) for a border barrier in areas not approved by Congress, Defendants violate the

23  Presentment Clause, U.S. Const., art. I, § 7. *City of New York*, 524 U.S. at 444-47. Also, by

24  relying on a general appropriation where there is a specific appropriation that governs barrier

25  funding, Defendants violate the Appropriations Clause, U.S. Const., art. I, § 9, cl. 7.

26       Second, as discussed *infra* II(B)(1)-(2), not only do Defendants' diversions violate the

27  Constitution, but Defendants fail to satisfy the criteria in the underlying statutes that must be met

28  in order to divert funding and use resources in the first place. *See Youngstown Sheet & Tube Co.*

13

Pls.' Notice of Mot. and Mot. for Prelim. Inj. and Mem. ISO (4:19-cv-00872-HSG)

1    *v. Sawyer*, 343 U.S. 579, 586 (1952) (since the statutory "conditions were not met" to authorize

2    seizure of property, the president lacked statutory authority to implement the executive order

3    directing seizure of the steel mills). Consequently, Defendants have acted ultra vires and "in

4    excess of statutory jurisdiction, authority, or limitations, or short of statutory right," in violation

5    of the APA. 5 U.S.C. § 706(2)(C); *see also City of Arlington v. FCC*, 569 U.S. 290, 297 (2013)

6    (When an official "act[s] improperly, no less than when they act beyond their jurisdiction, what

7    they do is ultra vires.").

8        Third, as discussed *infra* II(C), Defendants have violated the APA by failing to provide a

9    rational explanation for the diversions.

10       Fourth, and finally, as discussed *infra* II(D), Defendants have violated NEPA by failing to

11   consider the environmental impacts of the proposed construction on the southwest border of New

12   Mexico.

13       **A.    Plaintiff States Are Likely to Succeed on Their Constitutional Claims**

14           **1.    Separation of Powers and Appropriations Principles**

15       To avoid one branch of government usurping the powers of another, the Framers of the U.S.

16   Constitution delineated distinct lines of responsibility between them to serve as a "structural

17   protection[] against abuse of power." *Bowsher v. Synar*, 478 U.S. 714, 730 (1986). The Framers

18   viewed the "power over the purse . . . as the most complete and effectual weapon with which any

19   constitution can arm the immediate representatives of the people." The Federalist No. 58 (James

20   Madison). If, contrary to this precept, "the decision to spend [is] determined by the Executive

21   alone, without adequate control by the citizen's Representatives in Congress, liberty is

22   threatened." *City of New York*, 524 U.S. at 451 (Kennedy, J., concurring).

23       In furtherance of these fundamental principles, the Constitution provides that all legislative

24   powers are granted exclusively to Congress, U.S. Const., art. I, § 1, which includes the power to

25   spend and appropriate funding. *Id.* art. I, § 8. Under the Presentment Clause, every bill must pass

26   the House of Representatives and the Senate before being presented to the president. *Id.* art. I, § 7,

27   cl. 2. The president then must either sign the bill, in whole, or veto it and return it to Congress. *Id.*

28   Once a bill becomes law, the president must "take care that the laws be faithfully executed." *Id.*,

14

Pls.' Notice of Mot. and Mot. for Prelim. Inj. and Mem. ISO (4:19-cv-00872-HSG)

1    art. II, § 3. All of these constitutional provisions "were intended to erect enduring checks on each

2    Branch and to protect the people from the improvident exercise of power by mandating certain

3    prescribed steps. To preserve those checks, and maintain the separation of powers, the carefully

4    defined limits on the power of each Branch must not be eroded." *INS. v. Chadha*, 462 U.S. 919,

5    957-58 (1983). Specifically, within this constitutional design, "the President's power to see that

6    the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown*, 343

7    U.S. at 587.

8       In *Youngstown Sheet & Tube Co. v. Sawyer*, the Supreme Court held that the president's

9    executive order directing the seizure of steel mills during a work stoppage was unconstitutional,

10   as it did not stem from any power afforded to the president either by Congress or the Constitution.

11   *Id.* at 585. The Constitution does not grant to the president any inherent powers during an

12   emergency to "usurp[]" Congress's legislative functions, limiting the president's powers to those

13   that Congress has conferred. *Id.* at 649-50 (Jackson, J. concurring); *see also id.* (noting the

14   Founders "knew what emergencies were," and "omitted" powers to the president to act in times

15   of emergency). The Court deemed it significant that Congress had explicitly rejected an

16   amendment to the relevant statute that would have authorized seizure by the president as a

17   method for resolving labor disputes. *Id.* at 586. As recognized by Justice Jackson in his oft-cited

18   concurring opinion, "[w]hen the President takes measures incompatible with the express or

19   implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own

20   constitutional powers minus any constitutional powers of Congress over the matter." *Id.* at 637.

21       After *Youngstown*, in *Clinton v. City of New York*, the Court concluded that even Congress

22   cannot adopt procedures for making legislation that disturb the Constitution's separation of

23   powers framework. The Court held that Congress violated the constitutional design by giving the

24   president line-item veto power, which would have permitted the president to cancel

25   appropriations after they were passed by Congress and signed into law. Such a procedure violates

26   the Presentment Clause because Congress cannot by statute "alter the procedures set out in

27   Article I, § 7, without amending the Constitution." *City of New York*, 524 U.S. at 446.

28

15

Pls.' Notice of Mot. and Mot. for Prelim. Inj. and Mem. ISO (4:19-cv-00872-HSG)

These principles apply with particular force in the area of appropriations, an intrinsically legislative function. The Constitution directs that "[n]o money shall be drawn from the Treasury, but in consequence of appropriations made by law." U.S. Const. art. I, § 9, cl. 7. The Appropriations Clause is a "straightforward and explicit command" that "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)). The Appropriations Clause is a "bulwark of the Constitution's separation of powers among the three branches of the National Government. It is particularly important as a restraint on Executive Branch officers: If not for the Appropriations Clause, 'the executive would possess an unbounded power over the public purse of the nation; and might apply all its monied resources at his pleasure.'" *U.S. Dep't of Navy v. Fed. Labor Rel. Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (Kavanaugh, J.) (quoting Joseph Story, Commentaries on the Constitution of the United States § 1342, at 213-14 (1833)); *United States v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016) ("The Appropriations Clause plays a critical role in the Constitution's separation of powers among the three branches of government and the checks and balances between them.").

Known as the "Purpose Statute," 31 U.S.C. § 1301, which was originally enacted in 1809, "codified what was already required under the Appropriations Clause of the Constitution." Gov't Accountability Office (GAO), Office of the General Counsel, Principles of Federal Appropriations Law 3-10 (4th Ed. 2017) (citing 4 Lawrence, First. Comp. Dec. 137, 142 (1883)). In that regard, § 1301(a) "reinforce[s] Congress's control over appropriated funds," *Dep't of the Navy,* 665 F.3d at 1347, by requiring appropriations to be applied only "to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a). The limitations on how an agency may use appropriated funds under both the Appropriations Clause and § 1301(a) are memorialized in the GAO, Office of the General Counsel, Principles of Federal Appropriations (4th Ed. 2017), also referred to as the GAO Red Book.[4] *Cf. Dep't of the Navy*, 665 F.3d at 1349 (regarding the "assessment of the GAO" and its principles as "expert opinion" when

---

[4] The GAO Red Book discussed in this motion is available on GAO's website at https://www.gao.gov/assets/690/687162.pdf.

1   considering whether an agency order was consistent with the Appropriations Clause and §

2   1301(a)) (quoting *Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 201 & n.1 (D.C. Cir. 1984)

3   (Scalia, J.)).

4          As reflected in these principles, in order for an agency to make an expenditure that

5   complies with § 1301(a), and hence the Appropriations Clause, it must follow the "necessary

6   expense rule." GAO Red Book at 3-14-15. Among other requirements, the necessary expense rule

7   prohibits an agency from relying on a *general* appropriation for an expenditure when that

8   expenditure falls *specifically* "within the scope of some other appropriation or statutory funding

9   scheme." *Id.* at 3-16-17, 407-10. "Otherwise, an agency could evade or exceed congressionally

10  established spending limits," *id.* at 3-408, which the Constitution forbids. *See Richmond*, 496 U.S.

11  at 428 ("If agents of the Executive were able, by their unauthorized [actions], to obligate the

12  Treasury for the payment of funds, the control over public funds that the Clause reposes in

13  Congress in effect could be transferred to the Executive.").

## 2.   Defendants Have Violated the Separation of Powers, Including the Presentment Clause

16         Defendants have violated the separation of powers doctrine in this specific case by

17  unilaterally modifying the limited border barrier appropriation in the FY 2019 Consolidated

18  Appropriations Act contrary to Congress's express and implied intent. Between 2017 and 2018,

19  Congress repeatedly refused to appropriate or authorize billions of dollars in funding toward a

20  border wall. *See*, *e.g.*, RJN Ex. 14-20, 24; *see also City & Cty. of San Francisco v. Trump*, 897

21  F.3d 1225, 1234 (9th Cir. 2018) ("The sheer amount of failed legislation . . . demonstrates the

22  importance and divisiveness of the policies in play . . . ."). At the end of 2018, President Trump

23  demanded $5.7 billion in border wall funding, which was later formalized in a specific request by

24  the OMB. RJN Ex. 25. Eventually, after a nearly two-month standoff, including a record 35-day

25  partial government shutdown over funding for a border wall, Congress passed the 2019

26  Consolidated Appropriations Act that approved $1.375 billion for limited pedestrian fencing in

27  the Rio Grande Valley Sector in Texas subject to specific conditions, denying the president the

28  appropriation he requested. Pub. L. No. 116-6, §§ 230-32, 133 Stat. 13, 28 (2019). On the same

17

1   day that President Trump signed the 2019 Consolidated Appropriations Act into law, he

2   announced the repurposing of up to $6.7 billion in additional funding (including the $1.6 billion

3   that is the subject of this motion) to supplement the funding provided by Congress. RJN Ex. 28.

4         Defendants' diversions of funding and resources violate separation of powers principles in

5   at least two ways. First, the president is acting at the "lowest ebb of his power" here by flouting

6   Congress's clearly expressed will. *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring); *see San*

7   *Francisco*, 897 F.3d at 1234 (upholding injunction on executive order to withhold funds from

8   "sanctuary jurisdictions" where "Congress has frequently considered and thus far rejected

9   legislation accomplishing the goals of the Executive Order"). Even if statutes such as 10 U.S.C.

10  § 284 or 31 U.S.C. § 9705 may generally permit the Executive Branch to divert funding in some

11  instances not present here, Congress's more recent and specific action to explicitly refuse any

12  funding for a border barrier beyond the $1.375 billion for a *specific* type of pedestrian fencing and

13  *only* in the Rio Grande Valley precludes Defendants from thwarting the will of Congress

14  expressed in the 2019 Consolidated Appropriation Act. *See Youngstown*, 343 U.S. at 586.

15  "Where Congress has addressed the subject as it has here, and authorized expenditures where a

16  condition is met, the clear implication is that where the condition is not met, the expenditure is

17  not authorized." *United States v. MacCollom,* 426 U.S. 317, 321 (1976); *see also Benda v. Grand*

18  *Lodge of Int'l Assoc. of Machinists & Aerospace Workers*, 584 F.2d 308, 313 (9th Cir. 1978)

19  ("[W]e believe that an expression of specific congressional intent should prevail over the

20  conflicting general policy implications of a prior federal statute.").

21        Second, Defendants' proposed diversions violate the Presentment Clause. That clause

22  commands that legislation must be passed by both houses of Congress, and the president must

23  either sign or veto the legislation in toto. If the latter, the president must return it to Congress in

24  full to provide Congress the opportunity to override his veto. U.S. Const. art. I, § 7, cl. 2. As

25  discussed *supra*, in *City of New York*, the Supreme Court already determined that under the

26  Presentment Clause, the president does not possess the power to single-handedly cancel

27  appropriations approved by both Houses of Congress after they were signed into law. 524 U.S. at

28

18

Pls.' Notice of Mot. and Mot. for Prelim. Inj. and Mem. ISO (4:19-cv-00872-HSG)

1    436-41. "There is no provision in the Constitution that authorizes the president to enact, to

2    amend, or to repeal statutes." *Id.* at 438.

3         Here, Defendants violate the Presentment Clause by effectively seeking to amend the FY

4    2019 Consolidated Appropriations Act, where Congress provided a $1.375 billion appropriation

5    for limited border barrier funding for construction limited to a specified area, with $6.7 billion in

6    additional funding that is not subject to the specific constraints imposed by Congress. The

7    Constitution does not empower "the President himself to effect the repeal [or modification] of

8    laws, for his own policy reasons, without observing the procedures set out in Article I, § 7 [of the

9    U.S. Constitution]." *Id.* at 445. The Constitution constrains the president from acting as a

10   lawmaker in this manner, *Youngstown*, 343 U.S. at 587, and "exclusively grants the power of the

11   purse to Congress, not the President," *San Francisco*, 897 F.3d at 1231. Whether at some earlier

12   point Congress provided the president with general authority to divert funding in some instances

13   not applicable here "is of no moment." *City of New York*, 524 U.S. at 445-46. The Constitution

14   does not permit the president to "amend" an appropriation for a border barrier after signing it into

15   law by increasing its amount and expanding the scope of where and how the barrier may be built.

16   *Id.* at 438.

17        Notwithstanding the president's expressed frustration with Congress and the legislative

18   process, he must act in accordance with the procedures established in the Constitution to obtain

19   funding for his border wall. *See id.* at 445-46, 449. "There is no support in the Constitution or

20   decisions of [the Supreme] Court for the proposition that the cumbersomeness and delays often

21   encountered in complying with explicit constitutional standards may be avoided, either by the

22   Congress or by the President." *Chadha*, 462 U.S. at 959. Accordingly, the president cannot scour

23   the federal coffers to fund projects that Congress refused to appropriate. Nor can the president

24   take funds from other sources as a way of circumventing conditions set by Congress on a specific

25   appropriation. "[T]he fact that a given law or procedure is efficient, convenient, and useful in

26   facilitating functions of government, standing alone, will not save it if it is contrary to the

27   Constitution. Convenience and efficiency are not the primary objectives—or the hallmarks—of

28   democratic government . . . ." *Id.* at 944.

19

Pls.' Notice of Mot. and Mot. for Prelim. Inj. and Mem. ISO (4:19-cv-00872-HSG)

### 3. Defendants Have Violated the Appropriations Clause

Defendants' diversions of funds also violate the Appropriations Clause, as Congress has not appropriated the diverted funds toward a border wall. U.S. Const., art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."). As discussed *supra*, in protection of "congressionally established spending limits," it is "well-settled" that an expenditure may not be paid out of a general appropriation "where the expenditure falls specifically within the scope of another appropriation." GAO Red Book at 3-407-08; *see also* 65 Comp. Gen. 881, 884 (1986) ("As a general rule, an appropriation for a specific object is available for that object to the exclusion of a more general appropriation which might otherwise be considered available for the same object, and the exhaustion of the specific appropriation does not authorize charging any excess payment to a more general appropriation").

This restriction in the expenditure of appropriations is supported by a "legion" of GAO decisions "from time immemorial." *Id.* at 3-409 (collecting cases dating back to 1894 and quoting 1 Comp. Dec. 126 (1894)). For example, the Department of Navy could not use a general appropriation that was provided to it for the purpose of dredging a river "because dredging rivers was a function for which funds were appropriated to the Army Corps of Engineers, not the Navy and that the Corps was specifically charged by law to improve the nation's waterways." *Id* at 3-408-09 (citing B-139510, May 13, 1959). The D.C. Circuit likewise determined that although Congress appropriated $190 million to the Department of Energy to grant funds for nuclear waste disposal activities, "the fact that Congress appropriated $1 million expressly for Nevada" from an alternative and more specific source for that same purpose, "indicates that is all Congress intended Nevada to get [for that fiscal year]." *Nevada v. Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir. 2005); *see also* 36 Comp. Gen. 526 (1957) ("The specific appropriation of $18,000,000 for the construction [of a specific atomic ship], which was passed after the general appropriation act for ship construction for the same fiscal year had been enacted without funds for the [specific] ship, precludes [the agency] from using any of the funds in the general appropriation for the [specific] ship and from expending more for this construction than the amount provided in the supplemental appropriation.").

20

Pls.' Notice of Mot. and Mot. for Prelim. Inj. and Mem. ISO (4:19-cv-00872-HSG)

This longstanding limitation applies here. Congress specifically appropriated $1.375 billion to fund a barrier for a specific and limited segment of the southwest border. Defendants now attempt to supplement that appropriation by using funds that were more generally appropriated for "drug interdiction and counter-drug activities," FY 2019 DOD Appropriations Act at 17, or "in connection with [federal] law enforcement activities," 31 U.S.C. § 9705(g)(4)(B), in order to fund additional portions of President Trump's border wall project that were not part of Congress's specific appropriation. Defendants' attempt to use general appropriations to fund work that is typically the responsibility of DHS aggravates the violation. *See* 6 U.S.C. § 211(e)(3) & (g)(3)(C) (CBP's responsibilities to monitor land borders); *see also* B-139510 (GAO May 13, 1959) (Department of Navy could not use its general appropriation to conduct work that is specifically assigned to another agency). In particular, Defendants have confirmed that they will be using funds from TFF "exclusively" toward construction of a barrier in the Rio Grande Valley, the same area that Congress appropriated $1.375 billion for in the 2019 Consolidated Appropriations Act. Pub. L. No.  116-6, § 230(a)(1), 133 Stat. 13, 28 (2019). RJN Exs. 2, ¶ 12 & 31. Because "a specific appropriation exists for a particular item," *i.e.* the $1.375 billion, "then that appropriation must be used and it is improper to charge any other appropriations for that item." GAO Principles at 3-409. For all of these reasons, Defendants' actions violate the Appropriations Clause by "authoriz[ing] the expenditure of funds beyond what Congress has approved" for a particular project. *U.S. Dep't of the Air Force v. Fed. Labor Rels. Auth.*, 648 F.3d 841, 845, 847-48 (D.C. Cir. 2011) (using appropriated funds to clean uniforms would be a violation of the Appropriations Clause where the authorization to expend funds "for purchase and upkeep of uniforms" was deleted without explanation from Congress's conference report).

## B.  Plaintiff States Are Likely to Succeed on their Claims that Defendants Have Acted Ultra Vires and in Excess of Statutory Authority

Even leaving aside the express funding limits in the 2019 Consolidated Appropriations Act and the Act's further limitations on where and how that funding could be utilized, Defendants are exceeding the authority provided by Congress in their diversion of funds from two sources.  The first is DOD's drug-interdiction account, which Defendants have attempted to enlarge by

21

Pls.' Notice of Mot. and Mot. for Prelim. Inj. and Mem. ISO (4:19-cv-00872-HSG)

1   transferring $1 billion from DOD's military personnel account into the drug-interdiction account

2   for the sole purpose of paying for border wall construction. The second is the TFF. Defendants

3   have acted ultra vires and in excess of statutory authority with both of these diversions.

**1.   Defendants Lack Statutory Authority to Divert Funding and Resources for Construction of a Border Wall Under 10 U.S.C. § 284 and § 8005 of the FY 2019 DOD Appropriations Act**

6   Defendants seek to exploit the DOD's drug-interdiction account to divert the largest tranche

7   of funding to date for border wall construction. Defendants' scheme involves two steps. First,

8   Defendants rely on § 8005 of the FY 2019 DOD Appropriations Act to transfer $1 billion in

9   funding that Congress appropriated for military personnel to the DOD's drug-interdiction

10   account. RJN Ex 31. Second, Defendant Shanahan has announced that DOD will obligate the $1

11   billion transferred into the account to support DHS's construction of border fencing under §

12   284(b)(7). RJN Ex. 32. Defendants must therefore satisfy the criteria set forth by Congress in

13   both § 8005 and § 284(b)(7); the failure to satisfy the criteria under *either* provision means that

14   Defendants lack the authority to use the $1 billion to construct a border wall. Here, Defendants

15   fail to satisfy the criteria of both provisions.

16   The transfer into the drug-interdiction account violates the restrictions on DOD's authority

17   imposed by § 8005. Although Congress has given DOD authority to re-direct unused funds in §

18   8005, it has long restricted that authority. Starting in the FY 1974 appropriations act for DOD,

19   Pub. L. No. 93-238, 87 Stat. 1026, 1044, § 735 (1974), Congress included conditions on DOD's

20   transfer authority to "tighten congressional control of the re-programming process." H.R. Rep.

21   No. 93-662, at 16 (1973). As explained in the legislative history, on some occasions, DOD "has

22   requested that funds which have been specifically deleted in the legislative process be restored

23   through the re-programming process. The Committee believes that to concur in such actions

24   would place committees in the position of undoing the work of Congress." *Id.* Accordingly,

25   DOD's ability to transfer funds is now subject to several limitations, including that transfers may

26   be made only "for higher priority items, based on unforeseen military requirements, than those for

27   which originally appropriated," and that "in no case where the item for which funds are requested

28

22

1    has been denied by Congress." FY 2019 DOD Appropriations Act, Pub. L. No. 115-245, § 8005,

2    132 Stat. 2981, 2999 (2018) *see also* 10 U.S.C. § 2214(d) (imposing the same requirements).

3         Defendants' actions here violate these restrictions. In the first place, there is no "*unforeseen*

4    military requirement." The president's desire for a border wall was certainly "foreseen": the

5    president has called for a border wall throughout his presidency and indeed, well before he even

6    became president. *See, e.g.*, RJN Exs. 3-13. The president directed DOD to provide support and

7    resources to the southern border in an April 4, 2018 memorandum, RJN Ex. 27, nearly six months

8    before enactment of the FY 2019 DOD Appropriations Act. At that time, the president declared,

9    "Until we can have a wall and proper security, we are going to be guarding our border with our

10   military." RJN Ex. 7. The president and DOD, therefore, had ample opportunity to request DOD

11   funding from Congress to construct a border wall as part of the FY 2019 DOD Appropriations

12   Act; their failure to do so strongly undercuts any contention that a border wall is an *unforeseen*

13   military requirement. *See generally* FY 2019 DOD Appropriations Act, 132 Stat. 2981.

14        Nor is a border wall a "military requirement." The protection of the border is the job of

15   DHS, not DOD.[5] To the extent that DOD has a role, it is limited to the "detection and monitoring

16   of *aerial and maritime* transit of illegal drugs into the United States." 10 U.S.C. § 124 (emphasis

17   added). Congress has not assigned DOD with military responsibilities for enforcement of *land*

18   borders even in this limited respect. *See* 18 U.S.C. § 1385 (posse comitatus act forbidding use of

19   military to execute the laws). Even though Congress has authorized DOD to support construction

20   of border fencing under § 284(b)(7) when Congress has appropriated funding to DOD to do so, it

21   has by no means *required* DOD to undertake this task. In fact, Congress typically appropriates

22   funds for *DHS* to perform this function, including in the 2019 Consolidated Appropriations Act,

23   _____

[5] *See* 6 U.S.C. § 211(c) (listing among CBP commissioner's duties to: "(2) ensure the interdiction of persons and goods illegally entering or exiting the United States; . . . (5) detect, respond to, and interdict terrorists, drug smugglers and traffickers, human smugglers and traffickers, and other persons who may undermine the security of the United States, in cases in which such persons are entering, or have recently entered, the United States; (6) safeguard the borders of the United States to protect against the entry of dangerous goods"), (e)(3) (listing U.S. Border Patrol's duties to: "(A) serve as the law enforcement office of [CBP] with primary responsibility for interdicting persons attempting to illegally enter or exit the United States or goods being illegally imported into or exported from the United States at a place other than a designated port of entry; (B) deter and prevent the illegal entry of terrorists, terrorist weapons, persons, and contraband; and (C) carry out other duties and powers prescribed by the Commissioner").

23

Pls.' Notice of Mot. and Mot. for Prelim. Inj. and Mem. ISO (4:19-cv-00872-HSG)

1    Pub. L. No. 116-6, § 230(a)(1), 133 Stat. 13, and DHS, in turn, has used civilian private

2    contractors to carry out these border barriers appropriations after DOD informed DHS that

3    "military personnel would no longer be available to build fencing." RJN Ex. 45. Moreover, top

4    military officials, including Defendant Shanahan, have testified that the situation at the border "is

5    not a military threat." RJN Ex. 46; *see also* RJN Ex. 47 at 24. In fact, the Director of National

6    Intelligence's most recent "Worldwide Threat Assessment" does not even mention the southwest

7    border as a security threat. RJN Ex. 48 at 41; *see also* RJN Ex. 46 at 46 (Defendant Shanahan

8    stating that "30 or 40 percent" of the 6,000 troops stationed at the border would be departing "in

9    the next month or so").

10       Finally, funds cannot be transferred under § 8005 to construct the proposed border wall

11   because the proposed wall is an "item for which funds [have been] requested [and] has been

12   denied by the Congress." FY 2019 DOD Appropriations Act, § 8005. The president repeatedly

13   asked Congress for—and was denied—$5.7 billion for a border wall. *See, e.g.*, RJN Exs. 21, 23,

14   26. While the House on December 20, 2018, passed a funding bill that would have provided $5.7

15   billion to CBP for "Procurement, Construction, and Improvements" without any limitation on

16   how those funds could be used, RJN Ex. 24, that proposed appropriation never became law and

17   was removed from the 2019 Consolidated Appropriations Act. *See* §§ 230-32, 133 Stat. at 28-29.

18   On January 6, 2019, the OMB requested $5.7 billion from Congress to "fund construction of a

19   total of approximately 234 miles of new physical barrier [on the southwest border]." RJN Ex. 25.

20   Congress, however, denied OMB's request, instead, appropriating only $1.375 billion to construct

21   a limited amount of barrier fencing in the Rio Grande Valley. 2019 Consolidated Appropriations

22   Act, §§ 230-32, 133 Stat. at 28-29. Because Congress denied Defendants' request for funds

23   beyond this appropriated amount, § 8005 prohibits Defendants from transferring the additional $1

24   billion for border wall construction.

25       In addition to exceeding statutory authority by transferring DOD funds into the drug-

26   interdiction under § 8005, Defendants further lack authority under § 284(b)(7) to use DOD

27   resources to construct President Trump's proposed border wall. Far from providing authorization

28   to construct fencing across broad swaths of the border, § 284(b)(7) merely authorizes DOD

24

"support" for the "[c]onstruction of roads and fences and installation of lighting to block drug

smuggling corridors across international boundaries of the United States." Here, DOD is not just

providing "support" for the border wall; it is completely funding the construction of fencing in the

El Paso Sector. RJN Ex. 34. Moreover, § 284 could only be read to authorize the support of

"small scale construction." Section 284(h) requires congressional notification fifteen days before

DOD provides support under this subsection. The section additionally requires that DOD provide

"a description of any small scale construction project for which support is provided" under §

284(b), but imposes no similar requirement for other construction projects. "[S]mall scale

construction" is defined by § 284(i)(3) as "construction at a cost not to exceed $750,000 for any

project," which is significantly less than the $1 billon that Defendants have directed to be used

from the drug-interdiction account toward border wall construction. As a matter of statutory

construction, it strains logic that Congress would have required DOD to provide more notice for

"small scale construction" of $750,000 or less than it would have for the $1 billion construction

project of the type proposed by Defendants here. *See Silvers v. Sony Pictures Entm't, Inc.*, 402

F.3d 881, 900 (9th Cir. 2005) ("[Another] consideration in statutory interpretation is practicality,

or put another way, the avoidance of an absurd result.").

    Thus, Defendants' proposed diversion of funds and resources from the military personnel

account for transfer to the drug-interdiction account, and from the drug-interdiction account to the

border wall, fail to comport with the very statutes that they invoke.

    **2.    Defendants Lack Statutory Authority to Divert Funds from TFF
             Pursuant to 31 U.S.C. § 9705 for Construction of a Border Wall**

    Defendants' proposed transfer of funds from TFF to construct a border wall also exceeds

the scope of Treasury's authority under TFF's authorizing statute. That statute allows Defendants

to obligate or expend funding "in connection with . . . law enforcement activities of any Federal

agency." 31 U.S.C. § 9705(g)(4)(B). Although subdivision (a) of the TFF authorizing statute lists

no less than 33 "law enforcement purposes" that TFF may fund, *id.* § 9705(a), not one of those

purposes entails infrastructure construction. This omission reflects the established meaning of the

term "law enforcement activities." As the GAO has recognized, the term "federal law

25

Pls.' Notice of Mot. and Mot. for Prelim. Inj. and Mem. ISO (4:19-cv-00872-HSG)

enforcement activities" covers: "[t]he costs of operating the Federal Bureau of Investigation, Customs and Border Protection, Immigration and Customs Enforcement, the Drug Enforcement Administration, and police and crime prevention activities in other programs." *See* GAO, A Glossary of Terms Used in the Federal Budget Process 144-45 (2005). Thus, while CBP's "law enforcement activities" include "interdicting persons attempting to illegally enter or exit the United States or goods being illegally imported into or exported from the United States," 6 U.S.C. § 211(e)(3)(A), it does not include building a border wall.

### C. Plaintiff States Are Likely to Succeed on their APA Claim

For the reasons discussed *supra* sections II(A)-(B), Defendants have violated the APA because Defendants have acted "contrary to constitutional right, power, privilege or immunity," 5 U.S.C. § 706(2)(B), and "in excess of statutory jurisdiction, authority, or limitations, short of statutory right." *Id.* § 706(2)(C). Defendants' actions additionally violate the APA because they are arbitrary and capricious. *Id.* § 706(2)(A).

"[A]n agency must cogently explain why it has exercised its discretion in a given manner." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983). When an agency departs from prior agency practice, under the APA, it must "acknowledge and provide an adequate explanation for its departure from established precedent, and an agency that neglects to do so acts arbitrarily and capriciously." *Jicarilla Apache Nation v. U.S. Dep't of the Interior*, 613 F.3d 1112, 1119 (D.C. Cir. 2010) (internal citation omitted); *see also Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (agency cannot depart from prior policy without "explaining its changed position"); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (reversing a pre-existing policy requires a "more detailed justification than what would suffice for a new policy created on a blank slate").

Defendants' use of §§ 8005, 284, and 9705 to divert funding toward the construction of a border wall reflects a change in agency policy, but Defendants provide no awareness of this change or "good reasons" for doing so. *Id.* at 515. Although DOD has historically requested congressional approval prior to using its transfer authority under § 8005, RJN Exs. 37-38, DOD has not done so here without recognizing that this is a change in practice. *See* RJN Exs. 32, 34.

26

1   The intended use of counter-narcotic funds under § 284 for the purpose of constructing a border

2   wall is a marked departure from past precedent, as an instructions document from the Joint Chiefs

3   dated January 2007 discusses the use of § 284 funds only in terms of "military engineering

4   support . . . defined as mobility and countermobility (fences, lights, roads) efforts," which are

5   different from the wholesale construction of a border wall as envisioned by President Trump.

6   RJN Ex. 49. Indeed, that document states that "military engineering support" provided under §

7   284 "does not include military construction." *Id.* And Defendants have exhibited no "awareness"

8   that, for the first time, they are using TFF monies to support construction of a barrier on the

9   border, *see* RJN Ex. 30, let alone provide "good reasons" for this departure in policy. *Fox*, 556

10  U.S. at 515.

11      Nor does Defendants' arbitrary and capricious conduct stop there. Courts find agency

12  action to be arbitrary and capricious if the agency has "[a] relied on factors which Congress has

13  not intended it to consider; [b] entirely failed to consider an important aspect of the problem; [or]

14  [c] offered an explanation for its decision that runs counter to the evidence before the agency."

15  *State Farm*, 463 U.S. at 43. Any of these defects would suffice to find the diversion of funding

16  and resources arbitrary and capricious. Here, all three exist.

17      First, as a general proposition, Defendants have not, and cannot, demonstrate they acted

18  consistent with any factors that Congress intended because, for the reasons discussed, *supra*,

19  Congress explicitly did not intend for Defendants to allocate any funds toward a border barrier

20  beyond the $1.375 billion appropriated by Congress for limited pedestrian fencing in the Rio

21  Grande Valley. Second, Defendants have shown no indication that they considered the significant

22  liquidity challenges that TFF currently faces, *supra* at 12, in removing $601 million in Strategic

23  Support, more than has been allocated for Strategic Support for the *past nine fiscal years*

24  *combined*. *See* Cayaban Decl. ¶ 11. Third, as to the use of §§ 8005 and 284, Defendants have

25  acted, without explanation, contrary to the evidence that is before the DOD by using *DOD* funds

26  and resources toward border wall construction when DOD officials have acknowledged that the

27  situation at the border is *not* a military threat. RJN Exs. 47-49. "Unexplained inconsistency is . . .

28  a reason for holding an interpretation to be an arbitrary and capricious change from agency

27

Pls.' Notice of Mot. and Mot. for Prelim. Inj. and Mem. ISO (4:19-cv-00872-HSG)

1    practice under the [APA]." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S.

2    967, 981 (2005).

3        **D.    Plaintiff States Are Likely to Succeed on their NEPA Claim**

4        In addition, Defendants have violated NEPA by failing to conduct an environmental review

5    of the construction they plan (improperly) to undertake. NEPA is the country's "basic national

6    charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA requires environmental

7    review of "major Federal actions significantly affecting the quality of the human environment . . .

8    ." 42 U.S.C. § 4332(C). The goal of this environmental review is to ensure "that environmental

9    information is available to public officials and citizens before decisions are made and before

10   actions are taken." 40 C.F.R. § 1500.1(b). To achieve this goal, "[a]n agency shall commence

11   preparation of an environmental impact statement as close as possible to the time the agency is

12   developing or presented with a proposal . . . ." *Id.* § 1502.5. A "[p]roposal exists at that stage in

13   the development of an action when an agency subject to [NEPA] has a goal and is actively

14   preparing to make a decision on one or more alternative means of accomplishing that goal and the

15   effects can be meaningfully evaluated." *Id.* § 1508.23.

16       Here, DHS set forth a proposal as early as December 12, 2018, in which DHS stated that it

17   planned to build a border wall in six sectors, including the El Paso Sector in New Mexico. RJN

18   Ex. 40. DHS later crystalized its proposal in a February 25, 2019 request to DOD identifying

19   exact coordinates for where it proposes the wall to be built. RJN Ex. 33. While preparing to make

20   these decisions, DHS was required to engage in a public environmental review process that

21   includes the preparation of an environmental impact statement. Instead, DHS made these

22   determinations without the required environmental review.[6]

23       According to Defendant Shanahan's March 25 communications to Congress and Defendant

24   Nielsen, Defendants plan to use the $1 billion transferred to the drug-interdiction account to begin

25   _____

26   [6] The proposed projects are not located within areas covered by any existing waiver from NEPA
     requirements issued by the DHS Secretary pursuant to § 102 of the Illegal Immigration Reform
27   and Immigrant Responsibility Act (8 U.S.C. § 1103 note). 84 Fed. Reg. 2897 (Feb. 8, 2019); 83
     Fed. Reg. 3012 (Jan. 22, 2018); 82 Fed. Reg. 42829 (Sept. 12, 2017); 82 Fed. Reg. 35984 (Aug.
28   2, 2017), each of which pertained to projects that were authorized under that section and
     appropriated for by Congress.

28

Pls.' Notice of Mot. and Mot. for Prelim. Inj. and Mem. ISO (4:19-cv-00872-HSG)

1    construction in the El Paso and Yuma Sectors in New Mexico and Arizona, respectively. RJN

2    Exs. 34-35. Now, not only has DHS made a decision that required environmental review, it has

3    secured funding, unlawfully, to effectuate that decision. NEPA thus required environmental

4    review months ago. "NEPA's object is to minimize . . . the risk of uninformed choice, a risk that

5    arises in part from the practical fact that bureaucratic decisionmakers (when the law permits) are

6    less likely to tear down a nearly completed project than a barely started project." *Sierra Club v.*

7    *Marsh*, 872 F.2d 497, 500–01 (1st Cir. 1989); *see also* 40 C.F.R. § 1502.5 ("The statement shall

8    be prepared early enough so that it can serve practically as an important contribution to the

9    decisionmaking process and will not be used to rationalize or justify decisions already made.").

10   DHS made an "uninformed choice" and violated NEPA by failing to conduct any environmental

11   review before the December 12, 2018 decision regarding the location of the barriers or the March

12   25, 2019 funding decision.

13   **III.    PLAINTIFF STATES ARE LIKELY TO SUFFER IRREPARABLE HARM FROM THE**
         **FUNDING DIVERSIONS**
14
         **A.    New Mexico is Likely to Suffer Irreparable Harm from the Environmental**
15            **Impacts Caused by the Diversion of Funding and Resources and**
              **Construction of Border Wall Without Proper Environmental Review**
16

17           As the Ninth Circuit has observed, "'[e]nvironmental injury, by its nature, can seldom be

18   adequately remedied by money damages and is often permanent or at least of long duration, i.e.,

19   irreparable.'" *Idaho Sporting Cong. Inc. v. Alexander*, 222 F.3d 562, 569 (9th Cir. 2000)

20   (citations omitted). Further, "[i]n the NEPA context, irreparable injury flows from the failure to

21   evaluate the environmental impact of a major federal action." *California* ex rel. *Lockyer v. U.S.*

22   *Dept. of Agric.*, 459 F. Supp. 2d 874, 913 (N.D. Cal. 2006), *opinion clarified* sub nom. *People of*

23   *State of California* ex rel. *Lockyer v. U.S. Dept. of Agric.*, C05-03508 EDL, 2006 WL 2827903

24   (N.D. Cal. Oct. 3, 2006), *aff'd*, 575 F.3d 999 (9th Cir. 2009). Thus, irreparable injury exists when

25   the agency fails to consider the environmental concerns raised by NEPA such that "governmental

26   decisionmakers make up their minds without having before them an analysis (with prior public

27   comment) of the likely effects of their decision upon the environment." *Id.* at 913.

28           Irrespective of the procedural injury caused by the violation of NEPA, construction of a

29

1   border wall in New Mexico will cause irreparable injury to wildlife in the area and New Mexico

2   as a whole. This harm is caused not just by Defendants' violation of NEPA. This irreparable

3   injury would not occur but for Defendants' unlawful and unconstitutional diversion of DOD

4   funds toward construction of a border wall on New Mexico's southern border.

5          The proposed pedestrian fencing will permanently impede wildlife connectivity that is

6   essential to the survival of many species such as the Mexican wolf. The Mexican wolf is a rare,

7   endangered subspecies of the gray wolf. Env. App'x Ex. 5 (Traphagen Decl. ¶¶ 18-22). After

8   being nearly killed off in the 1970s, recovery efforts for this important species are still

9   ongoing. *Id.* The Mexican wolf is known to travel hundreds of miles and cross the United States-

10  Mexico border in the El Paso Project 1 area. *Id.* ¶¶ 23-25. This movement is essential for the

11  genetic diversity of this species. *Id.* Ex. 2 (Lasky Decl. ¶ 8); Ex. 3 (Nagano Decl. ¶ 17); Ex. 5

12  (Traphagen Decl. ¶ 20). The El Paso Project 1 border wall likely irreparably eliminates the

13  possibility of the recovery of the endangered Mexican wolf and precludes its delisting under the

14  Endangered Species Act. *Id.* Ex. 3 (Nagano Decl. ¶ 15). Other species that will suffer from a lack

15  of wildlife connectivity and be irreparably harmed by the El Paso Project 1 border wall include

16  the mountain lion, bobcat, mule deer, javelina, and at least 53 other non-volant mammal, 38

17  reptile, and 10 amphibian species. *Id.* Ex. 2 (Lasky Decl. ¶ 6, 11); Ex. 5 (Traphagen Decl. ¶ 28).

18         In addition to wildlife connectivity issues, noise, deep holes for fence posts, vehicle traffic,

19  lighting, and other disturbances associated with border wall construction will kill, injure, or alter

20  the behavior of many vital species such as the endangered Aplomado falcon, the iconic Gila

21  monster which is listed as endangered by the State of New Mexico, and many birds and bats. Env.

22  App'x Ex. 2 (Lasky Decl. ¶ 9); Ex. 3 (Nagano Decl. ¶¶ 16, 20, 25); Ex. 5 (Traphagen Decl. ¶ 26).

23  Harms to other wildlife will also have significant impacts on New Mexico residents, limiting

24  recreational opportunities and eliminating sources of income for local communities. *Id.* Ex. 1

25  (Hadley Decl.¶ 25); Ex. 5 (Traphagen Decl. ¶¶ 29-30); Ex. 6 (Trejo Decl. ¶¶ 8-10, 13, 17-18); Ex.

26  7 (Vasquez Decl. ¶¶ 8, 14). For example, a border wall would block the flight path of low-flying

27  quail, making it more vulnerable to natural predators and thus impairing residents' ability to hunt

28  the quail. *Id.* Ex. 6 (Trejo Decl. ¶¶ 10, 13).

30

Pls.' Notice of Mot. and Mot. for Prelim. Inj. and Mem. ISO (4:19-cv-00872-HSG)

Finally, the irreparable damage to species and to wildlife corridors, including on State Trust Lands, constitutes irreparable harm to the State of New Mexico. Under the New Mexico Constitution, "protection of the state's beautiful and healthful environment is . . . of fundamental importance to the public interest, health, and safety and the general welfare." N.M. Const. art. XX, § 21. This provision "recognizes that a public trust duty exists for the protection of New Mexico's natural resources . . . for the benefit of the people of this state." *Sanders-Reed ex rel. Sanders-Reed v. Martinez*, 350 P.3d 1221, 1225 (N.M. Ct. App. 2015). New Mexico is now committed to preserving wildlife corridors for large mammals and species of concern such as the Mexican gray wolf. Env. App'x Ex. 5 (Traphagen Decl. ¶ 27). Additionally, El Paso Project 1 abuts and includes New Mexico State Trust Lands and borders the Organ Mountains-Desert Peaks National Monument and other wilderness areas, which together constitute a critical wildlife corridor that the Project will disrupt. *Id.* Ex. 4 (Nestlerode Decl. Ex. A); Ex. 5 (Traphagen Decl. ¶¶ 27-31, Exs. A and B).

### B. Diversion from TFF is Likely to Irreparably Harm the Plaintiff States

Plaintiff States will suffer irreparable harm from the permanent diversion of funds from TFF because this is an unconstitutional action that deprives Plaintiff States of the same opportunity to receive TFF funds that they have enjoyed for years. "[C]onstitutional violation[s] alone, coupled with the damages incurred, can suffice to show irreparable harm." *Am. Trucking Ass'ns, v. Los Angeles,* 559 F.3d 1046, 1058-59 (9th Cir. 2009) (relying on *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992)). The harms that this diversion causes to Plaintiff States' public policy and sovereign interests in preserving public safety constitutes irreparable harm. *See Kansas v. United States*, 249 F.3d 1213, 1227-28 (10th Cir. 2001).

Defendants have used unconstitutional means to direct $601 million from TFF toward a new competing priority to which forfeitures may be devoted—*i.e.*, a border wall that Congress has refused to fund with additional appropriations. This $601 million in Strategic Support funding for one fiscal year is greater than the amount of Strategic Support funding that has been drawn from TFF for the *past nine years combined.* Cayaban Decl. ¶ 11. This diversion, which is taking place against the backdrop of "severe negative impacts" to the TFF caused by Congressional

31

1   rescissions in prior years, as well as "substantial" reductions in the TFF's base revenue, RJN Exs.

2   42-43, undermines the continued viability of TFF. As discussed above, the DOJ was compelled to

3   suspend its equitable sharing program when its Asset Forfeiture Fund faced similar financial

4   pressures, even without facing a diversion of this magnitude. RJN Ex. 44.

5        This diversion also jeopardizes the States' ability to collect their pending equitable share

6   claims of millions of dollars that they are entitled to receive after dedicating time and resources to

7   participating in joint law enforcement efforts. TFF App'x. Treasury's decision to agree to CBP's

8   request to devote $601 million from TFF towards a border wall prioritizes that use above all other

9   potential uses of those funds. Thus, Plaintiff States are placed at an irreparable and substantial

10  financial disadvantage vis-à-vis CBP as a result of this unconstitutional action, as CBP will

11  receive funds that would have otherwise gone to the states. *Cf. Int'l Franchise Ass'n, v. City of*

12  *Seattle*, 803 F.3d 389, 411 (9th Cir. 2015) ("A rule putting plaintiffs at a competitive

13  disadvantage constitutes irreparable harm."); *City of Los Angeles v. Sessions*, 293 F. Supp. 3d

14  1087, 1100 (C.D. Cal. 2018) (unconstitutional grant conditions imposed on future fiscal years

15  constitutes irreparable harm). As a result, state and local law enforcement agencies face the

16  likelihood that they will have to divert their limited resources to fund law enforcement priorities

17  that TFF would have funded but for the unconstitutional diversion of funds. TFF App'x. The

18  deleterious impacts on the States' public safety caused by their inability to fully fund their law

19  enforcement priorities is irreparable. *See Maryland v. King*, 567 U.S. 1301, 1302-03 (2012)

20  (Roberts, C.J., in chambers) (harm to state's "law enforcement and public safety interests . . .

21  constitutes irreparable harm").

22       While the harm to States from their inability to collect equitable shares from TFF and fund

23  law enforcement operations is alone irreparable, there is an additional risk that the harm caused to

24  Plaintiff States will be irreversible. Treasury notified Congress that as of March 2, 2019, up to

25  $242 million from TFF has been made "available for obligation" for DHS border wall

26  construction activities. RJN Ex. 30. The president has stated that "[m]any additional contracts are

27  close to being signed," RJN Ex. 1, and on April 2, 2019, CBP acknowledged that it "intends to

28  start obligating these funds in the near future," and to complete its obligation before the end of

32

Pls.' Notice of Mot. and Mot. for Prelim. Inj. and Mem. ISO (4:19-cv-00872-HSG)

1    FY 2019, or at the very latest, the end of the 2019 calendar year. RJN Ex. 2, ¶ 11. There is, thus, a

2    significant risk that this obligation could take place at any time. The imminent obligation of those

3    funds presents the possibility that, absent a preliminary injunction, the Court may be unable to

4    award complete relief should Plaintiffs ultimately prevail in this litigation. *See City of Houston v.*

5    *HUD*, 24 F.3d 1421, 1426 (D.C. Cir. 1994) (explaining that the plaintiff's case was moot because

6    the agency had obligated the relevant appropriations to other entities); *see also Ariz. Dream Act*

7    *Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) ("Irreparable harm is traditionally defined

8    as harm for which there is no adequate legal remedy, such as an award for damages.").

9    **IV.    THE BALANCE OF HARDSHIPS FAVORS GRANTING A PRELIMINARY INJUNCTION**

10   A preliminary injunction is appropriate when the plaintiff "establish[es] . . . that the balance

11   of equities tips in [their] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at

12   20. When the federal government is a party, these factors merge. *See Nken v. Holder*, 556 U.S.

13   418, 435 (2009). Here, they weigh decidedly in favor of granting the requested relief.

14   In the first place, "[t]he public has an interest in assuring that public funds are appropriated

15   and distributed pursuant to Congressional directives." *Population Inst. v. McPherson*, 797 F.2d

16   1062, 1082 (D.C. Cir. 1986). Moreover, the public interest is served by protecting environmental

17   resources from harm and ensuring that federal agencies consider and evaluate potential

18   environmental impacts under NEPA before undertaking major infrastructure projects like border

19   wall construction. *Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Int.*, 588 F.3d 718,

20   728 (9th Cir. 2009).

21   New Mexico will be significantly and irreparably harmed by the El Paso Project 1's

22   impacts to wildlife and wildlife corridors including on State Trust Lands. The loss of wildlife

23   connectivity will impact endangered animals such as the Mexican wolf and jaguar. Env. App'x

24   Ex. 2 (Lasky Decl. ¶ 7); Ex. 3 (Nagano Decl. ¶ 15); Ex. 5 (Traphagen Decl. ¶¶ 23-30 and Exs. A

25   and B). Direct effects include "injury, death, harm, and harassment due to construction of the

26   border wall" and associated activities such as "vegetation clearing; road construction; grading and

27   construction of equipment storage and parking areas; off road movement of vehicles and

28   equipment involved in construction; and poisoning from chemical application (herbicides and

33

1   pesticides)." *Id.* Ex. 3 (Nagano Decl. ¶ 13). Indirect effects include harassment as a result of

2   lighting associated with the wall's construction and the growth of "invasive weeds introduced by

3   construction and routine DHS and CBP operation . . . ." *Id.*; Ex. 5 (Traphagen Decl. ¶ 26). Injury,

4   death, harm, and harassment of species are irreparable and significant impacts, especially given

5   the endangered status of many of the species living in the vicinity of the El Paso Project 1. *Id.*

6   Ex. 2 (Lasky Decl. ¶¶ 6-7, 11, 15).

7          The balance of hardships tips in favor for the rest of the Plaintiff States as well due to the

8   harm caused to the States' public safety if they lose their equitable share payments as a result of

9   Defendants' diversion of funds from TFF. TFF App'x. Plaintiff States have relied on their

10  equitable share payments for decades, and Defendants' drastic cut of $601 million from TFF

11  toward one project is unprecedented. An injunction that protects the States' stake in their

12  equitable share payments preserves the status quo and does not prevent the federal government

13  from continuing to enforce federal law. *M.R. v. Dreyfus*, 663 F.3d 1100, 1120 (9th Cir. 2011)

14  ("[W]e conclude that the public interest is served by preserving the status quo by means of a

15  preliminary injunction.").

16         Defendants, meanwhile, experience no countervailing harm if they are enjoined from

17  illegally diverting funding under §§ 284, 8005 and 9705. *Rodriguez v. Robbins*, 715 F.3d 1127,

18  1145 (9th Cir. 2013) ("[T]he government[] . . . cannot suffer harm from an injunction that merely

19  ends an unlawful practice . . . ."). The federal government "is in no way harmed by issuance of a

20  preliminary injunction which prevents the [government] from enforcing restrictions likely to be

21  found unconstitutional. If anything, the system is improved by such an injunction." *Giovani*

22  *Carandola Ltd v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (quotation marks omitted). Further,

23  although the President has called for a wall throughout his presidency, RJN Exs. 3-13, he waited

24  for over two years before taking this Executive Action, undercutting any need to proceed with

25  Defendants' unconstitutional diversion of funding for the pendency of this litigation. President

26  Trump himself acknowledged that he "didn't need to" take extraordinary steps to divert funding

27  for border wall construction, and that Congress has provided more than enough funding for

28  homeland security without the wall. RJN Ex. 50. Therefore, the balance of hardships tips sharply

34

1    in Plaintiff States' favor, and supports granting the relief requested in this motion.

2                                    **CONCLUSION**

3          For the foregoing reasons, Plaintiff States request that the Court grant their motion.

4

      Dated:  April 8, 2019                          Respectfully Submitted,
5

6                                                    XAVIER BECERRA
                                                     Attorney General of California
                                                     ROBERT W. BYRNE
7                                                    SALLY MAGNANI
                                                     MICHAEL L. NEWMAN
8                                                    Senior Assistant Attorneys General
                                                     MICHAEL P. CAYABAN
9                                                    CHRISTINE CHUANG
                                                     EDWARD H. OCHOA
10                                                   Supervising Deputy Attorneys General

11                                                   */s/ Lee I. Sherman*
                                                     */s/ Heather C. Leslie*
12                                                   */s/ Janelle M. Smith*
                                                     */s/ James F. Zahradka II*
13
                                                     LEE I. SHERMAN
14                                                   HEATHER C. LESLIE
                                                     JANELLE M. SMITH
15                                                   JAMES F. ZAHRADKA II
                                                     Deputy Attorneys General
16                                                   *Attorneys for Plaintiff State of California*

17   PHILIP J. WEISER                                WILLIAM TONG
     Attorney General of Colorado                    Attorney General of Connecticut
18   ERIC R. OLSON (*appearance pro hac vice*)       MARGARET Q. CHAPPLE (*pro hac vice*
     Solicitor General                               *forthcoming*)
19   *Attorneys for Plaintiff State of Colorado*     Deputy Attorney General
                                                     *Attorneys for Plaintiff State of Connecticut*
20

21   KATHLEEN JENNINGS                               CLARE E. CONNORS
22   Attorney General of Delaware                    Attorney General of Hawaii
     AARON R. GOLDSTEIN                               CLYDE J. WADSWORTH
23   Chief Deputy Attorney General                   Solicitor General
     ILONA KIRSHON                                    *Attorneys for Plaintiff State of Hawaii*
24   Deputy State Solicitor
     DAVID J. LYONS (*appearance pro hac vice*)
25   Deputy Attorney General
     *Attorneys for Plaintiff State of Delaware*

26

27

28

                                              35

KWAME RAOUL
Attorney General of Illinois
CALEB RUSH
Assistant Attorney General
*Attorneys for Plaintiff State of Illinois*

BRIAN E. FROSH
Attorney General of Maryland
JEFFREY P. DUNLAP (*appearance pro hac vice*)
Assistant Attorney General
*Attorneys for Plaintiff State of Maryland*

AARON M. FREY
Attorney General of Maine
SUSAN P. HERMAN (*appearance pro hac vice*)
*Attorneys for Plaintiff State of Maine*

MAURA HEALEY
Attorney General of Massachusetts
ABIGAIL B. TAYLOR (*pro hac vice forthcoming*)
Director, Child & Youth Protection Unit
DAVID C. KRAVITZ
Assistant State Solicitor
TARA D. DUNN
Assistant Attorney General, Civil Rights Division
*Attorneys for Plaintiff Commonwealth of Massachusetts*

DANA NESSEL
Attorney General of Michigan
B. ERIC RESTUCCIA (*appearance pro hac vice*)
Assistant Attorney General
FADWA A. HAMMOUD
Solicitor General
*Attorneys for Plaintiff State of Michigan*

KEITH ELLISON
Attorney General of Minnesota
JOHN KELLER
Chief Deputy Attorney General
JAMES W. CANADAY
Deputy Attorney General
JACOB CAMPION (*appearance pro hac vice*)
Assistant Attorney General
*Attorneys for Plaintiff State of Minnesota*

AARON D. FORD
Attorney General of Nevada
HEIDI PARRY STERN (*appearance pro hac vice*)
Solicitor General
*Attorneys for Plaintiff State of Nevada*

GURBIR S. GREWAL
Attorney General of New Jersey
JEREMY FEIGENBAUM (*pro hac vice forthcoming*)
Assistant Attorney General
*Attorneys for Plaintiff State of New Jersey*

HECTOR BALDERAS
Attorney General of New Mexico
TANIA MAESTAS (*appearance pro hac vice*)
Chief Deputy Attorney General
NICHOLAS M. SYDOW
Civil Appellate Chief
JENNIE LUSK
Assistant Attorney General, Director
MATTHEW L. GARCIA
Governor's General Counsel
*Attorneys for Plaintiff State of New Mexico*

LETITIA JAMES
Attorney General of New York
MATTHEW COLANGELO (*appearance pro hac vice*)
Chief Counsel for Federal Initiatives
STEVEN C. WU
Deputy Solicitor General
ERIC R. HAREN
Special Counsel
GAVIN MCCABE
Special Assistant Attorney General
AMANDA MEYER
Assistant Attorney General
*Attorneys for Plaintiff State of New York*

ELLEN ROSENBLUM
Attorney General of Oregon
HENRY KANTOR (*appearance pro hac vice*)
Special Counsel to Attorney General
J. NICOLE DEFEVER
Senior Assistant Attorney General
*Attorneys for Plaintiff State of Oregon*

PETER F. NERONHA
Attorney General of Rhode Island
JUSTIN J. SULLIVAN (*appearance pro hac vice*)
Special Assistant Attorney General
*Attorneys for Plaintiff State of Rhode Island*

THOMAS J. DONOVAN
Attorney General of Vermont
BENJAMIN D. BATTLES (*pro hac vice forthcoming*)
Solicitor General
*Attorneys for Plaintiff State of Vermont*

MARK R. HERRING
Attorney General of Virginia
TOBY J. HEYTENS
Solicitor General
MATTHEW R. MCGUIRE
Principal Deputy Solicitor General
MICHELLE S. KALLEN
Deputy Solicitor General
BRITTANY M. JONES (*appearance pro hac vice*)
Attorney
*Attorneys for Plaintiff Commonwealth of Virginia*

JOSHUA L. KAUL
Attorney General of Wisconsin
GABE JOHNSON-KARP (*appearance pro hac vice*)
*Attorneys for Plaintiff State of Wisconsin*

37

## **ATTESTATION OF SIGNATURES**

I, Lee I. Sherman, hereby attest, pursuant to Local Civil Rule 5-1(i)(3) of the Northern District of California that concurrence in the filing of this document has been obtained from each signatory hereto.

/s/ Lee I. Sherman

LEE I. SHERMAN
Deputy Attorney General
*Attorney for Plaintiff*
*State of California*

38