JAMES M. BURNHAM
Deputy Assistant Attorney General
JOHN R. GRIFFITHS
Director, Federal Programs Branch
ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch
ANDREW I. WARDEN (IN #23840-49)
Senior Trial Counsel
KATHRYN C. DAVIS
MICHAEL J. GERARDI
LESLIE COOPER VIGEN
RACHAEL WESTMORELAND
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Tel.:     (202) 616-5084
Fax:      (202) 616-8470
*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION**

|  |  |
|---|---|
| STATE OF CALIFORNIA, *et al.*, | No. 4:19-cv-00872-HSG |
| Plaintiffs, | |
| v. | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| DONALD J. TRUMP, *et al.*, | |
| Defendants. | Hearing Date:  May 17, 2019 |
|  | Time:  10:00 a.m. |
|  | Place:  Oakland Courthouse |
|  |         Courtroom 2, 4th Floor |

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG – Defendants' Opp. to Prelim. Inj.

i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................................... 1

BACKGROUND ........................................................................................................................... 3

   I.   Congress's Express Authorization of Border Barrier Construction ............................... 3

   II.   DHS's Recent Efforts to Expedite Border Barrier Construction ................................... 4

   III.   Congress's Authorization for DoD Support of DHS's Border Security Efforts ....................... 4

   IV.   DoD's Current Support for DHS's Efforts to Secure the Southern Border ............................ 5

   V.   The President's Proclamation Declaring a National Emergency at the Southern
       Border ............................................................................................................................. 6

   VI.   The Use of Spending Authorities for Barrier Construction ............................................. 7

       A.   The Treasury Forfeiture Fund and 31 U.S.C. § 9705 .......................................... 8

       B.   10 U.S.C. § 284 .................................................................................................... 9

THE STATES' CLAIMS .............................................................................................................. 11

LEGAL STANDARD ................................................................................................................... 11

ARGUMENT ............................................................................................................................... 12

   I.   The States Have Not Demonstrated a Likelihood of Success on the Merits ........................... 12

       A.   The Court lacks jurisdiction over the States' § 9705 claim and, in any event,
          the claims fails on the merits ............................................................................... 12

          1.   The States are not injured by Treasury's decision to allocate surplus
              TFF money to border wall construction and thus lack standing
              to sue ........................................................................................................ 12

          2.   Treasury's decision to spend surplus TFF money on border barrier
              construction is committed to agency discretion by law ............................. 14

          3.   Treasury is authorized to fund border barrier construction because it is
              in connection with a law enforcement activity ......................................... 15

       B.   The Court lacks jurisdiction over New Mexico's § 8005 claim and,
          in any event, the claim fails on the merits ........................................................... 16

          1.   New Mexico lacks standing to challenge a transfer of DoD funds
              pursuant to § 8005 .................................................................................. 17

          2.   New Mexico does not fall within § 8005's "zone of interests" ................... 18

          3.   New Mexico's § 8005 claim fails on the merits. .......................................... 19

       C.   New Mexico's § 284 Claim Fails on the Merits ................................................... 21

       D.   Defendants' Use of § 8005, § 284, and § 9705 is Not Arbitrary and
          Capricious ........................................................................................................... 22

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG – Defendants' Opp. to Prelim. Inj.

i

E.  The States' NEPA Claims Fails Because the Acting Secretary of Homeland Security has Waived NEPA's Application to the New Mexico Construction Areas ........................................................................................................... 25

F.  Plaintiffs Are Unlikely to Succeed on the Merits of Their Constitutional Claims .................................................................................................................. 26

G.  This Court is Not the Proper Venue to Challenge Barrier Construction in New Mexico ........................................................................................................ 30

II.  The States Have Not Established an Irreparable Injury is Likely in the Absence of an Injunction ............................................................................................................. 31

III.  The Balance of Equities and Public Interest Weigh Against Injunctive Relief ........................ 34

CONCLUSION ............................................................................................................................ 35

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG – Defendants' Opp. to Prelim. Inj.

ii

1

## TABLE OF AUTHORITIES

2

**Cases**

3

*AFL-CIO v. Kahn,*
   618 F.2d 784 (D.C. Cir. 1979) ................................................................................................ 28

4

5

*All. for the Wild Rockies v. Cottrell,*
   632 F.3d 1127 (9th Cir. 2011) ........................................................................................ 12 , 32

6

7

*All. for the Wild Rockies v. Kruger,*
   35 F. Supp. 3d 1259 (D. Mont. 2014) ................................................................................... 32

8

*All. for the Wild Rockies v. U.S. Forest Serv.,*
   No. 1:15-cv-00193-EJL, 2016 WL 3349221 (D. Idaho June 14, 2016) ................................ 32

9

10

*Arizona v. United States,*
   567 U.S. 387 (2012) ............................................................................................................... 16

11

12

*Armstrong v. Exceptional Child Ctr., Inc.,*
   135 S. Ct. 1378 (2015) ........................................................................................................... 19

13

*ASARCO, LLC v. Celanese Chem. Co.,*
   792 F.3d 1203 (9th Cir. 2015) ............................................................................................... 19

14

15

*Ashley Creek Phosphate Co. v. Norton,*
   420 F.3d 934 (9th Cir. 2005) ................................................................................................. 25

16

17

*California v. Azar,*
   911 F.3d 558 (9th Cir. 2018) ........................................................................................... 11, 34

18

19

*City & Cty. of San Francisco v. U.S. Dep't of Transp.,*
   796 F.3d 993 (9th Cir. 2015) ................................................................................................. 14

20

*City of Sausalito v. O'Neill,*
   386 F.3d 1186 (9th Cir. 2004) ............................................................................................... 12

21

22

*Clinton v. City of New York,*
   524 U.S. 417 (1998) ............................................................................................................... 28

23

24

*Crickon v. Thomas,*
   579 F.3d 978 (9th Cir. 2009) ................................................................................................. 24

25

*Dalton v. Specter,*
   511 U.S. 462 (1994) ......................................................................................................... *passim*

26

27

*DISH Network Corp. v. FCC,*
   653 F.3d 771 (9th Cir. 2011) ................................................................................................. 11

28

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG – Defendants' Opp. to Prelim. Inj.

iii

*Encino Motorcars, LLC v. Navarro,*
  136 S. Ct. 2117 (2016) .................................................................................................. 23

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 167 (2009) ...................................................................................................... 23

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,*
  528 U.S. 167 (2000) ................................................................................................ 12, 17

*Gilligan v. Morgan,*
  413 U.S. 1 (1973) ......................................................................................................... 19

*Gringo Pass, Inc. v. Kiewit Sw. Co.,*
  No. CV-09-251-TUC, 2012 WL 12905166 (D. Ariz. Jan. 11, 2012) ............................. 5

*Heckler v. Chaney,*
  470 U.S. 821 (1985) ...................................................................................................... 14

*Hein v. Freedom From Religion Found., Inc.,*
  551 U.S. 587 (2007) ...................................................................................................... 17

*Hendricks v. Bank of Am., N.A.,*
  408 F.3d 1127 (9th Cir. 2005) ...................................................................................... 31

*In re Border Infrastructure Envtl. Litig.,*
  915 F.3d 1213 (9th Cir. 2019) ................................................................................... 4, 25

*Invention Submission Corp. v. Rogan,*
  357 F.3d 452 (4th Cir. 2004) ........................................................................................ 23

*Jicarilla Apache Nation v. U.S. Dep't of Interior,*
  613 F.3d 1112 (D.C. Cir. 2010) .................................................................................... 23

*Kater v. Churchill Downs Inc.,*
  886 F.3d 784 (9th Cir. 2018) .......................................................................................... 7

*Kowalski v. Tesmer,*
  543 U.S. 125 (2004) ...................................................................................................... 33

*Landon v. Plasencia,*
  459 U.S. 21 (1982) ........................................................................................................ 35

*Lexmark Intern., Inc. v. Static Control Components, Inc.,*
  527 U.S. 118 (2014) ................................................................................................ 18, 19

*Lincoln v. Vigil,*
  508 U.S. 182 (1993) ................................................................................................ 14, 15

*Lopez v. Brewer*,
    680 F.3d 1068 (9th Cir. 2012) ........................................................................................ 11

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ........................................................................................................ 18

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ........................................................................................................ 18

*Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012) ................................................................................................... 18, 19

*Maughn v. Vilsack*,
    No. 4:14-CV-0007-EJL, 2014 WL 201702 (D. Idaho Jan. 17, 2014) ............................ 32

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm*,
    463 U.S. 29 (1983) .......................................................................................................... 24

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
    545 U.S. 967 (2005) ........................................................................................................ 23

*Nat'l Wildlife Fed'n v. Burlington N. R.R.*,
    23 F.3d 1508 (9th Cir. 1994) .......................................................................................... 32

*Nevada v. Dep't of Energy*,
    400 F.3d 9 (D.C. Cir. 2005) ........................................................................................... 29

*New Mexico Dep't of Game & Fish v. U.S. Dept. of Interior*,
    854 F.3d 1236 (10th Cir. 2017) ................................................................................. 32, 34

*Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*,
    636 F.3d 1150 (9th Cir. 2011) ........................................................................................ 32

*People With Disabilities Found. v. Colvin*,
    No. 15-CV-02570-HSG, 2016 WL 2984898 (N.D. Cal. May 24, 2016) .......................... 7

*Ranchers Cattlemen Action Fund United Stockgrowers of Am. v. USDA*,
    415 F.3d 1078 (9th Cir. 2005) ........................................................................................ 18

*Russello v. United States*,
    464 U.S. 16 (1983) .......................................................................................................... 22

*Salazar v. Ramah Navajo Chapter*,
    567 U.S. 182 (2012) ........................................................................................................ 28

*Serrato v. Clark*,
    486 F.3d 560 (9th Cir. 2007) .......................................................................................... 15

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG – Defendants' Opp. to Prelim. Inj.

v

*Sierra Club v. Ashcroft,*
    No. 04-cv-0272-LAB, 2005 WL 8153059 (S.D. Cal. Dec. 13, 2005) .................................4

*Sierra Forest Legacy v. Sherman,*
    646 F.3d 1161 (9th Cir. 2011) ........................................................... 33

*Sierra Forest Legacy v. Sherman,*
    951 F. Supp. 2d 1100 (E.D. Cal. 2013) .............................................. 33

*Tenn. Valley Auth. v. Hill,*
    437 U.S. 153 (1978) ......................................................................... 28

*United States v. McIntosh,*
    833 F.3d 1163 (9th Cir. 2016) ............................................... 19, 27, 28

*Va. Ry. Co. v. Sys. Fed'n No. 40,*
    300 U.S. 515 (1937) ......................................................................... 35

*Warth v. Seldin,*
    422 U.S. 490 (1975) ......................................................................... 33

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ...................................................................... 11, 35

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) ......................................................................... 27

**Constitutional Provisions**

U.S. Const., art I, § 8, cl. 12 ................................................................ 18

U.S. Const., art I, § 7 ......................................................................... 28

**Statutes**

5 U.S.C. § 551 .................................................................................. 12

5 U.S.C. § 551(13) ............................................................................. 17

5 U.S.C. § 701(a)(2) ........................................................................... 14

6 U.S.C. § 211(c) .............................................................................. 16

8 U.S.C. § 1103 .................................................................................3

8 U.S.C. § 1325 ................................................................................ 16

10 U.S.C. § 284 ........................................................................ *passim*

10 U.S.C. § 284(b)(4) ......................................................................... 22

10 U.S.C. § 284(b)-(c) .......................................................................................... 21

10 U.S.C. § 284(b)(7) ....................................................................................... *passim*

10 U.S.C. § 284(h)(1)(B) ...................................................................................... 22

10 U.S.C. § 2808 ............................................................................................... 1, 8

18 U.S.C. § 545 ..................................................................................................... 16

21 U.S.C. § 865 ..................................................................................................... 16

28 U.S.C. § 1391 ................................................................................................... 31

28 U.S.C. § 1391(e)(1) .......................................................................................... 30

31 U.S.C. § 9705 .......................................................................................... *passim*

31 U.S.C. § 9705(a) ................................................................................................ 8

31 U.S.C. § 9705(a)(1)(A) ..................................................................................... 15

31 U.S.C. § 9705(a)(1)(G) ................................................................................... 9, 13

31 U.S.C. § 9705(g)(4)(B) ............................................................................. *passim*

31 U.S.C. § 9705(g)(1) ................................................................................. 13, 14, 15

Pub. L. No. 109-13, 119 Stat. 231 (2005) .............................................................. 3

Pub. L. No. 109-367, 120 Stat. 2638 (2006) ..................................................... 3, 16

Pub. L. No. 101-510, 104 Stat. 1485 (1990) .......................................................... 9

Pub. L. No. 104-208, 110 Stat. 3009 (1996) .......................................................... 3

Pub. L. No. 110-161, 121 Stat. 1844 (2007) .......................................................... 4

Pub. L. No. 115-232, 132 Stat. 1636 (2018) ........................................................ 10

Pub. L. No. 115-245, 132 Stat. 2981 (2018) .............................................. 2, 10, 20, 30

Pub. L. No. 116-6, 133 Stat. 13 (2019) ............................................................ *passim*

**Regulations**

83 Fed. Reg. 3012 (Jan. 22, 2018) .......................................................................... 4

83 Fed. Reg. 50949-03 (Oct. 10, 2018) .................................................................. 4

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG – Defendants' Opp. to Prelim. Inj.

vii

82 Fed. Reg. 8793 (Jan. 25, 2017) ............................................................................... 4

84 Fed. Reg. 4949 (Feb. 15, 2019) ............................................................................... 1

**Legislative Materials**

H.R. Rep. No. 93-662 (1973) ..................................................................................... 19

H.R. Rep. No. 103-200 (1993) ........................................................................... 5, 9, 21

H.R. Rep. No. 109-72 (2005) ........................................................................................ 3

H.R. Rep. No. 109-452 (2006) ................................................................................... 21

H.R. Rep. No. 110-652 (2008) ................................................................................... 10

H.R. Rep. No. 114-840 (2016) ............................................................................. 10, 21

H. Armed Servs. Comm. Hr'g on S. Border Defense Support,
     (Jan. 29, 2019).......................................................................................................... 4

Hr'g Before the S. Comm. on Armed Servs. Subcomm. on Emerging Threats and Capabilities,
     1999 WL 258030 (Apr. 27, 1999) ...................................................................... 5, 10

S. Appros. Hr'g on the DHS FY 2018 Budget,
     2017 WL 2311065 (May 25, 2017) .......................................................................... 4

S. Rep. No. 102-398 (1992) .......................................................................................... 8

Veto Message for H.J. Res. 46, 2019 WL 1219481 (Mar. 15, 2019) ...................... 6, 7

**Other Authorities**

Presidential Memorandum for the Secretary of Defense, Secretary of Homeland Security, and the
     Attorney General titled, "Securing the Southern Border of the United States,"
     2018 WL 1633761 (Apr. 4, 2018) ....................................................................... 5, 6

U.S. Gov't Accountability Office, Office of the Gen. Counsel,
     *Principles of Federal Appropriations Law* 3-407 (4th ed. 2017) (GAO Red Book) ................................. 29

**INTRODUCTION**

Plaintiffs seek a preliminary injunction to prevent the use of certain funds for any border barrier construction project and to stop all action on a planned border barrier in New Mexico. But Plaintiffs cannot show any injury from the internal government funding decisions they challenge, let alone the irreparable harm required to obtain extraordinary equitable relief. And even apart from the absence of any injury, the statutes Plaintiffs invoke support the Government's funding decisions on their merits, fail to create any rights for the Plaintiffs, and do not provide any basis for a justiciable controversy.

Plaintiffs take issue with the President's declaration of a national emergency, but this case is not about the President's Proclamation, or the underlying determinations of policymakers about whether and how to respond to the situation along the southern border. Indeed, the funding sources at issue do not require, and thus do not depend on, a declaration of a national emergency. The statutes the Government has relied on provide longstanding and express authority to use specific sources of appropriated funds for law-enforcement or drug-interdiction purposes. The invocation of those statutory authorities is consistent with decades-long practice, and is amply supported. Plaintiffs thus are unlikely to prevail on the merits of their claims, and the balance of harms supports the Government. The motion therefore should be denied.

There is no serious dispute that the southern border is "a major entry point for criminals, gang members, and illicit narcotics." Declaring a Nat'l Emergency Concerning the S. Border of the United States, Pres. Proc. No. 9844, 84 Fed. Reg. 4949 (Feb. 15, 2019) (Proclamation). The increasing surge of migrants, the highest in over a decade, has placed a tremendous strain on the limited resources of the Department of Homeland Security (DHS) and exacerbated the risks to border security, public safety, and the safety of the migrants themselves. *See* Letter from Secretary of Homeland Security Kirstjen M. Nielsen to the United States Senate and House of Representatives (Mar. 28, 2019) (Exhibit 1). Facilities are overcrowded, officers are stretched too thin, and resources are being redirected away from law enforcement to address this humanitarian and security crisis. *Id.*

Border barriers have historically proven to be an extremely effective tool for deterring and impeding illegal crossings into the United States. *See* Declaration of Jerry B. Martin, Chief of U.S.

Border Patrol Strategic Planning and Analysis Directorate (Exhibit 2). Indeed, the Government has been building barriers along the southern border since the 1990s pursuant to congressional authorization. Accordingly, the Government has identified three statutory authorities to continue the construction of border barriers, in addition to the $1.375 billion recently appropriated by Congress to DHS specifically for such construction: (1) the Treasury Forfeiture Fund (TFF) (31 U.S.C. § 9705); (2) the Department of Defense's (DoD) counter-drug support authority (10 U.S.C. § 284); and (3) the authority to spend unobligated military construction funds to undertake military construction projects necessary to support the use of the armed forces in response to a national emergency declaration (10 U.S.C. § 2808). Only the first two funding sources are at issue here.

The preliminary injunction Plaintiffs seek would interfere with the Government's ability to utilize these statutory authorities to respond to concerns about law enforcement, including drug interdiction, that are specifically within the scope of those statutes. Plaintiffs' motion specifically seeks to prevent the use of TFF funds for any border barrier construction project; to enjoin the use of funds made available pursuant to § 284 for a planned border barrier in New Mexico; and stop all action on the New Mexico project pending the Government's compliance with the National Environmental Policy Act (NEPA). Plaintiffs' claims are unlikely to succeed on the merits and their purported injuries are either nonexistent (as to alleged harm resulting from TFF expenditures) or entirely speculative (as to alleged environmental harms).

At the threshold, Plaintiffs lack standing to bring certain claims. They cannot show actual or imminent harm as a result of discretionary expenditures of surplus TFF funds because such expenditures have no effect upon their receipt of equitable sharing expenses. Nor does the State of New Mexico, which has brought independent claims, have standing to challenge DoD's transfer of funds under § 8005 of the DoD Appropriations Act for Fiscal Year 2019, Pub. L. No. 115-245, where the State has no entitlement to the funds, and the mere transfer of funds, without more, does not affect the State. Because Plaintiffs, particularly California, lack standing, this Court is not the proper venue to challenge barrier construction projects in New Mexico. For the same reasons, Plaintiffs cannot demonstrate any irreparable harm, and their motion should be denied because such a showing is a prerequisite for an injunction. The balance of equities also tips strongly in favor of the

Government because preventing the construction of border barriers would harm the Government's strong interest in border security and enforcement of counter-drug and immigration laws.

Plaintiffs' claims are also unlikely to succeed on the merits.  Plaintiffs cannot challenge TFF expenditures under the Administrative Procedure Act (APA) because such decisions are committed to agency discretion.  Plaintiffs have shown neither a violation of the statutory language of § 9705, § 8005, or § 284, nor that Defendants' utilization of these statutory authorities was arbitrary or capricious.  And their NEPA claims fail because the Acting Secretary of Homeland Security has exercised his statutory authority to waive NEPA.  Finally, Plaintiffs' constitutional claims are unlikely to succeed because they contravene the principle that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims."  *Dalton v. Specter*, 511 U.S. 462, 473 (1994).

For these reasons, Plaintiffs' motion for a preliminary injunction should be denied.

## **BACKGROUND**

### I.      **Congress's Express Authorization of Border Barrier Construction**

In 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), which authorizes the Secretary of Homeland Security to "take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States."  Pub. L. No. 104-208, Div. C., Title I § 102(a), 110 Stat. 3009 (1996) (codified at 8 U.S.C. § 1103 note).  Since then, Congress has amended IIRIRA three times to expand the Government's authority to construct barriers along the southern border.  In 2005, Congress grew frustrated by "[c]ontinued delays caused by litigation" preventing border barrier construction and thus granted the Secretary of Homeland Security authority to waive any "laws that might impede the expeditious construction of security infrastructure along the border."  *See* H.R. Rep. 109-72, at 171 (May 3, 2005).  The REAL ID Act of 2005, Pub. L. No. 109-13, Div. B, Title I § 102, 119 Stat. 231, 302, 306, empowers the Secretary of Homeland Security "to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section."

Congress amended IIRIRA again as part of the Secure Fence Act of 2006, requiring construction of "physical barriers, roads, lights, cameras, and sensors" across hundreds of miles of the southern border in five specified locations.  Pub. L. No. 109-367, § 3, 120 Stat. 2638.  In 2007, Congress expanded this requirement and directed "construct[ion of] reinforced fencing along not less than 700 miles of the southwest border." Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, Div. E, Title V § 564, 121 Stat. 1844 (2007) (IIRIRA § 102(b)).

Relying on these authorities, DHS has installed approximately 650 miles of barriers along the southern border.  *See* Senate Hearing on the DHS FY 2018 Budget, 2017 WL 2311065 (May 25, 2017) (Testimony of then-Secretary of Homeland Security John Kelly).  Courts have consistently denied relief in lawsuits challenging DHS's construction of border barriers under IIRIRA.  *See, e.g.*, *In re Border Infrastructure Envtl. Litig.*, 915 F.3d 1213 (9th Cir. 2019); *Sierra Club v. Ashcroft*, 2005 WL 8153059 (S.D. Cal. Dec. 13, 2005).

## II.     DHS's Recent Efforts to Expedite Border Barrier Construction

On January 25, 2017, the President issued an Executive Order directing federal agencies "to deploy all lawful means to secure the Nation's southern border."  Border Security and Immigration Enforcement Improvements, Exec. Order No. 13767, 82 Fed. Reg. 8793 (Jan. 25, 2017).  In order to "prevent illegal immigration, drug and human trafficking, and acts of terrorism," *id.*, the Order required agencies to "take all appropriate steps to immediately plan, design and construct a physical wall along the southern border," including "[i]dentify and, to the extent permitted by law, allocate all sources of Federal funds" to that effort.  *Id.* at 8794.  In furtherance of this directive, DHS has issued waivers pursuant to IIRIRA to expedite construction of border barrier projects over the past two years.  *See, e.g.*, Determinations Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 83 Fed. Reg. 3012 (Jan. 22, 2018) (New Mexico); 83 Fed. Reg. 50949 (Oct. 10, 2018) (Texas).

## III.    Congress's Authorization for DoD Support of DHS's Border Security Efforts

Congress also has expressly authorized DoD to provide a wide range of support to DHS at the southern border, including the "construction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States."  10 U.S.C.

§ 284(b)(7); *see id.* §§ 271-74.  Since the early 1990s, military personnel have supported civilian law-enforcement agency activities to secure the border, counter the spread of illegal drugs, and respond to transnational threats.  *See* H. Armed Servs. Comm. Hr'g on S. Border Defense Support (Jan. 29, 2019) (Joint Statement of John Rood, Under Secretary of Defense for Policy, and Vice Admiral Michael Gilday, Director of Operations for the Joint Chiefs of Staff) (Exhibit 3).   More recently, Presidents George W. Bush and Barack Obama deployed military personnel to the southern border to support DHS's border security efforts.  *Id.*

For decades, U.S. military forces have played an active role in barrier construction and reinforcement on the southern border.  Military personnel were critical to construction of the first modern border barrier near San Diego, CA in the early 1990s as well as other border fence projects. *See* H.R. Rep. No. 103-200, at 330-31, 1993 WL 298896 (1993) (commending DoD for its role in construction of the San Diego primary fence); Hr'g Before the S. Comm. on Armed Servs. Subcomm. on Emerging Threats and Capabilities, 1999 WL 258030 (Apr. 27, 1999) (Test. of Barry R. McCaffrey, Dir. of the Office of Nat'l Drug Control Policy) (military personnel constructed over 65 miles of barrier fencing).  In 2006, the National Guard improved the southern border security infrastructure by building more than 38 miles of fence, 96 miles of vehicle barrier, and more than 19 miles of new all-weather road, and performing road repairs exceeding 700 miles.  *See* Joint Statement of Rood and Gilday.  More recently, the U.S. Army Corps of Engineers has assisted DHS by providing planning, engineering, and barrier construction support.  *See, e.g., Gringo Pass, Inc. v. Kiewit Sw. Co.*, 2012 WL 12905166, at *1 (D. Ariz. Jan. 11, 2012).

## IV.   DoD's Current Support for DHS's Efforts to Secure the Southern Border

On April 4, 2018, the President issued a memorandum to the Secretary of Defense, Secretary of Homeland Security, and the Attorney General titled, "Securing the Southern Border of the United States."  Presidential Memorandum, 2018 WL 1633761 (Apr. 4, 2018).  The President stated "[t]he security of the United States is imperiled by a drastic surge of illegal activity on the southern border" and pointed to the "anticipated rapid rise in illegal crossings," as well as "the combination of illegal drugs, dangerous gang activity, and extensive illegal immigration."  *Id.* at 1.  The President determined the situation at the border had "reached a point of crisis" that "once again calls for the National Guard

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG – Defendants' Opp. to Prelim. Inj.

5

to help secure our border and protect our homeland." *Id.* To address this crisis, the President directed the Secretary of Defense to support DHS in "securing the southern border and taking other necessary actions to stop the flow of deadly drugs and other contraband, gang members and other criminals, and illegal aliens into this country." *Id.* at 2. The President also directed the Secretary of Defense to request the use of National Guard personnel to assist in fulfilling this mission. *Id.* In October 2018, the President expanded the military's support to DHS to include active duty military personnel. *See* Joint Statement of Rood and Gilday. Over the course of the last year, military personnel have provided a wide range of border security support to DHS, including hardening U.S. ports of entry, erecting temporary barriers, and emplacing concertina wire. *See id.*

## V.     The President's Proclamation Declaring a National Emergency at the Southern Border

On February 15, 2019, the President issued a proclamation declaring that "a national emergency exists at the southern border of the United States." *See* Proclamation. The President determined that "[t]he current situation at the southern border presents a border security and humanitarian crisis that threatens core national security interests and constitutes a national emergency." *Id.* The President explained:

> The southern border is a major entry point for criminals, gang members, and illicit narcotics. The problem of large-scale unlawful migration through the southern border is long-standing, and despite the executive branch's exercise of existing statutory authorities, the situation has worsened in certain respects in recent years.

*Id.* "Because of the gravity of the current emergency situation," the President determined that "this emergency requires use of the Armed Forces" and "it is necessary for the Armed Forces to provide additional support to address the crisis." *Id.*

On March 15, 2019, the President vetoed a joint resolution passed by Congress that would have terminated the President's national emergency declaration. *See* Veto Message for H.J. Res. 46, 2019 WL 1219481 (Mar. 15, 2019). The President relied upon statistics published by U.S. Customs and Border Protection (CBP) as well as recent congressional testimony by the Secretary of Homeland Security to reaffirm that a national emergency exists along the southern border. *See id.* The President highlighted (1) the recent increase in the number of apprehensions along the southern border,

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG – Defendants' Opp. to Prelim. Inj.

6

including 76,000 CBP apprehensions in February 2019; (2) CBP's seizure of more than 820,000 pounds of drugs in 2018; and (3) arrests of 266,000 aliens previously charged with or convicted of crimes in 2017 and 2018. *See id.* The President also emphasized that migration trends along the southern border have changed from primarily single adults from Mexico, who could be easily removed upon apprehension, to caravans that include record numbers of families and unaccompanied children from Central America. *See id.* The President explained that this shift requires frontline border enforcement personnel to divert resources away from border security to humanitarian efforts and medical care. *See id.* Further, the President stated that criminal organizations are taking advantage of the large flows of families and unaccompanied minors to conduct a range of illegal activity. *See id.* With additional surges of migrants expected in the coming months, the President stated that border enforcement personnel and resources are strained "to the breaking point." *See id.* The President concluded that the "situation on our border cannot be described as anything other than a national emergency, and our Armed Forces are needed to help confront it." *See id.*

The situation at the southern border has continued to deteriorate in recent weeks and DHS is facing "a system-wide meltdown." *See* Letter from Secretary of Homeland Security Kirstjen M. Nielsen to the United States Senate and House of Representatives (Mar. 28, 2019) (Ex. 1). "DHS facilities are overflowing, agents and officers are stretched too thin, and the magnitude of arriving and detained aliens has increased the risk of life threatening incidents." *Id.* In March 2019, there were over 103,000 apprehensions of undocumented migrants along the southern border, the highest one-month total in over a decade. *See* DHS Southwest Border Migration Statistics FY 2019 (Exhibit 4); U.S. Border Patrol Apprehension Statistics Since FY 2000 (Exhibit 5). Over 92,000 of these apprehensions were between ports of entry, compared with 66,884 in February and 47,984 in January. *See* Ex. 4; CBP Transcript March FY19 Year to Date Statistics (April 10, 2019) (Exhibit 6).[1]

### VI.     The Use of Spending Authorities for Barrier Construction

On the same day the President issued the Proclamation, the White House publicly released a

---

[1] The Court may take judicial notice of the official U.S. Government documents and the publicly available information on Government websites cited herein and attached. *See Kater v. Churchill Downs Inc.*, 886 F.3d 784, 788 n.2 (9th Cir. 2018); *People With Disabilities Found. v. Colvin*, Case No. 15-CV-02570-HSG, 2016 WL 2984898, at *3 (N.D. Cal. May 24, 2016).

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG – Defendants' Opp. to Prelim. Inj.

7

fact sheet announcing the sources of funding to be used to construct additional barriers along the southern border.  In addition to the $1.375 billion appropriation to DHS as part of the Consolidated Appropriations Act for Fiscal Year 2019 (CAA), *see* Pub. L. No. 116-6, § 230, 133 Stat. 13 (2019),[2] the fact sheet identifies three additional sources of funding, which it explains will be used sequentially and as needed:  (1) About $601 million from the Treasury Forfeiture Fund; (2) Up to $2.5 billion of DoD funds transferred for Support for Counterdrug Activities (10 U.S.C. § 284); and (3) Up to $3.6 billion reallocated from Department of Defense military construction projects pursuant 10 U.S.C. § 2808, a construction authority made available by the President's declaration of a national emergency.  *See* President Donald J. Trump's Border Security Victory (Feb. 15, 2019) (Exhibit 7).  The States' motion challenges only use of the TFF and § 284, which are not dependent on a Presidential declaration of a national emergency.  *See* Pls.' Mot. 6.

### A.      The Treasury Forfeiture Fund and 31 U.S.C. § 9705

The Department of Treasury Forfeiture Fund (TFF) collects proceeds from "seizures and forfeitures made pursuant to any law (other than section 7301 or 7302 of the Internal Revenue Code of 1986) enforced or administered by the Department of the Treasury or the United States Coast Guard."  31 U.S.C. § 9705(a).  The fund's authorizing legislation, 31 U.S.C. § 9705, sets forth the purposes for which the fund's revenue may be used.  *See* S. Rep. No. 102-398 (1992).  As relevant here, § 9705(g)(4)(B) states that, after reserving certain statutorily required amounts, any surplus unobligated funds "shall be available to the Secretary, without fiscal year limitation, . . . for obligation or expenditure in connection with the law enforcement activities of any Federal agency or of a Department of the Treasury law enforcement organization."

On December 26, 2018, DHS submitted a request to the Department of the Treasury (Treasury) to use TFF in order to enhance border security infrastructure and operations in support of CBP's law enforcement efforts.  *See* Declaration of Lauren Flossman ¶ 9 (April 1, 2019) (Exhibit 8).  Treasury approved DHS's request and, on February 15, 2019, notified Congress of this action, as

---

[2] The CAA consolidated separate appropriations acts for different federal agencies into one bill, including the DHS Appropriations Act for Fiscal Year 2019.  *See* Pub. L. 116-6, div. A; *see also id.* § 3 (explaining that each appropriations act within the CAA shall be referred to as its own "Act").

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG – Defendants' Opp. to Prelim. Inj.

8

required by § 9705(g)(4)(C).  *Id.*  TFF funds are being made available to CBP in two tranches.  *Id.* ¶ 10.  The first tranche of $242 million was made available to CBP for obligation on March 14, 2019.  *Id.*  The second tranche of $359 million is expected to be made available for obligation at a later date upon Treasury's receipt of additional anticipated forfeitures.  *Id.*  With respect to funding barrier construction along the southern border, CBP will use TFF funds exclusively for projects in the Rio Grande Valley Sector of Texas.  *Id.* ¶¶ 4-5, 11-12.

As explained in the attached declaration from the Director of the Executive Office for Asset Forfeiture at the Department of the Treasury, the TFF is statutorily required to prioritize and reserve sufficient funding for certain mandatory payments, including "equitable sharing," which are payments a state or local agency receives from the TFF for that agency's contribution to the total law enforcement effort that results in the federal forfeiture of a specific asset.  *See* Declaration of John M. Farley ¶¶ 7-23 (Exhibit 9); 31 U.S.C. § 9705(a)(1)(G).  After those mandatory expenses are accounted for, § 9705 authorizes Treasury to provide any remaining unobligated surplus TFF funds, known as Strategic Support funds, to other federal agencies "in connection with the law enforcement activities" of those agencies.  *See* Farley Decl. ¶ 11; 31 U.S.C. § 9705(g)(4)(B).  Because of the requirement to make equitable sharing determinations before providing Strategic Support to other federal agencies, the States will not lose any equitable sharing money they otherwise might receive as a result of Treasury's decision to provide $601 million of surplus funds to DHS.  *See id.* ¶¶ 13, 22-23, 26.  The Strategic Support money represents excess funds in the TFF after accounting for mandatory expenses, including equitable sharing expenses to the States, and has no bearing on the overall solvency of the TFF or the States' receipt of future equitable sharing money.  *See id.*

### B.  10 U.S.C. § 284

10 U.S.C. § 284 authorizes DoD to provide "support for the counterdrug activities . . . of any other department or agency of the Federal Government," including for "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States."  *Id.* § 284(a); (b)(7).  Congress first provided DoD this authority in the National Defense Authorization Act for Fiscal Year 1991.  Pub. L. No. 101-510, § 1004, 104 Stat. 1485 (1990).  Congress regularly renewed § 1004 and praised DoD's involvement in building barrier fences along

the southern border.  For example, in 1993, Congress "commend[ed]" DoD's efforts to reinforce the border fence along a 14-mile drug smuggling corridor in "the San Diego-Tijuana border area"  H.R. Rep. No. 103-200, at 330-31, 1993 WL 298896 (1993).  Executive Branch officials and Congress have also noted the importance of DoD's involvement in border security projects to prevent drug smuggling.  *See* Hr'g Before the S. Comm. on Armed Servs. Subcomm. on Emerging Threats and Capabilities, 1999 WL 258030 (Apr. 27, 1999) (Testimony of Barry R. McCaffrey) (testifying about the "vital contributions" made by DoD to construct 65 miles of barrier fencings, 111 miles of roads, and 17 miles of lighting "to support the efforts of law enforcement agencies operating along the Southwest Border"); H.R. Rep. No. 110-652, 420 (2008) (describing border fencing as an "invaluable counter-narcotics resource" and recommending a $5 million increase to DoD's budget to continue construction).  In light of the threat posed by illegal drug trafficking, Congress permanently codified § 1004 at 10 U.S.C. § 284 in December 2016, directing DoD "to ensure appropriate resources are allocated to efforts to combat this threat."  H.R. Rep. No. 114-840, 1147 (2016).

In accordance with § 284, on February 25, 2019, DHS requested DoD's assistance in blocking 11 specific drug-smuggling corridors on Federal land along certain portions of the southern border. *See* Declaration of Kenneth Rapuano ¶ 3, Ex. A (Exhibit 10).  The request sought the replacement of existing vehicle barricades or dilapidated pedestrian fencing with new pedestrian fencing, the construction of new and improvement of existing patrol roads, and the installation of lighting.  *Id.*  On March 25, 2019, the Acting Secretary of Defense approved two projects in Arizona and one in New Mexico.  *Id.* ¶ 4.  The States challenge only the project in New Mexico (identified as El Paso Sector Project 1), which will replace existing vehicle barriers with 30-foot high pedestrian fencing along a 46-mile stretch in Luna and Doña Ana Counties.  *Id.* ¶¶ 4, 7-9; Declaration of Paul Enriquez ¶¶ 3-18 (Exhibit 11) (describing project locations in detail and attaching maps).

In order to devote additional resources to border barrier construction, on March 25, 2019, the Acting Secretary of Defense authorized the transfer of $1 billion to the counter-narcotics support appropriation from Army personnel funds that had been identified as excess to current requirements. *See* Rapuano Decl.  ¶ 5.  The Acting Secretary of Defense directed the transfer of funds pursuant to DoD's general transfer authority under § 8005 of the DoD Appropriations Act for Fiscal Year 2019,

1  Pub. L. 115-245, div. A, 132 Stat. 2981, 2999 (Sept. 28, 2018), and Section 1001 of the John S. McCain

2  National Defense Authorization Act for Fiscal Year 2019, Pub. L. 115-232, § 1001, 132 Stat. 1636,

3  1945 (Aug. 13, 2018).  *Id.*  The Acting Secretary concluded the requirements of those statutes were

4  satisfied because the transfer was "for higher priority items, based on unforeseen military

5  requirements, than those for which originally appropriated" and "the item for which funds are

6  requested" had not "been denied by the Congress."  *Id.*, Ex. C.

7  **THE STATES' CLAIMS**

8  Plaintiffs are 20 States, only 2 of whom share a border with Mexico (California and New

9  Mexico).  The States filed their complaint on February 19, 2019 (ECF No. 1) and later amended it on

10  March 13, 2019 (ECF No. 47).  On April 5, 2019, the States filed the motion for preliminary injunction

11  presently before the Court.  *See* ECF No. 57.  The motion seeks injunctive relief on three separate

12  claims.  *See* Pls.' Mot. 1; Proposed Order.  First, all States move to enjoin Treasury's use of the TFF

13  to fund any border wall construction.  But because DHS is not using TFF money to build border

14  barriers in the States' territory, this claim for relief is based entirely on allegations that the States will

15  be harmed if TFF money is spent on border barriers rather than given to them.  Second, the State of

16  New Mexico seeks an injunction prohibiting DoD from using any funds made available pursuant to

17  § 8005 or § 284 to construct El Paso Sector Project 1 in southern New Mexico.  Third, all States seek

18  an injunction to stop construction of El Paso Sector Project 1 until Defendants comply with NEPA.

19  **LEGAL STANDARD**

20  A preliminary injunction is "an extraordinary and drastic remedy" that should not be granted

21  "unless the movant, by a clear showing, carries the burden of persuasion."  *Lopez v. Brewer*, 680 F.3d

22  1068, 1072 (9th Cir. 2012).  A plaintiff must show that (1) he is likely to succeed on the merits; (2) he

23  is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips

24  in his favor; and (4) an injunction is in the public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S.

25  7, 20 (2008).  "Likelihood of success on the merits is the most important factor" and if a plaintiff fails

26  to meet this "threshold inquiry," the court "need not consider the other factors."  *California v. Azar*,

27  911 F.3d 558, 575 (9th Cir. 2018).  Alternatively, "serious questions going to the merits and a balance

28  of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction,

1   so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction

2   is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

3   Plaintiffs bear the burden of demonstrating that each of these four factors is met. *DISH Network Corp.*

4   *v. FCC*, 653 F.3d 771, 776-77 (9th Cir. 2011).

5   **ARGUMENT**

6   **I.   The States Have Not Demonstrated a Likelihood of Success on the Merits.**

7   Defendants' reliance on § 9705, § 8005, and § 284 to fund or construct border barriers is lawful

8   and Plaintiffs cannot establish a likelihood of success on the merits of their statutory or constitutional

9   claims.  Because Congress did not create a private right of action to enforce the statutes that form the

10  basis of the States' challenge, their claims are governed by the Administrative Procedure Act (APA),

11  5 U.S.C. § 551 *et seq.  See, e.g., City of Sausalito v. O'Neil*, 386 F.3d 1186, 1205 (9th Cir. 2004).  For the

12  reasons set forth below, the States are not likely to succeed on the merits of any of their APA claims.

13  **A.   The Court lacks jurisdiction over the States' § 9705 claim and, in any
14  event, the claims fails on the merits.**

15  The States' challenge to the use of the TFF fails for three reasons.  First, the States cannot

16  establish Article III standing because Treasury's decision to allocate surplus TFF money to border

17  barrier construction does not jeopardize the solvency of the TFF or negatively impact the States'

18  receipt of future equitable sharing money.  Second, Treasury's decision to allocate surplus TFF funds

19  to DHS is committed to agency discretion by law and, therefore, unreviewable under the APA.  Third,

20  even if the Court could reach the merits of the States' claim, Treasury has complied with § 9705.

21  **1.   The States are not injured by Treasury's decision to allocate
22  surplus TFF money to border wall construction and thus lack
    standing to sue.**

23  To establish Article III standing, "a plaintiff must show (1) it has suffered an 'injury in fact'

24  that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2)

25  the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed

26  to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth,*

27  *Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000).  The States cannot demonstrate these

28  requirements.

The States allege that they will be harmed by Treasury's use of Strategic Support funding because it will "deprive[] Plaintiff States of the same opportunity to receive TFF funds that they have enjoyed for years." Pls.' Mot. 31-33. Specifically, the States assert that they are entitled to equitable sharing funds from the TFF, and speculate that Treasury's action of providing financial support to DHS to assist in border barrier construction will deprive them of such funds. *Id.* at 32. But there is not actually any funding gap. The statutory structure of the TFF mandates that money first goes to the States eligible for equitable sharing payments. Only surplus funds excess to equitable sharing and other statutory requirements are available for Strategic Support payments. And as explained in the declaration of the Director of Treasury's Executive Office for Asset Forfeiture, there is no basis for the States' allegations that Treasury has deviated from its statutory duties. *See* Farley Decl. ¶¶ 10-13, 26. The States have thus suffered no Article III injury as a result of the Strategic Support payment to DHS.

In accordance with § 9705(a), the TFF prioritizes reimbursements to state and local law enforcement agencies for expenses associated with federal seizures and asset forfeitures, and making "equitable sharing payments" to state and local law enforcement agencies that participate in federal law enforcement efforts that result in an asset forfeiture. 31 U.S.C. § 9705(a)(1)(G); *see* Farley Decl. ¶¶ 8, 17-23. Treasury sets aside forfeited revenue from cases where equitable sharing is anticipated in order to adjudicate requests for such payments, *id.* ¶ 8-10, and it must account for equitable sharing claims before it can consider using unobligated balances for Strategic Support to other federal law enforcement agencies. 31 U.S.C. §§ 9705(g)(1), (g)(4)(B); Farley Decl. ¶¶ 8-11. In other words, Treasury cannot disregard its need to keep funds available for anticipated equitable sharing payments in order to make more funding available for Strategic Support projects. Equitable sharing claims are keyed to specific forfeitures, and Treasury is statutorily obligated to ensure funds are available to pay those claims before making funds available for Strategic Support using unobligated funding, which means there is no risk that the States will lose equitable sharing funds as a result of Treasury's decision to provide surplus money to DHS. *Id.* ¶¶ 13, 22-23, 26.

The States thus cannot carry their burden to establish an injury-in-fact.  Strategic Support payments to DHS simply will not have any impact on the amount of equitable sharing money the States receive.

Nor will the Strategic Support payments to DHS somehow threaten the solvency of the TFF. Treasury accounts for its known anticipated liabilities and reserves sufficient funding to cover expenses for the first quarter of the next fiscal year.  Farley Decl. ¶¶ 9-10.  By statute, the TFF is required to reserve funds to meet priority category expenses for the following fiscal year, including equitable sharing.  31 U.S.C. §§ 9705(g)(1), (g)(3)(C), (g)(4)(B); Farley Decl. ¶¶ 8-11.  Treasury has complied with these obligations and, accordingly, the $601 million it is making available for border security purposes will have no impact on the TFF's solvency or the TFF's ability to make equitable sharing payments.  Farley Decl. ¶¶ 23-26.

The States have not established that the challenged action will cause them any injury—the most fundamental prerequisite to standing.  For that reason alone, their Motion fails.

### 2.    Treasury's decision to spend surplus TFF money on border barrier construction is committed to agency discretion by law.

Even if the States had standing, any APA claim challenging Treasury's compliance with § 9705 is not likely to succeed on the merits because the allocation of TFF funds is committed to agency discretion by law and is thus unreviewable under the APA.  *See Lincoln v. Vigil*, 508 U.S. 182, 192 (1993); 5 U.S.C. § 701(a)(2).

A decision is generally "'committed to agency discretion by law' when 'a court would have no meaningful standard against which to judge the agency's exercise of discretion."  *City and County of San Francisco v. Dep't of Transp.*, 796 F.3d 993, 1001 (9th Cir. 2015) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)).  The Supreme Court has recognized that an agency's decisions to allocate funds in a particular way fall into this category because the agency must be allowed to administer its statutory responsibilities "in what it sees as the most effective or desirable way." *Lincoln* 508 U.S. at 192. Moreover, Courts are not well equipped to review the "complicated balancing of a number of factors which are peculiarly within [the agency's] expertise:  whether its resources are best spent on one program or another; whether it is likely to succeed in fulfilling its statutory mandate; whether a

particular program best fits the agency's overall policies; and, indeed, whether the agency has enough resources to fund a program at all." *Id.* at 193.   So long as the agency's allocation of funds "meet[s] permissible statutory objectives," the APA prohibits judicial review of how funds are allocated. *Serrato v. Clark*, 486 F.3d 560, 568 (9th Cir. 2007) (quoting *Lincoln*, 508 U.S. at 193).

As in *Lincoln* and *Serrato*, Congress provided Treasury with broad authority to administer the TFF.   After the mandatory categories of expenses have been satisfied, *see* 31 U.S.C. § 9705(a)(1)(A), and funds have been reserved for these mandatory expenses in the next year, *see Id.* § 9705(g)(1), (3)(C), (4)(b), the Secretary has wide discretion to use the remaining funds "in connection with the law enforcement activities of any Federal agency."   31 U.S.C. § 9705(g)(4)(B); *see also* Farley Decl. ¶¶ 10-12.   Nothing in the statute prohibits using these funds for border barriers or constrains the agency's decision to use these funds for border barriers.   And, as explained further below, the construction of border barriers to stem the flow of illegal immigration and drugs is unquestionably a law enforcement activity.   *See* Martin Decl. (explaining the border barriers deter and impede drug smugglers and aliens from entering the United States illegally and increase the effectiveness of the Border Patrol).   Thus, funding the construction of border barriers is consistent with the statutory purposes of the TFF, such that the allocation of funds for this purpose is unreviewable.

### 3. Treasury is authorized to fund border barrier construction because it is in connection with a law enforcement activity.

The States' arguments that border wall construction does not constitute a "law enforcement activity" also fail.   The statutory phrase "law enforcement activities" in § 9705(g)(4)(B) is not limited to the "law enforcement purposes" for which payments are specifically authorized in § 9705(a). Section 9705(a) sets forth a specific list of expenses that Treasury must pay each fiscal year.   After those payments are made and an appropriate amount of money is reserved for the next fiscal year, *see* 31 U.S.C. §§ 9705(g)(1), (g)(3), (g)(4), unobligated surplus balances may then be used "in connection with the law enforcement activities of any Federal agency."   *Id.* § 9705(g)(4)(B); *see* Farley Decl. ¶¶ 10-12.   While Congress intentionally chose to list the required payment for specific expenses in § 9705(a), it placed no such limits on using surplus funds that could be provided to other federal agencies under § 9705(g)(4)(B).   Instead, Congress gave Treasury broad authority to use surplus funds "in connection

with the law enforcement activities of any Federal agency."  Treasury has never understood its authority under § 9705(g)(4)(B) to be limited to the expenses set forth in § 9705(a) and has funded a broad array of border security projects pursuant its Strategic Support authority.  *See* Farley Decl. ¶¶ 12, 16.  Indeed, Treasury notified Congress that these projects would be funded by the TFF and Congress did not object.  *Id.*  In light of both the plain text of § 9705 and Congress' acquiesce in Treasury's interpretation of its Strategic Support authority, the Court should reject the States' argument.

Here, the requirements of § 9705(g)(4)(B) are satisfied because use of TFF money to support border barrier construction is "in connection with the law enforcement activities" of CBP.  CBP has a statutory mandate as a law enforcement agency that encompasses the construction of border barriers. CBP was established to "ensure the interdiction of persons and goods illegally entering or exiting the United States," "interdict . . . persons who may undermine the security of the United States," and "safeguard the borders of the United States," among other duties.  6 U.S.C. § 211(c)(2), (5), (6); *see Arizona v. United States*, 567 U.S. 387, 397 (2012) (describing the role that DHS and CBP play in "securing the country's borders").  Indeed, the States readily admit that CBP's efforts to interdict persons or goods attempting to illegally enter the United States are "law enforcement activities."  *See* Pls.' Mot. 26.  CBP has also explained the important benefits of border barriers to its law enforcement mission.  *See* Martin Decl.  Further, Congress has expressly recognized that erecting "physical barriers" along the southern border will "deter illegal crossings" and prevent smuggling of contraband across the border, *see* IIRIRA § 102(a); Secure Fence Act of 2006, Pub. L. No. 109-367, §§ 2-3, 120 Stat. at 2638-39.  Physical barriers thus help enforce a range of criminal laws that prohibit such activities, *e.g.*, 8 U.S.C. § 1325 (improper entry by an alien); 18 U.S.C. § 545 (smuggling goods into the United States); 21 U.S.C. § 865 (smuggling methamphetamine into the United States).

## B.   The Court lacks jurisdiction over New Mexico's § 8005 claim and, in any event, the claim fails on the merits.

New Mexico's challenge to DoD's use of § 8005 fails for three reasons.  First, New Mexico lacks standing to challenge the mere transfer of funds from one DoD-controlled account to another. Second, New Mexico falls outside the zone of interests of § 8005—a provision that exists to govern

the relationship between Congress and DoD with respect to military spending, not to protect New Mexico's native wildlife. Third, New Mexico is wrong on the merits of their § 8005 claim because DHS's request for assistance with border barrier construction under § 284 is an "unforeseen military requirement" that Congress has never denied to DoD, while using money for border barriers is a "higher priority" than simply retaining unused surplus Army personnel funds.

### 1. New Mexico lacks standing to challenge a transfer of DoD funds pursuant to § 8005.

New Mexico has not been injured by DoD's invocation of § 8005. *Laidlaw*, 528 U.S. at 180-81. DoD transferred funds from its Military Personnel, Army" appropriation to its "drug interdiction and counter-drug activities" appropriation because of a projected surplus of Army personnel funds. *See* Rapuano Decl. ¶ 5. Because New Mexico has no entitlement to the money transferred, its standing to challenge that transfer of funding from one DoD appropriation to another is no greater than that of an ordinary taxpayer to challenge any expenditure of taxpayer money from a particular budget account. Outside extremely limited situations not presented here, such taxpayer injury cannot supply standing. As the Supreme Court has explained, "federal courts would cease to function as courts of law and would be cast in the role of general complaint bureaus" if "every federal taxpayer could sue to challenge any Government expenditure." *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 593 (2007). And indeed, even if taxpayer standing were available here, which it clearly is not, New Mexico's claim to standing would be even weaker than that of a taxpayer challenging a particular expenditure because DoD's transfer under § 8005 is not even an expenditure—it is simply a transfer of already-appropriated funds.

New Mexico attempts to finesse the standing question by asserting that it will be harmed by construction of a border barrier pursuant to § 284 using funds transferred to the "drug interdiction and counter-drug activities" appropriation under the authority of § 8005. But this argument incorrectly conflates two distinct agency actions: the transfer of funds among DoD accounts (under § 8005) and the subsequent construction of border fencing (under § 284). *See* 5 U.S.C. § 551(13). New Mexico is not the "object" of the § 8005 transfer, which simply moved funds among DoD's accounts.

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG – Defendants' Opp. to Prelim. Inj.

17

*Lujan*, 504 U.S. at 562.  DoD could permissibly use transferred funds on a variety of projects that New Mexico would have no basis to challenge.  New Mexico has thus not established any injury-in-fact arising from the transfer of funds, which is the "particular agency action" it challenges based on § 8005.  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990).  Nor can New Mexico bootstrap its alleged harm from the separate act of constructing barriers under § 284 to establish standing for its distinct § 8005 claim.  *See id.* at 891-94 (holding that APA review is limited to review of discrete agency action and multiple actions cannot be aggregated together).

### 2.   New Mexico does not fall within § 8005's "zone of interests."

New Mexico is also unlikely to prevail on the merits of its § 8005 claim because the statute does not confer on the States any right to sue to enforce its provisions.  *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014).  The "zone of interests" test forecloses suit "when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit."  *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012).  The plaintiff bears the burden of establishing that the injury he complains of "falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint."  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. at 883.

Here, New Mexico's interest in wildlife and environmental preservation that it seeks to protect in this lawsuit has absolutely no connection to the fiscal interests protected by § 8005.  *See Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. Dep't of Agric.*, 415 F.3d 1078, 1103 (9th Cir. 2005).  New Mexico's purported injuries are entirely unrelated to § 8005, and nothing in § 8005 purports to protect the wildlife habitats of wolves, jaguars, and Gila monsters.  *See* Pls.' Mot. 9-10. Indeed, there is no indication in the text that Congress intended § 8005 to be a vehicle for the States (or anyone else) to sue on the basis of alleged environmental harms.

DoD's transfer authority for appropriated funds comes with certain limitations that New Mexico now seeks to have judicially enforced.  But Congress never contemplated third parties inserting themselves into the DoD funding process through litigation.  The Constitution puts Congress and the Executive at the center of military policy.  *See* U.S. Const., art. I, § 8, cl. 12.  "The ultimate responsibility

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG – Defendants' Opp. to Prelim. Inj.

18

for these decisions" about the allocation of limited resources appropriated to DoD "is appropriately vested in branches of the government which are periodically subject to electoral accountability"—not the courts. *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973). Section 8005 was designed to "tighten congressional control of the re-programming process," H. Rep. 93-662 at 16-17, but it was "phrased as a directive to" DoD, "not as a conferral of the right to sue upon" those who disagree with DoD's decision to transfer funds. *See Armstrong v. Exceptional Child Center, Inc.*, 135 S. Ct. 1378, 1387 (2015). The notice provisions of § 8005 allow DoD and Congress to resolve reprogramming disagreements as a matter of comity, or via legislation and oversight. But § 8005 does not contemplate private parties filing lawsuit in order to resolve disputes between the Executive and Congress about defense spending. Plaintiffs' interest in the reprogramming process is "'so marginally related to … the purposes implicit in'" § 8005 "that it cannot reasonably be assumed that Congress authorized" suit when it enacted that provision. *Lexmark*, 527 U.S. at 130 (quoting *Patchak*, 527 U.S. at 225).

### 3. New Mexico's § 8005 claim fails on the merits.

Even if the Court reaches the merits of New Mexico's § 8005 arguments, New Mexico is unlikely to prevail. "[T]he plain language of [§ 8005] should be enforced according to its terms, in light of its context." *ASARCO, LLC v. Celanese Chem. Co.*, 792 F.3d 1203, 1210 (9th Cir. 2015); *see United States v. McIntosh*, 833 F.3d 1163, 1178 (9th Cir. 2016).

First, the provision restricts transfers only "where the item for which funds are requested has been denied by the Congress." Congress has not "denied" any request by DoD to fund "the item" referenced in the transfer—namely counter-drug activities funding, including fence construction, under § 284. New Mexico mistakenly assumes that § 8005 should be read to refer to a legislative judgment concerning the appropriation of funds for a different agency under different statutory authorities. But Congress's affirmative appropriation of $1.375 billion to CBP for the construction of "primary pedestrian fencing" in the Rio Grande Valley Sector in furtherance of CBP's mission under IIRIRA, Pub. L. 116-6, div. A, § 230, does not constitute a "denial" of appropriations to DoD for its counter-drug activities in furtherance of DoD's mission under § 284. The statutory language of § 8005 is focused on DoD funding, and nothing in the DHS appropriations statute indicates that Congress "denied" a request to fund DoD's statutorily authorized counter-drug activities, which expressly

include fence construction.  10 U.S.C. § 284(b)(7).  Nor did Congress otherwise restrict the use of available appropriations for that purpose.  *See* Pub. L. No. 116-6.  And because Congress never denied DoD funds to undertake the § 284 projects at issue, New Mexico's claim fails.

Second, Plaintiffs urge that barrier construction under § 284 was not "based on unforeseen military requirements" because the President requested funds for border barrier construction in his fiscal year 2019 budget.  Pls.' Mot. 16.  Again, this misses the relevant context of § 8005, which only speaks to DoD's ability to transfer funds to items that Congress previously affirmatively decided to deny *to DoD*.  The President's 2019 budget request did not propose additional funding for DoD's counter-drug activities under § 284.  The need for DoD to exercise its § 284(b)(7) authority to provide support for counter-drug activities did not arise until February 2019, when DHS requested support from DoD to construct fencing in drug trafficking corridors.  *See* 10 U.S.C. § 284(a)(1) (authorizing DoD to support counter-drug activities only once "such support is requested").  Accordingly, the need to provide support for these projects was an unforeseen military requirement at the time of the President's fiscal year 2019 budget request.  *See* Rapuano Decl., Ex. C, at 1-2.  And it remained an unforeseen military requirement through Congress's passage of DoD's fiscal year 2019 budget in September 2018, which was five months *before* DHS's request.  *See* Pub. L. No. 115-245, 132 Stat. 2981.  DoD's need to provide counter-drug assistance under § 284 in response to DHS's request was thus not accounted for in DoD's fiscal year 2019 budget and is accordingly "based on unforeseen military requirements" for purposes of § 8005.

Third, the States assert that construction under § 284—even if "unforeseen"—is not a "military requirement" because custody of the infrastructure will eventually be turned over to DHS.  Pls.' Mot. 16.  But that argument misses the entire point of § 284, which directs DoD to use its skills and resources to assist law enforcement agencies with counter-drug efforts.  DoD supporting CBP's law enforcement efforts by building fences and roads and installing lighting is precisely the sort of support the statute contemplates.  *See* 10 U.S.C. § 284(b)(7); Rapuano Decl. ¶ 5, Ex. C.  Indeed, DoD has been providing support to border fencing efforts since the 1990s with Congress's approval and encouragement.  *See supra* at 9-11.  In passing § 284, Congress expressed its concerns about the threat

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG – Defendants' Opp. to Prelim. Inj.

20

posed by illegal drugs, authorized DoD to construct fences along the southern border, and specifically "direct[ed] the Department [of Defense] to ensure appropriate resources are allocated to efforts to combat this threat." H.R. Rep. 114-840, 1147 (Nov. 30, 2016). Concluding that such support for counter-drug activities is not a "military requirement" requires overriding Congress's assignment of that function to the military in § 284. DoD's effort to build barriers in New Mexico easily satisfies the "military requirement" prong of § 8005 based on Congress's express provision for such military efforts.

### C.     New Mexico's § 284 Claim Fails on the Merits.

New Mexico also cannot succeed on the merits of its claim that DoD has exceeded its statutory authority under § 284. Without citing any authority, New Mexico claims that the "support" for counter-drug activities authorized in § 284 does not allow DoD to "completely fund[] the construction of fencing in the El Paso Sector." Pls.' Mot. 24-25. New Mexico also attempts to restrict the scope of "support" authorized under § 284 to "small scale construction," defined as construction that does not exceed $750,000. *Id.* at 25. Neither contention has merit.

No restrictions on the proportion of funding or cost of construction appear in the types of support permitted under § 284. *See* 10 U.S.C. § 284(b)-(c). To the contrary, the statute broadly approves "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States" without regard to the percentage of DoD's funding or the size, scale, or budget of the project. *Id.* § 284(b)(7). And since Congress first provided this authority in 1990, DoD has repeatedly used it, with Congress's explicit approval, to fund and complete large-scale fencing projects along the southern border in support of DHS's counterdrug activities. *See* H.R. Rep. No. 103-200, at 330-31 (1993) (describing DoD's construction of a 14-mile fence in a drug-smuggling corridor along the San Diego-Tijuana border as "precisely the kind of federal-local cooperative effort the Congress had in mind" in enacting § 284). As of 2006, Congress reported with approval that, since 1990, DoD's use of its authority to support counterdrug activities through "construction and rehabilitation" along the southern border "resulted in 7.6 miles of double-layer fencing, 59 miles of single fencing, and 169.5 miles of road." H.R. Rep. No. 109-452, at 368 (2006). And in determining appropriations for these construction activities, Congress has

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG – Defendants' Opp. to Prelim. Inj.

21

recommended that DoD spend millions of dollars on specific border projects.  *See, e.g., id.* at 369.

Likewise, the scope of "support" authorized under § 284 is not restricted by the types of congressional notification the statute requires in § 284(h), which provides that the Secretary of Defense must give Congress "a description of any small scale construction project for which support is provided" under § 284(b) or § 284(c) at least 15 days in advance of providing such support.  10 U.S.C. § 284(h)(1)(B), (i)(3).  Contrary to New Mexico's argument, *see* Pls.' Mot. 25, there is nothing inherently implausible about Congress requiring notice for some, but not all, projects that DoD could construct under § 284.  Certain types of support authorized under § 284 explicitly refer to—*but are not limited to*—"small scale" or "minor" construction.  *See* 10 U.S.C. § 284(b)(4), (c)(1)(B).  If Congress wanted to limit all construction authorized by § 284 to "small scale construction," it "presumably would have done so expressly."  *Russello v. United States*, 464 U.S. 16, 23 (1983).  Regardless of whether New Mexico thinks the scope of permissible construction activities under § 284 should be coextensive with the scope of the notification requirement, "[t]he short answer is that Congress did not write the statute that way."  *Id.*

For these reasons, too, New Mexico has not shown a likelihood of success on the merits of its § 284 claim.

### D.     Defendants' Use of § 8005, § 284, and § 9705 is Not Arbitrary and Capricious.

The States also fail to establish likelihood of success on their APA claim that Defendants' use of § 8005, § 284, and § 9705 is arbitrary and capricious.  *See* Pls.' Mot. 26-28.

There is no merit to the argument by the States that the agencies' use of § 284 or the TFF to fund border barrier construction is arbitrary and capricious because it is a "departure from past precedent."  *See* Pls.' Mot. 27.  As explained above, DoD has used § 284 and its predecessor statutes to build barriers along the southern border since the 1990s.  *See supra* at 9-11.  Similarly, Treasury has used TFF to fund a wide range of law enforcement activities related to border security initiatives.  *See* Farley Decl. ¶ 16.  This case thus does not involve a situation analogous to cases cited by the States, *see* Pls.' Mot. 26, where an agency exercised its authority to promulgate or rescind regulations, or to resolve an adjudication, and in so doing departed from longstanding policy without a reasoned

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG – Defendants' Opp. to Prelim. Inj.

22

explanation.  *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125-26 (2016); *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1119-20 (D.C. Cir. 2010).  Plaintiffs' argument—that an agency's explanation of its decision must acknowledge such a departure—simply does not apply where an agency is under no statutory obligation to provide an explanation for its decision at all.  Unlike rulemaking or adjudication, DoD's transfer of funds does not require the agency to issue any written explanation subject to judicial review under the APA.

Nor is there any merit to the claim that DoD acted arbitrarily and capriciously by proceeding with the transfer of funds pursuant to § 8005 without Congress's approval.  *See* Pls. Mot. 26.  There is no statutory requirement that DoD obtain Congress's consent before transferring funds under § 8005.  The statute merely requires that DoD "notify the Congress promptly of all transfers made pursuant to this authority." *See* § 8005.  DoD complied with that requirement and satisfied its statutory obligations to Congress, a fact Plaintiffs do not dispute.  *See* Rapuano Decl. ¶ 5, Ex. D.  Moreover, Plaintiffs cite no authority to support their position that an agency's response to a request from a congressional committee – here, an objection to the transfer from two House committees (Pls.' Ex. 35-36) – is the type of action that requires a reasoned public explanation in accordance with the APA.  The cases cited by Plaintiffs merely support the unremarkable positon that an agency must explain the reasons for reversing a public policy, and say nothing about application of that principle to the unique context of an agency's dealings with members of Congress.  *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *see also Invention Submission Corp. v. Rogan*, 357 F.3d 452, 459 (4th Cir. 2004) (APA "does not provide judicial review for everything done by an administrative agency").  In any event, in response to questions from members of Congress that DoD did not adhere to the so-called "gentleman's agreement" of obtaining approval of the relevant congressional appropriations committees before transferring funds pursuant to § 8005, the Acting Secretary of Defense has provided a rational explanation for DoD's decision to proceed with the transfer of funds in this case.  *See* House Armed Services Committee, Hearing on Fiscal Year 2020 Defense Authorization at 13-16 (stating that DoD evaluated the risks of losing future transfer authorization from Congress in deciding to proceed with the lawful transfer of funds absent consent from all committees) (Exhibit 12).

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG – Defendants' Opp. to Prelim. Inj.

23

This case also does not present a situation in which DoD "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983). With respect to § 284, the Acting Secretary of Defense evaluated the request for support from DHS, explained that the statutory requirements of § 284 were satisfied, and concluded that the proposed barriers at the designated project locations would further the national interest by stopping the illegal flow of drugs in the United States.[3] *See* Rapuano Decl. ¶ 4, Ex. B. Similarly, for § 8005, the Acting Secretary of Defense concluded that all necessary statutory requirements had been satisfied. *Id.*, Ex. C. Under the APA's "highly deferential" standard of review, these explanations are more than sufficient to satisfy DoD's obligation to provide a "reasonable basis" for its decision. *Crickon v. Thomas*, 579 F.3d 978, 982 (9th Cir. 2009).

Finally, there is no merit to Plaintiffs' contention that Treasury acted arbitrarily and capriciously by failing to consider the alleged liquidity problem that Plaintiffs claim would result from providing surplus TFF funding to DHS. *See* Pls.' Mot. 27. As explained above, the surplus money provided to DHS represents excess funds in the TFF after accounting for mandatory expenses, including equitable sharing expenses to the States, and those payments have no bearing on the overall solvency of the TFF or Plaintiffs' receipt of future equitable sharing money. *See supra* at 12-14; Farley Decl. ¶¶ ¶¶ 13, 22-23, 26.

### E. The States' NEPA Claims Fail Because the Acting Secretary of Homeland Security has Waived NEPA's Application to the New Mexico Construction Areas.

Plaintiffs' NEPA claims are not likely to succeed on the merits because the Acting Secretary of Homeland Security has waived NEPA's requirements for El Paso Sector Project 1 in the State of

---

[3] Plaintiffs also argue that DoD's efforts to build border fencing is arbitrary and capricious because the situation at the border is not a "military threat." *See* Pls.' Mot. 7. But there is no "military threat" requirement in § 284, and nothing in the statute requires DoD to limit its support only to circumstances in which it faces that type of opposing threat at the border.

New Mexico.[4]  IIRIRA authorizes such a waiver in conjunction with the statutory directive that the Secretary of Homeland Security "take such actions as may be necessary" to install "physical barriers" on the "United States border to detect illegal crossings in areas of high illegal entry into the United States."  IIRIRA § 102(a).  That statutory mandate includes a directive requiring DHS to "construct reinforced fencing along not less than 700 miles of the southwest border."  *Id.* § 102(b)(1)(A).  IIRIRA seeks to ensure expeditious construction pursuant to these mandates by waiving a broad array of legal impediments: "Notwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section." *Id.* at § 102(c)(1).

DHS determined, under § 102 of IIRIRA, that additional border infrastructure construction was necessary and requested that DoD use its authority pursuant to § 284 to assist with constructing border barriers.  *See* Rapuano Decl. ¶ 4, Ex. A.  DoD agreed to provide the requested support, and authorized support for two projects in Arizona, Yuma Sector Projects 1 and 2, and one project in New Mexico, El Paso Sector Project 1.  *Id.* ¶¶ 4, 7, 9.  On April 24, 2019, the Acting Secretary of Homeland Security exercised his authority under Section 102(c)(1) to issue waivers for these projects. *See* Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 84 Fed. Reg. 17185-87 (Apr. 24, 2019).  As relevant here, the waived laws include NEPA along with "all federal, state, or other laws, regulations, and legal requirements of, deriving from, or related to the subject of, the [listed] statutes."  *Id.* at 17187.  The law of this circuit is clear that "waiver of the relevant environmental laws under section 102(c) is an affirmative defense to all the environmental claims."  *In re Border Infrastructure Environmental Litigation,*

---

[4] DoD has approved projects to be funded under § 284 in the States of Arizona and New Mexico only, *see* Rapuano Decl. ¶ 4, and TFF funds will only be used to supplement projects in the State of Texas, *see* Flossman Decl. ¶ 12.  Thus, only New Mexico has standing to bring a NEPA claim, and such a claim must be limited to specific locations in Luna County and Doña Ana County, NM, where the border barriers will be constructed.  Although every State purports to seek an injunction under NEPA, these other states do not have the requisite "geographic nexus" to the construction areas to assert such a claim.  *See Ashley Creek Phosphate Co. v. Norton,* 420 F.3d 934, 938 (9th Cir. 2005).

915 F.3d 1213, 1221, 1225 (9th Cir. 2019) (affirming dismissal of NEPA claim).   Accordingly, Plaintiffs' NEPA claims are not likely to succeed.

### F.    Plaintiffs Are Unlikely to Succeed on the Merits of Their Constitutional Claims.

Plaintiffs' purported constitutional claims fare no better than their statutory claims.   Their constitutional claims do nothing more than assert that Defendants violated the appropriations to DHS in the CAA, Pub. L. 116-6, div. A., while the Supreme Court has made clear "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims."   *Dalton v. Specter*, 511 U.S. 462, 473 (1994).   The Government is not relying on independent Article II authority to undertake border construction; the actions alleged are being undertaken pursuant to express statutory authority.   The outcome of this case (to the extent it presents a justiciable controversy at all) thus turns on what those statutes mean—a purely statutory dispute with no constitutional dimension.   Plaintiffs are thus unlikely to succeed on the merits of their constitutional claims.

The Supreme Court's decision in *Dalton* makes this clear.   In *Dalton*, the Court specifically rejected the proposition that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine."   *Id.* at 471.   The Court instead recognized that the "distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution, on the other, is too well established to permit this sort of evisceration."   *Id.* at 474.

By asserting that actions in excess of statutory authority are constitutional violations, Plaintiffs are doing precisely what the Court rejected in *Dalton*.   Plaintiffs assert no constitutional violation separate from the alleged statutory violation.   They do not allege that the Government's compliance with any of the statutes would be unconstitutional.   Instead, Plaintiffs assert, in various ways, that Defendants violated the appropriations to DHS in the CAA.   They allege that the Government violated separation-of-powers principles by "thwarting the will of Congress expressed in the 2019 Consolidated Appropriations Act"—or, to another way, by exceeding the authority granted under the Act. Pls.' Mot. 18.  Plaintiffs frame the same allegation of CAA violations in terms of the Presentment Clause by asserting that Defendants' actions "effectively seek[] to amend the FY 2019 Consolidated

1   Appropriations Act." *Id.* at 19.  Finally, Plaintiffs' allegations of Appropriations Clause violations turn

2   on a principle of statutory construction to support the claim that Defendants are expending funds in

3   an unauthorized manner.  *See id.* at 20-21.  Again, these allegations of ultra vires statutory actions do

4   not state independent constitutional claims.  *See Dalton*, 511 U.S. at 473-74.

5     Plaintiffs' separation-of-powers claim also fails because the President has not purported to

6   exercise his inherent authority under Article II of the Constitution.  Contrary to Plaintiffs' contentions,

7   *see* Pls.' Mot. 18, this case presents a sharp contrast with *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S.

8   579 (1952), in which the President directed the Secretary of Commerce to seize the nation's steel mills

9   relying solely upon "the aggregate of his powers under the Constitution," and conceded the absence

10   of statutory authority.  *Id.* at 585-87.  The situation here is entirely different.  Here, unlike there, the

11   actions at issue are all "pursuant to an express . . . authorization of Congress," such that the agencies'

12   "authority is at its maximum."  *Id.* at 635 (Jackson, J. concurring).

13     Plaintiffs claim that the President contravened the will of Congress because its authorization

14   of certain border barrier construction to DHS in the CAA effectively prohibits the use of other

15   available statutory sources to provide additional funding for such construction, Pls.' Mot. 18, but that

16   is incorrect.  Congress did not address in its appropriations to DHS whether the Executive could

17   utilize other statutory authorities for border barrier construction.  The appropriations to DHS simply

18   authorized funding for border barrier construction in certain locations.  *See* Pub. L. 116-6, div. A,

19   §§ 230-32.  Had Congress wished to restrict all other border barrier construction—including

20   construction where other statutory authorities authorized funding—it could have done so by imposing

21   appropriations riders, as it has done in the past, including elsewhere in the very same appropriations

22   act.  *See, e.g., id.* § 219 ("None of the funds made available to the United States Secret Service by this

23   Act or by previous appropriations Acts may be made available for the protection of the head of a

24   Federal agency other than the Secretary of Homeland Security"); *McIntosh*, 833 F.3d at 1179.  The

25   President had already made clear prior to the CAA's passage his intention to use alternative statutory

26   sources to fund border barrier construction, *see* Pls.' Mot. 5, but Congress nonetheless did not include

27   any rider forbidding it.  The absence of such provisions precludes any inference that Congress

28   intended to, or actually did, disable the use of other available authorities.  *See Tennessee Valley Auth. v.*

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG – Defendants' Opp. to Prelim. Inj.

27

*Hill*, 437 U.S. 153, 190 (1978) ("doctrine disfavoring repeals by implication applies with full vigor when the subsequent legislation is an appropriations measure").  "It is a fundamental principle of appropriations law that [courts] may only consider the text of an appropriations rider."  *McIntosh*, 833 F.3d at 1178.  "An agency's discretion to spend appropriated funds is cabined only by the text of the appropriation."  *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 200 (2012).  Moreover, because this Court "must consider only the text of the rider," the history of negotiations between the President and Congress regarding fiscal year 2019 appropriations for border barrier construction is irrelevant to the meaning of that provision.  *McIntosh*, 833 F.3d at 1179; *see Salazar*, 567 U.S. at 200.  The action at issue here is thus squarely within the authority granted by Congress, and *Youngstown* is inapposite.  *See AFL-CIO v. Kahn*, 618 F.2d 784, 787 (D.C. Cir. 1979) (en banc); *see also Dalton*, 511 U.S. at 473.

For similar reasons, Plaintiffs have not alleged an actual Presentment Clause violation. Plaintiffs cannot dispute that the President signed the CAA into law according to the constitutionally mandated procedure.  *See* Pls.' Mot. 5; U.S. Const., Art. 1, § 7.  And their claim that the President has attempted to amend that law is baseless.  This case is in no way comparable to *Clinton v. City of New York*, 524 U.S. 417 (1998), wherein the Supreme Court held that the President's action explicitly "cancel[ing] in whole" portions of enacted statutes violated the Constitution.  *Id.* at 436; *see also id.* at 439.  Here, the President has made no attempt to "cancel" or otherwise alter any portion of the appropriations to DHS in the CAA.  To the contrary, the CAA remains in effect, and the agencies have acted pursuant to other duly enacted statutes to fund additional border barrier construction using statutory mechanisms Congress created.  The Executive's use of those statutory authorities does not alter the CAA.  Nor is the use of duly enacted statutes an end-run around constitutionally mandated procedures.  The President and his agents have invoked valid statutes to accomplish ends those statutes explicitly permit.  That does not violate the Presentment Clause.

Plaintiffs are also unlikely to succeed on their Appropriations Clause claim.  That claim rests on the principle that, where Congress appropriates funds to an agency for a specific object, that agency may not also use a general appropriation to that agency to fund that same object.  *See* Pls.' Mot. 20; U.S. Gov't Accountability Office, Office of the Gen. Counsel, *Principles of Federal Appropriations Law* 3-407 (4th ed. 2017) (GAO Red Book).  This principle is inapplicable here for three reasons.  First, it

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG – Defendants' Opp. to Prelim. Inj.

28

applies to the use of appropriations within the same bill or for the same agency to fund the same object.  *See, e.g.*, *Nevada v. Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir. 2005) (finding that a general provision in the 2004 Energy and Water Development Appropriations Act could not fund the same object as a specific provision from the same Act); *see also* GAO Red Book 3-407 ("[I]f *an agency* has a specific appropriation for a particular item, and also has a general appropriation broad enough to cover the same item, *it* does not have an option as to which to use." (emphasis added)); B-139510 (GAO May 13, 1959) (finding that one branch of DoD—the U.S. Navy—could not fund a project Congress had specifically delegated to another branch of DoD—the U.S. Army Corps of Engineers). In contrast, the statutes that Defendants are utilizing in addition to the DHS appropriations are funded via *different* statutory sources governing *different* agencies.  Defendants are not attempting to use general provisions of the CAA, or any other DHS appropriation, to fund border barrier construction. Moreover, Congress specified that of "the total amount made available under the 'U.S. Customs and Border Protection—Procurement, Construction, and Improvements'" appropriation, $1.375 billion would be available "for the construction of primary pedestrian fencing . . . in the Rio Grande Valley sector."  Pub. L. 116-6, div. A, § 230(a)(1).   As written, this restriction applies to the funds made available in that specific DHS appropriation, not to the federal budget as a whole.  And Defendants are not expending additional money from the general U.S. Customs and Border Protection appropriation.  To the contrary, the construction funds originate from DoD appropriations and the TFF, and Plaintiffs point to no authority suggesting that a funding allocation in *one* agency's appropriations act prohibits a *different* agency from expending funds authorized by its own governing statutes.

Second, funds utilized for border barrier construction pursuant to § 284 will be used for distinct purposes separate from the purpose for the funds appropriated to DHS for construction of pedestrian fencing in the Rio Grande Valley..  *See* Pub. L. 116-6, div. A., § 230(a)(1).  Border barrier construction undertaken pursuant to § 284 will occur in New Mexico and will be funded by DoD's Drug Interdiction and Counter-Drug Activities appropriation to construct barriers to "block drug smuggling corridors across international boundaries of the United States."  10 U.S.C. § 284(b)(7); *see* Pub. L. No. 115-245, div. A, Title VI.  Thus, the construction funded using § 284 funds will not take

place in any area where the Congress has appropriated funds for construction.  As a result, these distinct lines of funding are not being used for the same purpose.

Third, the TFF is not a general or specific appropriation.  It is a special fund account established pursuant to a statute that authorizes, among other things, the expenditure of funds originating from Treasury seizures and forfeitures for "law enforcement purposes" without further authorization from Congress.  *See* 31 U.S.C. § 9705.  An intended purpose of the TFF is to permit the Secretary of the Treasury to support "law enforcement activities of any Federal agency."  *Id.* § 9705(g)(4)(B).  If the Secretary were forbidden from utilizing such funds in support of any activity for which an agency had received funding via annual appropriations, it would severely curtail the broad law-enforcement-support authority Congress provided in § 9705.  Congress did not explicitly place such limits on this fund, and the Court should not infer one here.

At bottom, the thrust of Plaintiffs' constitutional claims is that the President and his agents did not comply with the appropriations to DHS in the CAA.  If such claims established constitutional issues, then every allegation that the President or his agents exceeded their statutory authority in some way would also constitute a constitutional claim.  The Supreme Court has foreclosed that path.  *Dalton*, 511 U.S. at 472.  Plaintiffs are thus unlikely to succeed on the merits of their constitutional claims.

## G. This Court is Not the Proper Venue to Challenge Barrier Construction in New Mexico.

The States also have not established that venue is proper in this Court.  California is the only plaintiff for whom venue would arguably be proper, 28 U.S.C. § 1391(e)(1), but California has not established that it has suffered an injury sufficient for Article III standing as to any claim advanced in the preliminary injunction or the amended complaint.  As explained above, California is not injured by the use of TFF funds, it does not claim any injury based on § 8005 or § 284, and it cannot establish a NEPA injury from construction occurring in New Mexico.  The only Plaintiff who could plausibly state an alleged injury traceable to the construction of border barriers in New Mexico is New Mexico, but that State's ability to seek relief in this Court hinges entirely on California having standing.  On its own, New Mexico would have no basis to seek a preliminary injunction concerning its New Mexico-based injury in this Court*, see* 28 U.S.C. § 1391, and it cannot piggyback on a party (California) that

has no right to sue in the first place.  For that reason, too, the Court should deny the motion for preliminary injunction.  *See Hendricks v. Bank of Am., N.A.*, 408 F.3d 1127, 1134-35 (9th Cir. 2005) (venue "bear[s] on the district court's power to issue [a preliminary] injunction, because the court would lack authority to grant relief" if venue was improper).

## II.   The States Have Not Established an Irreparable Injury is Likely in the Absence of an Injunction.

The States base their claim of irreparable injury on two allegations, both of which fail.  First, the States claim they will be irreparably harmed by Treasury's use of Strategic Support funding for border barriers because allocating that money to DHS will deprive the States of equitable sharing money.  *See* Pls.' Mot. 10-12; 31-33.  As explained above, this claim is factually incorrect and based on a fundamental misunderstanding of how TFF operates.  *See supra* at 12-14.  Because Treasury's Strategic Support payments to DHS do not pose any threat to the solvency of the TFF or diminish the equitable sharing payments to which the States may be entitled under § 9705, the States have not established a likelihood of irreparable injury.  Farley Decl. ¶¶ ¶¶ 13, 22-23, 26.

Second, New Mexico argues that border wall construction in the El Paso sector will harm the State's interest in protecting natural resources within its borders.  *See* Pls.' Mot. 31.[5]  Specifically, New Mexico alleges that a completed border wall will disrupt migration routes for the Mexican wolf and jaguar; that construction activity could "kill, injure, or alter the behavior of many vital species such as the endangered Aplomado falcon, the iconic Gila monster . . . and many birds and bats"; and that, depending on the height, a border wall could prevent low-flying quail from entering the state, potentially injuring the quail-hunting interests of New Mexicans. Pls.' Mot. 30.  Plaintiffs' declarations are heavy on conjecture and light on detail—Plaintiffs suggest that 53 unnamed non-flying mammal, 38 reptile, and 10 amphibian species could be impacted, offering no facts in support of that allegation. Plaintiffs have failed to meet their burden of demonstrating a likely irreparable injury to New Mexico's interests, and this Court should deny Plaintiffs' motion.  *See* Enriquez Decl.

---

[5] Plaintiffs also allege injuries to their procedural interests under NEPA, averring that construction, absent NEPA analysis, is itself an irreparable harm.  Pls.' Mot. 29.  But because the Acting Secretary of Homeland Security has issued an IIRIRA waiver for this construction, Plaintiffs' NEPA claims have been extinguished.

A plaintiff seeking a preliminary injunction bears the burden of demonstrating that irreparable harm is *likely*, not just possible, prior to a final disposition of the case. *All. for the Wild Rockies,* 632 F.3d at 1131. "An injunction will not issue if the person or entity seeking injunctive relief shows a mere possibility of some remote future injury, or a conjectural or hypothetical injury." *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011). Plaintiffs' vague allegations do not carry this burden.

New Mexico first appears to allege injury to its interests in managing the wildlife within its borders. Pls. Mot. 30-31. Carrying its burden would require New Mexico to show that construction of a border barrier in Luna and Doña Ana counties is likely to cause population-level harm to wildlife within New Mexico. *See New Mexico Dept. of Game & Fish v. U.S. Dept. of Interior*, 854 F.3d 1236, 1253 (10th Cir. 2017) (rejecting as insufficient the State of New Mexico's declaration regarding possible impacts of the release of Mexican wolves in New Mexico where the declaration did not show that "anticipated releases and importations will impact the State's ungulate herds, as opposed to individual members of those herds, or harm the Department's management efforts with respect to those populations."). That requires, in turn, that New Mexico establish a "definitive threat" of future harm "to protected *species*, not mere speculation." *Nat'l Wildlife Fed'n v. Burlington N.R.R.*, 23 F.3d 1508, 1512 n.8 (9th Cir. 1994) (emphasis added); *see also Maughn v. Vilsack*, No. 4:14-CV-0007-EJL, 2014 WL 201702, at *7 (D. Idaho. Jan. 17, 2014) (finding plaintiffs had failed to show a likelihood of irreparable harm to their interest in wolves because the challenged "program for hunting wolves will not result in the loss of the species as a whole"). Specificity is required; "generalized allegations of an abstract environmental injury" do not suffice. *All. for the Wild Rockies v. U.S. Forest Serv.*, 2016 WL 3349221, at *4 (D. Idaho June 14, 2016) (citing *Sierra Forest Legacy v. Sherman*, 951 F. Supp. 2d 1100, 1111 (E.D. Cal. 2013)); *accord All. for the Wild Rockies v. Kruger*, 35 F. Supp. 3d 1259, 1269 (D. Mt. 2014) ("Any alleged harm to the plaintiff must be anchored in a specific and detailed allegation of harm to a particular species or critical habitat." (citing *Sherman*, 951 F. Supp. 2d at 1111)).

At the outset, several of New Mexico's allegations are irrelevant here. First, Declarant Hadley makes allegations regarding Northern jaguar, white-sided jack rabbits, and Sonoran possum in Hidalgo County. Hadley Decl. ¶¶ 7, 10, 13-15, 17, 19. But the challenged construction is not in Hidalgo

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG – Defendants' Opp. to Prelim. Inj.

32

County; rather, it is confined to Luna and Doña Ana counties.  Enriquez Decl. ¶¶ 17-18.  None of the imminent barrier replacement will thus impact the jaguar critical habitat or the white-sided jack rabbit, and Plaintiffs' speculation about the possible impacts of border wall construction in Hidalgo County lacks merit.  Enriquez Decl. ¶¶ 43-46.  Similarly irrelevant are the declarations of Declarant Trejo and Declarant Vasquez, which speculate about possible impacts to the individual declarants' interests in hunting Montezuma quail and Gould's turkeys respectively.  Trejo Decl. ¶¶ 10, 13, 17; Vasequez Decl. ¶ 14.  Setting aside the lack of specific facts supporting these concerns, Plaintiffs cannot invoke the hunting interests of third parties not before the Court.  *See Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) ("We have adhered to the rule that a party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)).  To the extent New Mexico invokes the interests of New Mexican hunters as their *parens patriae*, New Mexico may not do so in an action against the United States.  *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1178 (9th Cir. 2011).

Plaintiffs' remaining allegations fail too.  Declarant Nagano suggests that construction could impact Aplomado falcons in the region.  Nagano Decl. ¶ 13.  But the nearest known Aplomado falcons are the Simpson Draw pair, located roughly seven miles from any proposed construction on the other side of Highway 9.  Enriquez Decl. ¶¶ 47-57.  Beyond the Simpson Draw pair, the next nearest falcons are over 100 miles from any proposed construction.  *Id.* ¶ 56.  That the Simpson Draw pair have remained despite Highway 9's traffic makes it exceedingly unlikely that temporary construction impacts will disturb them.  *Id.* ¶ 51.  But even in the unlikely event that the Simpson Draw pair abandon the area or are somehow killed by border wall construction, any impact to the *subspecies* would be negligible; Northern Aplomado falcon pairs in New Mexico likely number in the hundreds, and the loss of a single pair is not likely to significantly reduce the subspecies' survival and recovery probabilities.  *Id.* ¶ 56.

Likewise, several of Plaintiffs' declarations similarly hypothesize that a border wall could prevent Mexican wolf interchange across the border.  *See* Lasky Decl. ¶¶ 7-14; Nagano Decl. ¶ 14; Traphagen Decl. ¶¶ 23-24.  But Plaintiffs' declarations do not show a likely *population-level* harm will result.  *New Mexico Dept. of Game & Fish*, 854 F.3d at 1254.  The 2017 Recovery Plan for the Mexican

wolf makes plain that migrations of wolves from Mexico into the United States is not required for the species' recovery. *United States Fish and Wildlife Service, Mexican Wolf Recovery Plan, First Revision* (November 2017) at 8 (discussing how only two Mexican wolves are known to have crossed the southern border into the United states since reintroduction) (Exhibit 13); *id.* at 15 (discussing how "connectivity or successful migrants are not required to achieve recovery."); Enriquez Decl. ¶¶ 47-57. Moreover, despite the single cited example of a wolf moving through the project area, there is an abundance of high-quality wolf habitat in central Arizona stretching into west central New Mexico, areas not at issue in the instant litigation. *Id.* ¶ 57. The Mexican wolf is thus not likely to be irreparably harmed by border wall construction in Luna and Dona Ana counties.

Finally, in accordance IIRIRA § 102(b)(1)(C) and the agency's normal procedures for constructing border infrastructure, CBP is consulting with stakeholders, interested parties, and state and federal agencies for input on the potential environmental impacts of the New Mexico project. Enriquez Decl. ¶¶ 19-33, 40. CBP has a proven track record of responding to environmental concerns raised through this process, including design modifications accommodating known wildlife migration corridors. *Id.* ¶¶ 38-39. CBP's past record and demonstrated commitment to mitigating wildlife impacts where possible strongly undercut Plaintiffs' arguments of irreparable environmental harm.

In sum, Plaintiffs have not come forward with concrete evidence showing likely harm to New Mexico's interests in wildlife management within its borders. Plaintiffs cannot show likely population or species-level impacts before the final disposition of their case, and Plaintiffs' bare speculation is insufficient to meet their burden in seeking preliminary relief. *See* Enriquez Decl. For this reason, this Court should deny Plaintiffs' motion.

### III.      The Balance of Equities and Public Interest Weigh Against Injunctive Relief.

The final two preliminary injunction factors, the public interest and the balance of the equities, also weigh against granting the States' motion. These factors merge when the government is a party. *Azar,* 911 F.3d at 575. Plaintiffs have not established that their alleged harm would outweigh the public interest. As explained above, Plaintiffs' alleged injuries are nonexistent with respect to the use TFF funds and speculative as to their environmental claims. *See Winter*, 555 U.S. at 25-26 (holding that possible environmental harm to an unknown number of marine mammals was insufficient to tip

1    the balance of equities in favor of plaintiffs).  In contrast, preventing the construction of border

2    barriers would harm to the Government's "weighty" interest in border security and enforcement of

3    immigration laws.  *See Landon v. Plasencia*, 459 U.S. 21, 34 (1982).  Here, the President has declared a

4    national emergency along the southern border and the situation there is continuing to worsen due to

5    the increasing numbers of migrants that are overwhelming DHS's resources, thereby constraining the

6    resources available for drug interdiction and law enforcement priorities at the border.  *See*

7    Proclamation; Veto Message; Ex. 1.  Border walls have proven to be extremely effective at stopping

8    drugs and migrants from unlawfully crossing the southern border.  *See* Martin Decl.  An injunction

9    prohibiting the construction of additional barriers would therefore harm the public's interest in border

10   security and public safety.

11        Moreover, Congress has specifically authorized the construction of border barriers and made

12   a determination through passage of the broad waiver authority in IIRIRA that "expeditious

13   construction" should take precedence over all competing legal requirements.  *See supra* at 3-4, 24-26;

14   *Va. Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937) (courts "cannot ignore the judgment of

15   Congress, deliberately expressed in legislation," which is "a declaration of public interest and policy

16   which should be persuasive").

17                                            **<u>CONCLUSION</u>**

18        For the reasons explained above, the motion for preliminary injunction should be denied.

19

20

21

22

23

24

25

26

27

28

DATE:  April 25, 2019

Respectfully submitted,

JAMES M. BURNHAM
Deputy Assistant Attorney General

JOHN G. GRIFFITHS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

/s/ Andrew I. Warden
ANDREW I. WARDEN
Senior Trial Counsel (IN Bar No. 23840-49)

/s/ Rachael L. Westmoreland
RACHAEL L. WESTMORELAND
(GA Bar No. 539498)
KATHRYN C. DAVIS
MICHAEL J. GERARDI
LESLIE COOPER VIGEN
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Tel.:     (202) 616-5084
Fax:     (202) 616-8470


JEFFREY BOSSERT CLARK
Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

/s/ Tyler M. Alexander
TYLER M. ALEXANDER
(CA Bar No. 313188)
Natural Resources Section
Trial Attorney
PO Box 7611
Washington, DC 20044-7611
Tel: (202) 305-0238
Fax: (202) 305-0506
tyler.alexander@usdoj.gov