ARNOLD & PORTER KAYE SCHOLER LLP
Irvin B. Nathan*
Robert N. Weiner*
Andrew T. Tutt*
Kaitlin Konkel*
Samuel F. Callahan*
601 Massachusetts Ave, NW
Washington, DC 20001
Telephone:     (202) 942-5000
irv.nathan@arnoldporter.com
*Pro hac vice *application forthcoming*

Douglas A. Winthrop (SBN 183532)
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111
Telephone:     (415) 471-3100
douglas.winthrop@arnoldporter.com

*Counsel for Amici Curiae Former Members of Congress*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, President of the United States, in his official capacity, *et. al.*,<br><br>Defendants. | Case No.: 4:19-cv-00872-HSG<br><br>**BRIEF OF FORMER MEMBERS OF CONGRESS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>P.I. Hearing:  May 9, 2019, at 2:00 PM |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ iii

INTEREST OF AMICI CURIAE .................................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .............................................2

ARGUMENT ...............................................................................................................3

I.     THE PRESIDENT HAS DECLARED A PATENTLY FICTITIOUS EMERGENCY..........3

II.    THE EXECUTIVE BRANCH IS UNDERMINING THE SEPARATION OF POWERS
       BY USURPING THE APPROPRIATIONS POWER VESTED EXCLUSIVELY
       IN CONGRESS ...................................................................................................6

       A.     Congress Must Appropriate Money Before the Executive Branch Can Spend It........6

       B.     Congress's Exclusive Power over Appropriations Is Critical to our
              Constitutional Structure ...............................................................................10

       C.     Only The Courts Can Check Executive Branch Violations of the
              Appropriations Power ....................................................................................11

III.   THE EXECUTIVE BRANCH IS EXCEEDING THE LIMITS OF
       "THE EXECUTIVE POWER"...........................................................................12

CONCLUSION ..........................................................................................................16

ATTACHMENT A—LIST OF AMICI CURIAE

ATTACHMENT B—JOINT DECLARATION OF FORMER UNITED STATES
       GOVERNMENT OFFICIALS

CERTIFICATE OF SERVICE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Fed'n of Gov't Emps., AFL-CIO, Local 1647 v. FLRA,*
   388 F.3d 405 (3d Cir. 2004) .......................................................................................... 8

*Bowsher v. Synar,*
   478 U.S. 714 (1986) .................................................................................................... 11

*Buckley v. Valeo,*
   424 U.S. 1 .................................................................................................................... 15

*Cincinnati Soap Co. v. United States,*
   301 U.S. 308 (1937) ...................................................................................................... 7

*Clinton v. City of New York,*
   524 U.S. 417 (1998) .............................................................................................. 8, 9, 10

*Comm. on the Judiciary v. Miers,*
   558 F. Supp. 2d 53 (D.D.C. 2008) .............................................................................. 12

*Comm. on Oversight & Gov't Reform v. Holder,*
   979 F. Supp. 2d 1 (D.D.C. 2013) ................................................................................ 12

*Commodity Futures Trading Comm'n v. Schor,*
   478 U.S. 833 (1986) .................................................................................................... 11

*Consumer's Union of U.S., Inc. v. Kissinger,*
   506 F.2d 136 (D.C. Cir. 1974) ...................................................................................... 9

*Dames & Moore v. Regan,*
   453 U.S. 654 (1981) .................................................................................................... 13

*Dep't of the Navy v. FLRA,*
   665 F.3d 1339 (D.C. Cir. 2012) .................................................................................... 8

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.,*
   561 U.S. 477 (2010) .................................................................................................... 10

*Hart's Adm'r v. United States,*
   16 Ct. Cl. 459 (1880) .................................................................................................... 8

*Ho Ah Kow v. Nunan,*
   12 F. Cas. 252 (C.C.D. Cal. 1879) .............................................................................. 12

*INS v. Chadha,*
   462 U.S. 919 (1983) ................................................................................................. 9, 15

*King v. Burwell*,
    135 S. Ct. 2480 (2015)................................................................................5

*Lynch v. Alworth–Stephens Co.*,
    267 U.S. 364 (1925)...................................................................................4

*Marbury v. Madison*,
    5 U.S. (1 Cranch) 137 (1803)....................................................................2

*Medellin v. Texas*,
    552 U.S. 491 (2008).................................................................................12

*Metro. Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*,
    501 U.S. 252 (1991).................................................................................10

*Mistretta v. United States*,
    488 U.S. 361 (1989).................................................................................11

*Myers v. U.S.*,
    272 U.S. 52 (1926)...................................................................................11

*N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*,
    458 U.S. 50 (1982)...................................................................................11

*Nixon v. United States*,
    506 U.S. 224 (1993).................................................................................16

*NLRB v. Noel Canning*,
    134 S. Ct. 2550 (2014).............................................................................11

*Office of Pers. Mgmt. v. Richmond*,
    496 U.S. 414 (1990)...................................................................................7

*Powell v. McCormack*,
    395 U.S. 486 (1969).................................................................................16

*Pub. Citizen v. U.S. Dep't of Justice*,
    491 U.S. 440 (1989).................................................................................10

*Reeside v. Walker*,
    52 U.S. 272 (1850).....................................................................................7

*Rochester Pure Waters Dist. v. EPA*,
    960 F.2d 180 (D.C. Cir. 1992)...................................................................8

*Roper v. Simmons*,
    543 U.S. 551 (2005)...................................................................................5

*Sandifer v. U.S. Steel Corp.*,
    571 U.S. 220 (2014)...................................................................................4

- iii -

*United States v. AT&T,*
    551 F.2d 384 (D.C. Cir. 1976) ........................................................12

*United States v. Estate of Romani,*
    523 U.S. 517 (1998) ...........................................................................6

*United States v. MacCollom,*
    426 U.S. 317 (1976) ...........................................................................7

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952)...............................................................5, 13, 14, 15

*Zivotofsky v. Kerry,*
    135 S. Ct. 2076 (2015) .....................................................................13

**Statutes and Constitutional Provisions**

10 U.S.C. § 284 ...........................................................................................6

10 U.S.C. § 2808 .........................................................................................6

31 U.S.C. § 9705(g)(4)(B) ..........................................................................6

2019 Consolidated Appropriations Act ..............................................6, 14

Antideficiency Act, 31 U.S.C. §§ 1341 *et seq.* ........................................9

National Emergencies Act, Pub. L. 94-412, 90 Stat. 1255 ............2, 3, 4, 6

U.S. Const. art. I, § 1 ..............................................................................3, 6

U.S. Const. art. I, § 7, cl. 2 ...................................................................3, 7, 8

U.S. Const. art. I, § 9, cl. 7 ....................................................................3, 6

**Other Authorities**

H.J. Res. 31 § 230(b) .................................................................................21

H.J. Res. 31 § 280(a)(1) .............................................................................21

H.J. Res. 46 ................................................................................................20

S. Rep. No. 94-1168 (1976) .........................................................................4

*Hearing on H.R. 3884 Before the S. Comm. of Governmental Operations,*
    94th Cong. 7 (1976) ..........................................................................11

*Collins English Dictionary* (12th ed. 2014) ...........................................11

*The American Heritage Dictionary* (1976) ...............................................4

- iv -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Webster's New Collegiate Dictionary* (1977) ................................................................4

3 *Commentaries on the Constitution* § 1342 (1833) .........................................................8

*The Federalist* No. 58 (C. Rossiter, ed. 1961) (J. Madison) ...........................................9

Gerald S. Dickinson, Op-Ed., *The Biggest Problem for Trump's Border Wall Isn't
Money. It's Getting the Land.*, Wash. Post (Mar. 3, 2017),
http://tinyurl.com/y42cttcp..............................................................................................5

Peter Baker, *Trump Declares a National Emergency, and Provokes a Constitutional
Clash*, N.Y. Times (Feb. 15, 2019), https://tinyurl.com/y4ngfkyz...............................2

White House, *Remarks by President Trump on the Humanitarian Crisis on our
Southern Border and the Shutdown*
(Jan. 19, 2019), https://tinyurl.com/y7gdj6s8 .............................................................14

### INTEREST OF AMICI CURIAE[1]

Amici curiae are a bipartisan group of more than 100 former Members of the House of Representatives, both Republicans and Democrats. *Amici* have served an aggregate of approximately 1,500 years in Congress, hail from 36 States, and include 21 former Members from the states of the Ninth Circuit. *Amici* disagree on many issues of policy and politics. Some *amici* believe that a wall along the Southern Border is in the national interest. Others do not. But all *amici* agree that the Executive Branch is undermining the separation of powers by proposing to spend tax dollars to build a border wall that Congress repeatedly and emphatically refused to fund.

*Amici*, as former members of Congress and as citizens of our Nation, have a strong interest in preventing Executive Branch overreach from degrading Congress's unique and important role in America's tripartite system of separated powers. Some *amici* have served in leadership positions in their respective party caucuses, including as Majority Leader; several have served on the Appropriations, Budget and Intelligence Committees of the House; and some have gone on to serve in the Senate or in the Executive Branch. Two *amici* have served as U.S. Secretaries of the Defense Department (one Democrat and one Republican) and are particularly well versed in the laws and practices surrounding the Defense Department budget. One has served as the head of the Office of Management and Budget and went on to serve as Chief of Staff to the President. All of the *amici* are uniquely positioned to offer their perspective because they are former members of the Legislative Branch intimately familiar with the appropriations process. Each of them swore an oath to protect the Constitution; each has seen firsthand how the separation of powers safeguards the rights of the American people; and each firmly believes that defending Congress's power of the purse is essential to preserving democracy's promise that Americans' hard-earned tax dollars are spent in accordance with the will of the people.

A full listing of *amici* appears in the Appendix as Attachment A.

---

[1] All parties have consented to the filing of this *amicus* brief.  No party's counsel authored this brief in whole or in part.  Nor did any party or party's counsel, or any other person other than *amici curiae*, contribute money that was intended to fund preparing or submitting this brief.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

This suit concerns the continued viability of the separation of powers—the foundation upon which "the whole American fabric has been erected," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176 (1803)—as a limit on Executive authority. The Executive Branch plans, and has already begun, to take billions of dollars that Congress appropriated for other pressing national needs and spend it instead on a wall along the United States-Mexico border. It has done this despite repeated votes in both houses to refuse to fund construction of a border wall, and on the heels of a multi-month government shutdown provoked, in part, by that very dispute.  Now, more than four years after first arguing for a wall during the Presidential campaign, the President has determined that the situation at the border constitutes a national emergency justifying these extraordinary steps. Why? Because, as President Trump boasted: "I want to do it faster. I could do the wall over a longer period of time. *I didn't need to do this, but I'd rather do it much faster*…. I just want to get it done faster, that's all." Peter Baker, *Trump Declares a National Emergency, and Provokes a Constitutional Clash*, N.Y. Times (Feb. 15, 2019), https://tinyurl.com/y4ngfkyz.

Rarely in our Nation's history has the Executive Branch launched such an assault on Congress's exclusive legislative powers. In the statement quoted above and many others like it, the President's essential rationalization for unilateral Executive Branch action is that Congress has refused to authorize his requested appropriation. This subversion of Article I has caused, and continues to cause, grave harm to the House as an institution. Without action by this Court to prevent the Administration's usurpation of congressional authority, the unchecked expansion of the Executive's power at the expense of the Legislative Branch will threaten our democracy.

In light of this impending threat, this brief makes three points.

*First*, the President's invocation of powers under the National Emergencies Act to override Congress's appropriations decisions is pretextual. Under any plausible definition, the situation at the Southern Border is not an "emergency."  Emergencies are sudden, not glacial. Justified exercises of the emergency powers address problems so urgent that they require a response before Congress can appropriate funds for them, not longstanding problems where Congress has thoroughly considered, and rejected, the proposed appropriation.

*Second*, the President's action poses a grave threat to our constitutional system. The power to decide whether and how to appropriate and spend tax dollars—the People's money—is uniquely congressional.   For the President to justify expenditures Congress explicitly disapproved, by invoking a "national emergency" where none exists, usurps congressional power. The Framers regarded this power of the purse, *see* U.S. Const. art. I, § 9, cl. 7; *id.* art. I, § 1; *id.* art I, §7, cl. 2, as the *defining power* of the Legislative Branch. They also saw it as a fundamental check on Executive power. Making Congressionally disapproved expenditures on a border wall effectively nullifies this important constitutional safeguard.   Neither the National Emergencies Act nor any other statute could constitutionally surrender this power.   To read the laws otherwise would contravene the Court's duty to interpret statutes in a manner that avoids constitutional issues.

*Third*, the Executive Branch is not only trammeling on Congress's exclusive appropriations powers, but also aggrandizing its own power. The Executive Branch cannot act without authority granted by legislation or the Constitution. No legislative or constitutional provision authorizes building a lengthy border wall. To the contrary, Congress repeatedly denied such authority, and a majority of both houses expressly rejected the President's emergency declaration. The powers of the Executive Branch are therefore at their lowest ebb.

## ARGUMENT

## I.    THE PRESIDENT HAS DECLARED A PATENTLY FICTITIOUS EMERGENCY

The President has purported to use emergency powers that Congress granted in the National Emergencies Act, Pub. L. 94-412, 90 Stat. 1255, codified at 50 U.S.C. §§ 1601-1651, to spend on the border wall funds that Congress appropriated for other purposes. The English language, however, is not so boundlessly elastic as to allow the claim that there is a national emergency at the Southern Border. Emergencies are sudden and immediate, not longstanding and static. The President raised the need for a wall as early as 2015, promised in his campaign to build a "big beautiful wall," and also promised that Mexico would pay for it. After the government shutdown, the President signed legislation that passed both houses and once again rejected his request for border funding. Only after Congress explicitly refused to fund the wall did the President declare an emergency, even though he said he didn't need to do so. The proclamation fails to justify the President's actions. "Not

getting your way" is an improper ground for declaring a national emergency. After the proclamation, a majority of both houses rejected the claim of a national emergency.

In the aftermath of the abuses by the Executive Branch during Watergate, Congress passed the National Emergencies Act to "insure" that the president's "extraordinary" emergency powers would "be utilized only when emergencies actually exist." S. Rep. No. 94-1168, at 2 (1976). "[T]he President should not be allowed to invoke emergency authorities or in any way utilize the provisions of this Act for frivolous or partisan matters, nor for that matter in cases where important but not 'essential' problems are at stake." *Hearing on H.R. 3884 Before the S. Comm. of Governmental Operations*, 94th Cong. 7 (1976) (statement of Sen. Frank Church). "The Committee intentionally chose language which would make clear that the authority of the Act was to be reserved for matters that are 'essential' to the protection of the Constitution and the people." *Id.*

As former legislators, several of whom served during the Watergate crisis, *amici* know how challenging it is to write a statute that limits the authority of a resourceful President, as this statute was intended to do. To that end, it would be difficult to find a more restrictive formula than to confine those powers to "national emergencies." The Court has emphasized that "the plain, obvious, and rational meaning of a statute is always to be preferred," *Lynch v. Alworth–Stephens Co.*, 267 U.S. 364, 370 (1925) (internal quotation marks omitted), and that, absent an explicit statutory definition, courts should employ the common meaning of words, as reflected in the dictionary, *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227-28 (2014). The meaning of "emergency" is clear. Webster's Dictionary defines it as "an unforeseen combination of circumstances or the resulting state that calls for immediate action." *Webster's New Collegiate Dictionary* 372 (1977). Another dictionary defines it as, "A situation or occurrence of a serious nature, developing suddenly and unexpectedly, and demanding immediate action." *The American Heritage Dictionary* 427 (1976). Similarly, a third dictionary says an "emergency" is "An unforeseen or sudden occurrence, esp. of a danger demanding immediate remedy or action." *Collins English Dictionary* 644 (12th ed. 2014). Plainly, in providing presidential authority to deal with "emergencies," Congress intended those powers to apply only to issues that Congress had not had the opportunity to consider and that were too urgent for it to consider before the expenditures had to be made.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

If the circumstances at the Southern Border are a national emergency, "[w]ords no longer have meaning." *King v. Burwell*, 135 S. Ct. 2480, 2497 (2015) (Scalia, J., dissenting); *see also Roper v. Simmons*, 543 U.S. 551, 609 (2005) (Scalia, J., dissenting) (same). Whatever the dimensions of the situation at the Southern Border, whatever its importance, no one would mistake it for "unforeseen," "sudden," or "unexpected." The President issued the Emergency Proclamation more than *two years* after he took office and *six weeks* after first publicly suggesting that he could "do" a national emergency to secure funding that Congress in the exercise of its appropriations powers had refused to grant. During that period, Congress considered at length a border wall that would extend across the entire Southern Border, repeatedly voted *not* to fund it, and instead passed legislation appropriating funds for limited repair and construction of fencing in particular locations along the border. The fact that Congress had time to take action refutes the idea of an emergency.

A large group of highly respected, bipartisan former United States government officials, specializing in security matters, including former Secretaries of State and CIA Directors, have issued a fact-based declaration demonstrating that there is no "emergency" on our Southern Border. A copy of their declaration is set out in the Appendix as Attachment B.[2] These are the facts that Congress had before it when it rejected funding for the wall. Further, the alleged emergency is not amenable to a quick fix, as the eminent domain process necessary to acquire the land on which to build the wall will consume years, during which Congress is available to consider the proposal. *See* Gerald S. Dickinson, Op-Ed., *The Biggest Problem for Trump's Border Wall Isn't Money. It's Getting the Land.*, Wash. Post (Mar. 3, 2017), http://tinyurl.com/y42cttcp.

None of the other authorities the President invokes changes this assessment. Reliance on 10 U.S.C. § 2808 is unavailing because it, like the National Emergencies Act, is triggered only by an emergency. *See* 10 U.S.C. § 2808(a). And while the other statutes that the President has invoked, including 10 U.S.C. § 284 and 31 U.S.C. § 9705(g)(4)(B), do not explicitly refer to emergencies,

---

[2] As noted, not all amici, a large and diverse set of former House Members, agree with all of the assertions in Attachment B. However, all agree that Congress knew the arguments for and against the construction of the wall and consciously decided not to fund construction. The denial of funding was intentional, not the product of "inertia, indifference or quiescence." *Youngstown, Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952).

they were invoked here pursuant to an emergency declaration. More importantly, none of these provisions can override the subsequently adopted legislation—the 2019 Consolidated Appropriations Act—that *expressly* refused to fund the President's border wall. *See, e.g.*, *United States v. Estate of Romani*, 523 U.S. 517, 530 (1998) ("[A] specific policy embodied in a later federal statute should control our construction of the [earlier] statute ….").

## II. THE EXECUTIVE BRANCH IS UNDERMINING THE SEPARATION OF POWERS BY USURPING THE APPROPRIATIONS POWER VESTED EXCLUSIVELY IN CONGRESS

While the statutory issue discussed above is dispositive, the Administration's argument is so flimsy that it cannot camouflage the President's attempted usurpation of congressional authority. The Constitution guarantees the House the central role in any expenditure of public funds. It requires, before the funds are spent, that the House initiate appropriations, that both houses pass identical appropriations bills, and that the President sign them or allow them to become law. *See* U.S. Const. art. I, § 1; § 7 cl. 2; § 9, cl. 7. Put another way, the House's affirmative vote is a necessary precondition of any public expenditure by the Executive.

The Executive's expenditure of public funds that Congress has not appropriated, as the President proposes here, directly injures the House by nullifying its central constitutional power. That injury undermines the separation of powers.  If the Executive Branch can spend money for purposes the House specifically refused to fund, the House's appropriations power would no longer be an effective check or balance in the constitutional structure.  If, despite their clear language, the National Emergencies Act and other statutes cited by the President were interpreted as authorizing this overreaching, they would be unconstitutional.

### A. Congress Must Appropriate Money Before the Executive Branch Can Spend It

The Executive Branch does not have the power to appropriate money, nor does it have the power to spend money not appropriated. Congress alone controls appropriations. The Executive Branch's expenditure of money on the border wall, which Congress never appropriated for that purpose, violates this basic tenet of the separation of powers.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The Appropriations Clause, Article I, section 9 of the Constitution, states that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." The words "No Money" and "in Consequence of Appropriations" are not ambiguous. This straightforward language "was intended as a restriction upon the disbursing authority of the Executive department." *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937). The Clause "assure[s] that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents." *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 428 (1990).

The Supreme Court has strictly enforced the Appropriations Clause. Nearly 170 years ago, the Court ruled that, "No officer, however high, *not even the President*, much less a Secretary of the Treasury or Treasurer, is empowered to pay debts of the United States generally, when presented to them. . . . [in] the want of any appropriation by Congress to pay this claim." *Reeside v. Walker*, 52 U.S. 272, 291 (1850) (emphasis added). The Court emphasized that under Article 1, Section 9 of the Constitution, "no money can be taken or drawn from the Treasury except under an appropriation by Congress." *Id.* Indeed, the Court held, "[h]owever much money may be in the Treasury at any one time, not a dollar of it can be used in the payment of anything not thus previously sanctioned. Any other course would give to the fiscal officers a *most dangerous discretion*." *Id.* (emphasis added). The Court has been no less emphatic in its more recent expressions of this point. *See OPM v. Richmond*, 496 U.S. 414, 424 (1990) ("Our cases underscore the straightforward and explicit command of the Appropriations Clause. 'It means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress.'" (quoting *Cincinnati Soap*, 301 U.S. at 321)); *United States v. MacCollom*, 426 U.S. 317, 321 (1976) ("[T]he expenditure of public funds is proper only when authorized by Congress . . . ." (emphasis added)); *see also Dep't of the Navy v. FLRA*, 665 F.3d 1339, 1348 (D.C. Cir. 2012) ("Congress's control over federal expenditures is 'absolute.'" (quoting *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992))); *Rochester*, 960 F.2d at 185 (Congress has "exclusive power over the federal purse"); *Hart's Adm'r v. United States*, 16 Ct. Cl. 459, 484 (1880) ("[A]bsolute control of the moneys of the United States

is in Congress, and Congress is responsible for its exercise of this great power only to the people."), *aff'd*, 118 U.S. 62 (1886).

The Court has likewise made clear that the appropriations power may be exercised only through the "single, finely wrought, and exhaustively considered, procedure," *Clinton v. City of New York*, 524 U.S. 417, 439-40 (1998), that requires the cooperation of different constituencies and interests to secure passage of identical bills by the House and Senate (bicameralism), and delivery to the President for his signature or veto (presentment), *see* U.S. Const. art. I, § 7, cl. 2. Permitting the Executive, "on its own, [to] carve out an area of nonappropriated funding would create an Executive prerogative that offends the Appropriations Clause and affects the constitutional balance of powers." *Am. Fed'n of Gov't Emps., AFL-CIO, Local 1647 v. FLRA*, 388 F.3d 405, 414 (3d Cir. 2004).

In striking down the line item veto, the Supreme Court held that even where Congress intended to empower a President to repeal a portion of a spending bill, the two political branches could not violate the procedures set forth in Article I of the Constitution. *Clinton v. City of New York,* 524 U.S. 417. That case invalidated the President's decisions *not* to spend funds appropriated by Congress. It is even more obviously unconstitutional for the President to spend funds that Congress did not appropriate and actively opposes, even if the President claims that there is inapplicable legislation that authorizes it.

The Framers viewed it as critical that Executive Branch officials not have the power of the purse. As Joseph Story described their concerns, "In arbitrary governments the prince levies what money he pleases from his subjects, disposes of it, as he thinks proper, and is beyond responsibility or reproof." 3 *Commentaries on the Constitution* § 1342 (1833). The Framers feared that giving even an elected executive the power of the purse would be just as dangerous. *Id.* "[If not for the Appropriations Clause,] the executive would possess an unbounded power over the public purse of the nation; and might apply all its monied resources at his pleasure." *Id.* This concern about unchecked executive spending motivated Congress in 1884 to enact *criminal* penalties for officials who spent money without an appropriation. Such penalties remain in force today. *See* Antideficiency Act, 31 U.S.C. §§ 1341 *et seq.*

Instead of bestowing this power on the Executive, the Framers instead gave the people, through their elected representatives, a "check upon profusion and extravagance, as well as upon corrupt influence and public peculations." 3 *Commentaries on the Constitution* § 1342. "This power over the purse," James Madison believed, "may, in fact, be regarded as the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people, for obtaining a redress of every grievance, and for carrying into effect every just and salutary measure." *The Federalist* No. 58 (C. Rossiter, ed. 1961) (J. Madison).

*Amici* know firsthand the serious responsibilities that come with the power of the purse. In particular, they understand the gravity of denying an appropriation requested by the President. Withholding a requested appropriation renders the Executive Branch unable to complete projects for which it sought those funds. And while the President can veto appropriations bills and force Congress to return to the negotiating table, his power is only negative. The ultimate result of the negotiations still must be initiated and approved by Congress. Congress followed this procedure when it crafted the 2019 Appropriations Bill and presented it to the President. The Constitution gave the President two options: he could sign it or veto it.

The President, in effect, did both, and then reneged on the agreement his signature represented.  He signed the bill, but then proposed to seize money that Congress had appropriated for other purposes to divert it to one that Congress had repudiated. He proposes to spend money in direct violation of the Appropriations Clause. The separation of powers is "violated when one branch assumes a function that more properly is entrusted to another." *INS v. Chadha*, 462 U.S. 919, 963 (1983). That is precisely what happened here. The President is not just acting without constitutional authority of his own; he is *usurping* Congress's exclusive authority over appropriations. Courts have not hesitated to block executives from exercising legislative powers. *See, e.g.*, *Clinton*, 524 U.S. at 447 (Presentment Clause, Article I, § 7, forbade President from exercising "unilateral power to change the text of duly enacted statute"); *Consumer's Union of U.S., Inc. v. Kissinger*, 506 F.2d 136, 142 (D.C. Cir. 1974) (President has no inherent power to adjust tariffs or to regulate foreign commerce because those are enumerated legislative powers). This court should do the same.

If the statutes cited by the President were read to authorize the President to spend unappropriated funds—which they emphatically do not—they would be unconstitutional, and so would the President's actions. As Justice Kennedy wrote in a concurring opinion in *Clinton*: "That a congressional cession of [appropriations] power is voluntary does not make it innocuous. The Constitution is a compact enduring for more than our time, and one Congress cannot yield up its own powers, much less those of other Congresses to follow. Abdication of responsibility is not part of the constitutional design." 524 U.S. at 452 (citations omitted). The Court must interpret statutes so as to avoid such constitutional infirmities. *See, e.g.*, *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 465–66 (1989). The interpretation discussed above, *supra* Part A, thus is not only compelling, but also compelled by this principle.

**B.      Congress's Exclusive Power over Appropriations Is Critical to our Constitutional Structure**

Vesting Congress with the exclusive power to appropriate public funds was central to effectuate the Framers' intent that political compromises between competing and otherwise antagonistic groups be thrashed out in the legislative process. These structural elements of the Constitution, the Supreme Court has stated many times, are not simply matters of etiquette or architecture. They protect individual liberty—in this instance, by ensuring that only those representatives closest to the people can decide how to spend their money. *See generally Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 501 (2010) (the "Framers recognized that, in the long term, structural protections against abuse of power were critical to preserving liberty") (internal quotation marks omitted); *Clinton*, 524 U.S. at 450 (Kennedy, J., concurring) ("Liberty is always at stake when one or more of the branches seek to transgress the separation of powers."); *Metro. Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 272 (1991) ("The ultimate purpose of this separation of powers is to protect the liberty and security of the governed."); *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 537 F.3d 667, 714 (D.C. Cir. 2008) (Kavanaugh, J., dissenting) ("the separation of powers protects not simply the office and the officeholders, but also individual rights").

As a result, the Appropriations Clause plays a critical role in fashioning majoritarian compromises. Under a framework in which Congress has the exclusive power to appropriate public funds, the President may announce any policy priorities, give any speeches, and submit to Congress any budget he wishes, but in order to spend the taxpayer's money, he must persuade Congress to appropriate it for the particular purpose sought. If the Executive could spend freely without appropriations—or, as the defendants assert the right to do here, could re-appropriate funds for purposes different from the ones Congress chose—Congress would be reduced to an advisory role, no longer able to function as the crucible of political debate, negotiation, and compromise in our constitutional system.

Congress also carries out its oversight responsibilities and compels accountability on the part of the Executive Branch—the branch that spends well in excess of 99 percent of all federal dollars expended by the federal government—by forcing the Executive repeatedly to justify authorized programs, its operations of those programs, and the amounts needed to operate those programs effectively and efficiently. The Executive commands both the military and federal law enforcement. Without the appropriations power, Congress would have little ability to influence the Executive's policy or ensure that it faithfully and honestly executes the laws.

### C.  Only The Courts Can Check Executive Branch Violations of the Appropriations Power

The Legislative Branch's power of the purse is effective as a limitation on the "unbounded power" of the Executive only if that legislative power is enforceable through the courts. Policing the efforts of one branch to aggrandize its powers at the expense of other branches is one of the judiciary's critical functions. *See, e.g.*, *NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014); *Mistretta v. United States*, 488 U.S. 361 (1989); *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986); *Bowsher v. Synar*, 478 U.S. 714 (1986); *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982); *Myers v. U.S.*, 272 U.S. 52 (1926).

Unless the courts remain available to stop violations of the Appropriations Clause, disputes over the lawfulness of Executive Branch violations would linger for years in the political process, where only blunt and imperfect tools are available to bring about compliance. To be sure, courts

- 11 -

cannot be the arbiter of every constitutional disagreement between the political branches. But for violations like this one, that go to the very heart of Congress's exclusive powers and undermine its most important check on the Executive Branch, judicial review is necessary to safeguard the separation of powers. *See, e.g.*, *United States v. AT&T*, 551 F.2d 384, 391 (D.C. Cir. 1976) ("[T]he mere fact that there is a conflict between the legislative and executive branches . . . does not preclude judicial resolution of the conflict."); *Comm. on Oversight & Gov't Reform v. Holder*, 979 F. Supp. 2d 1, 3 (D.D.C. 2013) ("The fact that this case arises out of a dispute between two branches of government does not make it non-justiciable; Supreme Court precedent establishes that this branch has an equally fundamental role to play, and that judges not only may, but sometimes must, exercise their responsibility to interpret the Constitution and determine whether another branch has exceeded its power."); *Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53, 56 (D.D.C. 2008) ("[T]he Supreme Court has confirmed the fundamental role of the federal courts to resolve the most sensitive issues of separation of powers."). To allow the Executive Branch's bare incantation of the words "national emergency" to shift the power to appropriate funds for a border wall from Congress to the President would make judicial review a hollow exercise. As Justice Field wrote more than a century ago, in words particularly apropos today, "we cannot shut our eyes to matters of public notoriety and general cognizance. When we take our seats on the bench we are not struck with blindness, and forbidden to know as judges what we see as men." *Ho Ah Kow v. Nunan*, 12 F. Cas. 252, 255 (C.C.D. Cal. 1879).

### III.   THE EXECUTIVE BRANCH IS EXCEEDING THE LIMITS OF "THE EXECUTIVE POWER"

It also is clear that the Executive Branch has run roughshod over the constitutional limits on its power. The Executive Branch has no power to act unless legislation by Congress or a provision of the Constitution confers that power. *Medellin v. Texas*, 552 U.S. 491, 524 (2008). Because neither the Constitution nor any statute authorizes the Executive Branch to spend unappropriated funds to build a border wall, it is acting in excess of its constitutional authority.

The President pressed hard during legislative negotiations for funding of the wall, even shutting down the government for a record 39 days in early 2019 in an effort to coerce Congress to

accede to his demands. Nevertheless, on a bipartisan, bicameral basis, Congress denied the funding. If that disapproval were not sufficiently clear, a majority of both houses of Congress on March 14, 2019, passed a joint resolution to terminate the President's emergency declaration. *See* H.J. Res. 46.

Because Congress considered and expressly rejected the President's border-wall proposal, and because no other statute authorizes the President's actions, those actions violate the separation of powers under *Youngstown*. Justice Jackson in *Youngstown* laid out a three-part framework for evaluating the relationship between Congress's actions and the President's powers. 343 U.S. 579, 635-38 (1952) (concurring opinion). The Supreme Court has frequently applied Justice Jackson's framework in resolving challenges to executive action. *E.g.*, *Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2083-84 (2015); *Dames & Moore v. Regan*, 453 U.S. 654 (1981).

Justice Jackson explained that when Congress has authorized the President to take a certain action, that action is "supported by the strongest of presumptions and the widest latitude of judicial interpretation." 343 U.S. at 637. Courts rarely strike down presidential action in this first category.

If Congress has neither authorized nor forbidden the President's action, then it falls within "a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain." *Id.* at 637. In this category, courts ask whether Congress has shown "inertia, indifference or quiescence" in the face of past executive action. *Id.*

Finally, "[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb." In this third category, the President "can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Id.* In other words, for a court to uphold a presidential action forbidden by Congress, the Constitution must give the President "conclusive" power, to the exclusion of Congress. *Id.*; *see, e.g.*, *Zivotofsky*, 135 S. Ct. at 2095. These executive assertions of power must be "scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." *Youngstown*, 343 U.S. at 637-38.

Justice Jackson found that President Truman's executive order directing a temporary government seizure of the nation's steel mills fell into this "lowest ebb" category. *Id.* at 637, 640. No statute authorized executive seizure of the steel industry. *Id.* at 638. And the earlier legislation

- 13 -

that Congress *had* passed on the general subject of property seizures imposed detailed procedures the President had not followed. *Id.* at 639. By implication, Congress had forbidden the President's action.

That left the question whether the President had inherent constitutional power that Congress could not displace. *Id.* at 640. For Jackson and five other Justices, the answer was no. Justice Jackson rejected the notion that the President could rely on his "executive Power," his powers as "Commander in Chief of the Army and Navy," or his power to "take Care that the Laws be faithfully executed"—all granted under Article II—to justify a domestic seizure Congress had considered and not approved. *Id.* at 640-46. Nor could the President rely on "nebulous, inherent powers never expressly granted" by the Constitution, including "emergency powers." *Id.* at 646-47. Justice Black's majority opinion agreed. *Id.* at 586.

As an assault upon the separation of powers, President Trump's order goes far beyond the order struck down in *Youngstown*. President Truman did not take action that Congress had specifically considered and rejected immediately prior to his action. But that is exactly what President Trump did. He asked Congress to authorize and appropriate $5.7 billion to fulfill his campaign promise of a wall at the Southern Border, which he had assured the electorate Mexico (and not the American taxpayer) would fund. White House, *Remarks by President Trump on the Humanitarian Crisis on our Southern Border and the Shutdown* (Jan. 19, 2019), https://tinyurl.com/y7gdj6s8. Congress debated the President's proposal and, after weeks of negotiation, passed the 2019 Consolidated Appropriations Act allocating only $1.375 billion—not for a wall, but rather for "construction of primary pedestrian fencing, including levee pedestrian fencing, in the Rio Grande Valley Sector" of the border. H.J. Res. 31 § 280(a)(1). Congress went out of its way to differentiate this fencing from a border wall, limiting the designs to ones already deployed, which did not use solid material like concrete. *Id.* § 230(b). The Congressional record precludes any doubt that Congress rejected the President's proposal.[3] The emergency declaration is a transparent attempt to implement it anyway.

---

[3] Vice Chairman of the Senate Appropriations Committee Patrick Leahy: "The agreement does not fund President Trump's wasteful wall." 165 Cong. Rec. S1362 (daily ed. Feb 14, 2019).

1

2       Moreover, in *Youngstown*, President Truman faced a real emergency. His attempted seizure

3   came in the midst of a war, and he worried that labor strikes shuttering the mills would threaten

4   equipment supplies to American service members in Korea. That threat was credible. At the time of

5   Truman's executive order, American armed forces had been fighting in Korea for almost two years

6   and had suffered nearly 108,000 casualties. *See Youngstown*, 343 U.S. at 668 (Vinson, J.,

7   dissenting). By contrast, for the reasons discussed above, President Trump's declared emergency is

8   not even a plausible pretext. Whatever inherent power the President may have in true emergencies—

9   and *Youngstown* shows that such power is sharply limited—a counterfeit emergency authorizes

10  nothing. The court must prevent the President from overriding Congress's clearly expressed will.

11      The *amici* adopt and endorse the plaintiffs' analysis demonstrating that none of the narrow

12  statutes passed by Congress to deal with real emergencies authorize the President to spend on the

13  building of a border wall funds appropriated for other purposes. As demonstrated above, there is an

14  utter lack of an emergency. And, as demonstrated in the plaintiffs' briefs,  none of the statutes on

15  which the President purports to rely is applicable.

                              * * * * *

16      Immigration policy poses significant challenges. But meeting those challenges cannot

17  require sacrificing the backbone of our democracy:  a commitment to the Constitution and the rule

18  of law. Congress's power of the purse, like other aspects of the constitutionally enshrined separation

19  of powers, was "not simply an abstract generalization in the minds of the Framers," but was

20  expressly "woven into the document that they drafted in Philadelphia in the summer of 1787."

21  *Chadha*, 462 U.S. at 946 (quoting *Buckley v. Valeo*, 424 U.S. 1, 124) (internal quotation marks

22  omitted)).

23      Because the constitutional structure helps safeguard individual liberty, the Judiciary has long

24  played a critical role in preserving the structural compromises and choices embedded in the

25  constitutional text. As the Supreme Court has often explained, the "courts possess power to review

26  either legislative or executive action that transgresses identifiable textual limits." *Nixon v. United*

27  *States*, 506 U.S. 224, 238 (1993); *Powell v. McCormack*, 395 U.S. 486, 506 (1969).

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The Executive Branch has circumvented the Constitution's clear limits on Executive Power and usurped Congress's exclusive power to appropriate money. The Court should enjoin these unlawful actions and restore the checks and balances that govern the legislative and executive branches.

## CONCLUSION

For the foregoing reasons and the reasons set forth in the plaintiffs' briefs, the Court should grant the plaintiffs' motion for a preliminary injunction.

Dated:  May 1, 2019                                ARNOLD & PORTER KAYE SCHOLER LLP


By:   /s/ Douglas A. Winthrop
       Irvin B. Nathan*
       Robert N. Weiner*
       Andrew T. Tutt*
       Kaitlin Konkel*
       Samuel F. Callahan*
       601 Massachusetts Ave. NW
       Washington, DC 20001
       (202) 942-5000
       irv.nathan@arnoldporter.com
       robert.weiner@arnoldporter.com
       andrew.tutt@arnoldporter.com
       kaitlin.konkel@arnoldporter.com
       sam.callahan@arnoldporter.com

       Douglas A. Winthrop
       10th Floor
       Three Embarcadero Center
       San Francisco, CA 94111
       (415) 471-3100
       douglas.winthrop@arnoldporter.com

       *Counsel for Amici Curiae*

       *Application for admission pro hac vice forthcoming*

1

2

## ATTACHMENT A—LIST OF AMICI CURIAE

3

| | | |
|---|---|---|
| Gary Ackerman | Vic Fazio | George Miller |
| Tom Andrews | Barney Frank | Walt Minnick |
| James Bacchus | Martin Frost | Toby Moffett |
| Brian Baird | Richard Gephardt | Jim Moran |
| Michael Barnes | Wayne Gilchrest | Connie Morella |
| John Barrow | Dan Glickman | Leon Panetta |
| Steve Bartlett | Gene Green | Tom Perriello |
| Berkley Bedell | Janice Hahn | Earl Pomeroy |
| Howard Berman | Deborah Halvorson | Carol Shea Porter |
| Douglas Bereuter | Lee Hamilton | Silvestre Reyes |
| Tim Bishop | Colleen Hanabusa | Don Riegle |
| David Bonior | Richard Hanna | Tim Roemer |
| Rick Boucher | Paul Hodes | Max Sandlin |
| Charles Boustany | Elizabeth Holtzman | Claudine Schneider |
| Barbara Boxer | Bob Inglis | Patricia Schroeder |
| Bruce Braley | Steve Israel | Allyson Schwartz |
| Jack Buechner | David Jolly | Joe Sestak |
| Lois Capps | Steve Kagen | Chris Shays |
| Robert Carr | Mary Jo Kilroy | Gerry Sikorski |
| Rod Chandler | Ron Klein | David Skaggs |
| William Cohen | Jim Kolbe | Peter Smith |
| Jerry Costello | Mike Kopetski | John Spratt |
| Mark Critz | Dennis Kucinich | Alan Steelman |
| Joe Crowley | Nick Lampson | Charlie Stenholm |
| Jim Davis | Martin Lancaster | Bart Stupak |
| Lincoln Davis | Larry LaRocco | Betty Sutton |
| William Delahunt | Jim Leach | John Tanner |
| Chris Dodd | John LeBoutillier | John Tierney |
| Byron Dorgan | Mel Levine | Jim Turner |
| Steve Driehaus | Jim Marshall | Henry Waxman |
| Donna Edwards | Carolyn McCarthy | Tim Wirth |
| Mickey Edwards | Pete McCloskey | Lynn Woolsey |
| Bill Enyart | James McDermott | David Wu |
| Elizabeth Esty | Matt McHugh | Albert Wynn |
| Sam Farr | Tom McMillan | |
| | Brad Miller | |

# ATTACHMENT B

## JOINT DECLARATION OF FORMER UNITED STATES GOVERNMENT OFFICIALS

We, the undersigned, declare as follows:

1.      We are former officials in the U.S. government who have worked on national security and homeland security issues from the White House as well as agencies across the Executive Branch. We have served in senior leadership roles in administrations of both major political parties, and collectively we have devoted a great many decades to protecting the security interests of the United States. We have held the highest security clearances, and we have participated in the highest levels of policy deliberations on a broad range of issues. These include: immigration, border security, counterterrorism, military operations, and our nation's relationship with other countries, including those south of our border.

     a.      **Madeleine K. Albright** served as Secretary of State from 1997 to 2001. A refugee and naturalized American citizen, she served as U.S. Permanent Representative to the United Nations from 1993 to 1997. She has also been a member of the Central Intelligence Agency External Advisory Board since 2009 and of the Defense Policy Board since 2011, in which capacities she has received assessments of threats facing the United States.

     b.      **Jeremy B. Bash** served as Chief of Staff of the U.S. Department of Defense from 2011 to 2013, and as Chief of Staff of the Central Intelligence Agency from 2009 to 2011.

     c.      **John B. Bellinger III** served as the Legal Adviser to the U.S. Department of State from 2005 to 2009. He previously served as Senior Associate Counsel to the President and Legal Adviser to the National Security Council from 2001 to 2005.

     d.      **Daniel Benjamin** served as Ambassador-at-Large for Counterterrorism at the U.S. Department of State from 2009 to 2012.

     e.      **Antony Blinken** served as Deputy Secretary of State from 2015 to 2017. He previously served as Deputy National Security Advisor to the President from 2013 to 2015.

     f.      **John O. Brennan** served as Director of the Central Intelligence Agency from 2013 to 2017. He previously served as Deputy National Security Advisor for Homeland Security and Counterterrorism and Assistant to the President from 2009 to 2013.

     g.      **R. Nicholas Burns** served as Under Secretary of State for Political Affairs from 2005 to 2008. He previously served as U.S. Ambassador to NATO and as U.S. Ambassador to Greece.

h.      **William J. Burns** served as Deputy Secretary of State from 2011 to 2014. He previously served as Under Secretary of State for Political Affairs from 2008 to 2011, as U.S. Ambassador to Russia from 2005 to 2008, as Assistant Secretary of State for Near Eastern Affairs from 2001 to 2005, and as U.S. Ambassador to Jordan from 1998 to 2001.

i.      **Johnnie Carson** served as Assistant Secretary of State for African Affairs from 2009 to 2013. He previously served as the U.S. Ambassador to Kenya from 1999 to 2003, to Zimbabwe from 1995 to 1997, and to Uganda from 1991 to 1994.

j.      **James Clapper** served as U.S. Director of National Intelligence from 2010 to 2017.

k.      **David S. Cohen** served as Under Secretary of the Treasury for Terrorism and Financial Intelligence from 2011 to 2015 and as Deputy Director of the Central Intelligence Agency from 2015 to 2017.

l.      **Eliot A. Cohen** served as Counselor of the U.S. Department of State from 2007 to 2009.

m.      **Ryan Crocker** served as U.S. Ambassador to Afghanistan from 2011 to 2012, as U.S. Ambassador to Iraq from 2007 to 2009, as U.S. Ambassador to Pakistan from 2004 to 2007, as U.S. Ambassador to Syria from 1998 to 2001, as U.S. Ambassador to Kuwait from 1994 to 1997, and U.S. Ambassador to Lebanon from 1990 to 1993.

n.      **Thomas Donilon** served as National Security Advisor to the President from 2010 to 2013.

o.      **Jen Easterly** served as Special Assistant to the President and Senior Director for Counterterrorism from 2013 to 2016.

p.      **Nancy Ely-Raphel** served as Senior Adviser to the Secretary of State and Director of the Office to Monitor and Combat Trafficking in Persons from 2001 to 2003. She previously served as the U.S. Ambassador to Slovenia from 1998 to 2001.

q.      **Daniel P. Erikson** served as Special Advisor for Western Hemisphere Affairs to the Vice President from 2015 to 2017, and as Senior Advisor for Western Hemisphere Affairs at the U.S. Department of State from 2010 to 2015.

r.      **John D. Feeley** served as U.S. Ambassador to Panama from 2015 to 2018. He served as Principal Deputy Assistant Secretary for Western Hemisphere Affairs at the U.S. Department of State from 2012 to 2015.

s.      **Daniel F. Feldman** served as Special Representative for Afghanistan and Pakistan at the U.S. Department of State from 2014 to 2015.

t.      **Jonathan Finer** served as Chief of Staff to the Secretary of State from 2015 to 2017, and Director of the Policy Planning Staff at the U.S. Department of State from 2016 to 2017.

u.      **Jendayi Frazer** served as Assistant Secretary of State for African Affairs from 2005 to 2009. She served as U.S. Ambassador to South Africa from 2004 to 2005.

v.      **Suzy George** served as Executive Secretary and Chief of Staff of the National Security Council from 2014 to 2017.

w.      **Phil Gordon** served as Special Assistant to the President and White House Coordinator for the Middle East, North Africa and the Gulf from 2013 to 2015, and Assistant Secretary of State for European and Eurasian Affairs from 2009 to 2013.

x.      **Chuck Hagel** served as Secretary of Defense from 2013 to 2015, and previously served as Co-Chair of the President's Intelligence Advisory Board. From 1997 to 2009, he served as U.S. Senator for Nebraska, and as a senior member of the Senate Foreign Relations and Intelligence Committees.

y.      **Avril D. Haines** served as Deputy National Security Advisor to the President from 2015 to 2017. From 2013 to 2015, she served as Deputy Director of the Central Intelligence Agency.

z.      **Luke Hartig** served as Senior Director for Counterterrorism at the National Security Council from 2014 to 2016.

aa.     **Heather A. Higginbottom** served as Deputy Secretary of State for Management and Resources from 2013 to 2017.

bb.     **Roberta Jacobson** served as U.S. Ambassador to Mexico from 2016 to 2018. She previously served as Assistant Secretary of State for Western Hemisphere Affairs from 2011 to 2016.

cc.     **Gil Kerlikowske** served as Commissioner of Customs and Border Protection from 2014 to 2017. He previously served as Director of the Office of National Drug Control Policy from 2009 to 2014.

dd.     **John F. Kerry** served as Secretary of State from 2013 to 2017.

ee.     **Prem Kumar** served as Senior Director for the Middle East and North Africa at the National Security Council from 2013 to 2015.

ff.     **John E. McLaughlin** served as Deputy Director of the Central Intelligence Agency from 2000 to 2004 and as Acting Director in 2004. His duties included briefing President-elect Bill Clinton and President George W. Bush.

gg.     **Lisa O. Monaco** served as Assistant to the President for Homeland Security and Counterterrorism and Deputy National Security Advisor from 2013 to 2017. Previously, she served as Assistant Attorney General for National Security from 2011 to 2013.

3

hh.     **Janet Napolitano** served as Secretary of Homeland Security from 2009 to 2013. She served as the Governor of Arizona from 2003 to 2009.

ii.     **James D. Nealon** served as Assistant Secretary for International Engagement at the U.S. Department of Homeland Security from 2017 to 2018. He served as U.S. Ambassador to Honduras from 2014 to 2017.

jj.     **James C. O'Brien** served as Special Presidential Envoy for Hostage Affairs from 2015 to 2017. He served in the U.S. Department of State from 1989 to 2001, including as Principal Deputy Director of Policy Planning and as Special Presidential Envoy for the Balkans.

kk.     **Matthew G. Olsen** served as Director of the National Counterterrorism Center from 2011 to 2014.

ll.     **Leon E. Panetta** served as Secretary of Defense from 2011 to 2013. From 2009 to 2011, he served as Director of the Central Intelligence Agency.

mm.    **Anne W. Patterson** served as Assistant Secretary of State for Near Eastern Affairs from 2013 to 2017. Previously, she served as the U.S. Ambassador to Egypt from 2011 to 2013, to Pakistan from 2007 to 2010, to Colombia from 2000 to 2003, and to El Salvador from 1997 to 2000.

nn.     **Thomas R. Pickering** served as Under Secretary of State for Political Affairs from 1997 to 2000. He served as U.S. Permanent Representative to the United Nations from 1989 to 1992.

oo.     **Amy Pope** served as Deputy Homeland Security Advisor and Deputy Assistant to the President from 2015 to 2017.

pp.     **Samantha J. Power** served as U.S. Permanent Representative to the United Nations from 2013 to 2017. From 2009 to 2013, she served as Senior Director for Multilateral and Human Rights at the National Security Council.

qq.     **Jeffrey Prescott** served as Deputy National Security Advisor to the Vice President from 2013 to 2015, and as Special Assistant to the President and Senior Director for Iran, Iraq, Syria and the Gulf States from 2015 to 2017.

rr.     **Nicholas Rasmussen** served as Director of the National Counterterrorism Center from 2014 to 2017.

ss.     **Alan Charles Raul** served as Vice Chairman of the Privacy and Civil Liberties Oversight Board from 2006 to 2008. He previously served as General Counsel of the U.S. Department of Agriculture from 1989 to 1993, General Counsel of the Office of Management and Budget in the Executive Office of the President from 1988 to 1989, and Associate Counsel to the President from 1986 to 1989.

tt.     **Dan Restrepo** served as Special Assistant to the President and Senior Director for Western Hemisphere Affairs at the National Security Council from 2009 to 2012.

uu.     **Susan E. Rice** served as U.S. Permanent Representative to the United Nations from 2009 to 2013 and as National Security Advisor to the President from 2013 to 2017.

vv.     **Anne C. Richard** served as Assistant Secretary of State for Population, Refugees, and Migration from 2012 to 2017.

ww.     **Eric P. Schwartz** served as Assistant Secretary of State for Population, Refugees, and Migration from 2009 to 2011. From 1993 to 2001, he was responsible for refugee and humanitarian issues at the National Security Council, ultimately serving as Special Assistant to the President for National Security Affairs and Senior Director for Multilateral and Humanitarian Affairs.

xx.     **Andrew J. Shapiro** served as Assistant Secretary of State for Political-Military Affairs from 2009 to 2013.

yy.     **Wendy R. Sherman** served as Under Secretary of State for Political Affairs from 2011 to 2015.

zz.     **Vikram Singh** served as Deputy Special Representative for Afghanistan and Pakistan from 2010 to 2011 and as Deputy Assistant Secretary of Defense for Southeast Asia from 2012 to 2014.

aaa.     **Dana Shell Smith** served as U.S. Ambassador to Qatar from 2014 to 2017. Previously, she served as Principal Deputy Assistant Secretary of Public Affairs.

bbb.     **Jeffrey H. Smith** served as General Counsel of the Central Intelligence Agency from 1995 to 1996. He previously served as General Counsel of the Senate Armed Services Committee.

ccc.     **Jake Sullivan** served as National Security Advisor to the Vice President from 2013 to 2014. He previously served as Director of Policy Planning at the U.S. Department of State from 2011 to 2013.

ddd.     **Strobe Talbott** served as Deputy Secretary of State from 1994 to 2001.

eee.     **Linda Thomas-Greenfield** served as Assistant Secretary for the Bureau of African Affairs from 2013 to 2017. She previously served as U.S. Ambassador to Liberia and Deputy Assistant Secretary for the Bureau of Population, Refugees, and Migration from 2004 to 2006.

fff.     **Arturo A. Valenzuela** served as Assistant Secretary of State for Western Hemisphere Affairs from 2009 to 2011. He previously served as Special Assistant to the President and Senior Director for Inter-American Affairs at the National Security Council from 1999 to 2000, and as Deputy Assistant Secretary of State for Mexican Affairs from 1994 to 1996.

2.      On February 15, 2019, the President declared a "national emergency" for the purpose of diverting appropriated funds from previously designated uses to build a wall along the southern border. We are aware of no emergency that remotely justifies such a step. The President's actions are at odds with the overwhelming evidence in the public record, including the administration's own data and estimates. We have lived and worked through national emergencies, and we support the President's power to mobilize the Executive Branch to respond quickly in genuine national emergencies. But under no plausible assessment of the evidence is there a national emergency today that entitles the President to tap into funds appropriated for other purposes to build a wall at the southern border. To our knowledge, the President's assertion of a national emergency here is unprecedented, in that he seeks to address a situation: (1) that has been enduring, rather than one that has arisen suddenly; (2) that in fact has improved over time rather than deteriorated; (3) by reprogramming billions of dollars in funds in the face of clear congressional intent to the contrary; and (4) with assertions that are rebutted not just by the public record, but by his agencies' own official data, documents, and statements.

3.      *Illegal border crossings are near forty-year lows.* At the outset, there is no evidence of a sudden or emergency increase in the number of people seeking to cross the southern border. According to the administration's own data, the numbers of apprehensions and undetected illegal border crossings at the southern border are near forty-year lows.[1] Although there was a modest increase in apprehensions in 2018, that figure is in keeping with the number of apprehensions only two years earlier, and the overall trend indicates a dramatic decline over the last fifteen years in particular.[2] The administration also estimates that "undetected unlawful entries" at the southern border "fell from approximately 851,000 to nearly 62,000" between fiscal years 2006 to 2016, the most recent years for which data are available.[3] The United States currently hosts what is estimated to be the smallest number of undocumented immigrants since 2004.[4] And in fact, in recent years, the majority of currently undocumented immigrants entered the United States legally, but overstayed their visas,[5] a problem that will not be addressed by the declaration of an emergency along the southern border.

4.      *There is no documented terrorist or national security emergency at the southern border.* There is no reason to believe that there is a terrorist or national security emergency at the southern border that could justify the President's proclamation.

---

[1] *Southwest Border Sectors: Total Illegal Alien Apprehensions by Fiscal Year*, U.S. CUSTOMS & BORDER PROTECTION, https://www.cbp.gov/sites/default/files/assets/documents/2017-Dec/BP%20Southwest%20Border%20Sector%20 Apps%20FY1960%20-%20FY2017.pdf (last accessed Feb. 17, 2019); *Southwest Border Migration FY2019*, U.S. CUSTOMS & BORDER PROTECTION, https://www.cbp.gov/newsroom/stats/sw-border-migration (last accessed Feb. 17, 2019).

[2] *Southwest Border Migration FY2019*, *supra* note 1; *Southwest Border Migration FY2017*, U.S. CUSTOMS & BORDER PROTECTION, https://www.cbp.gov/newsroom/stats/sw-border-migration-fy2017 (last accessed Feb. 17, 2019).

[3] U.S. DEP'T OF HOMELAND SECURITY, DEP'T OF HOMELAND SECURITY BORDER SECURITY METRICS REPORT 13 (May 1, 2018), https://www.dhs.gov/sites/default/files/publications/BSMR_OIS_2016.pdf.

[4] Jeffrey S. Passel & D'Vera Cohn, *U.S. Unauthorized Immigrant Total Dips to Lowest Level in a Decade*, PEW RES. CTR. (Nov. 27, 2018).

[5] Richard Gonzales, *For 7th Consecutive Year, Visa Overstays Exceeded Illegal Border Crossings*, NPR (Jan. 16, 2019, 7:02 PM) (noting "that from 2016-2017, people who overstayed their visas accounted for 62 percent of the newly undocumented, while 38 percent had crossed a border illegally").

a.      This administration's own most recent Country Report on Terrorism, released only five months ago, found that "there was no credible evidence indicating that international terrorist groups have established bases in Mexico, worked with Mexican drug cartels, or sent operatives via Mexico into the United States."[6] Since 1975, there has been only one reported incident in which immigrants who had crossed the southern border illegally attempted to commit a terrorist act. That incident occurred more than twelve years ago, and involved three brothers from Macedonia who had been brought into the United States as children more than twenty years earlier.[7]

b.      Although the White House has claimed, as an argument favoring a wall at the southern border, that almost 4,000 known or suspected terrorists were intercepted at the southern border in a single year,[8] this assertion has since been widely and consistently repudiated, including by this administration's own Department of Homeland Security.[9] The overwhelming majority of individuals on terrorism watchlists who were intercepted by U.S. Customs and Border Patrol were attempting to travel to the United States by air;[10] of the individuals on the terrorist watchlist who were encountered while entering the United States during fiscal year 2017, only 13 percent traveled by land.[11] And for those who have attempted to enter by land, only a small fraction do so at the southern border. Between October 2017 and March 2018, forty-one foreign immigrants on the terrorist watchlist were intercepted at the northern border.[12] Only six such immigrants were intercepted at the southern border.[13]

5.      *There is no emergency related to violent crime at the southern border.* Nor can the administration justify its actions on the grounds that the incidence of violent crime on the southern border constitutes a national emergency. Factual evidence consistently shows that unauthorized immigrants have no special proclivity to engage in criminal or violent behavior. According to a Cato Institute analysis of criminological data, undocumented immigrants are 44 percent *less likely* to be incarcerated

---

[6] U.S. DEP'T OF STATE, COUNTRY REPORTS ON TERRORISM 2017, at 205 (Sept. 2018).

[7] *See* Alex Nowrasteh, *Trump's Wall Will Not Stop Terrorism*, CATO INST. (Dec. 18, 2018).

[8] *See Congressional Border Security Briefing: A Border Security and Humanitarian Crisis*, WHITE HOUSE (Jan. 4, 2019); Holly Rosenkrantz, *Sanders Repeats Claim on Terrorists at the Border Refuted by Administration's Own Data*, CBS NEWS (Jan. 7, 2019, 3:28 PM). Vice President Mike Pence made similar statements during his appearance on ABC the next week. *See* Betsy Klein, *Pence Misleadingly Cites Some Statistics to Push Trump Border Wall*, CNN (Jan. 8, 2019, 5:46 PM).

[9] *See* U.S. DEP'T OF HOMELAND SECURITY, MYTH/FACT: KNOWN AND SUSPECTED TERRORISTS/SPECIAL INTEREST ALIENS (Jan. 7, 2019); *see also, e.g.*, Brett Samuels, *Conway: Sarah Sanders Made 'Unfortunate Misstatement' About Terror Suspects at Border*, HILL (Jan. 8, 2019, 10:30 AM).

[10] *See* U.S. DEP'T OF HOMELAND SECURITY, *supra* note 9.

[11] *See* Press Release, Dep't of Homeland Security, DOJ, DHS Report: Three Out of Four Individuals Convicted of International Terrorism and Terrorism-Related Offenses were Foreign-Born (Jan. 16, 2018).

[12] *See* Julia Ainsley, *Only Six Immigrants in Terrorism Database Stopped by CBP at Southern Border from October to March*, NBC NEWS (Jan. 7, 2019, 4:10 PM).

[13] *See id.*

nationwide than are native-born citizens.[14] And in Texas, undocumented immigrants were found to have a first-time conviction rate 32 percent below that of native-born Americans;[15] the conviction rates of unauthorized immigrants for violent crimes such as homicide and sex offenses were also below those of native-born Americans.[16] Meanwhile, overall rates of violent crime in the United States have declined significantly over the past 25 years, falling 49 percent from 1993 to 2017.[17] And violent crime rates in the country's 30 largest cities have decreased on average by 2.7 percent in 2018 alone, further undermining any suggestion that recent crime trends currently warrant the declaration of a national emergency.[18]

6.      *There is no human or drug trafficking emergency that can be addressed by a wall at the southern border.* The administration has claimed that the presence of human and drug trafficking at the border justifies its emergency declaration. But there is no evidence of any such sudden crisis at the southern border that necessitates a reprogramming of appropriations to build a border wall.

      a.      The overwhelming majority of opioids that enter the United States across a land border are carried through legal ports of entry in personal or commercial vehicles, not smuggled through unauthorized border crossings.[19] A border wall would not stop these drugs from entering the United States. Nor would a wall stop drugs from entering via other routes, including smuggling tunnels, which circumvent such physical barriers as fences and walls,[20] and international mail (which is how high-purity fentanyl, for example, is usually shipped from China directly to the United States).[21]

      b.      Likewise, illegal crossings at the southern border are not the principal source of human trafficking victims. About two-thirds of human trafficking victims served by nonprofit organizations that receive funding from the relevant Department of Justice office are U.S. citizens, and even among non-citizens, most trafficking victims usually arrive in the country on valid visas.[22] None of these instances of trafficking could be addressed by a border wall. And the three states with the highest per capita trafficking reporting rates are not even located along the southern border.[23]

---

[14] Michelangelo Landgrave & Alex Nowrasteh, *Criminal Immigrants: Their Numbers, Demographics, and Countries of Origin*, CATO INST. (Mar. 15, 2017).

[15] Alex Nowrasteh & Andrew Forrester, *Illegal Immigrant Conviction Rates Are Low, Even When Factoring in Recidivism*, CATO INST. (Jan. 7, 2019).

[16] Alex Nowrasteh, *Criminal Immigrants in Texas: Illegal Immigrant Conviction and Arrest Rates for Homicide, Sex Crimes, Larceny, and Other Crimes,* CATO INST. (Feb. 26, 2018).

[17] John Gramlich, *5 Facts About Crime in the U.S.*, PEW RES. CTR. (Jan. 3, 2019).

[18] Ames Grawert & Cameron Kimble, *Crime in 2018: Updated Analysis*, BRENNAN CTR. FOR JUST. (Dec. 18, 2018).

[19] *2018 National Drug Threat Assessment*, U.S. DEP'T OF JUST. DRUG ENFORCEMENT ADMIN. (2018). Ninety percent of heroin seizures at U.S. borders and more than 85 percent of cocaine and methamphetamine seizures occur at ports of entry, where drugs can be smuggled in personal vehicles or hidden among legal commercial goods in tractor trailers. Joe Ward & Anjali Singhvi, *Trump Claims There Is a Crisis at the Border. What's the Reality?*, N.Y. TIMES (Jan. 11, 2019).

[20] *See* Gustavo Solis, *Drug Smuggling, and the Endless Battle To Stop It*, USA TODAY (last visited Feb. 18, 2019).

[21] *2018 National Drug Threat Assessment*, *supra* note 19, at 33.

[22] Jenna Krajeski, *The Hypocrisy of Trump's Anti-Trafficking Argument for a Border Wall*, NEW YORKER (Feb. 5, 2019).

[23] Holly Yan, *The Deadly Toll of Human Smuggling and Trafficking in the U.S.*, CNN (July 28, 2017, 3:45 PM).

7.      *This proclamation will only exacerbate the humanitarian concerns that do exist at the southern border.* There are real humanitarian concerns at the border, but they largely result from the current administration's own deliberate policies towards migrants. For example, the administration has used a "metering" policy to turn away families fleeing extreme violence and persecution in their home countries, forcing them to wait indefinitely at the border to present their asylum cases, and has adopted a number of other punitive steps to restrict those seeking asylum at the southern border. These actions have forced asylum-seekers to live on the streets or in makeshift shelters and tent cities with abysmal living conditions, and limited access to basic sanitation has caused outbreaks of disease and death. This state of affairs is a consequence of choices this administration has made, and erecting a wall will do nothing to ease the suffering of these people.

8.      *Redirecting funds for the claimed "national emergency" will undermine U.S. national security and foreign policy interests.* In the face of a nonexistent threat, redirecting funds for the construction of a wall along the southern border will *undermine* national security by needlessly pulling resources from Department of Defense programs that are responsible for keeping our troops and our country safe and running effectively.

> a.      Repurposing funds from the defense construction budget will drain money from critical defense infrastructure projects, possibly including improvement of military hospitals, construction of roads, and renovation of on-base housing.[24] And the proclamation will likely continue to divert those armed forces already deployed at the southern border from their usual training activities or missions, affecting troop readiness.[25]

> b.      In addition, the administration's unilateral, provocative actions are heightening tensions with our neighbors to the south, at a moment when we need their help to address a range of Western Hemisphere concerns. These actions are placing friendly governments to the south under impossible pressures and driving partners away. They have especially strained our diplomatic relationship with Mexico, a relationship that is vital to regional efforts ranging from critical intelligence and law enforcement partnerships to cooperative efforts to address the growing tensions with Venezuela. Additionally, the proclamation could well lead to the degradation of the natural environment in a manner that could only contribute to long-term socioeconomic and security challenges.

> c.      Finally, by declaring a national emergency for domestic political reasons with no compelling reason or justification from his senior intelligence and law enforcement officials, the President has further eroded his credibility with foreign leaders, both friend and foe. Should a genuine foreign crisis erupt, this lack of credibility will materially weaken this administration's ability to marshal allies to support the United States, and will embolden adversaries to oppose us.

---

[24] Claudia Grisales, *Trump Declares Emergency on Southern Border, Opens Battle Over Use of Military Funds To Build Wall*, STARS & STRIPES (Feb. 15, 2019).

[25] Leo Shane III, *Democrats Want To Know Why Active-Duty Troops Are Still on the Southern US Border*, MIL. TIMES (Jan. 29, 2019); Thomas Gibbons-Neff & Helene Cooper, *Impact of Border Deployments Is Felt by Troops at Home and Away*, N.Y. TIMES (Dec. 24, 2018); Ashley Roque, *Readiness Questions Abound, the Pentagon Prepares To Send Thousands of Additional Troops to Border*, JANE'S DEFENCE WKLY. (Jan. 29, 2019).

9.      *The situation at the border does not require the use of the armed forces, and a wall is unnecessary to support the use of the armed forces.* We understand that the administration is also claiming that the situation at the southern border "requires use of the armed forces," and that a wall is "necessary to support such use" of the armed forces. These claims are implausible.

> a.      Historically, our country has deployed National Guard troops at the border solely to assist the Border Patrol when there was an extremely high number of apprehensions, together with a particularly low number of Border Patrol agents. But currently, even with retention and recruitment challenges, the Border Patrol is at historically high staffing and funding levels, and apprehensions—measured in both absolute and per-agent terms—are near historic lows.[26]

> b.      Furthermore, the composition of southern border crossings has shifted such that families and unaccompanied minors now account for the majority of immigrants seeking entry at the southern border; these individuals do not present a threat that would need to be countered with military force.

> c.      Just last month, when asked what the military is doing at the border that couldn't be done by the Department of Homeland Security if it had the funding for it, a top-level defense official responded, "[n]one of the capabilities that we are providing [at the southern border] are combat capabilities. It's not a war zone along the border."[27] Finally, it is implausible that hundreds of miles of wall across the southern border are somehow necessary to support the use of armed forces. We are aware of no military- or security-related rationale that could remotely justify such an endeavor.

10.     *There is no basis for circumventing the appropriations process with a declaration of a national emergency at the southern border.* We do not deny that our nation faces real immigration and national security challenges. But as the foregoing demonstrates, these challenges demand a thoughtful, evidence-based strategy, not a manufactured crisis that rests on falsehoods and fearmongering. In a briefing before the Senate Intelligence Committee on January 29, 2019, less than one month before the Presidential Proclamation, the Directors of the CIA, DNI, FBI, and NSA testified about numerous serious current threats to U.S. national security, but none of the officials identified a security crisis at the U.S.-Mexico border. In a briefing before the House Armed Services Committee the next day, Pentagon officials acknowledged that the 2018 National Defense Strategy does not identify the southern border as a security threat.[28] Leading legislators with access to classified information[29] and

---

[26] Alex Nowrasteh, *Sending Troops to the Border Is Unnecessary and Dangerous*, CATO INST. (Apr. 4, 2018).

[27] Heather Timmons, *The US Border Situation Isn't a National Emergency, Pentagon Officials Tell Congress*, QUARTZ (Jan. 29, 2019).

[28] *See id.*

[29] *See, e.g.*, Press Release, Sen. Lamar Alexander, Statement on National Emergency Announcement (Feb. 15, 2019); Press Release, Sen. Susan Collins, Statement on Reports President Trump Will Declare National Emergency To Fund More Border Walls (Feb. 14, 2019); Press Release, Sen. Mitt Romney, Statement on Spending, Border Security Deal (Feb. 14, 2019).

the President's own statements[30] have strongly suggested, if not confirmed, that there is no evidence supporting the administration's claims of an emergency. And it is reported that the President made the decision to circumvent the appropriations process and reprogram money without the Acting Secretary of Defense having even started to consider where the funds might come from,[31] suggesting an absence of consultation and internal deliberations that in our experience are necessary and expected before taking a decision of this magnitude.

11.     For all of the foregoing reasons, in our professional opinion, there is no factual basis for the declaration of a national emergency for the purpose of circumventing the appropriations process and reprogramming billions of dollars in funding to construct a wall at the southern border, as directed by the Presidential Proclamation of February 15, 2019.

Respectfully submitted,

*Signed/\**

1. Madeleine K. Albright

2. Jeremy B. Bash

3. John B. Bellinger III

4. Daniel Benjamin

5. Antony Blinken

6. John O. Brennan

7. R. Nicholas Burns

8. William J. Burns

9. Johnnie Carson

10. James Clapper

11. David S. Cohen

12. Eliot A. Cohen

13. Ryan Crocker

---

[30] *Remarks by President Trump on the National Security and Humanitarian Crisis on our Southern Border*, White House (Feb. 15, 2019) ("I didn't need to do this. But I'd rather do it much faster.").

[31] Noah Gray, *Acting U.S. Defense Secretary Will Review Programs To Cut for Wall Funding*, CNN (Feb. 17, 2019).

\* Signatures on file with Harold Hongju Koh, Rule of Law Clinic, Yale Law School, P.O. Box 208215, New Haven, CT 06520, harold.koh@ylsclinics.org, 203-432-4932.

14. Thomas Donilon

15. Jen Easterly

16. Nancy Ely-Raphel

17. Daniel P. Erikson

18. John D. Feeley

19. Daniel F. Feldman

20. Jonathan Finer

21. Jendayi Frazer

22. Suzy George

23. Phil Gordon

24. Chuck Hagel

25. Avril D. Haines

26. Luke Hartig

27. Heather A. Higginbottom

28. Roberta Jacobson

29. Gil Kerlikowske

30. John F. Kerry

31. Prem Kumar

32. John E. McLaughlin

33. Lisa O. Monaco

34. Janet Napolitano

35. James D. Nealon

36. James C. O'Brien

37. Matthew G. Olsen

38. Leon E. Panetta

39. Anne W. Patterson

40. Thomas R. Pickering

41. Amy Pope

42. Samantha J. Power

43. Jeffrey Prescott

44. Nicholas Rasmussen

45. Alan Charles Raul

46. Dan Restrepo

47. Susan E. Rice

48. Anne C. Richard

49. Eric P. Schwartz

50. Andrew J. Shapiro

51. Wendy R. Sherman

52. Vikram Singh

53. Dana Shell Smith

54. Jeffrey H. Smith

55. Jake Sullivan

56. Strobe Talbott

57. Linda Thomas-Greenfield

58. Arturo A. Valenzuela

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on the date of electronic filing.

/s/ Douglas A. Winthrop_____
Douglas A. Winthrop
10th Floor
Three Embarcadero Center
San Francisco, CA 94111
(415) 471-3100
douglas.winthrop@arnoldporter.com