1   XAVIER BECERRA
    Attorney General of California
2   ROBERT W. BYRNE
    SALLY MAGNANI
3   MICHAEL L. NEWMAN
    Senior Assistant Attorneys General
4   MICHAEL P. CAYABAN
    CHRISTINE CHUANG
5   EDWARD H. OCHOA
    Supervising Deputy Attorneys General
6   HEATHER C. LESLIE
    JANELLE M. SMITH
7   JAMES F. ZAHRADKA II
    LEE I. SHERMAN (SBN 272271)
8   Deputy Attorneys General
     300 S. Spring St., Suite 1702
9    Los Angeles, CA 90013
     Telephone: (213) 269-6404
10   Fax: (213) 897-7605
     E-mail: Lee.Sherman@doj.ca.gov
11  *Attorneys for Plaintiff State of California*

12

13                    IN THE UNITED STATES DISTRICT COURT

14                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

15                              OAKLAND DIVISION

16

17  | **STATE OF CALIFORNIA et al.;** | Case No. 4:19-cv-00872-HSG |
    | --- | --- |
18  | Plaintiffs, | **PLAINTIFF STATES' REPLY IN** |
    |  | **SUPPORT OF THEIR MOTION FOR** |
19  | v. | **PRELIMINARY INJUNCTION** |
20  |  | Date:        May 17, 2019 |
    |  | Time:        10:00 a.m. |
21  | **DONALD J. TRUMP, in his official capacity** | Dept:        2 |
    | **as President of the United States of America** | Judge:       The Honorable Haywood S. |
    | **et al.;** |              Gilliam, Jr. |
22  | Defendants. | Trial Date:  None Set |
23  |  | Action Filed: February 18, 2019 |

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

**Page**

3    INTRODUCTION ........................................................................................................ 1

4        I.    Plaintiffs are Likely to Succeed on Their Claims ...................................... 1

5            A.    Plaintiff States Have Standing to Challenge the Diversions of Funding .......................................................................................... 1

6            B.    Plaintiffs Are Likely to Succeed on Their Constitutional Claims.............. 3

7                1.    Defendants Have Violated Separation of Powers Principles ......... 4

            2.    Defendants Have Violated the Presentment Clause...................... 6

8                3.    Defendants Have Violated the Appropriations Clause ................. 7

9            C.    New Mexico is Likely to Succeed on its Claim that Defendants Exceeded their Statutory Authority Under § 8005 and § 284.................... 9

10               1.    New Mexico has Standing to Challenge the § 8005 Diversion................................................................................. 9

11               2.    New Mexico's Interests Are within the Zone of Interests of § 8005 ...................................................................................... 9

12

13               3.    Defendants Have Exceeded Their Statutory Authority Under § 8005................................................................................... 11

14               4.    Defendants Have Exceeded Their Statutory Authority Under § 284................................................................................... 12

15               5.    Venue is Proper to Hear New Mexico's Challenge ..................... 13

16           D.    Plaintiffs Are Likely to Succeed on Their TFF Claim............................ 14

        E.    Defendants' Actions Are Arbitrary and Capricious................................ 15

17           F.    Plaintiff New Mexico is Likely to Succeed on its NEPA Claim .............. 16

18       II.    Plaintiff States Are Likely to Suffer Irreparable Harm Caused by Defendants' Conduct.................................................................................. 17

19           A.    Plaintiff New Mexico Will Suffer Irreparable Harm Caused by the Diversion Under § 8005 and § 284 and the Violation of NEPA............... 17

20           B.    Plaintiff States Will Suffer Irreparable Harm from the TFF Diversion.................................................................................... 19

21

22       III.    The Balance of Equities and Public Interest Favor an Injunction........................ 20

CONCLUSION ........................................................................................................ 20

23

24

25

26

27

28

i

# TABLE OF AUTHORITIES

**Page**

CASES

*A.J. Taft Coal Co. v. Barnhart*
    291 F. Supp. 2d 1290 (N.D. Ala. 2003) ................................................................14

*Alliance for the Wild Rockies v. Cottrell*
    632 F.3d 1127 (9th Cir. 2011) ............................................................................20

*Am. Tel. & Tel. Co. v. FCC*
    978 F.2d 727 (D.C. Cir. 1992) ............................................................................15

*Amoco Prod. Co. v. Vill. of Gambell, AK*
    480 U.S. 531 (1987) ............................................................................................17

*Armstrong v. Exceptional Child Ctr., Inc.*
    135 S. Ct. 1378 (2015) ........................................................................................11

*Citizens to Preserve Overton Park, Inc. v. Volpe*
    401 U.S. 402 (1971) ......................................................................................11, 15

*City & Cty. of San Francisco v. Trump*
    897 F.3d 1255 (9th Cir. 2018) ..........................................................................4, 5

*City of Houston v. HUD*
    24 F.3d 1421 (D.C. Cir. 1994) ............................................................................20

*City of Los Angeles v. Sessions*
    293 F. Supp. 3d 1087 (C.D. Cal. 2018) ................................................................2

*City of New York v. Clinton*
    524 U.S. 417 (1998) ......................................................................................4, 6, 7

*Clarke v. Sec. Indus. Ass'n*
    479 U.S. 388 (1987) ............................................................................................10

*Dalton v. Specter*
    511 U.S. 462 (1994) ..........................................................................................3, 4

*Earth Island Inst. v. Elliott*
    290 F. Supp. 3d 1102 (E.D. Cal. 2017) ..............................................................20

*FCC v. Fox Television Stations, Inc.*
    556 U.S. 502 (2009) ............................................................................................16

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*
    528 U.S. 167 (2000) ..............................................................................................1

ii

Pls.' Reply in Supp. of Mot. for Prelim. Inj. (4:19-cv-00872))

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3     *INS. v. Chadha*

4          462 U.S. 919 (1983) .................................................................................11

5     *Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*
           861 F.3d 944 (9th Cir. 2017) ....................................................................2

6
      *Inv. Co. Inst. v. FDIC*
7          606 F. Supp. 683 (D.D.C. 1985) .............................................................10

8     *Kansas v. United States*
           249 F.3d 1213 (10th Cir. 2001) ..............................................................18
9
      *League of Wilderness Defs./Blue Mountains Biodiversity Proj. v. Connaughton*
10         752 F.3d 755 (9th Cir. 2014) ..................................................................18

11    *Lincoln v. Vigil*
           508 U.S. 182 (1993) .................................................................................14
12
      *Lujan v. Defs. of Wildlife*
13         504 U.S. 555 (1992) ...................................................................................9

14    *Lujan v. Nat'l Wildlife Fed'n*
           497 U.S. 871 (1990) ...................................................................................9
15
      *Mach Mining, LLC v. EEOC*
16         135 S. Ct. 1645 (2015) ............................................................................11
17
      *Maine v. Taylor*
18         477 U.S. 131 (1986) .................................................................................17

19    *Martensen v. Koch*
           942 F. Supp. 2d 983 (N.D. Cal. 2013) ....................................................14
20
      *Maryland v. King*
21         567 U.S. 1301 (2012) ..............................................................................18

22    *Massachusetts v. EPA*
           549 U.S. 497 (2007) ...................................................................................9
23
      *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*
24         567 U.S. 209 (2012) .................................................................................10
25
      *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*
26         463 U.S. 29 (1983) ...................................................................................15
27

28

iii

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*Mount Evans Co. v. Madigan*
14 F.3d 1444 (10th Cir. 1994)........................................................................14

4

5

*Nat'l Ass'n of Home Builders v. Norton*
340 F.3d 835 (9th Cir. 2003)..........................................................................16

6

*Nat'l Assoc. of Neighborhood Health Ctrs., Inc. v. Mathews*
551 F.2d 321 (D.C. Cir. 1976) ..........................................................................2

7

*Nat'l Wildlife Fed'n v. Burlington N.R.R.*
23 F.3d 1508 (9th Cir. 1994)..........................................................................18

8

9

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*
886 F.3d 803 (9th Cir. 2018)..........................................................................18

10

*Nevada v. DOE*
400 F.3d (D.C. Cir. 2005) .................................................................................7

11

12

*Nigro v. Sears, Roebuck and Co.*
784 F.3d 495 (9th Cir. 2015)............................................................................2

13

14

*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*
477 F.3d 668 (9th Cir. 2007)..........................................................................16

15

*Office of Pers. Mgm't v. Richmond*
496 U.S. 414 (1990)...........................................................................................8

16

17

*Pac. Nw. Venison Producers v. Smitch*
20 F.3d 1008 (9th Cir. 1994)..........................................................................17

18

19

*Population Inst. v. McPhereson*
797 F.2d 1062 (D.C. Cir. 1986) .....................................................................20

20

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. USDA*
415 F.3d 1078 (9th Cir. 2005)........................................................................10

21

22

*S & M Inv. Co. v. Tahoe Regional Planning Agency*
911 F.2d 324 (9th Cir. 1990)..........................................................................15

23

24

*Salazar v. Ramah Navajo Chapter*
567 U.S. 182 (2012)...........................................................................................5

25

*Saravia v. Sessions*
280 F. Supp. 3d 1168 (N.D. Cal. 2017) .........................................................14

26

27

28

iv

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3

*Sausalito v. O'Neill*
      386 F.3d 1186 (9th Cir. 2004).................................................................11

4

*Silvers v. Sony Pictures Entm't, Inc.*
      402 F.3d 881 (9th Cir. 2005)..................................................................13

5

6

*Simula, Inc. v. Autoliv, Inc.*
      175 F.3d 716 (9th Cir. 1999)..................................................................18

7

8

*Susan B. Anthony List v. Driehaus*
      573 U.S. 149 (2014)................................................................................3

9

*Tennessee Valley Auth v. Hill*
      437 U.S. 153 (1978)................................................................................5

10

*United States v. MacCollom*
      426 U.S. 317 (1976)................................................................................5

11

12

*United States v. McIntosh*
      833 F.3d 1163 (9th Cir. 2016)..........................................................4, 5, 11

13

14

*Vt. Agency of Natural Res. v. United States* ex rel. *Stevens*
      529 U.S. 765 (2000)................................................................................9

15

16

*Va. Ry. Co. v. Sys. Fed'n No. 40*
      300 U.S. 515 (1937)..............................................................................20

17

18

*Washington v. Trump*
      847 F.3d 1151 (9th Cir. 2017)................................................................2

19

*Youngstown Sheet & Tube Co. v. Sawyer*
      343 U.S. 579 (1952)............................................................................4, 5

20

21

**STATE CASE**

22

*Sanders-Reed* ex rel. *Sanders-Reed v. Martinez*
      350 P.3d 1221 (N.M. Ct. App. 2015)....................................................18

23

24

**FEDERAL STATUTES**

25

10 U.S.C. § 284 ........................................................................... *passim*

26

10 U.S.C. § 284(i)(3) .........................................................................13

27

10 U.S.C. § 284(h) .............................................................................13

28

# TABLE OF AUTHORITIES
**(continued)**

Page

28 U.S.C. § 524(c)(1)(I) ...................................................................................3

28 U.S.C. § 524(c)(1)(A) ..................................................................................3

28 U.S.C. § 524(c)(8)(D) ..................................................................................3

31 U.S.C. § 9705 ..........................................................................................4, 8

31 U.S.C. § 9705(a) ..................................................................................14, 15

31 U.S.C. § 9705(g)(1) .....................................................................................3

31 U.S.C. § 9705(g)(4)(B) ....................................................................3, 8, 14, 15

46 U.S.C. § 501(a) ..........................................................................................17

Pub. L. No. 104-208, 110 Stat. 3009 (1996) ..............................................16, 17

Pub. L. No. 115-245, 132 Stat. 2981 (2018)........................................... *passim*

Pub. L. No. 116-6, 133 Stat. 13 (2019) .................................................. *passim*

STATE STATUTES

N.M. Stat. Ann. § 17-2-41 ................................................................................18

CONSTITUTIONAL PROVISIONS

U.S. Const., art. I, § 7 .....................................................................................6, 7

OTHER AUTHORITIES

B-139510 (GAO May 13, 1959) ..........................................................................7

40 C.F.R. § 1502.14 .........................................................................................19

Government Accountability Office, Office of the General Counsel, Principles of
    Federal Appropriations Law (4th Ed. 2017) (GAO Red Book)............................7, 8

H.R. Rep. No. 93-662 (1973) ......................................................................11, 12

H.R. Rep. No. 101-665 (1990) ...........................................................................13

H.R. Rep. No. 114-624 (2016) .............................................................................9

S. Rep. No. 102-398 (1992) ................................................................................3

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3    *Support*, Merriam-Webster's Dictionary (7th ed. 2016)...................................................13

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Pls.' Reply in Supp. of Mot. for Prelim. Inj. (4:19-cv-00872)

**INTRODUCTION**

At its core, this case is about the president's usurpation of Congress's powers by diverting federal funds to a border wall that Congress explicitly refused to fund. Defendants do not—and cannot—offer a persuasive defense of this action's constitutionality. Instead, they attempt to obscure its unconstitutionality by focusing on jurisdictional and procedural issues, none of which prevents this Court from reaching the merits. On the merits, Defendants argue that DOD and Treasury may divert funding to support border wall construction because Congress did not deny wall funding to *those* agencies. But Congress denied *any* funding toward a border barrier beyond the $1.375 billion it appropriated. The constitutional protections of separation of powers are not so feeble that the executive may circumvent them through an agency shell game. Nor do the statutes Defendants invoke to divert funding allow such quintessentially arbitrary and capricious action. Thus, the States have shown more than sufficient likelihood of success on the merits.

New Mexico also has shown a likelihood of success on its National Environmental Policy Act (NEPA) claim. Defendants attempt to rely on a waiver provision that is limited to DHS projects authorized and appropriated by Congress. But, in order to divert funding toward the border wall project that Congress rejected, Defendants contend that DOD, not DHS, will construct the wall on New Mexico's border, and DHS has no authority to waive DOD's compliance with NEPA. Defendants cannot have it both ways, presenting the construction in New Mexico as a DOD project when convenient for their arguments to secure funding, while at the same time arguing that it is a DHS-led project to waive environmental compliance.

The remaining factors—irreparable injury, balance of equities, and the public interest—also support a preliminary injunction. Indeed, New Mexico's basis for irreparable harm has strengthened since the motion was filed. On April 9, DOD awarded a $789 million contract to a private company to begin construction in New Mexico. Such construction will cause irreparable harm to New Mexico's environment and wildlife, and its sovereign interests in protecting both.

## I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIMS

### A.     Plaintiff States Have Standing to Challenge the Diversions of Funding

Plaintiffs meet the requirements for Article III standing. *Friends of the Earth, Inc. v.*

1

1   *Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180, 181 (2000). Defendants do not challenge New

2   Mexico's standing to bring its constitutional claims and § 284 claim. *See* Opp'n 17-18. In

3   addition, while they dispute New Mexico's standing to challenge the diversion under § 8005, as

4   discussed *infra,* § I.C.1, Defendants' actions will cause concrete and particularized injuries-in-fact

5   to New Mexico's environment and wildlife, giving New Mexico standing.

6       Defendants' arguments concerning the remaining Plaintiff States' standing to challenge

7   Treasury's diversion of funds from TFF, Opp'n 12-14, fail. Defendants acknowledge that the

8   States have a statutory interest in reimbursements and equitable share payments from TFF, *id.* 13,

9   but contend that their diversion from TFF does not impact those payments. *Id.* 13-14. Plaintiffs'

10  interest, however, extends to TFF as a whole; preventing any reduction in Plaintiffs' "prospect of

11  funding" itself is "substantial relief." *Nat'l Assoc. of Neighborhood Health Ctrs., Inc. v. Mathews*,

12  551 F.2d 321, 329 (D.C. Cir. 1976). Defendants' diversion causes "increased competition" due to

13  the reduced funds that remain available for all prospective TFF recipients. *Int'l Bhd. of Teamsters*

14  *v. U.S. Dep't of Transp.*, 861 F.3d 944, 950 (9th Cir. 2017). This "competitive injury" is

15  sufficient to establish irreparable harm, let alone injury-in-fact for Article III standing. *City of Los*

16  *Angeles v. Sessions* 293 F. Supp. 3d 1087, 1094, 1100 (C.D. Cal. 2018).

17      In addition, Defendants ignore the unprecedented siphoning off of *$601 million* of

18  Strategic Support funds from TFF, greater than the amount drawn from Strategic Support for the

19  *past nine years combined*. Cayaban Decl. ¶ 11. Instead, they rely on a self-serving declaration to

20  support their assertion that Treasury has taken necessary measures to ensure that the diversion

21  from TFF will not impact the Plaintiff States' ability to obtain equitable shares. Opp'n 13-14.

22  That declaration, however, is insufficient to rebut Plaintiffs' allegations at this stage. *See*

23  *Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017) (holding that allegations in complaint

24  and evidence submitted in support of TRO motion satisfy standing burden). Without any financial

25  data or analysis to accompany it, the declaration estimates that the projected balance of TFF for

26  FY 2020 will be approximately $507 million. Farley Decl. ¶ 26. This Court should disregard this

27  conclusory assertion. *See Nigro v. Sears, Roebuck and Co.*, 784 F.3d 495, 497-98 (9th Cir. 2015).

28      Defendants' contention that the diversion does not impact Plaintiff States because

2

1    Treasury is "statutorily obligated to ensure funds are available" to pay the states' equitable share

2    claims before transferring Strategic Support Funds, Opp'n 13 (citing 31 U.S.C. § 9705(g)(1) &

3    (g)(4)(B)), does not take into account the relevant history of the U.S. DOJ's Asset Forfeiture

4    Fund (AFF), which is subject to similar statutory requirements to "retain" enough "to ensure the

5    availability of amounts" for states' equitable share payments. 28 U.S.C. § 524(c)(1)(A), (c)(1)(I),

6    (8)(D); *see also* S. Rep. No. 102-398 (1992) (noting that TFF was "patterned" after AFF). Those

7    similar requirements did not save AFF from a solvency crisis that required suspension of the

8    states' equitable share payments. RJN Ex. 44. Defendants fail to respond to or even acknowledge

9    that: (a) at the end of FY 2018, TFF had approximately the same balance as AFF did when U.S.

10   DOJ suspended payments; and (b) Treasury stated that the "substantial drop in 'base' revenue . . .

11   that is relied upon to cover mandatory costs of [TFF]" was "especially troubling" even before the

12   $601 million diversion. RJN Exs. 42-43. The history of a fund with strikingly similar attributes to

13   TFF illustrates the "substantial risk" that Plaintiffs' equitable share payments will be impacted by

14   the diversion. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).

15         **B.    Plaintiffs Are Likely to Succeed on Their Constitutional Claims**

16         To avoid grappling with the serious constitutional infirmities that arise from Defendants'

17   repudiation of Congress's clear refusal to appropriate billions of dollars for a border wall,

18   Defendants miscast Plaintiffs' constitutional claims as merely statutory, and assert that such

19   claims are foreclosed by *Dalton v. Specter*, 511 U.S. 462 (1994). Opp'n 26-27. *Dalton* is not on

20   point, as the claim there only involved whether the president "violated the terms" of a statute. 511

21   U.S. at 474. Thus, the Court held that the claim was statutory in nature and that "claims simply

22   alleging that the President has exceeded his statutory authority are not 'constitutional' claims." *Id.*

23   at 473. Plaintiffs' constitutional claims here involve much more than just statutory compliance;

24   they concern the fundamental constitutional question of whether the executive branch may

25   expend federal funds on a project that Congress plainly refused to appropriate funding. This

26   involves considering whether Defendants have: (a) acted at the "lowest ebb" of their power; (b)

27   modified Congress's funding determination in the 2019 Consolidated Appropriations Act (CAA),

28   Pub. L. No. 116-6, 133 Stat. 13 (2019) in violation of the Presentment Clause; and (c) seized for

3

1   themselves Congress's power of the purse preserved in the Appropriations Clause by evading

2   Congress's spending limitations. *None of these constitutional questions were present in Dalton.*

3       Defendants' arguments are also inconsistent with the Court's decision in *City of New York*

4   *v. Clinton*, 524 U.S. 417 (1998) and the Ninth Circuit's ruling in *United States v. McIntosh*, 833

5   F.3d 1163 (9th Cir. 2016). If Defendants' view were correct, in *City of New York*, which was

6   decided after *Dalton*, the Court could only have considered whether the president's authorized

7   action to issue a line-item veto was in violation of the relevant appropriation act, rather than reach

8   the Presentment Clause question that it ultimately did. In *McIntosh*, the Ninth Circuit held that

9   criminal defendants could challenge federal agency actions—which were otherwise authorized by

10  federal law—as not only violating an appropriations rider, but also core separation of powers

11  principles. The court explained: "[I]f DOJ were spending money in violation of [the rider], it

12  would be drawing funds from the Treasury without authorization by statute, and thus violating the

13  Appropriations Clause. That Clause constitutes a separation-of-powers limitation that [a party]

14  can invoke." *Id.* at 1175. Likewise, here, even if Defendants satisfied the criteria of §§ 8005, 284,

15  and 9705 on their face, Defendants' exercise of these provisions in the face of Congress's specific

16  refusal to appropriate funding in this case violates the separation of powers doctrine.

17              **1.    Defendants Have Violated Separation of Powers Principles**

18      As such, Plaintiffs' separation of powers claim does not rest on a violation of any statute,

19  but stems from Defendants' actions to fund a border wall despite an explicit congressional refusal

20  to do so. Opp'n 26-27. The undisputed facts here—(a) Congress's repeated rejection of border

21  wall funding from 2017-18; (b) Congress's pointed refusal to appropriate $5.7 billion in requested

22  border wall funding resulting in a government shutdown exclusively over the border wall dispute;

23  *and* (c) Congress's limited $1.375 billion appropriation for specified pedestrian fencing—

24  demonstrate that Defendants' actions are "incompatible with the expressed or implied will of

25  Congress," placing their power at the "lowest ebb." *Youngstown Sheet & Tube Co. v. Sawyer*, 343

26  U.S. 579, 637 (1952) (Jackson, J., concurring); *see also, e.g.*, Br. of the House of Reps. as *Amicus*

27  *Curiae*, ECF No. 71-2, at 3-7 (Apr. 12, 2019). Because the president lacks power under Article II

28  of the Constitution to appropriate funding, *City & Cty. of San Francisco v. Trump*, 897 F.3d 1255,

4

1   1232 (9th Cir. 2018), Defendants' actions to fund a wall over Congress's objection violate the

2   Constitution. *See Youngstown*, 343 U.S. at 586.

3       Defendants ask the Court to ignore the extensive record here on the ground that courts

4   "must consider only the text of the [appropriation] rider." Opp'n 28. However, that principle is

5   inapplicable to determining the significance of Congress's *refusal* to appropriate funds—it only

6   applies to whether courts may use legislative history to determine the "meaning" of a provision

7   within an appropriations bill that limits the "[a]n agency's discretion to spend appropriated

8   funds." *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 200 (2012); *McIntosh*, 833 F.3d at

9   1178. The abundance of failed legislation, RJN Exs. 14-20, and prolonged negotiations between

10  Congress and the president, RJN Exs. 21-22, 24-25, are relevant not to interpret the meaning of

11  any provision within the CAA or to challenge Defendants' discretion to spend the $1.375 billion

12  appropriated there. Rather, it illuminates Congress's decision *not to appropriate* funds toward a

13  border wall, which is highly relevant to Plaintiffs' separation of powers claim. *See Youngstown*,

14  343 U.S. at 586 (rejected amendment by Congress informed Court's holding that seizure of steel

15  mills violated separation of powers); *San Francisco*, 897 F.3d at 1234 ("sheer amount of failed

16  legislation" in area that was the subject of an executive order was evidence that the executive

17  "attempted to coopt Congress's power to legislate" in violation of separation of powers).

18      Defendants also argue that if Congress intended to restrict the diversion of funding toward a

19  border wall, it would have included an explicit prohibition in the CAA. Opp'n 27-28. But that is

20  no answer to *United States v. MacCollom*, 426 U.S. 317 (1976), which instructs: "Where

21  Congress has addressed the subject as it has here, and authorized expenditures where a condition

22  is met, the clear implication is that where the condition is not met, the expenditure is not

23  authorized." *Id.* at 321.[1] Congress has addressed the subject of barrier funding in the CAA and

24  limited it to $1.375 billion subject to specific constraints as to where, when, and how the barrier

25  may be built. CAA, Pub. L. No. 116-6, 133 Stat. 13, 28, §§ 230-32. That is sufficient.

26  _____

27  [1] Defendants' only response is to refer to a "doctrine disfavoring repeals by implication appl[ying] with full vigor when the subsequent legislation is an appropriations measure."
    *Tennessee Valley Auth v. Hill*, 437 U.S. 153 (1978). Opp'n 28. Plaintiffs, though, assert not that

28  the CAA "repeal[s]" any statute, but that it serves as a limit on spending toward a border barrier.

5

Pls.' Reply in Supp. of Mot. for Prelim. Inj. (4:19-cv-00872)

Moreover, contrary to Defendants' assertions, Opp'n 27, Congress *did* include a rider in Section 739 of the CAA limiting augmentation of the $1.375 billion appropriation, which states:

> None of the funds made available in this or any other appropriations Act may be used to increase, eliminate, or reduce funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act, or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act.

The Administration requested $1.6 billion in border wall funding in its FY 2019 budget, Suppl. RJN Ex. 51; on January 6, 2019, the Administration modified that request to seek $5.7 billion. RJN Ex. 25. Congress did not approve any funding for a border barrier in FY 2019 beyond the $1.375 billion in the CAA. Thus, no funds made available in "any other appropriations Act" may be used to "increase" the $1.375 billion border barrier appropriation unless subsequently enacted in an appropriation act or done validly through a reprogramming or transfer provision in an appropriations act. Even if Defendants could reprogram funds via § 8005 (they cannot, as discussed *infra*), they may not use § 284 to increase the FY 2019 border barrier appropriation, because § 284 is not a reprogramming or transfer provision in an appropriations act.

## 2. Defendants Have Violated the Presentment Clause

Defendants fall far short in their claim that their actions comply with the Presentment Clause, U.S. Const., art. I, § 7. Opp'n 28. The president's unilateral supplementation of the $1.375 billion appropriation for limited barrier funding in the Rio Grande Valley with $6.7 billion of additional funds can only be viewed as "rejecting the policy judgment made by Congress and relying on [the president's] own policy judgment." *City of New York*, 524 U.S. at 444. The Presentment Clause denies the president the power "to enact, to amend, or to repeal" the amount and terms of an appropriation after it was enacted into law. *Id.* at 438.

The federal government argued in *City of New York*, as they do here, that there is no Presentment Clause violation where the congressional enactments impacted by executive actions "retain real, legal budgetary effect." *Id.* at 440-41; Opp'n 28 ("the CAA remains in effect"). *City of New York*, however, instructs looking at the "legal and practical effect" of the president's actions. 524 U.S. at 438. The augmentation of the $1.375 billion appropriation in the CAA with

6

1    an additional $6.7 billion is "the functional equivalent" of an amendment of Congress's

2    appropriation, which the Presentment Clause forbids. *Id.* at 441. Moreover, the existence of

3    independent "statutory authorities" ostensibly authorizing these presidential actions, Opp'n 28, is

4    of "no moment." *City of New York*, 524 U.S. at 445-6. If the president's diversion of funds

5    pursuant to independent statutory authority in contravention of the CAA were deemed valid, "it

6    would authorize the President to create a different law—one whose text was not voted on by

7    either House of Congress or presented to the President for signature." *Id.* at 448. That product is

8    "surely not a document that may 'become a law' pursuant to the procedures designed by the

9    Framers of Article I, § 7 of the Constitution." *Id.* at 449.

10                    **3.    Defendants Have Violated the Appropriations Clause**

11           Defendants do not dispute that use of a general appropriation to fund the border wall

12   "where the expenditure falls specifically within the scope of another appropriation" violates the

13   Appropriations Clause. GAO Red Book at 3-407; *see* Opp'n 28. Defendants claim this principle

14   is "inapplicable" here for three reasons, all of which fail. First, Defendants claim that this rule

15   only "applies to the use of appropriations within the same bill or for the same agency to fund the

16   same object." Opp'n 29. But the cases that Defendants cite show that this "well-settled rule" is

17   not so limited. GAO Red-Book at 3-407. In one case, GAO prohibited one DOD subagency from

18   using a general appropriation for the purpose of dredging a river where a *different* subagency of

19   DOD had funds appropriated for the function of dredging, and was charged by law with

20   improving the waterways. *Id.* at 3-408-09 (citing B-139510 (GAO May 13, 1959)). And the court

21   in *Nevada v. DOE* rejected the argument that the specific-over-general rule does not apply to

22   specific appropriations that are "distinctive" and "different" from the general appropriation, as a

23   specific appropriation "indicates that is all Congress intended [the state] to get [for that fiscal

24   year] from *whatever source*." 400 F.3d 9, 16 (D.C. Cir. 2005) (emphasis added).

25           However, even if the general/specific rule only applies to appropriations for the same

26   agency, the rule applies here. Defendants claim that the DHS Secretary has authority to waive

27   compliance with NEPA, Opp'n 24-25, which can only be done if this is a DHS project. In fact,

28   Defendants designated DHS as the "lead agency" on the border wall project. RJN Ex. 34. DHS,

                                                    7

1    meanwhile, has already received a specific appropriation from Congress for a border barrier,

2    CAA, §§ 230-32, and it is indisputable that the funds being diverted are part and parcel of the

3    president's plans to construct an extensive wall on the southern border. *See, e.g.*, RJN Ex. 28

4    (identifying the $1.375 billion appropriated by Congress as part of the "up to $8.1 billion that will

5    be available to build the border wall"). Defendants cannot use the fact that they are diverting

6    generally appropriated funds from DOD or Treasury to "evade or exceed congressionally

7    established spending limits." GAO Red Book at 3-407-08. Such an exception to the

8    general/specific rule would authorize executive branch officials who "were displeased with a . . .

9    restriction . . . imposed by Congress" to "evade" Congress's restrictions on funding, in violation

10   of the Appropriations Clause. *Office of Pers. Mgm't v. Richmond*, 496 U.S. 414, 428 (1990).

11       Second, Defendants claim that the specific/general rule does not apply to the use of § 284

12   because § 284 resources are being applied to the El Paso Sector, whereas the CAA funds are

13   appropriated for the Rio Grande Valley. Opp'n 29-30. But that proves Plaintiffs' point. The

14   executive branch requested $5.7 billion in barrier funding across the southwestern border for FY

15   2019, RJN Ex. 25, and Congress expressly limited the appropriation to $1.375 billion and only

16   for the Rio Grande Valley. CAA, §§ 230-32. That funding represents the specific appropriation

17   for *any* border barrier funding for FY 2019. Defendants cannot use their more general authority

18   under § 284 to augment that more specific appropriation to expand the geographic reach and

19   thereby evade "congressionally established funding limits." GAO Red Book at 3-408.

20       Third, Defendants cannot dispute that they are using funds from TFF to augment

21   construction for the same exact geographic area, the Rio Grande Valley, and for the same agency,

22   DHS, that was provided a specific appropriation as part of the CAA. Instead, Defendants suggest

23   that TFF is not an appropriation at all. Opp'n 30. But 31 U.S.C. § 9705(g)(4)(B) is clearly

24   identified as an "appropriation." *See* Farley Decl. ¶ 7 (Section 9705 "is a permanent, indefinite

25   appropriation available to the Secretary of the Treasury without fiscal year limitation."). While

26   Defendants claim that limiting TFF from being used to "support . . . any activity for which an

27   agency had received funding via annual appropriations" would "severely curtail" Defendants'

28   ability to use TFF, Congress has advised that TFF "must neither augment agency funding nor

8

1  circumvent the appropriations process," consistent with the specific/general rule and

2  Appropriations Clause limitations. *See, e.g.*, H.R. Rep. No. 114-624, at 15 (2016).

3  **C.   New Mexico is Likely to Succeed on its Claim that Defendants Exceeded
       their Statutory Authority Under § 8005 and § 284**

4

5  **1.   New Mexico has Standing to Challenge the § 8005 Diversion**

6       Defendants' arguments against New Mexico's Article III standing for its § 8005 claim

7  fail. New Mexico has articulated significant harms to its environment that will result from the

8  construction. Mot. 9-10; *see Massachusetts v. EPA*, 549 U.S. 497, 516-26 (2007).[2] But for

9  Defendants' unlawful diversion of $1 billion from DOD, the imminent construction and resulting

10 environmental harm in New Mexico would not take place. Thus, New Mexico has shown "a fairly

11 traceable connection between the alleged injury in fact and the alleged conduct of the defendant."

12 *Vt. Agency of Natural Res. v. United States* ex rel. *Stevens*, 529 U.S. 765, 771 (2000).

13      Defendants' claims that New Mexico is seeking to improperly "finesse" and "bootstrap"

14 its alleged harms by "conflat[ing]" two agency actions fall flat.[3] Opp'n 17. Defendants' use of

15 § 8005 and § 284 are part of the same agency action to divert DOD funding and resources for the

16 president's border wall. RJN Ex. 31 (referring to use of § 8005 and § 284 as components of same

17 action); Rapuano Decl. Ex. C (DOD memorandum describing that § 284 "support will be funded

18 through a transfer of $1B" from DOD pursuant to § 8005). Defendants' argument that the funding

19 diversion is analogous to the broad "land withdrawal review program" that the Court rejected in

20 *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) is also off the mark. Unlike in *Lujan*, New

21 Mexico challenges a discrete, "concrete action" that is focused on the particular illegal transfer

22 and misuse of funds to construct a border wall in a specified site in New Mexico. *Id.* at 891.

23      **2.   New Mexico's Interests Are within the Zone of Interests of § 8005**

24      Defendants do not challenge New Mexico's ability to bring a cause of action for § 284

25 _____

   [2] Comparing New Mexico's sovereign injuries here to "ordinary taxpayer" injuries, Opp'n 17, is

26 inappropriate because, as the Supreme Court has recognized, "[s]tates are not normal litigants for
   the purposes of invoking federal jurisdiction." *Massachusetts*, 549 U.S. at 518.

27 [3] Defendants cite *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992) for the proposition that
   New Mexico is not the "object" of § 8005, Opp'n 17-18, without explaining the legal significance

28 of this obvious fact. Here, the agency action does not target a party; rather, at issue is the harm
   caused by Defendants' failure to comply with legal requirements in transferring funds.

9

1    under the zone of interests test. Opp'n 18-19. This is not surprising, as New Mexico has profound

2    interests in preventing or ameliorating the environmental impact of the "[c]onstruction of roads

3    and fences and installation of lighting" contemplated by this provision. Mot. 29-31. New Mexico

4    is thus squarely within the zone of interests to challenge the diversion under § 8005 because, as

5    discussed above, the use of § 8005 and § 284 are part of a single course of conduct to provide

6    DOD funding and resources for a border wall. *See* RJN Ex. 31; Rapuano Decl. Ex. C. Defendants

7    cannot sever what is, practically speaking, the same agency action into two component parts in

8    order to evade judicial review. *See Inv. Co. Inst. v. FDIC*, 606 F. Supp. 683, 684 (D.D.C. 1985),

9    *aff'd*, 815 F.2d 1540 (D.C. Cir. 1987) ("The FDIC cannot so easily divide and conquer plaintiffs'

10   standing. The FDIC's challenged act must be examined as a whole, not in its pieces.").

11        Even if the Court analyzes New Mexico's interests under § 8005 separately from its

12   interests under § 284, Defendants ignore the liberal standard for satisfying the zone of interests

13   test. A party's interest need only be "*arguably* within the zone of interests to be protected or

14   regulated by the statute;" the test is "not meant to be especially demanding," and must be applied

15   "in keeping with Congress's 'evident intent' when enacting the APA 'to make agency action

16   presumably reviewable.'" *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,

17   567 U.S. 209, 224-25 (2012). Indeed, courts "have always conspicuously included the word

18   'arguably' in the test to indicate that *the benefit of any doubt goes to the plaintiff*." *Id.* (emphasis

19   added). A cause of action should be dismissed only if a suit is "more likely to frustrate than to

20   further statutory objectives." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 397 n.12 (1987).

21        Under that standard, Congress's failure to specifically include a discussion of wildlife and

22   environmental preservation in the text of § 8005 does not mean that New Mexico cannot bring a

23   claim under that provision. Opp'n 18. Rather, as one of the cases cited by Defendants makes

24   clear, plaintiffs need only allege an interest that is "causally related to an act within [the statute's]

25   embrace." *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. USDA*, 415

26   F.3d 1078, 1103 (9th Cir. 2005). This is exactly the case here, where New Mexico alleges injuries

27   to its environment and wildlife that are "causally related" to Defendants' attempt to skirt the

28   "tighten[ed] congressional control of the re-programming process" that § 8005 was intended to

10

Pls.' Reply in Supp. of Mot. for Prelim. Inj. (4:19-cv-00872)

1   put in place. Opp'n 19 (citing H.R. Rep. No. 93-662, at 16-17 (1973)). New Mexico's interest is

2   to prevent Defendants' abuse of the reprogramming process from injuring the state. That those

3   injuries are environmental does not push these interests outside of the "generously" construed

4   zone of interests. *Sausalito v. O'Neill*, 386 F.3d 1186, 1200 (9th Cir. 2004).

5        Defendants' position appears to be based on a misconception that *no party* could fall

6   within the zone of interests of § 8005. Defendants claim that "§ 8005 does not contemplate

7   private parties filing lawsuit[s] in order to resolve disputes between the Executive and Congress

8   about defense spending." Opp'n 19.[4] The Supreme Court has expressly declined to follow this

9   line of reasoning: "We must . . . reject the contention that [plaintiff] lacks standing because a

10  consequence of his prevailing will advance the interests of the Executive Branch in a separation

11  of powers dispute with Congress . . . ." *INS. v. Chadha*, 462 U.S. 919, 935–36 (1983); *see also*

12  *McIntosh*, 833 F.3d at 1174. And this blanket assertion of unreviewable authority flies in the face

13  of the "strong presumption favoring judicial review" of agency actions and the "heavy burden" to

14  establish that Congress intended to preclude judicial review. *Mach Mining, LLC v. EEOC*, 135 S.

15  Ct. 1645, 1651 (2015). The lack of any such intent in § 8005 or its legislative history is fatal to

16  this argument. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971).[5]

17       **3.    Defendants Have Exceeded Their Statutory Authority Under § 8005**

18       Defendants cannot reprogram DOD funds under § 8005 for a border wall because the wall

19  is not an "unforeseen military requirement" and *is* an item for which Congress has denied

20  funding. Defendants do not dispute that Congress refused to appropriate funding for a border wall

21  to DHS. *See* Opp'n 19; *supra*, § I.B.1. Instead, Defendants insist that they satisfy the

22  requirements under § 8005 because Congress did not deny border wall funding to *DOD*. Opp'n

23  19-20. That misconstrues § 8005, which provides that in "*no case* where the item for which funds

24

---

25  [4] Citing *Gilligan v. Morgan*, 413 U.S. 1 (1973), Defendants argue that it is inappropriate for judges to review decisions on DOD's resource allocation. But the injunction sought there would

26  have required the district court to "assume continuing regulatory jurisdiction over the activities of the Ohio National Guard," and to make "essentially professional military judgments." *Id.* at 5, 10. This is a far cry from the discrete judicial review sought by Plaintiffs here.

27  [5] The language that Defendants pull from *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1387 (2015) is in the context of whether Congress had displaced traditional equitable relief

28  through the Medicaid Act; that issue is not presented here, where Plaintiffs assert an APA claim.

11

Pls.' Reply in Supp. of Mot. for Prelim. Inj. (4:19-cv-00872)

1  are requested has been denied by the Congress" is a reprogramming or transfer of funds

2  permitted. FY 2019 DOD Appropriations Act, Pub. L. No. 115-245, § 8005, 132 Stat. 2981, 2999

3  (2018). The phrase "no case" confirms that the prohibition is not limited to just Congress's denial

4  of DOD funding requests, but extends to any request denied by Congress. If Defendants' view is

5  correct, then notwithstanding § 8005, the executive branch would have carte blanche to use DOD

6  accounts to satisfy presidential budget requests that Congress previously denied for other

7  agencies. That is not the outcome that Congress intended when it created § 8005 to prevent

8  agencies from "undoing the work of the Congress" by restoring funds "which have been

9  specifically deleted in the legislative process." H.R. Rep. No. 93-662, at 16 (1973).

10       Defendants also fall short of showing that the border wall is an "unforeseen military

11  requirement." To meet the "unforeseen" prong, Defendants claim that the "need" to use DOD

12  resources to construct a border wall to "support counter-drug activities" first arose in February

13  2019, after the enactment of § 8005. Opp'n 20. The record tells a different story. Not only has the

14  president advocated for a wall throughout his presidency, *e.g.*, RJN Exs. 3-13, the president

15  specifically ordered the military to "support DHS" to "stop the flow of deadly drugs and other

16  contraband" at the border on April 4, 2018, nearly six months before the enactment of § 8005.

17  Opp'n 6; RJN Ex. 27. As for the "military requirement" prong, Defendants do not deny the lack

18  of a "military threat" at the border, RJN Ex. 46-47, but contend that Congress's authorization to

19  construct fencing under § 284 makes it *ipso facto* a military requirement. Opp'n 20-21. The

20  question under § 8005, however, is whether the construction of a border wall is *required* for

21  DOD's military functions; that Congress has *permitted* DOD to construct fencing in some narrow

22  cases is irrelevant. DHS acknowledges that *it*, not DOD, possesses the "experience and technical

23  expertise" to construct border infrastructure. Rapuano Decl. Ex. A at 9; Enriquez Decl. ¶¶ 5-6.

24  Further, DOD's use of the reprogrammed funds to award contracts to *private* construction entities

25  belies the "need" for the military to handle the project. Rapuano Decl. Ex. G.

26       **4.  Defendants Have Exceeded Their Statutory Authority Under § 284**

27       Even if Defendants possess authority under § 8005 to reprogram $1 billion into the counter-

28  drug activities account, Defendants cannot utilize that account here under § 284. First, as

12

discussed *supra,* § I.B.1, since § 284 is not a reprogramming or transfer provision in an appropriations act, § 739 of the CAA prohibits using § 284 to "increase" funding for the border wall project. Second, § 284 does not provide broad authority for DOD to fund a large-scale $1 billion border wall. Defendants dismiss a limited reading of § 284, Opp'n 22, but do not explain how the word "support" authorizes DOD to completely fund the border wall project in the El Paso Sector. *Support*, Merriam-Webster's Dictionary (7th ed. 2016) ("back, assist"). When Congress first added this language to DOD appropriations bills, its intent was not for DOD resources to "primarily be used to fund" counter-drug activities of other agencies, and any support was to be of "short duration" only. H.R. Rep. No. 101-665, at 20 (1990). Nor do Defendants explain why Congress would require DOD to provide more detailed notice for "small scale construction" projects totaling $750,000 or less than larger construction projects. *See* 10 U.S.C. § 284(h) & (i)(3). Reading § 284 narrowly is the only way to avoid "an absurd result." *Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 890 (9th Cir. 2005).

### 5. Venue is Proper to Hear New Mexico's Challenge

Defendants do not dispute that if California has a justiciable claim, then venue is proper to hear New Mexico's motion challenging Defendants' use of funds toward and construction of a wall on the state's border. Opp'n 30-31. Rather, Defendants' suggestion that venue is not proper is premised solely on their contention that California lacks standing. *Id.* As discussed *supra*, § I.A, California possesses standing to challenge the diversion of monies from TFF because that action limits the pool of funds available for California to collect its equitable share payments. But even if that were not so, Defendants do not contest that California has alleged injury with respect to the other claims in the First Amended Complaint (FAC) that are not presented in this motion. For instance, California alleges that the State's economy faces harm from the diversion of funding for military construction projects in the State to a border wall. *See, e.g.*, FAC ¶¶ 337-48; *see also* Suppl. RJN Ex. 52 (DOD list of military construction projects at risk, including 37 in California). California also alleges a procedural injury under NEPA because Defendants have proposed using funds not appropriated by Congress toward construction of a wall on California's southern border without conducting an environmental review or issuing a proper waiver. *See, e.g.*, FAC ¶¶ 393-

13

99; *see also* RJN Exs. 33 (DHS request for support from DOD identifying El Centro as the fourth prioritized project), 40 (identifying the El Centro and San Diego Sectors for future construction).

Since California did have a justiciable claim when it filed the same complaint that gave rise to New Mexico's claim, and still does, this district is a proper venue for New Mexico's motion. *See A.J. Taft Coal Co. v. Barnhart*, 291 F. Supp. 2d 1290, 1303 (N.D. Ala. 2003); *cf. Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1191-93 (N.D. Cal. 2017) (finding plaintiff had venue despite "no independent basis for venue" because claims were "closely related" to claims where the court already had venue); *Martensen v. Koch*, 942 F. Supp. 2d 983, 988 (N.D. Cal. 2013) ("[C]ourts in this District have applied the pendent venue doctrine, which holds that if venue is proper on one claim, the court may find pendent venue for claims that are closely related.").

## D.    Plaintiffs Are Likely to Succeed on Their TFF Claim

Defendants argue that Treasury's decision to transfer $601 million to DHS is committed to agency discretion by law and is not subject to judicial review. Opp'n 14-15 (citing *Lincoln v. Vigil*, 508 U.S. 182 (1993)). However, unlike the appropriation in *Lincoln*, § 9705(g)(4)(B) is not a lump-sum appropriation committed to agency discretion. 508 U.S. at 192. As Defendants recognize, Treasury has to satisfy a number of statutory requirements before they may allocate Strategic Support funds. Opp'n 14. And even then, under § 9705(g)(4)(B), Strategic Support funds "*shall be available* . . . for obligation or expenditure in connection with [federal] law enforcement activities." The use of the word "shall" circumscribes Treasury's discretion, ensuring that Treasury "cannot spend the money it receives . . . on anything it wishes," but only on those projects "in connection with the law enforcement activities" of federal agencies. *See Mount Evans Co. v. Madigan,* 14 F.3d 1444, 1449-50 (10th Cir. 1994) (holding that an agency decision pursuant to a statute governing the allocation of funds that the Forest Service received as a result of forfeitures, judgments, compromises, or settlements is subject to judicial review).

Second, Defendants argue that the list of 33 permissible "law enforcement purposes" for use of TFF monies in § 9705(a) should not inform what the term "law enforcement activities" means in § 9705(g)(4)(B), and thus border wall construction comes within the latter. Opp'n 15-16. But, "[w]hen the same word or phrase is used in different parts of a statute, we presume that

14

1    the word or phrase has the same meaning throughout." *S & M Inv. Co. v. Tahoe Regional*

2    *Planning Agency*, 911 F.2d 324, 328 (9th Cir. 1990). Since Defendants do not disagree that the

3    construction of a border wall does not fall within the "law enforcement purposes" of § 9705(a),

4    *compare* Mot. 25-26 *with* Opp'n 15-16, wall construction cannot be construed as a permissible

5    "law enforcement activity" that can be funded through § 9705(g)(4)(B).

6           **E.    Defendants' Actions Are Arbitrary and Capricious**

7           Not only do Defendants' funding diversions fail to comport with the Constitution and

8    applicable statutes, they are also arbitrary and capricious in violation of the APA. Mot. 26-28.

9    Defendants clearly "relied on factors which Congress has not intended [them] to consider," *Motor*

10   *Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), by

11   devoting funding for border barrier construction beyond what Congress approved. Defendants

12   argue that the transfers are permissible because Congress did not deny a border wall appropriation

13   to DOD. *See* Opp'n 19. But Congress's intent is clear, and its limits on spending apply as much to

14   DOD as they do to DHS. Defendants' apparent effort to evade Congress's will by redirecting

15   funds via another agency—a kind of bureaucratic "shell game," *Am. Tel. & Tel. Co. v. FCC*, 978

16   F.2d 727, 732 (D.C. Cir. 1992)—is a quintessentially arbitrary and capricious act.

17          Further, Defendant Shanahan's bare "recit[ations]" of the statutory terms of § 284 and

18   § 8005 (in letters totaling barely three pages, *see* Rapuano Decl. Exs. B-C), are insufficient under

19   the APA. *See State Farm*, 463 U.S. at 52. There is even less of a record to support the diversion

20   from TFF beyond the declaration from Treasury, which makes conclusory statements about

21   compliance with the TFF authorizing statutes, Farley Decl. ¶¶ 8, 10, 11, 23, 26, and shows no

22   awareness that Treasury is diverting *over nine-years-worth of Strategic Support funds* at a time

23   when the stability of TFF is in jeopardy. *See* RJN Exs. 42-43; *see State Farm*, 463 U.S. at 43 (an

24   agency action is arbitrary and capricious if it "entirely failed to consider an important aspect of

25   the problem"). The fact that DOD and Treasury may have checked bureaucratic boxes does not

26   insulate those actions from the court's "searching and careful" review. *Volpe*, 401 U.S. at 416.[6]

---

[6] Without support, Defendants claim that no "written explanation" is needed for agency actions
not involving rulemaking or adjudication, Opp'n 23, but the Ninth Circuit has not so limited the

15

1      Finally, DOD fails to explain its departure from binding internal policy. *Nat'l Ass'n of*

2  *Home Builders v. Norton*, 340 F.3d 835, 852 (9th Cir. 2003). Defendants dismiss DOD's long-

3  time practice of obtaining approval from relevant congressional committees before exercising its

4  general transfer authority (including under § 8005) as an unenforceable "gentleman's agreement,"

5  Opp'n 23, but fail to acknowledge that the practice is enshrined in DOD internal regulation and

6  guidance. RJN Exs. 37-38. If Defendants choose to deviate from agency policy, they must both

7  exhibit "awareness" that they are doing so and provide "good reasons" for the departure. *FCC v.*

8  *Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Defendants show neither.

9      **F.    Plaintiff New Mexico is Likely to Succeed on its NEPA Claim[7]**

10     At the same time DHS takes advantage of DOD's funding and purported statutory authority

11  to build a border wall in the El Paso Sector, Defendants argue that a waiver issued by the DHS

12  Secretary days before the filing of their Opposition waives compliance with various

13  environmental laws (including NEPA) for that project. Opp'n. 24-25. Plaintiffs do not dispute

14  *DHS's* ability to waive NEPA compliance when constructing barriers pursuant to the Illegal

15  Immigration Reform and Immigrant Responsibility Act, Pub. L. No. 104-208, § 102(a), 110 Stat.

16  3009 (1996) (codified at 8 U.S.C. § 1103 note) (IIRIRA), with funds specifically appropriated by

17  Congress to be used for that construction. However, the DHS Secretary's waiver under IIRIRA

18  does not waive *DOD's* obligations to comply with NEPA prior to proceeding with El Paso

19  Project 1 under *DOD's* statutory authority, 10 U.S.C. § 284, and using *DOD's* appropriations.[8]

20  Therefore, DHS's waiver has no application to this project.

21     First, the plain language of IIRIRA does not support application of the DHS waiver to El

22  Paso Project 1. Under IIRIRA § 102, DHS, not DOD, is authorized to "install additional physical

23  barriers and roads . . . in the vicinity of the United States border" and to "construct reinforced

24  fencing." Only in connection with the "construction of the barriers and roads *under this section*,"

25  review of agency actions. *See Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668,
   686–90 (9th Cir. 2007) (agency's decision to transfer its functions to private entities was arbitrary
26  and capricious because agency failed to "cogently explain" its change of agency practice).
   [7] Plaintiffs clarify that only the State of New Mexico is moving on NEPA. *See* Opp'n 25 n.4.
27  [8] While CBP is accepting public comment on El Paso Project 1, Defendants acknowledge that
   DOD will ultimately decide whether to adopt any measures suggested by the comments—further
28  demonstrating DOD's central role in this project. Enriquez Decl. ¶¶ 33, 40, 50, 59.

1    however, is the DHS Secretary permitted "to waive all legal requirements such Secretary, in such

2    Secretary's sole discretion, determines necessary." IIRIRA § 102(c). DOD plainly is not acting

3    "under this section" within the meaning of IIRIRA § 102 when it acts under § 284. In another

4    context, Congress explicitly allows the DOD Secretary to request "the head of an[other] agency

5    responsible for the administration of [] navigation or vessel-inspection laws [to] waive

6    compliance with those laws to the extent the Secretary considers necessary. . . ." 46 U.S.C. §

7    501(a). But IIRIRA provides DOD with no such authority, meaning that authority does not exist.

8    *See Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 552–53 (1987) ("When statutory

9    language is plain, and nothing in the Act's structure or relationship to other statutes calls into

10   question this plain meaning, that is ordinarily the end of the matter.").

11        Second, Congress specifically authorized appropriations for all projects carried out pursuant

12   to IIRIRA § 102(b)(4), thus limiting the DHS Secretary's ability to waive laws to projects that

13   Congress funded "under this section," that is, pursuant to IIRIRA. Again, DOD makes clear it is

14   constructing El Paso Project 1 under § 284, and the project is being funded from appropriations to

15   DOD's drug-interdiction account and not pursuant to IIRIRA. Opp'n 10.

16        Third, Defendants' attempts to circumvent Congress's decision to not appropriate the funds

17   for El Paso Project 1 by toggling between DOD or DHS as the agency responsible for building

18   and funding this project have no support in the law. When it is convenient for Defendants, in

19   response to Plaintiffs' other claims, Defendants emphasize DOD is completing the project, not

20   DHS. *Id.* 19, 29. Yet when asserting NEPA compliance, Defendants rely on the DHS Secretary's

21   authority to issue a waiver. *Id.* 24-25. Defendants cannot have it both ways. As discussed *supra*,

22   § I.E, their attempt to do so only further establishes that their position is arbitrary and capricious.

23   **II.   PLAINTIFF STATES ARE LIKELY TO SUFFER IRREPARABLE HARM CAUSED BY
          DEFENDANTS' CONDUCT**

24

25         **A.   Plaintiff New Mexico Will Suffer Irreparable Harm Caused by the
                Diversion Under § 8005 and § 284 and the Violation of NEPA**

26        Defendants do not dispute that New Mexico has a sovereign interest in protecting its natural

27   resources and wildlife within its borders. *Compare* Mot. 31 *with* Opp'n 31-34; *see Maine v.*

28   *Taylor*, 477 U.S. 131, 151 (1986) (state has "broad regulatory authority to protect the . . . integrity

17

1   of its natural resources"); *Pac. Nw. Venison Producers v. Smitch*, 20 F.3d 1008, 1013 (9th Cir.

2   1994) ("Clearly, the protection of wildlife is one of the state's most important interests"). El Paso

3   Project 1 will undermine those sovereign interests by disrupting the State's ability to protect its

4   natural resources, and create and preserve wildlife corridors for large mammals and species of

5   concern like the Mexican wolf. *Sanders-Reed* ex rel. *Sanders-Reed v. Martinez*, 350 P.3d 1221,

6   1225 (N.M. Ct. App. 2015); Traphagen Decl. ¶¶ 27-31, Ex. B. And the IIRIRA waiver, which

7   likewise flows from Defendants' illegal funding actions, creates an additional injury to New

8   Mexico's sovereignty, as it interferes with New Mexico's ability to enforce its state laws designed

9   to protect its environment and wildlife corridors. *See* N.M. Stat. Ann. § 17-2-41 (prohibiting the

10  taking of endangered or threatened species); Wildlife Corridors Act of 2019 (requiring

11  preservation of wildlife corridors), Suppl. RJN Ex. 53. These sovereign injuries are sufficient for

12  establishing irreparable harm. *See Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001)

13  (injuries to "sovereign interests and public policies" are irreparable); *cf. Maryland v. King*, 567

14  U.S. 1301 (2012) (Roberts, C.J., in chambers) (state's inability to "employ a duly enacted

15  statute . . . constitutes irreparable harm").

16         New Mexico has also demonstrated the extensive harm that wall construction will have on

17  endangered species such as the Mexican wolf. Mot. 29-31. The stringent level of proof demanded

18  by Defendants concerning harm is not supported by case law. Opp'n 31-34. New Mexico does not

19  have to prove that El Paso Project 1 will be the but-for cause of the extinction of species, as even

20  the cases relied on by Defendants show. Opp'n 32 (*e.g.*, *Nat'l Wildlife Fed'n v. Burlington

21  N.R.R.*, 23 F.3d 1508, 1512 n.8 (9th Cir. 1994) ("We are not saying that a threat of extinction to

22  the species is required before an injunction may issue . . . .")); *see also Nat'l Wildlife Fed'n v.

23  Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 818-19 (9th Cir. 2018); *Simula, Inc. v. Autoliv, Inc.*,

24  175 F.3d 716, 725 (9th Cir. 1999). Rather, New Mexico need only show that El Paso Project 1 is

25  likely to harm protected species. *Id.*; *see League of Wilderness Defs./Blue Mountains Biodiversity

26  Proj. v. Connaguhton*, 752 F.3d 755, 764 (9th Cir. 2014).

27         In contrast to the cases Defendants cite, Opp'n 32, here New Mexico has proffered

28  evidence of demonstrable, significant harms to protected species. El Paso Project 1 will add 46

                                                    18

miles of impenetrable barriers that will block habitat corridors for many species. Traphagen Decl. ¶¶ 17-25, Ex. A. For example, the wall will obstruct the Mexican wolf from accessing its historic range and preclude wolves from two distinct populations (one in Mexico and one in the U.S.) from breeding with each other. *Id.*; Opp'n Ex. 13 at 3. The U.S. Fish and Wildlife Service acknowledges the benefits of habitat connectivity for wolf recovery, and that dispersal between the two distinct populations would facilitate the gene diversity required for the wolf's survival. Opp'n Ex. 13 at 14-15; Traphagen Decl. ¶¶ 17-25, Ex. A; Nagano Decl. ¶ 15; Lasky Decl. ¶¶ 7-8. It follows that a lack of genetic diversity caused by the construction of an extensive impenetrable barrier will imperil the wolf's recovery. Mexican wolves are crossing the border, which demonstrates that wolves from the two populations can inter-breed and achieve increased genetic variability, which they cannot do if a wall is constructed. *Id.*

Defendants try to minimize New Mexico's irreparable harm by claiming that CBP will, if feasible, propose mitigation measures and best management practices to DOD to lessen project impacts. Enriquez Decl. ¶¶ 33, 40, 50, 59. Those efforts will not reduce New Mexico's harms, especially if Defendants proceed without conducting NEPA review, which requires assessing less environmentally damaging alternatives to the project. 40 C.F.R. § 1502.14. Even so, there is no measure that could sufficiently mitigate El Paso Project 1's harmful impact of an impenetrable wall blocking the state's habitat corridors. Traphagen Decl. ¶¶ 17-25, Ex. A; Nagano Decl. ¶ 15. Blocking wildlife corridors is particularly concerning because Defendants are constructing a 30-foot-high wall along both New Mexico and Arizona's borders with Mexico. Enriquez Decl. ¶¶ 12, 18; Traphagen Decl. Ex. B. El Paso Project 1 is not an isolated project but is part of a larger scheme to complete the president's border wall, completely blocking cross-border wildlife corridors. *Id.*; RJN Ex. 33.

### B.    Plaintiff States Will Suffer Irreparable Harm from the TFF Diversion

Defendants' arguments against Plaintiff States' claims of irreparable harm on TFF are derivative of their contention that Plaintiffs lack Article III standing. Opp'n 31. Because Plaintiffs satisfy Article III standing, *see supra*, § I.A. Defendants' unconstitutional actions coupled with damages incurred and sovereign injuries are enough to show irreparable harm. Mot. 31-32. In

19

Pls.' Reply in Supp. of Mot. for Prelim. Inj. (4:19-cv-00872)

1   addition, Defendants fail to address a crucial point: once the funds are obligated, Plaintiffs'

2   claims to those funds may be moot. *See City of Houston v. HUD*, 24 F.3d 1421, 1426 (D.C. Cir.

3   1994). Defendants' repeatedly expressed intentions to move quickly to obligate funds shows the

4   likelihood of this injury absent judicial relief. Mot. 3, 32-33; *see also* Flossmore Decl. ¶ 11.

5   **III.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR AN INJUNCTION**

6        The harms caused to Plaintiff States' public safety as a result of the diversion from TFF, *see*

7   TFF App'x, and the aforementioned harms to New Mexico's environment and wildlife as a result

8   of the diversion of DOD funds, are decidedly against the public interest. *See Alliance for the Wild*

9   *Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011) (recognizing the "well-established public

10  interest in preserving nature and avoiding irreparable environmental injury"); *Earth Island Inst. v.*

11  *Elliott,* 290 F. Supp. 3d 1102, 1125 (E.D. Cal. 2017) (discussing "very serious public safety

12  concerns" in public interest factor). And "[t]he public has an interest in assuring that public funds

13  are appropriated and distributed pursuant to Congressional directives" and that the status quo is

14  maintained during this litigation, Mot. 33 (quoting *Population Inst. v. McPherson*, 797 F.2d

15  1062, 1082 (D.C. Cir. 1986)), considerations that Defendants do not address. *See* Opp'n 34-35.

16       Defendants cite to congressional intent to argue that the balance of equities and public

17  interest favor them. Opp'n 35. But the exact opposite is true, as Congress has not appropriated

18  any of the funds toward a border barrier that are at issue in this motion. Instead, Defendants

19  attempt to stretch various funding statutes to their breaking point to fund the president's border

20  wall project in direct defiance of Congress. As Defendants argue, courts "'cannot ignore the

21  judgment of Congress, deliberately expressed in legislation,' which is 'a declaration of public

22  interest and policy which should be persuasive.'" *Id.* (citing *Va. Ry. Co. v. Sys. Fed'n No. 40*, 300

23  U.S. 515, 551-52 (1937)). Plaintiffs agree. Accordingly, the public interest and balance of

24  hardships support this Court granting Plaintiffs' motion for preliminary injunction.

25                    **CONCLUSION**

26       For the foregoing reasons, Plaintiffs request this Court grant their Motion in full.

27

28

20

Pls.' Reply in Supp. of Mot. for Prelim. Inj. (4:19-cv-00872)

1  Dated: May 2, 2019                              Respectfully Submitted,

2                                                  XAVIER BECERRA
                                                   Attorney General of California
3                                                  ROBERT W. BYRNE
                                                   SALLY MAGNANI
4                                                  MICHAEL L. NEWMAN
                                                   Senior Assistant Attorneys General
5                                                  MICHAEL P. CAYABAN
                                                   CHRISTINE CHUANG
6                                                  EDWARD H. OCHOA
                                                   Supervising Deputy Attorneys General
7                                                  HEATHER C. LESLIE
                                                   JANELLE M. SMITH
8                                                  JAMES F. ZAHRADKA II

9                                                  */s/ Lee I. Sherman*

10                                                 LEE I. SHERMAN
                                                   Deputy Attorneys General
11                                                 *Attorneys for Plaintiff State of California*

12

13  PHILIP J. WEISER                               WILLIAM TONG
    Attorney General of Colorado                   Attorney General of Connecticut
14  ERIC R. OLSON (*appearance pro hac vice*)      MARGARET Q. CHAPPLE (*pro hac vice*
    Solicitor General                              *forthcoming*)
15  *Attorneys for Plaintiff State of Colorado*    Deputy Attorney General
                                                   *Attorneys for Plaintiff State of Connecticut*
16
    KATHLEEN JENNINGS                              CLARE E. CONNORS
17  Attorney General of Delaware                   Attorney General of Hawaii
    AARON R. GOLDSTEIN                             CLYDE J. WADSWORTH
18  Chief Deputy Attorney General                  Solicitor General
    ILONA KIRSHON                                  *Attorneys for Plaintiff State of Hawaii*
19  Deputy State Solicitor
    DAVID J. LYONS (*appearance pro hac vice*)
20  Deputy Attorney General
    *Attorneys for Plaintiff State of Delaware*
21
    KWAME RAOUL                                    BRIAN E. FROSH
22  Attorney General of Illinois                   Attorney General of Maryland
    CALEB RUSH                                     JEFFREY P. DUNLAP (*appearance pro hac*
23  Assistant Attorney General                     *vice*)
    *Attorneys for Plaintiff State of Illinois*    Assistant Attorney General
24                                                 *Attorneys for Plaintiff State of Maryland*

25

26

27

28

                                        21

| | |
|---|---|
| AARON M. FREY<br>Attorney General of Maine<br>SUSAN P. HERMAN (*appearance pro hac vice*)<br>*Attorneys for Plaintiff State of Maine* | MAURA HEALEY<br>Attorney General of Massachusetts<br>ABIGAIL B. TAYLOR (*appearance pro hac vice*)<br>Director, Child & Youth Protection Unit<br>DAVID C. KRAVITZ<br>Assistant State Solicitor<br>TARA D. DUNN<br>Assistant Attorney General, Civil Rights Division<br>*Attorneys for Plaintiff Commonwealth of Massachusetts* |
| DANA NESSEL<br>Attorney General of Michigan<br>B. ERIC RESTUCCIA (*appearance pro hac vice*)<br>Assistant Attorney General<br>FADWA A. HAMMOUD<br>Solicitor General<br>*Attorneys for Plaintiff People of Michigan* | KEITH ELLISON<br>Attorney General of Minnesota<br>JOHN KELLER<br>Chief Deputy Attorney General<br>JAMES W. CANADAY<br>Deputy Attorney General<br>JACOB CAMPION (*appearance pro hac vice*)<br>Assistant Attorney General<br>*Attorneys for Plaintiff State of Minnesota* |
| AARON D. FORD<br>Attorney General of Nevada<br>HEIDI PARRY STERN (*appearance pro hac vice*)<br>Solicitor General<br>*Attorneys for Plaintiff State of Nevada* | GURBIR S. GREWAL<br>Attorney General of New Jersey<br>JEREMY FEIGENBAUM (*appearance pro hac vice forthcoming*)<br>Assistant Attorney General<br>*Attorneys for Plaintiff State of New Jersey* |
| HECTOR BALDERAS<br>Attorney General of New Mexico<br>TANIA MAESTAS (*appearance pro hac vice*)<br>Chief Deputy Attorney General<br>NICHOLAS M. SYDOW<br>Civil Appellate Chief<br>JENNIE LUSK<br>Assistant Attorney General, Director<br>MATTHEW L. GARCIA<br>Governor's General Counsel<br>*Attorneys for Plaintiff State of New Mexico* | LETITIA JAMES<br>Attorney General of New York<br>MATTHEW COLANGELO (*appearance pro hac vice*)<br>Chief Counsel for Federal Initiatives<br>STEVEN C. WU<br>Deputy Solicitor General<br>ERIC R. HAREN<br>Special Counsel<br>GAVIN MCCABE<br>Special Assistant Attorney General<br>AMANDA MEYER<br>Assistant Attorney General<br>*Attorneys for Plaintiff State of New York* |
| ELLEN ROSENBLUM<br>Attorney General of Oregon<br>HENRY KANTOR (*appearance pro hac vice*)<br>Special Counsel to Attorney General<br>J. NICOLE DEFEVER<br>Senior Assistant Attorney General<br>*Attorneys for Plaintiff State of Oregon* | PETER F. NERONHA<br>Attorney General of Rhode Island<br>JUSTIN J. SULLIVAN (*appearance pro hac vice*)<br>Special Assistant Attorney General<br>*Attorneys for Plaintiff State of Rhode Island* |

22

1   THOMAS J. DONOVAN
    Attorney General of Vermont
2   BENJAMIN D. BATTLES (*appearance pro hac
    vice*)
3   Solicitor General
    *Attorneys for Plaintiff State of Vermont*
4

5

6

7

8   JOSHUA L. KAUL
    Attorney General of Wisconsin
9   GABE JOHNSON-KARP (*appearance pro hac
    vice*)
10  *Attorneys for Plaintiff State of Wisconsin*

MARK R. HERRING
Attorney General of Virginia
TOBY J. HEYTENS
Solicitor General
MATTHEW R. MCGUIRE
Principal Deputy Solicitor General
MICHELLE S. KALLEN
Deputy Solicitor General
BRITTANY M. JONES (*appearance pro hac
vice*)
Attorney
*Attorneys for Plaintiff Commonwealth of
Virginia*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

23

**ATTESTATION OF SIGNATURES**

I, Lee I. Sherman, hereby attest, pursuant to Local Civil Rule 5-1(i)(3) of the Northern District of California that concurrence in the filing of this document has been obtained from each signatory hereto.

/s/ *Lee I. Sherman*

LEE I. SHERMAN
Deputy Attorney General
*Attorney for Plaintiff*
*State of California*