Nicholas Espíritu (SBN 237665)
NATIONAL IMMIGRATION LAW
CENTER
3450 Wilshire Boulevard, #108-62
Los Angeles, CA 90010
Telephone: 213-639-3900
Facsimile: 213-639-3900
Email: espiritu@nilc.org

Max S. Wolson*
NATIONAL IMMIGRATION LAW
CENTER
P.O. Box 34573
Washington, D.C. 20043
Telephone: 202-216-0261
Facsimile: 202-216-0266
Email: wolson@nilc.org

Joanna Elise Cuevas Ingram (SBN 290011)
NATIONAL IMMIGRATION LAW
CENTER
P.O. Box 170392
Brooklyn, NY 11217
Telephone: 213-377-5258
Facsimile: 213-377-5258
Email: cuevasingram@nilc.org

Attorneys for *Amici Curiae*
*Admitted in Maryland and the District of
Columbia only

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA,** *et al.,* | No. 4:19-cv-00872-HSG |
| Plaintiff, | No. 4:19-cv-00892-HSG |
| v. | **BRIEF OF NATIONAL IMMIGRATION LAW CENTER, ASIAN AMERICANS ADVANCING JUSTICE-AAJC, ASIAN AMERICANS ADVANCING JUSTICE-LOS ANGELES, AALDEF, BLACK ALLIANCE FOR JUST IMMIGRATION AND LATINOJUSTICE PRLDEF AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' PRELIMINARY INJUNCTION** |
| **DONALD J. TRUMP,** *et al.,* | |
| Defendants. | |
| **SIERRA CLUB,** *et al.,* | |
| Plaintiff, | |
| v. | Dept: Courtroom 2, 4th floor |
| **DONALD J. TRUMP,** *et al.,* | Judge:  The Honorable Haywood S. Gilliam |
| Defendants. | Hearing Date:  May 17, 2019 |
| | Action Filed:  February 18, 2019 |
| | February 19, 2019 |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

INTEREST OF AMICI .................................................................................................. 1

SUMMARY OF ARGUMENT ....................................................................................... 1

ARGUMENT………… .................................................................................................. 2

    I. BORDER WALLS PROVED INEFFECTIVE AT DETERRING IMMIGRATION
    AND CREATED A HUMANITARIAN CRISIS ............................................................. 2

        A.    Initial Executive Actions to Erect a Border Wall .................................... 3

        B.    The 1990s "Wall" Effort Caused a Humanitarian Crisis, Instead of Achieving the
        Purported Goals of "Wall" Construction ................................................. 4

    II. CONSTRUCTION OF PHYSICAL BARRIERS AT THE BORDER CAUSED
    ECONOMIC, SOCIAL AND ENVIRONMENTAL HARMS ............................................ 8

    III. PRESIDENT TRUMP'S RHETORIC IN SUPPORT OF ADDITIONAL WALL
    CONSTRUCTION IS THE LATEST EXECUTIVE ACTION IN A   RACIALLY
    DISCRIMINATORY IMMIGRATION POLICY. ........................................................... 10

CONCLUSION ........................................................................................................... 15

1

## TABLE OF AUTHORITIES

2

**Cases**                                                                    **Page(s)**

*Batalla Vidal v. Nielsen,*
   291 F. Supp. 3d 260 (E.D.N.Y. 2018) ................................................................ 14, 15

*CASA de Maryland., Inc. v. Trump,*
   355 F. Supp. 3d 307 (D. Md. 2018) ........................................................................ 15

*Centro Presente v. U.S. Dep't of Homeland Security,*
   332 F. Supp. 3d 393 (D. Mass. 2018) ..................................................................... 15

*City of Philadelphia v. Attorney Gen. of United States of Am.,*
   916 F.3d 276 (3d Cir. 2019)..................................................................................... 14

*Cnty. of San Francisco v. Sessions, _ F. Supp. 3d _,*
   2019 WL 1024404 (N.D. Cal. Mar. 4, 2019)........................................................... 14

*D & D Landholdings v. United States,*
   82 Fed. Cl. 329 (2008) ............................................................................................... 3

*Grace v. Whitaker,*
   344 F. Supp. 3d 96 (D.D.C. 2018) .......................................................................... 13

*Gutierrez-Soto v. Sessions,*
   317 F. Supp. 3d 917 (W.D. Tex. 2018).................................................................... 15

*International Refugee Assistance Project v. Trump,*
   883 F.3d 233 (4th Cir. 2018) ................................................................................... 15

*NAACP v. Trump,*
   298 F. Supp. 3d 209 (D.D.C. 2018) ........................................................................ 14

*NAACP v. U.S. Dep't of Homeland Security, _ F. Supp. 3d _,*
   2019 WL 1126386 (D. Md. Mar. 12, 2019).............................................................. 14

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Security,*
   908 F.3d 476 (9th Cir. 2018) ................................................................................... 15

*Saget v. Trump,*
   345 F. Supp. 3d 287 (E.D.N.Y. 2018) ..................................................................... 15

*Trump v. Hawaii,*
   138 S. Ct................................................................................................ 12, 13, 14, 15

**Statutes**

Pub. L. No. 104-208, § 110 Stat. 3009 ........................................................................... 7

ii

Pub. L. No. 109-13, § 102, 119 Stat. 302 ........................................................................ 7

Pub. L. No. 109-367, § 3, 120 Stat. 2638 ....................................................................... 7

**Regulations**

*Inadmissibility on Public Charge Grounds*,
 83 Fed. Reg. 51,114 (Oct. 10, 2018)........................................................................ 13

**Other Authorities**

Balluck, Kyle, *Trump says some asylum-seekers look like they're 'fighting for the UFC'*, The
 Hill (Apr. 7, 2019)………………………............................................................ 12

Chacón, Jennifer M., *Loving Across Borders: Immigration Law and the Limits of Loving*, 2007
 Wis. L. Rev. 345, 369 (2007) ……………………………………………………… 9

Chang, Grace, *Precious Cargo*, 52 U.C. Davis L. Rev. 81 (2018)........................... 5, 7

Cornelius, Wayne A., *Death at the Border: Efficacy and Unintended Consequences of US
 Immigration Control Policy*, 27 Popul. Dev. Rev. 661 (2001)............................5, 6, 7

Cornelius, Wayne A., *Evaluating Enhanced U.S. Border Enforcement*, Migration Policy Institute
 Migration Information Source [*Cornelius II*] (May 1, 2004)………………………..…5, 6

Donnelly, Robert & Jacqueline Hagan, *The Dangerous Journey: Migrant Smuggling from
 Mexico and Central America, Asia, and the Caribbean*, 1 in Lois Ann Lorentzen (ed.), *Hidden
 Lives and Human Rights in the United States: Understanding the Controversies and Tragedies
 of Undocumented Immigration* 71 (2014)………………………………………………... 6

Eschbach, Karl et al., *Death at the Border*, 33 Int. Migr. Rev. 430–54 (1999)………………..5, 6

Gallegos,Gabriela A., *Border Matters: Redefining the National Interest in U.S.-Mexico
 Immigration and Trade Policy*, 92 Cal. L. Rev. 1729 (2004)................................. 3, 7

Gonzales, Richard, *U.S. to Limit the Number of Refugees Allowed Entry to 30,000*, National
 Public Radio, Sep. 17. 2018..................................................................................... 13

Gulasekaram, Pratheepan, *Why a Wall?*, 2 UC Irvine Law Rev. 147 (2012)…………………..6

Guy, Sandra, *Trump in Chicago: Says he's '100 percent correct' about Mexicans, blasts U.S. as
 'laughingstock' – 'we're all a bunch of clowns'*, Chicago Sun Times (June 24, 2016)…….. 11

Haddal, Chad C. et al., Cong. Research Serv., RL33659, *Border Security: Barriers along the
 U.S. International Border* 1 (2009) ...……………………………………………..…….. 2, 3

Hernandez-Leon, Ruben, *The Migration Industry in the Mexico-U.S. Migratory System*, UCLA
 California Center for Population Research ("CCPR") Popul. Work. Pap. (2005)…...................7

iii

Herweck, Stefanie & Scott Nicol, *Death, Damage, and Failure: Past, Present, and Future Impacts of Walls on the U.S.-Mexico Border,* (ACLU Border Rights Center Report, 2018),…………………………………………………………………….... 8, 9, 10

Hing, Bill Ong, *NAFTA, Globalization, and Mexican Migrants*, 5 J. Law Econ. Policy 87, (2009)…………………………………………………………………………….. 8

Hing, Bill Ong, *The Dark Side of Operation Gatekeeper*, 7 U.C. Davis J. Int. Law & Pol. 121, (2001) …………………………..……………………………………………….. passim

Hirschfeld Davis, Julie, et al., *Trump Alarms Lawmakers with Disparaging Words for Haiti and Africa*, N.Y. Times (Jan. 11, 2018) …………………………………………………… 12

Hirschfeld Davis, Julie, *Trump Calls Some Unauthorized Immigrants 'Animals' in Rant*, N.Y. Times (May 16, 2018) ………………………………………………………………. 12

Landers, Elizabeth & James Masters, *Trump retweets anti-Muslim videos,* CNN, Nov. 30, 2017……………………………………………………………………………………..12

McGuire, Randall H., *Steel Walls and Picket Fences: Rematerializing the U.S.–Mexican Border in Ambos Nogales*, 115 Am. Anthropol. 466 (2013) …………………………………..... 8

Mitchell, Don M., *The Geography of Injustice: Borders and the Continuing Immiseration of California Agricultural Labor in Era of 'Free Trade'*, 2 Rich. J. Global L. & Bus. 145 (2001) ....................................................................................................................... 9, 10, 11

Nevins, Joseph, *Operation Gatekeeper: The Rise of the "illegal Alien" and the Making of the U.S.-Mexico Boundary,* 43 (2002)……………………………………………….. 2, 3

Oppenheimer, David B., et al., *Playing the Trump Card: The Enduring Legacy of Racism in Immigration Law*, 26 Berkeley La Raza L.J. 1 (2016) ............................................... 3

Pence, Mike, *Mike Pence: Democrats refuse to compromise on border wall funding to end shutdown*, USA Today (Jan. 15, 2019) ……………………………………………….. 11

Phillips, Amber, *'They're rapists.' President Trump's campaign launch speech two years later, annotated*, Washington Post (June 16, 2017)......................................................10, 11

Pompeo, Michael R. Secretary of State, Remarks to the Media (Sept. 17, 2018)……………… 13

Presidential Memorandum for the Secretary of State (Sept. 29, 2017)………………………... 13

Romellón, Jorge Santibáñez, *Riesgos asociados al desplazamiento migratorio internacional* (2000)……………………………………………………………………...………6

Shear, Michael D. & Julie Hirschfeld Davis, *Stoking Fears, Trump Defied Bureaucracy to Advance Immigration Agenda*, N.Y. Times (Dec. 23, 2017)…………………..…………….. 12

Slack, Jeremy, et al., *In the Shadow of the Wall: Family Separation, Immigration Enforcement and Security: Preliminary Data from the Migrant Border Crossing Study* at 16 (The Center for Latin American Studies, University of Arizona, 2013)…………………………………..……7

iv

1
2

Trump, Donald J*., Proclamation Declaring a National Emergency Concerning the Southern Border of the United States* (Feb. 15, 2019)………………………...…………………………1

3
4

U.S. State Department Bureau of Counterterrorism and Countering Violent Extremism, *Country Reports on Terrorism 2017* ……………………………………………………………….. 11

5

White House, *President Donald J. Trump's Border Security Victory* (Feb. 15, 2019)…………...1

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Brief of National Immigration Law Center as *amici curiae* - California v. Trump, Case No. 4:19-cv-00872-HSG
Brief of National Immigration Law Center as *amici curiae* - Sierra Club v. Trump, Case No. 4:19-cv-00892-HSG

**INTEREST OF AMICI**

*Amici,* the National Immigration Law Center ("NILC"), Asian Americans Advancing Justice-AAJC ("Advancing Justice-AAJC"), Asian Americans Advancing Justice-Los Angeles ("Advancing Justice-Los Angeles"), the Asian American Legal Defense and Education Fund ("AALDEF"), Black Alliance for Just Immigration ("BAJI"), and LatinoJustice PRLDEF are all nonprofit organizations dedicated to advancing and defending the constitutional rights of diverse communities of color, immigrant communities, and their families. *Amici's* interest in the outcome of this case arises out of *amici's* efforts to defend against the racial animus and xenophobic nature of the Executive's immigration policies as well as their concern for the harms to immigrant communities and communities of color when the Executive takes unilateral action to exclude immigrants.

**SUMMARY OF ARGUMENT**

The instant case involves the Executive's claim that it has the power to build that which Congress has expressly refused.  On February 15, 2019, the Trump Administration announced that the President was taking Executive Action to redirect an additional $6.7 billion in funding beyond what was appropriated by Congress toward construction of a "border wall", and declared a national emergency under the National Emergencies Act.[1]  The Emergency Declaration claimed that "the problem of large-scale unlawful migration through the southern border is long-standing," and that "the southern border is a major entry point for criminals, gang members, and illicit narcotics" and that "despite executive branch's exercise of existing statutory authorities, the situation has worsened in certain respects in recent years."[2]

---

[1] White House, *President Donald J. Trump's Border Security Victory* (Feb. 15, 2019), https://www.whitehouse.gov/briefings-statements/president-donald-j-trumps-border-security-victory/; President Donald J. Trump, *Proclamation Declaring a National Emergency Concerning the Southern Border of the United States* (Feb. 15, 2019), https://www.whitehouse.gov/presidential-actions/presidential-proclamation-declaring-national-emergency-concerning-southern-border-united-states/ .

[2] President Donald J. Trump, *Proclamation Declaring a National Emergency Concerning the Southern Border of the United States, supra* note 1.

1   While, within this litigation, the Executive is now also asserting non-emergency powers, those

2   allegations are nonetheless a purported basis for the Executive's unilateral actions.   The

3   Executive's claims of necessity for a "wall" along the southern border with Mexico are grounded

4   in discriminatory animus and steeped in racialized and xenophobic tropes.   The Executive's

5   desired result from its usurpation of Congressional authority—the construction of a border wall—

6   has previously been attempted.   Those attempts failed at their goal of decreased or deterred

7   migration and instead resulted in migrant deaths and serious social, psychological, and

8   environmental harms to border communities.   This history reveals that the current Executive's

9   unilateral efforts to install physical barriers along the U.S.-Mexico border will likely result in many

10   of the same harms, except at a much larger scale—and with a much higher multiplier in terms of

11   the costs, risks, depth, and breadth of harm to the public.   Because Defendants' assertions of a

12   proper basis for their actions is undermined by abundant evidence of improper motive, and because

13   a preliminary injunction is in the public interest, amici respectfully request this Court grant

14   Plaintiffs' motion.

## ARGUMENT

### I.   BORDER WALLS PROVED INEFFECTIVE AT DETERRING IMMIGRATION AND CREATED A HUMANITARIAN CRISIS

The notion of "walling off" the southern border between the United States and Mexico is

relatively new.[3]   Indeed, the most significant instance of border wall construction designed to deter

entry along the United States-Mexico border occurred in the 1990s.

---

[3] Prior to 1990, the most substantial physical barriers were private fences used by ranchers to corral cattle.   In 1990, the U.S. Border Patrol ("CBP") erected a first formal physical barrier along the U.S.-Mexico border.   *See* Chad C. Haddal, Yule Kim & Michael John Garcia, Cong. Research Serv., RL33659, *Border Security: Barriers along the U.S. International Border* 1 (2009), https://fas.org/sgp/crs/homesec/RL33659.pdf (discussing installation of "primary fence" in the San Diego sector); *see also* Joseph Nevins*, Operation Gatekeeper: The Rise of the "illegal Alien" and the Making of the U.S.-Mexico Boundary,* at 43 (2002) (noting lone U.S. Civilian Conservation Corps efforts to build a barbed wire fence from the Pacific Ocean to Marone Valley, about eight miles west of Tecate, California, in 1936).

### A. Initial Executive Actions to Erect a Border Wall

First, in 1990, the U.S. Border Patrol ("CBP") erected the initial formal physical barrier along the U.S.-Mexico border, also known as the "primary fence".[4]  Second, in 1993, Silvestre Reyes, Border Patrol Chief of the El Paso Sector at the time,[5] "unilaterally launched Operation Blockade (renamed 'Hold-the-Line' as the former proved to be quite offensive to the Mexican government) in the El Paso Border region," sending 400 agents and their vehicles in a high-profile "show of force" along a 20-mile section of the boundary that divides El Paso, Texas in the United States from Ciudad Juarez in Mexico.[6]

The following year, perhaps the most notable 1990s-era barrier erection began, "Operation Gatekeeper."  There, the federal Executive sought to construct a "wall" to advance a "Prevention through Deterrence" policy, by creating multiple physical barriers, walls, and secondary fencing to "increase the [U.S. Border Patrol's] ability to discourage a significant number of illegal border crossers, to detect intruders early[,] delay them as long as possible, and to channel a reduced number of illegal border crossers to geographic locations where the [Border Patrol] was better prepared to deal with them.'" [7]  Under the auspices of the Immigration and Naturalization Service ("INS"), Operation Gatekeeper resulted in construction of multiple layers of secondary fencing around the primary fence, to create a "wall" along a 14-mile stretch of the California-Mexico border from the Pacific Ocean at Imperial Beach eastward to the Otay Mountains.[8]  The Executive later expanded the fence-building project to Nogales, Yuma, and Tucson, Arizona and  El Paso,

---

[4]  Haddal, Kim & Garcia, *supra* note 3.

[5]  Gabriela A. Gallegos, *Border Matters: Redefining the National Interest in U.S.-Mexico Immigration and Trade Policy*, 92 Cal. L. Rev. 1729, 1734–35 (2004) (noting Reyes's unilateral action).

[6]  Nevins, *supra* note 3 at 74.

[7] *D & D Landholdings v. United States*, 82 Fed. Cl. 329, 333 (2008) (reviewing background on "Operation Gatekeeper", and related border barrier construction and occupation of private property, ultimately ruling that Plaintiff stated a claim for unconstitutional taking of real property, denying the United States' Motion to Dismiss).

[8]  David B. Oppenheimer, Swati Prakash & Rachel Burns, *Playing the Trump Card: The Enduring Legacy of Racism in Immigration Law*, 26 Berkeley La Raza L.J. 1, 39 (2016) (internal quotation omitted).

Texas.[9]  "The vision for Operation Gatekeeper was also embodied in the [INS] San Diego Sector's own strategic planning document published in April 1994."[10]  While "the 14-mile section had been the focus of some resources before Gatekeeper", as "[s]teel fencing and bright lighting was already in place in sections of this corridor….Phase I of Gatekeeper, which would require up to two years to complete, further increased staffing and resources along the 14-mile stretch."[11]

Beyond the 14 miles of primary fencing, the INS built two "back-up" 15-foot tall fences, the first constructed of concrete pillars and rimmed with barbed wire.  Twelve of the 14 miles of this section were dotted with stadium lights, and some of the fencing was constructed on the Otay Mountains, as well as around various East San Diego County communities along the border.[12]

In 1995, Operation Safeguard followed in Nogales, Arizona, resulting in "17 miles of fencing—six in the Yuma sector and nine in the Tucson sector-erected exclusively in towns and cities, with three miles of lighting;  along with Operation Rio Grande (August 1997) in McAllen and Laredo, Texas, as well as seven miles of fencing in the El Paso/Ciudad Juarez area—two miles of primary and five miles of secondary fencing.[13]  As a result of these actions, the INS "erected 73 miles of fencing on the 2,000 mile border, 72 percent of it along the 66 mile San Diego sector."[14]

## B.  The 1990s "Wall" Effort Caused a Humanitarian Crisis, Instead of Achieving the Purported Goals of "Wall" Construction

Rather than preventing migration, these enforcement efforts and barriers simply geographically redistributed migrant border crossings.  Between 1994 and 2000, for example,

---

[9] Bill Ong Hing, *The Dark Side of Operation Gatekeeper*, 7 U.C. Davis J. Int. Law & Pol. 121, 130 (2001) (citing California Rural Legal Assistance Foundation, Operation Gatekeeper Fact Sheet, Feb. 23, 2001 (hereinafter, "CRLAF Fact Sheet"), at 1)) (noting Operation Safeguard (Arizona, 1995) soon followed Operation Gatekeeper along with Operation Rio Grande (Texas, August 1997)).

[10] *Id.* at 128–29 (citing Gustavo De La Viña, U.S. Border Patrol San Diego Sector Strategic Planning Document, Apr. 29, 1994, at 1).

[11] *Id.* (citing De La Viña, at 1, 4 and 8).

[12] *Id.* at 128–29.

[13] *Id.* at 130.

[14] *Id.*

4

Brief of National Immigration Law Center as *amici curiae*  - California v. Trump, Case No. 4:19-cv-00872-HSG
Brief of National Immigration Law Center as *amici curiae*  - Sierra Club v. Trump, Case No. 4:19-cv-00892-HSG

apprehensions in San Diego declined 66 percent but grew 351 percent in the Tucson and Yuma sectors in Arizona as migrants were pushed east.[15]  These new crossing points were in more remote areas: subsequently, migration journeys became more difficult and dangerous.  Migration scholar Wayne Cornelius argues that the increased costs and risks of these journeys "should not be treated as 'unintended' consequences, since they were an integral part of the INS's 'prevention through deterrence' strategy from its inception."[16]  By implementing prevention through deterrence strategies like Operation Gatekeeper, the "evidence suggests that the policy and practice instituted under Operation Gatekeeper explicitly relied on the assumption that migrants would either be discouraged from entering the country or die trying."[17]

As a result of geographic shifts in crossing and more hazardous crossing conditions, "prevention through deterrence" has been associated with changes in the locations of migrant deaths, changes in causes of deaths, and overall increases in the incidence of deaths.[18]  By 1997, researchers documented a sharp increase in deaths in Imperial County, California, which runs East of San Diego to the Arizona border.[19]  Later, between 1996 and 2000, deaths increased in Arizona by 1,186 percent and in Texas by 1,181 percent.[20] In total, deaths among those attempting to cross the Southwest border without authorization during this period increased by 474 percent.[21] Migrants increasingly perished from environmental causes—hypothermia, dehydration, and

---

[15] Wayne A. Cornelius, *Death at the Border: Efficacy and Unintended Consequences of US Immigration Control Policy*, 27 Popul. Dev. Rev. 661, 665-67 (2001).

[16] *Id.* at 667

[17] Grace Chang, *Precious Cargo*, 52 U.C. Davis L. Rev. 81, 96 (2018).

[18] *See generally,* Karl Eschbach, Jacqueline Hagan, Nestor Rodriguez, Ruben Hernandez-Leon & Stanley Bailey, et al., *Death at the Border*, 33 Int. Migr. Rev. 430–54 (1999); Cornelius, *supra* note 15 at 667-76; *Cornelius* II, *infra* note 25.

[19] Eschbach et al., *supra* note 18 at 442 (arguing this increase "almost certainly [wa]s a result in the deflection of undocumented flows" from the San Diego Sector as a result of Operation Gatekeeper).

[20] Cornelius, *supra* note 15.

[21] *Id.*

sunstroke—and by drowning.[22] Between 1993 and 1997, researchers estimated conservatively that there were more than 1,600 deaths on the northern side of the U.S.-Mexico border.[23] By 2004, there were 2,952 documented deaths associated with unauthorized attempts to cross the border.[24]

Increased deaths during the 1990s cannot be explained solely by increased migration flows, as "per-year increases in mortality [we]re much larger than the increases in Border Patrol apprehensions."[25] Between Fiscal Years 1998 and 2003, the probability of a migrant dying versus being apprehended doubled.[26] Overall, empirical studies demonstrate that Operation Gatekeeper and the initiation of the border fence project, in practice, turned out be "costly and ineffectual in accomplishing its stated goals" and that it has led to "significant death without any deterrence."[27]

Migrants who do not die experience physical suffering and violence on journeys through hazardous terrain.[28] A survey of returned migrants in Mexico in 1999-2000 found that 70 percent experienced a physical risk during their crossing attempt, including more than a third who lacked water or food.[29] This pattern persists. A 2013 study found that almost forty percent of the individuals who attempted to cross the border ran out of water in the desert and nearly a third ran

---

[22] Eschbach et al., *supra* note 18; Cornelius, *supra* note 15 at 671 (noting that environmental factors and drowning accounted for 76 percent of all deaths between 1998 and 2001).

[23] Eschbach et al., *supra* note 18 at 430.

[24] Wayne Cornelius, *Evaluating Enhanced U.S. Border Enforcement*, Migration Policy Institute Migration Information Source [*hereinafter Cornelius II*] (May 1, 2004), *available at* https://www.migrationpolicy.org/article/evaluating-enhanced-us-border-enforcement (last accessed Apr. 30, 2019).

[25] Cornelius, *supra* note 15 at 670.

[26] *Cornelius II*, *supra* note 24.

[27] Pratheepan Gulasekaram, *Why a Wall?*, 2 UC Irvine Law Rev. 147, 153 (2012).

[28] Robert Donnelly & Jacqueline Hagan, *The Dangerous Journey: Migrant Smuggling from Mexico and Central America, Asia, and the Caribbean*, 1 in Lois Ann Lorentzen (ed.), *Hidden Lives and Human Rights in the United States: Understanding the Controversies and Tragedies of Undocumented Immigration* 71–106 (2014).

[29] Cornelius, *supra* note 15 at 676 (citing Jorge Santibáñez Romellón, *Riesgos asociados al desplazamiento migratorio internacional* (2000)).

out of food.[30]  In addition to the physical hazards of the natural environment, migrants are subject to abuse, abandonment, and violence on journeys across the southern border.  Riskier crossings have given rise to a "migration industry"[31] of coyotes and human smugglers.[32]  Migrants increasingly relied on coyotes to complete crossings and the costs of these guides quadrupled between 1995 and 2004.[33]  Smuggling rings have made migration a "more profitable industry for organized crime"[34] and drug trafficking.[35]  Women are especially at risk: one study that approximately 12 percent of people who crossed "witnessed some form of violence against women during the crossing experience[, including] rape, beatings, and even disappearances."[36]

There is good reason to believe that the harms flowing from the radically expanded border fencing that the Trump Administration is attempting will be similarly, if not more, catastrophic to those taken by the Executive in the 1990s.  Border Patrol statistics from 2006 (the year the Secure Fence Act was passed, post-Operation Gatekeeper, together with related legislation)[37] demonstrate

[30] Jeremy Slack, Daniel Martinez, Scott Whiteford & Emily Peiffer, *In the Shadow of the Wall: Family Separation, Immigration Enforcement and Security: Preliminary Data from the Migrant Border Crossing Study* at 16 (The Center for Latin American Studies, University of Arizona, 2013), *available at* https://tinyurl.com/y6hodu5z (last accessed May 1, 2019).

[31] Ruben Hernandez-Leon, *The Migration Industry in the Mexico-U.S. Migratory System*, UCLA California Center for Population Research ("CCPR") Popul. Work. Pap. (2005), http://papers.ccpr.ucla.edu/index.php/pwp/article/view/PWP-CCPR-2005-049 (last visited Apr 19, 2019).

[32] Chang, *supra* note 17.

[33] Cornelius, *supra* note 15; Slack et al., *supra* note 30.

[34] Slack et al., *supra* note 30 at 133.

[35] Hing, *supra* note 9 at 133-34.

[36] Slack et al., *supra* note 30 at 17.

[37] Gallegos, *Border Matters, supra* note 5 at 1734–35 (2004); Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, § 110 Stat. 3009-546 (1996); REAL ID Act of 2005, Pub. L. No. 109-13, § 102, 119 Stat. 302.  *See also* Secure Fence Act of 2006, Pub. L. No. 109-367, § 3, 120 Stat. 2638, 2638-39 (authorizing extended fencing for another 700 miles along the U.S.-Mexico border).

the correlation between increased fencing and migrant deaths.  In fact, since 2006, the number of deaths per 100,000 migrants almost doubled.[38]

## II. CONSTRUCTION OF PHYSICAL BARRIERS AT THE BORDER CAUSED ECONOMIC, SOCIAL AND ENVIRONMENTAL HARMS

Border communities have suffered serious harms from physical border walls.  Border communities share integrated economies and cultures which are interrupted by "unnatural" barriers like fences and walls.[39]  These barriers have been contested by the residents of those communities: "religious leaders, community leaders, elected officials, local law enforcement officers, and even Border Patrol agents."[40]  In the community of Ambos Nogales, which spans Nogales, Sonora and Nogales, Arizona, the erection of a steel fence in 1996 divided a transnational community.  Although a chain-link fence marked the international border for decades before, this new, intensely surveilled barrier "blocked lines of sight between the communities and dominated the visual landscape.  It disrupted the sense of community along the border far more seriously than the chain-link fence."[41]  The Department of Homeland Security replaced this fence with a higher, bollard-style wall in 2011.  These barriers have harmed the local, interconnected economies and prevented the cooperation of both cities' fire departments.[42]  The barriers, including a five foot tall wall with metal gates, blocked an underground storm drain during flash flooding in Ambos Nogales in 2008,

---

[38] Stefanie Herweck & Scott Nicol, *Death, Damage, and Failure: Past, Present, and Future Impacts of Walls on the U.S.-Mexico Border,* 48-49  (ACLU Border Rights Center Report, 2018) (discussing border patrol statistics on death rates among undocumented immigrants along the southern border), *available at* https://www.aclutx.org/sites/default/files/field_documents/aclu-report-updates_0.pdf (last accessed May 1, 2019).

[39] Bill Ong Hing, *NAFTA, Globalization, and Mexican Migrants*, 5 J. Law Econ. Policy 87, 89 (2009).

[40] *Id.*

[41] Randall H. McGuire, *Steel Walls and Picket Fences: Rematerializing the U.S.–Mexican Border in Ambos Nogales*, 115 Am. Anthropol. 466–480, 472 (2013).

[42] *Id.* at 477.

"where water rose above the tops of the doorframes of shops on the Mexican side of the wall, but only ankle deep on the U.S. side…[t]ragically, two people drowned in the deep stormwaters, 575 Mexican homes and businesses, and 45 cars were damaged at an estimated cost of $8 million.[43] Border fencing, wall construction, and their ensuing risks also separated binational families who lacked economic resources to secure tourist visas to visit relatives living in the United States,[44] and drove down wages directly for immigrants seeking agricultural employment in the United States.[45]  It further encroached on public spaces, such as Friendship Park near the Pacific Ocean, between California and Baja California, which previously enabled binational families to enjoy a day at the beach together.[46]

It also endangered protected cross-border lands and transnational habitats for Thorne's Hairstreak butterflies in the Otay Mountain Wilderness Area, birds and fish in the Tijuana Estuary, endangered Sonoran Pronghorns that roamed the Organ Pipe National Monument, Cabeza Prieta and Kofa National Wildlife Refuges, as well as the El Pinacate y Gran Desierto de Altar Biosphere Reserve; endangered rare insects, birds, and fish in the San Pedro Riparian National Conservation Area, jaguars that roamed the Peloncillo Mountains between Sonora, Arizona, and New Mexico, ocelots and jaguarundi in the Lower Rio Grande Valley, and the nearly-extinct Mexican Wolf population that roamed between Chihuahua and Ciudad Juarez in Mexico and Arizona, New Mexico, and Texas in the U.S., among others.[47]

---

[43] Herweck & Nicol, *Death, Damage, and Failure*, *supra* note 38 at 31-32.

[44] Jennifer M. Chacón, *Loving Across Borders: Immigration Law and the Limits of Loving*, 2007 Wis. L. Rev. 345, 369–70 (2007).

[45] Don M. Mitchell, *The Geography of Injustice: Borders and the Continuing Immiseration of California Agricultural Labor in Era of 'Free Trade'*, 2 Rich. J. Global L. & Bus. 145, 161–62 (2001).

[46] Herweck & Nicol, *Death, Damage, and Failure, supra* note 38 at 21.

[47] *Id.* at 3, 16, 21, 23, 27-29, 32-34, 40-42.

In perpetuating social, cultural, and economic divisions, as well as environmental harms, communities at the border disproportionately bear the costs of immigration enforcement relative to communities in the interior United States.[48]

Cultural traditions associated with the Tohono O'odham's sacred land span the border, including annual pilgrimages to sites located on both sides.  The redistribution of migrants due to border walls, additionally, has meant greater traffic from smugglers and border crossers on their land, located in remote areas of Arizona.  Therefore, Tohono O'odham lands have become an unwitting site for many migrant deaths.  Vehicle barriers that the CBP erected in response to this traffic have led to further environmental degradation. [49]

### III. PRESIDENT TRUMP'S RHETORIC IN SUPPORT OF ADDITIONAL WALL CONSTRUCTION IS THE LATEST EXECUTIVE ACTION IN A RACIALLY DISCRIMINATORY IMMIGRATION POLICY.

President's Trump's call to build a "wall" and his claim of an immigration crisis at the southern border are enveloped in xenophobia and racism.  Formally announcing his candidacy for President in June 2015, President Trump claimed that a border wall is necessary to stop a tide of illegal immigration, claiming that "It's coming from more than Mexico.  It's coming from all over South and Latin America, and it's coming probably— probably— from the Middle East . . . .  And it's got to stop and it's got to stop fast."[50]  In that same speech announcing his campaign, the President infamously declared that:

> When Mexico sends its people, they're not sending their best . . . .  They're sending you people that have lots of problems and they're bringing those problems with us.  They're bringing drugs.  They're bringing crime.  They're rapists. And some, I assume, are good people.[51]

---

[48] Gulasekaram, *supra* note 27 at 160-61.

[49] Herweck & Nicol, *Death, Damage, and Failure, supra* note 38 at 21.

[50] Amber Phillips, *'They're rapists.' President Trump's campaign launch speech two years later, annotated*, Washington Post (June 16, 2017) https://tinyurl.com/y24l5bhl.

[51] *Id.*

He proposed, in that same speech, after engaging in this openly racialized and xenophobic rhetoric, that to address these "problems," he would "build a great, great wall on our southern border . . . ."[52]  He later reaffirmed these remarks as "100 percent correct."[53]

Since taking office, he has continued making misleading and baseless claims that the border wall he planned to build would help prevent terrorism, criminal activity, and drug trafficking[54], despite the fact that the State Department found no credible evidence of a terrorist threat coming through Mexico[55] and Vice President Pence himself acknowledging that drugs enter "primarily at points of entry."[56]

President Trump's faulty justifications rely not only on misrepresentations, but also xenophobic and racist tropes.  President Trump has continued to tweet anti-Mexican statements in

---

[52] *Id.*

[53] Sandra Guy, *Trump in Chicago: Says he's '100 percent correct' about Mexicans, blasts U.S. as 'laughingstock' – 'we're all a bunch of clowns',* Chicago Sun Times (June 24, 2016), http://chicago.suntimes.com/news/trump-in-chicago-says-hes-100-percent-correct-about-mexicans-blasts-u-s-as-laughingstock-were-all-a-bunch-of-clowns/.

[54] Donald J. Trump (@realDonaldTrump), Twitter [*hereinafter* Tweet] https://twitter.com/realdonaldtrump/status/1099366469010366464?lang=en (Feb. 23, 2019 12:52 PM) ("The under construction Wall will stop Gangs, Drugs and Crime!").

[55] U.S. State Department Bureau of Counterterrorism and Countering Violent Extremism, *Country Reports on Terrorism 2017, available at* https://www.state.gov/j/ct/rls/crt/2017/282846.htm (last accessed Apr. 30, 2019) ("At year's end, there was no credible evidence indicating that international terrorist groups have stablished bases in Mexico, worked with Mexican drug cartels, or sent operatives via Mexico into the United States.").

[56] Vice President Mike Pence, *Mike Pence: Democrats refuse to compromise on border wall funding to end shutdown,* USA Today (Jan. 15, 2019) https://tinyurl.com/y28d5z7c.

---

relation to the "wall,"[57] and has described immigrants at the southern border as "animals"[58] and described their entry as an "infestation."[59]

More recently, he has referred to asylum seekers on the southern border as "people who look like they should be fighting in the UFC [Ultimate Fighting Championship.]"[60]  President Trump's narrative regarding the purported need for a wall on the southern border is part of a larger consistent pattern and policy approach that, at its core, is focused on demonizing and targeting immigrants of color, and which includes reported statements by President Trump claiming that people entering the United States from Haiti "all have AIDS" and lamenting that Nigerians would never "go back to their huts[.]"[61]  President Trump has also been reported, in reference to African nations, to state that, Temporary Protected Status means the United States is "having all these people from shithole countries come here."[62]  He has also unabashedly used his social media platform to share, endorse and "retweet" false white nationalist claims against people of color visiting or immigrating to the U.S.[63]

---

[57]  Donald J. Trump (@realDonaldTrump), Twitter. (Aug. 27, 2017 8:44 a.m.) https://twitter.com/realdonaldtrump/status/901802524981817344?lang=en  ("With Mexico being one of the highest crime Nations in the world, we must have THE WALL.")

[58]  Julie Hirschfeld Davis, *Trump Calls Some Unauthorized Immigrants 'Animals' in Rant*, N.Y. Times (May 16, 2018) https://nyti.ms/2L6lyYH; *see also Hawaii*, 138 S. Ct. at 2437 (noting President's quoting of song about a snake attacking a person "as a warning about Syrian refugees").

[59]  Donald J. Trump (@realDonaldTrump), Twitter (June 19, 2018 6:52 a.m.) https://tinyurl.com/InfestationJune ("Democrats . . . want illegal immigrants, no matter how bad they may be, to pour into and infest our Country, like MS-13.").

[60]  Kyle Balluck, *Trump says some asylum-seekers look like they're 'fighting for the UFC'*, The Hill (Apr. 7, 2019) https://thehill.com/homenews/administration/437723-trump-says-some-asylum-seekers-look-like-theyre-fighting-for-the-ufc.

[61]  Michael D. Shear & Julie Hirschfeld Davis, *Stoking Fears, Trump Defied Bureaucracy to Advance Immigration Agenda*, N.Y. Times (Dec. 23, 2017), https://nyti.ms/2DCJqPP.

[62]  Julie Hirschfeld Davis, Sheryl Gay Stolberg & Thomas Kaplan, *Trump Alarms Lawmakers with Disparaging Words for Haiti and Africa*, N.Y. Times (Jan. 11, 2018) https://nyti.ms/2EzkEQe.

[63]  *See Trump v. Hawaii*, 138 S. Ct. 2392, 2438 (2018) (Sotomayor, J., dissenting) (describing President retweeting three explicitly anti-Muslim propaganda videos); *see also* Elizabeth Landers & James Masters, *Trump retweets anti-Muslim videos,* CNN, Nov. 30, 2017, https://www.cnn.com/2017/11/29/politics/donald-trump-retweet-jayda-fransen/index.html

These racialized appeals have been intertwined with a steady stream of exclusionary executive actions that disproportionately impact immigrant communities and United States citizens of color alike. These include:

**Reducing Lawful Entry into the United States:** The Administration sought to ban individuals traveling into the United States from several Muslim-majority countries.[64]  Thereafter, the Administration has twice sought to slash refugee admissions, cutting the number from 84,995 to 45,000 in 2017[65] and reducing that number to 30,000 in 2019.[66]  The Administration seeks to preclude asylum claims from individuals fleeing gang violence or domestic violence.[67] Additionally, the Administration has proposed a new regulation that would depart from 100 years of precedent to deny admission to individuals who it deems might become "public charges".[68]

**Limiting Access to Status:** The Administration has attempted to remove Temporary Protected Status from individuals from Haiti, Sudan, Nicaragua, El Salvador, Nepal, and

---

(observing that President Trump retweeted three explicitly anti-Muslim propaganda videos posted by the deputy leader of a far-right white nationalist group).

[64] *Hawaii*, 138 S. Ct. at 2416-17.  Amid lawsuits challenging that ban, the Administration added two, non-Muslim majority countries.  *See id.* at 2442 (Sotomayor, J., dissenting) ("[I]nclusion of North Korea and Venezuela, and the removal of other countries, simply reflect subtle efforts to start 'talking territory instead of Muslim.'").

[65] Presidential Memorandum for the Secretary of State (Sept. 29, 2017), *available at*, https://www.whitehouse.gov/presidential-actions/presidential-memorandum-secretary-state-4/ (last visited Apr. 30, 2019).  The Administration resettled less than half of even the reduced number.  Richard Gonzales, *U.S. to Limit the Number of Refugees Allowed Entry to 30,000*, National Public Radio, Sep. 17. 2018, *available at*, https://tinyurl.com/RefugeeReductions.

[66]  Michael R. Pompeo, Secretary of State, Remarks to the Media (Sept. 17, 2018), *available at*, https://www.state.gov/secretary/remarks/2018/09/285960.htm (last visited Apr. 30, 2019).

[67]  *See generally Grace v. Whitaker*, 344 F. Supp. 3d 96 (D.D.C. 2018), *appeal docketed*, No. 19-5013 (Jan. 30, 2019) (permanently enjoining Attorney General's changes to credible fear policies).

[68]  *See Inadmissibility on Public Charge Grounds*, 83 Fed. Reg. 51,114, 51,133 (Oct. 10, 2018) (proposing to include any receipt of certain cash and non-cash benefits as public charge factors while noting prior guidance requiring *primary* reliance upon public benefits instead).

Honduras.[69]   Moreover, the Administration has attempted to terminate two of the prior Administration's deferred action policies.[70]   Notwithstanding the Fourteenth Amendment, the President has also stated his intent to eliminate birthright citizenship.[71]

**Attempts to coerce state involvement in federal immigration policy:** The Administration has sought to preclude so-called "sanctuary cities" from receiving various government criminal justice grants.[72]  Multiple district and circuit courts have rejected those efforts as exceeding statutory and/or constitutional authority.[73]   Recently, the Administration threatened to release people detained in immigration custody in an apparent belief that such an act would punish those jurisdictions.[74]

In lawsuits challenging these actions, courts have declined to "bury [their] head[s] in the sand when faced with overt expressions of prejudice."[75]  Instead, they have routinely held that plaintiffs sufficiently alleged unconstitutional motives based, in part, on the President's words and statements.[76]  For example, considering the President's anti-Latino/a statements in the context of

---

[69] *See NAACP v. U.S. Dep't of Homeland Security*, _ F. Supp. 3d _, 2019 WL 1126386, at *1 (D. Md. Mar. 12, 2019) (identifying other cases challenging Administration's decision to end TPS).

[70] *NAACP v. Trump*, 298 F. Supp. 3d 209, 218-19 (D.D.C. 2018).

[71] Donald J. Trump (@realDonaldTrump), Twitter (Oct. 31, 2018 6:25 a.m.) https://tinyurl.com/BirthrightTweet ("So-called Birthright Citizenship . . . will be ended one way or the other . . . .")

[72] *See, e.g., City of Philadelphia v. Attorney Gen. of United States of Am.*, 916 F.3d 276 (3d Cir. 2019) (rejecting as impermissible anti-sanctuary conditions on receipt of federal funds).

[73] *See City and Cnty. of San Francisco v. Sessions*, _ F. Supp. 3d _, 2019 WL 1024404, at *3-4 (N.D. Cal. Mar. 4, 2019) (identifying cases unanimously rejecting anti-sanctuary conditions).

[74] *See, e.g.,* Donald J. Trump (@realDonaldTrump), Twitter (Apr. 12, 2019 9:38 a.m.) https://tinyurl.com/SanctuaryPlacement ("Due to the fact that Democrats are unwilling to change our very dangerous immigration laws, we are indeed, as reported, giving strong considerations to placing Illegal Immigrants in Sanctuary Cities only . . . .")

[75] *See Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 278 (E.D.N.Y. 2018) (holding that plaintiffs made plausible allegation of discriminatory purpose behind Executive's termination of DACA program).

[76] *Cf. Hawaii*, 138 S. Ct. 2435 (Sotomayor, J., dissenting) ("The full record paints a far more harrowing picture, from which a reasonable observer would readily conclude that the Proclamation was motivated by hostility and animus toward the Muslim faith.") *See also, e.g.,*

---

14

ending Temporary Protected Status for El Savadoran nationals, the District of Maryland explained that: "One could hardly find more direct evidence of discriminatory intent towards Latino immigrants," noting in particular how the President "has broadly painted Latino immigrants as drug-users, criminals, and rapists."[77]  Often, the Government has not "defend[ed] the President's comments but instead argue[d] that the court should simply ignore them."[78]  Even where courts have ruled in the Administration's favor on discrimination claims, they have done so in ways that did not question whether the President's statements depicted his personal animus.[79]  Here, the record is equally stark, and the Court should not turn a blind eye to the impermissible motives driving the administration's actions challenged in the litigation in the instant case.

## CONCLUSION

If the executive-initiated actions of the 1990's made anything clear, it is that, at a minimum, border construction does not deter or prevent immigration, but instead creates its own set of social, economic, humanitarian and environmental crises.  The risk of harm to the nation is the unilaterally proposed "wall" itself.  Defendants' unconstitutional usurpation of the role of Congressional appropriations powers and inaccurate claims of utility would build only one thing: a monument dedicated to racial discrimination, violence, and harms to people of color, and accordingly it is against the public interest.  This Court—aware of the myriad harms that will occur as a result—should decline to permit the Administration to turn its discriminatory motivations into a physical

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Security*, 908 F.3d 476, 519-20 (9th Cir. 2018); *CASA de Maryland., Inc. v. Trump*, 355 F. Supp. 3d 307, 326 (D. Md. 2018); *Saget v. Trump*, 345 F. Supp. 3d 287, 303-04 (E.D.N.Y. 2018); *Centro Presente v. U.S. Dep't of Homeland Security*, 332 F. Supp. 3d 393, 415 (D. Mass. 2018).

[77] *CASA de Md, Inc.*, 355 F. Supp. 3d at 325–26.

[78] *Batalla Vidal*, 291 F. Supp. 3d at 277; *see also  International Refugee Assistance Project v. Trump*, 883 F.3d 233, 264 (4th Cir. 2018), *vacated on other grounds* 138 S. Ct. 2710 (2018) ("Plaintiffs . . . offer undisputed evidence of such bias: the words of the President."); *CASA de Md, Inc.*, 335 F. Supp. 3d at 325-36 ("Defendants do not suggest that President Trump's alleged statements are not evidence of discriminatory motive on his part, nor could they.")

[79] *See, e.g., Hawaii*, 138 S. Ct. at 2420-23 (upholding ban because it could "reasonably be understood to result from a justification independent of unconstitutional grounds"); *Gutierrez-Soto v. Sessions*, 317 F. Supp. 3d 917, 931 (W.D. Tex. 2018) (rejecting animus claims because President's statements lacked "anything more than a tenuous connection to [non-President] Respondents' actions").

15

barrier.  For the reasons stated above, this Court should grant Plaintiffs' Motion for Preliminary Injunction.

Dated: May 3, 2019                              Respectfully submitted,

                                                /s/ Nicholas Espíritu

                                                Attorneys for *Amici Curiae*

                                                Nicholas Espíritu (SBN 237665)
                                                NATIONAL IMMIGRATION LAW CENTER
                                                3450 Wilshire Boulevard, #108-62
                                                Los Angeles, CA 90010
                                                Telephone: 213-639-3900
                                                Facsimile: 213-639-3900
                                                Email: espiritu@nilc.org

                                                Joanna Elise Cuevas Ingram (SBN 290011)
                                                NATIONAL IMMIGRATION LAW CENTER
                                                P.O. Box 170392
                                                Brooklyn, NY 11217
                                                Telephone: 213-377-5258
                                                Facsimile: 213-377-5258
                                                Email: cuevasingram@nilc.org

                                                Max S. Wolson*
                                                NATIONAL IMMIGRATION LAW CENTER
                                                P.O. Box 34573
                                                Washington, D.C. 20043
                                                Telephone: 202-216-0261
                                                Facsimile: 202-216-0266
                                                Email: wolson@nilc.org

                                                Attorneys for *Amici Curiae*
                                                *Admitted in Maryland and the District of
                                                 Columbia only

1

2

**CERTIFICATE OF SERVICE**

The undersigned certifies under penalty of perjury under the laws of the United States and the laws of the State of California, that on the 3rd day of May, 2019, the foregoing document will be served electronically upon registered participants identified on the Notice of Electronic Filing.

/s/ Nicholas Espíritu
Nicholas Espíritu

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Brief of National Immigration Law Center as *amici curiae* - California v. Trump, Case No. 4:19-cv-00872-HSG
Brief of National Immigration Law Center as *amici curiae*- Sierra Club v. Trump, Case No. 4:19-cv-00892-HSG