UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, et al.,<br><br>Defendants. | Case No. 19-cv-00872-HSG<br><br>**ORDER DENYING PLAINTIFFS'<br>MOTION FOR PRELIMINARY<br>INJUNCTION**<br><br>Re. Dkt. No. 59 |

On February 18, 2019, a coalition of sixteen states filed suit against Defendants Donald J. Trump, in his official capacity as President of the United States; the United States; the U.S. Department of Defense ("DoD"); Patrick M. Shanahan, in his official capacity as Acting Secretary of Defense; Mark T. Esper, in his official capacity as Secretary of the Army; Richard V. Spencer, in his official capacity as Secretary of the Navy; Heather Wilson, in her official capacity as Secretary of the Air Force; the U.S. Department of the Treasury; Steven T. Mnuchin, in his official capacity as Secretary of the Department of the Treasury; the U.S. Department of the Interior; David Bernhardt, in his official capacity as Secretary of the Interior[1]; the U.S. Department of Homeland Security ("DHS"); and Kevin K. McAleenan, in his official capacity as Acting Secretary of Homeland Security[2] (collectively, "Federal Defendants"). Dkt. No. 1. The next day, Sierra Club and Southern Border Communities Coalition (collectively, "Citizen Group Plaintiffs" or "Citizen Groups") brought a related suit against many, but not all, of the same Federal Defendants. *See* Complaint, *Sierra Club v. Trump*, No. 4:19-cv-00892-HSG, (N.D. Cal. Feb. 19,

---

[1] Secretary Bernhardt was named in his then-capacity as Acting Secretary, but was subsequently confirmed as Secretary by the U.S. Senate on April 11, 2019.
[2] Acting Secretary McAleenan is automatically substituted for former Secretary Kirstjen M. Nielsen. *See* Fed. R. Civ. P. 25(d).

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

1    2019), ECF No. 1.  Plaintiffs here filed an amended complaint on March 13, 2019, with the state

2    coalition now constituting twenty states (collectively, "Plaintiff States" or "States").  *See* Dkt. No.

3    47 ("FAC").

4         Now pending before the Court is Plaintiffs' motion for a preliminary injunction, briefing

5    for which is complete.  *See* Dkt. Nos. 59 ("Mot."), 89 ("Opp."), 112 ("Reply").  The Court held a

6    hearing on this motion on May 17, 2019.  *See* Dkt. No. 159.  In short, Plaintiffs seek to prevent

7    executive officers from using redirected federal funds for the construction of a barrier on the U.S.-

8    Mexico border.

9         It is important at the outset for the Court to make clear what this case is, and is not, about.

10   The case is not about whether the challenged border barrier construction plan is wise or unwise.  It

11   is not about whether the plan is the right or wrong policy response to existing conditions at the

12   southern border of the United States.  These policy questions are the subject of extensive, and

13   often intense, differences of opinion, and this Court cannot and does not express any view as to

14   them.  *See Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018) (indicating that the Supreme Court

15   "express[ed] no view on the soundness of the policy" at issue there); *In re Border Infrastructure*

16   *Envtl. Litig.*, 284 F. Supp. 3d 1092, 1102 (S.D. Cal. 2018) (noting that the court "cannot and does

17   not consider whether underlying decisions to construct the border barriers are politically wise or

18   prudent").  Instead, this case presents strictly legal questions regarding whether the proposed plan

19   for funding border barrier construction exceeds the Executive Branch's lawful authority under the

20   Constitution and a number of statutes duly enacted by Congress.  *See In re Aiken Cty.*, 725 F.3d

21   255, 257 (D.C. Cir. 2013) ("The underlying policy debate is not our concern. . . .  Our more

22   modest task is to ensure, in justiciable cases, that agencies comply with the law as it has been set

23   by Congress.").

24        Assessing whether Defendants' actions not only conform to the Framers' contemplated

25   division of powers among co-equal branches of government but also comply with the mandates of

26   Congress set forth in previously unconstrued statutes presents a Gordian knot of sorts.  But the

27   federal courts' duty is to decide cases and controversies, and "[t]hose who apply the rule to

28   particular cases, must of necessity expound and interpret that rule."  *See Marbury v. Madison*, 1

2

Cranch 137, 177 (1803).  Rather than cut the proverbial knot, however, the Court aims to untie

it—no small task given the number of overlapping legal issues.  And at this stage, the Court then

must further decide whether Plaintiffs have met the standard for obtaining the extraordinary

remedy of a preliminary injunction pending resolution of the case on the merits.

After carefully considering the parties' arguments, the Court **DENIES** Plaintiffs' motion.[3]

## I.     LEGAL STANDARD

A preliminary injunction is a matter of equitable discretion and is "an extraordinary

remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  "A plaintiff seeking preliminary

injunctive relief must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer

irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor,

and that an injunction is in the public interest."  *Id.* at 20.  Alternatively, an injunction may issue

where "the likelihood of success is such that serious questions going to the merits were raised and

the balance of hardships tips sharply in [the plaintiff's] favor," provided that the plaintiff can also

demonstrate the other two *Winter* factors.  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

1131–32 (9th Cir. 2011) (citation and internal quotation marks omitted).  Under either standard,

Plaintiffs bear the burden of making a clear showing that they are entitled to this extraordinary

remedy.  *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010).  The most important

*Winter* factor is likelihood of success on the merits.  *See Disney Enters., Inc. v. VidAngel, Inc.*, 869

F.3d 848, 856 (9th Cir. 2017).

## II.    ANALYSIS

In the pending motion, Plaintiffs seek to enjoin Defendants from using certain diverted

federal funds and resources for border barrier construction.  Specifically, Plaintiffs move to enjoin

Defendants from: (1) invoking Section 8005's reprogramming authority to channel funds into

DoD's drug interdiction fund, (2) invoking Section 284 to divert monies from DoD's drug

---

[3] The relevant background for this and the Citizen Groups' action is the same.  The Court thus
incorporates in full here the factual background and statutory framework as set forth in its
preliminary injunction order in the Citizen Groups' action.  *See* Order, *Sierra Club v. Trump*, No.
4:19-cv-00892-HSG (N.D. Cal. May 24, 2019), ECF No. 144.

3

1   interdiction fund for border barrier construction on the southern border of New Mexico, (3)

2   invoking Section 9705 to divert monies from the Treasury Forfeiture Fund for border barrier

3   construction,[4] and (4) taking any further action related to border barrier construction until

4   Defendants comply with NEPA.

5        Defendants oppose each basis for injunctive relief.  Defendants further contend that (1) the

6   Plaintiffs lack standing to bring their Sections 8005 and 9705 claims, and (2) the Court is not the

7   proper venue to challenge border barrier construction in New Mexico.  The Court addresses these

8   threshold issues first before turning to Plaintiffs' individual bases for injunctive relief.

9        **A.       Article III Standing**

10       A plaintiff seeking relief in federal court bears the burden of establishing "the irreducible

11  constitutional minimum" of standing.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)

12  (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  First, the plaintiff must have

13  "suffered an injury in fact."  *Id.*  This requires "an invasion of a legally protected interest" that is

14  concrete, particularized, and actual or imminent, rather than conjectural or hypothetical.  *Lujan*,

15  504 U.S. at 560 (internal quotation marks omitted).  Second, the plaintiff's injury must be "fairly

16  traceable to the challenged conduct of the defendant."  *Spokeo*, 136 S. Ct. at 1547.  Third, the

17  injury must be "likely to be redressed by a favorable judicial decision."  *Id.* (citing *Lujan*, 504 U.S.

18  at 560–61).

19       "States are not normal litigants for the purposes of invoking federal jurisdiction," and are

20  "entitled to special solicitude in [the] standing analysis."  *Massachusetts v. EPA*, 549 U.S. 497,

21  518–20 (2007).  For instance, states may sue to assert their "quasi-sovereign interest in the health

22  and well-being—both physical and economic—of [their] residents in general."  *Alfred L. Snapp &*

23  *Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607 (1982).  In that case, however, the "interest must be

24  sufficiently concrete to create an actual controversy between the State and the defendant" such that

25  the state is more than a nominal party.  *Id.* at 602.

26  //

27

28  _____

[4] Only the State Plaintiffs challenge the diversion of funds under Section 9705.

United States District Court
Northern District of California

1    **1.    New Mexico Has Standing for Its Section 8005 Claim.**

2         Only New Mexico contends that it has standing to challenge Defendants' reprogramming

3    of funds under Section 8005.  *See* Reply at 2 (arguing that "Defendants' actions [under Section

4    8005] will cause concrete and particularized injuries-in-fact to New Mexico's environment and

5    wildlife, giving New Mexico standing").  Defendants argue that New Mexico lacks standing to

6    challenge Defendants' invocation of Section 8005 to reprogram funds into the drug interdiction

7    fund, so that Defendants can then divert that money wholesale to border barrier construction using

8    Section 284.  *See* Opp. at 17–18.[5]  Defendants do not dispute that New Mexico has standing to

9    challenge the use of funds from the drug interdiction fund for border barrier construction under

10   Section 284.  Defendants nonetheless reason that harm from construction using drug interdiction

11   funds under Section 284 does not establish standing to challenge Defendants' use of Section 8005

12   to supply those funds.  *Id.* at 17.  Defendants argue that standing requires that the plaintiff be the

13   "object" of the challenged agency action, but that the Section 8005 augmentation of the drug

14   interdiction fund and the use of that money for construction are "two distinct agency actions."  *Id.*

15   at 17–18 (citing *Lujan*, 504 U.S. at 562).  According to Defendants, the "object" of the Section

16   8005 reprogramming was "simply mov[ing] funds among DoD's accounts."  *Id.* (citing *Lujan*, 504

17   U.S. at 562).

18        Defendants' logic fails in all respects.  As an initial matter, it is not credible to suggest that

19   the "object" of the Section 8005 reprogramming is anything but border barrier construction, even

20   if the reprogrammed funds make a pit stop in the drug interdiction fund.  Since Defendants first

21   announced that they would reprogram funds using Section 8005, they have uniformly described

22   the object of that reprogramming as border barrier construction.  *See* Dkt. No. 89-10 ("Rapuano

23   Decl.") ¶ 5 (providing that "the Acting Secretary of Defense decided to use DoD's general transfer

24   authority under section 8005 . . . to transfer funds between DoD appropriations to fund [border

25   barrier construction in Arizona and New Mexico]"); *id.* Ex. D, at 1 (notifying Congress that the

26   _____

27   [5] Defendants also argue New Mexico lacks standing because it falls outside Section 8005's "zone
     of interests."  *See* Opp. at 18–19.  Because the Court finds Defendants' "zone of interests"

28   challenge derivative of Defendants' misunderstanding of *ultra vires* review, the Court addresses
     those matters together, below.  *See infra* Section II.C.1.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    "reprogramming action" under Section 8005 is for "construction of additional physical barriers

2    and roads in the vicinity of the United States border").

3           Nor does *Lujan* impose Defendants' proffered strict "object" test.  The *Lujan* Court

4    explained that "when the plaintiff is not himself the object of the government action or inaction he

5    challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish."

6    504 U.S. at 562 (internal quotation marks omitted).  And the Supreme Court was concerned in

7    particular with "causation and redressability," which are complicated inquiries when a plaintiff's

8    standing "depends on the unfettered choices made by independent actors not before the courts and

9    whose exercise of broad and legitimate discretion the courts cannot presume either to control or to

10   predict." *Id.* (quoting *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989) (Kennedy, J.)).  As

11   concerns causation, the Ninth Circuit recently explained that Article III standing only demands a

12   showing that the plaintiff's injury is "fairly traceable to the challenged action of the defendant, and

13   not the result of the independent action of some third party not before the court." *Mendia v.*

14   *Garcia*, 768 F.3d 1009, 1012 (9th Cir. 2014) (quoting *Bennett v. Spear*, 520 U.S. 154, 167

15   (1997)).  "Causation may be found even if there are multiple links in the chain connecting the

16   defendant's unlawful conduct to the plaintiff's injury, and there's no requirement that the

17   defendant's conduct comprise the last link in the chain.  As we've said before, what matters is not

18   the length of the chain of causation, but rather the plausibility of the links that comprise the

19   chain." *Id.* (internal quotation marks and citations omitted).

20          No complicated causation inquiry is necessary here, as there are no independent absent

21   actors.  More important, if there were ever a case where standing exists even though the

22   challenged government action is nominally directed to some different "object," this is it.  Neither

23   the parties nor the Court harbor any illusions that the point of reprogramming funds under Section

24   8005 is to use those funds for border barrier construction.  And under Ninth Circuit law, there is

25   no requirement that the challenged conduct be the last link in the causal chain.  Rather, even if

26   there is an intervening link between the Section 8005 reprogramming and the border barrier

27   construction itself, any injury caused by the border barrier construction is nonetheless "fairly

28   traceable" to the Section 8005 reprogramming under the circumstances.  *See id.*  The Court thus

cannot accept the Government's "two distinct actions" rationale as a basis for shielding Defendants' actions from review.

### 2.    Plaintiffs Have Standing for Their Section 9705 Claim.

Defendants argue that no state has standing to challenge the Treasury's decision to allocate Treasury Forfeiture Fund ("TFF") money to border barrier construction because that decision "does not jeopardize the solvency of the TFF or negatively impact the States' receipt of future equitable sharing money." Opp. at 12. Defendants thus posit that "[t]he States have not established that the challenged action will cause them any injury." *Id.* at 14. As support, Defendants rely on the declaration of the Director of the Treasury's Executive Office for Asset Forfeiture ("TEOAF"), John M. Farley, who manages the TFF. Dkt. No. 89-9 ("Farley Decl.") ¶ 2. Mr. Farley assures that the Treasury has adequately accounted for mandatory and priority expenses in such a way that there is no risk to the TFF's solvency in general or to any equitable sharing payments specifically. *Id.* at 13–14. Defendants, however, do not address Plaintiffs' evidence to support standing, which includes recent statements from TEOAF that a "substantial drop in 'base' revenue," which "is relied upon to cover basic mandatory [TFF] costs . . . is especially troubling," even before the $601 million diversion. Dkt. No. 59-4 ("States RJN") Ex. 43, at 4[6]; Mot. at 12.

Defendants ask too much of Plaintiffs. A plaintiff need not present undisputable proof of a future harm. The injury-in-fact requirement instead permits standing when a risk of future injury is "at least *imminent*." *See Lujan*, 504 U.S. at 564 n.2. And while courts must ensure that the "actual or imminent" measure of harm is not "stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes," *see id.*, the Ninth Circuit has consistently held that a "'credible threat' that a probabilistic harm will materialize" is enough, *see Nat. Res. Def. Council v. EPA*, 735 F.3d 873, 878 (9th Cir. 2013) (quoting *Covington v. Jefferson*

---

[6] The Court takes judicial notice of various documents, for reasons set forth in the Court's preliminary injunction order in the Citizen Groups' action. *See* Order, *Sierra Club v. Trump*, No. 4:19-cv-00892-HSG (N.D. Cal. May 24, 2019), ECF No. 144, at 3 n.2; *see also* Request for Judicial Notice, *Sierra Club v. Trump*, No. 4:19-cv-00892-HSG (N.D. Apr. 4, 2019), ECF No. 36 ("Citizen Groups RJN").

1    *Cty.*, 358 F.3d 626, 641 (9th Cir. 2004)).

2    At this stage, Plaintiff States have carried their burden to demonstrate that there is a

3    "credible threat" that Defendants' diversion of TFF funds will have economic ramifications on the

4    states.  If the only information before the Court were bald allegations questioning the TFF's

5    solvency and the States' prospects of future equitable sharing payments on the one hand, and Mr.

6    Farley's declaration assuaging those concerns on the other, then whether Plaintiffs could

7    demonstrate a "credible threat" would be a closer call.  But that is not the case.  Plaintiffs instead

8    cite to recent statements by the Treasury characterizing "especially troubling" drops in revenue

9    which call into question its ability to cover "basic mandatory [TFF] costs."  *See* States RJN 43, at

10   4.  The Court finds these statements demonstrate a "credible threat," such that Plaintiffs have

11   satisfied the injury-in-fact requirement for Article III standing.  *See Nat. Res. Def. Council*, 735

12   F.3d at 878.

13        **B.        Venue is Proper in This Court.**

14   Because Defendants challenge Plaintiffs' standing as to all claims except New Mexico's

15   Section 284 claim, Defendants assert that New Mexico is the only Plaintiff that can plausibly state

16   an alleged injury and thus that venue is improper in the Northern District of California.  Opp. at

17   30.  But New Mexico's ability to seek relief in this Court relies on California having standing,

18   which the parties do not dispute would render venue proper for all claims in this case.  Because the

19   Court finds that California has independent Article III standing, the Court finds venue is proper.

20   *See* 28 U.S.C. § 1391(e)(1) (providing that venue is proper in actions against officers or

21   employees of the United States where a "plaintiff resides if no real property is involved in the

22   action").

23        **C.        Plaintiffs Have Not Shown They Are Entitled to a Preliminary Injunction.**

24   Applying the *Winter* factors, the Court finds Plaintiffs are not entitled to a preliminary

25   injunction at this time.

26        **1.        Likelihood of Success on the Merits**

27   The crux of Plaintiffs' case is that Defendants' methods for funding border barrier

28   construction are unlawful.  And Plaintiffs package that core challenge in several ways.  For

United States District Court
Northern District of California

8

1    present purposes, Plaintiffs contend that Defendants' actions (1) are unconstitutional, (2) exceed

2    Defendants' statutory authority—in other words, are *ultra vires*—(3) violate the APA because

3    they are arbitrary and capricious, and (4) violate NEPA.

4         The Court begins with a discussion of the law governing the appropriation of federal funds.

5    Under the Appropriations Clause of the Constitution, "No Money shall be drawn from the

6    Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. art. I, § 9, cl. 7.

7    "The Clause's words convey a 'straightforward and explicit command':  No money 'can be paid

8    out of the Treasury unless it has been appropriated by an act of Congress.'"  *U.S. Dep't of Navy v.*

9    *FLRA*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (quoting *OPM v. Richmond*, 496 U.S. 414, 424

10   (1990)).  "The Clause has a 'fundamental and comprehensive purpose . . . to assure that public

11   funds will be spent according to the letter of the difficult judgments reached by Congress as to the

12   common good and not according to the individual favor of Government agents.'"  *United States v.*

13   *McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016) (quoting *Richmond*, 496 U.S. at 427–28).  It

14   "protects Congress's exclusive power over the federal purse," and "prevents Executive Branch

15   officers from even inadvertently obligating the Government to pay money without statutory

16   authority."  *FLRA*, 665 F.3d at 1346–47 (internal quotation marks and citations omitted).

17        "Federal statutes reinforce Congress's control over appropriated funds," and under federal

18   law "appropriated funds may be applied only 'to the objects for which the appropriations were

19   made.'"  *Id.* at 1347 (quoting 31 U.S.C. § 1301(a)).  Moreover, "[a]n amount available under law

20   may be withdrawn from one appropriation account and credited to another or to a working fund

21   only when authorized by law."  31 U.S.C. § 1532.  "[A]ll uses of appropriated funds must be

22   affirmatively approved by Congress," and "the mere absence of a prohibition is not sufficient."

23   *FLRA*, 665 F.3d at 1348.  In summary, "Congress's control over federal expenditures is

24   'absolute.'"  *Id.* (quoting *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir.

25   1992)).

26        Rather than dispute these principles, Defendants contend that the challenged conduct

27   complies with them.  *See* Opp. at 26 ("The Government is not relying on independent Article II

28   authority to undertake border construction; rather, the actions alleged are being undertaken

1  pursuant to express statutory authority.").  Accordingly, one of the key issues in dispute is whether

2  Congress in fact provided "express statutory authority" for Defendants' challenged actions.

3       Turning to Plaintiffs' claims, it is necessary as a preliminary matter to outline the measure

4  and lens of reviewability the Court applies in assessing such broad challenges to actions by

5  executive officers.  As a first principle, the Court finds that it has authority to review each of

6  Plaintiffs' challenges to executive action.  "It is emphatically the province and duty of the judicial

7  department to say what the law is." *Marbury*, 1 Cranch at 177.  In determining what the law is,

8  the Court has a duty to determine whether executive officers invoking statutory authority exceed

9  their statutory power. *See Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384

10  (2015).  And even where executive officers act in conformance with statutory authority, the Court

11  has an independent duty to determine whether authority conferred by act of the legislature

12  nevertheless runs afoul of the Constitution. *See Clinton v. City of New York*, 524 U.S. 417, 448

13  (1998).

14       Once a case or controversy is properly before a court, in most instances that court may

15  grant injunctive relief against executive officers to enjoin both *ultra vires* acts—that is, acts

16  exceeding the officers' purported statutory authority—and unconstitutional acts.  The Supreme

17  Court recently reaffirmed this broad equitable power:

> It is true enough that we have long held that federal courts may in
> some circumstances grant injunctive relief against state officers who
> are violating, or planning to violate, federal law.  But that has been
> true not only with respect to violations of federal law by state
> officials, but also with respect to violations of federal law by federal
> officials. . . .  What our cases demonstrate is that, in a proper case,
> relief may be given in a court of equity . . . to prevent an injurious act
> by a public officer.
>
> The ability to sue to enjoin unconstitutional actions by state and
> federal officers is the creation of courts of equity, and reflects a long
> history of judicial review of illegal executive action, tracing back to
> England.

25  *Armstrong*, 135 S. Ct. at 1384 (internal quotation marks and citations omitted).

26       Misunderstanding the presumptive availability of equitable relief to enforce federal law,

27  Defendants contend that Plaintiffs may only challenge Defendants' conduct through the

28  framework of the APA, and ignore Plaintiffs' *ultra vires* challenges entirely. *See* Opp. at 12

United States District Court
Northern District of California

10

("Because Congress did not create a private right of action to enforce the statutes that form the basis of the States' challenge, their claims are governed by the [APA], 5 U.S.C. § *et seq.*")  But as the Citizen Group Plaintiffs detail at length in their reply brief, *ultra vires* review exists outside of the APA framework.  *See* Plaintiffs' Reply at 2–5, *Sierra Club v. Trump*, No. 4:19-cv-00892-HSG (N.D. Cal. May 2, 2019), ECF No. 91 ("Citizen Groups Reply"); *see also* Dkt. No. 129 (Brief of *Amici Curiae* Federal Courts Scholars).[7]

Due to their mistaken framing of the scope of *ultra vires* review, Defendants also incorrectly posit that Plaintiffs must establish that they fall within the "zone of interests" of a particular statute to challenge actions taken by the government under that statute.  *See* Opp. at 18–19.  The "zone of interests" test, however, only relates to statutorily-created causes of action.  *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (explaining that "[t]he modern 'zone of interests' formulation . . . . applies to all statutorily created causes of action").  The test has no application in an *ultra vires* challenge, which operates outside of the APA framework.  *See Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 811 n.14 (D.C. Cir. 1987) ("Appellants need not, however, show that their interests fall within the zones of interests of the constitutional and statutory powers invoked by the President in order to establish their standing to challenge the interdiction program as *ultra vires*."); *see also* 33 Charles Alan Wright et al., Federal Practice and Procedure § 8302 (2d ed. 2019) (explaining that the "zone of interests" test is to determine whether a plaintiff "seeks to protect interests that 'arguably' fall within the 'zone of interests' protected by that provision").  In other words, where a plaintiff seeks to vindicate a right protected by a statutory provision, the plaintiff must demonstrate that it arguably falls within the zone of interests Congress meant to protect by enacting that provision.  But where a plaintiff seeks equitable relief against a defendant for exceeding its statutory authority, the zone-of-interests test

---

[7] Congress may displace federal courts' equitable power to enjoin unlawful executive action, but a precluding statute must at least display an "intent to foreclose" injunctive relief.  *Armstrong*, 135 S. Ct. at 1385.  Courts have found such implied foreclosure where (1) the statute provides an express administrative remedy, and (2) the statute is otherwise judicially unadministrable in nature.  *Id.* at 1385–86.  No party contends that the statutes at issue in this case either expressly foreclose equitable relief or provide an express administrative remedy, which might warrant a finding of implied foreclosure of equitable relief.

United States District Court
Northern District of California

is inapposite.  Any other interpretation would lead to absurd results.  The very nature of an *ultra vires* action posits that an executive officer has gone beyond what the statute permits, and thus beyond what Congress contemplated.  It would not make sense to demand that Plaintiffs—who otherwise have standing—establish that Congress contemplated that the statutes allegedly violated would protect Plaintiffs' interests.  It is no surprise, then, that the Supreme Court's recent discussion of *ultra vires* review in *Armstrong* did not once reference this test.

In reviewing the lawfulness of Defendants' conduct, the Court thus begins each inquiry by determining whether the disputed action exceeds statutory authority.  For unless an animating statute sanctions a challenged action, a court need not reach the second-level question of whether it would be unconstitutional for Congress to sanction such conduct.  *See Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205 (2009) (explaining the "well-established principle governing the prudent exercise of this Court's jurisdiction that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case") (quoting *Escambia Cty. v. McMillan*, 466 U.S. 48, 51 (1984) (per curiam)).  This is not to say, however, that the yardstick of statutory authority overlooks constitutional concerns entirely.  "The so-called canon of constitutional avoidance . . . counsel[s] that ambiguous statutory language be construed to avoid serious constitutional doubts."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009).  Nonetheless, a court presented with both *ultra vires* and constitutional claims should begin by determining whether the statutory authority supports the action challenged, and only reach the constitutional analysis if necessary.[8]

//

//

---

[8] The Court finds it need not address Plaintiffs' claim that the use of the various reprogramming and diversion mechanisms is arbitrary and capricious under the APA.  Plaintiffs' APA arguments are largely repackaged *ultra vires* claims.  *See, e.g.*, Reply at 15 (arguing it is arbitrary and capricious to act in excess of statutory authority).  To the extent Plaintiffs' APA claim is based on Defendants' alleged departure from internal procedure concerning Section 8005 reprogramming, the Court finds Plaintiffs' are unlikely to succeed on the merits of that argument.  Among other reasons, this sort of DoD procedure does not appear to be the kind of "binding internal policy" that might demand an explanation if departed from.  *Cf. Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 852 (9th Cir. 2003) (involving an agency's departure from a formally promulgated policy).

United States District Court
Northern District of California

United States District Court
Northern District of California

### a.      Sections 284 and 8005

At the President's direction, Defendants intend to divert $2.5 billion, $1 billion of which is the subject of the pending motion, to the DoD's drug interdiction fund for border barrier construction.[9]  To do so, Defendants rely on Section 284(b)(7), which authorizes the Secretary of Defense to support other federal agencies for the "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States."  *See The Funds Available to Address the National Emergency at Our Border*, The White House, https://www.whitehouse.gov/briefings-statements/funds-available-address-national-emergency-border (Feb. 26, 2019).  To satisfy the President's directive, Defendants intend to rely on their reprogramming authority under Section 8005, and plan to "augment" the drug interdiction fund with the entire $2.5 billion in funds that DoD will then use for the construction.  *Id.*

Plaintiffs challenge both the augmentation of the drug interdiction fund through Section 8005 and the use of funds from the drug interdiction fund under Section 284.  Turning first to the augmentation of funds, Section 8005 authorizes the reprogramming of up to $4 billion "of working capital funds of the Department of Defense or funds made available in this Act to the Department of Defense."  The transfer must be (1) either (a) DoD working capital funds or (b) "funds made available in this Act to the [DoD] for military functions (except military construction)," (2) first determined by the Secretary of Defense as necessary in the national interest, (3) for higher priority items than those for which originally appropriated, (4) based on unforeseen (5) military requirements, and (6) in no case where the item for which funds are requested has been denied by Congress.  Plaintiffs argue that Defendants' actions fail the last three requirements.  The Court first considers whether the reprogramming Defendants propose here is

---

[9] The Court here only considers the lawfulness of Defendants' March 25, 2019 invocation of Section 8005 to reprogram $1 billion, given the parties' agreement that this order need not address Defendants' recently announced intent to use Sections 8005, 9002, and 284 to fund border barrier construction in the El Centro Sector and Tucson Sector Projects.  The parties reached this agreement after counsel for Defendants represented at the hearing on this motion that "no construction will start [with those funds] until at least 45 days from" the May 17, 2019 hearing date.  *See* Dkt. No. 159 at 55:16–17.  The parties confirmed that they would agree to a schedule to supplement the record, to permit the Court to review in a timely manner the lawfulness of the new reprogramming, under the framework set forth in this order.  *Id.* at 59:14–60:2.  The parties have since agreed on a schedule.  *See* Dkt. No. 163.

1    for an item for which funds were requested but denied by Congress.

        **i.**        **Plaintiffs are Likely to Show That the Item for Which Funds Are Requested Has Been Denied by Congress.**

4    Plaintiffs argue that Defendants are transferring funds for a purpose previously denied by

5    Congress.  Mot. at 24.  Defendants dispute, however, whether Congress's affirmative

6    appropriation of funds in the CAA to DHS constitutes a "denial" of appropriations to DoD's

7    "counter-drug activities in furtherance of DoD's mission under [Section] 284."  Opp. at 19.  In

8    their view, "the item" for which funds are requested, for present purposes, is counterdrug activities

9    under Section 284.  *Id.* at 19–20.  And Defendants maintain that "nothing in the DHS

10   appropriations statute indicates that Congress 'denied' a request to fund DoD's statutorily

11   authorized counterdrug activities, which expressly include fence construction."  *Id.*  In other

12   words, even though DoD's counter-drug authority under Section 284 is merely a pass-through

13   vessel for Defendants to funnel money to construct a border barrier that will be turned over to

14   DHS, Citizen Groups RJN Ex. I, at 10, Defendants argue that the Court should only consider

15   whether Congress denied funding to DoD.

16   Plaintiffs have shown a likelihood of success as to their argument that Congress previously

17   denied "the item for which funds are requested," precluding the proposed transfer.  On January 6,

18   2019, the President asked Congress for "$5.7 billion for construction of a steel barrier for the

19   Southwest border," explaining that the request "would fund construction of a total of

20   approximately 234 miles of new physical barrier."  Citizen Groups RJN Ex. A, at 1.  The request

21   noted that "[a]ppropriations bills for fiscal year (FY) 2019 that have already been considered by

22   the current and previous Congresses are inadequate to fully address these critical issues," to

23   include the need for barrier construction funds.  *Id.*  The President's request did not specify the

24   mechanics of how the $5.7 billion sought would be used for the proposed steel barrier

25   construction.  *Id.*  Nonetheless, in the CAA passed by Congress and signed by the President,

26   Congress appropriated only $1.375 billion for the construction of pedestrian fencing, of a specified

27   type, in a specified sector, and appropriated no other funds for barrier construction.  The Court

28   agrees with Plaintiffs that they are likely to show that the proposed transfer is for an item for

United States District Court
Northern District of California

1   which Congress denied funding, and that it thus runs afoul of the plain language of Section 8005

2   and 10 U.S.C. § 2214(b) ("Section 2214").[10]

3          As Defendants acknowledge, in interpreting a statute, the Court applies the principle that

4   "the plain language of [the statute] should be enforced according to its terms, in light of its

5   context." *ASARCO, LLC v. Celanese Chem. Co.*, 792 F.3d 1203, 1210 (9th Cir. 2015).  In its

6   *amicus* brief, the House recounts legislative history that provides critical context for the Court's

7   interpretative task.  The House explains that the "denied by the Congress" restriction was imposed

8   on DoD's transfer authority in 1974 to "tighten congressional control of the reprogramming

9   process."  Dkt. No. 73 ("House Br.") at 9 (citing H.R. Rep. No. 93-662, at 16 (1973)).  The House

10  committee report on the appropriations bill from that year explained that "[n]ot frequently, but on

11  some occasions, the Department ha[d] requested that funds which have been specifically deleted in

12  the legislative process be restored through the reprogramming process," and that "[t]he Committee

13  believe[d] that to concur in such actions would place committees in the position of undoing the

14  work of the Congress."  H.R. Rep. No. 93-662, at 16.  Significantly, the Committee stated that

15  such a position would be "untenable."  *Id.*  Consistent with this purpose, Congress has described

16  its intent that appropriations restrictions of this sort be "construed strictly" to "prevent the funding

17  for programs which have been considered by Congress and for which funding has been denied."

18  *See* H.R. Rep. No. 99-106, at 9 (1985) (discussing analogous appropriations restriction in Pub. L.

19  No. 99-169, § 502(b), 99 Stat. 1005 (codified at 50 U.S.C. § 3094(b)).

20         The Court finds that the language and purpose of Section 8005 and Section 2214(b) likely

21  preclude Defendants' attempt to transfer $1 billion from funds Congress previously appropriated

22  for military personnel costs to the drug interdiction fund for the construction of a border barrier.

23  Defendants argue that "Congress never denied DoD funding to undertake the [Section] 284

24  projects at issue," Opp. at 20, such that Section 8005 and Section 2214(b) are satisfied.  But in the

25

26  _____

27  [10] *See* Fox News, *Mick Mulvaney on chances of border deal, Democrats ramping up investigation of Trump admin*, YouTube (Feb. 10, 2019), https://www.youtube.com/watch?v=l_Z0xx_zS0M

28  (statement by Acting White House Chief of Staff that "[w]e'll take as much money as you can give us, and then we'll go off and find the money someplace else, legally, in order to secure that southern barrier.  But this is going to get built, with or without Congress.").

United States District Court
Northern District of California

Court's view, that reading of those sections is likely wrong, when the reality is that Congress was presented with—and declined to grant—a $5.7 billion request for border barrier construction. Border barrier construction, expressly, is the item Defendants now seek to fund via the Section 8005 transfer, and Congress denied the requested funds for that item.  *See* 10 U.S.C. § 2214(b) (explaining that transfer authority "may not be used if *the item to which the funds would be transferred* is an item for which Congress has denied funds") (emphasis added).  And Defendants point to nothing in the language or legislative history of the statutes in support of their assertion that only explicit congressional denial of funding for "[Section] 284 projects," or even DoD projects generally, would trigger Section 8005's limitation.  Opp. at 20.  It thus would be inconsistent with the purpose of these provisions, and would subvert "the difficult judgments reached by Congress," *McIntosh*, 833 F.3d at 1175, to allow Defendants to circumvent Congress's clear decision to deny the border barrier funding sought here when it appropriated a dramatically lower amount in the CAA.  *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 609 (1952) (Frankfurter, J., concurring) ("It is quite impossible . . . when Congress did specifically address itself to a problem . . . to find secreted in the interstices of legislation the very grant of power which Congress consciously withheld.  To find authority so explicitly withheld is not merely to disregard in a particular instance the clear will of Congress.  It is to disrespect the whole legislative process and the constitutional division of authority between President and Congress.").

### ii.     Plaintiffs are Likely to Show That the Transfer is Not Based on "Unforeseen Military Requirements."

Plaintiffs next argue that any need for border barrier construction—to the extent there is a need—was long "foreseen."  Mot. at 23.  The Citizen Group Plaintiffs highlight that the President supported his fiscal year 2019 budget request for border barrier funding with a description that such a barrier "is critical to combating the scourge of drug addiction that leads to thousands of unnecessary deaths."  Motion for Preliminary Injunction at 16, *Sierra Club v. Trump*, No. 4:19-cv-00892-HSG (N.D. Cal. Apr. 4, 2019) ("Citizen Groups Mot.") (quoting Citizen Groups RJN Ex. R, at 16).

In response, Defendants again seek to minimize the pass-through nature of DoD's

1    counterdrug activities authority under Section 284.  While not disputing that the President

2    requested—and was denied—more-comprehensive funds for border barrier construction,

3    Defendants instead note that "[t]he President's 2019 budget request did not propose additional

4    funding for DoD's counter-drug activities under [Section] 284."  Opp. at 20.  Defendants then

5    argue that because DHS only formally requested Section 284 support in February 2019, the need

6    for Section 284 support only become foreseen in February 2019.  *Id.*

7            Separate and apart from the Court's analysis above regarding whether Congress previously

8    denied funding for the relevant item, Plaintiffs also have shown a likelihood of success as to their

9    argument that Defendants fail to meet the "unforeseen military requirement" condition for the

10   reprogramming of funds under Section 8005.  As the House notes in its *amicus* brief, DoD has

11   used this authority in the past to transfer funds based on unanticipated circumstances (such as

12   hurricane and typhoon damage to military bases) justifying a departure from the scope of spending

13   previously authorized by Congress.  House Br. at 9 (citing Office of the Under Secretary of

14   Defense (Comptroller), DoD Serial No. FY 04-37 PA, Reprogramming Action (Sept. 3, 2004)).

15   Here, however, Defendants claim that what was "unforeseen" was "[t]he need for DoD to exercise

16   its [Section] 284 authority to provide support for counter-drug activities," which "did not arise

17   until February 2019, when DHS requested support from DoD to construct fencing in drug

18   trafficking corridors."  Opp. at 20.

19           Defendants' argument that the need for the requested border barrier construction funding

20   was "unforeseen" cannot logically be squared with the Administration's multiple requests for

21   funding for exactly that purpose dating back to at least early 2018.  *See* Citizen Groups Ex. R

22   (February 2018 White House Budget Request describing "the Administration's proposal for $18

23   billion to fund the border wall"); *see also* States RJN Exs. 14–20 (failed bills); *id.* Ex. 21

24   (December 11, 2018 transcript from a meeting with members of Congress, where the President

25   stated that "if we don't get what we want [for border barrier construction funding], one way or the

26   other – whether it's through you, through a military, through anything you want to call [sic] – I

27   will shut down the government"); Dkt. No. 89-12, at 14 (testimony of Defendant Shanahan before

28   the House Armed Services Committee explaining that the Administration discussed unilateral

United States District Court
Northern District of California

reprogramming "prior to the declaration of a national emergency"). Further, even the purported need for DoD to provide DHS with support for border security has similarly been long asserted. *See* States RJN Ex. 27 (April 4, 2018 presidential memorandum directing the Secretary of Defense to support DHS "in securing the southern border and taking other necessary actions" due to "[t]he crisis at our southern border"). Defendants' suggestion that by not specifically seeking border barrier funding under Section 284 by name, the Administration can later contend that as far as DoD is concerned, need for such funding is "unforeseen," is not likely to withstand scrutiny.

Interpreting "unforeseen" to refer to the request for DoD assistance, as opposed to the underlying "requirement" at issue, also is not reasonable. By Defendants' logic, *every* request for Section 284 support would be for an "unforeseen military requirement," because only once the request was made would the "need to exercise authority" under the statute be foreseen. There is no logical reason to stretch the definition of "unforeseen military requirement" from requirements that the government as a whole plainly cannot predict (like the need to repair hurricane damage) to requirements that plainly *were* foreseen by the government as a whole (even if DoD did not realize that it would be asked to pay for them until after Congress declined to appropriate funds requested by another agency). Nothing presented by the Defendants suggests that its interpretation is what Congress had in mind when it imposed the "unforeseen" limitation, especially where, as here, multiple agencies are openly coordinating in an effort to build a project that Congress declined to fund. The Court thus finds it likely that Plaintiffs will succeed on this claim.[11]

### iii. Accepting Defendants' Proposed Interpretation of Section 8005's Requirements Would Likely Raise Serious Constitutional Questions.

The Court also finds it likely that Defendants' reading of these provisions, if accepted, would pose serious problems under the Constitution's separation of powers principles. Statutes must be interpreted to avoid a serious constitutional problem where another "construction of the statute is fairly possible by which the question may be avoided." *Zadvydas v. Davis*, 533 U.S. 678,

---

[11] Because the Court has found that Plaintiffs are likely to succeed on their argument that the reprogramming violates the two Section 8005 conditions discussed above, it need not reach at this stage their argument that the border barrier project is not a "military requirement" at all.

689 (2001) (internal quotation marks and citations omitted).  Constitutional avoidance is "thus a means of giving effect to congressional intent," as it is presumed that Congress did not intend to create an alternative interpretation that would raise serious constitutional concerns.  *Clark v. Martinez*, 543 U.S. 371, 382 (2005).  Courts thus "have read significant limitations into . . . statutes in order to avoid their constitutional invalidation."  *Zadvydas*, 533 U.S. at 689 (citation omitted).

As Plaintiffs point out, the upshot of Defendants' argument is that the Acting Secretary of Defense is authorized to use Section 8005 to funnel an additional $1 billion to the Section 284 account for border barrier construction, notwithstanding that (1) Congress decided to appropriate only $1.375 billion for that purpose; (2) Congress's *total* fiscal year 2019 appropriation available under Section 284 for "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States" was $517 million, much of which already has been spent; and (3) Defendants have acknowledged that the Administration considered reprogramming funds for border barrier construction even before the President signed into law Congress's $1.375 billion appropriation.  *See* Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019, Pub. L. No. 115-245, div. A, tit. VI, 132 Stat. 2981, 2997 (2018) (appropriating $881 million in funds "[f]or drug interdiction and counter-drug activities" in fiscal year 2019, $517 million of which is "for counter-narcotics support"); Dkt. No. 151 at 4 (indicating that Defendants have not used—and do not intend to use in the near future—any funds appropriated by Congress for counter-narcotics support for border barrier construction); Dkt. No. 89-12, at 14 (testimony of Defendant Shanahan before the House Armed Services Committee explaining that the Administration discussed unilateral reprogramming "prior to the declaration of a national emergency").  Put differently, according to Defendants, Section 8005 authorizes the Acting Secretary of Defense to essentially triple—or quintuple, when considering the recent additional $1.5 billion reprogramming—the amount Congress allocated to this account for these purposes, notwithstanding Congress's recent and clear actions in passing the CAA, and the relevant committees' express disapproval of the proposed reprogramming.  *See* States RJN Ex. 35 ("The committee denies this request.  The committee does

not approve the proposed use of [DoD] funds to construct additional physical barriers and roads or install lighting in the vicinity of the United States border."); *id.* Ex. 36 ("The Committee has received and reviewed the requested reprogramming action . . . . The Committee denies the request.").  Moreover, Defendants' decision not to refer specifically to Section 284 in their $5.7 billion funding request deprived Congress of even the *opportunity* to reject or approve this funding item.[12]

The Court agrees with the Citizen Group Plaintiffs that reading Section 8005 to permit this massive redirection of funds under these circumstances likely would amount to an "unbounded authorization for Defendants to rewrite the federal budget," Citizen Groups Reply at 14, and finds that Defendants' reading likely would violate the Constitution's separation of powers principles. Defendants contend that because Congress did not reject (and, indeed, never had the opportunity to reject) a specific request for an appropriation to the Section 284 drug interdiction fund, DoD can use Section 8005 to route anywhere up to the $4 billion cap set by that statute, to be spent for the benefit of DHS via Section 284.  But this reading of DoD's authority under the statute would render meaningless Congress's constitutionally-mandated power to assess proposed spending, then render its binding judgment as to the scope of permissible spending.  *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (holding that the interpretation of statutes "must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude"); *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014) ("We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance.") (internal quotation marks omitted).  This is especially true given that Congress has repeatedly rejected legislation that would have funded substantially broader border barrier construction, as noted above, deciding in the end

---

[12] Defendants do not convincingly explain why the amount now sought to be transferred under Section 8005 could not have been sought directly from Congress as part of the fiscal year 2019 appropriation to the DoD Section 284 account to cover requests for counterdrug support, given that the President has consistently maintained since before taking office that border barrier funding is necessary.  If the answer is that the Administration expected, or hoped, that Congress would appropriate the funds to DHS directly, that highlights rather than mitigates the present problem with Defendants' position.

to appropriate only $1.375 billion.  *See City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018) ("In fact, Congress has frequently considered and thus far rejected legislation accomplishing the goals of the Executive Order.  The sheer amount of failed legislation on this issue demonstrates the importance and divisiveness of the policies in play, reinforcing the Constitution's 'unmistakable expression of a determination that legislation by the national Congress be a step-by-step, deliberate and deliberative process.'") (citing *Chadha*, 462 U.S. at 959).  In short, the Constitution gives Congress the exclusive power "not only to formulate legislative policies and mandate programs and projects, but also to establish their relative priority for the Nation," *McIntosh*, 833 F.3d at 1172, and "Congress cannot yield up its own powers" in this regard, *Clinton*, 524 U.S. at 452 (Kennedy, J., concurring).  Defendants' interpretation of Section 8005 is inconsistent with these principles.

While Defendants argue that the text and history of Section 284 suggest that their proposed transfer and use of the funds are within the scope of what Congress has permitted previously, Opp. at 21, that argument only highlights the serious constitutional questions that accepting their position would create.  First, Defendants note that in the past DoD has completed what they characterize as "large-scale fencing projects" with Congress's approval.  Opp. at 21 (citing H.R. Rep. No. 103-200, at 330–31 (1993)).  But Congress's past approval of relatively small expenditures, that were well within the total amount allocated by Congress to DoD under Section 284's predecessor, speaks not at all to Defendants' current claim that the Acting Secretary has authority to redirect sums over a hundred orders of magnitude greater to that account in the face of Congress's appropriations judgment in the CAA.  Similarly, whether or not Section 284 formally "limits" the Secretary to "small scale construction" (defined in Section 284(i)(3) as "construction at a cost not to exceed $750,000 for any project"), reading the statute to suggest that Congress requires reporting of tiny projects but nonetheless has delegated authority to DoD to conduct the massive funnel-and-spend project proposed here is implausible, and likely would raise serious questions as to the constitutionality of such an interpretation.  *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (noting that Congress "does not, one might say, hide elephants in mouseholes").

21

Similarly, if "unforeseen" has the meaning that Defendants claim, Section 8005 would give the agency making a request for assistance under Section 284 complete control over whether that condition is met, simply by virtue of the timing of the request.  As here, DHS could wait and see whether Congress granted a requested appropriation, then turn to DoD if Congress declined, and DoD could always characterize the resulting request as raising an "unforeseen" requirement because it did not come earlier.  Under this interpretation, DoD could in essence make a de facto appropriation to DHS, evading congressional control entirely.  The Court finds that this interpretation likely would pose serious problems under the Appropriations Clause, by ceding essentially boundless appropriations judgment to the executive agencies.

Finally, the Court has serious concerns with Defendants' theory of appropriations law, which presumes that the Executive Branch can exercise spending authority unless Congress explicitly restricts such authority by statute.  Counsel for Defendants advanced this theory at the hearing on this motion, arguing that when Congress passed the recent DoD appropriations act containing Section 8005, it "could have" expressly "restrict[ed] that authority" to preclude reprogramming funds for border barrier construction.  *See* Dkt. No. 159 at 76:16–77:3.  According to Defendants:  "If Congress had wanted to deny DOD this specific use of that [reprogramming] authority, that's something it needed to actually do in an explicit way in the appropriations process.  And it didn't."  *Id.* at 77:21–24.  But it is not Congress's burden to prohibit the Executive from spending the Nation's funds: it is the Executive's burden to show that its desired use of those funds was "affirmatively approved by Congress."  *See FLRA*, 665 F.3d at 1348 ("[A]ll uses of appropriated funds must be affirmatively approved by Congress," and "the mere absence of a prohibition is not sufficient.").  To have this any other way would deprive Congress of its absolute control over the power of the purse, "one of the most important authorities allocated to Congress in the Constitution's 'necessary partition of power among the several departments.'"  *Id.* at 1346–47 (quoting The Federalist No. 51, at 320 (James Madison) (Clinton Rossiter ed., 1961)).

To the extent Defendants believe the Ninth Circuit's decision in *McIntosh* suggests anything to the contrary, the Court disagrees.  Defendants appeared to argue at the hearing on this motion that *McIntosh* stands for the principle that the Executive enjoys unfettered spending power

United States District Court
Northern District of California

unless Congress crafts an appropriations rider cabining such authority.  *See* Dkt. No. 159 at 75:5–10.  As counsel for Defendants put it, "[Plaintiffs] want to say that something was denied by Congress if it wasn't funded by Congress. . . .  But that is just not how these statutes are written and that's not how [*McIntosh*] tells us we interpret the appropriations statute."  *Id.* at 75:13–20.  But Defendants overlook that no party in *McIntosh* disputed that the government's use of funds was authorized but for the appropriations rider at issue in that case.  *See* 833 F.3d at 1175 ("The parties dispute whether the government's spending money on their prosecutions violates [the appropriations rider].").  It is thus unremarkable that when faced with a dispute exclusively concerning whether the government's otherwise-authorized spending of money violated an appropriations rider, the Ninth Circuit held that "[i]t is a fundamental principle of appropriations law that we may only consider the text of an appropriations rider."  *Id.* at 1178; *see also* Dkt. No. 159 at 75:5–10 (defense counsel relying on this language from *McIntosh*).

Unlike in *McIntosh*, where the sole dispute concerned the scope of an external limitation on an otherwise-authorized spending of money, the present dispute concerns the scope of limitations within Section 8005 itself on the authorization of reprogramming funds.  Whether Congress gives authority in the first place is not the same issue as whether Congress later restricts that authority.  And it cannot be the case that Congress must draft an appropriations rider to breathe life into the internal limitations in Section 8005 establishing that the Executive may only reprogram money based on unforeseen military requirements, and may not do so where the item for which funds are requested has been denied by Congress.  To adopt Defendants' position would read out these limitations entirely, which the Court cannot do.  *See Life Techs. Corp. v. Promega Corp.*, 137 S. Ct. 734, 740 (2017) ("Whenever possible, however, we should favor an interpretation that gives meaning to each statutory provision.").  To give meaning to—and thus to construe the scope of—these internal limitations is wholly consistent with *McIntosh*, which explained that the Executive's authority to spend is at all times limited "by the text of the appropriation."  833 F.3d at 1178 (internal quotation marks omitted).

For all of these reasons, the Court finds that Plaintiffs have shown a likelihood of success as to their argument that the reprogramming of $1 billion under Section 8005 to the Section 284

account for border barrier construction is unlawful.[13]

### b.    Section 9705

At the President's direction, Defendants intend to divert $601 million from the Treasury

Forfeiture Fund to DHS, to provide additional funding for border barrier construction.  *See The*

*Funds Available to Address the National Emergency at Our Border*, The White House,

https://www.whitehouse.gov/briefings-statements/funds-available-address-national-emergency-

border (Feb. 26, 2019).  To do so, Defendants rely on 31 U.S.C. § 9705(g)(4)(B), which authorizes

the Secretary of Treasury to transfer "unobligated balances . . . for obligation or expenditure in

connection with the law enforcement activities of any Federal agency or of a Department of the

Treasury law enforcement organization."  Defendants intend to use the $601 million "in two

allocations, $242 million available immediately and $359 million from future anticipated

forfeitures."  *Id.*  Plaintiffs argue that Defendants' diversion of $601 million toward border barrier

construction is not an expenditure for "law enforcement activities."  Mot. at 25–26.[14]

As a threshold matter, Defendants contend that how the Treasury allocates funds is

unreviewable because it is committed to the Treasury's discretion by law, as "the agency must be

allowed to administer its statutory responsibilities" in ways "it sees as the most effective or

desirable."  Opp. at 14 (quoting *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993)).  They reason that as

long as the Treasury "meet[s] permissible statutory objectives," the APA precludes judicial review

of the allocation.  *Id.* at 15 (quoting *Serrato v. Clark*, 486 F.3d 560, 568 (9th Cir. 2007)).  And in

---

[13] Defendants have now acknowledged that all of the money they plan to spend on border barrier construction under Section 284 is money transferred into that account under Section 8005.  *See* Dkt. No. 151 at 4.  Given this acknowledgment, and the Court's finding that Plaintiffs are likely to show that the Section 8005 reprogramming is unlawful, the Court need not at this stage decide whether Defendants would have been permitted to use for border barrier construction any remaining funds that Congress appropriated to the Section 284 account for fiscal year 2019.  The Court notes that the House confirmed in its own lawsuit that it "does not challenge the expenditure of any remaining appropriated funds under section 284 on the construction of a border wall."  United States House of Representatives' Application for a Preliminary Injunction at 30, *U.S. House of Representatives v. Mnuchin*, No. 1:19-cv-00969 (TNM) (D.D.C. Apr. 23, 2019), ECF No. 17; *see also* House Br. at 11 (requesting preliminary injunction "prohibiting defendants from transferring and spending funds in excess of what Congress appropriated for counter-narcotics support under 10 U.S.C. § 284").
[14] Notably, the House does not challenge this expenditure in either its own lawsuit or in its *amicus* brief in this case.  *See* Complaint, *U.S. House of Representatives v. Mnuchin*, No. 1:19-cv-00969 (TNM) (D.D.C. Apr. 5, 2019), ECF No. 1; House Br.

United States District Court
Northern District of California

United States District Court
Northern District of California

this instance—according to Defendants—the Acting Secretary of Defense has exercised his "wide discretion to use" unobligated balances "in connection with the law enforcement activities of any Federal agency." *Id.* "Thus, funding the construction of border barriers is consistent with the statutory purposes of the TFF, such that the allocation of funds for this purpose is unreviewable." *Id.*

The Court finds Defendants' reliance on *Lincoln* and *Serrato* unavailing, and finds that the transfer of funds under Section 9705 is reviewable. Under the APA, Congress may preclude review by statute where the administrative action is committed by law to an agency. *See* 5 U.S.C. § 701(a)(2). Judicial review of agency action, however, is presumptively available. *See Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). And this presumption applies to judicial review of an agency's discretionary acts as well. *See* 5 U.S.C. § 706(2)(A) (permitting courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). That an agency enjoys discretion is thus only the beginning of the inquiry. Whether Section 701(a)(2) precludes review depends on whether the agency enjoys some special discretion.

Defendants maintain that such special discretion exists under *Lincoln* and *Serrato*. In *Lincoln*, the Supreme Court held that the Indian Health Service's decision to discontinue a pilot program called the Indian Children's Program and reallocate funds from a lump-sum appropriation was committed to agency discretion by law under Section 701(a)(2). 508 U.S. at 193. But the lump-sum nature of the appropriation at issue was critical to the *Lincoln* Court's conclusion. "After all, the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192. As the Supreme Court put it:

> [A]n agency's allocation of funds from a lump-sum appropriation requires a complicated balancing of a number of factors which are peculiarly within its expertise: whether its resources are best spent on one program or another; whether it is likely to succeed in fulfilling its statutory mandate; whether a particular program best fits the agency's overall policies; and, indeed, whether the agency has enough resources to fund a program at all.

United States District Court
Northern District of California

*Id.* at 193 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)) (internal quotation marks omitted).  The Ninth Circuit applied *Lincoln* to another lump-sum appropriation in *Serrato*.  *See* 486 F.3d at 567–69.  And the Ninth Circuit there summarized the test established by *Lincoln*: "[A]s long as the agency allocates funds from a lump-sum appropriation to meet permissible statutory objectives, [Section] 701(a)(2) gives the courts no leave to intrude.  [T]o [that] extent, the decision to allocate funds is committed to agency discretion by law."  *Id.* at 568 (internal quotation marks omitted).

Defendants' diversion of $601 million from the TFF to fund border barrier construction fails the *Lincoln* unreviewability test in two respects.  First, Congress's funding of the TFF arguably does not qualify as the sort of lump-sum appropriation present in *Lincoln* and *Serrato*.  Rather, Section 9705 delineates a comprehensive list of payments for which the TFF "shall be available," thus specifying how TFF funds may be used.  More important, Defendants' purported authority for diverting funds from the TFF itself establishes the limitation on discretion which Plaintiffs seek to vindicate here.  Section 9705(g)(4)(B) limits transfers for use "in connection with [] law enforcement activities."  And Plaintiffs maintain that Defendants have not met this limitation.  *See* Mot. at 25–26.  Thus, even accepting Defendants' argument that the APA precludes judicial review so long as the Treasury "meet[s] permissible statutory objectives," *see* Opp. at 14, judicial review is available because Plaintiffs maintain that the Treasury is transferring funds in a statutorily *impermissible* manner.  *See Hawaii v. Trump*, 878 F.3d 662, 681 (9th Cir. 2017), *rev'd on other grounds*, 138 S. Ct. 2392 (2018) (explaining that the "committed to 'agency discretion by law'" exception is "very narrow," and "does not apply where, as here, a court is tasked with reviewing whether an executive action has exceeded statutory authority").[15]

Although it finds that whether Defendants' conduct meets Section 9705's requirements is reviewable, the Court need not now address whether Plaintiffs are likely to succeed on the merits of their claim that the use of funds for border barrier construction is not "in connection with a law enforcement activity."  For reasons discussed below, the Court finds that Plaintiffs have not met

---

[15] Defendants' position on the reviewability of Plaintiffs' challenge to the diversion of TFF funds is, in this sense, symptomatic of Defendants' general misunderstanding of *ultra vires* claims.

their independently necessary burden of showing a likelihood of irreparable harm as to the diversion of TFF funds so as to be entitled to a preliminary injunction.

### c. NEPA

After Plaintiffs filed the instant motion—and one day before Defendants filed their opposition—the Acting Secretary of Homeland Security invoked his authority under Section 102(c) of IIRIRA to waive any NEPA requirements for construction in the El Paso and Yuma sectors. *See* Opp. at 24–26; *see also* Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 84 Fed. Reg. 17185-01 (Apr. 24, 2019); REAL ID Act of 2005, Pub. L. No. 109-13, § 102, 119 Stat. 231, 306 (May 11, 2005) (amending Section 102(c) to reflect that the Secretary "ha[s] the authority to waive all legal requirements" that, in the "Secretary's sole discretion," are "necessary to ensure expeditious construction" of barriers and roads). The Acting Secretary later waived NEPA requirements for the El Centro Sector and Tucson Sector Projects as well, on the same basis. *See* Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 84 Fed. Reg. 21,798 (May 15, 2019); Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 84 Fed. Reg. 21,800 (May 15, 2019).

Defendants contend that such waivers preclude Plaintiffs from advancing a NEPA claim. Opp. at 25 (citing *In re Border Infrastructure Envtl. Litig.*, 915 F.3d 1213, 1221 (9th Cir. 2019)). Plaintiffs respond that DHS's authority to waive NEPA requirements for construction under IIRIRA does not extend to construction undertaken by DoD under its own spending authority. Reply at 16–17. The Citizen Group Plaintiffs further contend that "Defendants' argument is incompatible with their own claim that they are not constructing the El Paso and Yuma sections of border wall under IIRIRA authority, but instead under the wholly separate DoD authority," and suggest that "Defendants cannot have it both ways." Citizen Groups Reply at 18–19.

Neither set of Plaintiffs appears to contest that the waivers, if applicable, would be dispositive of the NEPA claims. *See* Reply at 16 ("Plaintiffs do not dispute *DHS's* ability to waive NEPA compliance when constructing barriers pursuant to [IIRIRA], with funds specifically

appropriated by Congress to be used for that construction.") (emphasis in original); *see also In re Border Infrastructure Envtl. Litig.*, 915 F.3d at 1221 ("[A] valid waiver of the relevant environmental laws under section 102(c) is an affirmative defense to all the environmental claims [including NEPA claims]," and is "dispositive of [those] claims."). But Plaintiffs contend that "the DHS Secretary's waiver under IIRIRA does not waive *DOD's* obligations to comply with NEPA prior to proceeding with El Paso Project 1 under *DOD's* statutory authority, 10 U.S.C. § 284, and using *DOD's* appropriations," so that "DHS's waiver has no application to this project." Reply at 16 (emphasis in original); *see also* Citizen Groups Reply at 19 ("Defendants identify no statutory authority for a waiver for 'expeditious construction' under DOD's § 284 authority, and none exists.").

The Court finds that Plaintiffs are not likely to succeed on their NEPA argument because of the waivers issued by DHS. DoD's authority under Section 284 is derivative. Under the statute, DoD is limited to providing support (including construction support) to other agencies, and may invoke its authority only in response to a request from such an agency. *See* 10 U.S.C. § 284 ("The Secretary of Defense may provide support for the counterdrug activities . . . of any other department or agency of the Federal Government," including support for "[c]onstruction of roads and fences," if "such support is requested . . . by the official who has responsibility for the counterdrug activities."). Here, DHS has made such a request, invoking "its authority under Section 102 of IIRIRA to install additional physical barriers and roads" in designated areas, seeking support for its "ability to impede and deny illegal entry and drug smuggling activities." States RJN Ex. 33, at 1. DHS requested DoD's assistance "[t]o support DHS's action under Section 102." *Id.* at 2. Plaintiffs' argument would require the Court to find that even though it is undisputed that DHS could waive NEPA's requirements if it were paying for the projects out of its own budget, that waiver is inoperative when DoD provides support in response to a request from DHS. The Court finds it unlikely that Congress intended to impose different NEPA requirements on DoD when it acts in support of DHS's Section 102 authority in response to a direct request

under Section 284 than would apply to DHS itself.[16]  *See Defs. of Wildlife v. Chertoff*, 527 F.

Supp. 2d 119, 121, 129 (D.D.C. 2007) (finding DHS's Section 102 waiver authority authorized the

DHS Secretary to waive legal requirements where the U.S. Army Corps of Engineers, a federal

agency within the DoD, was constructing border fencing "on behalf of DHS").[17]

## 2.    Likelihood of Irreparable Injury

Plaintiffs advance two theories of irreparable harm: (1) New Mexico faces irreparable

environmental harm from border barrier construction; and (2) all States face irreparable harm from

the diversion of funds from the TFF.  Mot. at 29–33.  Defendants take issue with both theories.

Opp. at 31–34.

### a.    New Mexico's Environmental Harm

New Mexico's asserted environmental harm stems largely from Defendants' alleged failure

to comply with NEPA.  *See* Mot. at 29 ("Thus, irreparable injury exists when the agency fails to

consider the environmental concerns raised by NEPA such that governmental decisionmakers

make up their minds without having before them an analysis (with prior public comment) of the

likely effects of their decision upon the environment.") (internal quotation marks omitted).  But

for the reasons discussed above, the Court finds Plaintiffs are unlikely to succeed on the merits of

their NEPA claim.  Plaintiffs also allege, however, that beyond the procedural NEPA harm,

Defendants' overall unlawful reprogramming and use of funds under Sections 8005 and 284 for

border barrier construction "will cause irreparable injury to wildlife in the area and New Mexico

as a whole."  *Id.* at 30.  And among other things, Defendants' proposed border barrier construction

in the El Paso Sector Project 1 portion of New Mexico allegedly will (1) impede wildlife

[16] Plaintiffs argue that "[i]n another context, Congress explicitly allows the DOD Secretary to request 'the head of another agency responsible for the administration of navigation or vessel-inspection laws to waive compliance with those laws to the extent the Secretary considers necessary.'"  Reply at 17 (citing 46 U.S.C. 501(a)).  The Court finds this statute to be irrelevant to the issue here.  In this case, DoD is acting solely in response to DHS's request for support under Section 102; DHS has undisputed authority to issue waivers under that section; and it would not make sense to make NEPA compliance a condition of DoD's derivative support notwithstanding DHS's waiver.

[17] To the extent Plaintiffs' argument is that Defendants "cannot have it both ways," the Court agrees, to the extent it found a likelihood of success as to Plaintiffs' Section 8005 argument, as discussed in Section II.C.1.a, above.

United States District Court
Northern District of California

1    connectivity of over 100 species of wildlife, including the Mexican gray wolf, mountain lion,

2    bobcat, mule deer, and javelina; (2) generate "noise, deep holes for fence posts, vehicle traffic,

3    lighting, and other [construction] disturbances," which will "kill, injure, or alter the behavior of"

4    several species, including the Aplomado falcon and Gila monster; (3) limit New Mexico residents'

5    recreational opportunities; and (4) harm New Mexico as a whole, as it is entrusted by its residents

6    with a duty to protect natural resources for its residents' benefit.  *Id.* at 30–31.

7         Defendants posit that Plaintiffs' "vague allegations," only supported by "declarations [that]

8    are heavy on conjecture and light on detail" concerning harm to local species, are insufficient to

9    satisfy Plaintiffs' burden of demonstrating a likelihood of irreparable injury.  Opp. at 31–32.

10   More to the point, Defendants maintain that New Mexico fails to meet its burden of showing that

11   Defendants' plan "is likely to cause population-level harm," which Defendants claim requires

12   proof of a "definitive threat" to the species as a whole, and "not mere speculation."  *Id.* at 32

13   (quoting *Nat'l Wildlife Fed'n v. Burlington N.R.R.*, 23 F.3d 1508, 1512 n.8 (9th Cir. 1994)

14   ("*Burlington*")).  And as is relevant to the present discussion, Defendants highlight that any

15   purported environmental harm does not warrant a preliminary injunction because population or

16   species-level harm would not occur before a final disposition of the case on the merits.  *Id.* at 34.

17   Last, Defendants attack New Mexico's invocation of its residents' recreational interests as a

18   possible irreparable harm, because states may not advance resident interests in *parens patriae*

19   against the United States.  *Id.* at 33 (citing *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1178

20   (9th Cir. 2011)).

21        As the Ninth Circuit has explained, "it would be incorrect to hold that all potential

22   environmental injury warrants an injunction."  *League of Wilderness Defs./Blue Mountains*

23   *Biodiversity Project v. Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014).  "Environmental injury,"

24   however, "by its nature, can seldom be adequately remedied by money damages and is often

25   permanent or at least of long duration, *i.e.*, irreparable."  *Amoco Prod. Co. v. Vill. of Gambell,*

26   *Alaska*, 480 U.S. 531, 545 (1987).  Plaintiffs must nonetheless demonstrate that irreparable injury

27   "is *likely* in the absence of an injunction."  *Winter*, 555 U.S. at 22.  Mere "possibility" of

28   irreparable harm does not merit a preliminary injunction.  *Id.*

United States District Court
Northern District of California

30

United States District Court
Northern District of California

Contrary to Defendants' suggestion, the irreparable-injury inquiry does not require a showing of population-level harm or an extinction-level threat.  In fact, none of Defendants' proffered cases establish this standard.  *See N.M. Dep't of Game & Fish v. DOI*, 854 F.3d 1236, 1251 (10th Cir. 2017) (rejecting as insufficient evidence of irreparable harm a single declaration stating that the release of Mexican Wolves within a state "*has the potential* to affect predator-prey dynamics, and *may* affect other attributes of the ecosystem"); *Burlington*, 23 F.3d at 1511–12 (finding a district court did not clearly err in finding plaintiff failed to establish a likelihood of irreparable *future* injury based on *past* accidental injuries to protected grizzly bears); *Maughan v. Vilsack*, No. 4:14-cv-0007-EJL, 2014 WL 201702, at *6–7 (D. Idaho Jan. 17, 2014) (finding that growth in wolf population cut against plaintiffs' claim that a program authorizing wolf hunting would cause irreparable injury).[18]  For example, Defendants offer *Burlington* for the principle that New Mexico here must establish that the challenged conduct constitutes a "definitive threat" to a "protected *species*."  Opp. at 32 (citing 23 F.3d at 1512 n.8).  But the *Burlington* court added an important qualifier:  "We are not saying that a threat of extinction to the species is required before an injunction may issue under the ESA.  This would be contrary to the spirit of the statute, whose goal of preserving threatened and endangered species can also be achieved through incremental steps."  23 F.3d at 1512 n.8.  And *Burlington* cited favorably a case where "between three and nine grizzly bears would be killed" as meriting an injunction.  *Id.* (citing *Fund for Animals, Inc. v. Turner*, No. 91-2201(MB), 1991 WL 206232 (D.D.C. Sept. 27, 1991)).  Thus, while a showing of irreparable environmental injury to warrant injunctive relief may require evidence that the challenged action poses a threat of future demonstrable harm to a protected species, it does not require that the species is likely to be entirely wiped out.[19]

---

[18] Although the court in *Maughan* found a lack of irreparable injury because evidence showed the wolf species population was growing despite the challenged action, it nonetheless stated:  "The evidence in the current record shows that the [challenged] program for hunting wolves will not result in the loss of the species as a whole."  *See* 2014 WL 201702, at *7.  Even if the *Maughan* court meant for this passing comment to serve as the standard for irreparable injury, no court has since endorsed this view.  More important, that standard would be inconsistent with Ninth Circuit law, and thus the Court reads *Maughan* as standing for the narrow proposition that undisputed evidence of species growth in the face of a challenged action tilts against a finding of irreparable injury to that species from the challenged action.

[19] At the hearing on this motion, counsel for Defendants essentially acknowledged that this is the

However, whether or not New Mexico has proffered sufficient evidence to meet its burden of showing a likelihood of irreparable environmental harm from the use of reprogrammed and diverted funds under Sections 8005 and 284 for border barrier construction in the El Paso Sector Project 1 region, the contested use of such funds is no longer likely before resolution of the case on the merits.  This is because the Court has enjoined the relevant Defendants in the Citizen Groups' action from proceeding with such construction.  *See* Order at 55, *Sierra Club v. Trump*, No. 4:19-cv-00892-HSG (N.D. Cal. May 24, 2019), ECF No. 144 (enjoining the use of reprogrammed funds for border barrier construction in El Paso Sector Project 1).  Accordingly, no irreparable harm will result from the denial (without prejudice) of the States' duplicative requested injunction.

### b.    States' Harm from Diversion of TFF Funds

Plaintiffs' second theory of harm is that the diversion of TFF funds runs the risk of "depriv[ing] Plaintiff States of the same opportunity to receive TFF funds that they have enjoyed for years."  Mot. at 31.  Plaintiffs contend that a $601 million diversion "undermines the continued viability of TFF" moving forward and "jeopardizes the States' ability to collect their pending equitable share claims of millions of dollars that they are entitled to receive after dedicating time and resources to participating in joint law enforcement efforts."  *Id.* at 32.  In other words, Plaintiffs' alleged irreparable harms are that they (1) will not receive equitable share claims already owed, and (2) may not receive equitable share claims in the future.

Defendants respond to both irreparable injury bases with a declaration of the TEOAF Director, John M. Farley, who manages the TFF.  *See* Farley Decl. ¶ 2.  Mr. Farley acknowledges that equitable sharing payments to state and local enforcement agencies are "mandatory" TFF expenses.  *Id.* ¶ 8.  Mr. Farley explains, however, that "Strategic Support is an amount of unobligated funds at the end of the fiscal year, after accounting for equitable sharing and other mandatory expenses . . . [which] may be used in connection with the law enforcement activities of any Federal agency."  *Id.* ¶ 4.  He adds that TEOAF works with TFF member agencies "to track

_____

appropriate standard.  Dkt. No. 159 at 104:4–6 ("And I don't want to overstate that because it's -- as my colleagues on the other side have pointed out, it's not extinction.")

32

anticipated and current forfeiture cases and liabilities that may be associated with such cases," which "enables the program to accurately estimate its revenue and liabilities." *Id.* ¶¶ 5, 9.[20]  In this capacity, the "TFF has remained financially solvent and maintained adequate funds in its accounts to meet all of its expenses" since its inception in 1992.  *Id.* ¶ 9.

Because Strategic Support funding at the end of any fiscal year has already taken account of current fiscal year mandatory expenses and anticipated liabilities for the following fiscal year, Mr. Farley provides that "the decision to make Strategic Support funding available in fiscal year 2019 will have no impact on the amount of money state and local entities receive through equitable sharing." *Id.* ¶¶ 13, 23.  And the Treasury predicts that following the diversion of $601 million in strategic support payments to DHS, the "projected unobligated balance carry-over to fiscal year 2020 will be approximately $507 million." *Id.* ¶ 26.

Given Mr. Farley's representations, Defendants argue that there is no risk of irreparable harm to Plaintiffs from the diversion of TFF funds:  "Because Treasury's Strategic Support payments to DHS do not pose any threat to the solvency of the TFF or diminish the equitable sharing payments to which the States may be entitled under [Section] 9705, the States have not established a likelihood of irreparable injury."  Opp. at 31.  Plaintiffs' substantive response to the Farley declaration is to characterize it as a "self-serving declaration" that must be disregarded. But Plaintiffs' support for this proposition—*Nigro v. Sears, Roebuck & Co.*—stands for the exact opposite proposition.  *See* 784 F.3d 495, 497 (9th Cir. 2015) ("Although the source of the evidence may have some bearing on its credibility and on the weight it may be given by a trier of fact, the district court may not disregard a piece of evidence at the summary judgment stage solely based on its self-serving nature.").

At the hearing on this motion, Plaintiffs shifted their criticism of Mr. Farley to his TFF balance calculation.  *See* Dkt. No. 138 at 45:12–47:1.  Plaintiffs argued that Mr. Farley failed to consider contingent liabilities and noted that the TFF could theoretically be underwater based on such liabilities and other data contained in TEOAF's fiscal year 2020 budget.  *See id.*; *see also*

---

[20] TEOAF also sets aside funding to cover future fiscal year expenses.  *See* Farley Decl. ¶¶ 10–11 (explaining the process).

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Dkt. No. 136 Ex. 55, at 6–7.  It does not appear warranted, though, to discount the TFF balance

2   calculation by the entire contingent liability entry, given that such liabilities "are significant

3   because remission payments from multiple years are recorded and carried forward."  *See* Dkt. No.

4   136 Ex. 55, at 6.  Nothing indicates that the Treasury would pay out all contingent liabilities in the

5   next fiscal year.  And even accepting Plaintiffs' argument as true, they have not explained why the

6   TFF's existence alone manifests an entitlement to future equitable sharing payments.  Further,

7   Plaintiffs fail to consider that the amount of potential future equitable sharing payments is tethered

8   to future seizures or forfeitures for which a given state or local law enforcement agency

9   participates in the seizure or forfeiture, and is capped by the value of the seized or forfeited

10  property.  *See* 31 U.S.C. § 9705(a)(1)(g), (b)(2), (h)(1)(B)(ii).  Thus, to the extent a given law

11  enforcement agency participates in future seizures or forfeitures, the TFF necessarily will have the

12  funds to provide the mandatory equitable sharing payment.

13          Most important, Plaintiffs' ignore that the burden is theirs to demonstrate that irreparable

14  injury is *likely* in the absence of an injunction.  *Winter*, 555 U.S. at 22.  "Speculative" or

15  "possible" injury is not enough.  *All. for the Wild Rockies*, 632 F.3d at 1131–36.  Plaintiffs have

16  not met their burden.  Plaintiffs alleged there was some risk that Defendants' diversion of $601

17  million would undermine the continued viability of TFF and/or jeopardize their ability to collect

18  "pending" equitable share claims.  *See* Mot. at 31–32.  Defendants responded with a sworn

19  declaration demonstrating that no pending equitable share claims are at risk and that the TEOAF

20  has taken account of future needs to prevent any threat to TFF's continued viability.  The Court

21  cannot ignore this declaration just because it makes it more difficult for Plaintiffs to meet their

22  burden to demonstrate that irreparable injury is likely in the absence of an injunction.  And the

23  Court also cannot ignore that Plaintiffs failed to consider important relevant factors, such as the

24  nature of equitable sharing payments.  Thus, even though Plaintiffs have shown that they have

25  standing as to this claim, they have not shown an entitlement to the "extraordinary" remedy of a

26  preliminary injunction on this basis.[21]

27  _____

28  [21] To the extent Plaintiffs rely on *American Trucking Associations, Inc. v. City of Los Angeles*, 559
    F.3d 1046, 1058–59 (9th Cir. 2009), for the principle that a "constitutional violation alone,

United States District Court
Northern District of California

### 3.     Balance of Equities and Public Interest

When the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).  According to Defendants, these factors tilt in their favor, because their "weighty" interest in border security and immigration-law enforcement, as sanctioned by Congress, outweighs Plaintiffs' "speculative" injuries.  Opp. at 34–35.  The Ninth Circuit has recognized that "the public has a 'weighty' interest 'in efficient administration of the immigration laws at the border,'" and the Court does not minimize this interest.  *See E. Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1255 (9th Cir. 2018) (quoting *Landon v. Plasencia*, 459 U.S. 21, 34 (1982)).  On the other hand, "the public also has an interest in ensuring that statutes enacted by their representatives are not imperiled by executive fiat."  *Id.* (internal quotation marks and brackets omitted).  Because Plaintiffs have not shown a likelihood of irreparable harm as to the TFF diversion, and because the Court need not now reach that question with respect to the El Paso Sector project, this factor does not militate in favor of a preliminary injunction.[22]

//

//

//

//

//

//

---

coupled with the damages incurred, can suffice to show irreparable harm," that principle does not alter the Court's conclusion.  *See* Mot. at 31.  Even under that theory of irreparable harm, Plaintiffs must demonstrate some likely harm resulting from the challenged action, and not simply a constitutional violation.

[22] The Court observes that, although Congress appropriated $1.571 billion for physical barriers and associated technology along the Southwest border for fiscal year 2018, counsel for the House has represented to the Court that the Administration has stated as recently as April 30, 2019 that CBP represents it has only constructed 1.7 miles of fencing with that funding.  *See* Dkt. No. 161; *see also* Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, div. F, tit. II, § 230(a) 132 Stat. 348 (2018).  This representation tends to undermine Defendants' claim that irreparable harm will result if the funds at issue on this motion are not deployed immediately.

## III.     CONCLUSION

For the foregoing reasons, the Court **DENIES WITHOUT PREJUDICE** Plaintiffs' motion for a preliminary injunction.  A case management conference is set for June 5, 2019 at 2:00 p.m.  At the case management conference, the parties should be prepared to discuss a plan for expeditiously resolving this matter on the merits, whether through a bench trial, cross-motions for summary judgment, or other means.  The parties must submit a joint case management statement by May 31, 2019.

**IT IS SO ORDERED.**

Dated: 5/24/2019

HAYWOOD S. GILLIAM, JR.
United States District Judge

United States District Court
Northern District of California

36