1   XAVIER BECERRA
    Attorney General of California
2   ROBERT W. BYRNE
    SALLY MAGNANI
3   MICHAEL L. NEWMAN
    Senior Assistant Attorneys General
4   MICHAEL P. CAYABAN
    CHRISTINE CHUANG
5   EDWARD H. OCHOA
    Supervising Deputy Attorneys General
6   BRIAN J. BILFORD
    NOAH M. GOLDEN-KRASNER
7   SPARSH S. KHANDESHI
    HEATHER C. LESLIE
8   JANELLE M. SMITH
    JAMES F. ZAHRADKA II
9   LEE I. SHERMAN (SBN 272271)
    Deputy Attorneys General
10   300 S. Spring St., Suite 1702
    Los Angeles, CA 90013
11   Telephone: (213) 269-6404
    Fax: (213) 897-7605
12   E-mail: Lee.Sherman@doj.ca.gov
    *Attorneys for Plaintiff State of California*

13

14                  IN THE UNITED STATES DISTRICT COURT

15              FOR THE NORTHERN DISTRICT OF CALIFORNIA

16                           OAKLAND DIVISION

17

18

| | |
|---|---|
| **STATE OF CALIFORNIA et al.;** | Case No. 4:19-cv-00872-HSG |
| Plaintiffs, | **PLAINTIFF STATES OF CALIFORNIA AND NEW MEXICO'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING SECTIONS 284, 8005, AND 9002; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| v. | |
| **DONALD J. TRUMP, in his official capacity as President of the United States of America et al.;** | |
| Defendants. | Judge:        Honorable Haywood S. Gilliam, Jr.<br>Trial Date:    None Set<br>Action Filed: February 18, 2019 |

26

27

28

# TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT ................. 1

MEMORANDUM OF POINTS AND AUTHORITIES .............................................. 1

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 2

I.    The President and Congress's Dispute over Border Barrier Funding .................... 2

II.   Defendants' Actions to Divert Funding and Resources from Other Sources
      Toward Defendants' Proposed Border Wall ................................................... 3

III.  Harms Caused by Defendants' Border Barrier Construction Projects .................. 5

      A.    Construction in the El Centro Sector Harms California's Sovereign
            Interests in the Enforcement of its Laws that Protect its
            Environment, Natural Resources, and Wildlife ................................... 5

      B.    Construction in the El Paso Sector Harms New Mexico's Sovereign
            Interests in the Enforcement of its Laws that Protect its
            Environment, Natural Resources, and Wildlife ................................... 8

LEGAL ARGUMENT ............................................................................................ 9

I.    Legal Standard ......................................................................................... 9

II.   Defendants Lack Authority to Divert DOD Funding and Resources for a
      Border Barrier Under §§ 8005, 9002, and § 284 (Counts 3 and 4) ...................... 9

      A.    Defendants Have Exceeded Their Authority Under § 8005 ................... 10

      B.    Defendants Have Exceeded Their Authority Under § 9002 ................... 12

      C.    Defendants Have Exceeded Their Authority Under § 284 ..................... 13

III.  Defendants Have Violated the Constitution (Counts 1, 2, and 3) ...................... 13

      A.    Defendants' Actions Violate the Separation of Powers Doctrine ........... 14

      B.    Defendants Have Violated the Appropriations Clause .......................... 15

      C.    Defendants Have Violated the Presentment Clause .............................. 16

IV.   Defendants' Diversions of DOD Funds for a Border Barrier are Arbitrary
      and Capricious (Count 5) ........................................................................... 17

V.    California and New Mexico Would Suffer Irreparable Harm from the
      Diversions of Funds .................................................................................. 19

      A.    The Diversions of Funds Harm California's and New Mexico's
            Sovereign Interests in the Enforcement of Their State Laws ................. 19

      B.    The Diversions of Funds Cause Harm to California's and New
            Mexico's Environment, Wildlife, and Natural Resources .................... 21

VI.   The Balance of Hardships and Public Interest Favor Granting a Permanent
      Injunction ............................................................................................... 24

CONCLUSION .................................................................................................... 25

i

1

**TABLE OF AUTHORITIES**

2

**Page**

3

CASES

4

*Alfred L. Snapp & Son, Inc. v. Puerto Rico* ex rel. *Barez*
   458 U.S. 592 (1982).........................................................................................................19

5

6

*Amoco Prod. Co. v. Vill. of Gambell*
   480 U.S. 531 (1987).........................................................................................................25

7

*Citizens to Pres. Overton Park, Inc. v. Volpe*
   401 U.S. 402 (1971).........................................................................................................17

8

9

*City & Cty. of San Francisco v. Trump*
   897 F.3d 1225 (9th Cir. 2018).........................................................................................14

10

*City of Arlington v. FCC*
   569 U.S. 290 (2013).........................................................................................................10

11

12

*Clinton v. City of New York*
   524 U.S. 417 (1998)....................................................................................................16, 17

13

14

*Day v. Apoliona*
   505 F.3d 963 (9th Cir. 2007)...........................................................................................20

15

16

*Dep't of the Air Force v. FLRA*
   648 F.3d 841 (D.C. Cir. 2011) ........................................................................................13

17

*Dep't of the Navy v. FLRA*
   665 F.3d 1339 (D.C. Cir. 2012) ......................................................................................15

18

19

*eBay Inc. v. MercExchange, LLC*
   547 U.S. 388 (2006)...........................................................................................................9

20

*FDA v. Brown & Williamson Tobacco Corp.*
   529 U.S. 120 (2000).........................................................................................................13

21

22

*Feldman v. Reagan*
   843 F.3d 366 (9th Cir. 2016)...........................................................................................25

23

24

*Giovani Carandola, Ltd v. Bason*
   303 F.3d 507 (4th Cir. 2002)...........................................................................................25

25

*Gonzales v. Oregon*
   546 U.S. 243 (2006).........................................................................................................16

26

27

*Greater Yellowstone Coal., Inc. v. Servheen*
   665 F.3d 1015 (9th Cir. 2011).........................................................................................18

28

ii

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Idaho Sporting Cong. Inc. v. Alexander*
 222 F.3d 562 (9th Cir. 2000)..................................................................21

*Jicarilla Apache Nation v. U.S. Dep't of the Interior*
 613 F.3d 1112 (D.C. Cir. 2010) ...........................................................19

*Kansas v. United States*
 249 F.3d 1213 (10th Cir. 2001)..............................................................20

*Maine v. Taylor*
 477 U.S. 131 (1986) ................................................................................19

*Maryland v. King*
 567 U.S. 1301 (2012)..............................................................................19

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*
 463 U.S. 29 (1983) ..................................................................................18

*Nat'l Wildlife Fed'n v. Burlington N.R.R.*
 23 F.3d 1508 (9th Cir. 1994)..................................................................21

*Nevada v. Dep't of Energy*
 400 F.3d 9 (D.C. Cir. 2005) ...................................................................15

*New Motor Vehicle Bd. of California v. Orrin W. Fox Co.*
 434 U.S. 1345 (1977)........................................................................19, 24

*Nken v. Holder*
 556 U.S. 418 (2009) ..................................................................................9

*Office of Pers. Mgmt v. Richmond*
 496 U.S. 414 (1990) ................................................................................15

*Pac. Nw. Venison Producers v. Smitch*
 20 F.3d 1008 (9th Cir. 1994)..................................................................19

*Population Inst. v. McPherson*
 797 F.2d 1062 (D.C. Cir. 1986) .............................................................24

*Rent-A-Center, Inc. v. Canyon Television & Appliance Rental Inc.*
 944 F.2d 597 (9th Cir. 1991)..................................................................20

*Rodriguez v. Robbins*
 715 F.3d 1127 (9th Cir. 2013)................................................................25

iii

## TABLE OF AUTHORITIES
### (continued)

Page

*State of Ariz. v. Thomas*
824 F.2d 745 (9th Cir. 1987)...................................................................................17

*United States v. MacCollom*
426 U.S. 317 (1976)................................................................................................16

*Winter v. Natural Res. Def. Council, Inc.*
555 U.S. 7 (2008)....................................................................................................21

*Youngstown Sheet & Tube Co. v. Sawyer*
343 U.S. 579 (1952)................................................................................................14

**FEDERAL STATUTES**

United States Code, Title 5
§ 706(2)(A) .............................................................................................................17
§ 706(2)(B)-(C) .......................................................................................................17
§ 706(2)(C) .............................................................................................................10

United States Code, Title 10
§ 284........................................................................................................... *passim*
§ 284(b)(7) ...............................................................................................................4
§ 284(h), (i)(3) ........................................................................................................13
§ 2214(b) .................................................................................................................10

United States Code, Title 16
§ 1536(a)(2) ..............................................................................................................8

United States Code, Title 28
§ 2201(a) ...................................................................................................................9

United States Code, Title 33
§ 1323........................................................................................................................6
§ 1323(a) ...................................................................................................................6
§ 1341........................................................................................................................6
§ 1341(a)(1) ..............................................................................................................6
§ 1342........................................................................................................................6
§ 1344........................................................................................................................6

United States Code, Title 42
§ 7506(c)(1).........................................................................................................7, 20
§ 7506(c)(1)(B)(ii)-(iii) ............................................................................................7

Pub. L. No. 104-208, 110 Sat. 3009 (1996) ..................................................................4

Pub. L. No. 115-245, 132 Stat. 2981 (2018)................................................... *passim*

iv

# TABLE OF AUTHORITIES
**(continued)**

Page

Pub. L. No. 116-6, 133 Stat. 13 (2019)............................................................3, 10, 17

**STATE STATUTES**

California Government Code
    § 12600.....................................................................................................25
    § 12600(a).................................................................................................5

California Water Code
    § 13000-16104..........................................................................................5
    § 13050....................................................................................................20
    § 13220-13228.15....................................................................................20
    § 13240................................................................................................6, 20
    § 13247......................................................................................................6
    § 13247......................................................................................................6
    § 13260..................................................................................................5, 6
    § 13376................................................................................................6, 20
    § 13776..................................................................................................5, 6

California Endangered Species Act, Cal. Fish and Game Code
    §§ 2050-2155.5..........................................................................................5

2019 N.M. Laws Chapter 97..............................................................................20

N.M. Admin. Code
    §§ 20.2.23-109-122....................................................................................8

N.M. Admin. Code
    §§ 20.2.23.109-112...................................................................................20

N.M. Stat. Ann. § 17-2-41.............................................................................9, 20

N.M. Stat. Ann. § 75-6-1(D).................................................................................9

**U.S. CONSTITUTIONAL PROVISIONS**

United States Constitution
    Article I, § 7, cl. 2....................................................................................16

**STATE CONSTITUTIONAL PROVISIONS**

New Mexico Constitution
    Article XX, § 21....................................................................................8, 25

v

Pl.'s Notice of Mot. and Mot. for Prelim. Inj. re: El Centro Border Wall Project (4:19-cv-00872-HSG)

# TABLE OF AUTHORITIES
**(continued)**

**Page**

**COURT RULES**

Federal Rules of Civil Procedure
Rule 56 .................................................................................................................1
Rule 56(a) ............................................................................................................9
Rule 801 .........................................................................................................7, 20

**FEDERAL REGULATIONS**

40 Code of Federal Regulations
§ 51.930................................................................................................................8
§ 52.220(c)(345)(i)(E)(2) .................................................................................7, 20
§ 93.150 ................................................................................................................7
§ 93.153(b) ...........................................................................................................7
§ 93.156 ................................................................................................................7

75 Federal Register 39,366 (July 8, 2010) ...............................................................7, 20

84 Federal Register 17,185, 17,187 (Apr. 24, 2019) .......................................................5

84 Federal Register 21,800 (May 15, 2019) ....................................................................5

**STATE REGULATIONS**

California Code of Regulations, Title 23
§§ 3960-3969.4 ...............................................................................................5, 20

**OTHER AUTHORITIES**

Government Accountability Office, Office of the General Counsel, Principles of
Federal Appropriations Law (4th Ed. 2017) ....................................................15, 16

H.R. Rep. No. 101-665 (1990).......................................................................................13

*Requirement*, Merriam-Webster's Dictionary (7th ed. 2016) .......................................12

1     **NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**

2     PLEASE TAKE NOTICE that Plaintiff States of California and New Mexico hereby move

3     the Court under Federal Rule of Civil Procedure 56 for partial summary judgment. California and

4     New Mexico respectfully request that the Court enter judgment in their favor as to their claims

5     because the undisputed evidence establishes that the diversions of federal funds and resources

6     under §§ 8005 and 9002 of the Fiscal Year (FY) 2019 Department of Defense Appropriations Act

7     (FY 2019 DOD Appropriations Act), Pub. L. No. 115-245, 132 Stat. 2981, 2999, 3042 (2018) and

8     10 U.S.C. § 284 for construction of a barrier on the southern borders of California and New

9     Mexico: (1) are ultra vires; (2) violate the United States Constitution's separation of powers

10    principles, including the Appropriations and Presentment Clauses; and (3) violate the

11    Administrative Procedure Act (APA). California and New Mexico are entitled to injunctive relief

12    prohibiting Defendants from utilizing §§ 8005 and 9002 of the FY 2019 DOD Appropriations Act

13    and 10 U.S.C. § 284 to divert $2.5 billion in DOD funds for construction in California and New

14    Mexico. This motion is based on this Notice of Motion and Motion, the Memorandum of Points

15    and Authorities, the accompanying declarations and Request for Judicial Notice, all briefs and

16    evidence submitted in support of the earlier motions for preliminary injunction, ECF Nos. 59 and

17    167, this Court's prior rulings on the motion for preliminary injunction in this case, ECF No. 165,

18    and in *Sierra Club v. Trump,* No. 19-cv-892 (May 24, 2019), ECF No. 144, other papers,

19    evidence, and records on file, and any other evidence or arguments as may be presented.

20     **MEMORANDUM OF POINTS AND AUTHORITIES**

21     **INTRODUCTION**

22     This Court has already ruled that plaintiffs in this lawsuit and in the related case, *Sierra*

23    *Club v. Trump*, are likely to succeed on the merits of their claims that Defendants have acted

24    unlawfully by diverting $1 billion in Department of Defense (DOD) funds appropriated for other

25    purposes toward construction of a border barrier in the El Paso Sector in New Mexico, and "that

26    Defendants' reading [of § 8005] likely would violate the Constitution's separation of powers

27    principles." Order Den. Pls.' Mot. for Prelim. Inj. 20, 13-24, ECF No. 165 (*States* PI Order);

28    Order Granting in Part and Den. in Part Pls.' Mot. for Prelim. Inj. 31-42, *Sierra Club* (May 24,

1

Pl. States of California and New Mexico's Notice of Mot. and Mot. for Partial Summ. J. (4:19-cv-00872-HSG)

2019), ECF No. 144 (*Sierra Club* PI Order). Now, based on the reasoning in those rulings and the undisputed record, New Mexico is entitled to partial summary judgment in its favor.

California is likewise entitled to partial summary judgment. Relying on essentially the same authority that this Court enjoined Defendants from using in the *Sierra Club* PI Order, Defendants have diverted $1.5 billion in additional DOD funds toward construction of a border barrier in the El Centro Sector on California's southern border. Consequently, based on the reasoning in the Court's preliminary injunction rulings, the proposed diversion for construction in the El Centro Sector is unlawful and violates the Constitution. California and New Mexico are also entitled to partial summary judgment because Defendants' actions violate the APA.

For relief, California and New Mexico both request that this Court declare that the transfer and use of DOD funds toward Defendants' proposed border wall is unlawful and unconstitutional, and enjoin the use of those funds toward construction in California and New Mexico. California and New Mexico also respectfully urge that in determining whether to enjoin this construction, this Court consider the unique, significant harms to the States' sovereign interests, in addition to the irreparable injury facing the private plaintiffs, because Defendants may appeal any permanent injunction just as they have appealed the preliminary injunction that this Court granted.[1] Notice of Appeal, *Sierra Club* (May 29, 2019), ECF No. 145. As shown below, absent an injunction, Defendants will be unconstrained in their bypassing of the States' environmental laws and regulations in constructing border barriers, infringing California's and New Mexico's sovereign interests in enforcing their laws. This sovereign injury is in and of itself sufficient to establish irreparable harm. In addition, California and New Mexico would suffer irreparable harm to their natural resources and wildlife protected by those laws. Finally, as this Court has already held, the balance of the equities and public interest favor enjoining Defendants' unlawful conduct.

## BACKGROUND

### I.   THE PRESIDENT AND CONGRESS'S DISPUTE OVER BORDER BARRIER FUNDING

"The President has long voiced support for a physical barrier between the United States and

---

[1] This Court did not consider whether Plaintiff State of New Mexico established irreparable harm because it deemed the *Sierra Club* PI Order sufficient to provide relief. *States* PI Order 32.

1  Mexico." *Sierra Club* PI Order 3; *see also* Req. for Judicial Notice in Supp. of Mot. for Prelim.

2  Inj. (PI RJN), ECF No. 59-4, Exs. 3-13.[2] Between 2017 and 2018, Congress considered numerous

3  bills that would have authorized or appropriated billions of dollars toward President Trump's

4  proposed border wall, all of which failed. *See, e.g.*, *Sierra Club* PI Order 3-5; PI RJN Exs. 14-20.

5  Starting at the end of 2018, President Trump and Congress engaged in a protracted and public

6  dispute over funding for a border wall that resulted in a record 35-day partial government

7  shutdown. *Sierra Club* PI Order 3-5; *see also* PI RJN Exs. 21-24, 26.

8      During the shutdown, on January 6, 2019, the Office of Management and Budget requested

9  $5.7 billion from Congress to fund "approximately 234 miles of new physical barrier." PI RJN

10  Ex. 25. Congress never granted this funding request. Instead, after weeks of negotiation, on

11  February 14, 2019, Congress passed the Consolidated Appropriations Act, 2019, Pub. L. No. 116-

12  6, 133 Stat. 13 (2019) (CAA). The CAA appropriates only $1.375 billion to the Department of

13  Homeland Security (DHS) to construct primary pedestrian border fencing in the Rio Grande

14  Valley Sector on Texas's southern border subject to enumerated conditions and limitations. *Id.* §§

15  230-32, 133 Stat. at 28. This appropriation is the only funding in the CAA that Congress

16  designated for barrier construction. The funding imposes limits on where the barrier may be built

17  (only in certain portions of the Rio Grande Valley), how the barrier may be designed, and whom

18  DHS must consult with prior to construction. *Id.* §§ 230-32. The CAA became law on February

19  15, 2019.

20  **II.  DEFENDANTS' ACTIONS TO DIVERT FUNDING AND RESOURCES FROM OTHER SOURCES
        TOWARD DEFENDANTS' PROPOSED BORDER WALL**

21

22      On the same day that President Trump signed the CAA into law, the Trump Administration

23  announced it would redirect $6.7 billion of federal funds from three other sources to construct a

24  border wall, over and above the $1.375 billion that Congress had appropriated for limited fencing

25  at the border. *Sierra Club* PI Order 6-8; PI RJN Ex. 28. This motion concerns the redirection of

26  $2.5 billion of DOD resources toward construction of a border wall.

27  _____
    [2] To avoid duplication, California and New Mexico refer to previous requests for judicial notice
28  for all exhibits previously presented to the Court for judicial notice in the motion for preliminary
    injunction that this Court decided. *See States* PI Order 7 n.6; *Sierra Club* PI Order 4 n.3.

3

Pl. States of California and New Mexico's Notice of Mot. and Mot. for Partial Summ. J. (4:19-cv-00872-HSG)

1      While Defendants invoked 10 U.S.C. § 284(b)(7), which authorizes the Secretary of

2   Defense to use the DOD drug-interdiction account to support other federal agencies for the

3   "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors

4   across international boundaries of the United States," none of the transferred funds were

5   originally appropriated by Congress for drug-interdiction purposes. *See Sierra Club* PI Order 16.

6   Instead, on March 25, 2019, DOD transferred $1 billion from DOD's Military Personnel and

7   Reserve account to the drug-interdiction account through the Department's transfer authority in

8   § 8005 of the FY 2019 DOD Appropriations Act. Administrative Record (AR) 1-8, 34-37 (ECF

9   No. 173) (March 25 Reprogramming Action). DOD planned to use these funds for Yuma Sector

10  Projects 1 and 2 (on the southern border of Arizona) and El Paso Sector Project 1 (on the southern

11  border of New Mexico). *Id.* 1-8. In addition, on May 9, 2019, DOD transferred $818.5 million to

12  the drug-interdiction account by means of its general transfer authority in § 8005, and another

13  $681.5 million under its special Overseas Contingency Operations transfer authority in § 9002 in

14  the FY 2019 DOD Appropriations Act, for a total of $1.5 billion. *Id.* 137-56 (May 9

15  Reprogramming Action, with March 25 Reprogramming Action, Reprogramming Actions). DOD

16  plans to use these funds to construct Tucson Sector Projects 1, 2, and 3 (on the southern border of

17  Arizona) and El Centro Sector Project 1 (on the southern border of California). *Id.* 137-47.

18      Although DOD historically has sought congressional approval prior to using its transfer

19  authority—indeed, its internal appropriations rules require it, *see* PI RJN Exs. 37-38, DOD

20  notified Congress of all of the Reprogramming Actions only after the transfers were made, and

21  the relevant House committees then formally disapproved of these actions. *States* PI Order 19-20;

22  *Sierra Club* PI Order 37-38; *see also* PI RJN Exs. 35-36; Req. for Judicial Notice re Mot. for

23  Partial Summ. J. (Partial MSJ RJN) Ex. 1.

24      DOD's Acting Secretary Shanahan informed DHS that Customs and Border Protection

25  (CBP) would "serve as the lead agency for environmental compliance" and will accept and

26  maintain all of the completed border barrier projects. AR 7, 159. DHS issued waivers pursuant to

27  the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), Pub. L. No. 104-

28  208, § 102(c), 110 Stat. 3009 (1996) for construction in the El Paso and El Centro Sectors

4

1    obviating "all federal, state, or other laws, regulations, and legal requirements of, deriving from,

2    or related to the subject of" the federal statutes identified in the waiver. 84 Fed. Reg. 17,185,

3    17,187 (Apr. 24, 2019); 84 Fed. Reg. 21,800-01 (May 15, 2019). DOD has already awarded

4    contracts to private companies for construction in both sectors, Rapuano Decl. Ex. G, ECF No.

5    89-10; Partial MSJ RJN Ex. 2, and Defendants are poised to begin construction as soon as

6    possible. *See* Mot. to Stay re Order on Mot. for Prelim. Inj., *Sierra Club* (May 29, 2019), ECF

7    No. 146; Second Rapuano Decl. ¶ 11, ECF No. 143-1 (identifying start of construction for El

8    Centro Project 1 as early as 45 days after awarding of contract, i.e., July 1, 2019).

9    **III.    HARMS CAUSED BY DEFENDANTS' BORDER BARRIER CONSTRUCTION PROJECTS**

10           **A.    Construction in the El Centro Sector Harms California's Sovereign
                     Interests in the Enforcement of its Laws that Protect its Environment,**
11           **Natural Resources, and Wildlife**

12           As a sovereign state, California is entitled to enact and enforce its own laws. California has

13    an express statutory mandate to "conserve, protect, and enhance its environment" and "prevent

14    destruction, pollution, or irreparable impairment of the environment and the natural resources of"

15    the State, Cal. Gov't Code § 12600(a), and it has enacted a robust and extensive series of laws to

16    protect the State's water and air quality, species, land, and other environmental resources. *See,*

17    *e.g.,* Porter-Cologne Water Quality Control Act, Cal. Water Code §§ 13000-16104; California

18    Endangered Species Act, Cal. Fish and Game Code §§ 2050-2155.5. Pursuant to this body of law,

19    California agencies develop air, water quality, and wildlife resources management plans intended

20    to accomplish California's environmental quality objectives in specific regions of the State.

21    Defendants' diversion of funds to construct El Centro Project 1, and subsequent IIRIRA waiver,

22    bar California from meeting those objectives and enforcing those laws as discussed below.

23           ***Water Quality Laws***

24           Under California law, the State Water Resources Control Board and nine regional boards

25    (collectively, Water Boards) establish water quality objectives and standards to protect the

26    beneficial uses of water bodies in the State, which are set forth in "basin plans" that the regional

27    boards must apply in exercising their permitting authority. Cal. Water Code §§ 13260, 13776;

28    Cal. Code Regs. tit. 23, §§ 3960-3969.4; MSJ Env. App'x Ex. 2 (Dunn Decl. ¶¶ 4-6, 20).

5

Pl. States of California and New Mexico's Notice of Mot. and Mot. for Partial Summ. J. (4:19-cv-00872-HSG)

1   California ensures compliance with its water quality objectives through the Water Boards'

2   regulatory authority. MSJ Env. App'x Ex. 2 (Dunn Decl. ¶¶5, 6, 20). Consequently, their

3   certification and permitting decisions are the primary means by which the Water Boards

4   implement California's water quality objectives. Cal. Water Code §§ 13240, 13247, 13260,

5   13376; MSJ Env. App'x Ex. 2 (Dunn Decl. ¶¶5, 20).

6       For construction projects like El Centro Project 1, in which dredge and fill activities are

7   expected to occur at or near the Pinto Wash and several other ephemeral streams that drain into

8   the New River, a regional board must certify compliance with water quality standards. *See* 33

9   U.S.C. § 1323(a); MSJ Env. App'x Ex. 2 (Dunn Decl. ¶¶ 8-13). Ordinarily, such a construction

10  project could not move forward until a California regional water quality agency certified

11  Defendants' compliance with California's water quality standards, as the federal government

12  previously sought for prior projects in this area. Cal. Water Code §§ 13260, 13776; 33 U.S.C.

13  § 1341(a)(1) (state water quality certification required as part of federal permit); MSJ Env. App'x

14  Ex. 2 (Dunn Decl. ¶¶ 9-10). Compliance with California's water quality laws is required because

15  El Centro Project 1, which would entail significant soil disturbances, would traverse several

16  unnamed ephemeral streams that drain into the Pinto Wash and are protected waters of the United

17  States and of California. *Id.* ¶¶ 12-13, 16; Partial MSJ RJN Ex. 3. Such a project would also

18  require a National Pollution Discharge Elimination System (NPDES) General Construction

19  permit, which is issued by the State Water Resources Control Board and administered by a

20  California regional water quality agency. MSJ Env. App'x Ex. 2 (Dunn Decl. ¶¶ 18-19). Absent a

21  waiver, both these permitting and certification requirements apply to federal projects. *See* 33

22  U.S.C. §§ 1323, 1341, 1342 1344; MSJ Env. App'x Ex. 2 (Dunn Decl. ¶¶ 8-9, 11). Therefore,

23  denying the Water Boards their regulatory authority, through the funding diversion and IIRIRA

24  waiver, means California's water quality objectives, as set forth in California's Porter-Cologne

25  Water Quality Control Act and the corresponding basin plans, would not be enforced.

26      ***Air Quality Laws***

27      The diversion of funds and the waiver of California law would likewise undermine

28  California's enforcement of its air quality standards for complying with the federal Clean Air Act

6

1  as set forth in California's State Implementation Plan (SIP). The Clean Air Act prohibits federal

2  agencies, such as Defendant agencies, from engaging in, supporting, or financing any activity that

3  does not conform to a SIP. 42 U.S.C. § 7506(c)(1). "Conformity" violations include "increas[ing]

4  the frequency or severity of any existing violation of any standard in any area," or "delay[ing]

5  timely attainment of any standard . . . in any area." *Id.* § 7506(c)(1)(B)(ii)-(iii). These safeguards

6  prevent federal agencies from interfering with states' abilities to comply with the Clean Air Act's

7  requirements.

8      El Centro Project 1 would be constructed in Imperial County, where the local air district has

9  implemented Rule 801 as part of California's SIP, which has been approved by the California Air

10 Resources Board. Rule 801's purpose is to reduce the amount of fine particulate matter (PM 10)

11 generated from construction and earth-moving activities. Partial MSJ RJN Ex. 4 (Rule 801). If not

12 for the IIRIRA waiver, Defendants would be obligated to comply with Rule 801, which requires

13 the development and implementation of a dust-control plan for construction projects to prevent,

14 reduce, and mitigate PM 10 emissions. 42 U.S.C. § 7506(c)(1); 40 C.F.R.

15 § 52.220(c)(345)(i)(E)(2); 75 Fed. Reg. 39,366 (July 8, 2010); Rule 801. In addition to protecting

16 Californians by supporting federal health standards, these rules help mitigate blowing dust that

17 can cause additional acute regional or local health issues. Partial MSJ RJN Ex. 5.

18     The Clean Air Act also requires federal agencies to conduct a conformity analysis to

19 determine whether a proposed project, such as El Centro Project 1, is consistent with California's

20 SIP. 42 U.S.C. § 7506(c)(1); 40 C.F.R. § 93.150. A "conformity determination" including public

21 disclosures of the agency's decision, 40 C.F.R. § 93.156, is required for each pollutant where the

22 total amount of direct and indirect emissions in a nonattainment or maintenance area caused by

23 the proposed project would equal or exceed the threshold levels. 40 C.F.R. § 93.153(b).

24 Defendants have not conducted a conformity analysis or demonstrated that emissions from El

25 Centro Project 1 would fall below those thresholds.

26     ***Endangered and Threatened Species Protection***

27     Lastly, but for the IIRIRA waiver, DHS would be required to consult with the U.S. Fish and

28 Wildlife Service to ensure that El Centro Project 1 "is not likely to jeopardize the continued

7

existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species" that are identified as endangered under California (and federal) law. 16 U.S.C. § 1536(a)(2); MSJ Env. App'x Ex. 1 (Clark Decl. ¶ 15). As shown below, El Centro Project 1 would harm federal and California endangered species such as the Peninsular Bighorn Sheep, which utilizes an important lamb-rearing habitat adjacent to El Centro Project 1, and the flat-tailed horned lizard. The presence of these species led the federal Bureau of Land Management (BLM) to identify the area (including the segment of the border where El Centro Project 1 would be built) as an Area of Critical Environmental Concern. MSJ Env. App'x Ex 4 (Nagano Decl. ¶ 26). Recognizing the impact projects like El Centro Project 1 would have on the flat-tailed horned lizard in particular, the U.S. Fish and Wildlife Service, the BLM, California Department of Fish and Wildlife, and California State Parks implemented the "Flat-Tailed Horned Lizard Rangewide Management Strategy." This Management Strategy imposes restrictions on projects that would result in large-scale soil disturbances in the project area, like El Centro Project 1, MSJ Env. App'x Ex. 7 (Vanderplank ¶ 8), and flatly prohibits activities that would restrict the lizards' interchange with lizard populations south of the international border. Partial MSJ RJN Ex. 6 at 5, 27, 30, 56.

**B.**    **Construction in the El Paso Sector Harms New Mexico's Sovereign Interests in the Enforcement of its Laws that Protect its Environment, Natural Resources, and Wildlife**

The diversion of funds and ensuing IIRIRA waiver similarly undermine New Mexico's sovereign ability to implement and enforce its laws to improve air quality and protect wildlife and plant species. Much as in California, in New Mexico, "protection of the state's beautiful and healthful environment is . . . of fundamental importance to the public interest, health, and safety and the general welfare." N.M. Const. art. XX, § 21.

Defendants would normally be required to comply with New Mexico's fugitive dust control rule and High Wind Fugitive Dust Mitigation Plan that New Mexico adopted under the Clean Air Act due to PM 10 exceedances from high winds in Luna and Dona Ana Counties where the El Paso Sector barrier projects are planned for construction. Partial MSJ RJN Ex. 7; 40 C.F.R. § 51.930; N.M. Admin. Code §§ 20.2.23-109-122. Defendants also would normally be required to

8

consult with the U.S. Fish and Wildlife Service to protect species such as the Mexican wolf that are endangered under both federal and New Mexico law. N.M. Stat. Ann. § 17-2-41 (prohibiting the taking of endangered of threatened species); MSJ Env. App'x Ex. 6 (Traphagen Decl. ¶ 18); Ex. 1 (Clark Decl. ¶ 15). Endangered plants would be harmed by the proposed El Paso Project 1, and Defendants have not demonstrated how impacts to protected plant species would be avoided. N.M. Stat. Ann. § 75-6-1(D); MSJ Env. App'x Ex. 3 (Lasky Decl. ¶ 14). Defendants' diversions of funds to construct both El Centro Project 1 and El Paso Project 1, and the IIRIRA waiver that flows from the diversions, therefore, impede California's and New Mexico's abilities to protect the States' environment, natural resources, and wildlife.

## LEGAL ARGUMENT

### I.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Declaratory relief is appropriate "[i]n a case or actual controversy" in order to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). And a plaintiff is entitled to a permanent injunction if it has "suffered an irreparable injury," "remedies available at law . . . are inadequate," "the balance of hardships between the plaintiff and defendant" supports an equitable remedy, and "the public interest would not be disserved." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). When the federal government is the opposing party, these last two factors for injunctive relief merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

### II.   DEFENDANTS LACK AUTHORITY TO DIVERT DOD FUNDING AND RESOURCES FOR A BORDER BARRIER UNDER §§ 8005, 9002, AND § 284 (COUNTS 3 AND 4)

This Court already determined that Defendants likely exceeded their authority by utilizing DOD's general transfer authority under § 8005 of the FY 2019 DOD Appropriations Act to divert DOD funds appropriated for other purposes toward construction of a border barrier. *States* PI Order 14-18; *Sierra Club* PI Order 32-36. Although this Court did not consider DOD's subsequent transfer of funds under § 9002 of the FY 2019 DOD Appropriations Act, it recognized

9

that this provision, which incorporates the § 8005 criteria and imposes additional limitations, "is, at a minimum, subject to Section 8005's limitations." *Sierra Club* PI Order 12 n.7. Defendants have also exceeded their authority under 10 U.S.C. § 284, which does not authorize the use of DOD funds and resources for a multi-billion dollar border wall project. As the Court correctly determined, these actions in excess of statutory authority are ultra vires. *See City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). They also are "in excess of statutory jurisdiction, authority, or limitations, short of statutory right," in violation of the APA. 5 U.S.C. § 706(2)(C).

### A.    Defendants Have Exceeded Their Authority Under § 8005

As this Court has already found, *States* PI Order 13, *Sierra Club* PI Order 16-17, in order to divert any of the $1.819 billion in DOD funds toward border barrier construction under § 8005 as intended by the Reprogramming Actions, Defendants must, among other things, show that the transfer is not for an "item" that Congress has denied requested funding and that the transfer is based on "unforeseen military requirements." FY 2019 DOD Appropriations Act § 8005; *see also* 10 U.S.C. § 2214(b) (imposing same conditions). In its prior orders, this Court reasoned that plaintiffs were likely to succeed in showing that Defendants were impermissibly seeking to transfer funds for an item that Congress has denied funding, and there was no "unforeseen" requirement for the border barriers. *States* PI Order 14-18; *Sierra Club* PI Order 32-36. The same reasoning dictates the conclusion that, as a matter of law, Defendants violated § 8005's conditions by transferring money for a project that was denied by Congress and was foreseen. In addition, the transfer violates the § 8005 condition that it be for a "military requirement."

*First*, Defendants did not follow § 8005 as they transferred money for an item that Congress denied funding. It is undisputed that: (i) the executive branch requested $5.7 billion from Congress for border barrier construction for FY 2019, PI RJN Ex. 25; (ii) in the CAA, Congress appropriated only $1.375 billion "for the construction of pedestrian fencing, of a specified type, in a specified sector, and appropriated no other funds for barrier construction," *States* PI Order 14, *Sierra Club* PI Order 32-33; and (iii) now, Defendants seek to transfer funds by way of § 8005 for barrier construction in a different location and for an amount greater than what was appropriated by Congress. Accordingly, as this Court recognized, Defendants are

10

1    proposing to use § 8005 "for an item for which Congress has denied funding" and "thus run[]

2    afoul of the plain language of Section 8005." *States* PI Order 14-15; *Sierra Club* PI Order 33.

3    Moreover, there is nothing in § 8005 suggesting that the "item" for purposes of the provision is

4    *DOD funding* for border barrier construction, as Defendants have argued, rather than "[b]order

5    barrier construction" itself. *States* PI Order 16; *Sierra Club* PI Order 34. Such an interpretation

6    would contradict the purpose of this restriction and "subvert" the judgment made by Congress.

7    *States* PI Order 15-16; *Sierra Club* PI Order 33-34.

8         *Second*, Defendants violated the § 8005 condition requiring that the transfer is for a need

9    that was "unforeseen." Defendants' suggestion that any need for border barrier funding was

10   unforeseen "cannot logically be squared with the Administration's multiple requests for funding

11   for exactly that purpose dating back to at least early 2018." *States* PI Order 17; *Sierra Club* PI

12   Order 35. Defendants have contended that this Court should look to whether DHS's request for

13   DOD assistance rather than the need for border barrier construction was unforeseen. However, as

14   this Court pointed out, this contention is unreasonable because it makes every request for § 284

15   support unforeseen until the request is made and thus allows DOD to dictate when it may satisfy

16   § 8005's unforeseen requirement, *States* PI Order 18; *Sierra Club* PI Order 36, an interpretation

17   that would raise serious constitutional questions. *States* PI Order 18-24; *Sierra Club* PI Order 36-

18   42. Defendants' argument also fails because "even the purported need for DoD to provide DHS

19   with support for border security has . . . been long asserted." *States* PI Order 18 (citing the

20   president's April 4, 2018 memorandum directing DOD to support DHS at the border); *Sierra*

21   *Club* PI Order 36. Moreover, since the plaintiffs filed their preliminary injunction motions, the

22   record on this point has only become stronger, as the House of Representatives has produced

23   evidence of a DOD communication acknowledging that in early 2018, DOD held back the use of

24   funds for counter-drug activity projects "primar[ily]" in anticipation "for possible use in

25   supporting Southwest Border construction" in FY 2018. Partial MSJ RJN Ex. 8 ¶ 2.

26        *Third*, Defendants did not satisfy the criteria under § 8005 because the border barrier is not

27   a "military requirement." As Defendants acknowledge, conditions at the border do not pose a

28   "military threat." PI RJN Exs. 46-47. Nor is construction of a border barrier military in nature. To

                                          11

1  the contrary, it is DHS, not DOD, that possesses the "experience and technical expertise" to

2  construct border infrastructure, Rapuano Decl. Ex. A at 9; Enriquez Decl. ¶¶ 5-6, ECF No. 89-11,

3  and in fact, the funds transferred by DOD are being used to award contracts to *private*

4  construction companies, Rapuano Decl. Ex. G; Partial MSJ RJN Ex. 2. Indeed, the border barrier

5  is not a military "requirement," which is generally something that is a "necessity." *Requirement*,

6  Merriam-Webster's Dictionary (7th ed. 2016). Far from suggesting that a border wall is a

7  necessity, the president has acknowledged that he "didn't need to" divert funding for it; he just

8  would "rather do it much faster." PI RJN Ex. 50.[3]

9       **B.    Defendants Have Exceeded Their Authority Under § 9002**

10      Defendants' use of § 9002 to divert $681.5 million in DOD funding intended for overseas

11  operations in the May 9 Reprogramming Action toward construction in the El Centro Sector is

12  also unlawful and ultra vires. First, as this Court has recognized, *Sierra Club* PI Order 12 n.7, to

13  transfer funds under § 9002, Defendants must satisfy the criteria of § 8005. Section 9002

14  expressly states that the transfer authority provided in it "is subject to the same terms and

15  conditions as the authority provided in § 8005 of this Act." FY 2019 DOD Appropriations Act

16  § 9002. Thus, Defendants cannot satisfy the requirements of § 9002 because, as shown above,

17  they cannot satisfy § 8005's requirements.

18      Nor can Defendants satisfy the independent requirements of § 9002. Under § 9002, DOD

19  can only transfer funds "*between* the appropriations or funds made available to the Department of

20  Defense *in this title*" (emphases added)—namely, Title IX, the Overseas Contingency Operations

21  title (also referred to as Overseas Contingency Operations/Global War on Terrorism

22  [OCO/GWOT]). *Id.* The appropriation under Title IX for "Drug Interdiction and Counter-Drug

23  Activities" is limited to those amounts "designated by the Congress for [OCO/GWOT]." *Id.*, 132

24  Stat. at 3042. The proposed border barrier is plainly not an overseas contingency operation

25  because the lands on which the El Centro Project 1 is planned are all within the continental

26  United States. Nor is the barrier part of the "global war on terrorism," as made clear by the

---

[3] Defendants argued in opposition to the preliminary injunction motion that the States lacked standing under § 8005 and have no cause of action under that section. This Court correctly rejected both arguments. *States* PI Order 5-7, 9-12.

27

28

12

Pl. States of California and New Mexico's Notice of Mot. and Mot. for Partial Summ. J. (4:19-cv-00872-HSG)

1    national security goals set forth in President Trump's designation of those OCO/GWOT funds,

2    which discusses specific areas overseas. Partial MSJ RJN Ex. 9 at 1-2.

3        **C.    Defendants Have Exceeded Their Authority Under § 284**

4        Not only is DOD precluded from transferring funds for a border barrier via §§ 8005 and

5    9002, Defendants also lack statutory authority under 10 U.S.C. § 284 to utilize billions of dollars

6    in DOD funds and resources for these border barrier construction projects. *See Dep't of the Air*

7    *Force v. FLRA*, 648 F.3d 841, 845-46 (D.C. Cir. 2011) (holding it would be a violation of the

8    Appropriations Clause for the agency "to authorize the expenditure of funds beyond what

9    Congress has approved"). Section 284 is limited to authorizing DOD to provide "support" for the

10   "[c]onstruction of roads and fences and installation of lighting," but that "support" does not

11   authorize DOD to fully fund a construction project for DHS as Defendants plan to do here. PI

12   RJN Ex. 34. When Congress first added this language to DOD appropriations bill, Congress was

13   clear that DOD resources should not "primarily be used to fund" counter-drug activities of other

14   agencies, and any support was to be of "short duration" only. H.R. Rep. No. 101-665, at 20

15   (1990). Section 284's structure further limits its scope, as it requires notice to Congress for "small

16   scale construction" projects "not to exceed $750,000 for any project." 10 U.S.C. § 284(h), (i)(3).

17       As this Court observed, "reading [§ 284] to suggest that Congress requires reporting of tiny

18   projects but nonetheless has delegated authority to DoD to conduct the massive funnel-and-spend

19   project proposed here is implausible, and likely would raise serious questions as to the

20   constitutionality of such an interpretation." *States* PI Order 21; *Sierra Club* PI Order 39; *see also*

21   *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (statutory construction

22   "must be guided to a degree by common sense as to the manner in which Congress is likely to

23   delegate a policy decision of such economic and political magnitude"). This Court should grant

24   judgment that § 284, as well as §§ 8005 and 9002, cannot be used to effectuate Defendants'

25   border wall project.

26   **III.    DEFENDANTS HAVE VIOLATED THE CONSTITUTION (COUNTS 1, 2, AND 3)**

27       This Court recognized that, at minimum, Defendants' expansive interpretations of §§ 8005

28   and 284 "raise[d] serious constitutional questions," *States* PI Order 18-24; *Sierra Club* PI Order

13

1   36-42, and their interpretation of § 8005 "would likely violate the Constitution's separation of

2   powers principles." *States* PI Order 20; *Sierra Club* PI Order 38. But even if § 284 authorized

3   DOD to fund a multi-billion dollar border wall project, and DOD could utilize §§ 8005 and 9002

4   to divert $2.5 billion appropriated for other purposes into the drug-interdiction account for a

5   project that Congress has already rejected, the executive actions at issue in this case would violate

6   the Constitution's basic separation of powers principles, including the Appropriations and

7   Presentment Clauses. California and New Mexico are entitled to a final judgment that

8   Defendants' actions are unconstitutional.

9       **A.    Defendants' Actions Violate the Separation of Powers Doctrine**

10      Defendants' unilateral diversion of billions of dollars toward the construction of a border

11  barrier that Congress refused to fund is antithetical to the constitutional design that "exclusively

12  grants the power of the purse to Congress, not the President." *City & Cty. of San Francisco v.*

13  *Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). The undisputed facts here—(i) Congress's repeated

14  rejection of border barrier funding from 2017-18; (ii) Congress's pointed refusal to appropriate

15  $5.7 billion in requested border barrier funding resulting in a government shutdown exclusively

16  over the border barrier dispute; *and* (iii) Congress's limited $1.375 billion appropriation for

17  pedestrian fencing in a specified area —demonstrate that Defendants' transfer of funding for

18  construction in other geographic areas is "incompatible with the expressed or implied will of

19  Congress." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J.,

20  concurring). If Defendants' interpretation of the provisions on which they rely were correct, then

21  "DoD's authority under the statute would render meaningless Congress's constitutionally-

22  mandated power to assess proposed spending, then render its binding judgment as to the scope of

23  permissible spending." *States* PI Order at 20; *Sierra Club* PI Order at 38. Defendants' diversions

24  of funds toward the proposed border barrier projects despite Congress having "repeatedly rejected

25  legislation that would have funded substantially border barrier construction," only underscores

26  the separation of powers violation. *States* PI Order 21 (citing *San Francisco*, 897 F.3d at 1234);

27  *Sierra Club* PI Order 38.

28

14

Pl. States of California and New Mexico's Notice of Mot. and Mot. for Partial Summ. J. (4:19-cv-00872-HSG)

1

**B.    Defendants Have Violated the Appropriations Clause**

2        This Court also found that Defendants' interpretation of their authority "likely would pose

3    serious problems under the Appropriations Clause, by ceding essentially boundless appropriations

4    judgment to the executive agencies." *States* PI Order 22; *Sierra Club* PI Order 40. Under

5    Defendants' view, "DHS could wait and see whether Congress granted a requested appropriation,

6    then turn to DoD if Congress declined," allowing DOD to "make a de facto appropriation to

7    DHS, evading congressional control entirely." *States* PI Order 22; *Sierra Club* PI Order 40. The

8    Appropriations Clause, however, prohibits "the President or Executive Branch officials [who are]

9    displeased with . . . restriction[s] . . . imposed by Congress" to "evade" those restrictions, as they

10    have done here. *Office of Pers. Mgmt v. Richmond*, 496 U.S. 414, 428 (1990).

11        Additionally, Defendants violate the Appropriations Clause's bar against use of a *general*

12    appropriation for an expenditure when that expenditure falls *specifically* "within the scope of

13    some other appropriation or statutory funding scheme." Gov't Accountability Office (GAO),

14    *Principles of Federal Appropriations Law* 3-14-17, 407-10 (4th Ed. 2017)

15    https://www.gao.gov/assets/690/687162.pdf ("GAO Red Book").[4] This "well-settled" principle is

16    supported by a "legion" of GAO cases "from time immemorial." *Id.* at 3-409 (collecting cases);

17    *see also Nevada v. Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir. 2005) (Congress's appropriation of

18    $1 million specifically for Nevada's nuclear waste disposal activities "indicates that is all

19    Congress intended Nevada to get [for that fiscal year]," and precluded the use of a more general

20    appropriation to provide additional funding for those same activities). This principle plays a

21    crucial role in maintaining the balance of power between the legislative and executive branches

22    because, without it, "an agency could evade or exceed congressional established spending limits."

23    GAO Red Book at 3-408; *Dep't of the Navy*, 665 F.3d at 1347 ("If not for the Appropriations

24    Clause, the executive would possess an unbounded power over the public purse of the nation; and

25    might apply all its monied resources at his pleasure.") (internal quotations omitted).

26    _____

27    [4] *See Dep't of the Navy v. FLRA*, 665 F.3d 1339, 1349 (D.C. Cir. 2012) (Kavanaugh, J.)
(regarding the "assessment of the GAO" and its principles as "expert opinion" when considering
whether an agency order was consistent with the Appropriations Clause) (quoting *Delta Data Sys.*
28    *Corp. v. Webster*, 744 F.2d 197, 201 & n.1 (D.C. Cir. 1984) (Scalia, J.)).

15

1    The principle's application here is straightforward. Congress specifically appropriated

2    $1.375 billion to fund a barrier for a limited segment of the southwest border under enumerated

3    conditions. CAA, § 230-32. Defendants seek to supplement that appropriation by using funds

4    from the more general drug-interdiction appropriation, FY 2019 DOD Appropriations Act, 132

5    Stat. at 2997, in order to fund additional portions of Defendants' border barrier project that were

6    not part of Congress's specific appropriation. Because "a specific appropriation exists for a

7    particular item"—i.e., the $1.375 billion—"then that appropriation must be used and it is

8    improper to charge any other appropriations for that item." GAO Red Book 3-409.

9    Defendants cannot evade Congress's prescribed limitations on the specific amount,

10    location, and manner in which a border barrier may be built, CAA, §§ 230-32, by redirecting

11    different funds appropriated for more general purposes for construction in a location that

12    Congress declined to fund. *Cf. Gonzales v. Oregon*, 546 U.S. 243, 262 (2006) ("[I]t would be

13    anomalous for Congress to have so painstakingly described the Attorney General's limited

14    authority to deregister a single physician . . . but to have given him . . . authority to declare an

15    entire class of activity outside 'the course of professional practice' . . . ."). Simply put, "[w]here

16    Congress had addressed the subject as it has here, and authorized expenditures where a condition

17    is met, the clear implication is that where the condition is not met, the expenditure is not

18    authorized." *United States v. MacCollom,* 426 U.S. 317, 321 (1976). For these reasons,

19    Defendants' Reprogramming Actions violate the Appropriations Clause.

20    **C.    Defendants Have Violated the Presentment Clause**

21    Moreover, Defendants have violated the separation of powers principles engrained in the

22    Presentment Clause. U.S. Const., art. I, § 7, cl. 2. Under the Presentment Clause, the president

23    lacks the power to single-handedly "enact," "amend," or "repeal" appropriations after they were

24    approved by both Houses of Congress. *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). In

25    *City of New York*, the Supreme Court concluded that the Line-Item Veto Act violated the

26    Presentment Clause because it empowered the president to effectively amend appropriations

27    passed by Congress without following the Constitution's finely wrought procedures. *Id.* at 445-

28    46. Similarly, here, the president's unilateral supplementation of the $1.375 billion appropriation

16

1  for limited barrier funding in the Rio Grande Valley with billions of additional funds for use

2  across the southern border without limitation "reject[s] the policy judgment made by Congress"

3  and substitutes it with the president's "own policy judgment." *Id.* at 444.

4        This Court has already found that it "would subvert 'the difficult judgments reached by

5  Congress' to allow Defendants to circumvent Congress's clear decision to deny the border barrier

6  funding sought here when it appropriated a dramatically lower amount in the CAA." *States* PI

7  Order 16 (quoting *United States v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016)); *see also id.*

8  21 (raising doubt that DOD "has authority to redirect sums. . . in the face of Congress's

9  appropriations judgment in the CAA"). Under that same reasoning, Defendants' actions violate

10  the Presentment Clause. *City of New York*, 524 U.S. at 448-49 (the president's unilateral

11  modification of a bill presented to the president "is surely not a document that may 'become a

12  law' pursuant to the procedures designed by the Framers of Article I, § 7, of the Constitution").

13  **IV.   DEFENDANTS' DIVERSIONS OF DOD FUNDS FOR A BORDER BARRIER ARE**
      **ARBITRARY AND CAPRICIOUS (COUNT 5)**

14

15        Defendants' actions also violate the APA's prohibition on arbitrary and capricious agency

16  action. This aspect of the APA—where "[t]he court's role is to ensure that the agency considered

17  all of the relevant factors and that its decision contained no 'clear error of judgment,'" *State of*

18  *Ariz. v. Thomas*, 824 F.2d 745, 748 (9th Cir. 1987) (quoting *Citizens to Pres. Overton Park, Inc.*

19  *v. Volpe*, 401 U.S. 402, 416 (1971))—is separate from the question of whether the agency acted

20  within the scope of its authority (i.e., whether that action is ultra vires). *See Overton Park*, 401

21  U.S. at 416 ("Scrutiny of the facts does not end, however, with the determination that the

22  Secretary has acted within the scope of his statutory authority. Section 706(2)(A) requires a

23  finding that the actual choice made was not 'arbitrary, capricious, an abuse of discretion, or

24  otherwise not in accordance with law.'"); 5 U.S.C. § 706(2)(A).[5] The Administrative Record

25  shows that Army officials proffered evidence of significant readiness problems that would be

26  generated by reprogramming of "surplus" funds towards a border barrier. Army Chief of Staff Lt.

---

[5] For the reasons just explained, *supra* 9-17, Defendants' actions also violate the APA because they are "contrary to constitutional right, power, privilege, or immunity" and in excess of statutory authority. 5 U.S.C. § 706(2)(B)-(C); First. Am. Compl. ¶¶ 380-85 (Count 4).

17

1   Gen. Joseph F. Martin warned that not using these monies to meet "pressing unfunded readiness

2   requirements" would have a number of serious adverse consequences including: (i) reducing

3   facilities maintenance; (ii) limiting the availability and training of combat pilots; (iii) diminishing

4   Army personnel's "required readiness" and "battalion-level collective proficiency;" and (iv)

5   increasing attrition due to lack of training, which will impact the Army's ability to provide "the

6   required trained and ready Infantry Soldiers to the operational force." AR 51; *see also id.* 39, 182

7   (Joint Chiefs Chairman Gen. Joseph F. Dunford Jr. memoranda stating: "some of the sources

8   identified for reprogramming could be used to address currently unfunded DoD requirements").

9        There is nothing in the record showing that Defendant Shanahan or any other Defendant

10   considered General Martin's serious concerns, and although General Dunford's memoranda were

11   directed to Defendant Shanahan, AR 39, 182, nothing in the record indicates that Defendant

12   Shanahan addressed the problems articulated by General Martin either. Indeed, Defendant

13   Shanahan's "Action Memo" indicates that Defendants ignored these concerns entirely, as he

14   summarily stated that the "source funds are excess to need" despite the discussion of unfunded

15   DOD and Army requirements immediately preceding and following that statement. *Id.* 2-3.

16        Thus, the agency both failed to consider an important aspect of the problem and acted

17   counter to the evidence of adverse impacts to core military functions that result from the

18   diversions that is in the Administrative Record. *See Motor Vehicle Mfrs. Ass'n of U.S. v. State*

19   *Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency action is arbitrary and capricious if

20   agency has "entirely failed to consider an important aspect of the problem; [or] offered an

21   explanation for its decision that runs counter to the evidence before the agency"); *Greater*

22   *Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1030 (9th Cir. 2011) (overturning agency

23   decision where "considerable data . . . point[ed] in the opposite direction" of the agency's

24   decision). Further, DOD "relied on factors which Congress has not intended it to consider" by

25   diverting $2.5 billion additional federal funds toward a border barrier despite Congress's clear

26   rejection of any appropriation for a border barrier beyond $1.375 billion for FY 2019. *Supra* 3.

27   *See State Farm*, 463 U.S. at 43 (agency action that "relied on factors which Congress has not

28   intended it to consider" is arbitrary and capricious).

18

Pl. States of California and New Mexico's Notice of Mot. and Mot. for Partial Summ. J. (4:19-cv-00872-HSG)

1    Separately and independently, DOD's deviation from its binding rules regarding

2    reprogramming of funds under §§ 8005 and 9002 without Congress's consent, PI RJN Exs. 37-

3    38, without "acknowledg[ing] and provid[ing] an adequate explanation" for that departure is

4    arbitrary and capricious. *Jicarilla Apache Nation v. U.S. Dep't of the Interior*, 613 F.3d 1112,

5    1119 (D.C. Cir. 2010) (internal citation omitted).[6]

6    **V.    CALIFORNIA AND NEW MEXICO WOULD SUFFER IRREPARABLE HARM FROM THE**
     **DIVERSIONS OF FUNDS**

7

8    **A.    The Diversions of Funds Harm California's and New Mexico's Sovereign**
     **Interests in the Enforcement of Their State Laws**

9    It is well-established that whenever a state is prevented "from effectuating statutes enacted

10   by representatives of its people, it suffers a form of irreparable injury." *New Motor Vehicle Bd. of*

11   *California v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers); *see*

12   *also Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers) (state's inability to

13   "employ a duly enacted statute . . . constitutes irreparable harm"). States have an undeniable

14   sovereign interest not only in their "power to create and enforce a legal code," *Alfred L. Snapp &*

15   *Son, Inc. v. Puerto Rico* ex rel. *Barez*, 458 U.S. 592, 601 (1982), but also in protecting their

16   natural resources and wildlife within their borders, an interest that is effectuated through a

17   number of state environmental protection laws and regulations. *See Maine v. Taylor*, 477 U.S.

18   131, 151 (1986) (state has "broad regulatory authority to protect the . . . integrity of its natural

19   resources"); *Pac. Nw. Venison Producers v. Smitch*, 20 F.3d 1008, 1013 (9th Cir. 1994) ("Clearly,

20   the protection of wildlife is one of the state's most important interests.").

21   But for the illegal diversions of DOD funds and resources, Defendants would not have

22   available the funding and resources to initiate the planned construction of a barrier on California's

23   and New Mexico's southern borders, and thereby undermine the purposes of the states'

24   environmental laws. Unless Defendants are enjoined from illegally transferred DOD funds to

25   DHS to construct a border barrier, Defendants will act on the IIRIRA waiver[7] and infringe on

26   _____

27   [6] California and New Mexico recognize that this Court rejected this argument, *States* PI Order 12
     n.8, but raise it here to preserve it for appellate purposes.
     [7] While the States believe that DOD should not have been able to exercise a waiver here, this

28   Court has preliminarily ruled otherwise. *States* PI Order 28-29.

1    California's and New Mexico's sovereign interests in enforcing their environmental protection

2    laws.

3          For example, California would be prevented from enforcing its laws protecting water

4    quality, Cal. Water Code §§ 13050, 13220-13228.15, 13240, 13376; Cal. Code Regs. tit. 23, §§

5    3960-3969.4; MSJ Env. App'x Ex. 2 (Dunn Decl. ¶¶ 4-6, 20), its laws protecting residents from

6    the dust and fine particulate matter (PM 10) generated by construction projects, *see supra* 7; *see*

7    *also* 42 U.S.C. § 7506(c)(1); 40 C.F.R. § 52.220(c)(345)(i)(E)(2); 75 Fed. Reg. 39,366; Partial

8    MSJ RJN Ex. 4 (Rule 801), and its laws protecting rare and endangered wildlife species, *see* MSJ

9    Env. App'x Ex. 1 (Clark Decl. ¶¶ 14-18), Ex. 4 (Nagano Decl. ¶¶ 13-23). Similarly, New Mexico

10   would be prevented from enforcing its laws protecting air quality in Dona Ana and Luna

11   Counties, *see supra* 8-9; N.M. Admin. Code §§ 20.2.23.109-112; Partial MSJ RJN Ex. 7, as well

12   as its laws protecting endangered species and wildlife corridors, including on New Mexico State

13   Trust Lands that border the El Paso Project 1 site, *see* 2019 N.M. Laws Ch. 97; N.M. Stat. Ann. §

14   17-2-41; MSJ Env. App'x Ex. 5 (Nestlerode Decl. ¶ 4, Ex. A), Ex. 6 (Traphagen Decl. ¶¶ 18, 27).

15         These harms to the States' "sovereign interests and public policies," which cannot be

16   remedied by monetary damages, constitute an irreparable harm that justify the imposition of

17   injunctive relief. *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001); *see also Rent-A-*

18   *Center, Inc. v. Canyon Television & Appliance Rental Inc.*, 944 F.2d 597, 603 (9th Cir. 1991)

19   ("intangible injuries" that cannot be remedied by monetary damages "qualify as irreparable

20   harm"). These injuries are distinct from that of private party litigants, as the harm to the States'

21   sovereign interests in preserving and enforcing their own laws cannot be adequately asserted by

22   other parties. *See California v. United States*, 180 F.2d 596, 599 (9th Cir. 1950) (California had a

23   right to intervene in action between the United States and a non-public entity where the non-

24   public entity "can only assert in court the rights of its shareholders and cannot adequately protect

25   the State's interest in its public welfare"). Consequently, regardless of any other relief ordered for

26   private litigants, California and New Mexico are entitled to injunctive relief to ensure that the

27   States can vindicate their own sovereign interests in their environment and natural resources as

28   this case proceeds on appeal. *See Day v. Apolona*, 505 F.3d 963, 965 (9th Cir. 2007) (granting

20

1    intervention as of right to Hawaii because the action involved the state's "protectable interest in

2    the lands" of the state and "[t]he disposition of [the] action may impede the [s]tate's ability to

3    protect this interest").

4    **B.    The Diversions of Funds Cause Harm to California's and New Mexico's**
     **Environment, Wildlife, and Natural Resources**

5

6        Unless enjoined, the diversions of funds for border barrier construction will cause

7    irreparable injury to wildlife and plant species protected under federal, California, and New

8    Mexico law. "[E]nvironmental injury, by its nature, can seldom be adequately remedied by

9    monetary damages and is often permanent or at least of long duration, i.e., irreparable." *Idaho*

10   *Sporting Cong. Inc. v. Alexander*, 222 F.3d 562, 569 (9th Cir. 2000) (citations omitted).

11   California and New Mexico have demonstrated that, in the absence of injunctive relief, they will

12   suffer irreparable environmental injury. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7,

13   22 (2008); *see also States* PI Order 31 (holding that population-level harm is not required to

14   demonstrate irreparable injury to wildlife and plant species).

15   ***California Harms Due to El Centro Project 1***

16       The planned construction in the El Centro Sector constitutes a "definitive threat" to

17   protected "species" such as Peninsular Bighorn Sheep, flat-tailed horned lizards, and burrowing

18   owls, and would harm multiple other species of lizards, birds and mammals such as mountain

19   lions and bobcats. MSJ Env. App'x Ex. 1 (Clark Decl. ¶¶ 12-19), Ex. 4 (Nagano Decl. ¶¶ 12-27);

20   *cf. Nat'l Wildlife Fed'n v. Burlington N.R.R.*, 23 F.3d 1508, 1513 (9th Cir. 1994) (citing *Fund for*

21   *Animals, Inc. v. Turner*, No. 91-2201(MB), 1991 WL 206232 (D.D.C. Sept. 27, 1991))

22   (injunction warranted by the potential killing of three to nine grizzly bears); *see also States* PI

23   Order 31.

24       The Peninsular Bighorn Sheep is listed as endangered under both federal and California

25   law. MSJ Env. App'x Ex. 1 (Clark Decl. ¶ 14), Ex. 4 (Nagano Decl. ¶ 27). The sheep have been

26   recorded moving back and forth across the border immediately west of the project area,

27   movement that allows for genetic interchange between populations based in the United States and

28   Mexico. *Id.* Ex. 1 (Clark Decl. ¶ 14), Ex. 4 (Nagano Decl. ¶ 13). Without that genetic exchange,

21

1  inbreeding can cause physical abnormalities, behavioral problems, and reduced reproductive

2  capability. *Id.* Ex. 4 (Nagano Decl. ¶ 17). The sheep are currently able to move through the

3  existing vehicle fencing to access habitat on both sides of the border, but would not be able to do

4  so if the bollard barrier planned for El Centro Project 1 is constructed. *Id.* ¶¶ 13, 15.

5      In addition, over 11,000 acres in the Jacumba Mountains, immediately north of the

6  international border and adjacent to the El Centro Project 1 site, are undisputedly designated

7  critical habitat for the sheep because "the Jacumba Mountains represent the only area of habitat

8  connecting the DPS [Distinct Population Segment] listed in the United States with other bighorn

9  sheep populations that occupy the Peninsular Ranges in Mexico." *Id.* Ex. 1 (Clark Decl. ¶ 14).

10  "The California Department of Fish and Wildlife has tracked collared sheep in this area for many

11  years, and documented intensive use of the slopes immediately above and to the west of the

12  western terminus of the project area." *Id.* These slopes are lamb-rearing habitat, and pregnant

13  ewes would be adversely affected by construction activities at the El Centro Project 1 site and the

14  vehicle traffic and lighting associated with border infrastructure immediately below these slopes,

15  particularly because the ewe group depends on resources in both the United States and Mexico."

16  *Id.* Ex. 1 (Clark Decl. ¶ 14), Ex. 4 (Nagano Decl. ¶¶ 13-18). According to the California

17  Department of Fish and Wildlife, "[a] fence along the US-Mexico border would prohibit

18  movement to, and use of, prelambing and lamb-rearing habitat and summer water sources." *Id.*

19  Ex. 1 (Clark Decl. ¶ 14).

20      Other protected wildlife species that would be harmed by El Centro Project 1 include the

21  flat-tailed horned lizard and the burrowing owl, which are both species of concern under

22  California state law. MSJ Env. App'x Ex. 1 (Clark Decl. ¶¶ 15-18), Ex. 4 (Nagano Decl. ¶¶ 21-

23  26). The flat-tailed horned lizard occurs within the project footprint and surrounding area. *Id.* Ex.

24  1 (Clark Decl. ¶ 18). The extensive trenching, construction of roads, and staging of materials

25  would harm or kill lizards that are either active or in underground burrows within the project

26  footprint. *Id.*, Ex. 4 (Nagano Decl. ¶¶ 19-20, 23). Additionally, the principal predators of these

27  lizards include small birds of prey that use perches to hunt. *Id.* Ex. 1 (Clark Decl. ¶18). By

28  constructing a continuous 18-30 feet high fence, and numerous light poles, over the lizards'

1    habitat range, this project would greatly increase the predation rate of lizards adjacent to the

2    barrier. *Id.* And the permanent roads and infrastructure removing suitable habitat, would

3    effectively sever the linkage that currently exists between populations on both sides of the border.

4    *Id.* Ex. 4 (Nagano Decl. ¶¶ 19, 23). Thus, it is precisely the type of the project that the U.S. Fish

5    and Wildlife Service and BLM's rangewide management strategy prohibits. Partial MSJ RJN Ex.

6    6. Burrowing owls, which live in underground burrows, also face death or injury from project

7    construction, including being buried alive in their burrows. *Id.* Ex. 4 (Nagano Decl. ¶¶ 24-25).

8    And El Centro Project 1 would inflict irreparable and irreversible impacts to at least 23 plants of

9    conservation concern, 13 of which are considered rare, threatened, or endangered in California

10   and are eligible for state listing, including the flat-seeded spurge and Haydon's Lotus. *Id.* Ex. 7

11   (Vanderplank Decl. ¶¶ 6, 24).

12        ### *New Mexico Harms Due to El Paso Project 1*

13        The construction planned in New Mexico would similarly cause irreparable harm to the

14   endangered Mexican wolf, block wildlife corridors for other large mammals, and harm protected

15   plant species. MSJ Env. App'x Ex. 3 (Lasky ¶ 11), Ex. 6 (Traphagen Decl. ¶¶ 17-31). In New

16   Mexico, Defendants' plan for 30-feet tall barriers extending up to 37 miles, AR 56, would

17   undeniably permanently impede wildlife connectivity. *See* MSJ Env. App'x Ex. 3 (Lasky Decl. ¶

18   8), Ex. 4 (Nagano Decl. ¶ 31), Ex. 6 (Traphagen Decl. ¶¶ 17-25, 27, 31). Defendants contend that

19   New Mexico has "overstated" its harms, but do not dispute that the bollard barrier planned for El

20   Paso Project 1 would block wildlife corridors for the Mexican wolf, a rare, endangered subspecies

21   of the gray wolf that suffers from a lack of genetic diversity. Enriquez Decl. ¶ 55; Mexican Wolf

22   Recovery Plan (Wolf Plan) (ECF No. 89-13) 5, 13-14; MSJ Env. App'x Ex. 6 (Traphagen Decl.

23   ¶¶ 18-25). The U.S. Fish and Wildlife Service confirms that having the two wild wolf populations

24   (one based in Mexico and the other based in New Mexico and Arizona) interbreed would benefit

25   the species. Wolf Plan 5, 13-14. Defendants also acknowledge that two wolves have crossed from

26   Mexico into the United States, including one wolf that returned to Mexico, *id.* 8; that wolf crossed

27   through the El Paso Project 1 site. MSJ Env. App'x Ex. 6 (Traphagen Decl. ¶¶ 23-24) & Ex. A.

28   And Defendants recognize that if the proposed bollard barrier is constructed, Mexican wolves

23

Pl. States of California and New Mexico's Notice of Mot. and Mot. for Partial Summ. J. (4:19-cv-00872-HSG)

1   would no longer be able to cross the border and access habitat on both sides of the border,

2   meaning there would be zero chance of the two wild-wolf populations interbreeding and

3   improving the wolf's genetic diversity. *See* Enriquez Decl. ¶¶ 18, 55; MSJ Env. App'x Ex. 6

4   (Traphagen Decl. ¶¶ 18-25). Other species that would suffer from a lack of wildlife connectivity

5   and be irreparably harmed include the mountain lion, bobcat, mule deer, javelina, and at least 53

6   other land-based mammals, 38 reptiles, and 10 amphibian species. *Id.* Ex. 3 (Lasky Decl. ¶ 6, 11),

7   Ex. 6 (Traphagen Decl. ¶ 28).

8       Beyond harms due to a loss of wildlife connectivity, there would be additional impacts to

9   wildlife species from noise, deep holes for fence posts, vehicle traffic, lighting, and other

10  disturbances associated with border barrier construction. These construction activities would kill,

11  injure, or alter the behavior of many vital species such as the endangered Aplomado falcon, the

12  iconic Gila monster, which is listed as endangered by the State of New Mexico, and many birds

13  and bats. MSJ Env. App'x Ex. 3 (Lasky Decl. ¶ 9), Ex. 4 (Nagano Decl. ¶¶ 29, 32, 36, 41); Ex. 6

14  (Traphagen Decl. ¶ 26). Endangered plant species would also be harmed due to construction of El

15  Paso Project 1. *Id.* Ex. 3 (Lasky Decl. ¶ 14).

16  **VI.   THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST FAVOR GRANTING A
        PERMANENT INJUNCTION**

17

18      Here, the balance of the equities and public interest weigh decidedly in favor of granting the

19  requested relief. As this Court has recognized, the public "has an interest in ensuring that statutes

20  enacted by their representatives are not imperiled by executive fiat." *Sierra Club* PI Order 54

21  (quoting *E. Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1255 (9th Cir. 2018)); *see also*

22  *Population Inst. v. McPherson*, 797 F.2d 1062, 1082 (D.C. Cir. 1986) ("The public has an interest

23  in assuring that public funds are appropriated and distributed pursuant to Congressional

24  directives."). The public interest is also served by enforcing California's and New Mexico's

25  environmental protection laws, which as discussed *supra*, would be undermined by the

26  construction facilitated by Defendants' illegal and unconstitutional diversions. *See New Motor*

27  *Vehicle Bd.*, 434 U.S. at 1351 (the "[public] interest is infringed by the very fact that the State is

28  prevented from engaging in investigation and examination" pursuant to its own duly enacted state

24

Pl. States of California and New Mexico's Notice of Mot. and Mot. for Partial Summ. J. (4:19-cv-00872-HSG)

1    laws); *Feldman v. Reagan*, 843 F.3d 366, 394 (9th Cir. 2016) (weighing the state's "compelling

2    interest in the enforcement of its duly enacted laws"). The public's interest in protecting

3    environmental resources from harm also weighs toward the issuance of a permanent injunction.

4    *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987) ("Environmental injury, by its

5    nature, can seldom be adequately remedied by money damages and is often permanent or at least

6    of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of

7    harms will usually favor the issuance of an injunction to protect the environment."); *see also* Cal.

8    Gov't Code § 12600 ("It is in the public interest to provide the people of the State of California . .

9    . with adequate remedy to protect the natural resources of the state of California from pollution,

10    impairment or destruction."); N.M. Const. art. XX, § 21 (similar).

11         Moreover, there is no significant countervailing interest. As for Defendants' purported

12    harms, President Trump himself acknowledged that he "didn't need to" take the extraordinary

13    steps to divert funding for border wall construction, but he just would "rather do it faster" than

14    our system of government allowed. PI RJN Ex. 50. The president also acknowledged that

15    Congress has provided more than enough funding for homeland security without the wall,

16    undercutting the need for these diversions of funds. *Id.* Even more fundamentally, "the

17    government[] . . . cannot suffer harm from an injunction that merely ends an unlawful practice. . .

18    ." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *see also Giovani Carandola*, *Ltd v.*

19    *Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (similar). Consequently, the balance of equities and

20    public interest favor entry of a permanent injunction.

21                              **CONCLUSION**

22         For the foregoing reasons, Plaintiff States of California and New Mexico request that the

23    Court grant their motion for partial summary judgment in full.

24

25

26

27

28

1   Dated: June 12, 2019                              Respectfully submitted,

2                                                     XAVIER BECERRA
                                                      Attorney General of California
3                                                     ROBERT W. BYRNE
                                                      SALLY MAGNANI
4                                                     MICHAEL L. NEWMAN
                                                      Senior Assistant Attorneys General
5                                                     MICHAEL P. CAYABAN
                                                      CHRISTINE CHUANG
6                                                     EDWARD H. OCHOA
                                                      Supervising Deputy Attorneys General
7                                                     BRIAN J. BILFORD
                                                      NOAH M. GOLDEN-KRASNER
8                                                     SPARSH S. KHANDESHI
                                                      HEATHER C. LESLIE
9                                                     JANELLE M. SMITH
                                                      JAMES F. ZAHRADKA II
10
                                                      */s/ Lee I. Sherman*
11
                                                      LEE I. SHERMAN
12                                                    Deputy Attorneys General
                                                      *Attorneys for Plaintiff State of California*
13
14  HECTOR BALDERAS
    Attorney General of New Mexico
    TANIA MAESTAS *(appearance pro hac vice)*
15  Chief Deputy Attorney General
    NICHOLAS M. SYDOW
16  Civil Appellate Chief
    JENNIE LUSK
17  Assistant Attorney General, Director
    MATTHEW L. GARCIA
18  Governor's General Counsel
    *Attorneys for Plaintiff State of New Mexico*
19
20
21
22
23
24
25
26
27
28

1

**ATTESTATION OF SIGNATURES**

2

3

I, Lee I. Sherman, hereby attest, pursuant to Local Civil Rule 5-1(i)(3) of the Northern

District of California that concurrence in the filing of this document has been obtained from each

4

signatory hereto.

5

6
                                        */s/ Lee I. Sherman*

7
                                        LEE I. SHERMAN
                                        Deputy Attorney General
8                                       *Attorney for Plaintiff*
                                        *State of California*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Pl. States of California and New Mexico's Notice of Mot. and Mot. for Partial Summ. J. (4:19-cv-00872-HSG)

# CERTIFICATE OF SERVICE

Case Name:   **California, et al. v Trump, et al.**      No.   **4:19-cv-00872**
             **(Border Wall 2019)**

I hereby certify that on <u>June 12, 2019</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

- **PLAINTIFF STATES OF CALIFORNIA AND NEW MEXICO'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING SECTIONS 284, 8005, AND 9002; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

- **PLAINTIFF STATES OF CALIFORNIA AND NEW MEXICO'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING SECTIONS 284, 8005, AND 9002**

- **APPENDIX OF DECLARATIONS RE: ENVIRONMENTAL HARMS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING SECTIONS 284, 8005, AND 9002**

- **[PROPOSED] ORDER GRANTING PLAINTIFF STATES OF CALIFORNIA AND NEW MEXICO'S MOTION PARTIAL SUMMARY JUDGMENT REGARDING SECTIONS 284, 8005, AND 9002**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on <u>June 12, 2019</u>, at San Diego, California.

_____          _____
        V. Brizuela                           Signature
        Declarant

SD2019100647
71856365.docx