JAMES M. BURNHAM
Deputy Assistant Attorney General
JOHN R. GRIFFITHS
Director, Federal Programs Branch
ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch
ANDREW I. WARDEN (IN #23840-49)
Senior Trial Counsel
KATHRYN C. DAVIS
MICHAEL J. GERARDI
LESLIE COOPER VIGEN
RACHAEL WESTMORELAND
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Tel.:     (202) 616-5084
Fax:      (202) 616-8470

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>Defendants. | No. 4:19-cv-00872-HSG<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM AND POINTS OF AUTHORITIES IN SUPPORT THEREOF AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Hearing Date: None set per Court order |

# **TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT ...................1

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................................1

BACKGROUND ..............................................................................................................................2

    I.    Congress's Express Authorization of Border Barrier Construction ...............................2

    II.   Congress's Authorization for DoD Support of DHS's Border Security Efforts.........................3

    III.  DoD's Current Support for DHS's Efforts to Secure the Southern Border...............................4

    IV.  The President's Proclamation Declaring a National Emergency at the Southern Border.........4

    V.   The Use of Spending Authorities for Barrier Construction ...........................................6

          A.   10 U.S.C. § 284..............................................................................................6

STANDARD OF REVIEW ..............................................................................................................9

ARGUMENT....................................................................................................................................9

    I.    DoD's Transfer of Funds Pursuant to § 8005 is Lawful. ..............................................9

    II.   DoD's Transfer of Funds Pursuant to § 9002 is Lawful. ........................................... 12

    III.  DoD's Use of Counterdrug Support Authority Under § 284 Is Lawful. .................................. 13

    IV.  DoD's Use of Its Transfer and Counterdrug Support Authority Does Not Violate
         the Constitution. .......................................................................................................... 15

    V.   DoD's Transfer of Funds is Not Arbitrary and Capricious. ........................................ 18

    VI.  The States Have Not Met The Requirements For A Permanent Injunction. .......................... 18

          A.   The States Have Not Established an Irreparable Injury. ..................................... 19

          B.   The Balance of Equities and Public Interest Strongly Weigh Against Injunctive
             Relief. ................................................................................................................ 22

    VI.  The Court Should Deny Plaintiffs' Request for Overbroad Injunctive Relief,
         Stay Any Injunction Pending Appeal, and Certify its Final Judgment for Appeal
         Pursuant to Rule 54(b)................................................................................................. 24

CONCLUSION............................................................................................................................... 25

1

## **TABLE OF AUTHORITIES**

2

**CASES**

3    *Am. Fed'n of Labor & Congress of Industrial Orgs. v. Kahn,*

4      618 F.2d 784 (D.C. Cir. 1979) ................................................................ 16

5    *AMOCO Prod. Co. v. Village of Gambell,*

6      480 U.S. 531 (1987) ................................................................................ 21

7    *Armstrong v. Exceptional Child Ctr., Inc.,*

8      135 S. Ct. 1378 (2015) ............................................................................ 10

9    *California v. Azar,*

10     911 F.3d 558 (9th Cir. 2018) ................................................................... 24

11   *Cheyenne Tribe v. Norton,*

12     503 F.3d 836 (9th Cir. 2007) ................................................................... 19

13   *City and County of San Francisco v. Trump,*

14     897 F.3d 1225 (2018) ............................................................................... 16

15   *City of Sausalito v. O'Neil,*

16     386 F.3d 1186 (9th Cir. 2004) ................................................................. 10

17   *Clarke v. Securities Indus. Ass'n,*

18     479 U.S. 388 (1987) ................................................................................ 13

19   *Clinton v. City of New York,*

20     524 U.S. 417 (1998) ................................................................................ 17

21   *Crickon v. Thomas,*

22     579 F.3d 978 (9th Cir. 2009) ................................................................... 18

23   *Dalton v. Specter,*

24     511 U.S. 462 (1994) ....................................................................... 2, 15, 16

25   *Gringo Pass, Inc. v. Kiewit Sw. Co.,*

26     CV-09-251-TUC-DCB, 2012 WL 12905166 (D. Ariz. Jan. 11, 2012) ..................................... 3

27   *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.,*

28     527 U.S. 308 (1999) ................................................................................ 10

*Idaho Rivers United v. U.S. Army Corps of Eng'rs,*

  156 F. Supp. 3d 1252 (W.D. Wash. 2015) ........................................................... 20

*Jewel v. Nat'l Sec. Agency,*

  810 F.3d 622 (9th Cir. 2015) ............................................................................... 25

*Kater v. Churchill Downs Inc.,*

  886 F.3d 784 (9th Cir. 2018) .................................................................................6

*Kleppe v. New Mexico,*

  426 U.S. 529 (1976) ............................................................................................ 20

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*

  572 U.S. 118 (2014) ................................................................................. 9, 10, 13

*Lincoln v. Vigil,*

  508 U.S. 182 (1993) ............................................................................................ 12

*Lublin Corp. v. United States,*

  84 Fed. Cl. 678 (2008) ........................................................................................ 23

*Monsanto Co. v. Geertson Seed Farms,*

  561 U.S. 139 (2010) ............................................................................................ 19

*Nat'l Treasury Employees Union v. Von Raab,*

  489 U.S. 656 (1989) ............................................................................................ 22

*Nat'l Wildlife Fed'n v. Burlington N.R.R.,*

  23 F.3d 1508 (9th Cir. 1994) ............................................................................... 21

*Nevada v. Dep't of Energy,*

  400 F.3d 9 (D.C. Cir. 2005) ................................................................................. 17

*New Mexico Dept. of Game & Fish v. U.S. Dept. of Interior,*

  854 F.3d 1236 (10th Cir. 2017) ................................................................. 20, 21, 22

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.,*

  434 U.S. 1345 (1977) .......................................................................................... 19

*Nken v. Holder,*

  556 U.S. 418 (2009) ............................................................................................ 24

*People With Disabilities Found. v. Colvin,*
    Case No. 15-CV-02570-HSG, 2016 WL 2984898 (N.D. Cal. May 24, 2016) ...................................6

*Russello v. United States,*
    464 U.S. 16 (1983) ................................................................................................................... 15

*Salazar v. Ramah Navajo Chapter,*
    567 U.S. 182 (2012) ................................................................................................................. 17

*United States v. Guzman-Padilla,*
    573 F.3d 865 (9th Cir. 2009) ................................................................................................... 23

*United States v. McIntosh,*
    833 F.3d 1163 (9th Cir. 2016) ................................................................................................. 16

*United States v. Will,*
    449 U.S. 200 (1980) ................................................................................................................. 17

*Winter v. Natural Res. Def. Council,*
    555 U.S. 7 (2008) ............................................................................................................19, 22, 24

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) ................................................................................................................. 16

**STATUTES**

5 U.S.C. § 551 ................................................................................................................................ 10

8 U.S.C. § 1103 ................................................................................................................................2

10 U.S.C. § 276 .............................................................................................................................. 18

10 U.S.C. § 284 ....................................................................................................................... *passim*

10 U.S.C. § 2808 ..............................................................................................................................6

42 U.S.C. 4321 .................................................................................................................................9

John S. McCain National Defense Authorization Act for Fiscal Year 2019 (NDAA),
    Pub. L. 115-232, § 1001, 132 Stat. 1636, 1945 (Aug. 13, 2018) ...................................... 8, 9

National Defense Authorization Act for Fiscal Year 1991,
    Pub. L. No. 101-510, § 1004, 104 Stat. 1485 (1990) ..............................................................7

Pub. L. No. 104-208, Div. C, Title I § 102, 110 Stat. 3009 ................................................2

Pub. L. No. 109-13, Div. B, Title I § 102, 119 Stat. 231, 302, 306 ..............................2, 3

Pub. L. No. 109-367, § 3, 120 Stat. 2638 ........................................................................3

Pub. L. No. 110-161, Div. E, Title V § 564, 121 Stat. 1844 (2007) ..............................3

DoD Appropriations Act for Fiscal Year 2019, Pub. L. No. 115-245............................*passim*

Consolidated Appropriations Act for Fiscal Year 2019 (CAA),
    Pub. L. No. 116-6, § 230, 133 Stat. 13 (2019) ........................................................6

**FEDERAL RULES**

Fed. R. Civ. P. 56 ......................................................................................................1, 9

Fed. R. Civ. P. 54 ....................................................................................1, 9, 24, 25

**LEGISLATIVE MATERIALS**

H.R. Rep. 101-665....................................................................................................3

H.R. Rep. 109-72......................................................................................................2

H.R. Rep. 103-200..............................................................................................3, 6, 14

H.R. Rep. 110-672....................................................................................................7

H.R. Rep. 109-452..................................................................................................14

H.R. Rep. 114-840....................................................................................................7

**OTHER AUTHORITIES**

Border Security and Immigration Enforcement Improvements,
    Exec. Order No. 13767, 82 Fed. Reg. 8793 (Jan. 25, 2017) ......................................4

Presidential Memorandum to the Secretary of Defense, Secretary of Homeland Security, and the
    Attorney General titled, "Securing the Southern Border of the United States"
    2018 WL 1633761 (Apr. 4, 2018)............................................................................4

Declaring a Nat'l Emergency Concerning the S. Border of the United States,
    Pres. Proc. No. 9844, 84 Fed. Reg. 4949 (Feb. 15, 2019)......................................4, 6, 23

Veto Message for H.J. Res. 46, 2019 WL 1219481 (Mar. 15, 2019) ............................5

1    **NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**

2        PLEASE TAKE NOTICE that Defendants hereby move the Court pursuant to Federal Rules

3    of Civil Procedure 54(b) and 56 for partial summary judgment with respect to the funding and

4    construction of the border barrier projects identified as El Paso Sector Project 1 and El Centro Sector

5    Project 1.  The motion is based on the following Memorandum of Points and Authorities in support

6    of Defendants' motion and in opposition to Plaintiffs' motion for partial summary judgment, as well

7    as all previous filings in this action, including the certified administrative record (ECF No. 173) and

8    Defendants' opposition to Plaintiffs' motion for preliminary injunction (ECF No. 89).

9        **MEMORANDUM OF POINTS AND AUTHORITIES**

10        At the southern border, enormous quantities of illegal drugs are flowing into our Nation.  In

11    response to this crisis, and pursuant to longstanding statutory authority (10 U.S.C. § 284), the

12    Department of Homeland Security (DHS) asked the Department of Defense (DoD) to support its

13    counternarcotics operations by building barriers and roads and installing lighting in two high priority

14    drug-smuggling corridors between ports of entry.   The Court should not permanently enjoin DoD

15    from providing DHS that critical support.

16        Partial summary judgment should be granted in favor of Defendants because DoD lawfully

17    transferred funds across internal budget accounts to fund the requested barrier projects in accordance

18    with the requirements of § 8005 of the DoD Appropriations Act for Fiscal Year 2019, Pub. L. No.

19    115-245.  Section 8005 governs DoD's internal budget and regulates the agency's relationship with

20    Congress; it does not provide a cause of action for private enforcement.  Even assuming there is an

21    implied cause of action in equity for private enforcement of this internal transfer provision of the

22    Defense budget, the environmental injuries asserted by the States fall well outside any zone of interests

23    conceivably protected by § 8005.  And even if the Court reaches the merits, § 8005's requirements as

24    well as the additional requirements in § 9002 of the DoD Appropriations Act for transferring funds

25    within DoD's accounts are satisfied here.

26        The States also fall outside the zone of interests protected by § 284, which authorizes DoD to

27    provide support to civilian law enforcement agencies through "construction of roads and fences and

28    installation of lighting to block drug smuggling corridors across international boundaries of the United

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

1

States." Even if they could raise a challenge on the merits, the elements of § 284 are plainly satisfied here because the two border barrier projects DoD plans to undertake at DHS's request in the El Centro and El Paso Border Patrol Sectors are located in drug-smuggling corridors.

The States' remaining claims similarly lack merit. DoD's decision to provide support to DHS was not arbitrary or capricious under the Administrative Procedure Act (APA). Additionally, the States' constitutional claims fail because they contravene the principle that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims." *Dalton v. Specter*, 511 U.S. 462, 473 (1994).

Finally, the Court should deny the States' request for a permanent injunction. The States' speculative environmental interests do not come close to outweighing the harm from interfering with efforts to stop the flow of drugs entering the country. Moreover, the Executive Branch would face significant irreparable harm from the entry of a permanent injunction because it would prevent DoD from obligating millions of dollars that will permanently lapse at the end of the fiscal year, as well as impose significant unrecoverable expenses for stopping work on the projects.

For these reasons, as further explained below, the Court should deny the States' motion, grant Defendants' motion, and enter final judgment for Defendants on all claims related to the funding and construction of El Centro Sector Project 1 and El Paso Sector Project 1.

## BACKGROUND

### I.   Congress's Express Authorization of Border Barrier Construction

The Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) authorizes the Secretary of Homeland Security to "take such actions as may be necessary to install additional physical barriers and roads . . . in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." Pub. L. No. 104-208, Div. C., Title I § 102(a), 110 Stat. 3009 (1996) (codified at 8 U.S.C. § 1103 note). In 2005, Congress grew frustrated by "[c]ontinued delays caused by litigation" preventing border barrier construction and amended IIRIRA by granting the Secretary of Homeland Security authority to "to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section." *See* H.R. Rep. 109-72, at 171 (May 3, 2005); Pub. L. No. 109-13, Div. B,

Title I § 102, 119 Stat. 231, 302, 306 (IIRIRA § 102(c).  Congress amended IIRIRA again in 2006, requiring construction of "physical barriers, roads, lights, cameras, and sensors" across hundreds of miles of the southern border in five specified locations.  Pub. L. No. 109-367, § 3, 120 Stat. 2638.  In 2007, Congress expanded this requirement to require "construct[ion of] reinforced fencing along not less than 700 miles of the southwest border." Pub. L. No. 110-161, Div. E, Title V § 564, 121 Stat. 1844 (2007) (IIRIRA § 102(b)).  Relying on these authorities, DHS has installed approximately 650 miles of barriers along the southern border.  *See* Senate Hearing on the DHS FY 2018 Budget, 2017 WL 2311065 (May 25, 2017) (Testimony of then-Secretary of Homeland Security John Kelly).

## II.    Congress's Authorization for DoD Support of DHS's Border Security Efforts

Congress also has expressly authorized DoD to provide a wide range of support to DHS at the southern border.  10 U.S.C. § 284; *see id.* §§ 271-74.  Since the early 1990s, military personnel have supported civilian law-enforcement agency activities to secure the border, counter the spread of illegal drugs, and respond to transnational threats.  *See* H. Armed Servs. Comm. Hr'g on S. Border Defense Support (Jan. 29, 2019) (Joint Statement of John Rood and Vice Admiral Michael Gilday) (Ex. 1).  For decades, U.S. military forces have played an active role in barrier construction and reinforcement on the southern border.  Military personnel were critical to construction of the first modern border barrier near San Diego, CA in the early 1990s, as well as other border fence projects.  *See* H.R. Rep. No. 103-200, at 330-31, 1993 WL 298896 (1993) (commending DoD for its role in construction of the San Diego primary fence); Hr'g Before the S. Comm. on Armed Servs. Subcomm. on Emerging Threats and Capabilities, 1999 WL 258030 (Apr. 27, 1999) (Test. of Barry R. McCaffrey) (military personnel constructed over 65 miles of barrier fencing).  In 2006, the National Guard improved southern border security infrastructure by building more than 38 miles of fence, 96 miles of vehicle barrier, and more than 19 miles of new all-weather road, and performing road repairs exceeding 700 miles.  *See* Joint Statement of Rood and Gilday.  More recently, the U.S. Army Corps of Engineers has assisted DHS by providing planning, engineering, and barrier construction support.  *See, e.g.*, *Gringo Pass, Inc. v. Kiewit Sw. Co.*, 2012 WL 12905166, at *1 (D. Ariz. Jan. 11, 2012).

## III.    DoD's Current Support for DHS's Efforts to Secure the Southern Border

On January 25, 2017, the President issued an Executive Order directing federal agencies "to

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

3

deploy all lawful means to secure the Nation's southern border." Border Security and Immigration Enforcement Improvements, Exec. Order No. 13767, 82 Fed. Reg. 8793 (Jan. 25, 2017). To "prevent illegal immigration, drug and human trafficking, and acts of terrorism," *id.*, the Order required agencies to "take all appropriate steps to immediately plan, design and construct a physical wall along the southern border," including to "[i]dentify and, to the extent permitted by law, allocate all sources of Federal funds" to that effort. *Id.* at 8794.

On April 4, 2018, the President issued a memorandum to the Secretary of Defense, Secretary of Homeland Security, and the Attorney General titled, "Securing the Southern Border of the United States." Presidential Memorandum, 2018 WL 1633761 (Apr. 4, 2018). The President stated "[t]he security of the United States is imperiled by a drastic surge of illegal activity on the southern border" and pointed to "the combination of illegal drugs, dangerous gang activity, and extensive illegal immigration." *Id.* at 1. The President determined the situation at the border had "reached a point of crisis" that "once again calls for the National Guard to help secure our border and protect our homeland." *Id.* To address this crisis, the President directed DoD to support DHS in "securing the southern border and taking other necessary actions to stop the flow of deadly drugs and other contraband, gang members and other criminals, and illegal aliens into this country." *Id.* at 2. Over the course of the last year, military personnel, both active duty and National Guard, have provided a wide range of border security support to DHS, including hardening U.S. ports of entry, erecting temporary barriers, and emplacing concertina wire. *See* Joint Statement of Rood and Gilday.

### IV.    The President's Proclamation Declaring a National Emergency at the Southern Border

On February 15, 2019, the President issued a proclamation declaring that "a national emergency exists at the southern border of the United States." *See* Declaring a Nat'l Emergency Concerning the S. Border of the United States, Pres. Proc. No. 9844, 84 Fed. Reg. 4949 (Feb. 15, 2019) (Proclamation). The President determined that "[t]he current situation at the southern border presents a border security and humanitarian crisis that threatens core national security interests and constitutes a national emergency." *Id.* The President explained:

The southern border is a major entry point for criminals, gang members, and illicit

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

4

narcotics. The problem of large-scale unlawful migration through the southern border is long-standing, and despite the executive branch's exercise of existing statutory authorities, the situation has worsened in certain respects in recent years.

*Id.* "Because of the gravity of the current emergency situation," the President determined that "this emergency requires use of the Armed Forces" and "it is necessary for the Armed Forces to provide additional support to address the crisis." *Id.*

On March 15, 2019, the President vetoed a joint resolution passed by Congress that would have terminated the President's national emergency declaration. *See* Veto Message for H.J. Res. 46, 2019 WL 1219481 (Mar. 15, 2019). The President relied upon statistics published by U.S. Customs and Border Protection (CBP) as well as congressional testimony by the Secretary of Homeland Security to reaffirm that a national emergency exists along the southern border. *See id.* The President highlighted (1) the recent increase in the number of apprehensions along the southern border; (2) CBP's seizure of more than 820,000 pounds of drugs in 2018; and (3) arrests of 266,000 aliens in 2017 and 2018 previously charged with or convicted of crimes. *See id.* The President also emphasized that migration trends along the southern border have changed to caravans that include record numbers of families and unaccompanied children, which requires frontline border enforcement personnel to divert resources away from border security to humanitarian efforts and medical care. *See id.* Further, the President stated that criminal organizations are taking advantage of the large flows of families and unaccompanied minors to conduct a range of illegal activity. *See id.* The President stated that border enforcement personnel and resources are strained "to the breaking point" and concluded that the "situation on our border cannot be described as anything other than a national emergency, and our Armed Forces are needed to help confront it." *See id.*

The situation at the southern border "is growing worse by the day" and DHS is facing "a system-wide meltdown." *See* Testimony of Kevin McAleenan, Acting Secretary of Homeland Security, Before the U.S. Senate Committee on the Judiciary (June 11, 2019) (Ex. 2); Letter from Secretary of Homeland Security Kirstjen M. Nielsen to the United States Senate and House of Representatives (Mar. 28, 2019) (Ex. 3). "DHS facilities are overflowing, agents and officers are stretched too thin, and the magnitude of arriving and detained aliens has increased the risk of life threatening incidents." *See* Nielsen Letter. In May 2019 alone, over 132,887 people were apprehended between ports of entry

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

5

on the southern border, compared with 99,304 in April and 92,840 in March.  *See* DHS Sw. Border Migration Statistics FY 2019, at 2 (dated June 5, 2019) (Ex. 4).[1]

## V.    The Use of Spending Authorities for Barrier Construction

On the same day the President issued the Proclamation, the White House announced the sources of funding to be used to construct additional barriers along the southern border.  In addition to the $1.375 billion appropriation to DHS as part of the Consolidated Appropriations Act for Fiscal Year 2019 (CAA), *see* Pub. L. No. 116-6, § 230, 133 Stat. 13 (2019), the fact sheet identifies three additional sources of funding:  (1) About $601 million from the Treasury Forfeiture Fund; (2) Up to $2.5 billion of DoD funds transferred for Support for Counterdrug Activities (10 U.S.C. § 284); and (3) Up to $3.6 billion reallocated from Department of Defense military construction projects pursuant 10 U.S.C. § 2808.  *See* President Donald J. Trump's Border Security Victory (Feb. 15, 2019) (Ex. 5). The parties' respective motions for partial summary judgment address only the funding and construction of border barriers pursuant to § 284.

### A.    10 U.S.C. § 284

Section 284 authorizes DoD to provide "support for the counterdrug activities . . . of any other department or agency of the Federal Government," including for "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States."  10 U.S.C. § 284(a); (b)(7).  Congress first provided DoD this authority in the National Defense Authorization Act for Fiscal Year 1991.  Pub. L. No. 101-510, § 1004, 104 Stat. 1485 (1990).  Congress regularly renewed § 1004 and praised DoD's involvement in building barrier fences along the southern border.  For example, in 1993, Congress "commend[ed]" DoD's efforts to reinforce the border fence along a 14-mile drug smuggling corridor in "the San Diego-Tijuana border area"  H.R. Rep. No. 103-200, at 330-31, 1993 WL 298896 (1993).  Executive Branch officials and Congress have also noted the importance of DoD's involvement in border security projects to prevent

---

[1] The Court may take judicial notice of the official U.S. Government documents and the publicly available information on Government websites cited herein and attached.  *See Kater v. Churchill Downs Inc.*, 886 F.3d 784, 788 n.2 (9th Cir. 2018); *People With Disabilities Found. v. Colvin*, Case No. 15-CV-02570-HSG, 2016 WL 2984898, at *3 (N.D. Cal. May 24, 2016).

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

6

drug smuggling.  *See* Hr'g Before the S. Comm. on Armed Servs. Subcomm. on Emerging Threats and Capabilities, 1999 WL 258030 (Apr. 27, 1999) (Testimony of Barry R. McCaffrey) (testifying about the "vital contributions" made by DoD to construct 65 miles of barrier fencings, 111 miles of roads, and 17 miles of lighting); H.R. Rep. No. 110-652, 420 (2008) (describing border fencing as an "invaluable counter-narcotics resource" and recommending a \$5 million increase to DoD's budget to continue construction).  In light of the threat posed by illegal drug trafficking, Congress permanently codified § 1004 at 10 U.S.C. § 284 in 2016, directing DoD "to ensure appropriate resources are allocated to efforts to combat this threat."  H.R. Rep. No. 114-840, 1147 (2016).

In accordance with § 284, on February 25, 2019, DHS requested DoD's assistance in blocking 11 specific drug-smuggling corridors on federal land along certain portions of the southern border. *See* Administrative Record (AR) at 15-24 (ECF No. 173).  The request sought the replacement of existing vehicle barricades or dilapidated pedestrian fencing with new pedestrian fencing, the construction of new and improvement of existing patrol roads, and the installation of lighting. *Id.*

As relevant to this case, the Acting Secretary of Defense approved construction and funding of one project in New Mexico and one project in California.  *See* AR at 1-8, 137-44.[2]  El Paso Sector Project 1 will replace existing vehicle barriers with 30-foot high pedestrian fencing along approximately 46 miles of federal land in Luna and Doña Ana Counties, New Mexico.  *See* AR at 22-23, 55-60; First Declaration of Paul Enriquez (April 25, 2019) ¶¶ 16-18 (Ex. 6).  El Centro Sector Project 1 will replace approximately 15 miles of existing vehicle barriers with new pedestrian fencing in Imperial County, California.  *See* AR at 17, 138; Second Declaration of Paul Enriquez (June 19, 2019) ¶¶ 11-13 (Ex. 7).

In approving these projects, the Acting Secretary of Defense noted that that DHS identified each project location as a drug-smuggling corridor, thereby satisfying the statutory requirement of § 284(b)(7).  *See* AR at 7, 143.  The United States Border Patrol collectively had more than 900 separate drug-related events between border crossings in the El Paso Sector and El Centro Sectors in fiscal year 2018, through which it seized over 15,000 pounds of marijuana, over 500 pounds of cocaine, over

---

[2] The Acting Secretary approved seven total projects.  The States do not challenge the 5 projects located in Arizona.

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

7

95 pounds of heroin, and over 1,800 pounds of methamphetamine.  *Id.* at 17, 22-23.  These high rates of drug smuggling have continued into fiscal year 2019.  *See* First Declaration of Millard LeMaster ¶¶ 4-5 (May 28, 2019) (Ex. 8); Second Declaration of Millard LeMaster ¶¶ 7-8 (June 19, 2019) (Ex. 9). The existing vehicle barriers in these areas must be replaced because they no longer effectively stop transnational criminal organizations from smuggling illegal drugs into United States.  *See* AR at 17-22.

To fund El Paso Sector Project 1, the Acting Secretary of Defense authorized the transfer of $1 billion to the Drug Interdiction and Counter-Drug Activities, Defense, appropriation, from Army personnel funds that had been identified as excess to current requirements.  *See* AR at 2, 5, 10-11, 35-37.  The Acting Secretary directed the transfer of funds pursuant to DoD's general transfer authority under § 8005 of the DoD Appropriations Act for Fiscal Year 2019, Pub. L. 115-245, div. A, 132 Stat. 2981, 2999 (Sept. 28, 2018), and § 1001 of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 (NDAA), Pub. L. 115-232, § 1001, 132 Stat. 1636, 1945 (Aug. 13, 2018).  *See id.*

Section 8005 authorizes the Secretary of Defense to transfer up to $4 billion of certain DoD funds between appropriations provided "[t]hat the authority to transfer may not be used unless for higher priority items, based on unforeseen military requirements than those for which originally appropriated and in no case where the item for which funds are requested has been denied by the Congress." Pub. L. No. 115-245, § 8005.  Section 1001 of the NDAA provides the Secretary of Defense with similar transfer authority and incorporates the same substantive elements as § 8005.  *See* Pub. L. 115-232, § 1001.

To fund El Centro Project 1, the Acting Secretary of Defense authorized a transfer of $1.5 billion pursuant to § 8005 and § 1001, as well as DoD's special transfer authority under § 9002 of the DoD Appropriations Act and § 1512 of the NDAA.  *See* AR at 137-141, 146-56.  Section 9002 authorizes the Secretary of Defense to transfer up to $2 billion "between the appropriations or funds made available to the Department of Defense in [Title IX]" of the DoD Appropriations Act "subject to the same terms and conditions as the authority provided in section 8005 of this Act."  *See* Pub. L. No. 115-245, § 8005.  Section 1512 of the NDAA authorizes special transfer authority similar to § 9002 and also requires compliance with same requirements as § 8005.  *See* Pub. L. 115-232, § 1512.

On April 24 and May 15, 2019, the Acting Secretary of Homeland Security exercised his

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

8

authority under § 102(c)(1) of IIRIRA to waive the application of various laws to ensure expeditious construction of the El Paso and El Centro projects. *See* Determinations Pursuant to Section 102 of the IIRIRA, as Amended, 84 Fed. Reg. 17185-87 (Apr. 24, 2019); 21798-801 (May 15, 2019). The waived laws include NEPA (42 U.S.C. 4321 *et seq.*) along with "all federal, state, or other laws, regulations, and legal requirements of, deriving from, or related to the subject of, the [listed] statutes." *Id.*

## STANDARD OF REVIEW

Summary judgment is appropriate when, viewing the evidence and drawing all reasonable inferences most favorably to the nonmoving party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Here, where the parties have filed cross-motions for partial summary judgment, "the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." *See* Fed. R. Civ. P. 54(b).

## ARGUMENT

**I.     DoD's Transfer of Funds Pursuant to § 8005 is Lawful.**

With respect to the transfer of funds pursuant to the requirements set forth in § 8005,[3] Defendants acknowledge that the Court previously rejected Defendants' arguments about the proper interpretation of § 8005 in its opinion granting in part and denying in part Plaintiffs' motion for preliminary injunction. *See* Order Denying Plaintiffs' Motion for Preliminary Injunction at 13-24 (ECF No. 165) (PI Order). Defendants' respectfully submit that the Court erred for two reasons.

First, the States fall outside the zone of interests of § 8005 and thus cannot sue to enforce it. The zone-of-interests requirement is a general presumption about Congress's intended limits on the scope of *all* causes of action, not just express causes of action under the APA or other statutes. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (the zone-of-interests test "is a requirement of general application"). The Court incorrectly concluded that the zone-of-interests

---

[3] Because § 1001, § 1512, and § 9002 incorporate § 8005 by reference or are subject to the same substantive requirements as § 8005, *see Sierra Club v. Trump*, ECF No. 144 at 12 n.7, this motion refers to these requirements collectively by reference to § 8005.

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

9

requirement did not apply to the States because they sought equitable relief against Defendants for exceeding statutory authority. *See* PI Order at 11-12. *Lexmark*'s reference to the requirement applying to all "statutory" or "statutorily created" causes of action, *see id.*, encompasses equitable causes of action, which are inferred from Congress's statutory grant of equity jurisdiction and which enforce statutes enacted against the backdrop of the zone-of-interests limitation, *see Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384-85 (2015); *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318 (1999). It turns the separation of powers on its head to hold that the zone-of-interests requirement applies where Congress has provided a statutory cause of action, but that, where Congress has not expressly authorized suit *at all*, any injured persons can sue, even if their interests are entirely unrelated to the interests protected by the statute. There is no basis to conclude that Congress intended to allow individuals outside the zone of interests of a particular statute nonetheless to enforce that statute in equity. Thus, even if there were an implied cause of action in equity for private enforcement of § 8005,[4] the States fall outside of any interest conceivably protected by § 8005 because the statute exists to govern the relationship between Congress and DoD with respect to military spending, not to protect the State's interests in environmental protection. *See Lexmark*, 572 U.S. at 129-32.

Second, DoD has satisfied the requirements set forth in § 8005. The Court previously concluded that DoD had not satisfied two of § 8005's elements, holding that DoD had transferred funds for an "item" that was previously "denied" by Congress and that supported a military requirement that was not "unforeseen." *See* PI Order at 13-18. The Court's rationale was that, at the time of DoD's appropriation, the Executive Branch's general desire for border-wall funding was foreseen and Congress provided DHS only a limited amount of funding. *See id.* But that reasoning considers the appropriations process at far too high a level of generality and misunderstands both the statutory language and budget process. Section 8005 is a provision in the *DoD* appropriations statute,

---

[4] Because Congress did not create a private right of action to enforce § 8005 or the statutes that form the basis of the States' motion, their claims should be governed by the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.*, as challenges to agency action. *See City of Sausalito v. O'Neil*, 386 F.3d 1186, 1205 (9th Cir. 2004) (citing cases). *But see* PI Order at 10-11.

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

10

which grants DoD limited authorization to make internal transfers to fund *particular items* after DoD's annual appropriations statute is enacted.  Under § 8005, an "item for which funds are requested" is a particular budget item requiring additional funding beyond the amount in the DoD appropriation for the fiscal year.  At no point in the budgeting process, however, did Congress deny DoD funding for construction of the El Paso or El Centro projects under its counter-narcotics support appropriation.  Consequently, the States' reliance on Executive Branch funding requests for the border wall generally are irrelevant to the meaning of § 8005.  *See* States' Motion for Partial Summary Judgment at 10-11 (ECF No. 176) (States' SJ Mot.).

Similarly, the "item" at issue here—DoD's support for the projects requested by DHS under § 284—was "unforeseen."  An expenditure is "unforeseen" under § 8005 if DoD was not aware of the specific need when it made its budgeting requests and Congress finalized the DoD appropriation.  Congress enacted DoD's fiscal year 2019 appropriation on September 28, 2018.  *See* Pub. L. No. 115-245, 132 Stat. 2981.  DHS did not request DoD's assistance in blocking specific drug-smuggling corridors until February 25, 2019, five months later.  *See* AR at 15-24.  Therefore, the need for DoD to provide support to DHS for projects at issue here was not known at the time of DoD's budget request in 2018.  *See* AR 10-11, 146-47.  Further, DoD may undertake counter-drug support pursuant to § 284 only upon receiving a request by another agency, *see* 10 U.S.C. § 284(a), thus there is no merit to the argument that the funding requests at issue were "foreseen" simply that there was an ongoing legislative debate over DHS's separate request for appropriations for border barriers.

Section 284 support is also undoubtedly a "military requirement" under § 8005.  Congress enacted § 284 precisely because it recognized the need for DoD to support civilian agencies by bringing military resources, both skills and funding, to bear upon the problem of drug smuggling.  *See* H.R. Rep. 114-840, 1147 (Nov. 30, 2016).  Concluding that DoD's support for counter-drug activities is not a "military requirement" requires overriding Congress's assignment of that function to the military in § 284.  Moreover, the States' proposed interpretation of a "military requirement" is inconsistent with the way Congress and DoD have understood the provision for many years.  *See* Reprogramming Application & Congressional Approvals, Sept. 2007 (Ex. 10) ( § 8005 transfer to the counter-drug account for an infrastructure project in Nicaragua to prevent smuggling of cocaine into

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

11

the United States); Reprogramming Application & Congressional Approvals, Sept. 2006 (Ex. 11) (§ 8005 transfer to support DoD's involvement in CBP's border security mission). Accordingly, there is no historical or legal basis for the Court to adopt the States' narrow construction that § 8005 transfers should be limited solely for activities that suppress "military threats" for which only DoD has exclusive authority to address. *See* States' SJ Mot. at 11-12.

There is also no constitutional issue presented by Defendants' interpretation of § 8005. Congress has long provided agencies with "lump-sum appropriation[s]," and agencies' delegated authority over "[t]he allocation of funds" is not only constitutional, but "committed to agency discretion by law" and "accordingly unreviewable." *Lincoln v. Vigil*, 508 U.S. 182, 192-93 (1993). Given that Congress thus could have granted DoD unfettered discretion over its total budget, § 8005's limited grant of transfer authority poses no constitutional concerns, however broadly construed.

## II.    DoD's Transfer of Funds Pursuant to § 9002 is Lawful.

The States also raise a separate argument about the scope of § 9002 and contend that it imposes additional constraints on the transfer of funds beyond the requirements of § 8005. *See* States' SJ Mot. at 12-13. The States fall outside the zone of interests of § 9002 for the same reasons as § 8005. Additionally, as relevant here, § 9002 provides that DoD may transfer up to $2 billion "between the appropriations or funds made available to the Department of Defense in this title:" – that is, within appropriations in "Title IX–Overseas Contingency Operations" of the DoD Appropriations Act  *See* Pub. L. No. 115-245, 132 Stat. 3042. But contrary to the States' argument, that is precisely the type of transfer that was undertaken in this case.

As explained in Part II of the May 9, 2019 reprogramming notification that DoD submitted to Congress, *see* AR at 149, 155-56, DoD transferred $681.535 million between several Title IX, Overseas Contingency Operations Defense appropriations. *See* AR at 149, 155-56. The States contend that the transfer of money to the counter-drug appropriation of Title IX was unlawful based on language that the funds in this appropriation must be "designated by the Congress for Overseas Contingency Operations/Global War on Terrorism pursuant to section 251(b)(2)(A)(ii) of the Balanced Budget and Emergency Deficit Control Act of 1985 [BBEDCA]." *See* 132 Stat. 3042. Contrary to the State's argument, that appropriation of an additional amount for the Drug Interdiction

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

12

and Counter-Drug Activities, Defense account in Title IX has been properly designated for Overseas Contingency Operations/Global War on Terrorism.  Here, acting in accordance with § 251(b)(2)(A) of BBEDCA, the President has designated the Drug Interdiction and Counter-Drug Activities, Defense account for Overseas Contingency Operations/Global War on Terrorism.  *See* Letter from Donald J. Trump to Speaker of the House Paul D. Ryan (Sept. 28, 2018) (Ex. 12).  In text of the Title IX appropriation, Congress made a similar designation in accordance with § 251(b)(2)(A)(ii).  *See* 132 Stat. 3042.  It is these designations by the President and Congress that have legal significance for purposes of the BBEDCA and § 9002; the narrative recommendation in the memorandum from the OMB Director that the States rely upon is irrelevant.  *See* States' SJ Mot. at 13.  Even if that memorandum were of legal consequence under the statute, it contemplates using the funds to "address other emergent crises[,]" such as the national emergency on the southern border.  Accordingly, DoD has complied with the requirements of § 9002.

### III.    DoD's Use of Counterdrug Support Authority Under § 284 Is Lawful.

DoD is lawfully providing counterdrug support to DHS pursuant to its authority under § 284 to construct barrier projects in two drug-smuggling corridors along the southern border.  Accordingly, the Court should enter partial summary judgment in Defendants' favor on the States' § 284 claims.

As a threshold matter, the States cannot sue to enforce § 284 because they are not within the zone of interests of the statute.  *See Lexmark*, 572 U.S. at 129.  Section 284's limitations on when DoD can provide counter-drug support are designed to regulate the relationship between Congress, DoD, and state or federal agencies seeking assistance, based on budgetary control and agency focus.  The "interests protected by the" statute are completely unrelated to the environmental and sovereign interests the States seek to vindicate in this case.  *See id.* at 131.  Nothing in the statute suggests that Congress intended to give states a remedy for protecting against the alleged negative externalities of barrier construction; and as such, neither the APA nor an implied cause of action in equity provides the States with a remedy for an alleged violation.  *Id.* at 129; *see Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 396, 400 & n.16 (1987).

Even if the States could sue to enforce § 284, DoD's construction of the barrier projects at issue is squarely within its counterdrug support authority.  The States do not dispute that the projects

at issue were approved in accordance with § 284's procedural requirements, *id.* § 284(a), (a)(1)(A), and encompass the type of border infrastructure construction permitted by the statute, *id.* § 284(b)(7).  The States likewise do not dispute that the projects at issue are being constructed in "drug smuggling corridors" along the U.S.-Mexico border.  10 U.S.C. § 284(b)(7).  As explained above, the record includes extensive evidence to support recent drug-smuggling activities between ports of entry in the El Paso and El Centro Sectors, and explains why border-barrier construction in the project areas is necessary to impede and deny illegal drug activities.  *See supra* at 7-8

Instead, the States raise only issues of statutory interpretation, all of which lack merit.  The text and history of § 284 contradict the States' claim that Congress impliedly limited DoD's authority under the statute.  *See* States' SJ Mot. at 13 (citing the congressional notification requirement for "small scale construction" under $750,000 provided in § 284(h)(1)(B), (i)(3)).  No monetary restrictions appear in the types of support permitted under § 284.  *See* 10 U.S.C. § 284(b)-(c).  To the contrary, the statute broadly approves certain construction without regard to the size, scale, or budget of the project.  *Id.* § 284(b)(7).  And since Congress first provided this authority in 1990, DoD has repeatedly used it, with Congress's explicit approval, to complete large-scale fencing projects along the southern border in support of DHS's counter-drug activities.  *See* H.R. Rep. No. 103-200, at 330-31; H.R. Rep. No. 109-452, at 368.  In fact, Congress has recommended that DoD spend millions of dollars on specific border projects.  *See* H.R. Rep. No. 109-452, at 369; *see also supra* at 6-7.  There is simply no reason to infer that Congress intended to limit all "support" authorized under § 284 by the types of congressional notification required in § 284(h).  Indeed, inferring some unspecified monetary limit on DoD's § 284's authority would be entirely arbitrary, as nothing in the statute even arguably defines any upper limit.[5]

There is also nothing inherently "implausible" about Congress choosing to require notice for some, but not all, projects that DoD could construct under § 284.  *See* States' SJ Mot. at 13 (quoting

---

[5] Plaintiffs' reliance on a 1990 House Armed Services Committee report fares no better.  *See* States' SJ Mot. at 13.  DoD is constructing discrete projects under its § 284 authority, not "fund[ing] the drug war for" DHS.  H.R. Rep. 101-665.  The type of support DoD is providing DHS here is, as Congress described it, "precisely the kind of federal-local cooperative effort the Congress had in mind in enacting section 1004."  H.R. Rep. No. 103-200, at 330–31.

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

14

PI Order at 21). Certain types of support authorized under § 284 explicitly refer to—*but are not limited to*—"small scale" or "minor" construction. *See* 10 U.S.C. § 284(b)(4), (c)(1)(B). Accordingly, if Congress wanted to limit all construction authorized by § 284 to "small scale construction," it "presumably would have done so expressly." *Russello v. United States*, 464 U.S. 16, 23 (1983). "The short answer is that Congress did not write the statute that way." *Id.*

## IV.    DoD's Use of Its Transfer and Counterdrug Support Authority Does Not Violate the Constitution.

DoD's use of its statutory authority to fund and construct the projects at issue is not unconstitutional. The States' claims merely recast their statutory claims in constitutional terms, and "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims." *Dalton*, 511 U.S. at 473. The outcome of their claims turns on what the transfer and counterdrug support statutes mean—a purely statutory dispute with no constitutional dimension.

The Supreme Court's decision in *Dalton* makes this clear. In *Dalton*, the Court specifically rejected the proposition that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." *Id.* at 471. The Court instead recognized that the "distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution, on the other, is too well established to permit this sort of evisceration." *Id.* at 474.

The States make precisely the argument that the Court disapproved in *Dalton*. The States assert no constitutional violation separate from the alleged statutory violations. Instead, they assert that Defendants' use of statutory authorities violated the appropriations to DHS in the CAA. The States' Appropriations Clause claim hinges on the allegation that Defendants evaded the restrictions imposed in the CAA. *See* States SJ Mot. at 16. The States' separation-of-powers claim likewise turns on the allegation that Defendants acted contrary to the will of Congress because they allegedly took actions outside the CAA's restrictions. *See id.* at 14. And the States' Presentment Clause claim asserts that, by directing the funding of barrier construction under other statutory authorities, the President "substitute[d]" his own judgment for that of Congress in the CAA. *Id.* at 17. These allegations of

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

15

ultra vires statutory actions do not state independent constitutional claims.[6]  *See Dalton*, 511 U.S. at 473-74.

The States' separation-of-powers claim also fails because the President has not purported to exercise his inherent authority under Article II of the Constitution.  Contrary to the States' contentions, *see* States' SJ Mot. at 15, this case presents a sharp contrast to *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), in which the President directed the Secretary of Commerce to seize the nation's steel mills relying solely upon "the aggregate of his powers under the Constitution," and conceding the absence of statutory authority.  *Id.* at 585-87.  The situation here is entirely different, for the actions at issue are all "pursuant to an express . . . authorization of Congress," such that the agencies' "authority is at its maximum."  *Id.* at 635 (Jackson, J. concurring).  For that reason, the States' reliance on *City and County of San Francisco v. Trump*, 897 F.3d 1225 (2018), is misplaced because the decision there hinged on the absence of congressional authorization.  *See id.* at 1234-35.

The fact that Congress authorized one-year funding for certain border-barrier construction in the CAA does not mean that it prohibited the use of other available statutory sources to provide additional funding for such construction.  Had Congress wished to prohibit the use of those permanent authorities, it could have explicitly stated so.  *See United States v. McIntosh*, 833 F.3d 1163, 1179 (9th Cir. 2016).  Because Congress has statutorily authorized the conduct at issue, there can be no concerns that Defendants are usurping "Congress's constitutionally-mandated power" to assess and determine "permissible spending."  *States* PI Order at 20.  DoD is acting pursuant to authority granted by Congress, and *Youngstown* is thus inapposite.  *See Am. Fed'n of Labor & Congress of Industrial Orgs. v. Kahn*, 618 F.2d 784, 787 (D.C. Cir. 1979) (en banc); *see also Dalton*, 511 U.S. at 473.

The States' Appropriations Clause claim also fails.  The States rely on the principle that, where two appropriations are available to an agency—one that specifically encompasses an expenditure and one whose general terms could authorize the expenditure, the agency must use the specific

---

[6] This is so even if the Court believes that Defendants' interpretation of its statutory authority "would pose serious [constitutional] problems."  PI Order at 18.  Although Defendants respectfully disagree, the resulting ruling would likely be that Defendants' actions were not statutorily authorized, not that they were unconstitutional.  *Id.* at 18-19.

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

16

appropriation to the exclusion of the general appropriation. *See* States' SJ Mot. at 15. The States cite no authority that the principle extends beyond the circumstance of a *single* agency determining which of two appropriations *to that agency* should be used for a particular object or purpose.[7] That is not the case here. Separate from the $1.375 billion appropriation to DHS, DoD is acting under its § 284 authority, using its own appropriated funds transferred pursuant to § 8005 and § 9002.

The Supreme Court has held that "[a]n agency's discretion to spend appropriated funds is cabined only by the text of the appropriation." *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 200 (2012). Here, Congress did not expressly limit in DHS's or DoD's fiscal year 2019 appropriations the use of DoD's transfer authority or counterdrug support authority for barrier construction. Nor does Congress's appropriation to DHS for border-barrier construction under specific conditions prevent DoD from utilizing its § 284 authority for other construction. Indeed, the whole purpose of § 284 is to permit DoD to use its own appropriated funds to support DHS through, among other things, construction of barriers to block drug-smuggling corridors.[8] *See supra* at 6-7.

Finally, the States have not alleged an actual Presentment Clause violation. The States cannot dispute that the President signed the CAA into law according to the constitutionally mandated procedure. *See* U.S. Const., art. 1, § 7. And their claim that the President has rejected that law is baseless. This case is in no way comparable to *Clinton v. City of New York*, 524 U.S. 417 (1998), wherein the Supreme Court held that the President's action explicitly "cancel[ing] in whole" portions of enacted statutes violated the Constitution. *Id.* at 436; *see also id.* at 439. The CAA remains in effect, and DoD has acted pursuant to other statutory authority to fund border-barrier construction. Such

---

[7] Indeed, the authority Plaintiffs cite involves that very scenario. *See Nevada v. Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir. 2005) (holding that the Department of Energy could limit payment to Nevada for nuclear waste activities to the appropriation made specifically for that purpose; payments in excess of that appropriation from a fund created under a general statutory provision was not allowed).

[8] Accepting Plaintiffs' argument would mean DoD is prohibited from providing authorized support under § 284 in any year in which Congress appropriates funds to DHS specifically for border fence construction. Inferring such a restriction—without Congress's express intention and contrary to the purpose of § 284—would be tantamount to a repeal by implication, a disfavored rule that "applies with special force when the provision advanced as the repealing measure was enacted in an appropriations bill." *United States v. Will*, 449 U.S. 200, 221-22 (1980).

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

17

1    use of these statutory authorities does not render the CAA moot.

2    **V.    DoD's Transfer of Funds is Not Arbitrary and Capricious.**

3        The States also contend that the Acting Secretary of Defense's decision to approve DHS's

4    request for border barrier support was arbitrary and capricious under the APA because it did not take

5    into account military readiness concerns.  *See* States' SJ Mot. at 17-18.  But the Acting Secretary did,

6    in fact, consider whether the proposed support would impact military preparedness.  10 U.S.C. § 276

7    provides that DoD support "may not be provided to any civilian law enforcement official under this

8    chapter if the provision of such support will adversely affect the military preparedness of the United

9    States."  That statutory limitation was among the requirements specifically presented to and considered

10   by the Acting Secretary of Defense when he authorized the projects at issue here.  *See* AR at 2-3, 5,

11   10-11, 139-40, 146-47.  Moreover, to inform his decision, the Acting Secretary directed the Chairman

12   of the Joint Chiefs of Staff to prepare an assessment of the "impacts to force readiness and impacts

13   on the Combatant Command missions."  *See* AR at 40.  The Chairman concluded that the

14   reprogramming of excess funds would not have an immediate negative impact on the readiness of the

15   joint force.  *See* AR at 39, 182.  Based on this record, there is no basis for the Court to conclude that

16   the Acting Secretary's decision was arbitrary and capricious, particularly in light of the "healthy

17   deference" due "executive judgments in the area of military affairs."[9]  *Rostker v. Goldberg*, 453 U.S. 57,

18   66 (1981); *see Crickon v. Thomas*, 579 F.3d 978, 982 (9th Cir. 2009) (APA review is "highly deferential")

19       Nor is there any merit to the claim that DoD acted arbitrarily and capriciously by transferring

20   funds without Congress's approval.  *See* States' SJ Mot. at 19.  The Court rejected this argument

21   previously, *see* PI Order at 12 n.8, and the States offer nothing new to warrant a different conclusion.

22   *See also* Defs.' Opp'n to Pls' Mot. for Prelim. Inj. at 22-24 (ECF No. 89).

23   **VI.    The States Have Not Met The Requirements For A Permanent Injunction.**

24       The Court should deny the States' request for a permanent injunction to prohibit the funding

25

26       [9] Plaintiffs ignore this evidence and base their argument on a memorandum attached as an
27   exhibit to the Chairman's analysis from a lower raking DoD official that lists various alternative Army
     projects to which funds could be transferred if not used to support DHS.  *See* AR at 51.
28

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

18

and construction of the El Paso and El Centro projects using § 8005, § 9002, and § 284.

"[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-58 (2010). Even if the States were to prevail on the merits of their claims, permanent "injunctive relief is not automatic, and there is no rule requiring automatic issuance of a blanket injunction when a violation is found." *See N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 843 (9th Cir. 2007). As the Supreme Court has emphasized, a permanent "injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." *Winter v. Natural Res. Def. Council,* 555 U.S. 7, 32 (2008).

## A. The States Have Not Established an Irreparable Injury.

The States base their claim of irreparable injury on two claims, both of which fail. First, the States claim they will be irreparably harmed by the inability to enforce various state laws intended to project California and New Mexico's environmental and natural resources. *See* States' SJ Mot. at 19-21. The States rely on cases where courts held states suffer irreparable injury from judicial injunctions prohibiting the enforcement of state law. *See, e.g.*, *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers). But these cases do not support the States' argument because there is no court injunction that prevents the States from enforcing their laws. Rather, Congress has passed a federal statute – IIRIRA – that authorizes DHS to waive the application of state laws that impede border barrier construction. The Acting Secretary of Homeland Security has invoked that statutory waiver authority with respect to the El Centro and El Paso projects and it is this exercise of Congress's authority that prevents the States from enforcing its laws here, not the funding or construction of the barriers under § 8005, § 9002, and § 284.

Because Congress has made a policy judgment that expeditious barrier construction should take precedence over enforcement of state laws that would hinder such construction, the States cannot establish an irreparable injury by arguing that they cannot enforce their waived laws. Indeed, the States

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

19

present no authority for their assertion that the inability to enforce state laws in the face of a contrary federal law is a proper basis for an irreparable injury. The absence of such authority is not surprising because "when Congress so acts, the federal legislation necessarily overrides conflicting state laws under the Supremacy Clause." *Kleppe v. New Mexico*, 426 U.S. 529, 543 (1976). The Court previously rejected the States' argument that the IIRIRA waivers cannot extend to projects undertaken by DoD pursuant to § 284. *See* ECF No. 165 at 27-29. The States do not contest that conclusion in their current motion. Consequently, the States cannot demonstrate irreparable injury by being deprived of something to which they have no legal right in the first instance.

Second, California and New Mexico allege that the construction of the border wall along federal lands directly adjacent to the international boundary line will negatively impact their interests in various flora and fauna. Specifically, California argues that the border wall will threaten Peninsular bighorn sheep, Flat-tailed horned lizards, burrowing owls, twenty-three plant species, and "multiple other species of lizards, birds, and mammals." *See* States' SJ Mot. at 21-23. New Mexico largely repeats speculative allegations that border wall construction will impact its interests in the Mexican wolf and other species. *See id.* at 23-24. These arguments lack merit; neither California nor New Mexico can show that population-level impacts to their respective species of concern are likely, or that the border barrier projects will otherwise interfere with their management of wildlife on State lands. *See* First Enriquez Decl.; Second Enriquez Decl.

In arguing that the border wall will impact their interests in wildlife and plant life, California and New Mexico must show that likely, population- or species-level harms will result absent an injunction. *See New Mexico Dept. of Game & Fish v. U.S. Dept. of Interior*, 854 F.3d 1236, 1254 (10th Cir. 2017) (denying an injunction where New Mexico could not show that "anticipated releases and importations will impact the State's ungulate herds, as opposed to individual members of those herds, or harm the Department's management efforts with respect to those populations."); *Idaho Rivers United v. U.S. Army Corps of Eng'rs*, 156 F. Supp. 3d 1252, 1262-64 (W.D. Wash. 2015) (explaining that, where a plaintiff's "relationship is with the species generally and its interest in the continuity of the species as a whole," the plaintiff must show the challenged "action [is] likely to cause irreparable harm to the species in general or even to that portion of the species generally that

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

20

1    exists in the [relevant area] . . . .”).  *But see* PI Order at 30-31.  California and New Mexico must

2    show a “definitive threat” of future harm—”not mere speculation”—to a “*species*.”  *Nat’l Wildlife*

3    *Fed’n v. Burlington N.R.R.*, 23 F.3d 1508, 1512 n.8 (9th Cir. 1994) (emphasis added).  This does not

4    require the States to show that, in the absence of an injunction, a given species would go extinct.

5    But it does require the States to show a likelihood of a harm to a population or the species that is

6    “permanent or at least of long duration, *i.e.*, irreparable.”  *AMOCO Prod. Co. v. Village of Gambell*, 480

7    U.S. 531, 545 (1987).  The States cannot meet that standard here.

8        California argues that the El Centro Sector project would prevent interchange of Peninsular

9    bighorn sheep across the southern border and that pregnant ewes might be scared off of critical

10   habitat adjacent to the western terminus of the El Centro project.  *See* States’ SJ Mot. at 21-22.

11   Neither alleged harm is likely.  *See* Second Enriquez Decl. ¶¶ 48-49.  El Centro Project 1 ends at the

12   base of the Jacumba Mountains, which contain the 11,000 acres of designated critical habitat that

13   California describes.  *See* States’ SJ Mot. at 22; Second Enriquez Decl. ¶ 49.  There will thus remain

14   large areas west of the El Centro 1 Project Area—adjacent to designated critical habitat—where

15   sheep will be able to cross the southern border.  *See* Second Enriquez Decl. ¶ 49.  Additionally, CBP

16   will likely recommend mitigation measures to DoD that could reduce construction impacts in the

17   area.  *See id.*  And even if some sheep abandon habitat near the El Centro 1 Project during

18   construction, the construction phase is temporary.  *See id.*; *see also AMOCO*, 480 U.S. at 545

19   (irreparable injury must be “permanent or at least of long duration, *i.e.*, irreparable.”).

20       California also alleges that Flat-tailed horned lizards and burrowing owls will be harmed or

21   killed by construction activities.  *See* States’ SJ Mot. at 22-23.  California cannot credibly claim that

22   population- or species-level harms will follow from the speculative deaths of a few individual

23   animals during construction.  So, even if true, these allegations would not entitle California to a

24   permanent injunction.  *New Mexico Dept. of Game & Fish*, 854 F.3d at 1254; *Idaho Rivers United*, 156 F.

25   Supp. at 1262-64.  California’s claims also run contrary to the CBP’s track record of implementing

26   mitigation measures that can prevent construction impacts to the flat-tailed horned lizard and which

27   have proven successful in the past with burrowing owls.  *See* Second Enriquez Decl. ¶¶ 51-53.

28   Additionally, California argues that twenty-three plant species could be impacted by construction

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG
Defendants’ Motion for Partial Summary Judgment and Opp. to Plaintiffs’ Motion for Partial Summary Judgment

21

impacts. *See* States' SJ Mot. at 23. But construction will be limited to a narrow, 60-foot strip of land along the southern border that is already disturbed and currently functions as a law enforcement zone, thus very little new land will be disturbed for the projects at issue here. *See* Second Enriquez Decl. ¶¶ 10, 62-63. Moreover, given the narrow project footprint, the majority of adjacent land will remain undisturbed. *See id.* ¶¶ 10, 54-55. Further, CBP implemented mitigation measures in prior projects to limit vegetation removal and curtail the spread of non-native species, and CBP expects to recommend the same measures for the projects here. *See id.* ¶¶ 62-63. Consequently, none of California's alleged injuries warrants the drastic remedy it seeks.

New Mexico repeats allegations from the preliminary injunction stage regarding the Mexican wolf. *See* States' SJ Mot. at 23-24. New Mexico suggests that genetic interchange is beneficial to the species, but it does not follow that the lack of genetic interchange threatens population- or species-level harms. *New Mexico Dept. of Game & Fish*, 854 F.3d at 1254; *Nat'l Wildlife Fed'n*, 23 F.3d at 1512 n.8 (9th Cir. 1994). New Mexico's allegations remain speculative and do not entitle the State to a permanent injunction. *See* First Enriquez Decl. ¶¶ 47-57. Further, New Mexico cannot obtain permanent injunctive relief based on the speculative claim that "53 other land-based mammals, 38 reptiles, and 10 amphibian species" may be "potentially impacted" by the El Paso project. *See* States' SJ Mot. at 24 (citing Lasky Decl. ¶ 6). New Mexico's other alleged harms to the Aplomado falcon, Gila monster as well as other species are similarly without merit. *See* First Enriquez Decl. ¶¶ 41-61.

Neither California nor New Mexico has met the high burden of showing likely population- or species-level impacts as a result of the El Centro and El Paso projects. Accordingly, the States cannot establish an irreparable injury necessary for permanent injunctive relief.

## B.     The Balance of Equities and Public Interest Strongly Weigh Against Injunctive Relief.

A permanent injunction prohibiting construction of the El Paso and El Centro border barrier projects will cause serious harm to the Government and public interest that significantly outweighs the alleged interests asserted by the States. *See Winter*, 555 U.S. at 23-24.

The Supreme Court has recognized that the Government has "compelling interests in safety and in the integrity of our borders," *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 672

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

22

(1989), but a permanent injunction would prohibit the Government from taking critical steps needed to prevent the continuing surge of illegal drugs from entering the country through the southern border. As the President recently explained in declaring the national emergency, tens of thousands of pounds of illegal drugs are smuggled across the southern border each year and the border is a "major entry point" for "illegal narcotics." *See* Proclamation; Veto Message. Indeed, the record establishes that thousands of pounds of illegal drugs are entering the country between ports of entry in in the El Paso and El Centro Sectors, and explains that existing barriers in these areas have proved ineffective as transnational drug organizations have changed their tactics. *See supra* at 7-8; *see also* McAleenan Testimony at 2 (drug cartels are using large caravans as diversions to redirect border patrol agents). A permanent injunction would harm the Government's "strong interest[ ]" in "interdicting the flow of drugs" entering the United States. *United States v. Guzman-Padilla*, 573 F.3d 865, 889 (9th Cir. 2009).

Moreover, the injunction would permanently deprive DoD of its authorization to use the funds at issue to complete the El Paso and El Centro projects, because the funding will lapse at the end of the fiscal year. In addition to prohibiting any actual spending on these projects, a permanent injunction would forbid DoD from obligating approximately $495 million it has transferred for these projects but has not yet obligated via construction contracts. *See* First Declaration of Eric McFadden ¶ 6 (Ex. 13) (May 29, 2019); Second Declaration of Eric McFadden ¶ 6 (Ex. 14) (June 18, 2019). Unless those funds are obligated by September 30, 2019, this money will no longer remain available to DoD. *See* First McFadden Decl. ¶ 7; Second McFadden Decl. ¶ 7; *see also City of Houston v. Department of Hous. & Urban Dev.*, 24 F.3d 1421, 1424, 1426-27 (D.C. Cir. 1994) (recognizing the "well-settled matter of constitutional law that when an appropriation has lapsed . . . federal courts cannot order the expenditure of funds that were covered by that appropriation"). This harm is particularly acute because the complex and time-consuming process required to obligate the remaining money requires DoD to take multiple steps before the September 30 deadline. *See* First McFadden Decl. ¶¶ 8-10; Second McFadden Decl. ¶¶ 8-10. By contrast, the States identify no irreparable injury from the mere obligation of funds, which simply creates a legal liability for the Government to pay for goods or services that would be provided or performed by the contractors. *See Lublin Corp. v. United States*, 84 Fed. Cl. 678, 685 (2008) (defining "obligation").

1    In addition, a permanent injunction would force DoD to incur unrecoverable fees and

2    penalties of hundreds of thousands of dollars to its contractors for each day that construction is

3    suspended.  *See* First McFadden Decl. ¶¶ 11-19; Second McFadden Decl. ¶¶ 11-19.  That money

4    cannot be spent for productive purposes, and will result in signifcant costs for the Government.  *See*

5    First McFadden Decl. ¶ 14 (estimating costs of $195,000 per day for the El Paso Project 1); Second

6    McFadden Decl. ¶ 15 (estimating costs of $47,000 per day for El Centro Project 1).  These costs will

7    quickly become unsustainable for the Government, and if the contracts remain suspended for too

8    long, DoD will be forced to de-scope or terminate the contracts.  *See* First McFadden Decl. ¶ 19;

9    Second McFadden Decl. ¶ 19.

10    As was the case in *Winter*, the lopsided equitable balance of harms in favor of the Government

11    supports denial of a permanent injunction in this case.  *See* 555 U.S. at 23-31.

12    **VII.   The Court Should Deny Plaintiffs' Request for Overbroad Declaratory and**
13    **Injunctive Relief, Stay Any Injunction Pending Appeal, and Certify its Final**
       **Judgment for Appeal Pursuant to Rule 54(b).**

14    In the event the Court grants the States' request for injunctive and declaratory relief, that relief

15    should be tailored solely to the two specific border projects presently before the Court.  *See*

16    *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018).  The States argue for much broader relief and

17    request that the Court enjoin "any barrier or border-related infrastructure and/or project along the

18    southern borders of California and New Mexico."  *See* Proposed Order.  But there is no basis for the

19    Court to issue such overbroad relief in order to provide complete relief to the States.  *See Azar*, 911

20    F.3d at 582-83.  The focus of this litigation has been on the El Centro and El Paso projects and the

21    Court should not enjoin or declare unlawful other projects in other locations that are not before it.

22    Further, if the Court grants the States' requested injunction, the Court should stay the order

23    pending appeal.  For the reasons explained above, Defendants have, at a minimum, satisfied the

24    requirements for a stay of any injunction pending appeal.  *See Nken v. Holder*, 556 U.S. 418, 434 (2009).

25    In addition, the Court should certify its final judgment pursuant to Rule 54(b):  "the court may

26    direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court

27    expressly determines that there is no just reason for delay."  Here, there is no reason to delay entry of

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG
Defendants' Motion for Partial Summary Judgment and Opp. to Plaintiffs' Motion for Partial Summary Judgment

24

final judgment with respect to the claims related to the funding and construction of the El Paso and El Centro projects undertaken pursuant to § 8005, § 9002, and § 284. The legal and factual issues do not "intersect and overlap" with the outstanding claims in this case, which focus on separate statutory authorities, and final judgment on these claims will not result in piecemeal appeals on the same sets of facts. *Jewel v. Nat'l Sec. Agency*, 810 F.3d 622, 629-30 (9th Cir. 2015).

## **CONCLUSION**

For the foregoing reasons, the Court should grant Defendants' motion for partial summary judgment, deny the States' motion for partial summary judgment, and enter final judgment for Defendants on all claims related to the funding and construction of El Centro Sector Project 1 and El Paso Sector Project 1. A proposed order is attached.

1    DATE:  June 19, 2019                    Respectfully submitted,

2                                            JAMES M. BURNHAM
                                             Deputy Assistant Attorney General
3
                                             JOHN G. GRIFFITHS
4                                            Director, Federal Programs Branch

5                                            ANTHONY J. COPPOLINO
6                                            Deputy Director, Federal Programs Branch

7                                            /s/ Andrew I. Warden
8                                            ANDREW I. WARDEN
                                             Senior Trial Counsel (IN Bar No. 23840-49)
9
                                             /s/ Kathryn C. Davis
10                                           RACHAEL L. WESTMORELAND
                                             KATHRYN C. DAVIS
11                                           MICHAEL J. GERARDI
                                             LESLIE COOPER VIGEN
12                                           Trial Attorneys
13                                           U.S. Department of Justice
                                             Civil Division, Federal Programs Branch
14                                           1100 L Street, NW
15                                           Washington, D.C. 20530
                                             Tel.:    (202) 616-5084
16                                           Fax:     (202) 616-8470

17

18                                           JEFFREY BOSSERT CLARK
                                             Assistant Attorney General
19                                           United States Department of Justice
20                                           Environment & Natural Resources Division

21                                           /s/ Tyler M. Alexander
                                             TYLER M. ALEXANDER
22                                           (CA Bar No. 313188)
                                             Natural Resources Section
23                                           Trial Attorney
                                             PO Box 7611
24                                           Washington, DC 20044-7611
25                                           Tel: (202) 305-0238
                                             Fax: (202) 305-0506
26                                           tyler.alexander@usdoj.gov

27

28