1  XAVIER BECERRA
   Attorney General of California
2  ROBERT W. BYRNE
   SALLY MAGNANI
3  MICHAEL L. NEWMAN
   Senior Assistant Attorneys General
4  MICHAEL P. CAYABAN
   CHRISTINE CHUANG
5  EDWARD H. OCHOA
   Supervising Deputy Attorneys General
6  BRIAN J. BILFORD
   SPARSH S. KHANDESHI
7  LEE I. SHERMAN
   JANELLE M. SMITH
8  JAMES F. ZAHRADKA II
   HEATHER C. LESLIE
9  Deputy Attorney General
   State Bar No. 305095
10   1300 I Street, Suite 125
     P.O. Box 944255
11   Sacramento, CA 94244-2550
     Telephone: (916) 210-7832
12   Fax: (916) 327-2319
     E-mail: Heather.Leslie@doj.ca.gov
13 *Attorneys for Plaintiff State of California*

14            IN THE UNITED STATES DISTRICT COURT

15          FOR THE NORTHERN DISTRICT OF CALIFORNIA

16                    OAKLAND DIVISION

17

18 | **STATE OF CALIFORNIA et al.;** | Case No. 4:19-cv-00872-HSG |

19 | Plaintiffs, | **PLAINTIFF STATES OF CALIFORNIA, COLORADO, HAWAII, MARYLAND, NEW MEXICO, NEW YORK, OREGON, VIRGINIA, AND WISCONSIN'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING SECTION 2808 AND NEPA; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |

20 | v. |

21 |

22 | **DONALD J. TRUMP, in his official capacity as President of the United States of America et al.;** |

23 |

24 | Defendants. |

| | Date:        November 20, 2019 |
| | Time:        10:00 am |
| | Judge:       Honorable Haywood S. Gilliam, Jr. |
| | Trial Date:  None Set |
| | Action Filed: February 18, 2019 |

28

# TABLE OF CONTENTS

**Page**

Notice of Motion and Motion for Partial Summary Judgment ........................................ 1

Memorandum of Points and Authorities ......................................................................... 1

Introduction .................................................................................................................... 1

Background ..................................................................................................................... 3

I.    The President and Congress's Dispute over Border Barrier Funding .................... 3

II.   Procedural History ............................................................................................... 4

III.  Defendants' Border Barrier Projects Under § 2808 ............................................. 6

Legal Argument .............................................................................................................. 7

I.    Legal Standard ..................................................................................................... 7

II.   The States Are Entitled to Summary Judgment in Their Favor ............................ 8

    A.    Defendants Exceeded Their Statutory Authority under § 2808 and Thus, Their Actions are Ultra Vires (Count 3) ......................................... 8

        1.    The President's Emergency Powers Do Not Negate § 2808's Requirements ......................................................................................... 8

        2.    Defendants' Border Barrier Projects Are Not "Military Construction Projects" as Required by § 2808 ............................... 9

        3.    Defendants' Border Barrier Projects Are Not Necessary to Support the Use of the Armed Forces as Required by § 2808 ...... 12

    B.    Defendants Violated the APA (Count 4) ........................................................ 13

    C.    Defendants Violated the Constitution (Counts 1, 2, and 3) ...................... 15

        1.    Defendants' Actions Violate the Separation of Powers Doctrine ............................................................................................. 15

        2.    Defendants Have Violated the Appropriations Clause ................. 16

        3.    Defendants Have Violated the Presentment Clause ..................... 18

    D.    Defendants Violated NEPA (Claim 6) ....................................................... 19

III.  This Court Should Enjoin Defendants' Use of § 2808 to Defund Military Construction Projects in the States and Construct Border Barriers in California and New Mexico ...................................................................................... 21

    A.    Defendants' Actions Irreparably Harm the States .................................... 21

        1.    Construction and Operation of Defendants' Border Barriers Harm California's and New Mexico's Sovereign Interests in Enforcing Their State Laws ........................................................... 22

            a.    Defendants' Actions Prevent California from Enforcing Its Laws ................................................................. 22

                (1)    Water Quality Laws ....................................................... 22

                (2)    Air Quality Laws ............................................................ 23

                (3)    Endangered Species Laws .............................................. 24

i

**TABLE OF CONTENTS**
(continued)

Page

b.    Defendants' Actions Prevent New Mexico from Enforcing its Laws ............................................................. 24

    (1)    Air Quality Laws ..................................................... 24

    (2)    Wildlife Corridors and Endangered Species Laws ........................................................................ 25

c.    Defendants Irreparably Harm California's and New Mexico's Sovereign Interests by Preventing Them from Enforcing State Laws ................................................. 26

2.    Construction and Operation of Defendants' Border Barriers Harm California's and New Mexico's Environment, Wildlife, and Natural Resources ................................................... 26

    a.    Harms from the California Projects .................................. 27

    b.    Harms from the New Mexico Projects ............................. 29

3.    Diversion of Funds from Military Construction Projects in Colorado, Hawaii, Maryland, New Mexico, New York, Oregon, Virginia, and Wisconsin Causes those States Financial Harm ........................................................................ 30

B.    The Balance of Hardships and Public Interest Favor Granting a Permanent Injunction ............................................................................ 32

1.    Defendants' Alleged Harms Are Unsubstantiated and Do Not Outweigh the Harms to the States and the Public Interest ........................................................................................... 33

    a.    Defendants Suffer No Cognizable Harm by This Court's Halting of an Unlawful Practice ........................... 33

    b.    Defendants' Alleged Harms Are Speculative and Unsupported .................................................................... 33

2.    The Public Interest and the States' Harms Justify an Injunction ............................................................................... 34

Conclusion ............................................................................................................. 35

ii

1

# TABLE OF AUTHORITIES

2

**Page**

3

**CASES**

4

*Alabama v. U.S. Army Corps of Engineers*
424 F.3d 1117 (11th Cir. 2005)..................................................................................31

*Alfred L. Snapp & Son, Inc. v. Puerto Rico* ex rel. *Barez*
458 U.S. 592 (1982).....................................................................................................26

*Amoco Prod. Co. v. Vill. of Gambell*
480 U.S. 531 (1987).....................................................................................................35

*Anacostia Watershed Soc. v. Babbit*
871 F.Supp. 475 (D.C. Cir. 1994).........................................................................20, 21

*Brackeen v. Bernhardt*
937 F.3d 406 (5th Cir. 2019).......................................................................................22

*California v. Azar*
911 F.3d 558 (9th Cir. 2018).......................................................................................32

*California v. Health & Human Servs.*
351 F.Supp.3d 1267 (N.D. Cal. 2019) .......................................................................32

*Chemehuevi Indian Tribe v. Newsom*
919 F.3d 1148 (9th Cir 2019)......................................................................................10

*City & Cty. of San Francisco v. Trump*
897 F.3d 1225 (9th Cir. 2018).....................................................................................15

*City of Arlington v. FCC*
569 U.S. 290 (2013).......................................................................................................8

*City of Oakland v. Lynch*
798 F.3d 1159 (9th Cir. 2015).....................................................................................31

*City of Sausalito v. O'Neill*
386 F.3d 1186 (9th Cir. 2004).....................................................................................31

*Clinton v. City of New York*
524 U.S. 417 (1998).............................................................................................18, 19

*Dep't of the Navy v. Fed. Labor Rel. Auth.*
665 F.3d 1339 (D.C. Cir. 2012)..................................................................................17

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

iii

Pls.' Notice of Mot. and Mot. for Partial Summ. J. re Section 2808 and NEPA (4:19-cv-00872-HSG)

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3  *Duncan v. Walker*
    533 U.S. 167 (2001)..................................................................................................12

4

5  *E. Bay Sanctuary Covenant v. Trump*
    932 F.3d 742 (9th Cir. 2018)....................................................................................34

6  *eBay Inc. v. MercExchange, LLC*
    547 U.S. 388 (2006)....................................................................................................7

7

8  *FDA v. Brown & Williamson Tobacco Corp.*
    529 U.S. 120 (2000)..................................................................................................17

9

10  *Golden Gate Rest. Ass'n v. City & Cty. of San Francisco*
    512 F.3d 1112 (9th Cir. 2008)..................................................................................33

11  *Gonzales v. Oregon*
    546 U.S. 243 (2006)..................................................................................................18

12

13  *Greater Yellowstone Coal., Inc. v. Servheen*
    665 F.3d 1015 (9th Cir. 2011)..................................................................................14

14

15  *Hernandez v. Sessions*
    872 F.3d 976 (9th Cir. 2017)....................................................................................33

16  *Kansas v. United States*
    249 F.3d 1213 (10th Cir. 2001)................................................................................22

17

18  *Maine v. Taylor*
    477 U.S. 131 (1986)..................................................................................................26

19

20  *Maryland v. King*
    567 U.S. 1301 (2012)................................................................................................26

21  *Motor Vehicles Mrfs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*
    463 U.S. 29 (1983)..............................................................................................14, 15

22

23  *Nat'l Wildlife Fed'n v. Burlington N. R.R.*
    23 F.3d 1508 (9th Cir. 1994)....................................................................................27

24

25  *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*
    886 F.3d 803 (9th Cir. 2018)....................................................................................27

26  *Nevada v. DOE*
    400 F.3d 9 (D.C. Cir. 2005)......................................................................................17

27

28

iv

**TABLE OF AUTHORITIES**
(continued)

Page

*New Motor Vehicle Bd. of California v. Orrin W. Fox Co.*
  434 U.S. 1345 (1977)...............................................................................26, 34

*New York v. United States*
  505 U.S. 144 (1992)...............................................................................32, 35

*Nken v. Holder*
  556 U.S. 418 (2009)...............................................................................7

*Oakland Tribune, Inc. v. Chronicle Publ'g Co.*
  762 F.2d 1374 (9th Cir. 1985)...............................................................33

*Off. of Pers. Mgmt. v. Richmond*
  496 U.S. 414 (1990)...............................................................................17

*Rodriguez v. Robbins*
  715 F.3d 1127 (9th Cir. 2013)...............................................................33

*Salinger v. Colting*
  607 F.3d 68 (2d Cir. 2010)....................................................................33

*State of Alaska v. U.S. Dept. of Transp.*
  868 F.2d 441 (D.C. Cir. 1989)...............................................................26

*State of Ariz. v. Thomas*
  824 F.2d 745 (9th Cir. 1987)...............................................................13

*Texas v. United States*
  809 F.3d 134 (5th Cir. 2015)...............................................................31

*United States v. MacCollom*
  426 U.S. 317 (1976)...............................................................................18

*United States v. Spawr Optical Research, Inc.*
  685 F.2d 1076 (9th Cir. 1982)...............................................................8

*Village of Arlington Heights v. Metropolitan Housing Develop. Corp.*
  429 U.S. 252 (1977)...............................................................................30

*Wyoming v. Oklahoma*
  502 U.S. 437 (1992)...............................................................................31

*Yates v. United States*
  135 S.Ct. 1074 (2015)...............................................................................11

v

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3   *Youngstown Sheet & Tube Co. v. Sawyer*
        343 U.S. 579 (1952) ..................................................................................................15

4

5   **FEDERAL STATUTES**

6   5 United States Code
        § 706(2)(C) ..............................................................................................................13

7

8   8 United States Code
        § 1103........................................................................................................................20

9       § 1103(a)(5)...............................................................................................................12

10  10 United States Code
        § 284 ................................................................................................................... *passim*

11      § 2801(a) .................................................................................................................8, 9
        § 2801(c)(4).....................................................................................................9, 10, 11

12      § 2808 ................................................................................................................ *passim*
        § 2808(a) ...............................................................................................................8, 12

13      § 8005........................................................................................................................17

14  16 United States Code
        § 1536(a)(2) ..............................................................................................................24

15

16  28 United States Code
        § 2201(a) .....................................................................................................................7

17

18  31 United States Code
        § 1301(a) ...................................................................................................................17

19  33 United States Code
        § 1341(a)(1)..........................................................................................................22, 23

20

21  42 United States Code
        § 4332(2)(C)..............................................................................................................20

22      § 4332(C) ..................................................................................................................19
        § 7418(a) ...................................................................................................................23

23      § 7506(c)(1)...............................................................................................................23
        § 7506(c)(1)(B)(i)-(iii)..............................................................................................23

24

25  50 United States Code
        § 1621..........................................................................................................................9

26      § 1622(a) .....................................................................................................................4
        § 1622(a)(1)...............................................................................................................19

27

    Pub. L. No. 115-245, 132 §§ 8005 and 9002 Stat. 2981 (2018) .........................2, 4, 5, 15

28

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3  Pub. L. No. 116-6, 133 Stat. 13 (2019) .......................................................................3, 15, 16, 18

4  **FEDERAL REGULATIONS**

5  40 Code of Federal Regulations

6  § 51.930(b) ...................................................................................................................24
   § 52.220(c)(345)(i)(E)(2) .............................................................................................23
7  § 93.150(a) ...................................................................................................................23
   § 1500.1(a) ...................................................................................................................19
8  § 1500.1(b) ...................................................................................................................19

9  75 Federal Register 39,366 (July 8, 2010) ....................................................................24

10 84 Federal Register 17,185, 17,187 (Apr. 24, 2019).....................................................20

11 84 Federal Register. 21,800-01 (May 15, 2019) ...........................................................20

12 84 Federal Register 4949 (Feb. 15, 2019).......................................................................4

13 **STATE STATUTES**

14 California Fish and Game Code

15 §§ 2050-2089.26 ..........................................................................................................22
   § 2052............................................................................................................................24
16
17 California Government Code
   § 12600..........................................................................................................................34
18
19 California Water Code
   § 13000..........................................................................................................................23
20 §§ 13000-16104 ...........................................................................................................22
   § 13050(c) .....................................................................................................................22
21 § 13260..........................................................................................................................22

22 2019 New Mexico Laws
   Chapter 97 .....................................................................................................................25
23 Chapter 97 § 2.B ..........................................................................................................25

24 New Mexico Statute Annotated
25 § 17-2-41 ......................................................................................................................25

26 New Mexico Admininistration Code
   § 20.2.23.6....................................................................................................................25
27 §§ 20.2.23.108-113 ......................................................................................................25

28

vii

Pls.' Notice of Mot. and Mot. for Partial Summ. J. re Section 2808 and NEPA (4:19-cv-00872-HSG)

1

**TABLE OF AUTHORITIES**
(continued)

**Page**

2

3  **CONSTITUTIONAL PROVISIONS**

4  United States Constitution
5      article I, § 7, cl. 2.................................................................................................18

6  Constitution New Mexico
       art. XX, § 21.................................................................................................24, 34

7

8  **COURT RULES**

9  Federal Rule of Civil Procedure
       Rule 56 ............................................................................................................1
10      Rule 56(a).........................................................................................................7

11  **OTHER AUTHORITIES**

12  House Joint Resolution 46, 116th Cong. (2019) .................................................4

13  Senate Joint Resolution 54, 116th.......................................................................4

14  Senate Report No. 94-1168 (1976) .....................................................................9

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   **NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**

2        PLEASE TAKE NOTICE that on November 20, 2019 at 10:00 a.m. in the United States

3   District Court for the Northern District of California, 1301 Clay Street, Oakland, CA 94612, the

4   Plaintiff States of California, Colorado, Hawaii, Maryland, New Mexico, New York, Oregon, and

5   Wisconsin, and the Commonwealth of Virginia (the States) will and hereby do move under

6   Federal Rule of Civil Procedure 56 for partial summary judgment. The States respectfully request

7   that this Court enter judgment in their favor as to their claims because the undisputed evidence

8   establishes that diversions of federal funds from military construction projects located within the

9   States and construction of seven border barrier projects in California and New Mexico under 10

10  U.S.C. § 2808 (§ 2808): (1) are *ultra vires*; (2) violate the Administrative Procedure Act (APA);

11  and (3) violate the United States Constitution's separation of powers doctrine and the

12  Appropriations and Presentment Clauses. The States also request that this Court enter judgment

13  on the grounds that the Defendants have violated the National Environmental Policy Act (NEPA)

14  with respect to their construction of border barrier projects under both 10 U.S.C. §§ 284 and

15  2808. The States are entitled to declaratory and injunctive relief prohibiting Defendants from

16  utilizing § 2808 to defund military construction projects located within the States and to construct

17  border barrier projects in California and New Mexico. This motion is based on this Notice of

18  Motion and Motion; the Memorandum of Points and Authorities; the accompanying declarations

19  and Request for Judicial Notice; all briefs and evidence submitted in support of the earlier

20  motions; this Court's prior rulings; other papers, evidence, and records on file; and any other

21  evidence or arguments as may be presented.

22                **MEMORANDUM OF POINTS AND AUTHORITIES**

23                          **INTRODUCTION**

24        Congress clearly denied the President's request for billions of dollars for a border wall.

25  After Congress refused the President's requested appropriation, the President unilaterally

26  redirected $6.7 billion, including the $3.6 billion at issue in this motion, claiming that there was a

27  "national emergency" that required border wall construction. Then, nearly seven months later,

28  Defendants acted upon that emergency declaration by diverting $3.6 billion that was appropriated

                                        1

1   by Congress for "military construction projects"—a number of which the Department of Defense

2   (DoD) described as critically needed for public health and safety–toward border barrier

3   construction. These include over $500 million worth of projects in the States.[1]

4        This Court has already found, with preliminary agreement of a Ninth Circuit panel, that

5   Defendants could not divert funds through sections 8005 and 9002 of the DoD Appropriations

6   Act, 2019, Pub. L. No. 115-245, 132 Stat. 2981 (2018) (FY 2019 DoD Appropriations Act).

7   Defendants' proposed actions under § 2808 are just as unlawful, as they are unsupported by the

8   statutes Defendants invoke. They also violate the APA, the U.S. Constitution, and, with respect to

9   the proposed actions under both §§ 284 and 2808, NEPA. As the undisputed facts establish, the

10  States are entitled to partial summary judgment.

11       The States are entitled to injunctive and declaratory relief. Absent injunctive relief,

12  Defendants' actions will irreparably harm the States in many ways. First, Defendants' actions in

13  constructing and operating border barriers in California and New Mexico, in disregard of state

14  environmental law and regulations and in contravention of Defendants' obligations under federal

15  law will irreparably harm those states' sovereign interests in enforcing such laws. In addition,

16  construction and operation of the border barriers will irreparably harm these states' natural

17  resources and wildlife. Second, Defendants' diversion of funds from military construction

18  projects within the states' will cause Colorado, Hawaii, Maryland, New Mexico, New York,

19  Oregon, Virginia, and Wisconsin to lose thousands of jobs and millions of dollars in tax revenues.

20  The elimination of particular projects will also harm the public interest by, among other things,

21  exposing military personnel and the residents of these states to increased risks to their health and

22  safety. Finally, in part because Defendants have no legitimate interest in engaging in illegal

23  conduct, the balance of equities and public interest favor enjoining Defendants' unlawful conduct.

24       Thus, this Court should: (a) grant the States' motion for partial summary judgment

25  regarding § 2808 and NEPA; (b) enjoin Defendants from defunding military construction projects

26  [1] The States only move with respect to 17 projects, totaling $493 million. The States have
    excluded Virginia's Pentagon Metro Entrance Facility project and Oregon's Klamath Falls Fuel

27  Facility Replacement project from their analysis because information obtained indicated that
    these projects were unlikely to be constructed as intended even before Defendants' actions to

28  divert funds. Declaration of Alison Lynn Reaser (Reaser Decl.) ¶ 9.

2

1   located within the States and constructing border barriers in California and New Mexico under §

2   2808; and (c) enjoin Defendants from all border barrier projects, including projects constructed

3   under § 284, until they have complied with NEPA.

4   **BACKGROUND**

5   **I.    THE PRESIDENT AND CONGRESS'S DISPUTE OVER BORDER BARRIER FUNDING**

6   As this Court observed, "[t]he President has long voiced support for a physical barrier

7   between the United States and Mexico." Order re: Pls.' Mot. for Prelim. Inj. 3, *Sierra Club v.*

8   *Trump* (*Sierra Club*), No. 19-cv-892 (May 24, 2019), ECF 144 (*Sierra Club* PI Order); *see also*

9   Req. for Judicial Notice in Supp. of Pls.' Mot. for Prelim. Inj., Exs. 3-13, *California v. Trump*

10  (*California*), No. 19-cv-872 (Apr. 8, 2019), ECF 59-4 (PI RJN).[2] Congress has considered

11  numerous bills that would have authorized or appropriated billions of dollars toward the

12  President's proposed border wall, all of which failed. *Sierra Club* PI Order 3; PI RJN Exs. 14-20.

13  Starting at the end of 2018, President Trump and Congress engaged in a protracted and public

14  dispute over funding for a border wall which resulted in a record 35-day partial government

15  shutdown. *Sierra Club* PI Order 3-5; PI RJN Exs. 21-26.

16  During the shutdown, on January 6, 2019, the Office of Management and Budget requested

17  $5.7 billion from Congress to fund "approximately 234 miles of new physical barrier." PI RJN

18  Ex. 25. Congress did not grant this funding request. Instead, after weeks of negotiation, on

19  February 14, 2019, Congress passed the Consolidated Appropriations Act, 2019, Pub. L. No. 116-

20  6, 133 Stat. 13 (2019) (CAA). The CAA appropriates only $1.375 billion to the Department of

21  Homeland Security (DHS) to construct primary pedestrian border fencing in the Rio Grande

22  Valley Sector on Texas's southern border subject to enumerated conditions and limitations. *Id.* §§

23  230-232. The CAA limits where the barrier may be built (only in certain portions of Texas), how

24  the barrier may be designed, and whom DHS must consult with prior to construction. *Id.* §§ 230-

25  32. This is the only funding in the CAA that Congress designated for barrier construction. *Id.*

26  _____

27  [2] To avoid duplication, the States refer to prior requests for judicial notice. This Court took judicial notice of all exhibits the States and Sierra Club plaintiffs submitted in support of their preliminary injunction motions. Order Den. Pls.' Mot. For Prelim. Inj. 7, n.6, *California*, No. 19-

28  cv-872 (N.D. Cal. May 24, 2019), ECF 165 (*States* PI Order); *Sierra Club* PI Order 4 n.3.

3

1    On February 15, 2019, the same day that President Trump signed the CAA into law, he

2  declared a national emergency pursuant to the National Emergencies Act (NEA) that he

3  contended necessitates the construction of a wall across the United States-Mexico border. 84 Fed.

4  Reg. 4949 (Feb. 15, 2019) (the Emergency Declaration). In addition to issuing the Emergency

5  Declaration, the President announced the redirection of $6.7 billion of federal funds to construct a

6  border wall from three other sources, over and above the $1.375 billion that Congress had

7  appropriated for limited border fencing. *Sierra Club* PI Order 6-8; PI RJN Ex. 28. One of those

8  sources was the $3.6 billion in reallocated DoD military construction projects that were diverted

9  under the Emergency Declaration and § 2808 at issue in this motion. PI RJN Ex. 28.

10    Under the NEA, a national emergency is terminated if either: (a) a joint resolution

11  terminating the emergency is "enacted into law;" or (b) the President issues a proclamation

12  terminating the emergency. 50 U.S.C. § 1622(a). In March 2019, both houses of Congress had

13  passed a joint resolution to terminate the national emergency. H.R.J. Res. 46, 116th Cong. (2019).

14  President Trump vetoed that resolution, and the House did not reach the necessary two-thirds

15  majority to override the veto. *Sierra Club* PI Order 8. Six months later, in September 2019, both

16  houses of Congress passed a nearly identical resolution to terminate the national emergency. S.J.

17  Res. 54, 116th Cong. (2019). The President has not yet acted on this resolution.

18  **II.   PROCEDURAL HISTORY**

19    The States and the Sierra Club plaintiffs filed suit challenging these diversions of federal

20  funds. *Sierra Club* PI Order 1. This Court first preliminarily enjoined Defendants' use of

21  transferred funds via § 8005 of the FY 2019 DoD Appropriations Act, towards construction of

22  border barriers. *Id.* 55. This Court found that the States and the Sierra Club plaintiffs had

23  demonstrated: (a) Defendants acted *ultra vires*, *States* PI Order 14-18; *Sierra Club* PI Order 32-

24  36; and (b) their interpretation of the provisions in question "raise[d] serious constitutional

25  questions" and "would likely violate the Constitution's separation of powers principles." *States* PI

26  Order 20-21; *Sierra Club* PI Order 36-37. This Court affirmed that ruling in granting California's

27  and New Mexico's and the Sierra Club plaintiffs' motions for partial summary judgment and

28

4

1  granting the Sierra Club plaintiffs' motion for a permanent injunction.[3] Order re: Pls.' Partial

2  Mot. For Summ. J., *California* (June 28, 2019) (*States* MSJ Order), ECF 185; Order re: Pl's

3  Partial Mot. For Summ. J., *Sierra Club* (June 28, 2019), ECF 185.[4]

4      Defendants filed an emergency application for a stay of the injunction with the Ninth

5  Circuit and, ultimately, the Supreme Court. The Ninth Circuit motions panel majority denied the

6  stay application and found that this Court was correct in its determination that Defendants'

7  transfers were unlawful. Order, *Sierra Club v. Trump*, No. 19-16102 and 19-16300 (9th Cir. July

8  3, 2019), ECF 76. The Supreme Court, by a 5-4 vote, without commenting on the lawfulness of

9  Defendants' transfers or the States' ability to bring suit, granted a stay of the injunction in a one-

10  paragraph order, stating only that "the Government has made a sufficient showing at this stage

11  that the [Sierra Club] plaintiffs have no cause of action to obtain review of the Acting Secretary's

12  compliance with Section 8005." Order, on Appl. For Stay, *Trump v. Sierra Club*, No. 19A60

13  (U.S. July 26, 2019). The Ninth Circuit is now considering the merits of Defendants' appeal from

14  this Court's grant of partial summary judgment to the States and the Sierra Club plaintiffs.

15      In their earlier preliminary injunction motion, the States did not move on § 2808, but the

16  Sierra Club plaintiffs did. In ruling on the Sierra Club plaintiffs' motion, this Court expressed

17  deep skepticism of the legality of Defendants' reliance on § 2808. *Sierra Club* PI Order 42-46.

18  However, the Court withheld judgment concerning § 2808 because Defendants had not yet

19  decided to take final action under § 2808. *Id.* at 46. Neither the subsequent motion for summary

20  judgment, nor the appeals of this Court's rulings, addressed § 2808.

21

22

23  [3] This Court denied California and New Mexico injunctive relief in part because any injunction in favor of the States would be duplicative of the relief contemporaneously granted to the Sierra Club plaintiffs, and therefore the States would not suffer irreparable harm. *States* MSJ Order 8.

24  California and New Mexico have filed a cross-appeal from this ruling. ECF No. 191.

25  [4] California's and New Mexico's motion for summary judgment relating to construction under § 284 and funding diversions under §§ 8005 and 9002 of FY 2019 DoD Appropriations Act did not

26  include arguments in support of their NEPA claims. The Court rejected plaintiffs' arguments concerning the applicability of the IIRIRA waiver to DoD construction projects. *Sierra Club* PI

27  Order 47-48. The States are reasserting those arguments here to preserve their rights on appeal. The NEPA claims stemming from the construction under § 284 are based on documents

28  previously filed with the court including PI RJN Exs. 34-35; Second Decl. of Kenneth P. Rapuano, ECF No. 143-1.

5

## III.   DEFENDANTS' BORDER BARRIER PROJECTS UNDER § 2808

Pursuant to President Trump's national emergency declaration, Defendants are now diverting over $3.6 billion from 128 military construction projects to build 11 border barrier projects. This motion addresses the harm caused by: (a) the diversion of funds from 17 of 19 military construction projects in the Plaintiff States, and (b) the use of those and other diverted funds toward construction of seven border barrier projects within California and New Mexico.

On September 3, 2019, the DoD Secretary announced that he was authorizing the Army to spend $1.8 billion originally intended for military construction projects outside of the United States toward these border barrier projects. Notice of Decision by the DoD to Authorize Border Barrier Projects Pursuant to 10 U.S.C. § 2808 (Sept. 3, 2019), ECF 206 (Sept. 3 Notice). Once that money is spent, another $1.8 billion originally intended for military construction projects within the United States will be made available for these projects. *Id.*

Of the 64 defunded domestic military construction projects, 19 are located in the Plaintiff States. Ex. 1 to the Suppl. to Notice of Decision by DoD to Authorize Border Barrier Projects Pursuant to 10 U.S.C. § 2808 (Sept. 5, 2019), ECF 207-1 (Defunded MILCON List). As shown in the chart below, those 19 defunded projects total over $500,000,000. *Id.*[5]

**Defunded Military Construction Projects in States' Jurisdiction**

| State | Location Title | Line Item Title | Amount |
|---|---|---|---|
| California | Channel Islands ANGS | Construct C-130J Flight Simulator Facility | $8,000,000 |
| Colorado | Peterson AFB | Space Control Facility | $8,000,000 |
| Hawaii | Joint Base Pearl Harbor-Hickam | Consolidated Training Facility | $5,500,000 |
| | Kaneohe Bay | Security Improvements Mokapu Gate | $26,492,000 |
| Maryland | Fort Meade | Cantonment Area Roads | $16,500,000 |
| | Joint Base Andrews | PAR Relocate Haz Cargo Pad and EOD Range | $37,000,000 |
| | | Child Development Center | $13,000,000 |
| New Mexico | Holloman AFB | MQ-9 FTU Ops Facility | $85,000,000 |
| | White Sands | Information Systems Facility | $40,000,000 |
| New York | U.S. Military Academy | Engineering Center | $95,000,000 |
| | | Parking Structure | $65,000,000 |
| Oregon | Klamath Falls IAP | Construct Indoor Range | $8,000,000 |
| | | Replace Fuel Facilities | $2,500,000 |
| Virginia | Joint Base Langley-Eustis | Construct Cyber Ops Facility | $10,000,000 |

---

[5] As further discussed below, the States only assert harms regarding 17 of these projects.

6

| | Norfolk | Replace Hazardous Materials Warehouse | $18,500,000 |
|---|---|---|---|
| | Pentagon | Pentagon Metro Entrance Facility | $12,111,000 |
| | Portsmouth | Replace Hazardous Materials Warehouse | $22,500,000 |
| | | Ships Maintenance Facility | $26,120,000 |
| Wisconsin | Truax Field | Construct Small Arms Range | $8,000,000 |

The money from the defunded military construction projects will be used to build 11 new border barriers. Ex. 1 to Sept. 3 Notice, ECF 206-1 (List of Proposed Border Barrier Projects). Defendants will use these funds to build five of these border barrier projects in California: San Diego Project 4, San Diego Project 11, El Centro Project 5, El Centro Project 9, and Yuma Project 6[6] (California Projects); totaling approximately 2.5 miles of new primary pedestrian fencing and 20 miles of new secondary pedestrian fencing. *Id.* Defendants will build two border barrier projects in New Mexico: El Paso Project 2 and El Paso Project 8 (New Mexico Projects); totaling 29.51 miles of new primary pedestrian fencing and 6 miles of new secondary pedestrian fencing. *Id.* The first construction project within the States will be San Diego Project 4 where ground-disturbing activities may begin as early as November 22, 2019. Ex. 3 to Sept. 3 Notice ¶ 11. The Secretary authorized Defendants to proceed with construction without complying with environmental laws. § 2808 Admin. Record Part 2 (2808 AR) at 9 (Sept. 16, 2019), ECF 212-2.

## LEGAL ARGUMENT

### I.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Declaratory relief is appropriate "[i]n a case of actual controversy" in order to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). A plaintiff is entitled to a permanent injunction if it has "suffered an irreparable injury," "remedies available at law . . . are inadequate," "the balance of hardships between the plaintiff and defendant" supports an equitable remedy, and "the public interest would not be disserved." *eBay Inc. v. MercExchange, LLC*, 547

---

[6] Yuma Project 6 is located partially in California and partially in Arizona.

7

1   U.S. 388, 391 (2006). When the federal government is the opposing party, these last two factors

2   for injunctive relief merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

3   **II.   THE STATES ARE ENTITLED TO SUMMARY JUDGMENT IN THEIR FAVOR**

4       **A.   Defendants Exceeded Their Statutory Authority under § 2808 and Thus,
            Their Actions are *Ultra Vires* (Count 3)**

5

6       As this Court preliminarily indicated in *Sierra Club v. Trump*, Defendants lack statutory

7   authority under § 2808 to construct border barriers across vast swaths of the U.S.-Mexico border.

8   *See Sierra Club* PI Order 42-46. Under § 2808, when the President declares a national emergency

9   "that requires the use of the armed forces, the Secretary of Defense, without regard to any other

10  provision of law, may undertake military construction projects . . . not otherwise authorized by

11  law that are necessary to support such use of the armed forces." 10 U.S.C. § 2808(a). Defendants

12  fail to satisfy at least two conditions of § 2808. First, while such "military construction" must be

13  "carried out with respect to a military installation," 10 U.S.C. § 2801(a), the locations where

14  Defendants plan to build border barriers with these funds are not military installations and

15  therefore are not "with respect to" a military installation. Second, while construction must be

16  "necessary to support [the] use of the armed forces" required by the national emergency, 10

17  U.S.C. § 2808(a), construction to assist Customs and Border Protection, a civilian law

18  enforcement agency, is plainly not. Consequently, Defendants' actions—including the diversion

19  of funds and imminent construction of border barriers under § 2808—are in excess of

20  Defendants' statutory authority and thus, *ultra vires*. *See City of Arlington v. FCC*, 569 U.S. 290,

21  297 (2013) ("[F]or agencies charged with administering congressional statutes[,] [b]oth their

22  power to act and how they are to act is authoritatively prescribed by Congress, so that when they

23  act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires").

24  The States are entitled to a final judgment to that effect.

25          **1.   The President's Emergency Powers Do Not Negate § 2808's
                Requirements**

26

27      The States do not challenge the President's declaration of a national emergency here.

28  Instead, the States challenge the Defendants' improper actions taken pursuant to that declaration.

8

1   Such a claim is justiciable. *United States v. Spawr Optical Research, Inc.,* 685 F.2d 1076, 1081

2   (9th Cir. 1982) (Courts are "free to review whether the actions taken pursuant to a national

3   emergency comport with the power delegated by Congress.")

4         The NEA allows the President, when a national emergency has been declared, to utilize

5   emergency powers only as authorized by Congress in other federal statutes. *See* 50 U.S.C. § 1621.

6   It was enacted by Congress in 1976 to rein in, rather than expand, the presidential powers. The

7   NEA was designed to ensure that the president's "extraordinary" emergency powers would "be

8   utilized only when emergencies actually exist." S. Rep. No. 94-1168, at 2 (1976). Senator Frank

9   Church, who led the development of the NEA, testified before the Senate Committee of

10   Government Operations "that the President should not be allowed to invoke emergency

11   authorities . . . for frivolous or partisan matters, nor for that matter in cases where important but

12   not 'essential' problems are at stake." *Hearing on H.R. 3884 Before the S. Comm. of

13   Governmental Operations*, 94th Cong. 7 (1976). Senator Church continued that "[t]he Committee

14   intentionally chose language which would make clear that the authority of the Act was to be

15   reserved for matters that are 'essential' to the protection of the Constitution and the people." *Id.*

16   When such a national emergency has been declared, the NEA allows the president to utilize

17   emergency powers, but only as authorized by Congress in other federal statutes. Thus, Defendants

18   must comply with the requirements of § 2808.

19         **2.    Defendants' Border Barrier Projects Are Not "Military Construction**

20                **Projects" as Required by § 2808**

21         Defendants' proposed border barrier projects in California and New Mexico are not

22   "military construction projects." The chapter in which § 2808 appears defines "military

23   construction" as "any construction, development, conversion, or extension of any kind carried out

24   *with respect to a military installation*." 10 U.S.C. § 2801(a) (emphasis added). This Court

25   recognized the "critical language" in this definition "is the condition 'with respect to a military

26   installation.'" *Sierra Club* PI Order 43. A "military installation" is defined as a "base, camp, post,

27   station, yard, center, or other activity under the jurisdiction of the Secretary of a military

28   department." 10 U.S.C. § 2801(c)(4). The proposed barrier projects do not satisfy this definition.

9

1    The stretches of the U.S.-Mexico border where Defendants will build their border barrier

2    projects contain no military base, camp, post, station, yard, or center. To the contrary, much of the

3    land where the intended construction will take place was not even originally under the jurisdiction

4    of a military department. Sept. 3 Notice 2-4. In fact, none of the seven planned border barrier

5    projects in California and New Mexico were entirely within federal land under the administrative

6    jurisdiction of DoD when announced. *Id.*, Ex. 3 at 2-3. El Centro Project 5 will be built on a

7    combination of "Federal non-public domain land and non-Federal land." *Id.* at 3. The other six

8    projects will be built, "at least in part, on Federal public domain land currently under the

9    administrative jurisdiction of the Department of the Interior" (DOI). *Id.* DOI subsequently

10   transferred the federal lands under its jurisdiction into the Army's jurisdiction for three years to

11   effectuate this construction. Req. for Judicial Notice in Supp. of Mot. for Partial Summ. J. re: §

12   2808 (2808 RJN), Ex. 1.

13   In response to the Sierra Club's preliminary injunction motion regarding § 2808, as this

14   Court noted, Defendants did not attempt to characterize the U.S. Mexico border or a border

15   barrier as a "base, camp, post, station, yard [or] center;" in any event, this Court correctly held

16   they could not do so. *Sierra Club* PI Order 43-44. Instead, Defendants argued that their plan to

17   build border barriers fell within the statutory term "or other activity." *Id.* This Court properly

18   rejected that argument, *id.* at 44-46, and it has no more validity now than it did then.

19   The plain language of a statute controls where "the statutory language [is] unambiguous."

20   *Chemehuevi Indian Tribe v. Newsom*, 919 F.3d 1148, 1151 (9th Cir 2019). "When deciding

21   whether the language is plain, courts must read the words in their context and with a view to their

22   place in the overall statutory scheme." *Id.* (internal citation and quotation marks omitted). As this

23   Court already stated, classifying the southern border or border barriers as an "other activity,"

24   "fail[s] to appreciate that the words immediately preceding 'or other activity' in Section

25   2801(c)(4)—'a base, camp, post, station, yard, [and] center'—provide contextual limits on the

26   catch-all term." *Sierra Club* PI Order 44 (alteration in original).

27   This conclusion is supported by traditional tools of statutory interpretation. This Court

28   properly applied the statutory interpretation principles of *noscitur a sociis* and *ejusdem generis* to

10

"construe 'other activity' as referring to similar discrete and traditional military locations" and thus did "not readily see how the U.S.-Mexico border could fit this bill." *Id.* at 44-45. The principle *noscitur a sociis* requires that a "word is known by the company it keeps." *Id.* at 44 (quoting *Gustafson v. Alloyd Co., Inc.,* 513 U.S. 561, 575 (1995)) (internal quotation marks omitted). The principle *ejusdem generis* requires that "where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Id.* at 45 (quoting *Wash. State Dept. of Social & Health Servs. v. Guardianship Estate of Keffeler*, 536 U.S. 371, 384 (2003)). The Supreme Court has applied these canons of statutory interpretation to limit "catchalls for known unknowns" like "other activity." *Yates v. United States*, 135 S.Ct. 1074, 1087 (2015). In *Yates*, the Supreme Court limited the term "tangible object" by the words that preceded it in a list, "record" and "document," reasoning that Congress would not have specifically referred to "record" and "document" if it intended "tangible object" to be generic. *Id.* Here, had Congress intended any military construction at any location to constitute "other activity" it would have had no reason to refer specifically to "a base, camp, post, station, yard, [and] center." 10 U.S.C. § 2801(c)(4); *see also Sierra Club* PI Order at 45. The phrase "other activity" necessarily refers to something with the characteristics of other places listed, such as a base or camp.

Ignoring the traditional tools of statutory interpretation, Defendants argue that these border barrier projects constitute "military construction" because: (1) non-DoD federal land was transferred to the jurisdiction of a Secretary of a Military Department, (2) the Secretary of a Military Department will acquire non-Federal land through purchase and condemnation, and (3) the Secretary of a Military Department will accept "custody and accountability over the land" and will report "the land in the Military Department's inventory, either as its own installation or as part of an existing, nearby military installation." 2808 AR at 3. In other words, according to Defendants, once a military department takes possession of the land necessary for construction of a project, the Secretary of a Military Department can simply declare that construction on such land constitutes a "military installation." But, if this were correct, it is difficult to conceive of any

11

1    construction by the military that would not constitute construction with respect to a "military

2    installation," effectively nullifying the "military installation" condition in the statute.

3           This interpretation violates another fundamental principle of statutory interpretation. Courts

4    have a "duty to give effect, if possible to every clause and word of a statute." *Duncan v. Walker*,

5    533 U.S. 167, 174 (2001) (internal citation and quotation marks omitted). Defendants' theory

6    violates this principle because it would render the term "military installation" "insignificant, if not

7    wholly superfluous." *Id.* This Court properly recognized that the term "other activity" cannot

8    include "everything under the jurisdiction of the secretary of a military department" for then

9    "there would have been no reason to include a list of specific, discrete military locations." *Sierra*

10   *Club* PI Order 45. There is no reason for this Court to depart from this determination.

11              **3.    Defendants' Border Barrier Projects Are Not Necessary to Support**
                        **the Use of the Armed Forces as Required by § 2808**
12

13          Another limitation on the military construction authority granted to DoD "in the event

14   of . . . the declaration by the President of a national emergency . . . that requires the use of armed

15   forces" is that DoD may only undertake construction projects "that are necessary to support such

16   use of the armed forces." 10 U.S.C. § 2808(a). Defendants state that their goals in building these

17   border barrier projects are to "deter illegal entry," "channel migrants to ports of entry," and

18   "increase the vanishing time of those illegally crossing the border." List of Proposed Border

19   Barrier Projects 1. However, Congress has made clear that such goals are to be effectuated by

20   civilian law enforcement through DHS, not the armed forces. *See* 8 U.S.C. § 1103(a)(5) (the

21   Secretary of Homeland Security "shall have the power and duty to control and guard the

22   boundaries and borders of the United States against the illegal entry of aliens.").

23          The President's emergency declaration does not help Defendants. Even if the Court accepts

24   that the President has declared an emergency that requires the use of the armed forces, nothing

25   suggests that these construction projects are necessary to support that use of the armed forces.

26   Defendants' own explanation of the armed forces' role in *building* border barriers on its face

27   shows that the barriers are not a military construction project necessary to support the use of the

28   armed forces. Defendants argue that construction of the border barriers will help DoD provide

                                              12

1   "support functions" *to DHS*—effectively admitting that the involvement of the armed forces is

2   only occurring to assist a civilian agency, not to support the use of the armed forces. 2808 AR 1.

3   Defendants' further admission that the border barriers will reduce DHS's reliance on DoD, *id.* at

4   2, underscores the point. Construction with the express purpose of reducing a civilian law

5   enforcement agency's reliance on a military department is not necessary to support the "use of the

6   armed forces." As it is aimed at supporting a *civilian* agency in carrying out its statutory function,

7   such construction could not be much further from this description. Defendants' border barrier

8   projects are thus not necessary to support the use of the armed forces as required by § 2808.

9   **B.    Defendants Violated the APA (Count 4)**

10      By failing to comply with the statutory limitations of § 2808 as described above,

11   Defendants also violated the APA, which prohibits actions "in excess of statutory jurisdiction,

12   authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). Defendants' actions

13   violate the APA's prohibition on arbitrary and capricious agency action as well. This aspect of the

14   APA—where "[t]he court's role is to ensure that the agency considered all of the relevant factors

15   and that its decision contained no 'clear error of judgment,'" *State of Ariz. v. Thomas*, 824 F.2d

16   745, 748 (9th Cir. 1987) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416

17   (1971))—is separate from the question of whether the agency acted outside the scope of its

18   authority (*i.e.*, whether that action is *ultra vires*).

19      Defendants did not consider all the relevant factors as the APA requires. Critically, the

20   Section 2808 administrative record fails to address any of the harms to public health and safety

21   arising from the defunding of over 120 military construction projects. Defunded MILCON List,

22   1-3. For example, Defendants have cancelled two projects totaling $41 million to construct new

23   hazardous materials warehouses at Naval Stations in Norfolk and Portsmouth, Virginia, to replace

24   existing World War II-era facilities that were not designed to contain hazardous materials. 2808

25   RJN Exs. 15, 17. Further, in explaining the need for a new ship's maintenance facility, including

26   a nuclear containment shop, the Navy itself described the existing facility as presenting "severe

27   life safety and environmental concerns" and a "high risk environment." 2808 RJN Ex. 18.

28   Cancellation of the projects will place servicemembers and the nearby public at "high risk" of

13

"severe" harm from these improperly contained hazardous materials. Similarly, Defendants have cancelled a $26.5 million project in Hawaii to improve security at one of only two access points to the Marine Corps Base in Kaneohe Bay, which the Marine Corps asserted was necessary to bring it into compliance with current anti-terrorism and force protection standards. 2808 RJN Ex. 5. Cancellation of these project will therefore place servicemembers at risk, as well as impede military readiness. Defendants themselves identified these harms and as well as other significant public health, safety, and environmental harms that would result from these particular projects not moving forward. 2808 RJN Exs. 2-19.

Defendants have also canceled the construction of an $8 million facility that would have housed a C-130J flight simulator, depriving the California Air National Guard of the ability to provide enhanced aerial firefighting training to flight crews that regularly combat massive wildfires in California. Declaration of Colonel William Green (Green Decl.), ¶¶ 6-9, 15-16, 18-25. In a state that faces increasing threats due to wildfires, the elimination of this enhanced training exposes Californians and their communities to significant health and safety risks. *Id.* ¶¶ 8, 25.

The Section 2808 administrative record contains no evidence that Defendants considered these serious public health and safety concerns. Instead, Defendants simply assert that these projects were defunded because the award dates are in fiscal year 2020 or later and the cancellation of these projects "would have a minimal effect on Component readiness." 2808 AR at 5. However, as explained above, the record shows that the cancellation of these projects may cause severe harm to both the military and the general public. Thus, Defendants "entirely failed to consider an important aspect of the problem" in violation of the APA. *Motor Vehicles Mrfs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1030 (9th Cir. 2011) (overturning agency decision where "considerable data . . . point[ed] in the opposite direction" of the agency's decision).

Finally, Defendants "relied on factors which Congress has not intended it to consider" by diverting $3.6 billion additional federal funds toward a border barrier despite Congress's clear rejection of any appropriation for a border barrier beyond $1.375 billion for FY 2019. *Supra*

14

1   Background I; *see State Farm*, 463 U.S. at 43 (agency action that "relied on factors which

2   Congress has not intended it to consider" is arbitrary and capricious).

3   **C.   Defendants Violated the Constitution (Counts 1, 2, and 3)**

4   This Court previously recognized that interpreting § 8005 of the FY 2019 DoD

5   Appropriations Act and 10 U.S.C. § 284 to "permit [the] massive [$2.5 billion] redirection of

6   funds" toward a border wall project that Congress explicitly refused to fund "raise[d] serious

7   constitutional questions," *Sierra Club* PI Order 36-42, and that interpretation "would likely

8   violate the Constitution's separation of powers principles." *Sierra Club* PI Order 38. Defendants'

9   use of § 2808 to redirect $3.6 billion of funds toward 11 border barrier projects Congress refused

10  to fund raises equally serious concerns under the separation of powers doctrine as well as the

11  Appropriations and Presentment Clauses. Accordingly, this Court should find Defendants' actions

12  are unconstitutional on each of the grounds discussed below.

13  **1.   Defendants' Actions Violate the Separation of Powers Doctrine**

14  Defendants' unilateral diversion of billions of dollars toward the construction of a border

15  wall, in the face of Congress's refusal to appropriate funds to that project, is antithetical to the

16  design of our constitutional system, which "exclusively grants the power of the purse to

17  Congress, not the President." *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th

18  Cir. 2018). The undisputed facts here—(i) Congress's repeated rejection of border barrier funding

19  from 2017-18; (ii) Congress's pointed refusal to appropriate $5.7 billion in requested border

20  barrier funding resulting in a government shutdown exclusively over the border barrier dispute;

21  and (iii) Congress's limited $1.375 billion appropriation for pedestrian fencing in a specified area,

22  CAA § 230-32—demonstrate that Defendants' transfer of funding for construction in other

23  geographic areas is "incompatible with the expressed or implied will of Congress." *Youngstown*

24  *Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

25  If Defendants' interpretation of the provisions on which they rely were correct, then

26  "DoD's authority under the statute would render meaningless Congress's constitutionally-

27  mandated power to assess proposed spending, then render its binding judgment as to the scope of

28  permissible spending." *Sierra Club* PI Order at 38. Defendants' diversion of funds toward the

15

Pls.' Notice of Mot. and Mot. for Partial Summ. J. re Section 2808 and NEPA (4:19-cv-00872-HSG)

proposed border barrier projects despite Congress having "repeatedly rejected legislation that would have funded substantially broader border barrier construction" only underscores the separation of powers violation. *Id.* at 38-39 (citing *San Francisco*, 897 F.3d at 1234).

While Congress's intent to refuse to appropriate any more funding for border barriers is clear without more, Congress *also* included a rider in the CAA limiting the augmentation of the $1.375 billion appropriation made by Congress in that act. That provision states:

> None of the funds available in this or any other appropriations Act may be used to increase, eliminate or reduce funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act, or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act.

CAA, § 739. The Trump Administration requested $1.6 billion in border barrier funding in its FY 2019 budget, and later modified that request to seek $5.7 billion. *Sierra Club* PI Order 4. Since Congress did not approve any funding for a border barrier in FY 2019 beyond the $1.375 billion in the CAA, no funds made available in "any other appropriations Act" may be used to "increase" that appropriation unless subsequently enacted in an appropriation act or done validly through a reprogramming or transfer provision in an appropriations act. Accordingly, Defendants cannot use § 2808, which is not a reprogramming or transfer provision, to increase the FY 2019 border barrier appropriation made by Congress in the CAA. Mem. Op. at 29-32, *El Paso Cty. v. Trump*, No. 19-cv-66 (W.D. Tex. Oct. 11, 2019), ECF No. 129 (Texas Border Wall Decision) (finding the diversion of fund under § 2808 violates § 739 of the CAA).

### 2. Defendants Have Violated the Appropriations Clause

This Court also previously found that Defendants' interpretation of their authority to divert $2.5 billion under these circumstances "would likely pose serious problems under the Appropriations Clause, by ceding essentially boundless appropriations judgment to the executive agencies." *Sierra Club* PI Order 40. The redirection of an even greater amount of funds to the border wall under § 2808 raises the same Appropriations Clause problem.

The Appropriations Clause secures Congress's control over federal spending with its

16

Pls.' Notice of Mot. and Mot. for Partial Summ. J. re Section 2808 and NEPA (4:19-cv-00872-HSG)

"straightforward and explicit command" that "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (citation omitted). To satisfy the Appropriations Clause, there must be both (1) a "command," *i.e.*, an authorization to spend funds, and (2) an actual "appropriation of . . . money that [the agency] may use for that [particular] purpose." *Nevada v. DOE*, 400 F.3d 9, 13 (D.C. Cir. 2005). For the reasons discussed above, § 2808's authorization to "undertake military construction projects" neither authorizes construction of border barriers nor appropriates funding for that purpose. *See* 31 U.S.C. § 1301(a) ("Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law.").

The $3.6 billion diversion of military construction funds toward the border wall project further violates the Appropriations Clause's prohibition against "evad[ing]" spending limitations set by Congress. *Richmond*, 496 U.S. at 428. As a bedrock principle of appropriations law and the separation of powers, a federal agency cannot use a *general* appropriation for an expenditure where Congress has spoken more *specifically* on the same expenditure. *See Nevada*, 400 F.3d at 16; *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("[T]he meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and *more specifically* to the topic at hand.") (emphasis added).[7] This principle plays a crucial role in maintaining the balance of power between the legislative and executive branches, because without it "the executive would possess an unbounded power over the public purse of the nation; and might apply all its monied resources at his pleasure." *Dep't of the Navy v. Fed. Labor*

---

[7]Although the Government Accountability Office (GAO) has recognized this to be a "well settled" principle supported by a "legion" of cases, *Principles of Federal Appropriations Law* 3-409 (4th Ed. 2017), the GAO recently concluded that DOD's use of 10 U.S.C. § 284 and § 8005 of the FY 2019 DoD Appropriations Act for border barrier construction, where the CAA provided for a more specific appropriation, did not violate this principle. B-330862 (Sept. 5, 2019). That conclusion contradicts prior GAO opinions and was not based on full consideration of the issues relevant here. The GAO reviewed Defendants' "legal views" and pleadings from this case, but there is no indication that it considered or even reviewed the Plaintiff States' pleadings and arguments. B-330862 (Sept. 5, 2019). The GAO did not consider whether the use of a general appropriation through §§ 284 and 8005 "evade[s]" Congress's specific appropriation in violation of the Appropriations Clause. *See id.*; *see also Richmond*, 496 U.S. at 428. Finally, the GAO opinion does not make any findings about § 2808 and there is no indication that Congress "vested DOD with authority to construct fences" under § 2808, as the GAO believed to be the case with respect to 10 U.S.C. § 284.

1    *Rel. Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (Kavanaugh, J.) (citation omitted).

2        The principle's application here is straightforward. Congress specifically appropriated

3    $1.375 billion to fund a barrier for a specific and limited segment of the southwest border in

4    Texas under enumerated conditions. CAA, § 230-32. Even if § 2808 authorized and appropriated

5    funds for border barrier construction (which it did not), that provision, at most, provides a more

6    general appropriation. Defendants cannot evade Congress's prescribed limitations on the specific

7    amount, location, and manner in which a border barrier may be built, CAA, §§ 230-32, by

8    redirecting different funds appropriated for more general purposes for construction in a location

9    that Congress declined to fund. *See Gonzales v. Oregon*, 546 U.S. 243, 262 (2006). A federal

10   district court in Texas has, in fact, preliminarily enjoined use of funds diverted through § 2808 for

11   this reason. Texas Border Wall Decision at 25-29. Simply put, "[w]here Congress has addressed

12   the subject as it has here, and authorized expenditures where a condition is met, the clear

13   implication is that where the condition is not met, the expenditure is not authorized." *United*

14   *States v. MacCollom*, 426 U.S. 317, 321 (1976).

### 3.   Defendants Have Violated the Presentment Clause

16       This Court has already found that it "would subvert 'the difficult judgments reached by

17   Congress' to allow Defendants to circumvent Congress's clear decision to deny the border barrier

18   funding sought here when it appropriated a dramatically lower amount in the CAA." *Sierra Club*

19   PI Order 34 (quoting *United States v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016)); *see also*

20   *id.* at 39 (raising doubt that DoD "has authority to redirect sums. . . in the face of Congress's

21   appropriations judgment in the CAA"). Under that same reasoning, Defendants' actions under the

22   NEA and § 2808 violate the Presentment Clause. U.S. Const., art. I, § 7, cl. 2.

23       Under the Presentment Clause, the president lacks the power to single-handedly "enact,"

24   "amend," or "repeal" appropriations after they were approved by both Houses of Congress.

25   *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). In *City of New York*, the Supreme Court

26   concluded that the Line-Item Veto Act violated the Presentment Clause because it empowered the

27   president to effectively amend appropriations passed by Congress without following the

28   Constitution's "finely wrought" procedures. *Id.* at 445-46. Here, Congress appropriated $1.375

18

billion for limited barrier funding in Texas. In augmenting that funding with billions of additional funds for use across the southern border without limitation, the President "reject[ed] the policy judgment made by Congress" and substituted it with "his own policy judgment" based "on the same conditions that Congress evaluated when it passed [the CAA]." *Id.* at 444.

Even if Congress had authorized this action through the NEA or § 2808, that would be of "no moment," because Congress cannot authorize the executive branch to effectively amend appropriations "without observing the procedures set out in Article I, § 7." *Id.* at 445-46. But, as applied here, the NEA turns the Article I, § 7 procedures on their head. Although Congress can pass a resolution terminating the national emergency, that resolution has to be enacted into law, requiring the president's signature. 50 U.S.C. § 1622(a)(1). The Line-Item Veto Act held unconstitutional in *City of New York* contained a similar procedure, under which congressional passage of a "disapproval bill" would void the president's line-item veto of an appropriation, but *only* if it was enacted into law. *City of New York*, 524 U.S. at 436 (citing 2 U.S.C. § 691b(a)). In either case, the statutory disapproval process violates the Constitution because it reverses the balance of power by effectively requiring a two-thirds vote by Congress to override a presidential veto and reclaim the effect of its original appropriation, rather than, as the Constitution commands, requiring the President to observe the limits of enacted appropriations laws unless he convinces Congress to pass a new law.

### D.    Defendants Violated NEPA (Claim 6)

Defendants violated NEPA by failing to conduct an environmental review of the construction they unlawfully plan to undertake. NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). It requires environmental review of "major Federal actions significantly affecting the quality of the human environment . . . ." 42 U.S.C. § 4332(C). The goal is to ensure "that environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b).

Defendants violated NEPA by failing to conduct environmental review with respect to the border barrier projects constructed ostensibly under both § 284 and §2808. As asserted in California's and New Mexico's motion for a preliminary injunction, DoD cannot utilize the

19

Secretary of Homeland Security's authority under section 102 of the Illegal Immigrant

Responsibility and Immigrant Reform Act (IIRIRA) (8 U.S.C. 1103 note) in order to expedite

construction of the barriers constructed pursuant to Section 284. States PI Reply, ECF 112, 16-17.

Section 102(c)(1) explicitly states that the waiver authority is limited to barriers constructed

"under this section," meaning section 102 of IIRIRA. Since the barriers at issue are being

constructed by DoD pursuant to a different statutory provision, any waiver issued by DHS under

IIRIRA would be inapplicable and DoD must comply with NEPA. *See* Determination Pursuant to

Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as

Amended, 84 Fed. Reg. 17,185, 17,187 (Apr. 24, 2019); 84 Fed. Reg. 21,800-01 (May 15, 2019);

*see also* PI RJN Exs. 34-35; Second Decl. of Kenneth P. Rapuano, ECF No. 143-1.

With respect to Defendants' multifaceted scheme to build the border barrier projects under

§ 2808, the obligation to conduct environmental review under NEPA falls on two agencies. First,

DoD should have prepared an environmental impact statement concerning the construction of the

border barrier projects. On February 15, 2019, President Trump declared a national emergency

and stated his intent to use up to $3.6 billion to build border barriers under Section § 2808. PI

RJN Ex. 28. This proposal crystalized on September 3, 2019 when the Secretary of Defense

authorized and identified the location of 11 border barrier projects in California, Arizona, New

Mexico, and Texas under § 2808. Sept. 3 Notice. This was a major federal action requiring DoD

to engage in a public environmental review process. DoD violated NEPA by failing to conduct

any such review.

Second, DOI should have complied with NEPA before transferring land to DoD. A decision

to transfer jurisdiction over land to another agency to enable construction is a "major federal

action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). In

*Anacostia Watershed Soc. v. Babbit*, 871 F.Supp. 475, 481-483 (D.C. Cir. 1994), the Court held

the National Park Service (NPS) violated NEPA by failing to conduct environmental review

before transferring jurisdiction of National Parks land to the District of Columbia. The Court

rejected the NPS's attempt to classify the transfer as a "mere paper transaction." *Id.* at 481. The

NPS knew the District of Columbia planned to develop a theme park on the transferred land and

20

1    thus "had sufficient information regarding potential environmental effects" to "comply with

2    NEPA before making its decision to transfer jurisdiction." *Id.* at 483. Here, the intent to build

3    border barriers on the land transferred from DOI to DoD is well known and therefore DOI had

4    sufficient information regarding the potential effects of the border barrier projects to comply with

5    NEPA before making its decision to transfer jurisdiction. Thus, DOI also violated NEPA.

6        Defendants argue § 2808 authorizes the Secretary of Defense to undertake military

7    construction projects without complying with NEPA. 2808 AR at 9 (the Secretary of Defense

8    authorized and directed the Acting Secretary of the Army to construct the border barriers

9    "without regard to any other provision of law," including NEPA). Regardless of whether or not

10   this language exempts the Secretary of Defense from complying with NEPA in some

11   circumstances, it cannot excuse NEPA compliance here where the border barrier projects cannot

12   be built under § 2808 for all the reasons described above. Further, even if this Court found the

13   proposed border barriers could be built under § 2808 and DoD was exempt from NEPA, DOI

14   would still need to comply with NEPA. The plain language of § 2808 does not extend the ability

15   to take action "without regard to any other provision of law" to DOI. The States are thus entitled

16   to summary judgment with respect to NEPA.

17   **III.   THIS COURT SHOULD ENJOIN DEFENDANTS' USE OF § 2808 TO DEFUND MILITARY
18           CONSTRUCTION PROJECTS IN THE STATES AND CONSTRUCT BORDER BARRIERS IN
              CALIFORNIA AND NEW MEXICO**

19       **A.   Defendants' Actions Irreparably Harm the States**

20       California and New Mexico have been and will further be irreparably harmed in two ways

21   from the border barriers built under § 2808. First, by constructing the border barriers without

22   complying with state environmental laws, Defendants will and already have harmed those states'

23   sovereign interests. Second, Defendants' construction activities and border barriers will

24   irreparably injure wildlife and plants in the sensitive desert environments where the barriers are to

25   be constructed.

26       In addition, New Mexico, Colorado, Hawaii, Maryland, New York, Oregon, Virginia, and

27   Wisconsin face irreparable harm from Defendants' unlawful diversion of funds from military

28

1   construction projects that would otherwise bring valuable financial benefits, including lost tax

2   revenue, directly to those states.

**1.    Construction and Operation of Defendants' Border Barriers Harm California's and New Mexico's Sovereign Interests in Enforcing Their State Laws**

5   Defendants' diversion of funds, border barrier construction, and disregard for

6   environmental law undermine California's and New Mexico's sovereign interests in enforcing

7   state laws, and these injuries to the States' "sovereign interests and public policies" constitute

8   irreparable harm. *Kansas v. United States*, 249 F.3d 1213, 1227-28 (10th Cir. 2001); *see also*

9   *Brackeen v. Bernhardt*, 937 F.3d 406, 424 (5th Cir. 2019) (holding if federal authorities

10   "promulgated a rule binding on states without the authority to do so, then State Plaintiffs have

11   suffered a concrete injury to their sovereign interest.").

**a.    Defendants' Actions Prevent California from Enforcing Its Laws**

14   California has many laws designed to protect the State's water and air quality; wildlife,

15   land, and other environmental resources; and public health. *See, e.g.*, Porter-Cologne Water

16   Quality Control Act, Cal. Water Code §§ 13000-16104; California Endangered Species Act, Cal.

17   Fish and Game Code §§ 2050-2089.26. Defendants' unlawful diversion of funds to construct the

18   California Projects and refusal to comply with these environmental laws that apply to their

19   actions prevent California from exercising its sovereign right to enforce these laws.

**(1)    Water Quality Laws**

21   Construction of the California Projects will involve dredge and fill activities that could

22   impair water quality in violation of federal and state law. Ordinarily, before such dredge and fill

23   activities can proceed, federal officials must obtain certification of compliance with California's

24   water quality standards. Cal. Water Code § 13260 (imposing requirements on "persons" prior to

25   discharging waste); *id.* § 13050(c) (defining "person" to include "the United States, to the extent

26   authorized by federal law"); *see also* 33 U.S.C. § 1341(a)(1) (requiring *state* water quality

27   certification as part of *federal* permit). Indeed, as required by federal and state law, federal

28   officials have previously sought such certifications for construction projects in the project areas.

22

1    App'x of Decls. Re: Envt'l Harms ISO Partial MSJ on 2808 and NEPA (2808 Env. App'x) Ex. 2

2    (Dunn Decl. ¶¶ 11-13); Ex. 3 (Gibson Decl. ¶ 12). Further, under the *federal* Clean Water Act,

3    Defendants must adopt water-pollution-mitigation measures to obtain a *state* permit certification

4    from a California regional water board. 33 U.S.C. § 1341(a)(1); 2808 Env. App'x Ex. 2 (Dunn

5    Decl. ¶¶ 8-10, 21); Ex. 3 (Gibson Decl. ¶¶ 9-11, 19). The conditions and mitigation measures

6    imposed during the state permit and certification process are a primary means by which

7    California implements its water quality objectives and enforces its water quality laws. *Id.*

8            By disregarding environmental law, Defendants undermine California's sovereign interests

9    "in the conservation, control, and utilization of the water resources of the state" and in protecting

10   "the quality of all the waters of the state . . . for use and enjoyment by the people of the state."

11   Cal. Water Code § 13000. Defendants' actions are particularly injurious because the California

12   Projects "pose a high risk for storm water run-off impacting . . . water quality during the

13   construction phase." 2808 Env. App'x Ex. 2 (Dunn Decl. ¶ 20); Ex. 3 (Gibson Decl. ¶ 18).

14                              **(2)   Air Quality Laws**

15           Defendants also would ordinarily be required to ensure the California Projects conform to

16   California's air quality standards by complying with the federal Clean Air Act as set forth in

17   California's State Implementation Plan (SIP). 42 U.S.C. § 7506(c)(1). The Clean Air Act

18   prohibits federal agencies from engaging in, supporting, or financing any activity that does not

19   conform to a SIP. 40 C.F.R. § 93.150(a). "Conformity" violations include "caus[ing] or

20   contribut[ing] to any new violation of any standard," "increas[ing] the frequency or severity of

21   any existing violation of any standard in any area," or "delay[ing] timely attainment of any

22   standard . . . in any area." 42 U.S.C. § 7506(c)(1)(B)(i)-(iii). These safeguards prevent federal

23   agencies from interfering with states' abilities to comply with the Clean Air Act. *Id.*

24           But for the funding diversion and Defendants' failure to comply with environmental law,

25   the local air districts with jurisdiction over the California Project areas would enforce rules to

26   reduce the amount of fine particulate matter generated from Defendants' construction activities,

27   by requiring Defendants to develop and implement a dust control plan. Pls.' RJN ISO 284 MSJ,

28   [ECF No. 176-3] ("284 RJN") Ex. 4; 2808 RJN Ex. 20; 42 U.S.C. §§ 7418(a); 7506(c)(1); 40

                                              23

1  C.F.R. § 52.220(c)(345)(i)(E)(2); 75 Fed. Reg. 39,366 (July 8, 2010). In addition to protecting

2  Californians by supporting federal health standards, these rules mitigate blowing dust that can

3  cause additional acute regional or local health problems. 284 RJN Ex. 5. Thus, by proceeding

4  with the unlawfully funded construction without complying with California's laws, Defendants

5  will impair California's sovereign interests in protecting its environment and public health.

6  (3)    <strong>Endangered Species Laws</strong>

7         Finally, but for Defendants' diversion of funds under § 2808 and refusal to comply with

8  environmental law, Defendants could not build the California Projects without ensuring the

9  project "is not likely to jeopardize the continued existence of any endangered species or

10  threatened species or result in the destruction or adverse modification of [critical] habitat of such

11  species." 16 U.S.C. § 1536(a)(2). Compliance with this provision would protect species

12  threatened, endangered, or of special concern under California law and allow California to

13  continue implementing habitat conservation agreements with federal agencies that impose

14  limitations on habitat-severing projects like the California Projects. 284 RJN Ex. 6; 2808 Env.

15  App'x Ex. 1 (Clark Decl. ¶¶ 22, 34, 36-37). Defendants' disregard for these protections

16  undermines California's ability to enforce the California Endangered Species Act and "the policy

17  of the state to conserve, protect, restore, and enhance any endangered species or any threatened

18  species and its habitat." Cal. Fish & Game Code § 2052.

19  <strong>b.    Defendants' Actions Prevent New Mexico from Enforcing its</strong>
20  <strong>Laws</strong>

21         New Mexico also has enacted and enforces environmental laws to protect its air quality and

22  wildlife. By using the disputed funds to construct the New Mexico Projects without complying

23  with these laws, Defendants impair New Mexico's "protection of the state's beautiful and

24  healthful environment," which is "of fundamental importance to the public interest, health, safety

25  and the general welfare." N.M. Const., art. XX, § 21.

26  (1)    <strong>Air Quality Laws</strong>

27         El Paso Project 2, a portion of which falls within Luna County, would normally be subject

28  to a dust control plan that New Mexico adopted under the Clean Air Act. 284 RJN Ex. 7; 40

24

1   C.F.R. § 51.930(b); N.M. Admin. Code §§ 20.2.23.108-113. The plan "limit[s] human-caused

2   emissions of fugitive dust into the ambient air by ensuring that control measures are utilized to

3   protect human health and welfare." N.M. Admin. Code § 20.2.23.6. Defendants' unlawful funds

4   transfer and disregard of environmental law would thus impair New Mexico's ability to vindicate

5   its sovereign interest in protecting human health and welfare.

6              **(2)    Wildlife Corridors and Endangered Species Laws**

7         Defendants' § 2808 funding diversion, refusal to comply with environmental law, and

8   resulting construction also will impede New Mexico's ability to implement its Wildlife Corridors

9   Act, which aims to protect large mammals' habitat corridors from human-caused barriers such as

10   roads and walls, 2019 N.M. Laws Ch. 97, and requires New Mexico agencies to create a "wildlife

11   corridors action plan" to protect species' habitat. Supp. PI RJN [ECF No. 112-1] Ex. 53. Several

12   important wildlife corridors run through, or adjacent to, the New Mexico Projects including in

13   Hidalgo and Luna Counties. 2808 Env. App'x Ex. 5 (Traphagen Decl. ¶¶ 19, 22-24). Pronghorn

14   antelope, mule deer, mountain lions, and bighorn sheep are all "large mammals" protected under

15   the Act. 2019 N.M. Laws Ch. 97 § 2.B. The New Mexico Projects will completely block habitat

16   corridors for these species and impair New Mexico's ability to protect these important corridors.

17   2808 Env. App'x Ex. 5 (Traphagen Decl ¶ 23).

18         Further, the New Mexico Projects will harm species that New Mexico's laws were enacted

19   to protect such as the white-sided jackrabbit and the Mexican wolf, which is endangered under

20   both New Mexico and federal endangered species acts. *See* N.M. Stat. Ann. § 17-2-41; 2808 Env.

21   App'x Ex. 5 (Traphagen Decl. ¶¶ 16-19, 24). The New Mexico Projects will bisect important

22   wildlife habitats, impairing the access of the Mexican Wolf and other endangered species to those

23   habitats. *Id.* Ex. 4 (Nagano Decl. ¶ 25); Ex. 5 (Traphagen Decl. ¶¶ 18-19, 23-24). Absent a ruling

24   in the States' favor and issuance of an injunction, New Mexico's sovereign ability to enforce

25   these laws and protect these interests will be impaired.

26

27

28

25

**c.      Defendants Irreparably Harm California's and New Mexico's Sovereign Interests by Preventing Them from Enforcing State Laws**

There is irreparable harm whenever a government cannot enforce its own laws. *Maryland v. King*, 567 U.S. 1301, 1301 (2012) (Roberts, C.J., in chambers). States possess undeniable sovereign interests in their "power to create and enforce a legal code," *Alfred L. Snapp & Son, Inc. v. Puerto Rico* ex rel. *Barez*, 458 U.S. 592, 601 (1982), including codes protecting the natural resources and public health within their borders. *See also Maine v. Taylor*, 477 U.S. 131, 151 (1986) (the State "retains broad regulatory authority to protect the health and safety of its citizens and the integrity of its natural resources."). Courts recognize that these sovereign interests are undermined where federal action impedes enforcement of state statutes. *See, e.g., State of Alaska v. U.S. Dept. of Transp.*, 868 F.2d 441, 443 (D.C. Cir. 1989) (holding states have sovereign interests in enforcing state consumer protection laws impeded by federal actions). And any time a state is prevented "from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury" separate from any injury to the persons or things those statutes are designed to protect. *New Motor Vehicle Bd. of California v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers).

Defendants argue § 2808 authorizes the Secretary of Defense to undertake military construction projects without following environmental laws. 2808 AR at 4. In addition to being wrong for the reasons described above, this position also impedes the States' ability to enforce and effectuate duly enacted state environmental laws protecting the States, their residents, and their wildlife from Defendants' construction projects—which will result in nearly 58 linear miles of permanent border wall in California and New Mexico. Defendants' use of § 2808 to effectuate their plan and override otherwise applicable state laws infringes on the States' sovereign interests and causes irreparable harm as a result.

**2.      Construction and Operation of Defendants' Border Barriers Harm California's and New Mexico's Environment, Wildlife, and Natural Resources**

The California and New Mexico Projects will also irreparably harm protected wildlife and other natural resources within those states. The Projects pose a threat of demonstrable harm to

26

1   numerous rare and special-status species that warrants issuance of injunctive relief. *Nat'l Wildlife*

2   *Fed'n v. Burlington N. R.R.*, 23 F.3d 1508,1512 n. 8 (9th Cir. 1994) ("[w]e are not saying that a

3   threat of extinction to the species is required before an injunction may issue"); *see also Nat'l*

4   *Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 818-19 (9th Cir. 2018) (holding

5   "extinction-level threat" not required to show irreparable harm to protected species).

6                          **a.   Harms from the California Projects**

7       The California Projects will undermine the recovery of several federally listed endangered

8   species and California Species of Special Concern, as well as damage those species' habitat. Both

9   San Diego Project 4 and Project 11 fall within the California Floristic Province, which is one of

10  the world's biodiversity hotspots, and because the United States' borderlands are often the

11  northernmost outpost for plants otherwise restricted to Mexican portions of the province, the San

12  Diego area contains many plants not found elsewhere in the United States. 2808 Env. App'x Ex. 6

13  (Vanderplank Decl. ¶¶ 9-10). At least 80% of habitat for plants and animals in this region has

14  been significantly impacted. *Id.* at ¶ 9; 2808 Env. App'x Ex. 1 (Clark Decl. ¶¶ 23, 27). San Diego

15  Project 4 includes part of the Otay Mountain Wilderness, a federal Wilderness Area that is home

16  to at least twenty sensitive plant and animal species including the federally endangered Quino

17  Checkerspot Butterfly. *Id.* Ex. 6 (Vanderplank Decl. ¶¶ 12-13). And it cuts through the butterfly's

18  critical habitat as designated under the federal Endangered Species Act (ESA). *Id.* Ex. 1 (Clark

19  Decl. ¶¶ 13, 15, 17).

20      The Quino Checkerspot Butterfly has been documented to occur in and immediately

21  adjacent to the San Diego Project 4 area, and lives only in a few locations in Riverside and San

22  Diego counties. *Id.* ¶¶ 15-16. The butterfly is found in open scrub and grassland habitat that

23  support its primary host plant, dwarf plantain, where it lays its eggs. *Id.* ¶ 15. The caterpillars that

24  hatch from these eggs can only feed on this host plant. *Id.* Because they are so dependent on the

25  availability of this plant, if dry conditions occur and the plant is not available, the caterpillars

26  enter a biological stasis or "diapause," where they bury themselves in leaf litter—sometimes for

27  years—until suitable conditions arrive again. *Id.* The Quino Checkerspot Butterfly uses this

28  strategy to persist in habitats, such as southern California, that are prone to extended droughts. *Id.*

27

1    Construction of San Diego Project 4, including the road improvements that Plaintiffs understand

2    are part of the project, will irreparably harm the Quino Checkerspot Butterfly population and its

3    critical habitat in Otay Mesa by crushing and burying diapausing larvae, removing the butterfly's

4    host plant, and destroying the plant's seed bank in the project area. *Id.* ¶ 17.

5          San Diego Project 4 will also irreparably harm the federally threatened Coastal California

6    Gnatcatcher and its habitat. *Id.* ¶¶ 18-20. The Gnatcatcher is a bird that only lives in coastal

7    southern California in areas of open coastal sage scrub vegetation, and it forages for insects (its

8    sole food) on plant species such as coastal sagebrush, which currently grows in the project area.

9    *Id.* California Gnatcatchers have been documented within the project footprint, and likely remain

10   there based on its suitable habitat. *Id.* San Diego Project 4 will destroy essential habitat for

11   numerous Gnatcatcher pairs due to the vegetation clearance required to construct both the primary

12   and secondary fences. *Id.* ¶ 20. Additional roads needed to access the project site will necessitate

13   significant cut and fill activities, as were required for previous border fence projects that

14   Defendants have undertaken in the steep terrain in and around Otay Mountain where San Diego

15   Project 4 is being constructed. *Id.* These destructive construction actions will result in a major

16   displacement of California Gnatcatchers into already diminished and limited habitat areas that are

17   now occupied by other Gnatcatcher pairs. *Id.* The affected pairs will either be required to move or

18   challenge adjacent pairs for available territory, and the result will be a substantial reduction of the

19   Gnatcatcher population in the San Diego Project 4 area, with irreparable harm to a threatened

20   species that is already facing significant stress from habitat destruction. *Id.*

21         San Diego Project 4 will also harm the Western Burrowing Owl, which the U.S. Fish and

22   Wildlife Service has designated as a Bird of Conservation Concern. The owl is also a Species of

23   Special Concern under California law, and habitat loss and modification is a key threat to the

24   species' survival. *Id.* ¶¶ 22-26. Recent surveys show that burrowing owls are present in and

25   around the project site and that the area is the last stronghold for the owl in San Diego County.

26   This species lives underground in burrows. Project construction with its extensive vegetation

27   clearing, trenching and roadwork will destroy owl habitat and possibly kill owls directly, or

28   expose them to increased mortality by flushing them from their burrows where they face

1   increased predation as they search for new burrows. Owl chicks in particular are at risk.

2   Construction of San Diego Project 4 will hasten the decline of this last breeding population of

3   burrowing owls in coastal southern California. *Id.*

4        Additional impacts from San Diego Project 4 include harms to vernal-pool habitat and

5   species, many of which (such as the San Diego Fairy Shrimp) are endangered. 2808 Env. App'x

6   Ex. 1 (Clark Decl. ¶¶ 27-33); Ex. 3 (Gibson Decl. ¶ 16). Project construction involves roadwork

7   that will likely fill the pools, and will irreparably harm vernal-pool species and reduce their

8   potential for recovery under the ESA as upwards of 90% of vernal-pool habitat has already been

9   destroyed in Southern California. *Id.* Ex. 1 (Clark ¶¶ 27, 33). Rare plants such as the Tecate

10   Cypress are at risk as well, and will likely be killed during construction. *Id.* Ex. 6 (Vanderplank

11   Decl. ¶¶ 21-24).

12        Finally, San Diego Project 11 and Yuma Project 6 will harm numerous wildlife species that

13   are protected under both federal and state law including the federally endangered Quino

14   Checkerspot Butterfly, Yuma Ridgeway's Rail, Southwestern Willow Flycatcher, and Western

15   Yellow-billed Cuckoo, and California Species of Special Concern such as the Flat-tailed Horned

16   Lizard and Sonoran mud turtle. 2808 Env. App'x Ex. 1 (Clark Decl. ¶¶ 34-39).

17              **b.**    **Harms from the New Mexico Projects**

18        The New Mexico Projects will be built primarily in the "Bootheel" of New Mexico in the

19   Animas and Playas Valleys. 2808 Env. App'x Ex. 4 (Nagano Decl. ¶¶ 15-16); Ex. 5 (Traphagen

20   Decl. ¶¶ 13, 16). This area in Southwestern New Mexico is a "pinch point for ecological

21   diversity, migration, and dispersal in the western North American continent." *Id.* Ex. 5

22   (Traphagen ¶ 13). The Bootheel is extremely high in both plant and wildlife diversity and harbors

23   numerous biotic communities and also the Peloncillo Mountains—the only range that directly

24   connects Mexico's Sierra Madres with the Rocky Mountains in the U.S. *Id.* ¶¶ 13-15. The 35-

25   miles of bollard-style pedestrian fencing planned for the New Mexico Projects will create

26   fragmented habitat and block wildlife corridors for numerous protected species such as the white-

27   sided jackrabbit and the jaguar. *Id.* Ex. 4 (Nagano Decl. ¶¶ 15-20); Ex. 5 (Traphagen ¶¶ 16-24);

28   "List of Proposed Border Barrier Projects."

29

1       For example, the Animas Valley is home to an estimated 61 white-sided jackrabbits, a rare

2   and threatened species under New Mexico law. 2808 Env. App'x Ex. 5 (Traphagen Decl. ¶

3   16). The jackrabbit's U.S. habitat is limited to the Animas Valley, and the current population

4   there is estimated to be only 61 hares. *Id.* The species' survival in the United States depends upon

5   its ability to access habitat and other white-sided jackrabbits in Mexico. *Id.* ¶¶ 16-19. It is already

6   in decline due in part to actions by Border Patrol (including roadkill incidents and the

7   introduction of exotic grasses), and the population will decrease even further due to El Paso

8   Projects 2 and 8 since they will block the jackrabbits' only route to habitat in Mexico. *Id.* Given

9   the pressures already affecting the species, if the New Mexico Projects are constructed the white-

10  sided jackrabbit's prospects for survival in the United States are "dismal." *Id.* ¶ 18.

11      The New Mexico Projects will also bisect the intracontinental corridor for the jaguar, a rare

12  species that is federally endangered. *Id.* ¶¶ 20-22. The New Mexico Projects will create an

13  impenetrable barrier adjacent to the designated Critical Habitat for this endangered species. *Id.*

14  Jaguars have been documented in the United States on conservation lands that directly adjoin the

15  location of El Paso Project 2 in the Animas Valley. *Id.* ¶ 20 and Exs. A-B, E. These border

16  barriers will "almost certainly . . . significantly contribute to the elimination of this imperiled

17  species in the United States." *Id.* Ex. 4 (Nagano Decl. ¶ 20).

18          **3.   Diversion of Funds from Military Construction Projects in Colorado,**
            **Hawaii, Maryland, New Mexico, New York, Oregon, Virginia, and**

19              **Wisconsin Causes those States Financial Harm**

20      Defendants' actions will subject Colorado, Hawaii, Maryland, New Mexico, New York,

21  Oregon, Virginia, and Wisconsin to serious financial harms that also should be weighed by this

22  Court alongside the relevant non-economic harms.[8] *See, e.g., Village of Arlington Heights v.*

23  *Metropolitan Housing Develop. Corp.*, 429 U.S. 252 (1977) (private developer of low-income

24  housing demonstrated economic injury and potential homeowner demonstrated noneconomic

25  injury in the form of racial discrimination in challenge to ordinance banning low-income

26  _____

27  [8] California does not assert irreparable financial harm in this motion. However, as discussed
above, California's irreparable harm arises from the serious environmental and sovereignty

28  injuries caused by Defendants' actions, and Defendants' defunding of the Channel Islands project
will also have detrimental public safety impacts, contrary to the public interest.

30

1    housing); *Texas v. United States*, 809 F.3d 134, 152-53 (5th Cir. 2015) (recognizing financial

2    harms to states by federal actions that cause "a major effect on the states' fiscs" and harms to

3    state sovereignty by "federal interference with the enforcement of state law").

4         Defendants intend to divert all funding from 17 separate military construction projects

5    within the borders of the States, totaling $493 million in funds approved and allocated by

6    Congress. Defunded MILCON List. That construction would have brought $366 million in direct

7    and inter-state benefits to the economies of Colorado, Hawaii, Maryland, New Mexico, New

8    York, Oregon, Virginia, and Wisconsin *even when offsetting* the economic benefits that would

9    result from the border barrier construction occurring within the boundaries of New Mexico.

10   Reaser Decl. ¶ 18.

11        This loss of economic activity will have a substantial, direct effect on the tax revenues of

12   state and local governments of Colorado, Hawaii, Maryland, New Mexico, New York, Oregon,

13   Virginia, and Wisconsin, irreparably harming them. *See, e.g., Wyoming v. Oklahoma*, 502 U.S.

14   437, 447 (1992) (finding standing for Wyoming arising from its direct injury from the loss of

15   specific tax revenues); *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1194 (9th Cir. 2004)

16   (recognizing financial harm from, *inter alia*, decreased tax revenue caused by federal plan to

17   develop and rehabilitate a former military base "due to impaired vehicular movement and

18   commerce," even where harm could not be quantified); *City of Oakland v. Lynch*, 798 F.3d 1159,

19   1164 (9th Cir. 2015) (recognizing that "[a]n expected loss of tax revenue" constituted a harm).

20   Specifically, Defendants' actions will reduce the tax revenues of these states and their

21   municipalities (including taxes on personal income, retail sales, corporate profits, and other

22   sources) by over $36 million. Reaser Decl. ¶ 20. Such financial effects of federal actions

23   constitute cognizable harms that will go unremedied without an injunction. *See Alabama v. U.S.*

24   *Army Corps of Engineers*, 424 F.3d 1117, 1130 (11th Cir. 2005) (downstream environmental and

25   economic effects of federal policies are cognizable harms).

26        This Court recently affirmed these principles. Facing a state challenge to federal actions

27   that would "lead to women losing employer-sponsored contraceptive coverage, which [would]

28   then result in economic harm to the states as these women turn to state-based programs or

31

1   programs reimbursed by the state," this Court recognized the financial harms of state plaintiffs.

2   *California v. Health & Human Servs.*, 351 F.Supp.3d 1267, 1281-82 (N.D. Cal. 2019) (citations

3   omitted); *see also California v. Azar*, 911 F.3d 558, 572 (9th Cir. 2018) (finding that the plaintiff

4   states "need not have already suffered economic harm" and that there "is also no requirement that

5   the economic harm be of a certain magnitude").

6       Here, the states' financial harm is direct, quantifiable, and inevitable. By diverting funds

7   from military construction projects within the States' borders, Defendants will cause lost sales for

8   contractors and subcontractors for the projects, various firms in the supply chains, and companies

9   selling goods and services to individuals hired to work directly on the projects or at some point in

10   the supply chain. Reaser Decl. ¶ 18. All that lost business activity would create tax revenues for

11   the states that can be quantifiably calculated now. *Id.* ¶¶ 18-20. The uncompensated loss of those

12   revenues is a substantial harm that further merits injunctive relief.

13       **B.    The Balance of Hardships and Public Interest Favor Granting a
                Permanent Injunction**

14

15       When this Court previously enjoined Defendants' unlawful diversions of funds from the

16   purposes for which Congress appropriated them, it did not explicitly evaluate the State plaintiffs'

17   unique interests. Protecting California's and New Mexico's sovereign interests here is an

18   especially important factor for this Court's consideration, because, as the Supreme Court has

19   held, "[s]tate sovereignty is not just an end in itself: Rather, federalism secures to citizens the

20   liberties that derive from the diffusion of sovereign power." *New York v. United States*, 505 U.S.

21   144, 181 (1992) (quotation omitted). Barring an injunction, Defendants' actions will seriously

22   harm both the sovereign interests and natural environments of California and New Mexico. They

23   will also cost the States millions in specifically-identified lost tax revenues and, in some

24   circumstances, expose States to public health and safety risks as described above.

25       Defendants' side of the balance does not outweigh these harms to State interests and the

26   public. Because, as shown above, Defendants cannot lawfully use the funds at issue for border

27   barrier construction, they have no cognizable interest in using the funds for such purposes.

28   Further, Defendants have not shown how border barriers will substantially advance their interests,

32

Pls.' Notice of Mot. and Mot. for Partial Summ. J. re Section 2808 and NEPA (4:19-cv-00872-HSG)

1    even though the planned construction will certainly harm the interests of the States and the public.

2            1.    **Defendants' Alleged Harms Are Unsubstantiated and Do Not
                    Outweigh the Harms to the States and the Public Interest**
3

4                    a.    **Defendants Suffer No Cognizable Harm by This Court's
                            Halting of an Unlawful Practice**

5            There is no cognizable harm to the federal government from the requested injunction

6    because the federal government "cannot suffer harm from an injunction that merely ends an

7    unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *see also Salinger*

8    *v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010) (explaining that when conducting the balancing

9    analysis "the relevant harm is the harm that . . . occurs to the parties' *legal* interests") (emphasis

10   added). In *Rodriguez*, the Ninth Circuit evaluated the propriety of a preliminary injunction against

11   the federal government's extended detention of undocumented immigrants. 715 F.3d at 1131. In

12   upholding the lower court's preliminary injunction, *Rodriguez* explained that the government

13   would not be harmed by an injunction prohibiting the government from exercising its detention

14   authority in an unconstitutional manner, even though the statutes at issue—allowing mandatory

15   detention of certain classes of illegal immigrants—were "not constitutionally impermissible *per*

16   *se.*" *Id.* at 1137-38, 1142, 1445. Because Defendants are unlawfully utilizing § 2808 for

17   construction that is not authorized under that law, the same is true here.

18                    b.    **Defendants' Alleged Harms Are Speculative and Unsupported**

19           Defendants will likely assert that they would suffer irreparable harm if enjoined from using

20   the disputed funds to build the border barriers. But these harms are insignificant, speculative, and

21   not supported by credible evidence. *See, e.g., Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir.

22   2017) (balancing the harms requires consideration only of consequences that are "supported by

23   evidence") (citation omitted); *Golden Gate Rest. Ass'n v. City & Cty. of San Francisco*, 512 F.3d

24   1112, 1126 (9th Cir. 2008) (holding that "highly speculative" harms are not cognizable). First,

25   any claims by Defendants of irreparable harm are severely undercut by the nearly seven-month

26   delay between President Trump's declaration of a national emergency and DoD's decision to

27   build border barriers under § 2808. *See, e.g., Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762

28   F.2d 1374, 1377 (9th Cir. 1985) ("long delay… implies a lack of urgency and irreparable harm").

                                                    33

1    Second, Defendants have asserted that a border wall will support DoD's mission to support

2    DHS. *See, e.g.*, AR 9, 43, 53, 55-56, 120-21. However, these assertions ignore basic facts about

3    the historical effectiveness of border walls and the character of the current population of migrants.

4    The characteristics of individuals who are apprehended at the southwest border have changed

5    significantly, from predominantly adult male Mexican nationals entering the United States alone,

6    to increasing numbers of families from Central America. 2808 RJN Ex. 21. Many of these

7    migrant families are requesting asylum upon entry into the United States. *Id.* Thus, a border wall

8    designed to prevent migrants from entering the United States undetected and fleeing into the

9    interior will not have an impact on the migration that is ostensibly creating the emergency at the

10   border. *See* Emergency Declaration ("In particular, recent years have seen sharp increases in the

11   number of family units entering and seeking entry to the United States.").

12       Third, President Trump himself has acknowledged that he "didn't need to" take the

13   extraordinary steps to divert funding for border wall construction, but he just would "rather do it

14   faster" than our system of government allowed. PI RJN Ex. 50. The President also acknowledged

15   that Congress has provided more than enough funding for homeland security without the wall,

16   undercutting any claimed need for these diversions of funds. *Id.*

17           **2.    The Public Interest and the States' Harms Justify an Injunction**

18       Protecting California's and New Mexico's sovereignty and their ability to enforce their

19   environmental protection laws shields the public interest from the Defendants' unlawful and

20   unconstitutional usurpation of state authority. *See New Motor Vehicle Bd.*, 434 U.S. at 1351 ("the

21   public interest . . . is infringed by the very fact that the State is prevented from engaging in

22   investigation and examination" pursuant to its own duly enacted state laws); *E. Bay Sanctuary*

23   *Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018) ("the public also has an interest in ensuring

24   that statutes enacted by their representatives are not imperiled by executive fiat") (internal

25   citations omitted); *see also* Cal. Gov't Code § 12600 ("It is in the public interest to provide the

26   people of the State of California . . . with adequate remedy to protect the natural resources of the

27   state of California from pollution, impairment or destruction."); N.M. Const. art. XX § 21 ("The

28   protection of the state's beautiful and healthful environment is . . . of fundamental importance to

34

1  the public interest."). The strong public interest in preserving the States' sovereignty heavily

2  favors an injunction. *See New York*, 505 U.S. at 162-63.

3       Separately, the Supreme Court has recognized that, because environmental and natural

4  resource harms "can seldom be adequately remedied by money damages" and are often

5  irreparable, "the balance of harms will usually favor the issuance of an injunction to protect the

6  environment." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). Consequently,

7  protecting California's and New Mexico's interests in their environment merits injunctive relief.

8       Further, as discussed above, the $36 million in tax revenue that would be lost by Colorado,

9  Hawaii, Maryland, New Mexico, New York, Oregon, Virginia, and Wisconsin as a result of

10  Defendants' cancellation of military construction projects within their borders militates in favor

11  of an injunction. Reaser Decl. ¶ 20. Moreover, the loss of the benefits of the $789 million in

12  direct and inter-state economic activity that would have been conferred upon the residents of the

13  states but for the funds diversion significantly harms the public interest. *Id.* ¶ 18.

14       Finally, the cancellation of those projects will cause a myriad of non-economic harms. DoD

15  itself has detailed the detrimental public health and safety harms that would arise from these

16  defunded military projects not moving forward such as woefully inadequate security at military

17  bases, improperly contained hazardous materials, and a lack of enhanced aerial firefighting

18  training. RJN Exs. 2-19; Green Decl. ¶¶ 6-9, 18-25. Cancelling such projects will place

19  servicemembers and the nearby public at significant risk. In short, Defendants' harms are neither

20  legally cognizable nor substantiated and they are outweighed by the States' harms and the harms

21  to the public interest.

22                                      **CONCLUSION**

23       For the foregoing reasons, the States request that the Court grant their motion for partial

24  summary judgment in full by granting the States declaratory relief and enjoining Defendants

25  from: (1) defunding military construction projects located within the States, (2) constructing

26  border barrier projects in California and New Mexico under § 2808, and (3) constructing border

27  barrier projects in California and New Mexico under § 284 until Defendants comply with NEPA.

28

1    Dated: October 11, 2019                      Respectfully submitted,

2                                                 XAVIER BECERRA
                                                  Attorney General of California
3                                                 ROBERT W. BYRNE
                                                  SALLY MAGNANI
4                                                 MICHAEL L. NEWMAN
                                                  Senior Assistant Attorneys General
5                                                 MICHAEL P. CAYABAN
                                                  CHRISTINE CHUANG
6                                                 EDWARD H. OCHOA
                                                  Supervising Deputy Attorneys General
7
                                                  /s/ Heather C. Leslie
8
                                                  HEATHER C. LESLIE
9                                                 BRIAN J. BILFORD
                                                  SPARSH S. KHANDESHI
10                                                LEE I. SHERMAN
                                                  JANELLE M. SMITH
11                                                JAMES F. ZAHRADKA II
                                                  Deputy Attorneys General
12                                                *Attorneys for Plaintiff State of California*

13
     PHILIP J. WEISER                             CLARE E. CONNORS
14   Attorney General of Colorado                 Attorney General of Hawaii
     ERIC R. OLSON (*appearance pro hac vice*)    ROBERT T. NAKATSUJI (*appearance pro*
15   Solicitor General                            *hac vice*)
     *Attorneys for Plaintiff State of Colorado*  Deputy Solicitor General
16                                                *Attorneys for Plaintiff State of Hawaii*

17
     BRIAN E. FROSH                               HECTOR BALDERAS
18   Attorney General of Maryland                 Attorney General of New Mexico
     JEFFREY P. DUNLAP (*appearance pro hac vice*) TANIA MAESTAS (*appearance pro hac vice*)
19   Assistant Attorney General                   Chief Deputy Attorney General
     *Attorneys for Plaintiff State of Maryland*   NICHOLAS M. SYDOW
20                                                 Civil Appellate Chief
                                                   JENNIE LUSK
21                                                 Civil Rights Bureau Chief
                                                   *Attorneys for Plaintiff State of New Mexico*
22

23

24

25

26

27

28

| 1 | LETITIA JAMES | ELLEN ROSENBLUM |
| | Attorney General of New York | Attorney General of Oregon |
| 2 | MATTHEW COLANGELO (*appearance pro hac* | J. NICOLE DEFEVER |
| | *vice*) | Senior Assistant Attorney General |
| 3 | Chief Counsel for Federal Initiatives | *Attorneys for Plaintiff State of Oregon* |
| | STEVEN C. WU | |
| 4 | Deputy Solicitor General | |
| | ERIC R. HAREN | |
| 5 | Special Counsel | |
| | GAVIN MCCABE | |
| 6 | Special Assistant Attorney General | |
| | AMANDA MEYER | |
| 7 | Assistant Attorney General | |
| | *Attorneys for Plaintiff State of New York* | |
| 8 | | |
| | MARK R. HERRING | JOSHUA L. KAUL |
| 9 | Attorney General of Virginia | Attorney General of Wisconsin |
| | TOBY J. HEYTENS | GABE JOHNSON-KARP (*appearance pro* |
| 10 | Solicitor General, Counsel of Record | *hac vice*) |
| | MICHELLE S. KALLEN | Assistant Attorney General |
| 11 | MARTINE E. CICCONI | *Attorneys for Plaintiff State of Wisconsin* |
| | Deputy Solicitors General | |
| 12 | JESSICA M. SAMUELS | |
| | Assistant Solicitor General | |
| 13 | ZACHARY R. GLUBIAK (*pro hac vice pending*) | |
| | Attorney | |
| 14 | *Attorneys for the Commonwealth of Virginia* | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

1

### ATTESTATION OF SIGNATURES

2      I, Heather C. Leslie, hereby attest, pursuant to Local Civil Rule 5-1(i)(3) of the Northern

3  District of California that concurrence in the filing of this document has been obtained from each

4  signatory hereto.

5
                                    /s/ Heather C. Leslie
6                                   HEATHER C. LESLIE
                                    Deputy Attorney General
7                                   Attorney for Plaintiff
                                    State of California
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28